US Court of Appeals, 3rd Circuit.
Case No. 24-3223
Hackman v. Induct EV

# Appendix Vol. 2

RECEIVED
JAN 30 2025
U.S.C.A. 3rd. CIR

1. Doc 92 (and 92-2) . . . . . p. 25

2. Doc 145 . . . . . . . . . p. 108

3. Doc 142 . . . . . . . . p. 119

4. Doc 144 (and 144-1, 144-2) p. 148

5. Doc 137 . . . . . . . . p. 159

6. Doc 141 . . . . . . . p. 664

7. Doc 12 (and 12-1, 12-2) p. 724

8. Doc 87 . . . . . p. 833

9. Doc 109 . . . . p. 834

10. Doc 128 . . . . . p. 841

11. Doc 158 . . . . p. 845

12. Doc 160 . . . . p. 847

13. Doc 161 (and 161-1) . . . . p. 848

14. Doc 165 . . . . . . . . . p. 852

15. Doc 167 . . . . . . . . . p. 853

16. Doc 131 (and 131-1, 131-2) . . . p. 856

17. Doc 10 (and 10-1, 10-7) . . p. 1116

18. Doc 1 (and 1-1, 1-4) . . . p. 1176

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ASSATA ACEY, | : | |
| | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| v. | : | |
| | : | |
| | : | |
| **INDUCTEV,** | : | |
| | : | |
| *Defendant.* | : | |
| | : | |
| | : | **No. 2:23-1438** |

### <u>Amended Rule 56 Motion for Partial Summary Judgement</u>

The motion submitted yesterday (Doc 89) was incomplete. Apologies for any confusion. This is the completed motion.

I, Plaintiff, submit this motion for summary judgment of those remaining (undismissed) complaint counts pertaining to retaliation (XVII, XVIII, and XIX).

#### Concurrent Determination of Claims

Regarding concurrent evaluation of state and federal employment discrimination claims, the third circuit's 2002 precedent was upheld again in *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 327 (3d Cir. 2015):

"'[T]he PHRA is to be interpreted as identical to federal antidiscrimination laws except where there is something specifically different in its language requiring that it be treated differently,' Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir.2002)"

#### Applicable Tests

I.      Retaliation Tests

As upheld in *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 329 (3d Cir. 2015):

""A prima facie case of illegal retaliation requires a showing of (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.' Allstate, 778 F.3d at 449")

Also upheld in *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015):

"first we ask whether the plaintiff has stated a prima facie case of discrimination or retaliation; if she has, we ask whether the employer has advanced a legitimate reason for its conduct; and finally we give the plaintiff an opportunity to prove that the employer's proffered reason is pretextual. See Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir.1994)."

Those precedents upheld by *Jones v. Se. Pa. Transp. Auth.* continue to be upheld by *Minarsky v. Susquehanna Cnty.*, 895 F.3d 303 (3d Cir. 2018), *Komis v. Sec'y of the U.S. Dep't of Labor*, 918 F.3d 289, 292-93 (3d Cir. 2019), and *Crosbie v. Highmark Inc.*, 47 F.4th 140, 144 and 146 (3d Cir. 2022)

Proposed Facts and Conclusions of Law

I.    Retaliation counts (XVII, XVIII and XIX)

    A)  Test 1

        i)  On 05/08/2022, I filed my original dual-filed complaint with EEOC and PHRC against the defendant (pp. 2, 9 Doc 15-5, Appendix p. 3).

        ii)  On 09/19/2022, I attended a virtual mediation session with the Defendant. (Ex 1, Appendix p. 5)

        iii)  Adverse Action 1: On 09/23/2022, I was informed by the Defendant that I was not permitted to take PTO during my disability leave. (p. 1 of Doc 15-75, Denial of PTO, Appendix p. 63).

        iv)  Causal Connection: This communication occurred 4 days after the mediation session.

        v)  Adverse Action 2: On 09/27/2022, my employment was deemed terminated and I was locked out of my employee accounts. (Doc 10-5, Appendix p. 9). (Ex. 2, Appendix p.15)

        vi)  Causal Connection 2: The termination occurred 7 days after my virtual mediation session with the Defendant and was concurrent with the Defendant's submission of a written contract to resign and dismiss my claims in exchange for $50, 000. (Ex. 1, Appendix p. 5). (Doc 10-5, Appendix p. 9).

vii)  Adverse action and Causal Connection 3: On 10/17/2022 the Defendant informed me that

if I continued to pursue my claims and reject their contract the defendant would sue me:

You cannot void or invalidate your agreement by stating it "was contingent on a contract that included agreeable material terms." Regardless, the document I provided includes all of and only the material terms the parties agreed upon (including, for example, you agreeing to a general release, non-disparagement and confidentiality, and InductEV agreeing to provide a neutral reference). Any other language is immaterial to the agreement to settle your claims and was included because it is either standard practice or legally required. In any event, I do appreciate you may have been taken aback by a document containing legal language you may be unfamiliar with. We strongly recommend that you retain a lawyer to help you understand all the terms. If you do not plan to hire one, I am willing to simplify the document and/or remove specific language you are uncomfortable with, provided those changes do not modify the material terms we agreed to on September 19th.

Regardless of whether we have a formal signed document memorializing of our settlement, our agreement is a binding enforceable contract. If you continue pursuing your claims against my client this will constitute breach of contract. When the matter reaches court, InductEV will seek dismissal of your claims and enforcement of the settlement agreement. More importantly, InductEV will sue for breach of contract and demand reimbursement of all attorneys' fees it has incurred as a result of your breach, including all fees spent on defending against claims you already agreed to settle. InductEV may take any other legal and equitable action available to it regarding your breach, now or in the future. My client reserves all rights and waives none.

(Ex. 3, Email from May Mon Post on 10/17/2022, Appendix p. 21)

B)  Test 2

i)  On 09/23/2022 the Defendant stated via email that I was not permitted to take PTO

because it could not be taken during disability leave:

I understand that you requested to take PTO for September 22 and 23. Please be advised that you are unable to put in for PTO as you are still on disability leave and you cannot take PTO unless you are back to work. (Also, per your doctor's

. (p.1 of Doc 15-75, Email from May Mon Post, Appendix p. 63)

ii)  On 06/17/2022 and 06/17/2022 I had received assurances by then-CAO Judy Talis, that I

would be permitted to use PTO during my disability leave:

share any additional information please do not hesitate to contact me. As noted below, you become eligible for job-protected Family and Medical Leave (FMLA) as of June 14, 2022. Based upon the information that has already been provided, we are enclosing your Notice of Eligibility & Rights and Responsibilities under the Family and Medical Leave Act. This leave would be unpaid, although you remain entitled to your STD payments and may use your accrued PTO. Kindly sign and return the Notice on or before June 29, 2022 if your leave will extend beyond June 17, 2022.

(Ex. 12 and 13, 06/07/2022 Email from Ms. Talis, Appendix p.65, 68)

iii)  The defendant has claimed that they were legally acting on a verbal agreement to resign

and drop my claims in exchange for $50,000.

(pp.5-6, Part I of Discussion in 02/28/2024 Memorandum (Doc 49)) Appendix, p. 17)

iv)  The defendant has failed to produce any compelling evidence of there being a final

agreement between myself and the Defendant to release all of my claims and resign in

exchange for $50,000.

(pp.5-6, Part I of Discussion in 02/28/2024 Memorandum (Doc 49)) Appendix, p. 18)

v)    The only attendees of the mediation on the Defendant's behalf were Alexa Heisler, Patti
      Rensel and May Mon Post:

        19 Okay. So we had a virtual mediation

        20 set up privately, Ms. Acey, you had suggested

        21 through -- I don't recall the name -- I only

        22 remember the woman's name was Serena that we

        23 exchanged information with -- was setup a

        24 mediation with Barbara, Tracy, and then I

        Page 10

        1 think in attendance on our side was May-Mon

        2 and Ms. Patti Rensel, and myself.

        (Ex. 4: p.9 lines 19-24 and p.10 lines 1-2 of Alexa Heisler Deposition
        Transcript, Appendix p. 27)

vi)   In her deposition, Ms. Heisler, (who is former counsel for the defendant and who was
      represented by the defendant's legal counsel) admitted that she was not present for the
      second half of mediation and had not witnessed any agreement being reached:

        12 Q. Okay. Can you recall any specific

        13 words that I spoke conveying an agreement to

        14 Induct EV's s terms during mediation?

        15 A. No. I wasn't on the call throughout.

        16 So the last part when I was there with the

        17 company, and you had not come to an agreement

        18 at that time

        (Ex. 4 lines 12-18 of p. 11 of Alexa Heisler Deposition Transcript, Appendix p.
        27)

vii)  In her Deposition, Ms. Rensel testified that she was not aware of any particular wording
      or statement used to convey my agreement, and that she was unable to recall several
      terms in May Mon Post's alleged agreement:

        9 Q. Okay. Do you recall discussion

        10 regarding a general release at the mediation

11 between Ms. Acey and Momentum?

12 A. I do not recall.

13 Q. Do you recall discussions regarding a

14 non-disparagement -- I'm going to say a

15 clause -- in the mediation involving Ms. Acey

16 and Momentum?

17 A. I don't recall.

18 Q. Do you recall discussions regarding a

19 confidentiality clause in the Mediation

20 between Ms. Acey and Momentum?

21 A. I don't recall.

(p.22 lines 9-21 of Patti Rensel Deposition Transcript, Appendix p. 42)

17 BY MS. ACEY:

18 Q. Ms. Rensel, do you recall any specific

19 wording or anything said by me to convey my

20 agreement during mediation?

21 A. I do not.

(p.24 lines 17-21 of Patti Rensel Deposition Transcript, Appendix p. 42)

viii)   The only remaining witness to the mediation (on defendant's behalf) is May Mon Post, and the email that alleged a final binding agreement (including terms of resignation, general release, confidentiality etc.) was sent from her email account. (Doc 10-5, Appendix p. 9).

ix)   May Mon Post has not been disclosed on the defendant's witness list and was not called for deposition.

x)   The morning after mediation, I attended therapy with Chantele Mallory, of which she

noted my anxiety over not having reached a final agreement:

| **Patient:** Assata Acey | **DOB:** ▓▓▓▓▓▓ | **Sex:** F |
|---|---|---|
| **Provider:** Chantele Mallory, LCSW | **Visit:** 09/20/2022 10:00AM | **Chart:** ACAS000002 |

Therapy Type: supportive, interpersonal
Focus: mood, stressors

Session Note: Patient spoke about recent mediation with job and feeling physically drained. Provider supported patient with exploring emotion related to mediation. Patient seemed to struggle with identification of any feelings of relief due to an unclear resolution. Patient supported with increasing awareness to successes throughout the process and effort placed with self-advocacy.
Patient also reports being placed on a new medication to manage flare-ups related to medical condition. Patient recognizes an increase in flare-ups when managing stressful situations and recognizes the past few months have been a challenge. Patient was reflective of traumatic experiences and how this impacts her

(Ex. 4, 09/20/2022 Session Note from Response to Defendant's Subpoena, Appendix p.

50)

xi)   Less than 36hours after mediation, I texted my former supervisor that a final agreement

had not been reached, and outlined the anticipated process for settlement and any

outstanding conditions precedent:

| Sent | 09/20/2022 8:26:49 PM | Joren(boss) (+1203300399 0) | Resignation process is as follows. I have to get a letter from my doctor certifying that I can work it's okay if I need accommodations. I have to send that to the new head of HR. The special lawyer they hired has to send me their settlement draft based off of the key things that we negotiated. I have to have that draft reviewed by a lawyer based off of the additional confidentiality terms that she might tag on. If everything checks out it would be signed. If not it would be thrown out and I would just go to investigation cuz I'm not dealing with those people. |
|---|---|---|---|
| Sent | 09/20/2022 8:27:42 PM | Joren(boss) (+1203300399 0) | After it was signed, I would have to you know resign. I'm assuming they would comp my vacation days. Unsure if I'd have to mail my laptop in. |
| Sent | 09/20/2022 8:28:07 PM | Joren(boss) (+1203300399 0) | So yeah until my doctor updates the note and Patty acknowledges it and I get a lawyer to review the new contract and stuff I wouldn't actually be resigned. |

(Ex. 7, Text messages from myself to Joren Wendschuh on 09/20/2022, Appendix p. 52)

C)   Damages

i)   At the time of my termination, the defendant was allowing employees to be paid for time

spent completing their virtual osha-40 training.

ii)   After submitting my return-to-work letter, I continued to receive disability benefits

totaling $3,348 per month, in the amount of $10,044.

iii)     At the time of Termination, my employment with the defendant included terms of $35.19

per hour, 3% 401k match, and $100 biweekly health plan opt-out payments:

| EARNINGS | BASIS OF PAY | DESCRIPTION | HRS/UNITS | RATE | THIS PERIOD ($) | YTD HOURS | YTD ($) |
|----------|--------------|-------------|-----------|------|-----------------|-----------|---------|
| | | Hourly | 80.00 | 35.1900 | 2815.20 | 722.00 | 25024.00 |
| | | OOP | | | 100.00 | | 900.00 |
| | | Overtime | | | | 35.00 | 1835.87 |
| | | Total Hours | 80.00 | | | 757.00 | |
| | | Gross Earnings | | | 2915.20 | | 27759.87 |
| | | Total Hrs Worked | 80.00 | | | | |
| OTHER Do not increase Net Pay | | DESCRIPTION | | | THIS PERIOD ($) | | YTD ($) |
| | | 401k ER Match | | | 84.46 | | 805.80 |

(Ex. 11 Paystub for 04/29/2022, Appendix p. 61)

iv)     I continued to interview and search for new roles in my field that would accommodate

my disability through December 31, 2022, but never received a job offer.

v)      Had I continued to work for the defendant (through Dec 31, 2022) at my previous hourly

rate of $35.19 with reduced hours of 30hrs/week, my net pay would have been $12,668,

which is $2, 624.40 more than I received on disability. Had I returned to work for the

defendant full time with accommodations, my net pay would have been $16, 891, which

is a difference of $6, 847.

vi)     The 3% gross income 401k match and $100 biweekly health coverage opt out payments

would have then amounted to $980 had I worked reduced hours of 30hr/wk and $1,106

had I worked full time with accommodations.

vii)    Therefore, the defendant's termination of my employment cost me a total of $3, 604 at

least and $7, 953 at most in lost wages and benefits, not including interest.

viii)   A week after my termination, I attended my then-weekly therapy with Chantele Mallory,

who noted a psychosomatic effect from termination:

| **Patient:** Assata Acey | **DOB:** ▮▮▮▮▮▮ | **Sex:** F |
|---|---|---|
| **Provider:** Chantele Mallory, LCSW | **Visit:** 10/04/2022 10:00AM | **Chart:** ACAS000002 |

Therapy Type: supportive, interpersonal
Focus: mood, stressors

Session Note: Patient reports focusing a lot of attention on her home and continuing to follow up with medical issues. Patient reports feeling more frustrated recently due to becoming easily tired although she has a desire to remain active. Patient spoke about impacts on her autonomic nervous system. Provider supported patient with awareness to stress and impacts on the body. Patient reports being wrongfully terminated and was allotte space to express feelings related to events. Patient appears to lack insight to body's response when discussir stressful events. Provider supported patient with awareness to body's changes while speaking about events. Provider and patient also explored her health conditions seeming to increase as her external stressors have increased.

(Ex. 8, 10/04/2022 Session note from response to Defendant's Subpoena, Appendix p.

54)

ix)   On 09/26/2023, I attended weekly therapy with Chantele Mallory, LCSW who noted my

increase intrusive thoughts related to pursuing my claims:

**Monitoring:** Relationships, anxiety, mood, stressors, coping skills, communication

**Barriers to Progress:** None

### Intervention:

Therapy Type: supportive, insight oriented
Focus: mood, stressors

Session Note: Patient joined session late due to tending to personal phone call. Patient reports feeling busy with family life but also excited about upcoming wedding. Patient provided update on medical conditions and experiencing increased nausea. Patient's PCP attributes to stress opposed to medical concerns. Patient expressed awareness to increased intrusive thoughts and feelings of hopelessness when working on legal case "it's really impacting my mental health." Provider encouraged exploration of triggers and offered psychoeducation regarding typical responses to stressors. Provider shared feedback regarding patient's response appearing aligned to PTSD and trauma reactions. Provider and patient engaged in techniques during session for emotional regulation and reducing physiological distress. Patient and provider also discussed use of emergency resources and supports if patient has an increase in intrusive thoughts or SI. Patient currently denies SI or plan and also has communicated feelings with partner. Patient has also received emotional support from grandmother.

Provider will revisit intrusive thoughts at next session and complete safety plan if warranted. Provider

(Ex. 9, 09/26/2023 Therapy Session Note from Response to Defendant's Subpoena, Appendix, p.

56)

x)        On 04/15/2024, I was seen by my primary care provider, Jennifer Flom, DO (who also at

that time increased the prescription amount of Sertraline for my depression), who noted

the stress caused by pursuing my claims:

**She is in an acute depressive episode now. Usually lasts 4hrs to 1 day but this one has lasted 4 days.**

(Ex. 10, Visit Note from Dr. Flom 04/15/2024, Appendix p. 58)

Main Line Health MyChart - Visit Summary

**She has not been able to obtain a lawyer and therefore is representing herself. She worries that the judge and opposing lawyers are working together against her.**

**She is having vivid intrusive thoughts.**

**She hyperventilates when she cries. She is not sure if this is triggering her asthma attacks.**

**When she is stressed, she is not taking a full deep breath.**

(Ex 10, Visit Note from Dr. Flom 04/15/2024, Appendix p. 59)

Proposed conclusion:

1. There is no record of any agreement being made for me to either resign or withdraw my complaint without first receiving, reviewing, and approving the final contract.

2. By pursuing the dismissal of my complaint and terminating my employment prior to my receipt of any written contract, the defendant bypassed the conditions precedent in violation of our tentative agreement.

3. The defendant's termination of my employment violates both title VII and PHRA because it was done in response to my filing a complaint against them with the EEOC and PHRC.

4. This was further aggravated by their threat to sue me if I did not withdraw my claims as well as their withholding of previously assured PTO until I "resigned".

5. The defendant's retaliatory acts facilitated a breakdown in trust that is critical to settlement discussions-which ultimately led to my complaint being filed in state court.

6. The termination and its aftermath caused more than the garden variety of stress and its execution by legal counsel on the Defendant's behalf demonstrates it as being done with reckless disregard for my legal rights and warrants punitive damages.

Sincerely,

/s/ Assata Acey Hackman

Assata Acey Hackman (Pro Se)

5121 Brown St,

Philadelphia, PA 19139

aceyassata@gmail.com

770-231-1017

Date: 05/06/2024

# <u>Appendix For Plaintiff's First Rule 56 Motion</u>

1.  Doc 15-5 05-09-2022 Submission of Dual-filed Complaint............................................p. 2
2.  Ex. 1. 09-16-2022 Confirmation of Mediation Date.......................................................p. 4
3.  Doc 10-5 09-27-2022 Termination of Employment........................................................p. 7
4.  Ex. 2.  09-27-2022 PM 2-40 Company Database Lockout..............................................p. 14
5.  pp. 5-6 of Doc 49 Memoranda of Courts Order on Motion to Dismiss.......................p. 16
6.  Ex. 3. 10-17-2022-10-21-2022 Post Termination Threats from Defendants Counsel..p. 19
7.  Ex. 4. 04-01-2024 Alexa Heisler Deposition Transcript.................................................p. 23
8.  Ex 5. 03-28-2024 Patti Rensel Deposition Transcript....................................................p. 35
9.  Ex. 6. 09-20-2022 Therapy Visit Note Morning after Mediation_Redacted................p. 49
10. Ex. 7. 09-20-2022 Text Messages from Myself to Joren Wendschuh Disclosing
    Mediation Conditions....................................................................................................p. 51
11. Ex. 8. 10-04-2022 Therapy Visit Note Week after Terminaition_Redacted................p. 53
12. Ex. 9. 09-26-2023 Therapy Visit During Litigation........................................................p. 55
13. Ex. 10. 04-15-2024 PCP Visit Note Regarding Depression Medication_Redacted......p. 57
14. Ex. 11. 04-29-2022 Paystub..........................................................................................p. 60
15. p.1 of Doc 15-75. 09-23-2022 Denial of PTO...............................................................p. 62
16. Ex. 12. 06-07-2022 Letter from Judy Talis Assuring PTO.............................................p. 64
17. Ex. 13. 06-17-2022 Letter from Judy Talis Assuring PTO.............................................p. 67

# 1. Doc 15-5 05-09-2022 Submission of Dual-filed Complaint

 Gmail

Assata Acey <aceyassata@gmail.com>

## Employment Complaint, Submission of Evidence, HIPPA release

**Assata Acey** <aceyassata@gmail.com>
To: phrc@pa.gov

9 May 2022 at 08:06

Please accept the attached complaint and submission of evidence.
Please let me know of any additional information needed to file these documents.

Additional Information
Complainant
Assata Acey
5121 brown st, philadelphia PA 19139
770-231-1017

Respondent
Momentum Dynamics
3 Pennsylvania Ave
Malvern, PA

Summary:
Assata Acey v. Momentum Dynamics Corporation.
Ongoing discrimination due to race, gender, and in retaliation to opposing acts believed to violate PHRA.
Chiefly through
    a) Hiring discrimination, classification and terms of employment, failure to promote.
    b) Harassment

---

**3 attachments**

📄 **Submitted Evidence.pdf**
21083K

📄 **Filled Employment Complaint Form-12-2020.pdf**
1199K

📄 **HIPPA Release Form.pdf**
404K

# 2.   Ex. 1. 09-16-2022 Confirmation of

# Mediation Date

5/6/24, 10:54 AM                Gmail - CORA Good Shepherd Mediation - MONDAY 9/19 10:30AM - Zoom Link - Consent form from grandmother needed

 Gmail                                                                        **Assata Acey <aceyassata@gmail.com>**

---

## CORA Good Shepherd Mediation - MONDAY 9/19 10:30AM - Zoom Link - Consent form from grandmother needed

**Harris, Alexandra** <aharris@coraservices.org>                                         16 September 2022 at 15:07
To: "aceyassata@gmail.com" <aceyassata@gmail.com>

Dear Assata,

Has your grandmother got a chance to sign the consent form? Would you like me to send via Adobe Sign to your grandmother's email address?

We look forward to hosting your mediation on Monday 9/19 at 10:30AM. Please promptly log into the following Zoom link:

Join Zoom Meeting
https://us02web.zoom.us/j/6261338302?pwd=SVo2WFRuSGxaUnMreTJVVjVDMkFBZz09

Thank you,

Alexandra "Serene" Harris

---

**From:** tracy@pivotal-communication.com <tracy@pivotal-communication.com>
**Sent:** Friday, September 16, 2022 10:42 AM
**To:** aceyassata@gmail.com; Harris, Alexandra <aharris@coraservices.org>
**Cc:** bef423 <bef423@mindspring.com>
**Subject:** Confidentiality Form

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Assata,

Attached is a copy of CORA Good Shephard's consent to mediate form.  Please have your grandmother sign it and return it to Alex Harris and me *before* Monday's mediation.

You will need to send her the zoom link also.

Best,

Tracy

**Tracy Hornig**

Principal

Pivotal Communication

tracy@pivotal-communication.com

484-888-2837



Transforming how you navigate conflict and change

Consulting | Training | Coaching | Mediation

www.pivotal-communication.com

3.  Doc 10-5 09-27-2022 Termination of

Employment

# EXHIBIT E

| From: | Assata Acey |
|---|---|
| To: | Post, May Mon |
| Cc: | Patti Rensel; Alexa Heisler; Barbara Foxman; hornigtracy@gmail.com |
| Subject: | Re: Acey v. Momentum |
| Date: | Tuesday, September 27, 2022 2:53:02 PM |

### EXTERNAL EMAIL

As you are currently aware, this case has been moved to investigation.
I reject your contract.

In mediation I did agree to
a verbal agreement in which I would resign and dismiss existing claims(prior to Sep 19) in
return for a settlement amount of 50,000 from Momentum Dynamics Corp.
The execution of this agreement was contingent on a contract that included agreeable material
terms. The fact that you requested me to execute terms of an agreement that I had yet to
review or sign suggests that we did not resolve the issue.

At no point was resignation agreed to as a requirement to review or receive any agreement. At
no point was a deadline agreed to for resignation. The only requirement agreed to as a
condition of receiving a contract was that I would provide a letter from my doctor. The
deadline given for this letter was September 26 2022. My Grandmother is a witness to my
agreements during mediation and can confirm the same.

As of yet, I have not resigned and  I consider my immediate lock-out from company databases
as a direct attempt to fire me after my complaint, which is to be added to my charge file along
with all other documents submitted to Alexa and Pattis Momentum emails this past friday
afternoon.

On Tue, 27 Sept 2022 at 14:10, Post, May Mon <maymon.post@bunkerray.com> wrote:

> Dear Ms. Acey,
>
> I am confused by your email below. At the mediation on September 19, 2022, the parties
> agreed on the following material terms:
>
> You agreed to resign from employment with Momentum effective immediately (September
> 19, 2022) and further agreed to provide Momentum with the said resignation letter on or
> before September 23, 2022. Therefore, Momentum has accepted your resignation as of that
> date.
>
> Additionally, you agreed to provide Momentum with a verification form from a medical
> provider, on or before September 23, 2022, returning you to return to work on full duty with
> or without restrictions.

In addition, you agreed to a general release, non-disparagement and confidentiality, and Momentum agreed to provide a neutral reference.

In exchange for the above, within 30 days of the execution of the settlement agreement by you, Momentum agreed to pay the settlement proceeds in the total amount of $50,000 (less ordinary deductions required by law, if applicable].

I indicated to the mediators that a settlement agreement would be sent to you for execution as soon as it was finalized. To that end, I am attaching it herewith.

Thank you.

**May Mon Post, Esq. | Lead Employment Attorney | Bunker & Ray**

Employees of ACE American Insurance Company, a Chubb Company

436 Walnut St. | WA01A | Philadelphia, PA 19106
(215) 845-6154 (direct) | (267) 372-1240 (mobile)
maymon.post@bunkerray.com

This email (which includes any attachments) is intended to be read only by the person(s) to whom it is addressed. This email may contain confidential, proprietary information and may be a confidential attorney-client communication, exempt from disclosure under applicable law. If you have received this email in error, do not print it, forward it or disseminate or use it or its contents. In such event, please notify the sender by return email (or by phone at the number shown above) and delete the email file immediately thereafter. Thank you for your cooperation.

We strive to be a paperless office. I encourage you to send all correspondence via email instead of U.S. mail when at all possible. If you email a document to me, it is not necessary to send a separate copy via U.S. mail. Thank you.

**From:** Assata Acey <aceyassata@gmail.com>
**Sent:** Friday, September 23, 2022 10:39:46 PM
**To:** Post, May Mon <Maymon.post@bunkerray.com>; Patti Rensel
<patti.rensel@momentumdynamics.com>; Alexa Heisler
<Alexa.Heisler@momentumdynamics.com>; Assata Acey
<Assata.Acey@momentumdynamics.com>
**Subject:** Re: Acey v. Momentum


**EXTERNAL EMAIL**

My collected evidence of inferred bias is proof of discrimination in my hiring decision work classification/failure to promote. This bias consists mainly of experiences I had with HR that were not replicated with my colleagues (accusations of stealing time, asks of if I were pregnant/should see daughter's gynecologist, degree of meeting invite harassment, response to reported bias and harassment incidents at work etc). Failure to classify or promote would be a part of that because the performed tasks were reasonably beyond the scope of my role, requiring skills of a process engineer/beyond technician job description. And not only was HR aware of this through my performance review and subsequent communications, but I specifically mentioned in my performance review that I would be seeking compensation commensurate with the tasks that I was completing.

Regardless of your evaluation of evidenced inferred bias, conspicuous skill gap between my tasks and role, and previous (re performance review) request to be adequately compensated. My claim still holds additional charges of severe harassment and ADA related retaliation. The severe racially/gender impacted harassment of not being allowed to use my cell phone and an evidently unusual/severe reimbursement process (where I was denied from opting out) is supported by the same inferred bias as well as additional bias acts by coworkers( pen markings on a work desk vowing not to "talk about race", comic regarding a fake "phizzics" degree posted outside my cubicle, additional biased/policing behavior of coworkers)

This retaliation would include the onset of my illness when I expressly needed to take time off and was told at the last minute before heading out that the current pay period would not allow me to do unpaid time (as supported by my 5/12 doctors note). Which caused me such severe distress that after returning from two doctor's appointments, I worked until 9:00 PM in pain to make up those pay period hours.

The stress of this ordeal is further documented in my diagnosis of major depressive disorder from both my PCP and therapist as well as therapy sessions where these issues were discussed.

Due to the documentation of this issue, I am convinced that a full investigation will find Momentum Dynamics Corporation in noncompliance of EEOC law with order to pay the full 50,000 amount regardless of whether I resigned--being that resignation would be my right.

Beyond this, I do perceive your emails of this week as attempts to:
a) have this case dismissed

b) convince me to resign (a condition contingent on our "meeting of minds" as demonstrated through a contract) without submitting and written documentation/contract for my review between myself and you to review or sign.

c) change or misconstrue existing and communicated FMLA policy to use PTO payment as

a bargaining chip towards part b.

I view these as direct actions to intimidate and retaliate against me for filing this EEOC complaint if not to also interfere with EEOC process by avoiding the need to include your resignation condition in a written unredacted settlement agreement

In the scope of the merit of my claims(existing complaint), right to resign or not, previously noted actions,  and supporting documentation, I am now asking for a settlement amount of $130,000, acceptable for review ONLY with receipt legally drafted settlement offer (including ALL material terms: resignation,  rehire eligibility, time scale/terms of payment, confidentiality, etc).

Unless/until an agreement is signed detailing resignation, I am an employee of Momentum Dynamics Corp and will be either using PTO or reporting to work.

All supporting documentation has been attached. Please refer any questions, comments, or followup to my email.


On Fri, 23 Sept 2022 at 16:13, Assata Acey <aceyassata@gmail.com> wrote:

> ---------- Forwarded message ---------
> From: **Assata Acey** <aceyassata@gmail.com>
> Date: Fri, 23 Sept 2022 at 16:10
> Subject: Re: Acey v. Momentum
> To: Post, May Mon <maymon.post@bunkerray.com>
>
>
> Thank you for your clarifying email. Please confirm whether the following previous PTO/FMLA/REturn to work policies, as communicated in the attached email PDFs and FMLA form, have been changed to match what you are currently saying. thank you,
>
>
> On Fri, 23 Sept 2022 at 16:01, Post, May Mon <maymon.post@bunkerray.com> wrote:
>
> > Good afternoon, Ms. Acey:
> >
> >
> > I understand that you requested to take PTO for September 22 and 23. Please be advised that you are unable to put in for PTO as you are still on disability leave and you cannot take PTO unless you are back to work. (Also, per your doctor's note, you are not to be released to return until Monday, which is a moot point as you have resigned or will be resigning shortly). However, you will be paid the balance of your PTO upon your resignation. If you resign today through Sunday, you will receive your final pay check on 09/30. If you resign 09/26 – 10/09, you will receive your final pay check on 10/14. Please provide me with a copy of your resignation letter as soon as possible.

Thank you, and please let me know if you have any questions.

**May Mon Post, Esq. | Lead Employment Attorney | Bunker & Ray**

Employees of ACE American Insurance Company, a Chubb Company

436 Walnut St. | WA01A | Philadelphia, PA 19106
(215) 845-6154 (direct) |  (267) 372-1240 (mobile)
maymon.post@bunkerray.com

This email (which includes any attachments) is intended to be read only by the person(s) to whom it is addressed. This email may contain confidential, proprietary information and may be a confidential attorney-client communication, exempt from disclosure under applicable law. If you have received this email in error, do not print it, forward it or disseminate or use it or its contents. In such event, please notify the sender by return email (or by phone at the number shown above) and delete the email file immediately thereafter. Thank you for your cooperation.

We strive to be a paperless office. I encourage you to send all correspondence via email instead of U.S. mail when at all possible. If you email a document to me, it is not necessary to send a separate copy via U.S. mail. Thank you.

This email (including any attachments) is intended for the designated recipient(s) only, and may be confidential, non-public, proprietary, and/or protected by the attorney-client or other privilege. Unauthorized reading, distribution, copying or other use of this communication is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) should not be deemed a waiver of any privilege or protection. If you are not the intended recipient or if you believe that you have received this email in error, please notify the sender immediately and delete all copies from your computer system without reading, saving, printing, forwarding or using it in any manner. Although it has been checked for viruses and other malicious software ("malware"), we do not warrant, represent or guarantee in any way that this communication is free of malware or potentially damaging defects. All liability for any actual or alleged loss, damage, or injury arising out of or resulting in any way from the receipt, opening or use of this email is expressly disclaimed.

4.   Ex. 2.  09-27-2022 PM 2-40 Company

Database Lockout



**Momentum**

← assata.acey@momentumdynamics.com

# Enter password

Your account has been locked. Contact your support person to unlock it, then try again.

Password

Forgot my password

Sign in

Welcome to Momentum Dynamics!

Terms of use    Privacy & cookies    • • •

5.   pp. 5-6 of Doc 49 Memoranda of Courts

Order on Motion to Dismiss

## LEGAL STANDARD

At the motion to dismiss stage, the Court must accept factual allegations as true, but it is not "compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (internal citations and quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## DISCUSSION

InductEV's motion to dismiss advances three arguments: (1) Ms. Acey released her claims as part of a binding settlement agreement; (2) Ms. Acey failed to exhaust her claims before the EEOC; and (3) Ms. Acey failed to state claims upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court addresses each argument in turn.

### I.   InductEV has not demonstrated the existence of a binding settlement agreement.

Ms. Acey has specifically, plausibly, and clearly pled that she did not conclude a final settlement agreement with InductEV. Compl. ¶¶ 66-72, 82-84, Doc. No. 1-2. At the Rule 12 stage, the Court must accept these allegations as true. *Baraka*, 481 F.3d at 195. InductEV attempts to demonstrate the existence of a settlement agreement by pointing to language from a September 27, 2022 email from Ms. Acey, which reads: "I did agree to a verbal agreement in which I would resign and dismiss existing claims . . . in return for a settlement amount of [$]50,000[.]" Mem. of

---

2023, Doc. No. 13. Because InductEV timely responded to Ms. Acey's complaint, her motion for default judgment is denied.

5

L. in Supp. of Mot. to Dismiss at 11, Doc. No. 10 (quoting Compl. ¶ 266, Doc. No. 1-2). However, the next sentence of Ms. Acey's email reads, "The execution of this agreement was contingent on a contract that included agreeable material terms." Compl. ¶ 266, Doc. No. 1-2. In context, this email suggests that the putative settlement agreement between Ms. Acey and InductEV may have been subject to a condition precedent, namely a writing containing agreeable terms. *See Am. Diabetes Ass'n v. Friskney Family Tr., LLC*, 177 F. Supp. 3d 855, 877 (E.D. Pa. 2016) (quoting *Acme Markets, Inc. v. Fed. Armored Exp., Inc.*, 648 A.2d 1218, 1220 (Pa. Super. Ct. 1994)) ("[A] condition precedent may be defined as a condition which must occur before a duty to perform under a contract arises."). The Court expresses no opinion at this early stage about either whether a binding settlement agreement was reached or whether any such agreement was subject to a condition precedent. Ms. Acey has pled that no agreement was reached, and the evidence before the Court of a binding agreement is equivocal. The Court takes Ms. Acey's allegation as true.

InductEV's conclusory assertion that Ms. Acey "developed" *post hoc* reasons that she was not bound by her putative settlement agreement fails to persuade the Court, especially in the absence of a writing memorializing the agreement. Of course, a binding settlement agreement may exist absent a writing, *Commerce Bank v. First Union Nat'l Bank*, 911 A.2d 133, 147 (Pa. Super. Ct. 2006), and InductEV is free to gather evidence of a binding oral agreement for the Court to consider at summary judgment. However, accepting the allegations of the complaint as true, the Court declines to find that Ms. Acey's claims are barred by a settlement agreement.

Thus, the Court denies InductEV's motion to dismiss insofar as it relies on the existence of a binding settlement agreement in this matter.

## II.   InductEV has failed to demonstrate Ms. Acey's failure to exhaust.

InductEV further argues that Ms. Acey failed to exhaust her administrative remedies under Title VII, the ADA, and the PHRA. However, the exhaustion section of InductEV's motion to

6

6.   Ex. 3. 10-17-2022-10-21-2022 Post

Termination Threats from Defendants Counsel

2/18/24, 9:00 PM          Gmail - Acey, Assata v. Momentum Dynamics Corporation; CLAIMS REF NO KY22K2593096-A DOL 06/22/2022

 Gmail

Assata Acey <aceyassata@gmail.com>

## Acey, Assata v. Momentum Dynamics Corporation; CLAIMS REF NO KY22K2593096-A DOL 06/22/2022

**Post, May Mon** <maymon.post@bunkerray.com>                                 21 October 2022 at 14:45
To: Assata Acey <aceyassata@gmail.com>
Cc: Alexa Heisler <Alexa.Heisler@inductev.com>, Patti Rensel <Patti.Rensel@inductev.com>

Ms. Acey:

Our position has not changed. The fact that you agreed to resign and dismiss your claims in exchange for $50,000 is not in dispute, is confirmed by you in writing, and constitutes an enforceable contract. Your latest email does not even dispute these terms – your only objection is that resignation would occur after execution of the agreement. Accordingly, even assuming a fact finder found in your favor, they would conclude resignation was effective no later than the time allotted to have the agreement reviewed by counsel.

Nevertheless, if you wish to review the settlement agreement with an attorney and propose a counteroffer, including the date of your resignation date (i.e., effective the date of execution of the settlement agreement), I will forward the counteroffer to my client as soon as I receive it from you. Would two weeks (Friday, November 4, 2022) be enough for you to review the agreement with an attorney and get back to me? Please advise.

Nothing in this email constitutes a counteroffer or a new offer, and my client has no obligation to accept the terms of your counteroffer. However, I will do my best to persuade them to take it into consideration, if reasonable. With respect to our position as outlined in my email dated October 17th, my client reserves all rights and waives none.

Thank you.

**May Mon Post, Esq. | Lead Employment Attorney | Bunker & Ray**

Employees of ACE American Insurance Company, a Chubb Company

436 Walnut St. | WA01A | Philadelphia, PA 19106
(215) 845-6154 (direct) |   (267) 372-1240 (mobile)

maymon.post@bunkerray.com

This email (which includes any attachments) is intended to be read only by the person(s) to whom it is addressed. This email may contain confidential, proprietary information and may be a confidential attorney-client communication, exempt from disclosure under applicable law. If you have received this email in error, do not print it, forward it or disseminate or use it or its contents. In such event, please notify the sender by return email (or by phone at the number shown above) and delete the email file immediately thereafter. Thank you for your cooperation.

We strive to be a paperless office. I encourage you to send all correspondence via email instead of U.S. mail when at all possible. If you email a document to me, it is not necessary to send a separate copy via U.S. mail. Thank you.

**From:** Assata Acey <aceyassata@gmail.com>
**Sent:** Monday, October 17, 2022 7:18 PM
**To:** Post, May Mon <maymon.post@bunkerray.com>
**Subject:** [EXTERNAL] Re: Acey, Assata v. Momentum Dynamics Corporation; CLAIMS REF NO KY22K2593096-A DOL 06/22/2022

Thank you for your correspondence.

I have been as forthcoming as possible, submitting all communications regarding this dispute to EEOC.
I did not agree to resign effective September 19. And was of the impression, as communicated, that I would receive a settlement contract (for review with optional legal counsel) detailing resignation effective on the date of execution. Your communicated understanding of our mediation was that I would resign effective sept 19 with or without prior receipt/execution of a written agreement.

These understandings are not the same. If your understanding of our mediation as shown in your emails and submitted contract is different than mine, then we did not reach an agreement.

With this understanding, I am under no obligation to accept any agreement that I did not verbally agree to.

On Mon, 17 Oct 2022 at 15:26, Post, May Mon <maymon.post@bunkerray.com> wrote:

Good afternoon, Ms. Acey:

Your claims against InductEV (f/k/a Momentum Dynamics Corporation) were fully resolved during mediation on September 19th. Your September 27th email provides written confirmation of the parties' agreement: you agreed to "resign and dismiss existing claims" in exchange "for a settlement amount of [$]50,000." At mediation, I made it repeatedly and unambiguously clear that settlement was contingent on resignation being effective immediately. You accepted. InductEV did not (and would never) agree to a resignation at some unknown point in the future – that's an unreasonable assertion on its face since it would defeat the entire purpose of settling the claims.

Be advised that the parties' agreement reached on September 19th – later confirmed by you in writing – constitutes a binding contract and InductEV will take all necessary action to ensure you honor and comply with that agreement, as outlined below.

You cannot void or invalidate your agreement by stating it "was contingent on a contract that included agreeable material terms." Regardless, the document I provided includes all of and only the material terms the parties agreed upon (including, for example, you agreeing to a general release, non-disparagement and confidentiality, and InductEV agreeing to provide a neutral reference). Any other language is immaterial to the agreement to settle your claims and was included because it is either standard practice or legally required. In any event, I do appreciate you may have been taken aback by a document containing legal language you may be unfamiliar with. We strongly recommend that you retain a lawyer to help you understand all the terms. If you do not plan to hire one, I am willing to simplify the document and/or remove specific language you are uncomfortable with, provided those changes do not modify the material terms we agreed to on September 19th.

Regardless of whether we have a formal signed document memorializing of our settlement, our agreement is a binding, enforceable contract. If you continue pursuing your claims against my client this will constitute breach of contract. When the matter reaches court, InductEV will seek dismissal of your claims and enforcement of the settlement agreement. More importantly, InductEV will sue for breach of contract and demand reimbursement of all attorneys' fees it has incurred as a result of your breach, including all fees spent on defending against claims you already agreed to settle. InductEV may take any other legal and equitable action available to it regarding your breach, now or in the future. My client reserves all rights and waives none.

To avoid any such consequences, we need to execute a document that memorializes the terms agreed to by both parties at mediation on September 19th. If you would like me to revise any terms or language in that document, please let me know and, as mentioned above, I will do my best to work with you to arrive at a document that contains mutually agreeable language.  Please see attached Word version of the settlement agreement, which you can feel free to mark up.  I look forward to hearing from you.

If we do not hear back from you by the end of this Friday, October 21st, we will assume you have chosen to reject your contractual obligations and InductEV will proceed accordingly.

Thank you.

**May Mon Post, Esq. | Lead Employment Attorney | Bunker & Ray**

Employees of ACE American Insurance Company, a Chubb Company

436 Walnut St. | WA01A | Philadelphia, PA 19106
(215) 845-6154 (direct) |   (267) 372-1240 (mobile)

maymon.post@bunkerray.com

This email (which includes any attachments) is intended to be read only by the person(s) to whom it is addressed. This email may contain confidential, proprietary information and may be a confidential attorney-client communication, exempt from disclosure under applicable law. If you have received this email in error, do not print it, forward it or disseminate or use it or its contents. In such event, please notify the sender by return email (or by phone at the number shown above) and delete the email file immediately thereafter. Thank you for your cooperation.

We strive to be a paperless office. I encourage you to send all correspondence via email instead of U.S. mail when at all possible. If you email a document to me, it is not necessary to send a separate copy via U.S. mail. Thank you.

This email (including any attachments) is intended for the designated recipient(s) only, and may be confidential, non-public, proprietary, and/or protected by the attorney-client or other privilege. Unauthorized reading, distribution, copying or other use of this communication is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) should not be deemed a waiver of any privilege or protection. If you are not the intended recipient or if you believe that you have received this email in error, please notify the sender immediately and delete all copies from your computer system without reading, saving, printing, forwarding or using it in any manner. Although it has been checked for viruses and other malicious software ("malware"), we do not warrant, represent or guarantee in any way that this communication is free of malware or potentially damaging defects. All liability for any actual or alleged loss, damage, or injury arising out of or resulting in any way from the receipt, opening or use of this email is expressly disclaimed.

# 7.  Ex. 4. 04-01-2024 Alexa Heisler Deposition

# Transcript

# In The Matter Of:

*Acey vs.*
*Induct EV*

---

*Alexa Heisler*
*April 1, 2024*

---

*Media Court Reporting*
*211 North Olive Street, Suite 210*
*Media, PA   19063*
*610.566.0805*
*www.mediacourtreporting.com*

Original File 040124AH_1.TXT
Min-U-Script® with Word Index



Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3                     - - -
 4
 5    ASSATA ACEY,              :
           Plaintiff           :
 6                             :
       vs.                     :Docket No.2:23-cv-01438
 7                             :
      INDUCT EV,               :
 8                             :
           Defendant           :
 9                     - - -
10              Monday, April 1, 2024
11                     - - -
12
13          Deposition via Zoom of ALEXA HEISLER,
14    taken pursuant to notice on the above date
15    beginning at approximately 1:40 p.m., before
16    Donna Hunter, Registered Professional Reporter
17    and Notary Public.
18                     - - -
19
20              MEDIA COURT REPORTING
21         211 North Olive Street, Suite 210
                 Media, PA  19063
22                  610.566.0805
              mcr@mediacourtreporting.com
23            www.mediacourtreporting.com
24
```

Page 2

```
 1    APPEARANCES:
 2
         ASSATA ACEY, pro se
 3       aceyassata@gmail.com
 4       Pro Se Plaintiff
 5
 6    RANDALL C. SCHAUER, ESQUIRE
      ALBERTO LONGO, ESQUIRE
 7       FOX ROTHSCHILD LLP
         747 Constitution Drive
 8       Suite 100
         Exton, PA 19341
 9
10       Counsel for Defendant
         rschauer@foxrothschild.com
11
12
13
14
15          (INDEX at end of transcript)
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1
 2    - - -
 3       MCR REPORTING: Ms. Acey
 4    requested that this deposition be
 5    recorded, as long as all counsel agree.
 6    - - -
 7    . . . ALEXA HEISLER, having
 8    remotely affirmed, was examined and
 9    testified as follows . . .
10       MR. SCHAUER: I would like the
11    witness to be able to read and sign the
12    transcript.
13       Also, I am not going to tell
14    people not to record the Zoom; I'm not
15    going to be difficult.
16       MS. ACEY: Okay.
17       MR. SCHAUER: And just for the
18    record, I am here with the witness.  We
19    are in a conference room in the
20    Montgomery County office of Fox
21    Rothschild.
22       E X A M I N A T I O N
23       BY MS. ACEY:
24    Q.  All right, Ms. Heisler, could you state
```

Page 4

```
 1    your name for the record, please.
 2    A.  Alexa Heisler.
 3    Q.  Are you currently employed?
 4    A.  No.
 5    Q.  Have you been recently employed?
 6    A.  Yes.
 7    Q.  What was the name of your most recent
 8    employer?
 9    A.  Infinite Blue Applications, LLC.
10    Q.  Did you work from home?
11    A.  Some days.
12    Q.  How often would you say you worked from
13    home?
14    A.  I worked from home Wednesdays and
15    Fridays, or if I was sick, or my kids were
16    sick.
17       MS. ACEY: Okay.  I would like
18    to take a minute, and I want to see if
19    I can share a document.  I am going to
20    e-mail a document to Ms. Heisler's
21    counsel, and I want to share my screen
22    of the document, but I just want to
23    make sure they have a copy to see
24    separate at the same time.
```

Page 5

1       MR. SCHAUER: Ms. Acey, I may
2   have it.  But if you don't mind my
3   asking, what is it you're going to
4   e-mail?
5       MS. ACEY: It's filed as
6   document 65-3 on our case.
7       MR. SCHAUER: All right, I
8   don't have that.
9       MS. ACEY: I am going to e-mail
10  that to you, and I am going to include
11  Media Court Reporting because I wanted
12  to just put it into the Zoom chat, but
13  it looks like it's not allowing me to
14  do it that way.  So I am going to do
15  that before I share my screen, so
16  please bear with me for a minute.
17      And, Attorney Schauer, are you
18  still here?
19      MR. SCHAUER: Yes, I'm here.
20      MS. ACEY: Okay, I see Attorney
21  Longo's name, so I wasn't sure.  But, I
22  think I get it now.
23      MR. SCHAUER: Send it to me,
24  also; I'm running it through my laptop.

Page 6

1       MS. ACEY: Well, it was just
2   sent so I want to confirm that you
3   received it?
4       MR. SCHAUER: All right, I have
5   that document, it came in.  So what are
6   we doing with it?
7       MS. ACEY: Okay, perfect.  I
8   want to share my screen with this
9   document, so I am just going to start
10  that now.
11      BY MS. ACEY:
12  Q.  Okay.  Ms. Heisler, can you see the
13      document that I'm sharing right now?
14  A.  Yes.
15  Q.  Do you have a LinkedIn account?
16  A.  Yes, this is my LinkedIn account.
17  Q.  Okay.  So this is your LinkedIn
18      account.  In the experience section, so this
19      is the information that you put out for the
20      times and dates of your experience.
21      Is this accurate?
22  A.  It is not updated with my most recent
23      departure from Infinite Blue.
24  Q.  Okay.

Page 7

1   A.  Otherwise, it appears accurate.
2   Q.  Okay.  Is this account publically
3       accessible, or is it private?
4   A.  I do not know.  I don't recall my
5       privacy settings on LinkedIn.
6   Q.  Okay.  So when did you end your
7       employment with Induct EV?
8   A.  Induct EV was March, 2023.
9   Q.  Okay.  And, when did you transition
10      from being General Counsel -- or were there
11      any transitions during your employment?
12  A.  What do you mean "transitions?"
13  Q.  I guess in your title?
14  A.  Yes.  I was hired is as legal counsel
15      in October of 2019, and then was appointed
16      general counsel October of 2022.  So that's --
17      yes.
18  Q.  Are you able to share the date that you
19      became general counsel, that you referred to?
20      I mean I know you said -- I'm sorry.  You're
21      saying the and the year.  I'm asking if you
22      are able to say the day of the month?
23  A.  No, I don't know.
24  Q.  Okay.  Are you aware of a mediation

Page 8

1   being attended by myself, and the defendant?
2   Are you aware of any medication being
3   attended by myself, and the defendant?
4   A.  Yes.
5   Q.  Okay.  Did you attend this medication?
6   A.  I attended partially of the mediation.
7   Q.  What parts did you attend?
8   A.  I attended from the start of it, and
9       then I had to drop for another call.
10  Q.  What do you recall seeing or hearing
11      outside of your communications with the
12      parties during the mediation?
13      MR. SCHAUER: I object to the
14      form of the question.  If you can
15      answer it, go ahead.
16      THE WITNESS: I'm not sure I
17      understand the question.  Can you
18      rephrase it?
19      MS. ACEY: Sure.
20      BY MS. ACEY:
21  Q.  During your time attending the
22      mediation, what do you recall seeing or
23      hearing?
24      MR. SCHAUER: I'm going to

Acey vs.
Induct EV

Alexa Heisler
April 1, 2024

Page 9

1  direct the witness not to share any
2  communications related to legal advice
3  as privileged, obviously.  But to the
4  extent there was other communications,
5  the witness can talk about, sure,
6  that's fine.
7      THE WITNESS: You want a
8  summary of my experience at the
9  mediation barring any privileged
10 communication or --
11     MS. ACEY: Yes.
12     THE WITNESS: I am not
13 understanding your question.
14     BY MS. ACEY:
15 Q.  No, I get the question.  But I think
16 the first part that you offered as far as your
17 experience barring the privileged
18 communication, that's what I am trying to get.
19 A.  Okay.  So we had a virtual mediation
20 set up privately, Ms. Acey, you had suggested
21 through -- I don't recall the name -- I only
22 remember the woman's name was Serena that we
23 exchanged information with -- was setup a
24 mediation with Barbara, Tracy, and then I

Page 10

1  think in attendance on our side was May-Mon
2  and Ms. Patti Rensel, and myself.
3  It started in the morning.  It was
4  supposed to be around, like, five hours --
5  that's based on my recollection.  We started
6  all in one group, and then had breakout
7  sessions where you met with the mediators
8  separately and then the mediators came to us.
9  But, you know, the specifics on that,
10 you know, I think our attorney spoke on our
11 behalf of Induct EV -- or Momentum -- formerly
12 known as Momentum and, you know, that is the
13 brief and basics of my experience.
14 Q.  Okay.
15     MR. SCHAUER: Ms. Acey, could
16 you stop sharing that, or are you done
17 with it, or --
18     MS. ACEY: Oh, sorry.  Yes, I
19 can stop sharing this now.  I don't
20 need it anymore.
21     MR. SCHAUER: Thank you.
22     BY MS. ACEY:
23 Q.  So, I'm sorry, I want to recalibrate to
24 the testimony that you just gave.

Page 11

1  So, what is the name of the attorney
2  who spoke on behalf of Induct EV?
3  A.  May-Mon, I believe her last name is
4  Post.
5  Q.  Okay.  You also mentioned, I think it
6  was a Tracy, and another name?
7  A.  Barbara?
8  Q.  Barbara and Tracy?
9  A.  Yes, who were the mediators, if I'm
10 recalling -- frankly, I don't recall their
11 last names.
12 Q.  Okay.  Can you recall any specific
13 words that I spoke conveying an agreement to
14 Induct EV's s terms during mediation?
15 A.  No.  I wasn't on the call throughout.
16 So the last part when I was there with the
17 company, and you had not come to an agreement
18 at that time.
19 Q.  Okay.  Are you aware of any contract
20 terms being said to the mediators before the
21 mediation?
22 A.  No.
23 Q.  Are you aware of any contract terms
24 being said to the mediators after mediation?

Page 12

1  A.  I'm not sure.  I don't recall.
2  Q.  Okay.  Did you see or receive any
3  communications with the mediators after the
4  mediation?
5  I'm sorry, I want to rephrase that
6  question because it's not exactly what I want
7  to ask.
8  Did you see or receive any
9  communication from the mediators after the
10 mediation?
11 A.  I do not believe I received any
12 communications from the mediators.
13 Q.  Okay.  Are you aware of any contract
14 terms being e-mailed to me before
15 September 27th?
16 A.  I'm not sure.
17 Q.  Okay.  I only have, like, one or two
18 last questions, so just let me state that.
19 When did you first view the subpoena
20 for this deposition?
21 A.  I've never received a subpoena for the
22 deposition.  My first notice was when Mr. --
23 Randy over here had e-mailed me, like, on a
24 Friday afternoon saying: Hey, you were served

Page 13

1  on March 5th.  And, I had not received
2  anything.  So, you know, I had a call with him
3  to, like, can you send me a copy of what I was
4  alleged to be to be served with.  And I don't
5  believe I have seen anything with that, other
6  than the Proof of Service, which I stated was
7  not served to me.
8  And I called the contacts below to see
9  if they had been served.  I called my
10  secretary/receptionist at the time, and she
11  did not have anything either of that service.
12  I spoke to the receptionist at the
13  first floor, Valley Forge Financial.  They did
14  not say that a Melissa Evans worked at that
15  company.  So I tried to find the subpoena, but
16  I did not receive it.
17  Q.  Just to circle back, you said that you
18  spoke with the receptionist at Infinite Blue,
19  as well?
20  A.  Yes, yes.  So I spoke to her; I spoke
21  to the receptionist at the office below
22  Infinite Blue.  And, no one had received
23  anything.
24  Q.  What was the name of the receptionist

Page 14

1  at Infinite Blue?
2  A.  Andrea -- I can't pronounce her name --
3  D'Annunzio.
4  Q.  Andrea D'Annunzio, I think?
5  A.  Yes.
6  MS. ACEY: All right, those are
7  all my questions.
8  MR. SCHAUER: I have a few
9  brief questions.
10  First, I'm going to share
11  something.  Give me one second, please.
12  All right.  I have here an
13  e-mail from me to Alexa Heisler dated
14  March 8th, 2024.  I'm going to be
15  marking this as AH-1.
16  (Document marked AH Exhibit No.
17  1 for identification.)
18  BY MR. SCHAUER:
19  Q.  I'm going to give a copy to the
20  witness, and ask the witness to take a look at
21  that Exhibit AH-1, and then tell us, yes or
22  no, whether that was the e-mail that was
23  referenced in her testimony regarding hearing
24  from Randy Schauer regarding being subpoenaed?

Page 15

1  A.  Correct, this was the e-mail that you
2  introduced yourself, and I learned about the
3  subpoena.
4  Q.  Now, at that point, we were not
5  attorney/client, we didn't have an
6  attorney/client relationship; correct?
7  A.  Yes.
8  Q.  At some point that day, did I provide
9  you with a -- we have a followup e-mail that I
10  am going to actually mark as AH-2, and show
11  you.  And, I will put that on the screen.
12  (Document marked AH Exhibit No.
13  2 for identification.)
14  BY MR. SCHAUER:
15  Q.  All right.  What we have here now is a
16  copy of e-mails, again between Randall Schauer
17  and Alexa Heisler.  The date is March 8th,
18  2024.  I've marked this as Exhibit AH-2.
19  If we scroll to the bottom, we see the
20  body of the e-mail previously identified as
21  AH-1.  And just, you know, to scroll down
22  through, there is an indication there's an
23  image attached to this e-mail string.  It's
24  the e-mail, the initial e-mail from Randy

Page 16

1  Schauer to Alexa Heisler.  It's at the bottom;
2  it's the last thing.
3  So I am going to ask you is this a true
4  and correct copy of an e-mail exchange between
5  you and Randy Schauer dated March 8, 2024?
6  And, did we have a telephone conversation,
7  also, during the course of the day on March
8  8th, 2024 regarding this subpoena.
9  And, you know, essentially, is that
10  what lead you to go look for the subpoena, as
11  you described to Ms. Acey?  And, did you ever
12  see a copy of this subpoena left at any office
13  in the Momentum Blue Offices?
14  A.  No.  Infinite Blue.
15  Q.  Infinite Blue?
16  A.  No, I did not.
17  Q.  There were some -- well, I'm going to
18  move from here.  Just a second, I have one
19  more exhibit, and we'll soon be done.
20  I'll be back in a second here.
21  - - -
22  THE REPORTER: While we're
23  waiting, is it D'Annunzio, the name you
24  mentioned before?

Page 17

1    THE WITNESS: Yes. It's
2  D'Annunzio, yes.
3    THE REPORTER: So, it's
4  D'A-N-N...
5    THE WITNESS: D'Annunzio, yes.
6  And, she's the office manager; I
7  incorrectly stated receptionist.
8    THE REPORTER: Thank you.
9    MR. SCHAUER: Okay, I'm
10  referring now to Exhibit AH-3.
11    (Document marked AH Exhibit No.
12  3 for identification.)
13    BY MR. SCHAUER:
14  Q.  I am referring now to Exhibit AH-3,
15  which is a document, it says Document 55-1,
16  page 10 of 10 at the top, actually. And a
17  filing I believe from Ms. Acey.
18  Is this a copy of the Proof of Service
19  that was sent to you as part of that e-mail
20  trail, Page 2, that we just identified? And
21  did you utilize this document to try and
22  assist you in determining whether, in fact,
23  the subpoena was ever received by anybody at
24  Infinite Blue?

Page 18

1  In fact, even if you had, had you
2  authorized anybody at Infinite Blue to accept
3  service of a subpoena on you for a matter not
4  involving Infinite Blue?
5  A.  No.
6    MS. ACEY: Attorney Schauer,
7  I'm sorry. It seems like you put three
8  questions one after the other. Is it
9  possible for you to go one question at
10  a time.
11    BY MR. SCHAUER:
12  Q.  Is this Proof of Service a document
13  that you utilized in attempting to find some
14  subpoena that might have been served at the
15  building in which Infinite Blue has its
16  offices?
17  A.  Yes.
18  Q.  Did you authorize anybody there in
19  those offices in any event to accept a
20  subpoena to be served on you in an individual
21  capacity not related to your employment with
22  Infinite Blue?
23  A.  No.
24    THE REPORTER: I'm sorry, was

Page 19

1  that no?
2    THE WITNESS: No.
3    THE REPORTER: Keep your voice
4  up, please.
5    BY MR. SCHAUER:
6  Q.  Were you, at any time, prior -- we're
7  talking about conversations between Randy
8  Schauer and you prior to becoming represented
9  by Randy Schauer -- where you were advised in
10  any way to attempt to avoid or, you know, not
11  accept a subpoena that somebody might be
12  trying serve on you?
13  A.  No.
14  Q.  In fact, you then agreed to appear for
15  this deposition despite having never found or
16  seen this subpoena that ostensibly was served
17  by Joe Horton, as reflected in Exhibit AH-3;
18  is that correct?
19  A.  Yes.
20    MR. SCHAUER: I have no more
21  questions.
22    MS. ACEY: Okay. Well, I don't
23  have a recross. So, it think this
24  deposition has occurred, and we're

Page 20

1  good.
2    MR. SCHAUER: Okay. Thank you.
3  I will send the exhibits to the
4  court reporter as last time.
5    THE REPORTER: Okay. Very
6  good. Thank you.
7    - - -
8    (Witness excused.)
9    (Deposition via Zoom concluded
10  at 2:00 p.m.)
11    - - -
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 21

```
 1                I N D E X
 2
 3   WITNESS:                        PAGE
 4   ALEXA HEISLER
 5   By Ms. Acey.............................3
 6   By Mr. Schauer.........................14
 7
 8
 9           E X H I B I T S
10   NO.           DESCRIPTION          PAGE
11   AH-1    E-mail from Mr. Schauer      14
             to Alexa Heisler dated
12           March 8th, 2024
13   AH-2    E-mail exchange              15
14   AH-3    Document 55-1, Proof         17
             of Service
15
16
        (Also attached but not marked:  LinkedIn
17   account for Ms. Heisler.)
18
                    -  -  -
19
20
21
22
23
24
```

Page 22

```
 1             CERTIFICATE
 2
 3        I HEREBY CERTIFY that the proceedings,
 4   evidence and objections are contained fully
 5   and accurately in the stenographic notes taken
 6   by me upon the deposition of ALEXA HEISLER,
 7   taken on Monday, April 1, 2024, via web
 8   conference connection and subject to the
 9   clarity and completeness of the computer
10   transmission, and that this is a true and
11   correct transcript of same.
12
13
14   _____
15             DONNA HUNTER,
               Registered Professional Reporter
16             and Notary Public
17
18
19        (The foregoing certification of this
20   transcript does not apply to any reproduction
21   of the same by any means, unless under the
22   direct control and/or supervision of the
23   certifying reporter.)
24
```

## A

**able (3)**
3:11;7:18,22
**accept (3)**
18:2,19;19:11
**accessible (1)**
7:3
**account (4)**
6:15,16,18;7:2
**accurate (2)**
6:21;7:1
**Acey (24)**
3:3,16,23;4:17;5:1,
5,9,20;6:1,7,11;8:19,
20;9:11,14,20;10:15,
18,22;14:6;16:11;
17:17;18:6;19:22
**actually (2)**
15:10;17:16
**advice (1)**
9:2
**advised (1)**
19:9
**affirmed (1)**
3:8
**afternoon (1)**
12:24
**again (1)**
15:16
**agree (1)**
3:5
**agreed (1)**
19:14
**agreement (2)**
11:13,17
**AH (3)**
14:16;15:12;17:11
**AH-1 (3)**
14:15,21;15:21
**AH-2 (2)**
15:10,18
**AH-3 (3)**
17:10,14;19:17
**ahead (1)**
8:15
**ALEXA (5)**
3:7;4:2;14:13;
15:17;16:1
**alleged (1)**
13:4
**allowing (1)**
5:13
**Andrea (2)**
14:2,4
**anymore (1)**
10:20
**appear (1)**
19:14
**appears (1)**
7:1
**Applications (1)**

4:9
**appointed (1)**
7:15
**around (1)**
10:4
**assist (1)**
17:22
**attached (1)**
15:23
**attempt (1)**
19:10
**attempting (1)**
18:13
**attend (2)**
8:5,7
**attendance (1)**
10:1
**attended (4)**
8:1,3,6,8
**attending (1)**
8:21
**Attorney (5)**
5:17,20;10:10;
11:1;18:6
**attorney/client (2)**
15:5,6
**authorize (1)**
18:18
**authorized (1)**
18:2
**avoid (1)**
19:10
**aware (5)**
7:24;8:2;11:19,23;
12:13

## B

**back (2)**
13:17;16:20
**Barbara (3)**
9:24;11:7,8
**barring (2)**
9:9,17
**based (1)**
10:5
**basics (1)**
10:13
**bear (1)**
5:16
**became (1)**
7:19
**becoming (1)**
19:8
**behalf (2)**
10:11;11:2
**below (2)**
13:8,21
**Blue (13)**
4:9;6:23;13:18,22;
14:1;16:13,14,15;
17:24;18:2,4,15,22
**body (1)**

15:20
**bottom (2)**
15:19;16:1
**breakout (1)**
10:6
**brief (2)**
10:13;14:9
**building (1)**
18:15

## C

**call (3)**
8:9;11:15;13:2
**called (2)**
13:8,9
**came (2)**
6:5;10:8
**can (8)**
4:19;6:12;8:14,17;
9:5;10:19;11:12;13:3
**capacity (1)**
18:21
**case (1)**
5:6
**chat (1)**
5:12
**circle (1)**
13:17
**communication (3)**
9:10,18;12:9
**communications (5)**
8:11;9:2,4;12:3,12
**company (2)**
11:17;13:15
**concluded (1)**
20:9
**conference (1)**
3:19
**confirm (1)**
6:2
**contacts (1)**
13:8
**contract (3)**
11:19,23;12:13
**conversation (1)**
16:6
**conversations (1)**
19:7
**conveying (1)**
11:13
**copy (7)**
4:23;13:3;14:19;
15:16;16:4,12;17:18
**counsel (6)**
3:5;4:21;7:10,14,
16,19
**County (1)**
3:20
**course (1)**
16:7
**Court (2)**
5:11;20:4

**currently (1)**
4:3

## D

**D'A-N-N (1)**
17:4
**D'Annunzio (5)**
14:3,4;16:23;17:2,
5
**date (2)**
7:18;15:17
**dated (2)**
14:13;16:5
**dates (1)**
6:20
**day (3)**
7:22;15:8;16:7
**days (1)**
4:11
**defendant (2)**
8:1,3
**departure (1)**
6:23
**deposition (6)**
3:4;12:20,22;
19:15,24;20:9
**described (1)**
16:11
**despite (1)**
19:15
**determining (1)**
17:22
**difficult (1)**
3:15
**direct (1)**
9:1
**document (14)**
4:19,20,22;5:6;6:5,
9,13;14:16;15:12;
17:11,15,15,21;18:12
**done (2)**
10:16;16:19
**down (1)**
15:21
**drop (1)**
8:9
**during (5)**
7:11;8:12,21;
11:14;16:7

## E

**either (1)**
13:11
**e-mail (13)**
4:20;5:4,9;14:13,
22;15:1,9,20,23,24;
24;16:4;17:19
**e-mailed (2)**
12:14,23
**e-mails (1)**
15:16

**employed (2)**
4:3,5
**employer (1)**
4:8
**employment (3)**
7:7,11;18:21
**end (1)**
7:6
**essentially (1)**
16:9
**EV (4)**
7:7,8;10:11;11:2
**Evans (1)**
13:14
**even (1)**
18:1
**event (1)**
18:19
**EV's (1)**
11:14
**exactly (1)**
12:6
**examined (1)**
3:8
**exchange (1)**
16:4
**exchanged (1)**
9:23
**excused (1)**
20:8
**Exhibit (9)**
14:16,21;15:12,18;
16:19;17:10,11,14;
19:17
**exhibits (1)**
20:3
**experience (5)**
6:18,20;9:8,17;
10:13
**extent (1)**
9:4

## F

**fact (3)**
17:22;18:1;19:14
**far (1)**
9:16
**few (1)**
14:8
**filed (1)**
5:5
**filing (1)**
17:17
**Financial (1)**
13:13
**find (2)**
13:15;18:13
**fine (1)**
9:6
**first (5)**
9:16;12:19,22;
13:13;14:10

**five (1)**
  10:4
**floor (1)**
  13:13
**follows (1)**
  3:9
**followup (1)**
  15:9
**Forge (1)**
  13:13
**form (1)**
  8:14
**formerly (1)**
  10:11
**found (1)**
  19:15
**Fox (1)**
  3:20
**frankly (1)**
  11:10
**Friday (1)**
  12:24
**Fridays (1)**
  4:15

**G**

**gave (1)**
  10:24
**General (3)**
  7:10,16,19
**good (2)**
  20:1,6
**group (1)**
  10:6
**guess (1)**
  7:13

**H**

**hearing (3)**
  8:10,23;14:23
**HEISLER (7)**
  3:7,24;4:2;6:12;
  14:13;15:17;16:1
**Heisler's (1)**
  4:20
**Hey (1)**
  12:24
**hired (1)**
  7:14
**home (3)**
  4:10,13,14
**Horton (1)**
  19:17
**hours (1)**
  10:4

**I**

**identification (3)**
  14:17;15:13;17:12
**identified (1)**

**15:20;17:20**
**image (1)**
  15:23
**include (1)**
  5:10
**incorrectly (1)**
  17:7
**indication (1)**
  15:22
**individual (1)**
  18:20
**Induct (5)**
  7:7,8;10:11;11:2,
  14
**Infinite (12)**
  4:9;6:23;13:18,22;
  14:1;16:14,15;17:24;
  18:2,4,15,22
**information (2)**
  6:19;9:23
**initial (1)**
  15:24
**into (1)**
  5:12
**introduced (1)**
  15:2
**involving (1)**
  18:4

**J**

**Joe (1)**
  19:17

**K**

**Keep (1)**
  19:3
**kids (1)**
  4:15
**known (1)**
  10:12

**L**

**laptop (1)**
  5:24
**last (6)**
  11:3,11,16;12:18;
  16:2;20:4
**lead (1)**
  16:10
**learned (1)**
  15:2
**left (1)**
  16:12
**legal (2)**
  7:14;9:2
**LinkedIn (4)**
  6:15,16,17;7:5
**LLC (1)**
  4:9
**long (1)**

**3:5**
**Longo's (1)**
  5:21
**look (2)**
  14:20;16:10
**looks (1)**
  5:13

**M**

**manager (1)**
  17:6
**March (6)**
  7:8;13:1;14:14;
  15:17;16:5,7
**mark (1)**
  15:10
**marked (4)**
  14:16;15:12,18;
  17:11
**marking (1)**
  14:15
**matter (1)**
  18:3
**may (1)**
  5:1
**May-Mon (2)**
  10:1;11:3
**MCR (1)**
  3:3
**mean (2)**
  7:12,20
**Media (1)**
  5:11
**mediation (12)**
  7:24;8:6,12,22;9:9,
  19,24;11:14,21,24;
  12:4,10
**mediators (8)**
  10:7,8;11:9,20,24;
  12:3,9,12
**medication (2)**
  8:2,5
**Melissa (1)**
  13:14
**mentioned (2)**
  11:5;16:24
**met (1)**
  10:7
**might (2)**
  18:14;19:11
**mind (1)**
  5:2
**minute (2)**
  4:18;5:16
**Momentum (3)**
  10:11,12;16:13
**Montgomery (1)**
  3:20
**month (1)**
  7:22
**more (2)**
  16:19;19:20

**morning (1)**
  10:3
**most (2)**
  4:7;6:22
**move (1)**
  16:18
**myself (3)**
  8:1,3;10:2

**N**

**name (11)**
  4:1,7;5:21;9:21,22;
  11:1,3,6;13:24;14:2;
  16:23
**names (1)**
  11:11
**need (1)**
  10:20
**notice (1)**
  12:22

**O**

**object (1)**
  8:13
**obviously (1)**
  9:3
**occurred (1)**
  19:24
**October (2)**
  7:15,16
**offered (1)**
  9:16
**office (4)**
  3:20;13:21;16:12;
  17:6
**Offices (3)**
  16:13;18:16,19
**often (1)**
  4:12
**one (7)**
  10:6;12:17;13:22;
  14:11;16:18;18:8,9
**only (2)**
  9:21;12:17
**ostensibly (1)**
  19:16
**Otherwise (1)**
  7:1
**out (1)**
  6:19
**outside (1)**
  8:11
**over (1)**
  12:23

**P**

**page (2)**
  17:16,20
**part (3)**
  9:16;11:16;17:19

**partially (1)**
  8:6
**parties (1)**
  8:12
**parts (1)**
  8:7
**Patti (1)**
  10:2
**people (1)**
  3:14
**perfect (1)**
  6:7
**please (4)**
  4:1;5:16;14:11;
  19:4
**pm (1)**
  20:10
**point (2)**
  15:4,8
**possible (1)**
  18:9
**Post (1)**
  11:4
**previously (1)**
  15:20
**prior (2)**
  19:6,8
**privacy (1)**
  7:5
**private (1)**
  7:3
**privately (1)**
  9:20
**privileged (3)**
  9:3,9,17
**pronounce (1)**
  14:2
**Proof (3)**
  13:6;17:18;18:12
**provide (1)**
  15:8
**publically (1)**
  7:2
**put (4)**
  5:12;6:19;15:11;
  18:7

**R**

**Randall (1)**
  15:16
**Randy (6)**
  12:23;14:24;15:24;
  16:5;19:7,9
**read (1)**
  3:11
**recalibrate (1)**
  10:23
**recall (7)**
  7:4;8:10,22;9:21;
  11:10,12;12:1
**recalling (1)**
  11:10

receive (3)
    12:2,8;13:16
received (6)
    6:3;12:11,21;13:1,
    22;17:23
recent (2)
    4:7;6:22
recently (1)
    4:5
receptionist (5)
    13:12,18,21,24;
    17:7
recollection (1)
    10:5
record (3)
    3:14,18;4:1
recorded (1)
    3:5
recross (1)
    19:23
referenced (1)
    14:23
referred (1)
    7:19
referring (2)
    17:10,14
reflected (1)
    19:17
regarding (3)
    14:23,24;16:8
related (2)
    9:2;18:21
relationship (1)
    15:6
remember (1)
    9:22
remotely (1)
    3:8
Rensel (1)
    10:2
rephrase (2)
    8:18;12:5
REPORTER (7)
    16:22;17:3,8;
    18:24;19:3;20:4,5
REPORTING (2)
    3:3;5:11
represented (1)
    19:8
requested (1)
    3:4
right (7)
    3:24;5:7;6:4,13;
    14:6,12;15:15
room (1)
    3:19
Rothschild (1)
    3:21
running (1)
    5:24

**S**

same (1)
    4:24
saying (2)
    7:21;12:24
SCHAUER (28)
    3:10,17;5:1,7,17,
    19,23;6:4;8:13,24;
    10:15,21;14:8,18,24;
    15:14,16;16:1,5;17:9,
    13;18:6,11;19:5,8,9,
    20;20:2
screen (4)
    4:21;5:15;6:8;
    15:11
scroll (2)
    15:19,21
second (3)
    14:11;16:18,20
secretary/receptionist (1)
    13:10
section (1)
    6:18
seeing (2)
    8:10,22
seems (1)
    18:7
Send (3)
    5:23;13:3;20:3
sent (2)
    6:2;17:19
separate (1)
    4:24
separately (1)
    10:8
September (1)
    12:15
Serena (1)
    9:22
serve (1)
    19:12
served (7)
    12:24;13:4,7,9;
    18:14,20;19:16
Service (5)
    13:6,11;17:18;
    18:3,12
sessions (1)
    10:7
set (1)
    9:20
settings (1)
    7:5
setup (1)
    9:23
share (7)
    4:19,21;5:15;6:8;
    7:18;9:1;14:10
sharing (3)
    6:13;10:16,19
show (1)
    15:10
sick (2)
    4:15,16

side (1)
    10:1
sign (1)
    3:11
somebody (1)
    19:11
soon (1)
    16:19
sorry (6)
    7:20;10:18,23;
    12:5;18:7,24
specific (1)
    11:12
specifics (1)
    10:9
spoke (7)
    10:10;11:2,13;
    13:12,18,20,20
start (2)
    6:9;8:8
started (2)
    10:3,5
state (2)
    3:24;12:18
stated (2)
    13:6;17:7
still (1)
    5:18
stop (2)
    10:16,19
string (1)
    15:23
subpoena (13)
    12:19,21;13:15;
    15:3;16:8,10,12;
    17:23;18:3,14,20;
    19:11,16
subpoenaed (1)
    14:24
suggested (1)
    9:20
summary (1)
    9:8
supposed (1)
    10:4
sure (7)
    4:23;5:21;8:16,19;
    9:5;12:1,16

**T**

talk (1)
    9:5
talking (1)
    19:7
telephone (1)
    16:6
terms (4)
    11:14,20,23;12:14
testified (1)
    3:9
testimony (2)
    10:24;14:23

three (1)
    18:7
throughout (1)
    11:15
times (1)
    6:20
title (1)
    7:13
top (1)
    17:16
Tracy (3)
    9:24;11:6,8
trail (1)
    17:20
transcript (1)
    3:12
transition (1)
    7:9
transitions (2)
    7:11,12
tried (1)
    13:15
true (1)
    16:3
try (1)
    17:21
trying (2)
    9:18;19:12
two (1)
    12:17

**U**

up (2)
    9:20;19:4
updated (1)
    6:22
utilize (1)
    17:21
utilized (1)
    18:13

**V**

Valley (1)
    13:13
via (1)
    20:9
view (1)
    12:19
virtual (1)
    9:19
voice (1)
    19:3

**W**

waiting (1)
    16:23
way (2)
    5:14;19:10
Wednesdays (1)
    4:14

witness (13)
    3:11,18;8:16;9:1,5,
    7,12;14:20,20;17:1,5;
    19:2;20:8
woman's (1)
    9:22
words (1)
    11:13
work (1)
    4:10
worked (3)
    4:12,14;13:14

**Y**

year (1)
    7:21

**Z**

Zoom (3)
    3:14;5:12;20:9

**1**

1 (1)
    14:17
10 (2)
    17:16,16

**2**

2 (2)
    15:13;17:20
2:00 (1)
    20:10
2019 (1)
    7:15
2022 (1)
    7:16
2023 (1)
    7:8
2024 (4)
    14:14;15:18;16:5,8
27th (1)
    12:15

**3**

3 (1)
    17:12

**5**

55-1 (1)
    17:15
5th (1)
    13:1

**6**

65-3 (1)
    5:6

**8**

**8 (1)**
   16:5
**8th (3)**
   14:14;15:17;16:8

8.   Ex 5. 03-28-2024 Patti Rensel Deposition

Transcript

# In The Matter Of:

*Acey vs.*
*Induct EV*

---

*Patti Rensel*
*March 28, 2024*

---

*Media Court Reporting*
*211 North Olive Street, Suite 210*
*Media, PA   19063*
*610.566.0805*
*www.mediacourtreporting.com*

Original File 032824PR.txt
Min-U-Script® with Word Index



Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT
 2     FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3                  - - -
 4
   ASSATA ACEY,            :
 5         Plaintiff      :
 6      vs.               :Docket No.2:23-cv-01438
 7   INDUCT EV,            :
 8         Defendant      :
 9                  - - -
10         Thursday, March 28, 2024
11                  - - -
12
13        Deposition via Zoom of PATTI RENSEL,
14   taken pursuant to notice on the above date
15   beginning at approximately 1:40 p.m., before
16   Donna Hunter, Registered Professional Reporter
17   and Notary Public.
18                  - - -
19
20            MEDIA COURT REPORTING
21      211 North Olive Street, Suite 210
                Media, PA  19063
22                610.566.0805
          mcr@mediacourtreporting.com
23          www.mediacourtreporting.com
24
```

Page 2

```
 1   APPEARANCES:
 2
         ASSATA ACEY, pro se
 3       aceyassata@gmail.com
 4            Plaintiff
 5
     RANDALL C. SCHAUER, ESQUIRE
 6   ALBERTO LONGO, ESQUIRE
         FOX ROTHSCHILD LLP
 7       747 Constitution Drive
         Suite 100
 8       Exton, PA 19341
 9
10       Counsel for Defendant
         rschauer@foxrothschild.com
11
12
13
14
15       (INDEX at end of transcript)
16
17
18
19
20
21
22
23
24
```

Page 3

1    - - -
2    . . .PATTI RENSEL, having been
3 remotely sworn, was examined and
4 testified as follows . . .
5    - - -
6    MR. SCHAUER: I am representing
7 the defendant, as well as this witness,
8 for purposes of this deposition.
9    We don't waive signing of the
10 deposition, but otherwise are amenable
11 to the usual stipulations.
12    BY MS. ACEY:
13 Q.  Good morning, Ms. Rensel.  Could you
14   confirm for me the correct way to pronounce
15   your name?
16 A.  Patti Rensel.
17 Q.  Rensel, all right.  I'm so sorry for
18   mispronouncing it earlier.
19   Have you been employed by Induct EV?
20 A.  Could you repeat the question?
21 Q.  Sure.  Were you at any time employed by
22   Induct EV?
23 A.  Yes.
24 Q.  What were the dates of your employment?

Page 4

1 A.  I don't recall.
2 Q.  Understood.  Are you able to recall the
3   date that you stopped working for Induct EV?
4 A.  No.
5 Q.  Do you recall the month or the year
6   that you stopped working for Induct EV?
7 A.  The year was 2023.
8 Q.  To confirm, do you recall the month or
9   only the year?
10 A.  I do not recall the month.  I do recall
11   the year.
12 Q.  Okay.  What is your impression of why
13   this case was started?
14    MR. SCHAUER: Objection, but
15 you can answer the question if you can.
16    MS. ACEY: Actually, I would
17 like to retry the question.
18    BY MS. ACEY:
19 Q.  Do you recall any communication to you
20   from co-workers at Induct EV about what my
21   employment was like with the defendant?
22    MR. SCHAUER: I'm going to
23 object but if you can answer it, go
24 ahead.

Page 5

1     THE WITNESS: I can't answer --
2   can you rephrase that question.
3     MS. ACEY: Sure.
4     BY MS. ACEY:
5   Q.  Has anyone spoken to you about my
6   employment with the defendant outside of
7   counsel?
8   A.  I can't answer that question the way
9   it's being asked.  Can you rephrase it for me?
10  Q.  Do you recall hearing anything about my
11  employment with the defendant?
12  A.  No.
13  Q.  Do you recall discussing my complaint
14  with employees of the defendant?
15  A.  No.
16  Q.  Do you recall discussing my complaint
17  with Diana Wilmes?
18    MR. SCHAUER: Are you referring
19  to the complaint filed in this case
20  because --
21    MS. ACEY: I understand.
22  That's a reasonable question.
23    BY MS. ACEY:
24  Q.  Do you recall discussing the claims of

Page 6

1   my EEOC Complaint with Diana Wilmes?
2   A.  I don't -- it's very difficult to
3   answer your question because it's so broad.
4   Could you be more specific?
5   Q.  Do you recall initiating or
6   participating in any conversations about the
7   allegation of my EEOC Complaint?
8   A.  I don't recall specific conversations
9   about the EEOC Complaint.
10  Q.  Thank you.  Did you attend the
11  mediation on behalf of the defendant?
12  A.  I attended mediation.
13  Q.  Did you attend medication on behalf of
14  the defendant to settle my EEOC Complaint?
15  A.  I don't know.  I don't know if that's
16  what it's considered, so I don't know how to
17  answer that question.
18  Q.  Okay.  To your knowledge, what was the
19  medication for?
20  A.  I believe you requested the mediation.
21  Q.  To your knowledge, what was the
22  defendant's goal in attending the mediation?
23  A.  I don't recall.
24  Q.  During mediation, do you recall hearing

Page 7

1   me at any time stating an agreement of any
2   kind?  Actually, strike that.
3   Do you recall any verbal agreement
4   being entered during mediation?
5   A.  Yes.
6   Q.  What is the verbal agreement that you
7   recall from mediation?
8   A.  You were asked to resign from
9   employment in exchange for compensation.
10  Q.  Do you recall who was relaying this
11  agreement, who was speaking about the details
12  of this agreement to me during mediation?
13  A.  I don't recall.  It was not me.
14  Q.  Do you recall any of the attorneys
15  present with you, May Mon Post or Alexa
16  Heisler, stating the details of this agreement
17  to me during the mediation?
18    MR. SCHAUER: Are you asking
19  about the agreement that the witness
20  just testified to?
21    MS. ACEY: Yes.
22    MR. SCHAUER: Thank you.
23  Sorry.
24    THE WITNESS: As I stated, I

Page 8

1   recall that that was presented to you,
2   and that it was agreed to.
3     BY MS. ACEY:
4   Q.  But, you do not recall whether that
5   agreement was verbalized, by the attorneys
6   present, to me the during mediation.  Said
7   with words, whether it was conveyed through
8   oral -- let me just restart this.
9   To confirm, do you recall the agreement
10  being communicated to me orally by either May
11  Mon Post or Alexa Heisler during that
12  mediation?
13  A.  Let me think about this for one moment.
14  Let me think about the question you are
15  asking.  It was communicated verbally.
16  Q.  By verbal, you do mean, like, orally.
17  A.  It was communicated -- yes, it was
18  communicated orally.
19  Q.  Do you recall whether it was
20  communicated orally by Alexa Heisler or May
21  Mon Post?
22  A.  I do not recall.
23  Q.  Do you recall whether that
24  communication was made by the mediators only?

Page 9

1  A. I do not recall.
2     MS. ACEY: Let's have a break
3  for about 10, 15 minute. Can we
4  reconvene at 9:30?
5     MR. SCHAUER: It's your
6  deposition, sure. I mean, you
7  initially projected like an
8  hour-and-a-half. Do you still
9  anticipate that; just if you care to
10  answer the question?
11     MS. ACEY: Yes. I think we are
12  still on schedule. Yes, I would like
13  to take a break until 9:30.
14     MR. SCHAUER: We will be back
15  on Zoom at 9:30.
16     MS. ACEY: All right, thank
17  you.
18     (Brief recess from 9:16 to
19  9:30.)
20     MS. ACEY: All right. I am so
21  sorry, but could you remind me again of
22  the pronunciation of your name?
23     THE WITNESS: Rensel.
24     MS. ACEY: Rensel, all right.

Page 10

1     BY MS. ACEY:
2  Q. What was your role at Induct EV?
3  A. Could you put a timeframe to that
4  question?
5  Q. What was your initial role at Induct
6  EV?
7  A. HR Director.
8  Q. What was your final role at Induct EV?
9  A. I don't recall my title when I left.
10  Q. DO YOU recall any changes to your
11  title?
12  A. There were changes to my title.
13  Q. Which changes do you recall?
14  A. I was hired as the HR Director. My
15  title changed a few times.
16  Q. What did your title change to?
17  A. I honestly don't recall. I --
18  Q. Would you describe -- oh, I'm sorry.
19  A. I am trying to remember. I had several
20  titles while I was there; I don't recall.
21  Q. Would you normally describe yourself --
22  just, actually, before I ask this question, I
23  just want to be clear that it is meant
24  objectively, and not necessarily to be

Page 11

1  offensive, or anything like that.
2  But, would you normally describe
3  yourself as forgetful?
4  A. No.
5  Q. Are you currently employed?
6  A. Yes.
7  Q. What is your current role?
8  A. Would you be more specific?
9  Q. What is your current title?
10  A. Director of Operations.
11  Q. Who is your employer?
12  A. The Spearhead Group.
13  Q. How many years of experience do you
14  have in Human Resources?
15  A. I will need a second to count.
16     MR. SCHAUER: Off the record.
17     (Discussion held off the
18  record.)
19     MR. SCHAUER: Back on.
20     THE WITNESS: 40 years.
21     BY MS ACEY:
22  Q. Do you have a degree? Do you have a
23  Bachelor's Degree or a Graduate Degree?
24  A. Could you clarify that question?

Page 12

1  Q. Sure. Have you completed any higher
2  education?
3  A. Yes.
4  Q. What higher education have you
5  completed?
6  A. I have a Bachelor's Degree.
7  Q. What was your Bachelor's Degree in?
8  A. Bachelor of Science in Business
9  Administration with a concentration in
10  Personnel and Labor Relations.
11  Q. Do you have any other qualifications,
12  aside from your experience in your Bachelor's
13  Degree for Human Resources?
14  A. Yes.
15  Q. What are those qualifications?
16  A. I am certified as a Master Trainer by
17  the Zenger-Miller Corporation as a trainer and
18  a certified trainer.
19  I have taught Human Resources classes
20  at Welling College, Community College, DCC,
21  and Rowan College of Burlington County for 20
22  years.
23  And I've served in the role of Human
24  Resources Director for most of my career.

Page 13

1  Q.  Have you ever accepted a job offer
2  without receiving it in writing?
3      MR. SCHAUER: Objection.  If
4  you can answer, go ahead.
5      I apologize.  The objection is
6  for the record, but please answer the
7  question.
8      THE WITNESS: Yes, yes.
9      BY MS. ACEY:
10 Q.  Have you ever entered a Multi-Term
11 Agreement without reviewing it in writing?
12     MR. SCHAUER: Objection.  Go
13 ahead.
14     THE WITNESS: I don't
15 understand the question.
16     BY MS. ACEY:
17 Q.  Okay.  For the purpose of this
18 deposition, a Multi-Term Agreement would be
19 defined as a binding legal agreement that
20 involves multiple terms, such as monetary
21 terms, timing of performance, things of that
22 nature?
23 A.  So, could you repeat the question.
24 Q.  Yes.  Have you ever -- actually, I'll

Page 14

1  rephrase the question partially.
2  Have you ever, through your signature,
3  executed a Multi-Term Agreement without
4  receiving it in writing?
5  A.  I don't understand the question.
6  Q.  Have you ever made any multi-term
7  agreement without seeing it in writing?
8      MR. SCHAUER: Objection.
9      THE WITNESS: I'm really sorry,
10 that question is so vague.  I can't
11 answer the question.
12     BY MS. ACEY:
13 Q.  All right.  Again, for the purposes of
14 this deposition, a Multi-Term Agreement is
15 defined as a binding legal agreement.  This
16 time I would state whether oral or written,
17 that involves multiple terms.  A term being
18 exemplified as a monetary amount associated,
19 like, if you say:  We agree to provide this
20 product for the amount of $50 at the time of
21 April 12th, 2021.
22 Does this definition and example make
23 sense to you?
24 A.  I understand the term.

Page 15

1  Q.  Do you have any questions about my
2  example?
3  A.  I understand your example.
4  Q.  Have you orally, or in writing, made
5  any multi-term agreements without reviewing
6  those agreements in writing?
7      MR. SCHAUER: Objection.  Go
8  ahead.
9      THE WITNESS: Well, I can't
10 answer your question because you're
11 asking if I orally, or in writing, ever
12 did something that I didn't see in
13 writing.  So I can't answer that
14 question.
15     BY MS. ACEY:
16 Q.  So are you stating that you can't make
17 -- to clarify:  Are you saying that you can't
18 make a written agreement to an agreement that
19 you can't see in writing?  Is that what you're
20 saying?
21     MR. SCHAUER: Objection.
22     THE WITNESS: I can't answer
23 the question the way it's being asked.
24     MS. ACEY: Thank you.

Page 16

1      BY MS. ACEY:
2  Q.  Did you attend the mediation virtually?
3  A.  Yes.
4      MS. ACEY: Okay.  I don't have
5  any further question.
6      Attorney Schauer, is there
7  anything that you want to ask?
8      MR. SCHAUER: Yes, I have a few
9  questions, if I may.
10     BY MR. SCHAUER:
11 Q.  Can you please describe what your
12 role -- r-o-l-e, I know I don't pronounce that
13 well -- was in attending the mediation between
14 Momentum and Ms. Acey?
15 A.  At the time of the mediation, I was the
16 HR director, and I was asked to attend.
17 Q.  Were there others there who, if you
18 will, were the primary spokesperson or leads
19 spokesperson for Momentum for purposes of the
20 mediation?
21 A.  Others -- yes.  Others were
22 spokespeople, yes.
23 Q.  And, who was that?
24 A.  May Mon, the attorney.  I do not recall

Page 17

1  if anyone else spoke.
2  Q.  When you say anyone else, do you mean
3  anyone else on behalf of Momentum?
4  A.  Oh, yes, correct.  On behalf of
5  Momentum, I do not recall if anyone else
6  spoke.
7      MR. SCHAUER: Give me second,
8  please.
9      I am going to share a document
10  here, and I am going to refer to it as
11  document PR-1, as in Patti Rensel-1.
12     (Document marked PR Exhibit No.
13  1 for identification.)
14     MR. SCHAUER: Ms. Acey, you saw
15  this document yesterday; it's been
16  produced in discovery.  It was used as
17  an exhibit in a deposition, as here.
18     MS. ACEY: Yes.  I just want to
19  clarify, Attorney Schauer, my last --
20  well, now, my maiden name.  My maiden
21  name is pronounced Acey.
22     MR. SCHAUER: I'm sorry.
23  Okay, I'll do my best.
24     Thank you.

Page 18

1      BY MR. SCHAUER:
2  Q.  Okay.  I will refer to this document as
3  Exhibit PR-1, and the first page of the
4  document appears to be an e-mail from Ms. Acey
5  to May Mon Post, yourself, and some others
6  from Tuesday, September 27th.
7  Do you see that at the top of the first
8  page?
9  A.  Yes.
10  Q.  Can everybody see my cursor?
11  A.  Yes, I can.
12     MS. ACEY: I can see it.
13     MR. SCHAUER: Thank you.
14     BY MR. SCHAUER:
15  Q.  And here at about the fifth line down
16  on the first page of this PR-1, there is a
17  statement:  In mediation, I did agree to a
18  verbal agreement at which I would resign and
19  dismiss existing claims (prior to Sep 19) in
20  return for a settlement amount of 50,000 from
21  Momentum Dynamics Corp.
22  Do you see that sentence?
23  A.  I do.
24  Q.  Do you have any recollection with

Page 19

1  respect to whether, in fact, there was an
2  agreement made to that Ms. Acey would resign
3  and dismiss claims and that in return there
4  would be a payment of $50,000 from Momentum
5  Dynamics Corp.
6  Do you have a recollection of such an
7  agreement at the mediation?
8  A.  Yes.
9  Q.  Do you have a recollection of whether
10  Ms. Acey agreed to those terms in the course
11  of that mediation?
12  A.  My recollection is that, yes, she
13  agreed to those terms in the mediation.
14  Q.  Let's move further down on this exhibit
15  PR-1.  I apologize, there's no page number on
16  the exhibit by in the lower right-hand corner,
17  there's a series of numbers ending in 51, so
18  we will go with that.
19  This is an e-mail from May Mon Post.
20  It says it was on September 27th, 2022 at
21     14:10, and it appears to set forth terms
22  agreed upon.
23  So let's look at the paragraph at the
24  bottom of the page I just described.  It says:

Page 20

1      You agreed to resign from employment with
2  Momentum effective immediately September 19th,
3  2022.
4  Do you recall whether that topic was
5  discussed and/or agreed upon at the mediation
6  with Ms. Acey?
7  A.  Yes.
8  Q.  And, was it?
9  A.  It was discussed.
10  Q.  Was it agreed upon by Ms. Acey?
11  A.  Yes.
12  Q.  The next part of that sentence says:
13  Further agreed to provide -- this is Ms.
14  Acey -- you further agreed to provide Momentum
15  with the said resignation letter on or before
16  September 23, 2022.
17  Do you recall discussions involving
18  Ms. Acey and Ms. Post regarding a resignation
19  letter on or before Sept 23, 2022 from
20  Momentum?
21  A.  I recall the agreement for the
22  resignation letter; I do not recall the date
23  that we -- this September 23rd, I don't recall
24  if that was discussed.

Page 21

1  Q.  Thank you.  There is also a provision
2  in the communication from May Mon Post.  It
3  says you, and that would be Ms. Acey, agreed
4  to provide Momentum with a verification form
5  from a medical provider on or before
6  September 23, 2022, returning you to return to
7  work on full duty with or without
8  restrictions.
9  Do you recall that term being discussed
10  in the mediation involving Ms. Acey and
11  Momentum?
12  A.  I recall the discussion; I recall the
13  agreement.  I do not recall the date of
14  September 23rd being discussed.
15  Q.  And, when you say "discussed," was that
16  a discussion involving Ms. Acey and I guess
17  Ms. Post?
18  A.  Yes.  I recall the discussion about the
19  verification form for medical provider.  I
20  recall the agreement of the medical provider.
21  Q.  So the next statement in this e-mail
22  from May Mon Post says:  You, that would be
23  Ms. Acey, agreed to a general release,
24  non-disparagement and confidentially, and

Page 22

1  Momentum agreed to provide neutral reference.
2  Do you remember that particular set of
3  terms having been discussed at the mediation
4  with Ms. Acey?
5  A.  Can you divide the question into
6  specifics on that sentence because some of
7  that, there are parts of that, that I can say
8  I remember, and parts that I don't.
9  Q.  Okay.  Do you recall discussion
10  regarding a general release at the mediation
11  between Ms. Acey and Momentum?
12  A.  I do not recall.
13  Q.  Do you recall discussions regarding a
14  non-disparagement -- I'm going to say a
15  clause -- in the mediation involving Ms. Acey
16  and Momentum?
17  A.  I don't recall.
18  Q.  Do you recall discussions regarding a
19  confidentiality clause in the Mediation
20  between Ms. Acey and Momentum?
21  A.  I don't recall.
22  Q.  Do you recall discussions regarding
23  Momentum providing Ms. Acey with a neutral
24  reference at the mediation between Ms. Acey

Page 23

1  and Momentum?
2  A.  I do recall that, yes.
3  Q.  Do you have any specific recollection
4  as to the discussion around the neutral
5  reference?
6  A.  I just recall it coming up in
7  discussion, that there was some discussion
8  about neutral reference.  I don't recall the
9  details of the rest of it.
10  Q.  Do you have a recollection as to
11  whether Ms. Acey agreed and concluded in this
12  resolution?
13  A.  I don't recall if she asked.
14  Q.  Okay.  The next line says that in
15  exchange for the above within 30 days of the
16  execution of the Settlement Agreement by you,
17  meaning Ms. Acey, Momentum agreed to pay the
18  settlement proceeds in the total amount of
19  $50,000 less deductions?
20  Do you recall discussion of that term,
21  meaning payment of the $50,000?
22  A.  I recall the amount of $50,000 being
23  discussed.  I do not recall the 30-day
24  execution of the settlement agreement.  I just

Page 24

1  don't remember that detail.
2  Q.  Were you involved in any way with
3  preparation of a settlement agreement or a
4  draft of a settlement agreement be provided to
5  Ms. Acey following?
6  A.  I wasn't involved in the preparation.
7  Q.  Do you know who prepared that as you
8  sit here today?
9  A.  Legal counsel.  I don't remember which
10  legal counsel, but legal counsel.
11     MR. SCHAUER: I don't have any
12  other questions.
13     MS. ACEY: I just want to
14  circle back with some additional
15  questions.  It's really just a few
16  questions.
17     BY MS. ACEY:
18  Q.  Ms. Rensel, do you recall any specific
19  wording or anything said by me to convey my
20  agreement during mediation?
21  A.  I do not.
22  Q.  Do you work from home?
23     MR. SCHAUER: Now?
24     BY MS. ACEY:

Page 25

1  Q.  Do you currently work from home?
2  A.  No -- that's a really hard question to
3  answer.  Could you be more specific?
4  Q.  Okay.  Do you usually now work from
5  home or report to a physical office?
6  A.  I do not normally work from home.
7  Q.  All right.  What is the city and state
8  of the office that you work in?
9     THE WITNESS:  Do I have to
10  answer that question?
11     MR. SCHAUER:  Go ahead, yes.
12     There is no objection, and you
13  haven't been directed not to, so yes.
14     THE WITNESS:  Okay.  So,
15  rephrase the question.
16     MS. ACEY:  Sure.
17     BY MS. ACEY:
18  Q.  What is the city and state of the
19  office that you work in?
20  A.  Yardley, Pennsylvania.
21     MS. ACEY:  Thank you.  No
22  further questions.
23     THE WITNESS:  May I clarify a
24  question that I couldn't remember the

Page 26

1  answer to?
2     MS. ACEY:  Sure.
3     THE WITNESS:  So you asked a
4  question about my titles when I was at
5  Momentum.  My title changed a lot.  I
6  was hired as the HR Director.  I was
7  promoted to another position -- I don't
8  remember what they called me at that
9  time.  Then, I was the Chief People
10  Officer.  And then my job title changed
11  again, after I was Chief People
12  Officer, very briefly to something else
13  before I left.
14     So, to your question, at one
15  point I was called the Chief People
16  Officer.  I may have had other titles
17  while I was there.
18     MS. ACEY:  Thank you very much.
19     THE WITNESS:  Of course.
20     MR. SCHAUER:  I have no further
21  questions.
22     Are you done with questions,
23  Ms. Acey?
24     MS. ACEY:  Yes, I think we can

Page 27

1  conclude this deposition.
2     MR. SCHAUER:  Actually, Ms.
3  Rensel, you are discharged, I guess is
4  the word; is that fair to say?
5     THE WITNESS:  Thank you.
6     MR. SCHAUER:  You're welcome.
7     - - -
8     (Witness excused.)
9     (Deposition concluded at 10:00
10  a.m.)
11     MR. SCHAUER:  Donna, do you
12  want me to e-mail you the exhibits that
13  have been referred to?
14     THE REPORTER:  Yes, and do you
15  want a copy of the transcript?
16     MR. SCHAUER:  Yes, please.
17     MS. ACEY:  And, I want a copy
18  of the transcript.
19     THE REPORTER:  Okay.  And, the
20  read and sign, I will send to you, Mr.
21  Schauer, to forward to Ms. Rensel.
22     MR. SCHAUER:  That's fine.
23     THE REPORTER:  All right, have
24  a good day.

Page 28

1
2           I N D E X.
3  Witness:                    Page
4  PATTI RENSEL
5  By Ms. Acey.........................3, 24
6  By Mr. Schauer......................16
7
8
9
10          E X H I B I T S
11  NO.        DESCRIPTION          PAGE
12  PR-1    E-mails from September, 2022   17
13
14
15
16
17          - - -
18
19
20
21
22
23
24

Acey vs.
Induct EV

Patti Rensel
March 28, 2024

Page 29

```
 1                    CERTIFICATE
 2
 3        I HEREBY CERTIFY that the proceedings,
 4   evidence and objections are contained fully
 5   and accurately in the stenographic notes taken
 6   by me upon the deposition of PATTI RENSEL,
 7   taken on Thursday, March 28, 2024, via web
 8   conference connection and subject to the
 9   clarity and completeness of the computer
10   transmission, and that this is a true and
11   correct transcript of same.
12
13
14        _____
15        DONNA HUNTER,
          Registered Professional Reporter
16        and Notary Public
17
18
19        (The foregoing certification of this
20   transcript does not apply to any reproduction
21   of the same by any means, unless under the
22   direct control and/or supervision of the
23   certifying reporter.)
24
```

**$**

**$50 (1)**
14:20
**$50,000 (4)**
19:4;23:19,21,22

**A**

**able (1)**
4:2
**above (1)**
23:15
**accepted (1)**
13:1
**ACEY (59)**
3:12;4:16,18;5:3,4,
21,23;7:21;8:3;9:2,
11,16,20,24;10:1;
11:21;13:9,16;14:12;
15:15,24;16:1,4,14;
17:14,18,21;18:4,12;
19:2,10;20:6,10,14,
18;21:3,10,16,23;
22:4,11,15,20,23,24;
23:11,17;24:5,13,17,
24;25:16,17,21;26:2,
18,23,24;27:17
**Actually (5)**
4:16;7:2;10:22;
13:24;27:2
**additional (1)**
24:14
**Administration (1)**
12:9
**again (3)**
9:21;14:13;26:11
**agree (2)**
14:19;18:17
**agreed (14)**
8:2;19:10,13,22;
20:1,5,10,13,14;21:3,
23;22:1;23:11,17
**agreement (29)**
7:1,3,6,11,12,16,
19;8:5,9;13:11,18,19;
14:3,7,14,15;15:18,
18;18:18;19:2,7;
20:21;21:13,20;
23:16,24;24:3,4,20
**agreements (2)**
15:5,6
**ahead (5)**
4:24;13:4,13;15:8;
25:11
**Alexa (3)**
7:15;8:11,20
**allegation (1)**
6:7
**amenable (1)**
3:10
**amount (5)**

14:18,20;18:20;
23:18,22
**and/or (1)**
20:5
**anticipate (1)**
9:9
**apologize (2)**
13:5;19:15
**appears (2)**
18:4;19:21
**April (1)**
14:21
**around (1)**
23:4
**aside (1)**
12:12
**associated (1)**
14:18
**attend (4)**
6:10,13;16:2,16
**attended (1)**
6:12
**attending (2)**
6:22;16:13
**Attorney (3)**
16:6,24;17:19
**attorneys (2)**
7:14;8:5

**B**

**Bachelor (1)**
12:8
**Bachelor's (4)**
11:23;12:6,7,12
**back (3)**
9:14;11:19;24:14
**behalf (4)**
6:11,13;17:3,4
**best (1)**
17:23
**binding (2)**
13:19;14:15
**bottom (1)**
19:24
**break (2)**
9:2,13
**Brief (1)**
9:18
**briefly (1)**
26:12
**broad (1)**
6:3
**Burlington (1)**
12:21
**Business (1)**
12:8

**C**

**called (2)**
26:8,15
**can (14)**

4:15,15,23;5:2,9;
9:3;13:4;16:11;
18:10,11,12;22:5,7;
26:24
**care (1)**
9:9
**career (1)**
12:24
**case (2)**
4:13;5:19
**certified (2)**
12:16,18
**change (1)**
10:16
**changed (3)**
10:15;26:5,10
**changes (3)**
10:10,12,13
**Chief (3)**
26:9,11,15
**circle (1)**
24:14
**city (2)**
25:7,18
**claims (3)**
5:24;18:19;19:3
**clarify (4)**
11:24;15:17;17:19;
25:23
**classes (1)**
12:19
**clause (2)**
22:15,19
**clear (1)**
10:23
**College (3)**
12:20,20,21
**coming (1)**
23:6
**communicated (5)**
8:10,15,17,18,20
**communication (3)**
4:19;8:24;21:2
**Community (1)**
12:20
**compensation (1)**
7:9
**complaint (7)**
5:13,16,19;6:1,7,9,
14
**completed (2)**
12:1,5
**concentration (1)**
12:9
**conclude (1)**
27:1
**concluded (2)**
23:11;27:9
**confidentiality (1)**
22:19
**confidentially (1)**
21:24
**confirm (3)**

3:14;4:8;8:9
**considered (1)**
6:16
**conversations (2)**
6:6,8
**convey (1)**
24:19
**conveyed (1)**
8:7
**copy (2)**
27:15,17
**corner (1)**
19:16
**Corp (2)**
18:21;19:5
**Corporation (1)**
12:17
**counsel (4)**
5:7;24:9,10,10
**count (1)**
11:15
**County (1)**
12:21
**course (2)**
19:10;26:19
**co-workers (1)**
4:20
**current (2)**
11:7,9
**currently (2)**
11:5;25:1
**cursor (1)**
18:10

**D**

**date (3)**
4:3;20:22;21:13
**dates (1)**
3:24
**day (1)**
27:24
**days (1)**
23:15
**DCC (1)**
12:20
**deductions (1)**
23:19
**defendant (7)**
3:7;4:21;5:6,11,14;
6:11,14
**defendant's (1)**
6:22
**defined (2)**
13:19;14:15
**definition (1)**
14:22
**degree (6)**
11:22,23,23;12:6,7,
13
**deposition (8)**
3:8,10;9:6;13:18;
14:14;17:17;27:1,9

**describe (4)**
10:18,21;11:2;
16:11
**described (1)**
19:24
**detail (1)**
24:1
**details (3)**
7:11,16;23:9
**Diana (2)**
5:17;6:1
**difficult (1)**
6:2
**directed (1)**
25:13
**Director (6)**
10:7,14;11:10;
12:24;16:16;26:6
**discharged (1)**
27:3
**discovery (1)**
17:16
**discussed (8)**
20:5,9,24;21:9,14,
15;22:3;23:23
**discussing (3)**
5:13,16,24
**Discussion (9)**
11:17;21:12,16,18;
22:9;23:4,7,7,20
**discussions (4)**
20:17;22:13,18,22
**dismiss (2)**
18:19;19:3
**divide (1)**
22:5
**document (6)**
17:9,11,12,15;18:2,
4
**done (1)**
26:22
**Donna (1)**
27:11
**down (2)**
18:15;19:14
**draft (1)**
24:4
**During (7)**
6:24;7:4,12,17;8:6,
11;24:20
**duty (1)**
21:7
**Dynamics (2)**
18:21;19:5

**E**

**earlier (1)**
3:18
**education (2)**
12:2,4
**EEOC (4)**
6:1,7,9,14

**effective (1)**
20:2
**either (1)**
8:10
**else (5)**
17:1,2,3,5;26:12
**e-mail (4)**
18:4;19:19;21:21;
27:12
**employed (3)**
3:19,21;11:5
**employees (1)**
5:14
**employer (1)**
11:11
**employment (6)**
3:24;4:21;5:6,11;
7:9;20:1
**ending (1)**
19:17
**entered (2)**
7:4;13:10
**EV (8)**
3:19,22;4:3,6,20;
10:2,6,8
**everybody (1)**
18:10
**examined (1)**
3:3
**example (3)**
14:22;15:2,3
**exchange (2)**
7:9;23:15
**excused (1)**
27:8
**executed (1)**
14:3
**execution (2)**
23:16,24
**exemplified (1)**
14:18
**Exhibit (5)**
17:12,17;18:3;
19:14,16
**exhibits (1)**
27:12
**existing (1)**
18:19
**experience (2)**
11:13;12:12

**F**

**fact (1)**
19:1
**fair (1)**
27:4
**few (3)**
10:15;16:8;24:15
**fifth (1)**
18:15
**filed (1)**
5:19

**final (1)**
10:8
**fine (1)**
27:22
**first (3)**
18:3,7,16
**following (1)**
24:5
**follows (1)**
3:4
**forgetful (1)**
11:3
**form (2)**
21:4,19
**forth (1)**
19:21
**forward (1)**
27:21
**full (1)**
21:7
**further (6)**
16:5;19:14;20:13,
14;25:22;26:20

**G**

**general (2)**
21:23;22:10
**goal (1)**
6:22
**Good (2)**
3:13;27:24
**Graduate (1)**
11:23
**Group (1)**
11:12
**guess (2)**
21:16;27:3

**H**

**hard (1)**
25:2
**hearing (2)**
5:10;6:24
**Heisler (3)**
7:16;8:11,20
**held (1)**
11:17
**higher (2)**
12:1,4
**hired (2)**
10:14;26:6
**home (4)**
24:22;25:1,5,6
**honestly (1)**
10:17
**hour-and-a-half (1)**
9:8
**HR (4)**
10:7,14;16:16;26:6
**Human (4)**
11:14;12:13,19,23

**I**

**identification (1)**
17:13
**immediately (1)**
20:2
**impression (1)**
4:12
**Induct (8)**
3:19,22;4:3,6,20;
10:2,5,8
**initial (1)**
10:5
**initially (1)**
9:7
**initiating (1)**
6:5
**into (1)**
22:5
**involved (2)**
24:2,6
**involves (2)**
13:20;14:17
**involving (4)**
20:17;21:10,16;
22:15

**J**

**job (2)**
13:1;26:10

**K**

**kind (1)**
7:2
**knowledge (2)**
6:18,21

**L**

**Labor (1)**
12:10
**last (1)**
17:19
**leads (1)**
16:18
**left (2)**
10:9;26:13
**legal (5)**
13:19;14:15;24:9,
10,10
**less (1)**
23:19
**letter (3)**
20:15,19,22
**line (2)**
18:15;23:14
**look (1)**
19:23
**lot (1)**
26:5

**lower (1)**
19:16

**M**

**maiden (2)**
17:20,20
**many (1)**
11:13
**marked (1)**
17:12
**Master (1)**
12:16
**May (11)**
7:15;8:10,20;16:9,
24;18:5;19:19;21:2,
22;25:23;26:16
**mean (3)**
8:16;9:6;17:2
**meaning (2)**
23:17,21
**meant (1)**
10:23
**mediation (27)**
6:11,12,20,22,24;
7:4,7,12,17;8:6,12;
16:2,13,15,20;18:17;
19:7,11,13;20:5;
21:10;22:3,10,15,19,
24;24:20
**mediators (1)**
8:24
**medical (3)**
21:5,19,20
**medication (2)**
6:13,19
**minute (1)**
9:3
**mispronouncing (1)**
3:18
**moment (1)**
8:13
**Momentum (19)**
16:14,19;17:3,5;
18:21;19:4;20:2,14,
20;21:4,11;22:1,11,
16,20,23;23:1,17;
26:5
**Mon (8)**
7:15;8:11,21;
16:24;18:5;19:19;
21:2,22
**monetary (2)**
13:20;14:18
**month (3)**
4:5,8,10
**more (3)**
6:4;11:8;25:3
**morning (1)**
3:13
**most (1)**
12:24
**move (1)**

**19:14**
**much (1)**
26:18
**multiple (2)**
13:20;14:17
**Multi-Term (6)**
13:10,18;14:3,6,14;
15:5

**N**

**name (4)**
3:15;9:22;17:20,21
**nature (1)**
13:22
**necessarily (1)**
10:24
**need (1)**
11:15
**neutral (4)**
22:1,23;23:4,8
**next (3)**
20:12;21:21;23:14
**non-disparagement (2)**
21:24;22:14
**normally (3)**
10:21;11:2;25:6
**number (1)**
19:15
**numbers (1)**
19:17

**O**

**object (1)**
4:23
**Objection (8)**
4:14;13:3,5,12;
14:8;15:7,21;25:12
**objectively (1)**
10:24
**Off (2)**
11:16,17
**offensive (1)**
11:1
**offer (1)**
13:1
**office (3)**
25:5,8,19
**Officer (3)**
26:10,12,16
**one (2)**
8:13;26:14
**only (2)**
4:9;8:24
**Operations (1)**
11:10
**oral (2)**
8:8;14:16
**orally (6)**
8:10,16,18,20;15:4,
11
**others (4)**

16:17,21,21;18:5
**otherwise (1)**
3:10
**outside (1)**
5:6

---

## P

**page (5)**
18:3,8,16;19:15,24
**paragraph (1)**
19:23
**part (1)**
20:12
**partially (1)**
14:1
**participating (1)**
6:6
**particular (1)**
22:2
**parts (2)**
22:7,8
**PATTI (3)**
3:2,16;17:11
**pay (1)**
23:17
**payment (2)**
19:4;23:21
**Pennsylvania (1)**
25:20
**People (3)**
26:9,11,15
**performance (1)**
13:21
**Personnel (1)**
12:10
**physical (1)**
25:5
**please (4)**
13:6;16:11;17:8;
27:16
**point (1)**
26:15
**position (1)**
26:7
**Post (9)**
7:15;8:11,21;18:5;
19:19;20:18;21:2,17,
22
**PR (1)**
17:12
**PR-1 (4)**
17:11;18:3,16;
19:15
**preparation (2)**
24:3,6
**prepared (1)**
24:7
**present (2)**
7:15;8:6
**presented (1)**
8:1
**primary (1)**

16:18
**prior (1)**
18:19
**proceeds (1)**
23:18
**produced (1)**
17:16
**product (1)**
14:20
**projected (1)**
9:7
**promoted (1)**
26:7
**pronounce (2)**
3:14;16:12
**pronounced (1)**
17:21
**pronunciation (1)**
9:22
**provide (5)**
14:19;20:13,14;
21:4;22:1
**provided (1)**
24:4
**provider (3)**
21:5,19,20
**providing (1)**
22:23
**provision (1)**
21:1
**purpose (1)**
13:17
**purposes (3)**
3:8;14:13;16:19
**put (1)**
10:3

---

## Q

**qualifications (2)**
12:11,15

---

## R

**read (1)**
27:20
**really (3)**
14:9;24:15;25:2
**reasonable (1)**
5:22
**recall (60)**
4:1,2,5,8,10,10,19;
5:10,13,16,24;6:5,8,
23,24;7:3,7,10,13,14;
8:1,4,9,19,22,23;9:1;
10:9,10,13,17,20;
16:24;17:5;20:4,17,
21,22,23;21:9,12,12,
13,18,20;22:9,12,13,
17,18,21,22;23:2,6,8,
13,20,22,23;24:18
**receiving (2)**
13:2;14:4

**recess (1)**
9:18
**recollection (6)**
18:24;19:6,9,12;
23:3,10
**reconvene (1)**
9:4
**record (3)**
11:16,18;13:6
**refer (2)**
17:10;18:2
**reference (4)**
22:1,24;23:5,8
**referred (1)**
27:13
**referring (1)**
5:18
**regarding (5)**
20:18;22:10,13,18,
22
**Relations (1)**
12:10
**relaying (1)**
7:10
**release (2)**
21:23;22:10
**remember (7)**
10:19;22:2,8;24:1,
9;25:24;26:8
**remind (1)**
9:21
**remotely (1)**
3:3
**RENSEL (9)**
3:2,13,16,17;9:23,
24;24:18;27:3,21
**Rensel-1 (1)**
17:11
**repeat (2)**
3:20;13:23
**rephrase (4)**
5:2,9;14:1;25:15
**report (1)**
25:5
**REPORTER (3)**
27:14,19,23
**representing (1)**
3:6
**requested (1)**
6:20
**resign (4)**
7:8;18:18;19:2;
20:1
**resignation (3)**
20:15,18,22
**resolution (1)**
23:12
**Resources (4)**
11:14;12:13,19,24
**respect (1)**
19:1
**rest (1)**
23:9

**restart (1)**
8:8
**restrictions (1)**
21:8
**retry (1)**
4:17
**return (3)**
18:20;19:3;21:6
**returning (1)**
21:6
**reviewing (2)**
13:11;15:5
**right (7)**
3:17;9:16,20,24;
14:13;25:7;27:23
**right-hand (1)**
19:16
**role (6)**
10:2,5,8;11:7;
12:23;16:12
**r-o-l-e (1)**
16:12
**Rowan (1)**
12:21

---

## S

**saw (1)**
17:14
**saying (2)**
15:17,20
**SCHAUER (35)**
3:6;4:14,22;5:18;
7:18,22;9:5,14;11:16,
19;13:3,12;14:8;15:7,
21;16:6,8,10;17:7,14,
19,22;18:1,13,14;
24:11,23;25:11;
26:20;27:2,6,11,16,
21,22
**schedule (1)**
9:12
**Science (1)**
12:8
**second (2)**
11:15;17:7
**seeing (1)**
14:7
**send (1)**
27:20
**sense (1)**
14:23
**sentence (3)**
18:22;20:12;22:6
**Sep (1)**
18:19
**Sept (1)**
20:19
**September (7)**
18:6;19:20;20:2,
16,23;21:6,14
**series (1)**
19:17

**served (1)**
12:23
**set (2)**
19:21;22:2
**settle (1)**
6:14
**settlement (6)**
18:20;23:16,18,24;
24:3,4
**several (1)**
10:19
**share (1)**
17:9
**sign (1)**
27:20
**signature (1)**
14:2
**signing (1)**
3:9
**sit (1)**
24:8
**sorry (6)**
3:17;7:23;9:21;
10:18;14:9;17:22
**speaking (1)**
7:11
**Spearhead (1)**
11:12
**specific (6)**
6:4,8;11:8;23:3;
24:18;25:3
**specifics (1)**
22:6
**spoke (2)**
17:1,6
**spoken (1)**
5:5
**spokespeople (1)**
16:22
**spokesperson (2)**
16:18,19
**started (1)**
4:13
**state (3)**
14:16;25:7,18
**stated (1)**
7:24
**statement (2)**
18:17;21:21
**stating (3)**
7:1,16;15:16
**still (2)**
9:8,12
**stipulations (1)**
3:11
**stopped (2)**
4:3,6
**strike (1)**
7:2
**Sure (6)**
3:21;5:3;9:6;12:1;
25:16;26:2
**sworn**

3:3

**T**

taught (1)
12:19
term (4)
14:17,24;21:9;
23:20
terms (7)
13:20,21;14:17;
19:10,13,21;22:3
testified (2)
3:4;7:20
timeframe (1)
10:3
times (1)
10:15
timing (1)
13:21
title (8)
10:9,11,12,15,16;
11:9;26:5,10
titles (3)
10:20;26:4,16
today (1)
24:8
top (1)
18:7
topic (1)
20:4
total (1)
23:18
Trainer (3)
12:16,17,18
transcript (2)
27:15,18
trying (1)
10:19
Tuesday (1)
18:6

**U**

Understood (1)
4:2
up (1)
23:6
upon (3)
19:22;20:5,10
used (1)
17:16
usual (1)
3:11
usually (1)
25:4

**V**

vague (1)
14:10
verbal (4)
7:3,6;8:16;18:18

verbalized (1)
8:5
verbally (1)
8:15
verification (2)
21:4,19
virtually (1)
16:2

**W**

waive (1)
3:9
way (4)
3:14;5:8;15:23;
24:2
welcome (1)
27:6
Welling (1)
12:20
Wilmes (2)
5:17;6:1
within (1)
23:15
without (6)
13:2,11;14:3,7;
15:5;21:7
witness (18)
3:7;5:1;7:19,24;
9:23;11:20;13:8,14;
14:9;15:9,22;25:9,14,
23;26:3,19;27:5,8
word (1)
27:4
wording (1)
24:19
words (1)
8:7
work (7)
21:7;24:22;25:1,4,
6,8,19
working (2)
4:3,6
writing (9)
13:2,11;14:4,7;
15:4,6,11,13,19
written (2)
14:16;15:18

**Y**

Yardley (1)
25:20
year (4)
4:5,7,9,11
years (3)
11:13,20;12:22
yesterday (1)
17:15

**Z**

Zenger-Miller (1)

12:17
**Zoom (1)**
9:15

**1**

1 (1)
17:13
10 (1)
9:3
10:00 (1)
27:9
12th (1)
14:21
14:10 (1)
19:21
15 (1)
9:3
19 (1)
18:19
19th (1)
20:2

**2**

20 (1)
12:21
2021 (1)
14:21
2022 (5)
19:20;20:3,16,19;
21:6
2023 (1)
4:7
23 (3)
20:16,19;21:6
23rd (2)
20:23;21:14
27th (2)
18:6;19:20

**3**

30 (1)
23:15
30-day (1)
23:23

**4**

40 (1)
11:20

**5**

50,000 (1)
18:20
51 (1)
19:17

**9**

9:16 (1)

9:18
**9:30 (4)**
9:4,13,15,19

9.   Ex. 6. 09-20-2022 Therapy Visit Note

Morning after Mediation_Redacted


SOHO**MD**

**Soho Medical Doctors, PLLC**
**Patient:** Assata Acey
**Provider:** Chantele Mallory, LCSW

**DOB:** ▮▮▮▮▮▮
**Visit:** 09/20/2022 10:00AM

**Sex:** F
**Chart:** ACAS000002

Therapy Type: supportive, interpersonal
Focus: mood, stressors

Session Note: Patient spoke about recent mediation with job and feeling physically drained. Provider supported patient with exploring emotion related to mediation. Patient seemed to struggle with identification of any feelings of relief due to an unclear resolution. Patient supported with increasing awareness to successes throughout the process and effort placed with self-advocacy.
Patient also reports being placed on a new medication to manage flare-ups related to medical condition. Patient recognizes an increase in flare-ups when managing stressful situations and recognizes the past few months have been a challenge. Patient was reflective of traumatic experiences and how this impacts her current relationships, specifically a desire to be protective in certain situations. Patient also recognizes a pattern of avoiding issues that involve feelings of sexual abuse and discomfort, referring to most recent concern with medical profession. Provider offered validation and supported patient with body's desire to protect from traumatic experiences. Patient was receptive to exploring these feelings further over the course of treatment. Patient and provider discussed strategies to limit stress within the next week.

Plan: Patient will engage in strategies to engage in self care and minimize stress. Next session scheduled for 9/27 at 10am.

Therapy time spent with patient: 57 minutes

**Chief Complaint:** Major Depressive Disorder and Anxiety

**Assessment:**

| Type | Code | Description |
|------|------|-------------|
| ICD-10-CM Condition | F33.0 | Major depressive disorder, recurrent, mild |
| ICD-10-CM Condition | F41.1 | Generalized anxiety disorder |

[Page 3]

E-signed by Chantele Mallory, LCSW on 09/20/2022 12:21PM EDT
This page was generated at 09/20/2022 12:21PM EDT

# 10. Ex. 7. 09-20-2022 Text Messages from Myself to Joren Wendschuh Disclosing Mediation Conditions



Download

| Sent | 09/20/2022 8:17:50 PM | Joren(boss) (+1203300399 0) | Done interrupted the concurrent zoom chat family is anmoying |
|---|---|---|---|
| Received | 09/20/2022 8:19:54 PM | Joren(boss) (+1203300399 0) | Loll |
| Sent | 09/20/2022 8:26:49 PM | Joren(boss) (+1203300399 0) | Resignation process is as follows. I have to get a letter from my doctor certifying that I can work it's okay if I need accommodations. I have to send that to the new head of HR. The special lawyer they hired has to send me their settlement draft based off of the key things that we negotiated. I have to have that draft reviewed by a lawyer based off of the additional confidentiality terms that she might tag on. If everything checks out it would be signed. If not it would be thrown out and I would just go to investigation cuz I'm not dealing with those people. |
| Sent | 09/20/2022 8:27:42 PM | Joren(boss) (+1203300399 0) | After it was signed, I would have to you know resign. I'm assuming they would comp my vacat days. Unsure if I'd have to mail my laptop in. |
| Sent | 09/20/2022 8:28:07 PM | Joren(boss) (+1203300399 0) | So yeah until my doctor updates the note and Patty acknowledges it and I get a lawyer to review the new contract and stuff I wouldn't actually be resigned. |

11. Ex. 8. 10-04-2022 Therapy Visit Note Week

after Terminaition_Redacted



# SOHO**MD**

**Soho Medical Doctors, PLLC**
**Patient:** Assata Acey
**Provider:** Chantele Mallory, LCSW

**DOB:**
**Visit:** 10/04/2022 10:00AM

**Sex:** F
**Chart:** ACAS000002

---

Therapy Type: supportive, interpersonal
Focus: mood, stressors

Session Note: Patient reports focusing a lot of attention on her home and continuing to follow up with medical issues. Patient reports feeling more frustrated recently due to becoming easily tired although she has a desire to remain active. Patient spoke about impacts on her autonomic nervous system. Provider supported patient with awareness to stress and impacts on the body. Patient reports being wrongfully terminated and was allotted space to express feelings related to events. Patient appears to lack insight to body's response when discussing stressful events. Provider supported patient with awareness to body's changes while speaking about events. Provider and patient also explored her health conditions seeming to increase as her external stressors have increased.

Patient reports also being really reflective of the outcome she wants from her current mediation, since monetary compensation has not been a motivation. Provider supported with labeling emotions about patient's awareness to desirable outcomes and prioritizing health.

Plan: Patient will engage in strategies to engage in self care and minimize stress. Next session scheduled for 10/6 at 12pm.

Therapy time spent with patient: 57 minutes

**Chief Complaint:** Major Depressive Disorder and Anxiety

## Assessment:

| Type | Code | Description |
|------|------|-------------|
| ICD-10-CM Condition | F33.0 | Major depressive disorder, recurrent, mild |
| ICD-10-CM Condition | F41.1 | Generalized anxiety disorder |

---

[Page 3]

INDUCTEV INITIDISCL018842

# 12. Ex. 9. 09-26-2023 Therapy Visit During

# Litigation



## Soho Medical Doctors, PLLC

**Patient:** Assata Acey                                              **Sex:** F
**Provider:** Chantele Mallory, LCSW          **Visit:** 09/26/2023 10:00AM          **Chart:** ACAS000002

Patient will increase use of self affirmations on a daily basis to manage stress related to medical condition. Patient has utilized religious/ spiritual practices to recognize locus of control/ reduce worry.
Status: in progress

**Monitoring:** Relationships, anxiety, mood, stressors, coping skills, communication

**Barriers to Progress:** None

## Intervention:

Therapy Type: supportive, insight oriented
Focus: mood, stressors

Session Note: Patient joined session late due to tending to personal phone call. Patient reports feeling busy with family life but also excited about upcoming wedding. Patient provided update on medical conditions and experiencing increased nausea. Patient's PCP attributes to stress opposed to medical concerns. Patient expressed awareness to increased intrusive thoughts and feelings of hopelessness when working on legal case "it's really impacting my mental health." Provider encouraged exploration of triggers and offered psychoeducation regarding typical responses to stressors. Provider shared feedback regarding patient's response appearing aligned to PTSD and trauma reactions. Provider and patient engaged in techniques during session for emotional regulation and reducing physiological distress. Patient and provider also discussed use of emergency resources and supports if patient has an increase in intrusive thoughts or SI. Patient currently denies SI or plan and also has communicated feelings with partner. Patient has also received emotional support from grandmother.
Provider will revisit intrusive thoughts at next session and complete safety plan if warranted. Provider concluded session with words of encouragement for patient's wedding this weekend.

Plan: Next session scheduled for 10/3/23 at 10am.

Therapy time spent with patient: 49 minutes

[Page 3]

INDUCTEV INITIDISCL018990

13. Ex. 10. 04-15-2024 PCP Visit Note

Regarding Depression Medication_Redacted

Name: Assata Acey | ██████████████████████ | PCP: Jennifer L. Flom, DO

# Progress Notes

Jennifer L. Flom at 4/15/2024 9:40 AM

Main Line HealthCare - Medicine For Women

**Subjective:**
Assata Acey is a 26 y.o. female presenting with the chief complaint of:
**Chief Complaint**
Patient presents with
• Follow-up

Chronic medical conditions include:
**Patient Active Problem List**
Diagnosis
• Nonintractable episodic headache
• Irregular periods
• Attention deficit hyperactivity disorder (ADHD), combined type
• Anxiety
• Recurrent major depressive disorder, in remission (CMS/HCC)
• Auditory processing disorder
• Dizziness
• Lymphadenopathy
• Shortness of breath
• Rathke's cleft cyst (CMS/HCC)
• Mild intermittent asthma without complication
• Elevated testosterone level
• POTS (postural orthostatic tachycardia syndrome)
• Family history of breast cancer
• Dysmenorrhea
• Recurrent pregnancy loss
• Autism
• Chalazion
• Abnormal cortisol level
• Enlarged pituitary gland (CMS/HCC)

HPI:
Pt presents for f/u

She is not doing well today
She wants to establish w/ a therapist
She is interested to delve into how the PTSD/anxiety/depression all integrate together.

She is in an acute depressive episode now. Usually lasts 4hrs to 1 day but this one has lasted 4 days.

She is struggling with her ongoing legal case.
She was deposed for 7 hours last Thursday. She did not have SI during or after the deposition. She did have significant physical symptoms. Thought she was going to collapse when she stood up on first break. She feels pressure in her neck and has loud/strong pulse in the neck.
She is struggling with internalizing the way that she is being treated in court.

She has not been able to obtain a lawyer and therefore is representing herself.
She worries that the judge and opposing lawyers are working together against her.

She is having vivid intrusive thoughts.

She hyperventilates when she cries. She is not sure if this is triggering her asthma attacks.

When she is stressed, she is not taking a full deep breath.

She tried to get in with Wills Eye for a second opinion for diplopia
Worsens during the day as she gets tired.

She is interested to see how her pituitary volume changed in relation to her stress. She is going to discuss this with endocrinology.

The following portions of the patient's history were reviewed and updated as appropriate: allergies, current medications, family history, past medical history, social history, surgical history, and problem list.

## Current Outpatient Medications

| Medication | Instructions |
|---|---|
| • albuterol HFA 90 mcg/actuation inhaler | No dose, route, or frequency recorded. |
| • gabapentin (NEURONTIN) | 200 mg, oral, 3 times daily |
| • montelukast (SINGULAIR) | 10 mg, oral, See admin instructions, At Night |
| • propranoloL (INDERAL) | 10 mg, oral, 3 times daily |
| • sertraline (ZOLOFT) | 100 mg, oral, Daily |
| • SLYND | 4 mg, oral, Daily |

Review of Systems
As noted in HPI and otherwise negative

**Objective:**

**Vitals:**

|  | 04/15/24 0953 |
|---|---|
| BP: | 112/88 |
| BP Location: | Right upper arm |
| Patient Position: | Sitting |
| Pulse: | 72 |
| Resp: | 16 |
| Temp: | 36.8 °C (98.2 °F) |
| TempSrc: | Temporal |
| SpO2: | 97% |
| Weight: | 71.7 kg (158 lb) |
| Height: | 1.676 m (5' 6") |

**Wt Readings from Last 3 Encounters:**

| 04/15/24 | 71.7 kg (158 lb) |
|---|---|
| 03/11/24 | 72.1 kg (159 lb) |
| 01/09/24 | 70.8 kg (156 lb) |

Body mass index is 25.5 kg/m².

**Physical Exam**
Vitals reviewed.

14. Ex. 11. 04-29-2022 Paystub




MOMENTUM DYNAMICS CORPORATION
3 Pennsylvania Ave
Malvern PA 19355

1406-4445
ORG1:200 R&D
EE ID: 273    DD

*Payrolls by Paychex, Inc.*

*Payrolls by Paychex, Inc.*

NON-NEGOTIABLE

ASSATA S ACEY
5121 BROWN ST
PHILADELPHIA PA 19139

NON-NEGOTIABLE

---

## PERSONAL AND CHECK INFORMATION

Assata S Acey
5121 Brown St
Philadelphia, PA 19139
**Soc Sec #:** xxx-xx-xxxx   **Employee ID:** 273

**Home Department:** 200 R&D

**Pay Period:** 04/11/22 **to** 04/24/22
**Check Date:** 04/29/22   **Check #:** 5710

NET PAY ALLOCATIONS

| DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| Amount | 0.00 | 0.00 |
| 353 | 2040.30 | 19292.53 |
| **NET PAY** | **2040.30** | **19292.53** |

| EARNINGS | BASIS OF PAY | DESCRIPTION | HRS/UNITS | RATE | THIS PERIOD ($) | YTD HOURS | YTD ($) |
|---|---|---|---|---|---|---|---|
| | | Hourly | 80.00 | 35.1900 | 2815.20 | 722.00 | 25024.00 |
| | | OOP | | | 100.00 | | 900.00 |
| | | Overtime | | | | 35.00 | 1835.87 |
| | | **Total Hours** | 80.00 | | | 757.00 | |
| | | **Gross Earnings** | | | 2915.20 | | 27759.87 |
| | | **Total Hrs Worked** | 80.00 | | | | |

| OTHER Do not increase Net Pay | DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|
| | 401k ER Match | 84.46 | 805.80 |

| WITHHOLDINGS | DESCRIPTION | FILING STATUS | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|---|
| | Social Security | | 180.46 | 1718.54 |
| | Medicare | | 42.21 | 401.92 |
| | Fed Income Tax | SMS | 342.93 | 3411.44 |
| | PA Income Tax | | 89.36 | 850.95 |
| | PA Unemploy | | 1.75 | 16.65 |
| | PA LMALV-Che L | | 2.00 | 18.00 |
| | PA PHILA-Phi Inc | | 111.94 | 1065.93 |
| | **TOTAL** | | 770.65 | 7483.43 |

| DEDUCTION | DESCRIPTION | THIS PERIOD ($) | YTD ($) |
|---|---|---|---|
| | PX401 EEPRE | 87.46 | 832.80 |
| | PXUME EE PRE | 4.61 | 41.49 |
| | Voluntary Life | 12.18 | 109.62 |
| | **TOTAL** | 104.25 | 983.91 |

| NET PAY | THIS PERIOD ($) | YTD ($) |
|---|---|---|
| | **2040.30** | **19292.53** |

*Payrolls by Paychex, Inc.*

0026 1406-4445  Momentum Dynamics Corporation • 3 Pennsylvania Ave • Malvern PA 19355 • (484) 320-8222

# 15. p.1 of Doc 15-75. 09-23-2022 Denial of

# PTO

 Gmail

**Assata Acey <aceyassata@gmail.com>**

## Acey v. Momentum
8 messages

**Post, May Mon** <maymon.post@bunkerray.com>                                    23 September 2022 at 16:01
To: Assata Acey <aceyassata@gmail.com>
Cc: Alexa Heisler <Alexa.Heisler@momentumdynamics.com>, Patti Rensel <patti.rensel@momentumdynamics.com>

Good afternoon, Ms. Acey:

I understand that you requested to take PTO for September 22 and 23. Please be advised that you are unable to put in for PTO as you are still on disability leave and you cannot take PTO unless you are back to work. (Also, per your doctor's note, you are not to be released to return until Monday, which is a moot point as you have resigned or will be resigning shortly). However, you will be paid the balance of your PTO upon your resignation. If you resign today through Sunday, you will receive your final pay check on 09/30. If you resign 09/26 – 10/09, you will receive your final pay check on 10/14. Please provide me with a copy of your resignation letter as soon as possible.

Thank you, and please let me know if you have any questions.

**May Mon Post, Esq. | Lead Employment Attorney | Bunker & Ray**

Employees of ACE American Insurance Company, a Chubb Company

436 Walnut St. | WA01A | Philadelphia, PA 19106
(215) 845-6154 (direct) |   (267) 372-1240 (mobile)

maymon.post@bunkerray.com

This email (which includes any attachments) is intended to be read only by the person(s) to whom it is addressed. This email may contain confidential, proprietary information and may be a confidential attorney-client communication, exempt from disclosure under applicable law. If you have received this email in error, do not print it, forward it or disseminate or use it or its contents. In such event, please notify the sender by return email (or by phone at the number shown above) and delete the email file immediately thereafter. Thank you for your cooperation.

We strive to be a paperless office. I encourage you to send all correspondence via email instead of U.S. mail when at all possible. If you email a document to me, it is not necessary to send a separate copy via U.S. mail. Thank you.

This email (including any attachments) is intended for the designated recipient(s) only, and may be confidential, non-public, proprietary, and/or protected by the attorney-client or other privilege. Unauthorized reading, distribution, copying or

# 16. Ex. 12. 06-07-2022 Letter from Judy Talis

## Assuring PTO

 Gmail

Assata Acey <aceyassata@gmail.com>

---

## Return to Work Status

**Judy Talis** <judy.talis@momentumdynamics.com>
To: Assata Acey <aceyassata@gmail.com>
Cc: Joren Wendschuh <joren.wendschuh@momentumdynamics.com>

7 June 2022 at 13:14

Hello Assata.

Thank you for your response. Please allow me to update my earlier email today.   Shortly after sending my email, we received information from Mutual of Omaha indicating that your STD has been extended through June 17, 2022. Accordingly,  your leave of absence has been extended through the 17th. We will contact you again on or about June 14th to discuss whether you will require any further accommodations after June 17, 2022. If you have any questions or wish to share any additional information please do not hesitate to contact me. As noted below, you become eligible for job-protected Family and Medical Leave (FMLA) as of June 14, 2022.  Based upon the information that has already been provided, we are enclosing your Notice of Eligibility & Rights and Responsibilities under the Family and Medical Leave Act.  This leave would be unpaid, although you remain entitled to your STD payments and may use your accrued PTO. Kindly sign and return the Notice on or before June 29, 2022 if your leave will extend beyond June 17, 2022.

Best Regards,

Judy

**Judy Talis | Chief Administrative Officer**
**O: 484-320-8222 ext 128**
**M: 610-613-1449**

## Momentum®
Wireless EV Charging

***Connect***   LinkedIn | Website | Newsletter
***Media***    Taxis - NYTimes | Airport & Transit | Driver Experience

*Confidentiality Notice: The information, and any attachments and/or documents, transmitted by this email is intended for the addressee only and contains information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender immediately.*

**From:** Assata Acey <aceyassata@gmail.com>
**Sent:** Tuesday, June 7, 2022 12:08 PM
**To:** Judy Talis <judy.talis@momentumdynamics.com>
**Cc:** Joren Wendschuh <joren.wendschuh@momentumdynamics.com>; Assata Acey <Assata.Acey@momentumdynamics.com>
**Subject:** Re: Return to Work Status

**EXTERNAL EMAIL**

[Quoted text hidden]

**WH-381 (Assata Acey).pdf**
324K

17. Ex. 13. 06-17-2022 Letter from Judy Talis

Assuring PTO

 **Gmail**

**Assata Acey <aceyassata@gmail.com>**

## FMLA and STD Updates
4 messages

**Judy Talis** <judy.talis@momentumdynamics.com>                    17 June 2022 at 14:06
To: Assata Acey <aceyassata@gmail.com>
Cc: Joren Wendschuh <joren.wendschuh@momentumdynamics.com>

Assata:

We have received notice from Mutual of Omaha extending your STD benefits through June 27, 2022.  Accordingly, you
have been approved for continued job-protected leave through that date as well.

As you know from my previous emails, you became eligible for Family and Medical Leave (FMLA Leave) as of June 14,
2022.  As a result, your current leave of absence has been designated as FMLA Leave commencing on June 14, 2022.
Please see attached the completed notice of your FMLA Leave designation which confirms your right to take up to 12-
weeks of job-protected leave to address your current serious health condition. Although FMLA Leave is unpaid, you
remain eligible for STD benefits under the Company's policies and may also use your earned and unused PTO as well.

You will find additional information about your FMLA Leave in our Company handbook, which was previously provided to
you.  Of course, please do not hesitate to contact me with any other questions you may have about your FMLA Leave.

Best,

Judy

**Judy Talis | Chief Administrative Officer**
**O: 484-320-8222 ext 128**
**M: 610-613-1449**

**Momentum**®
Wireless EV Charging

***Connect***   LinkedIn  |  Website  |  Newsletter
***Media***     Taxis - NYTimes  |  Airport & Transit  |  Driver Experience

*Confidentiality Notice: The information, and any attachments and/or documents, transmitted by this email is intended for the
addressee only and contains information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves
as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or
copying is prohibited. If you have received this communication in error, please contact the original sender immediately.*

**From:** Assata Acey <aceyassata@gmail.com>
**Sent:** Monday, June 13, 2022 10:23 AM
**To:** Judy Talis <judy.talis@momentumdynamics.com>
**Cc:** Joren Wendschuh <joren.wendschuh@momentumdynamics.com>; Assata Acey
<Assata.Acey@momentumdynamics.com>
**Subject:** Re: Return to Work Status

**EXTERNAL EMAIL**

Thank you for your communication.

I have noted that the FMLA form you have sent for me to sign has several fields blank(regarding options of PTO, whether my role is key or not, etc).

Please let me know if there is a reason these are blank and or if its possible to have one prefilled before signing and returning.

On Tuesday, 7 June 2022, Judy Talis <judy.talis@momentumdynamics.com> wrote:

> Hello Assata.
>
> Thank you for your response. Please allow me to update my earlier email today.   Shortly after sending my email, we received information from Mutual of Omaha indicating that your STD has been extended through June 17, 2022. Accordingly,  your leave of absence has been extended through the 17th. We will contact you again on or about June 14th to discuss whether you will require any further accommodations after June 17, 2022. If you have any questions or wish to share any additional information please do not hesitate to contact me. As noted below, you become eligible for job-protected Family and Medical Leave (FMLA) as of June 14, 2022.  Based upon the information that has already been provided, we are enclosing your Notice of Eligibility & Rights and Responsibilities under the Family and Medical Leave Act.  This leave would be unpaid, although you remain entitled to your STD payments and may use your accrued PTO.  Kindly sign and return the Notice on or before June 29, 2022 if your leave will extend beyond June 17, 2022.
>
> Best Regards,
>
> Judy
>
>
>
>
> **Judy Talis | Chief Administrative Officer**
>
> **O: 484-320-8222 ext 128**
>
> **M: 610-613-1449**
>
> 
> Wireless EV Charging
>
> *Connect*    LinkedIn | Website | Newsletter
>
> *Media*    Taxis - NYTimes | Airport & Transit | Driver Experience

*Confidentiality Notice: The information, and any attachments and/or documents, transmitted by this email is intended for the addressee only and contains information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender immediately.*

**From:** Assata Acey <aceyassata@gmail.com>
**Sent:** Tuesday, June 7, 2022 12:08 PM
**To:** Judy Talis <judy.talis@momentumdynamics.com>
**Cc:** Joren Wendschuh <joren.wendschuh@momentumdynamics.com>; Assata Acey <Assata.Acey@momentumdynamics.com>
**Subject:** Re: Return to Work Status

**EXTERNAL EMAIL**

Hi and good afternoon,

Yes, there has been some additional specialists consulted for my treatment, so my agent proacrively reached out to extend tentatively to Jun 17 depending on the specific doctor's availability.

They said they would send out a letter, so I am looking out for that.

Sorry for the confusion and thank you for your communication.

On Tuesday, 7 June 2022, Judy Talis <judy.talis@momentumdynamics.com> wrote:

> They have not contacted us yet so we will follow up with them to get their confirmation. Thanks for letting me know.
>
>
>
> **Judy Talis | Chief Administrative Officer**
>
> **O: 484-320-8222 ext 128**
>
> **M: 610-613-1449**
>
> 
>
> *Connect*    LinkedIn | Website | Newsletter
>
> *Media*    Taxis - NYTimes | Airport & Transit | Driver Experience
>
> *Confidentiality Notice: The information, and any attachments and/or documents, transmitted by this email is intended for the addressee only and contains information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender immediately.*

**From:** Joren Wendschuh <joren.wendschuh@momentumdynamics.com>
**Sent:** Tuesday, June 7, 2022 10:34 AM
**To:** Judy Talis <judy.talis@momentumdynamics.com>; Assata Acey <aceyassata@gmail.com>
**Cc:** Assata Acey <Assata.Acey@momentumdynamics.com>
**Subject:** Re: Return to Work Status

Judy,

FYI - Assata just informed me that the STD insurance has been extended, I believe to June 17th at this time, by the insurance company, with the option to extend longer (per the company). What needs to be setup with MD to confirm this June 17th extension?

Thank you!

**Joren Wendschuh | Manager, Product Introduction**

**484-320-8222 ext 143**

**Momentum®**
Wireless EV Charging

***Connect***   LinkedIn | Website | Newsletter

***Media***   Taxis - NYTimes | Airport & Transit | Driver Experience

*Confidentiality Notice: The information, and any attachments and/or documents, transmitted by this email is intended for the addressee only and contains information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender immediately.*

---

**From:** Judy Talis <judy.talis@momentumdynamics.com>
**Sent:** Tuesday, June 7, 2022 10:28
**To:** Assata Acey <aceyassata@gmail.com>
**Cc:** Joren Wendschuh <joren.wendschuh@momentumdynamics.com>
**Subject:** Return to Work Status

Hello Assata. I hope this email finds you well.

As indicated in my May 26, 2022 email, I am writing to inquire as to your return-to-work status. As you know, your current leave expires on June 10, 2022. In the absence of the need for further accommodations, we look forward to

your return to full-time work at Momentum on Monday, June 13, 2022.

If, however, you do require further accommodations in connection with your medical condition at this time, please contact me no later than Friday, June 10, 2022 so that we may review your status and needed accommodations. Please also be advised that you become eligible for Family and Medical Leave (FMLA) as of June 14, 2022.  I would be happy to review your FMLA leave entitlement at any time.

Best,

Judy


**Judy Talis | Chief Administrative Officer**

**O: 484-320-8222 ext 128**

**M: 610-613-1449**



**Connect**   LinkedIn | Website | Newsletter

**Media**   Taxis - NYTimes | Airport & Transit | Driver Experience

*Confidentiality Notice: The information, and any attachments and/or documents, transmitted by this email is intended for the addressee only and contains information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender immediately.*


**WH-381 (Assata Acey).pdf**
326K

---

**Assata Acey** <aceyassata@gmail.com>                                   22 August 2022 at 12:46
To: Jack.Fu@mutualofomaha.com
Cc: submitgrpdisinfo@mutualofomaha.com

FMLA form should be attached
[Quoted text hidden]


**WH-381 (Assata Acey).pdf**
326K

**Jack.Fu@mutualofomaha.com** <Jack.Fu@mutualofomaha.com>                    22 August 2022 at 14:39
To: Assata Acey <aceyassata@gmail.com>

Hi Assata,

FMLA forms does not come to Mutual of Omaha as these are required from your employer please.

Thank you,
Jack Fu, DHP, DIA, DIF, GBDS
Lead Benefits Claim Specialist
Mutual of Omaha / Workplace Solutions
Phone 402-351-5144 / Fax 402-997-1865
Customer Service 1-800-877-5176
Email: jack.fu@mutualofomaha.com
MooCon

**From:** Assata Acey <aceyassata@gmail.com>
**Sent:** Monday, August 22, 2022 11:47 AM
**To:** Fu, Jack <Jack.Fu@mutualofomaha.com>
**Cc:** SMB-submitgrpdisinfo <submitgrpdisinfo@mutualofomaha.com>
**Subject:** Fwd: FMLA and STD Updates

[EXTERNAL MESSAGE] To ensure continued focus on protection of our customer data, be cautious with links and attachments. If you suspect a phishing attempt, report it by selecting the Report Phishing button on this message.

[Quoted text hidden]

This e-mail and any files transmitted with it are confidential and are solely for the use of the addressee. It may contain material that is legally privileged, proprietary or subject to copyright belonging to the sender and its affiliates, and it may be subject to protection under federal or state law. If you are not the intended recipient, you are notified that any use of this material is strictly prohibited. If you received this transmission in error, please contact the sender immediately by replying to this e-mail and delete the material from your system. The sender may archive e-mails, which may be accessed by authorized persons and may be produced to other parties, including public authorities, in compliance with applicable laws.

**Assata Acey** <aceyassata@gmail.com>                    23 August 2022 at 09:00
To: "Jack.Fu@mutualofomaha.com" <Jack.Fu@mutualofomaha.com>

Hi Jack,
Unfortunatley I was unable to reach you via call yesterday afternoon. I was able to reach the customer service line where they suggested uploading the employer signed FMLA form in the same procedure as my other medical documents.

Your email is unclear. Does Mutual of Omaha not accept FMLA forms, or do they only accept these forms directly from the employer.

In the latter case, please elaborate.

Thank you,
[Quoted text hidden]

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASSATA ACEY<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>INDUCTEV<br><br>　　　　　　　Defendant. | Case No.: 2:23-cv-01438<br><br>Judge Paul S. Diamond |

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S AMENDED RULE 56 MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant InductEV ("Defendant"), by and through its attorneys, Fox Rothschild LLP, respectfully submits this Opposition to Plaintiff's Amended Rule 56 Motion for Partial Summary Judgment (ECF No. 92) (the "Motion").[1]

### I.    Introduction

Plaintiff cites two reasons the Court should grant summary judgment on her retaliation claims (Counts XVII, XVIII, and XIX).  The first is that four days after the parties engaged in mediation, Defendant informed her that she could not use PTO while out on a disability leave. Motion, 1(A)(iii), p. 3. Plaintiff makes no claim of

---

[1] One day prior to filing this Motion, Plaintiff filed a separate Motion for Summary Judgment (ECF No. 89) that Plaintiff later deemed incomplete. *See* Motion (ECF No. 92) at p.1 Accordingly, Defendant responds to Plaintiff's Amended Rule 56 Motion for Partial Summary Judgment only (ECF No. 92).

damages as a result of this alleged act of retaliation because she has none. Motion C, p. 6 – 7. Plaintiff was paid earned but unused PTO following her resignation from employment. The second reason Plaintiff thinks the Court should grant summary judgment is based on the Defendant's treating the employment relationship as ended following her resignation, which Plaintiff says happened seven days after the mediation. This despite her own acknowledgement, and the testimony of her grandmother, that she agreed to resign.

Plaintiff's Motion fails for several reasons. First, Plaintiff cannot establish that she did not resign from employment with Defendant and thus cannot show any adverse action by Defendant (none exists). Second, the documents relied upon by Plaintiff to claim she was told she could use PTO during a paid disability leave, and then retaliated against by being told she could not based on a tortured reading of emails, do not support Plaintiff's factual premise, and certainly not a claim of retaliation. Third, Plaintiff cannot establish a causal connection between her alleged protected activity—filing her PHRC Complaints—and any alleged adverse action by Defendant., Plaintiff's arguments regarding causation are legally insufficient and rely on "facts" about which there are genuine issues.

II.    **Plaintiff's Motion for Summary Judgment should be denied as the bases therefore are not supported by law, nor based upon material facts about which there is no issue**

    *A.    Plaintiff is not entitled to summary judgment on her claim of retaliation for engaging in mediation, and thereafter being: terminated; or refused use of PTO while on disability leave contrary to a prior statement from Defendant's Chief Administrative Officer that she could*

Contrary to Plaintiff's view, it is undisputed that Plaintiff agreed to resign in exchange for $50,000 ***prior*** to leaving Defendant's employ.[2]  There can be no retaliation *i.e.*, adverse action by Defendant where Plaintiff resigned from employment—as she admitted in writing—and her own grandmother confirmed during her deposition.  *See Green v. Brennan*, 578 U.S. 547, 574 (2016) ("A resignation cannot be deemed the equivalent of an actionable intentional termination of the employer lacks intent to terminate." (Alito, J., concurring) (citing *Staub v. Proctor Hospital*, 562 U.S. 411, 417-418 (2011)).  Summary judgment should be entered in Defendant's favor because Plaintiff cannot show that she did ***not*** resign— and she cannot show that Defendant's belief that she did resign was based on anything other than her agreement to do so.

---

[2] Defendant has also filed a Motion For Summary Judgment asking the Court to enforce the parties agreement that Plaintiff agreed to resign and release InductEV of claims in exchange for $50,000. Motion for Summary Judgment (ECF No. 131-2) at p. 21. Defendant incorporates the evidence of record and argument cited therein in response to Plaintiff's Motion.

With audacity bordering on lack of candor with the Court, Plaintiff's Motion omits any mention of her written acknowledgement that she agreed to resign—which she referenced as early as the Complaint filed on March 10, 2023, and addressed again when responding Defendant's Motion to Dismiss the Complaint. *See* Complaint (ECF No. 1 at Ex. A, ¶ 266); Defendant's Motion to Dismiss (ECF No. 10) at p. 10). That is, Plaintiff ignores her own September 27, 2022 admission: "*In mediation I did agree to a verbal agreement in which I would resign and dismiss existing claims(prior to Sep 19) in return for a settlement amount of 50,000 from Momentum Dynamics Corp.*" Motion at Ex. 3 (ECF No. 92-2). Nor does she address her grandmother's testimony "[t]here was a verbal agreement that she would resign and dismiss existing claims in return for a settlement amount of 50,000 dollars." Motion for Summary Judgment (ECF No. 132-2) at p. 21. *Id.* Plaintiff has stridently and ineffectively attempted to rationalize her revocation of the settlement and agreement to resign based primarily on what she thought, but not based on the words expressed between the parties. And while Plaintiff attempts to cast doubt on Defendant's reliance on her "verbal agreement" to resign, she presents no evidence creating an issue of material fact that Defendant relied on anything to the contrary. *See id.*

Plaintiff also references the deposition testimony of Alexa Heisler and Patti Rensel ostensibly for the purpose of disproving that any agreement existed—

4

ignoring her own written acknowledgement and ignoring Ms. Rensel's testimony that a verbal agreement was reached during mediation in which Plaintiff agreed "to resign from employment in exchange for compensation." *See* Motion for Summary Judgment (ECF No. 131-8, at p. 5). Further as Plaintiff indicates, Ms. Heisler was not present for the entire mediation. Motion at p. 4; Ex. A at 11:12-18. But the mere fact that Ms. Heisler was not present for the entire mediation does not mean that a verbal agreement was not reached.

Plaintiff claims that she was retaliated against when, after the mediation, Judy Talis told her she could not take PTO while on a paid disability leave. Plaintiff claims this was done in retaliation for participating in the mediation as it supposedly contradicts an earlier statement from Ms. Talis that Plaintiff could use PTO during paid disability. This convenient, forced reading of Ms. Talis' first message is another example of Plaintiff projecting unlawful intent onto a neutral act based on standard policy.

The initial June 17, 2022 statement of Ms. Talis that Plaintiff could use PTO was communicated in relation to Plaintiff having qualified for FMLA leave as of June 14, 2022, and reflects InductEV's FMLA policy that allowed employees on unpaid FMLA leave to use PTO. Motion I. (B)(ii). It was not in reference to use of PTO during a paid disability leave—which is not a common practice as it encourages malingering. As there are more than 14 weeks between June 14, 2022, when

5

Plaintiff's FMLA began, and Ms. Talis' September 23, 2022 message, Plaintiff's FMLA entitlement had been exhausted. Therefore, when Ms. Talis informed Plaintiff on September 23, 2022 that she is "unable to put in for PTO as you are still on disability leave and you cannot take PTO unless you are back to work" it is because Plaintiff was no longer on FMLA leave, and employees on paid disability leave are ineligible for PTO. Motion I. (B)(i). It is not because of retaliatory or discriminatory reasons, but for the simple fact it is true and is not contradictory to the June 17, 2022 message from Ms. Talis. However, as Plaintiff had decided to disavow her settlement of the case and resignation and look for actions she can cite in support of her claims, she conveniently misreads that June 17, 2022 message as extending the opportunity to take PTO to an employee on paid disability leave. *Id.* Indeed, Plaintiff never cites the respective policies relating to STD or FMLA in support of her claim.

> B. *Setting aside the lack of legal or factual support for Plaintiff's Motion, it also fails as Plaintiff cannot establish causation between her allegedly protected acts, and the allegedly retaliatory acts*

Nor can Plaintiff establish the requisite causation required to maintain her Title VII retaliation claims. To prevail on her retaliation claims, Plaintiff must establish a "causal connection" between her protected activity—filing her administrative complaints—and some adverse action—Plaintiff's alleged termination. *See Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015).

To do so, Plaintiff must prove that her "protected activity was a but-for cause of the alleged adverse action by the employer." *Tomaszewski v. City of Philadelphia*, 460 F. Supp. 3d 577, 599 (E.D. Pa. 2020) (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)). This can be established "by showing '(1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link' or (3) 'from the evidence gleaned from the record as a whole' the trier of the fact should infer causation.'" *Kargbo v. Philadelphia Corp. v. Aging*, 16 F. Supp. 3d 512, 533 (E.D. Pa. 2014) (quoting *Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)). Plaintiff fails to make that showing. Nor can she, given that three months had elapsed between when she filed her administrative complaints and when she claims she was terminated—three months during which Plaintiff remained employed, was granted accommodations, FMLA leave, and except for the two acts cited in her Motion, apparently satisfied with how she was treated.

Plaintiff also argues she was terminated "in response to [her] filing a complaint against [Defendant] with the EEOC and PHRC." Motion at p. 10, ¶ 3. Plaintiff's complaints were served on Defendant on June 22, 2022. *See* Defendant's Motion for Summary Judgment (ECF No. 131-3, ¶ 3).[3] Yet Plaintiff claims she

---

[3] According to Plaintiff's Motion, she "dual-filed" her complaint with the EEOC and PHRC on May 8, 2022. Motion at p. 2, I. A) i).

suffered adverse employment action via termination months later on September 27, 2022. Motion at p. 2 ("On 9/27/2022, my employment was deemed terminated and I was locked out of my employee accounts."). Hence three months (and five days) had elapsed between Plaintiff's alleged protected activity and her alleged termination. The Third Circuit has held that shorter time periods are not unusually suggestive for purposes of establishing causation to support a retaliation claim. *See Williams v. Philadelphia Hous. Auth. Police Dept'*, 380 F.3d 751, 760 (3d Cir. 2004) (concluding that two-month time frame, without more, is not "unusually suggestive" of retaliation and affirming summary judgment in favor of employer), *superseded on other grounds as stated in Petti v. Ocean Cnty. Bd. of Health*, 931 F'App'x 59 (3d Cir. 2020); *see also LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (concluding that three-month time frame was not unusually suggestive and affirming summary judgment in favor of employer).

Yet Plaintiff attempts to rely on the timing between the mediation and her request to take PTO while on disability leave (4 days), and the timing between the mediation—during which she agreed to resign—and when she was removed from her employee account (7 days) as unusually suggestive of a causal connection. Plaintiff is reasonably facile with legal research, and may well have been aware of the cases cited in the preceding paragraph in deciding to ascribe protected status to the acts cited, thereby collapsing three months to a week. Plaintiff conflates these

8

events with her actual protected activity—filing her administrative complaints—to manufacture a causal nexus when none exists.

However, neither participating in a voluntary mediation nor seeking PTO while already on disability leave constitutes protected activity for purposes of a Title VII retaliation claim. *See Moyer v. Kaplan Higher Educ. Corp.*, 413 F. Supp. 2d 522, 526 (E.D. Pa. 2006) ("to demonstrate that she engaged in a protected activity, plaintiff must show that she 1) opposed a practice made unlawful by Title VII or the PHRA, 2) filed a charge of discrimination, or 3) participated in a charge brought by another."). The more obvious (and unrebutted explanation) is that Plaintiff agreed to resign during mediation and Defendant, relying on that resignation and believing she was no longer employed, removed her from her employee account.

Plaintiff attempts to bolster her causation argument by arguing Defendant threatened to sue her to enforce the terms of the settlement agreement after she reneged. Other than this one-off (and natural) response to Plaintiff's refusal to honor the terms of her bargained for agreement—which occurred literally months after she engaged in any protected activity—Plaintiff has no evidence suggesting any "pattern of antagonism" coupled with the timing of Plaintiff's protected activity, or ***any*** evidence from which a jury could infer causation. Indeed, everything Plaintiff relies on suggests that Defendant relied on Plaintiff's agreed-upon resignation—and nothing more—in believing she resigned.

9

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion should be denied, and summary judgment should be entered in Defendant's favor, as Plaintiff cannot establish that she did not resign and cannot as a matter of law establish causation on her retaliation claims.

Respectfully Submitted,

**FOX ROTHSCHILD LLP**

*/s/ Randall C. Schauer*
Randall C. Schauer (ID No. 34273)
Alberto M. Longo (ID No. 328893)
Eagleview Corporate Center
747 Constitution Drive, Suite 100
Exton, PA 19341-0673
Tel – (610) 458-7500
Fax – (610) 458-7337
rschauer@foxrothschild.com
alongo@foxrothschild.com
*Attorneys for Defendant*

10

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 13, 2024, a true and correct copy of the foregoing document was served on all parties via electronic mail per the addresses contained on the docket in this matter.

**FOX ROTHSCHILD LLP**

*/s/ Randall C. Schauer*
Randall C. Schauer, Esquire
*Attorney for Defendant, InductEV*

Plaintiff's Email to Chambers and Opposing counsel
with EDS submission and confirmation pages
with PreTrial Memoranda (the appendix of which is Doc 137)
Resubmitted due to Technical Error

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ASSATA ACEY,** | : | **CIVIL ACTION** |
| | : | |
| *Plaintiff* | : | |
| | : | |
| *v.* | : | |
| | : | |
| | : | |
| **INDUCTEV,** | : | |
| | : | |
| *Defendant.* | : | **No. 2:23-01438-PD** |
| | : | |

### Notice

I, plaintiff, submit this notice that the filing labelled as 137 is the Appendix to the Memoranda Brief, not the brief itself.

The following documents were submitted to the ProSe EDS system on 09/9/2024 with the Appendix but not filed by the clerk:

Plaintiffs first Pre-Trial Memoranda (Brief)
Exhibit Named: PTE-110 (5 video clips)


Court and opposing counsel were notified via email at 12:12PM, with electronic copies of the missing documents attached.

The Proof of submission and receipt have been attached. Memoranda brief (which includes witness designations) and email has also been attached.


Sincerely,

Assata Acey Hackman /s/

Assata Acey (Pro Se)

5121 Brown St,

Philadelphia, PA, 19139

770-231-1017

aceyassata@gmail.com

 Gmail

Assata Acey <aceyassata@gmail.com>

## Acey v. InductEV 2:23-cv-01438-PD Courtesy Copy: ECF-Filing Error
2 messages

**Assata Acey** <aceyassata@gmail.com>                                      9 September 2024 at 12:12
To: Chambers_of_Judge_Paul_S_Diamond@paed.uscourts.gov, "Schauer, Randall C." <RSchauer@foxrothschild.com>,
"Longo, Alberto" <ALongo@foxrothschild.com>

Letter is to advise Opposing counsel and the court that the filing labelled as 137 is the Appendix to the Memoranda Brief,
not the brief itself.
The following documents were submitted to the ProSe EDS system but not filed by the clerk:
Plaintiffs first Pre-Trial Memoranda (Brief)
Exhibit Named: PTE-110 (5 video clips)

The Proof of submission and receipt have been attached. Memoranda brief (which includes witness designations) has
been attached as well as 4/5ths of Exhibits marked "PTE 110".

I am heading to the clerk's office by 2:30 with paper copies of all documents and a flash drive with the video clips and will
file this letter as well.

Best,
Assata Hackman

---

**5 attachments**

📄 **Plaintiffs first Submission of Pre-Trial Memoranda .pdf**
787K

📄 **PTE 110_04-18-2024 A. Acey Dep. Video cc 10-59-29 AM-11-02-57 AM.mp4**
10792K

📄 **PTE 110_04-18-2024 A. Acey Deposition Clip 11-54-05 AM-11-54-34 AM.mp4**
2198K

📄 **PTE 110_04-18-2024 A. Acey Deposition Clip 11-36-02 AM-11-37-17 AM.mp4**
3622K

📄 **PTE 110_04-18-2024 A. Acey Deposition Clip 03-00-00 PM-03-01-50 PM.mp4**
7316K

---

**Assata Acey** <aceyassata@gmail.com>                                      9 September 2024 at 12:19
To: Chambers_of_Judge_Paul_S_Diamond@paed.uscourts.gov, "Schauer, Randall C." <RSchauer@foxrothschild.com>,
"Longo, Alberto" <ALongo@foxrothschild.com>

[Quoted text hidden]

---

**2 attachments**

📄 **Success page.pdf**
28K

📄 **PTE 110_04-18-2024 A. Acey Deposition Clip 11-12-41 AM-11-19-09 AM.mp4**
16723K

## Case Number

Enter the number of the case in which you are filing. To file a document in more than one case, you must complete this form for each case in which you would like to file the document. Failure to include your case number may result in processing delays and/or the misfiling of your paper. If you do not know your case number, you can contact the Clerk's Office by emailing PAED_clerksoffice@paed.uscourts.gov. If you are filing a new case, enter NEW CASE in the field below.

2:23-cv-01438-PD

## Description of Document(s)

Please provide a brief description of the document or documents that you are filing. For example, some common submissions are "Complaint," "Motion to Proceed In Forma Pauperis," "Amended Complaint," "Motion," "Response," "Notice," "Exhibit." The description will assist the Clerk's Office in timely processing your document and will not necessarily appear on the docket.

Plaintiff's first submission of Pretrial Memoranda, PTE

## Terms of Submission *

By submitting these documents to the Court, I represent the following: (1) I am intending to file, or am submitting on behalf of an individual who intends to file, the attached document(s) with the United States District Court for the Eastern District of Pennsylvania. (2) This filing is made in compliance with Federal

Uploading

Plaintiffs first Submission of Pre-Trial Memoranda .pdf

PTE 110_04-18-2024 A. Acey Dep. Video cc 10-59-29 AM-11-02-57 AM.mp4

PTE 110_04-18-2024 A. Acey Deposition Clip 11-12-41 AM-11-19-09 AM.mp4

PTE 110_04-18-2024 A. Acey Deposition Clip 11-36-02 AM-11-37-17 AM.mp4

PTE 110_04-18-2024 A. Acey Deposition Clip 11-54-05 AM-11-54-34 AM.mp4

PTE 110_04-18-2024 A. Acey Deposition Clip 03-00-00 PM-03-01-50 PM.mp4

Appendix.pdf

Success! Your files have been submitted.



UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

ASSATA ACEY,

|  |  |  |
|---|---|---|
| | : | |
| *Plaintiff* | : | **CIVIL ACTION** |
| | : | |
| *v.* | : | |
| | : | |
| | : | |
| **INDUCTEV,** | : | |
| | : | |
| *Defendant.* | : | |
| | : | |
| | : | **No. 2:23-01438-PD** |

**Plaintiff's First Submission of Pre-Trial Memoranda**

Case summary:

I, Plaintiff, allege that my former employer, InductEV/Defendant discriminated against me from 05/23/2021 and that this discrimination continued through the statutory period (12/11/2021- 09/27/2022) by four major categories: failure to promote due to race, hostile work environment due to race, hostile work environment due to gender, and retaliation for filing a charge. The Defendant denies any wrongdoing in this case, asserts all available affirmative defenses, and argues that our dispute was initially settled in a verbal agreement during mediation. The Defendant has made no counter-claims.

**Witness List** (*See exhibit list and or asserted facts and evidence for designations*)

Omar Jackson- Deposition Transcript

Daniel Hackman- Deposition Transcript

Jacqueline Acey- Deposition Transcript

Maria Tabbut- Deposition Transcript

Assata Acey- Deposition Transcripts, Deposition Video clips, and Live testimony

Seth Wolgemuth Live Testimony- as needed to discuss qualifications and InductEV work environment

## Plaintiff's asserted facts and evidence (including Designations) to be presented at trial:

*Compiled transcripts/summaries are listed alongside their original documentation. FRE 1006*

I. Hostile Work Environment due to Gender-

**Behaviors-Gender**

1. I attended InductEV's diversity and harassment training with Bogdan Proca as a part of orientation 07/13/2021.

   **Plaintiff's Trial Exhibit (PTE) 1 (07/13/2021 training certificate). PTE 2 (07/16/2021 Teams Messages between myself and my Supervisor, Doc 40 transcript (I)(1),** *originals filed in Doc 40-2 pp. 1-20).*

2. Within 6 days of training, Proca compared me to dark chocolate ice cream.

   **PTE 3 (07/19/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (I)(2),** *originals filed in Doc 40-2 pp.21-26).* **PTE 4 (04/11/2024 A. Acey Dep. Transcript, pp. 272 (ll24)-274). PTE 5 (04/11/2024 A. Acey Dep. Transcript, pp. 290(ll21)- 292).**

3. 14 days after training, Bogdan Proca chased me around the lab after most employees had left.

   **PTE 6 (07/28/2021 Teams Messages between myself and my Supervisor, Doc 40**

Transcript (I)(3), *originals filed in Doc 40-2 pp. 27-34).* **PTE 7 (04/11/2024 A. Acey Dep. Transcript, pp. 278(ll3)-282(ll10). PTE 8a (03/27/2024 J. Acey Dep. pp. 57-63). PTE 8b (03/27/2024 J. Acey Dep. pp. 78-80, 87-93).**

4. Roughly one month from 09/22/2021, Bogdan Proca left his desk, approached my work unit and continued to stare and follow me before causing sparks to come out of said unit. **PTE 9 (10/15/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (I)(6),** *originals filed in Doc 40-2 pp. 101-124).* **PTE 10 (04/11/2024 A. Acey Dep. pp.275-277).**

5. On 12/10/2021, I attended a coworkers' lunch and witnessed Proca suggest that another employee find a "local wife" after emigrating.
   PTE 11 (12/10/2021 Text messages between myself and my husband pp.711(11:20:07 am- 11:20:43 am), 715(13:22:12)-716(13:25:31)). PTE 12 (03/01/2022 Text messages between myself and my Husband pp.1847(12:18:46)- 1848(12:23:03)).

6. Before or during my employment, Robert "Bob/Rob S." Sweirzawski was hired as quality (QA) engineer.

7. Sweirzawski was responsible for approving my units, and on 08/17/2021, he made jokes about me during an inspection.
   **PTE 13 (08/17/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (III)(2),** *originals filed in Doc 40-2 pp. 735-740).*

8. At some point before 11/16/2021, Sweirzawski flagged one of my devices for flow assembly alignment.
   **PTE 14 (11/16/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (III)(11)(3:05PM-3:28:21PM),** *originals filed in Doc 40-2 pp. 838-867).*

9. Sweirzawski was also responsible for approving devices at pai, and had been included in emails discussing the flow assembly he had flagged.

**PTE 15 (10/22/2021 and 10/28/2021 Emails and Teams Messages between myself, QA Team, and my Supervisor, Doc 40 Transcripts (III)(7-9),** *originals filed in Doc 40-2 pp. 763-771, 1723-1734*).

10. On 12/14/2021, InductEV employees *asked* me to clean a unit that another department was responsible for. Then as I consulted my manager, Sweirzawski *told* me to clean it and I tried to laugh it off.

**PTE 16 (12/14/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (III)(14),** *originals filed in Doc 40-2 pp.* **933-1089).**

11. On 04/07/2022, Sweirzawski was seen tampering with one of my cabinet enclosures.

**PTE 17 (04/07/2022 Teams Messages between myself and my Supervisor, Doc 40 Transcript (III)(18),** *originals filed in Doc 40-2 pp.* **1110-1121).**

**12.** On 12/07/2021, InductEV employee Mike Russell touched my shoulder from behind in the office hallway.

**PTE 18 (12/07/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (I)(11),** *originals filed in Doc 40-2 pp.* **173-192).**

13. On 04/07/2022, I observed another male employee, "Gary" looking up and down at my body without acknowledging my face. **PTE 19 (04/07/2022 Teams Messages between myself and my Supervisor, Doc 40 Transcript (I)(13),** *originals filed in Doc 40-2 pp.* **243-254).**

**Motivations-Gender**

1. Prior to my complaints of his behavior (07/16/2021-12/10/2021), Proca commented that it was "natural" for supervisors to date subordinates.

**PTE 2** *(See fact 1 under "behaviors-gender").* **PTE 20 (04/11/2024 A. Acey Dep. pp. 269(ll16)-272(ll21)).**

2. Soon after my first complaint of Sweirzawski's behavior but before the others (11/2021-4/2022), he emphasized my and another woman (Maria Tabbut)'s being "ladies" while minimizing our involvement in a defect investigation.
**PTE 21 (08/30/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (III)(3), *originals filed in Doc 40-2 pp. 741-748*).**

3. Sweirzawski also ignored Ms. Tabbut's authored enclosure assembly documents, leading to his flagging of flow assemblies around 10/22/2021; on 10/22/2021, Sweirzawski also arrived for his enclosure inspection with popcorn (in lieu of the assembly documents).
**PTE 22 (11/18/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (III)(13), *originals filed in Doc 40-2 pp. 900-932, 1737-1738*). PTE 23 (10/22/2021-11/18/2021 Teams Messages between myself and Maria Tabbut, Doc 40 Transcript (III)(6), *originals filed in Doc 40-2 pp. 757-762*).**

4. Around 10/08/2021, I experienced harassment from InductEV-tenant("Ron")'s assistant, "Volans", during which he began purchasing items on my behalf against my consent.
**PTE 24 (10/08/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (I)(5), *originals filed in Doc 40-2 pp. 37-100*).**

5. At least three employees present during my tenure at InductEV have been observed in directly sexual conduct:
   a) Former InductEV employee, Bill Gallagher, was witnessed openly using a photoshopped image of a woman politician in a bikini as his desktop image, and later commenting to others about the physical appearance of a female investor.
   **PTE 25 (04/09/2024 D. Hackman Dep. pp. 31(ll7)-32(ll20)).**
   b) InductEV employee, Mike Haggerty, was witnessed joking several times about telling a female intern to "spread her legs" during a soldiering process.
   **PTE 26 (04/09/2024 D. Hackman Dep. p. 37(ll3-17).**

c) InductEV employee, John Wolgemuth was witnessed discussing his view of appropriate role for his wife, and that she should be content as a housewife.

**PTE 27 (04/09/2024 D. Hackman Dep. pp. 123(ll4)-125(ll18)).**

**Awareness-Gender**

1. one month prior to my complaint about "Ron" 's assistant, a member of InductEV's managerial staff, Jerry Frank, expressed general concern over me working late while "Ron" used the lab.

   **PTE 28 (09/09/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (I)(4), *originals filed in Doc 40-2 pp.* 35-36).**

2. Sweirzawski's deviation from Ms. Tabbut's procedures and specifications was also accepted and repeated by his manager, Joe Sokalski.

   **PTE 29 (04/08/2024 M. Tabbut Dep. pp. 163(ll14)-166(ll1)).**

3. On 04 12/20/24 Talis claimed to only recall one "incident" between me and Sweirzawski. She further claimed to have investigated and documented any of my complaints, yet InductEV has produced no such documentation.

   **PTE 30 (04/12/2024 Judy Talis Certification).**

4. Talis was also the facilitator during the 07/13/21 orientation that Proca and I attended.

   **PTE 1 (See fact 1 under "behaviors-gender").**

5. On 09/22/2021, I attended a one-on-one, employee check-in, meeting with Talis, during which I complained of Proca's behavior as sexual harassment.

   **PTE 31 (09/20/2021 90-day Check-in Invite Screenshot, doc. 111-1).**

6. During that same meeting, Talis brushed my complaints of sexual harassment aside.

   **PTE 4 *(see fact 2 under "behaviors-gender")*. PTE 32 (04/11/2024 A. Acey Dep**

p.283(ll4-19)). **PTE 33 (04/11/2024 Acey A. Deposition pp. 101-103). PTE 34**

**(03/14/2024 Complaint, Doc 8-1 pp. 13-14).**

7. I also complained of Proca's behavior to my supervisor.

   **PTE 32** *(see above citation).*

8. While interviewing to work for InductEV, I complained to (former HR executive) Talis of interview comment I had seen as sexually motivated. She brushed my complaint off as a joke.

   **PTE 35 (04/28/2021 Interview Evaluation from Bruce Mitchell, Defendant's AA-9).**
   **PTE 36 (04/11/2024 A. Acey Dep. pp. 24(ll9)-29(ll21), pp.83-88(ll10), pp.159(ll11-pp 161(ll20).**

9. On 02/11/2022, Talis vocally implied that I was pregnant, after I disclosed working from home due to nausea.

   **PTE 37 (02/11/2022 Teams Messages between myself and my Supervisor, Doc 40 Transcript (II)(27),** *originals filed in Doc 40-2 pp.* **614-636).**

**Severity-Gender**

1. On 11/16/2021 Concerns of others tampering with my enclosures became so strong that I had to begin placing seals on cabinets at the end of each workday.

   **PTE 38 (11/16/2021 Teams messages between myself and my Supervisor, Doc 40 Transcript (III)(10), originals filed in Doc 40-2 pp.772-785).**

2. On 04/03/2024, former employee, Omar Jackson, claimed to have observed me as emotional and unresponsive at least once during my employment with InductEV.

   **PTE 39 (04/03/2024 O. Jackson Dep. pp. 37(ll14)-38 (ll15)).**

3. On 02/23/2022, I expressed discomfort and suspicion towards other male coworkers to

my supervisor

**PTE 40 (02/23/2022 Teams and Text Messages between myself and my Supervisor, ECF 15-52(pp. 2-3) and ECF 15-53(pp. 2-3)).**

4. On 12/07/2021, I became angry Mike Russell tapped my shoulder.

   **PTE 18** *(see fact 12 under "behaviors-gender").*

5. On 04/09/2024 my spouse, D. Hackman, testified that I expressed discomfort during my employment with either attending or saying no to one male coworker's lunch invitations for fear of sexual and romantic undertones.

   **PTE 41 (04/09/2024 D. Hackman Dep. pp. 49(ll19)-51(ll11)).**

II. Hostile work Environment due to Race

**Behavior-Race**

1. On 09/01/2021, HR demanded an apology for my RSVP-ing to a meeting invite two days after it was sent, because the organizer had complained after my RSVP.

   **PTE 43 (09/01/2021 Apology Email and Meeting Screenshot, ECF 15-45).**

2. Between 10/05/2021 and 10/13/2021, InductEV required proof of purchase for both a new phone and my previous phone after my previous phone became damaged at work (09/30/2021). **PTE 44 (10/05/2021-10/13/2021 Emails between myself and D. Wilmes (HR)). PTE 45 (04/11/2024 A. Acey Dep. pp. 167(ll2)-168(ll20), 170(ll4)-173(ll19), 174(ll3)-176(ll21)).**

3. On 10/25/2021, Talis accused me of stealing company time in front of other employees. **PTE 46 (10/25/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (II)(14),** *originals filed in Doc 40-2 pp.* **415-452).**

4. Around 07/07/2021, InductEV employee, Taylor Johnson, from a separate department,

personally asserted my job duty to me.

**PTE 47 (07/07/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (II)(3),** *originals filed in Doc 40-2 pp.* **1544-1547). PTE 48 (07/07/2021 Teams Messages between myself and my Supervisor, ECF 15-36 and 15-37**).

5.  On 08/10/2021, InductEV employees (Rob Rosenberger and Taylor Johnson) criticized how much work I was actually doing, and compared me to a white employee (Chris Schatz) that I was supervising. **PTE 49 (08/10/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (III)(1),** *originals filed in Doc 40-2 pp.* **703-734).**

6.  On 10/07/2021 Rosenberger (who is white) criticized my job performance.
    **PTE 50 (10/07/2021) Teams Messages between myself and my Supervisor, Doc 40 Transcript (III)(4),** *originals filed in Doc 40-2 pp.* **749-752).**

7.  On 04/21/2022, Rosenberg criticized my work and projects, while in my immediate presence, to a white employee and a team member (Brian Kenney) while refusing to look at or talk to me.
    **PTE 51 (04/21/2022 Teams Messages between myself and my Supervisor, Doc 40 Transcript (III)(19),** *originals filed in Doc 40-2 pp.* **1122-1154).**

8.  On 01/28/2022, this same team-member (Brian Kenney) closed a door in my face as I transported a team-breakfast delivery from the main entrance to the meeting location (after Kenney opened the door 6 times for the white delivery woman who delivered the food at the main entrance).
    **PTE 52 (01/28/2022 Teams Messages between myself and my Supervisor, Doc 40 Transcript (II)(21),** *originals filed in Doc 40-2 pp.* **515-569).**

9.  On 10/08/2021, InductEV employees anonymously reported me to the safety committee despite my prior communication and safety compliance.

**PTE 53 (10/08/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (II)(11),** *originals filed in Doc 40-2 pp.* **1548-1573).**

10. On 11/17/2021, a white InductEV employee (Tom Hornberger) refused to look me in the eye during a conversation.

**PTE 54 (11/17/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (II)(16),** *originals filed in Doc 40-2 pp.* **453-476).**

11. On 12/13/2021, a cartoon was placed outside my cubicle that mocked physics degrees (no other employee--or very few--held a physics degree at that time).

**PTE 55 (12/13/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (II)(17),** *originals filed in Doc 40-2 pp.* **1620-1631). PTE 56 (12/13/2021 Screenshot Teams messages between myself and my Supervisor, ECF 15-34 and 15-35(p.2)).**

12. Sometime before 02/18/2022, InductEV employee Jorge Rive insisted on a detailed account of my away-from desk activities despite my communicated discomfort.

**PTE 57(02/18/2022 Teams Messages between myself and my Supervisor, Doc 40 Transcript (II)(32),** *originals filed in Doc 40-2 pp.* **1604-1619).**

13. After being confronted by my supervisor, Rive openly told others that I was not a team player. **PTE 57b (02/24/2022Teams Messages between myself and my Supervisor,** *Doc 40-2 pp. 691-702***).**

**Motivations -Race**

1. Johnson also insisted on reading assignments aloud to another black employee (Julian Jackson). Jackson was also openly called lazy, and Jackson's manager (Daniel Winters also white) relocated Jacksons desk for "being too talkative".

**PTE 58 (11/09/2021 Teams Messages between myself and my Supervisor, Doc 40**

Transcript (II)(9, 12-13, 15), *originals filed in Doc 40-2 pp.* 365-367, 387-414, 1574-1595). **PTE 59 (04/03/2024 O. Jackson Dep. pp. 72(ll16)-73(ll14)).**

2. 01/25/2022, I witnessed Hornberger call for Jackson to get off his "lazy ass" while Jackson was out of earshot, receiving a supplier's delivery.

   **PTE 60 (01/25/2022 Teams Messages between myself and my Supervisor, Doc 40 Transcript (II)(20),** *originals filed in Doc 40-2 pp.* **507-514).**

3. On 09/14/2022, another employee (Steven "Steve" Brown) commented in two separate company chat rooms about a black team-member (Omar Jackson) being "that slacker" whose "nickname should be PTO".

   **PTE 61 (09/14/2022 Teams Messages between members of the Electrical Engineering Team, Doc 40-2, pp. 1711-1712). PTE 62 (09/14/2022 Text Messages between myself and my Supervisor, Doc 40-2 pp. 1715-1718).**

4. On 4/03/2024, O. Jackson initially denied knowing Steve brown multiple times, yet claimed to be close to Brown after being questioned about Brown's comment.

   **PTE 63 (04/03/2024 O. Jackson Dep. pp. 55(ll4-12), 66 (ll11-16), 99 (ll18-24)).**

5. O. Jackson has been known in the past to complain about lack of support and the racial environment a work.

   **PTE 64 (01/04/2022 Text messages between myself and my Husband p. 1284 (11:45:06)).**

6. Despite 20 years of relevant experience (including supervisory), managers shared that Omar's Jackson's qualifications for the senior technician" title and pay range were rejected due to being 9-months in from a 3-4 year "career gap" (where O. Jackson coached tennis and basketball).

   **PTE 65 (04/03/2024 O. Jackson Dep. pp. 93(ll8)-94(ll19), 96(ll-97(ll). PTE 66 (09/03/2021 Promotions Email Thread between Supervisor, HR exec, CEO, and VP**

of engineering, ECF 20-9).

7. Nevertheless, Mr. Jackson is described in my text messages and deposition transcripts as one who tries to "keep his head down" among others. **PTE 67 (04/11/2024 A. Acey Dep. pp. 107(ll10)-115(ll14). PTE 68 (09/04/2022 Text messages between myself and my Husband p. 2798).**

8. During his deposition, Mr. Jackson stated three times his intention to "stay out of" things or to himself.

   **PTE 69 (04/03/2024 O. Jackson Dep. pp. 33 (ll2-23), 38 (ll2-15), 40 (ll1-18)).**

9. At least one employee present during my time at InductEV has been observed making explicitly racial comments:

   a) On 04/08/2024, Maria Tabbut testified to hearing white employee Chris Williams discussing his ability to say the "n-word", and William's later comments that the company was "this far south" after having a black man work in the office.

      **PTE 70 (04/08/2024 M. Tabbut Dep. pp.25(ll21)-27 (ll7)).**

   b) Ms. Tabbut also testified that: Mr. Williams labelled her as the "person to keep him in check"; it was a culture where people said what they wanted; she did not feel comfortable reporting things and did expect her coworkers to report anything; that she ultimately felt unable to continue working in InductEV's environment.

      **PTE 71 (04/08/2024 M. Tabbut Dep. P27(ll17)-35).**

**Awareness-Race**

1. On 02/10/2022, I complained to a HR executive (Judith "Judy" Talis of racial harassment, yet InductEV continuously postponed corrective action through November 2022.

   **PTE 72 (02/14/2022 CAO email commenting on my complaints, Doc 73-3, p. 11;**

Various dates, HR Training Emails, Doc 73-3 pp. 43-51). **PTE 73 (02/23/2022 Teams Messages between myself and my Supervisor, Doc 40 Transcript (II)(30), originals filed in Doc 40-2 pp. 637-640).**

2. Instead, Talis questioned the validity of my complaints as I was giving them.
   **PTE 74 (02/10/2022 Text messages between myself and my Husband pp.1672-1673). PTE 75 (02/15/2022 Teams Messages between myself and my Supervisor, Doc 40 Transcript (II)(31), originals filed in Doc 40-2 pp. 641-676).**

3. On 02/14/2024, Talis indicated that company training would be the sole corrective action.
   **PTE 73 *(See fact 1 under "Awareness- Race")*. PTE 76 (04/11/2024 A. Acey Dep. pp. 161(ll4)-164).**

4. On 04/18/2022, I complained to Talis that the 10/08/2022 false safety report was caused by racial bias; Talis dismissed the complaint.
   **PTE 77 (Complaint doc 8-1, ll45-50).**

5. Company procedure for reporting harassment tells employees to make complaints to their direct supervisor, HR or any manager they feel comfortable with, and promised immediate, appropriate, and corrective action if "any conduct contrary to the policy" is confirmed.
   **PTE 78 (12/2021 Company Handbook p. 9 ("Reporting of Harassment"), AA-19).**

6. InductEV's HR department was in charge of communicating and carrying out InductEV's anti-harassment policy.
   **PTE 1 (see fact 1 under behaviors-gender). PTE 79 (06/2021 assigned onboarding schedule and Anti-harassment Training Title Page).**

7. I complained to my supervisor (Joren Wendschuh) of racial harassment at least once in one-on-one meetings.

PTE 51 *(see fact 7 in "behavior-race").*

**Severity-Race**

1. On 03/02/2021, My supervisor stated that I had become super aversive after I blamed myself for treatment from coworkers.

   **PTE 80 (03/02/2022 Teams Messages between myself and my Supervisor, Doc 40 Transcript (III)(15), *originals filed in Doc 40-2 pp. 1632-1669).***

2. My experiences of workplace racial harassment caused additional conflict between myself and my spouse.

   **PTE 81 (04/18/2024 A. Acey Dep. pp. 69(ll3)-70(ll5)).**

3. On 04/09/2024, my spouse claimed to have watched my work environment at InductEV affect my mood and my behavior.

   **PTE 82 (04/09/2024 D. Hackman Dep. pp. 43 (ll16)- p45 (ll23).**

III. Failure to Promote

**Behavior-Non-promotion**

1. In the months surrounding InductEV's performance evaluations process, several projects were asked of me that exceeded my formal role and description.

   **PTE 83 (11/12/2021 Multi-Switch Emergency Stopcircuit Final Board Schematic; 09-24-2021 Cost-Tiered Primer Surface Energy Consult; 01/10/2022 Laser Classification Calculation; 11/30/2022 Coil Connector Limits Test Plan). PTE 84 (04/09/2024 D. Hackman Dep. pp. 106(ll16)-110).**

2. On 12/04/2021, I submitted my self-review portion, expecting that I would be compensated or promoted in proportion to my current and future work within InductEV.

   **PTE 85 (12/04/2021 Performance Evaluation Excerpt, Doc 20-17 p.2).**

3. On 01/04/2022, my supervisor advised me of a team opening for process engineer. Later,

-- but before my performance meeting--- I submitted and began to discuss a new description and role with my supervisor.

**PTE 86 (02/09/2022 Email from myself to my Supervisor). Add text message**

4. During this time, tasks asked of me continue to exceed that of my formal job title and description.

**PTE 87 (02/10/2022 ANSI Safety lens calculation; 02-16-2022 ANSI Laser PPE and Administrative Controls Determination; 02-24-2022 Corrective Procedure; 03/27/2022 JIRA Roadmap Presentation Notes).**

**PTE 88 (04/09/2024 D. Hackman Dep. pp. 110(ll6)-116(ll14))**

5. On 02/04/2022, I explicitly expressed continued interest in reclassifying my role to better match my tasks and InductEV's hostile work environment

**PTE 89 (02/04/2022 Teams Messages between myself and my Supervisor, Doc 40 Transcript (II)(22), *originals filed in Doc 40-2 pp.* 570-571).**

6. After my final evaluation meeting, I continue to meet with my supervisor to discuss and revise my proposed job description, but my job title in description remained unchanged.

**PTE 90 (03/10/2022 Teams meeting Scheduled between myself and my Supervisor). PTE 91 (02/2022-04/2022 Emails between myself and my Supervisor). PTE 92 (04/18/2024 A. Acey Dep p. 171 (ll7-16)). PTE 93 (04/11/2024 A. Acey Dep. p. 151(ll15)-153(ll19)).**

7. On 04/08/2022, I submitted an article to my boss about invisible labor and misclassification of roles.

**PTE 94 (04/08/2022 Teams Messages between myself and my Supervisor, Doc 40 Transcript (IV)(3)(7:45 AM-8:02 AM), *originals filed in Doc 40-2 pp.* 1241-1248).**

8. Around 04/20/2022, I was asked to provide and discuss life trajectory to aid in my being reclassified.

**PTE 95a (04-20-2022 Emails between myself, my Supervisor, and D. Hackman).**
**PTE 95b (04/2022 Supervisor feedback).**

9. My Job description was never changed. 12 days after the Defendant received notice of the EEOC investigation, my supervisor deleted evidence of one of my most recent work products.

**PTE 96 (08/03/2022 Notice of Charge AND 08/15/2022 JIRA Notification)**

**Motivations-Non-promotion**

1. In 2021, on an interview evaluation form for the senior technician role, my supervisor indicated an interest in having me perform "Engineering" tasks while receiving the formal role and benefits of a general technician.

   **PTE 97 (04/28/2021 Interview Evaluations from both Supervisor and CAO, ECF 20-5, ECF 20-7)**

2. Between 2016 and 2022, InductEV promoted or reclassified at least 24 persons: Bill Gallagher, Patti Rensel, Rob Rosenberger, Daniel Schwartz, Seth Wolgemuth, Kyle Abramowitz, Maria Tabbut, Daniel Hackman, John Wolgemuth, Anthony Calabro, Brian Wisniewski, Frank Mcmahon, Jason Stolnis, Jerry Frank, Erik Lydick, Chris Schatz, Diana Wilmes, Taylor Johnson, Jennifer Steiner, Stephen Carras, Jerry Girard, Harry Nask, and Ryan Taggart, Daniel Winters.

   **PTE 98 (03/18/2024 Defendant's Answers (ll144-145); 03/28/2024 P. Rensel Dep. p. 10; 04/08/2024 M. Tabbut Dep. p. 25; Various Employee Profiles).**

3. The persons listed vary in terms of experience, tenure, and department--some were even promoted several times before Dec 2022.

4. All of these persons are white.

5. The only records produced, of InductEV promoting or reclassifying a black person from 2011-2022, are those records pertaining to Omar Jackson in November of 2021.

InductEV was founded by or before 2011.

6. Talis, who dismissed my complaints of racial harassment also influenced hiring and promotions decisions as in InductEV's HR executive.

7. Two days after my complaining of racial harassment, Talis discussed both my complaint and career path with my supervisor.

   **PTE 72** *(see fact 1 under "awareness-race")*. **PTE 99 (02/16/2022 Text Message from Joren Wendschuh, ECF 15-49(p.2)).**

8. On 01/14/2019, InductEV's engineering VP (Ben Cohen) recorded that a white employee required more supervision and was "not performing at [their title's] level" throughout 2018, yet he gave them a leadership opportunity running the company's test department.

   **PTE 100 (Cohen's 2018 and 2019 Overall Manager Comments of B. Gallagher).**

9. In September of 2022, Cohen agreed with my supervisor (Joren Wendschuh) a black employee (Omar Jackson)'s promotion had been delayed in 2019 by criteria beyond his job description. Within the same email, both Wendschuh and Cohen were able to agree that a white employee had earned their promotion (despite this employee not matching his role's formal requirements).

   **PTE 66 (see fact 6 in "motivations- race"). PTE 101 (04/03/2024 O. Jackson Dep. pp. 73(ll19)-75(ll23)). PTE 102 (04/03/2024 O. Jackson Dep. pp. 88(ll18)-94(ll19)).**
   **PTE 103 (Descriptions of Senior and General Tech Roles with Resumes of O. Jackson and S. Wolgemuth)**

10. This appeared to be in spite of the black employee (Omar Jackson)'s own requests for a promotion.

    **PTE 101** *(see above citation)*.

11. Frank Mcmahon, like Omar Jackson, also had a "career gap"; unlike O. Jackson, Mcmahon's 2.75 year "gap" directly preceded his time at InductEV, yet did not prevent

InductEV from immediately classifying him as a Senior Engineer in 2017. McMahon is also white. **PTE 98 (see fact 2 of "motivations-non-promotion").**

12. On 05/2021, Harry Nask, like Omar Jackson, was hired after applying to a company opening for a non-senior role; unlike O. Jackson, Nask was offered the Senior designation upon hire. Nask is white.

    **PTE 98 (see fact 2 of "motivations-non-promotion")**

13. Talis was included on the e-mail thread but made no denials of Wendschuh's statement.

14. The decisionmakers for Omar's benefits included the decisionmakers for mine and others who had been promoted.

    **PTE 62** *(see fact 3 in "motivations- race").* **PTE 99** *(see fact 5 in "motivations-non promotion").* **PTE 104 (05/2021 and 09/2022 Hiring evaluations and Emails amongst CAO, VP Engineering and CEO, ECF 20-6 and 20-10).**

## Awareness-Non-promotion

1. During my employment, InductEV's HR department reviewed performance evaluations and escalated promotion requests to the CEO. The department was also aware -or should have been- of the laws prohibiting workplace racial discrimination.

    **PTE 64 (see fact 3 in "motivations- race").**

2. **The HR department was also aware of my supervisor's intent for my job tasks. PTE 105 (04/11/2024 A. Acey Dep. p. 88(ll2-ll19), PTE 97** *(see fact 1 in "motivations- non-promotion").*

3. InductEV's employee handbook required employees to bring concerns over equal employment opportunities such as terms and conditions of employment directly to the CEO.

    **PTE 106 (12/2021 Company Handbook, p. 6 ("Equal Employment Opportunities"),**

AA-19).

4. InductEV's employee handbook also required employees to bring concerns over retaliation (for complaining to the CEO), to the CEO.

   **PTE 106 (see above citation).**

5. InductEV's equal opportunity complaints policy was unrealistic and in bad faith.

**Monetary Effect-Non-promotion**

1. During my employment, InductEV's 401k match was based on base pay

   **PTE 107 (12/2021 Company Handbook, p. 17 (bottom portion), AA-19).**

2. During my employment, InductEV's standard raises were often based on base pay. InductEV also established salary grades and midpoints based on job classification.

   **PTE 64 (see fact 3 in "motivations- race").  PTE 114 (Defendant's Production, INDUCTEV INITDISCL019275.xlsx).**

3. During my employment, InductEV's disability benefits were also based on base pay

   **PTE 108 (12/2021 Company Handbook, p. 20 ("Short Term Disability"), AA-19).**

1. IV. Retaliation for filing a Charge

   *Plaintiff intends to assert all claims listed in doc. 92, with the addition of the following*:

   **Severity-Retaliation**

1. Throughout this case, InductEV has continued to blame me for the mental and emotional damage that I have sustained because of their discrimination, while also antagonizing me in the name of zealous advocacy.

   **PTE 109 (04/18/2024 A. Acey Dep. pp. 57-65, 93-98, 129(ll16)-130 (ll9), 242(ll10)-243(ll20)).  PTE 110 (04/18/2024 A. Acey Dep. Video cc 10:59:29-11:02:57, 11:12:41-**

**11:19:09, 11:36:00-11:37:17, 11:54:05-11:54:34, 3:00:00-3:01:50). PTE 111 (08/28/2024 Defendant Email). PTE 112 (03/27/2024 J. Acey Dep. pp. 50-51). PTE 113 (04/09/2024 D. Hackman Dep. p. 93).**

*All evidence listed on page 1 of Doc 92-2 (appendix of Doc 92 motion for partial Summary judgement) is also intended to be presented at trial with exhibits 1-17 becoming PTE 115-PTE 131 respectively, (with Ex 1 of Doc 92 starting as PTE 115).*

Sincerely,

Assata Acey Hackman /s/

Assata Acey (Pro Se)

5121 Brown St,

Philadelphia, PA, 19139

770-231-1017

aceyassata@gmail.com

Date: 09/08/2024

Success! Your files have been submitted.



## Case Number

Enter the number of the case in which you are filing. To file a document in more than one case, you must complete this form for each case in which you would like to file the document. Failure to include your case number may result in processing delays and/or the misfiling of your paper. If you do not know your case number, you can contact the Clerk's Office by emailing PAED_clerksoffice@paed.uscourts.gov. If you are filing a new case, enter NEW CASE in the field below.

01438-PD

## Description of Document(s)

Please provide a brief description of the document or documents that you are filing. For example, some common submissions are "Complaint," "Motion to Proceed In Forma Pauperis," "Amended Complaint," "Motion," "Response," "Notice," "Exhibit." The description will assist the Clerk's Office in timely processing your document and will not necessarily appear on the docket.

Notice, Brief, Confirmation of Submission, Email to Op

## Terms of Submission *

By submitting these documents to the Court, I represent the following: (1) I am intending to file, or am submitting on behalf of an individual who intends to file, the attached document(s) with the United States District Court for the Eastern District of Pennsylvania. (2) This filing is made in compliance with Federal

Uploading

# Processing your files

**Keep window open until you see a success message**

courthouse lobbies which are available 24 hours per day; or delivering them in person at the Clerk's Office during the hours the courthouses are open to the public. If you successfully file using EDS, you should not mail or deliver additional copies of your filing to the Clerk's Office. PLEASE ALLOW THE UPLOAD TO FINISH. DO NOT CLOSE THIS PAGE UNTIL THE UPLOAD IS COMPLETE. ALL DOCUMENT SECURITY PROTECTIONS MUST BE REMOVED BEFORE UPLOADING FILES.

## Upload files *

Limit: 20 Files Per Submission

| | | |
|---|---|---|
| **PDF** Email to Counsel and Chambers.pdf | 87.2 KB | × |
| **PDF** Success page.pdf | 27.1 KB | × |
| **PDF** Submission page 2.pdf | 146.4 KB | × |
| **PDF** Plaintiffs first Submission of Pre-Trial Memoranda .pdf | 786.5 KB | × |
| **PDF** Notice (1).pdf | 13.5 KB | × |

**Add another file**

## Name: *

Type your name as it appears on your documents.

Assata Acey Hackman

## Email Address: *

If you provide your email address you are consenting to service by email. You will receive notice of court documents, as well as documents filed by other parties in the case, at the email address you provide and not via U.S. mail

Enter a response

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ASSATA ACEY,** | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| *v.* | : | |
| | : | |
| **INDUCTEV,** | : | |
| *Defendant.* | : | **No. 2:23-01438-PD** |

### Amendment to Plaintiff's Trial Exhibits (PTE 61 and PTE 62) from Doc 137

I, Plaintiff, submit these amendments to PTE 61 and 62 (which were filed in Doc 137, the appendix to my Trial Memorandum), upon noting that the exhibits did not convert fully to PDF. Updated and printer friendly versions have been attached.

Sincerely,

Assata Acey Hackman /s/

Assata Acey (Pro Se)

5121 Brown St,

Philadelphia, PA, 19139

770-231-1017

aceyassata@gmail.com

Date: 09/13/2024

**PTE 61 AMENDED (09/14/2022 Text Message forwarding 08/12/2022 Teams Messages between members of the Electrical Engineering Team, Doc 40-2, pp. 1711-1712).**

Exhibit 844- 09-14-2022 Steve Comments on attendance of other Black Employees- Omar Jackson IMG_2112.PNG



**PTE 62 AMENDED (09/14/2022 Text Messages between myself and my Supervisor discussing 08/12/2022 Teams Messages, Doc 40-2 pp. 1715-1718).**

# Exhibit 846- 09-15-2022 Steve Comments on Black Employee Screenshot_20230526_072737 _Messages.jpg



Exhibit 847- 09-15-2022 Steve Comments on Black Employee Screenshot_20230526_072743 _Messages.jpg



# Zoom in of 08/12/2022 Messages-Forwarded via Text on 09/15/2022

8/11 9:27 AM
Thanks Steve!

Yesterday

**Steve Brown**   Yesterday 8:27 AM    🔥 1
Hey Omar, guess what day it is.....HUMP DAY!

Yesterday 8:29 AM
Haha.  He's on PTO today.

**Steve Brown**   Yesterday 8:32 AM    😆 1
That SLACKER.....his nick name should be PTO....LOL!

Yesterday 8:33 AM
Ouch!  Hah

He earned the time off.

**Steve Brown**   Yesterday 9:04 AM    🔥 1
Okie Dokie.....I like rattling his cage, he takes it so well.

Yesterday 9:10 AM
All good!  PTO is all that's sacred!   😊

**Steve Brown**   Yesterday 9:11 AM
You defiantly got that correct!

Type a new message

T   Stay in the know. Turn on
    desktop notifications.

    Turn on          Dismiss

MMS

# PTE 1 (07/13/2021 training certificate)



## ATTENDANCE CERTIFICATE

**Training:** **_Diversity & Harassment Classroom_**

**Date of Attendance:** 07/13 _____, 2021

**Facilitator/Instructor:** **Judy Talis**

**Method of Delivery:** **Microsoft Teams**

| Name of Attendee: | Assata Acey |
|---|---|
| | *Check Sessions Attended:* |
| | |
| **2.0 Hours** | ☑ Diversity & Harassment Classroom  *(All Must Attend)* |
| **1.0 Hours** | ☐ Supervisor Training (*Additional Training for all Supervisors*) |

I confirm that, on the date noted above, I attended the training sessions checked above.

Signature: _~~Assata A. Acey~~_____

Date: 07/14/2021 _____

CONFIDENTIAL


**Momentum**
Wireless Power

## ATTENDANCE CERTIFICATE

**Training:**      *Diversity & Harassment Classroom*

**Date of Attendance:**      07/13 _____, **2021**

**Facilitator/Instructor:**      **Judy Talis**

**Method of Delivery:**      **Microsoft Teams**

| Name of Attendee: | Assata Acey |
|---|---|
| | *Check Sessions Attended:* |
| | |
| **2.0 Hours** | ☑ Diversity & Harassment Classroom *(All Must Attend)* |
| **1.0 Hours** | ☐ Supervisor Training (*Additional Training for all Supervisors*) |

**I confirm that, on the date noted above, I attended the training sessions checked above.**

Signature:     *Assata D. Acey* _____

Date:     07/14/2021 _____

CONFIDENTIAL      INDUCTEV INITDISCL000166



## Attendance Certificate (2021).pdf

Document ID: 860a6c8c-e4c2-11eb-aa90-02f1b321d785

**Requested:**
Jul 13, 2021, 10:40 AM EDT (Jul 13, 2021, 2:40 PM UTC)
Diana Wilmes (diana.wilmes@momentumdynamics.com)
IP: 71.162.243.94

**Signed:**
Jul 14, 2021, 12:42 PM EDT (Jul 14, 2021, 4:42 PM UTC)
Assata Acey (Assata.Acey@momentumdynamics.com)
IP: 50.78.131.36

INDUCTEV INITDISCL000167

**PTE 2 (07/16/2021 Teams Messages between myself and my Supervisor, Doc 40 transcript (I)(1),** *originals filed in Doc 40-2 pp. 1-20***).**



1. 07/16/2021 Excited utterance (made by myself) and reputation concerning character statements
   (from my supervisor) about sexual undertones in (then principal engineer--now Electrical
   Engineering Manager) Bogdan Proca's behavior (Ex. 1-10). References ECF 8-1(¶25, ¶180-183), ECF-

**2:58:17 PM Assata:** Peripherally, Bogden does creep me out a bit. There've been other one time comments made by others in poor taste, but its giving a different gut feeling(that could still be wrong) I will stay tuned to see if it becomes a pattern or if it plateaus out.

**3:00:31 PM Joren:** Agree on the creep part, but if it's ever malicious or an issue, please feel free to talk to me, and / or HR.

**3:05:47 PM Assata:** I won't lie, the question/comments during harassment training about whether its ok to date a subordinate and how "natural" it is has me on edge. Or asking during icecream if I still run track and then getting curt that I didn't have the expected answer? Will keep you posted.

**3:13:07 PM Joren:** You were in training with him?

**3:14:06 PM Assata:** yes, I had training with Him, Fran, Chris and Brenda since its once a month

**3:14:10 PM Joren:** That's kind of concerning...

**3:15:48 PM Assata:** I don't know if Judy noticed the direction of his comments in training. He and Fran had the most resistance to training, but I think Fran's was more politically inclined, and he seems to have no vendetta to treat anyone weird.

**3:16:27 PM Assata:** He's just on my radar as possibly extra creepy. But wanted to give a heads up in case I notice a pattern later

**3:17:59 PM Joren:** Thanks for letting me know. Please feel welcome to continue bringing this up if it continues, that's unacceptable, and not going to be stood for.

**4:27:15 PM Joren:** Please note -1 am taking this information very seriously. Please do not hesitate to reach out to me if anything further comes up, no matter how small. You matter as a person, and by default, deserve to be in an environment where you are able to focus on work without having other things distracting you, let alone anything further. Also please certainly let me know if there is any way / any thing I, or others, can do to assist.



**PTE 3 (07/19/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (I)(2),** *originals filed in Doc 40-2 pp.21-26***).**

2. 07/19/2021 Excited utterance and recorded recollection from myself to my supervisor (Joren Wendschuh) regarding sexual undertones in Bogdan Proca's behavior.
(Exhibits 11-13). References ECF 8-1 (¶25(a)-(b)), ¶184), ECF 15 (¶79).

9:06:05 PM Assata: ok retyping... On my way home friday, I mentally flagged another statement that I had blocked out. During icecream, i had asked chis what flavor he got, to which he said "chocolate. I'm a simple man." I then turned and asked the folks behind and to the left of us what flavor they got/was it the same. Bogdan who was closest, responded that he was getting "dark chocolate, if they have it." before proceeding into his track questions. Im not sure about the statement, when chris subsequently went in I [assumed] it was the sun, and it may have been. But I've also never hear anyone order dark choc[o]late ice cream. Regardless, after a full weekend, I definitely feel like there isnt too much overlap where ill have to seen Bogdan often. I'm probabl[y] going to politely avoid him

1:22:39 PM Joren: Assata Acey - Want to be clear here - is there anything you are asking / wanting me to do with the information about Bogden?

1:37:54 PM Assata: To be clear, not really. I'm just keeping an open log as things occur so that 1. You know of the situation, behind the scenes- which lowers stress of explaining wanting to avoid being around him too much and further lowers the unlikely chance of you accidentally place us together[or insert awkward or otherwise avoidable exchange here] unless important. 2. If it gets to be a pattern/ Or a bigger issue, you will know. 3. If it becomes a pattern and I'm too confused to figure that out, theres another set of eyes. The message this morning was me wanting to

make sure I expressed all of what from yester-workday(friday). My current status with interactions is to avoid, since I dont interact with him often. Although I have caught him staring a bit., and watching me during my morning chat with Tina? Honestly hes getting close but not quite an issue yet, and idk what time frame is best for these updates(weekly or not) and I'm hoping he stops. But also if he says anything else[blatantly] weird, then I'd probably raise a flag jic



**PTE 4 (04/11/2024 A. Acey Dep. Transcript, pp. 272 (ll24)-274).**



Page 273

1    Ms. Talis at your 90-day check-in afterwards?

2         A.    So she asked me how I was doing,

3    and I took the opportunity to brag about my

4    boss.

5              And I was saying, "Oh, you know,

6    like, I tell him when people are harassing

7    me, and he's been very supportive."

8              She asked for examples of something

9    that, I guess, she felt she could help with,

10   and I told her about Bogdan, and for me she

11   failed that test.  She -- she totally just --

12   it just wasn't -- I don't know.

13             I told her about the comments in

14   orientation, how they made me feel.  I told

15   her the company gives free ice cream on

16   certain days, about Bogdan's comments in

17   front of the ice cream truck.

18             I told her --

19        Q.    What comment is that?

20        A.    He had said a couple things, but, I

21   mean, he just came near me at a respectful

22   distance, and he -- like, we were stand- --

23   the truck was here, opening there, and we

24   were standing, like, this side of truck.

1          And he asked about, you know,

2     whether I run, and I was excited.  I was,

3     like, "Well, you know, not" -- "not as much."

4          But I -- you know, I thought it was

5     a fun conversation, but when he found out

6     that I didn't run, he looked -- he started

7     frowning, almost in a cartoonish way, but I

8     guess he wasn't happy.  And I guess the topic

9     of ice cream came up and he was looking at me

10    and he mentioned dark chocolate.

11         The exact words he stated were

12    probably more accurately recounted to my

13    boss, I believe, like, a day or two after we

14    had teams, but I can't remember his direct

15    quotes right now.

16    Q.    When you say you shared his comment

17    that bothered you with your boss, do you

18    know, did Joren speak with Bogdan?

19    A.    No.  He just said it was weird, and

20    that he had noticed a creepy vibe from him

21    before.  And we agreed that if it ever came

22    up for me to have to work with Bogdan or be

23    in the same room, he would support me keeping

24    a healthy distance.

**PTE 5 (04/11/2024 A. Acey Dep. Transcript, pp. 290(ll21)- 292).**

21    Q    You had just given some examples.
22    You said that you felt that there were racist
23    people at the company.  You mentioned --
24    you -- I guess, the ice cream with Bogdan?



```
 1       A.   I thought that was weird.   I think
 2   the judge pointed that out as racism because
 3   it was dark chocolate.   I just thought it was
 4   sexual harassment because I'm dark skinned.
 5   I mean, he wasn't calling me like do-do, so I
 6   didn't feel, like, he was being degrading
 7   or -- I can understand sexing blackness, but
 8   I felt like it he was more so sexualizing my
 9   body than my race.
10       Q.   Well, this -- this happened that
11   there was an ice cream truck in the parking
12   lot at InductEV?
13       A.   Yes.   So that one of the -- one of
14   the things I loved about the company was --
15   and one of the things they always talked
16   about was they would pick one day a week
17   where they would have ice cream.   There's
18   this guy, a contractor -- a lot of people
19   felt strongly about who provided the ice
20   cream.
21            But there was this guy, and he
22   would come and he would announce, "All right.
23   Everyone, it's ice cream time."
24            I was so excited for this ice
```

Page 292

1    cream.  And I'd ask people what flavor

2    they're going to get.  Oh that's probably why

3    he -- yeah.

4           Anyway, I would ask people what

5    flavor they were going to get.  And -- and I

6    just thought it was a nice place to say hi to

7    people at work.  And Bogdan kind of -- I

8    wouldn't say he ruined that for me, but in

9    that moment he put a damper on it.

10         Q.   Were there other people when he

11   made the comment, was it out at the truck?  I

12   mean, where did it happen?

13         A.   It was out at the truck.  Everybody

14   came out, even the VPs would come out.  And,

15   I mean, there's this guy named Chris Shotz.

16   He was a recent field technician.  I was

17   really fond of Chris Shotz.  And I believe I

18   was trying to, like, interact with him, as

19   far as, like, "Hey, how are you," like,

20   "How's it" -- and Bogdan approached.

21           And I mean, if you're going to

22   stare, you might as well talk, and I asked

23   him -- you know, I don't even know.  I'm

24   trying to -- I don't want to piecework things

**PTE 6 (07/28/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (I)(3),** *originals filed in Doc 40-2 pp. 27-34).*

3. **07/28/2021 Excited utterance from myself to my supervisor about escalated concerns about Bogdan Proca's sexual behavior.**

   **(Ex. 14-17). References ECF 8-1 (¶25(c), ¶184), ECF 15 (¶79).**

   **[\*Preceding Messages not Produced\*]**

   **5:57:02 PM Assata:** Yw! I knew what you meant but others may not. In other stories, Bogdan heard me singing in back [o[f lab and walked across stuff/around table to me and asked if we were the last two people in the building... I just kept walking and pointed him towards the gold car person he asked me to take him there but eventually found the door. Probably benign but jic

   **5:59:45 PM Joren:** Understood. Thanks. Gold car person == Ron Turi! [shrunken image]

   **6:02:27 PM Joren:** You're out of the building, right?

   **6:02:32 PM Assata:** Yes

**PTE 7 (04/11/2024 A. Acey Dep. Transcript, pp. 278(ll3)-282(ll10).**

4   incidences that you remember where he made

5   you to feel uncomfortable, or you thought his

6   behavior was weird?

7        A.   Yes.  I think we just -- I think we

8   briefly discussed the -- the after-hours lab

9   thing with him.  I don't remember.

10       Q.   Tell me about that.  I've seen it

11   in the papers, so...

12       A.   Yeah.  So I was working late.  If

13   you remember that map you showed me of the --

14   the area, like, closer to the back of the

15   lab, closer to the back, away from the garage

16   door, and all the way against the other wall,

17   and I was -- like, there's this big old table

18   with all these things on it -- because it's

19   usually Seth's area where they keep things

20   for the ground assembly, those big

21   rectangular things where they build them and

22   put the ferrite.  And I think I was just

23   going to get a tool or something, and Bogdan

24   kind of comes from the other side of that

Page 279

1   room, which is, like, out the back of what
2   would be Andy's office where that gets into
3   some of those rooms, and he -- from across
4   that room he asked if we're the only people
5   there.
6           I thought, "Okay.  Well" -- I'm
7   sorry, I don't remember if that was his first
8   question.  I just know it was a question that
9   he asked in -- during that exchange.
10          Do you want me to circle on here?
11      Q.   Yeah.  Could you get Exhibit.
12   AA-17 --
13      A.   I have it.
14      Q.   -- and put a circle with a "B" as
15   to where Bogdan was.
16      A.   Okay.  I was out here --
17          (Witness complies.)
18      Q.   -- to your recollection?
19      A.   So Bogdan started off here.
20      Q.   And where -- where -- where -- were
21   you in essentially the same spot the whole
22   time during this episode?
23      A.   I was originally here (Witness
24   indicating) and --

Page 280

1          Q.    What letter did you use?

2          A.    I just used an "A" for Assata.

3          Q.    That makes sense.  Good enough.

4          A.    There was a table, like, around

5     there (Witness indicating) --

6          Q.    Oh, okay.

7          A.    So I didn't mark -- I just tried to

8     gesture where it is.

9               So Bogdan calls out to me from

10    here, and he starts with some type of

11    question.  I know that he eventually asked me

12    if we were the only people there, but I can't

13    remember if the first question was about Ron.

14               Ron's a contractor.  He stays there

15    late.  I mean, not a cont- -- yeah, he's a

16    contractor, doing work for the company, used

17    the space, stays there late, and a lot of

18    times they let Ron lock up last.  So that's

19    why it would be relevant.

20               But, regardless, I responded to

21    him.

22          Q.    What did you say?

23          A.    I don't remember what his first

24    question was.  I only know the response when

1  he asked me if we were the only people there.

2  I didn't know the answer, but I lied --

3  because I didn't know the answer to be true,

4  and I told him that Ron was still there

5  because at that point I was uncomfortable

6  because he was coming around the table to get

7  closer to me, and I couldn't understand

8  because the table was only this wide (Witness

9  indicating).  He could have spoken to me from

10 this side.

11        But I -- I didn't like the idea of

12 him -- what's the word -- approaching me

13 physically when he was already able to hear

14 me in reference to whether we were alone,

15 given his history with me.  And as he moved

16 around, I kind of backed up further.

17     Q.   Well, when you -- what was the --

18 what happened, did you -- were you going back

19 to your office or?

20     A.   I left immediately, and I texted my

21 boss what happened and confirmed to him that

22 I had left -- made it out the building, as he

23 asked me if I did make it out.

24     Q.   Now, I'm going to take a guess

1   here.  I'm going to show a picture.

2          Is this the table that you're

3   talking about?

4      A.  No that looks like the meeting room

5   table that's closer to the garage.

6      Q.  Okay.  Then don't worry about it.

7          When approximately did this occur

8   in your employment there?

9      A.  It had to occur towards the end of

10   2021.  I don't recall it happening in 2022.

**PTE 8a (03/27/2024 J. Acey Dep. pp. 57-63).**

```
10              Before the mediation, before any
11    of this started, did she ever talk to you about
12    her employment with Momentum?
13         A.      She, at first, she was very happy
14    to be there and she had a boss that she liked and
15    he seemed to be in her corner.  There was -- she
16    did talk sometimes about -- I believe she did
17    mention being chased around the lab or something
18    like that.  That's all.
19              Just in general, things that you
20    would talk about, nothing as -- and that she -- so
21    she would take work home and she liked to work.
22              She enjoyed it and she got -- she
23    seemed to get along with a lot of her co-workers,
24    not all of them.  I guess not the ones that chased
```

Page 58

1    her around the lab.

2         Q.    Can you explain a bit more?  What

3    do you mean when you say chased around?

4         A.    No.  That's what she told me and

5    I'm just repeating what she said.  I wasn't there,

6    so I don't know.

7         Q.    Did she ever explain what she meant

8    by chased around?

9         A.    She was being harassed is what she

10   meant.

11        Q.    How do you know that's what she

12   meant?

13        A.    Because she didn't like it, she

14   thought it was not -- that it was not something

15   that should happen at work.

16        Q.    When you say it, what was it that

17   she was telling you?

18        A.    Being chased around the lab.

19        Q.    Can you be a bit more specific?

20        A.    No, because I don't know more than

21   that.

22        Q.    She didn't tell you what she meant

23   by chased around?

24        A.    No, and I didn't go into it.  I

1    just knew she was unhappy about it and it's

2    another case where she was talking to me about

3    things she needed to talk about and I was there to

4    listen.

5            Q.    I understand that, but when she

6    said -- did she use those words chased around or

7    did she use some other words that describe it?

8            A.    I think she used -- I'm pretty

9    certain she used those words as much as I can

10   recall.

11           Q.    Okay.  It's your testimony today

12   that she didn't explain what was going on, just

13   that she was being chased around?

14           A.    I didn't ask her to go into it.

15   That's all.  I was just there, as I said, to

16   listen, so I listened to what was going on.

17           Q.    Understood.  I'm not asking whether

18   you asked her.  My question is more specific.

19                 It's did she explain what she

20   meant by being chased around; in other words, did

21   she give any additional details about what was

22   going on that she did not like at work with

23   respect --

24           A.    No.

JACQUELINE ACEY

Page 60

```
 1              Q.      Okay --
 2              A.      She may have said it in passing and
 3      talking about work, so no.
 4              Q.      That instance where she was being,
 5      quote, chased around, do you recall when she told
 6      you about that?
 7              A.      No, I don't.
 8              Q.      Do you recall when that occurred?
 9              A.      No.
10              Q.      Do you know whether -- do you know
11      who she was being chased around by?
12              A.      No.  I don't even know the people
13      she was working with.
14              Q.      Did she tell you who?
15              A.      She may have, but I don't know.  I
16      don't -- I didn't retain that information if she
17      did.  I don't think she did.
18              Q.      So she may have, but it's your
19      testimony that you can't remember?
20              A.      I don't think -- I don't know if
21      she did or not.  I really don't remember.  As I
22      said, most of the time when she talked to me, I
23      listened to her.
24                      The only reason I knew Judy's name
```

JACQUELINE ACEY

Page 61

1    is because she talked about her a lot.  She had a

2    lot to do with this case.  I don't know any other

3    names.

4                    I know she had a manager that she

5    liked and that seemed to be in her corner and I

6    don't even know his name.

7          Q.      Were you concerned at all when she

8    told you she was being chased around the lab?

9          A.      I'm concern -- I'm always concerned

10   when she is unhappy.

11         Q.      That's fair.  But that's not --

12   that's not really -- that doesn't really answer

13   the question.

14                    So did you have -- when Plaintiff

15   told you that she was being chased around, did you

16   have concerns about who was chasing her around?

17         A.      No.

18         Q.      Do you know whether the Plaintiff

19   ever reported that occurrence?

20         A.      No.

21         Q.      And never gave you any specific

22   details about what she meant by being chased

23   around?

24         A.      No.

1          Q.       And you never thought to ask?

2          A.       No.

3          Q.       Did the Plaintiff share any other

4     concerns with you?

5          A.       She shared the concern about the

6     cell phone and having to -- having to be charged

7     for time that she took when she was sick and all

8     of those were in passing.

9                   There's things that she talked

10    about, but I didn't take notes or anything like

11    that.  I don't remember.  I just I don't remember

12    exactly what happened.  I just remember those

13    things occurred.

14                  I remember when she first started

15    working there she was happy and as time progressed

16    -- she was happy about working there; and as time

17    progressed, she became unhappy.

18         Q.       And as time went on and she became

19    unhappy, she --

20         A.       Things were happening that made her

21    unhappy, yes.

22         Q.       And she shared those concerns with

23    you, right?

24         A.       In pass -- when she called to talk,

JACQUELINE ACEY

Page 63

1    just as I was saying, I mean.

2            Q.        I understand.  One of which was

3    being chased around the lab, right?

4            A.        Yes.

**PTE 8b (03/27/2024 J. Acey Dep. pp. 78-80, 87-93).**

```
11                    Are you aware of any other motive
12   of being like chased around a lab?  Are you aware
13   of any other interpretations that you would have
14   to those words?
15                    MR. LONGO:  Objection to the form
16          of the question.  You can answer.
17                    THE WITNESS:  I'm sorry.  I can
18          answer?
19                    MR. LONGO:  Yes.
20   BY MS. ACEY:
21          Q.    Our understanding is that the
22   objections will come out, but you generally would
23   be answering the questions.
24          A.    Okay.  If I was being chased around
```

1    a lab, I would presume that's sexual harassment.

2          Q.    Well, if I'm telling -- if someone

3    tells you they're being chased around the lab,

4    what do you visualize?  When I told you I was

5    being chased around the lab, what did you

6    visualize occurring?

7          A.    I visualized someone trying to

8    interact with you physically that you did not want

9    to interact with you physically.

10         Q.    At the time of that communication,

11   was I still in the lab or was I re -- at the time

12   of that communication, did I appear to you to be

13   in distress or in fear?

14              MR. LONGO:  Objection to the form

15         of the question.  You can answer.

16              THE WITNESS:  I don't remember.

17   BY MS. ACEY HACKMAN:

18         Q.    Do I often call you during these

19   events when I complain about -- did I often call

20   you while at work to complain about events at

21   work?

22         A.    No, not that I can recall.

23         Q.    Do I tell you things usually while

24   they're happening or after they happen?

JACQUELINE ACEY

Page 80

1          A.          After they happen.

2                      MR. LONGO:   Objection.

3      BY MR. LONGO:

4          Q.          The problems that I have brought to

5      you about my job at Momentum, have you felt that

6      you were able to solve them?

7          A.          No.

8          Q.          Did you believe that there was

9      anything that you could do to prevent people from

10     chasing me at my job?

11         A.          No.



12                             -   -   -

13        BY MR. LONGO:

14             Q.      Ms. Acey, you testified earlier

15        that you didn't recall any specific details of the

16        circumstances that you described as being chased

17        around, correct?

18             A.      Yes.

19             Q.      And you testified just a minute ago

20        that you would have described that experience

21        being chased around as sexual harassment, right?

22             A.      If it were to happen to me, yes.

23             Q.      You would agree with me that -- let

24        me back up.

JACQUELINE ACEY

Page 88

1          A.      If I'm -- go ahead.  I'm sorry.
2          Q.      You don't remember a specific date
3     Plaintiff told you about being chased around,
4     right?
5          A.      That's right.
6          Q.      You don't remember any details
7     about Plaintiff being chased around, right?
8          A.      That's right.
9          Q.      You don't know whether the
10    Plaintiff was being chased around by a man or a
11    woman, right?
12         A.      No.  It was a man.
13         Q.      That's not what you testified to
14    earlier; is it?
15         A.      I said she was being chased
16    around.  I didn't say whether it was a man or a
17    woman.  It was a man.
18         Q.      Okay.  So other than the detail
19    that it was a man, do you have any other
20    information about that incident being chased
21    around?
22         A.      I knew that she didn't want to be
23    chased around.
24         Q.      Not my question.  Do you have any

```
 1       other specific information relating to that
 2       experience other than the fact that she was chased
 3       around by a man?
 4              A.      With that exact experience, no, I
 5       don't have any other information.
 6              Q.      You don't know the name of the
 7       person?
 8              A.      I don't know any names, except Dan
 9       and Judy.
10              Q.      You don't know where that happened
11       within the company?
12              A.      In the lab, she said.
13              Q.      You don't know which lab; do you?
14              A.      I would not know.  I have no idea.
15              Q.      So it's fair to say other than the
16       fact she was chased around by a man, you have no
17       additional details regarding that experience,
18       right?
19              A.      That's right.
20              Q.      Give me one minute to review my
21       notes.
22                      When Plaintiff told you she was
23       chased, did you ask her what she meant?
24              A.      No.  I assumed what she meant.
```

JACQUELINE ACEY

Page 90

1          Q.      Why did you assume what she meant?

2          A.      Because she was upset about it, she

3     didn't want to be chased.

4          Q.      You didn't think to ask what she

5     meant by chased around?

6          A.      No.  Would you?

7          Q.      I would, yes.  But you did not?

8          A.      I didn't.  It wasn't something that

9     she wanted to happen that she enjoyed that it

10    happened.  She was upset about it.

11         Q.      And you testified earlier that you

12    weren't -- when she told you she was being chased

13    around, you weren't concerned, right?  That was

14    your testimony?

15         A.      I didn't say that.

16         Q.      We'll have a transcript.  I believe

17    that's what you testified to.

18         A.      I'm sorry?

19         Q.      We'll have the transcript and see

20    what you testified to.

21         A.      I'm sure I didn't say I wasn't

22    concerned.

23         Q.      But you didn't ask any questions

24    about what Plaintiff was telling you; did you?

JACQUELINE ACEY

Page 91

```
 1           A.      That's what I said.
 2           Q.      What is what you said?
 3           A.      I didn't ask any questions about
 4   it.  I didn't say I wasn't concerned.
 5           Q.      All right.  I may be --
 6           A.      Surmised.
 7           Q.      Excuse me?
 8           A.      You surmised?
 9           Q.      No.  I may be misremembering your
10   testimony, but we'll see what the transcript
11   says.
12           A.      Okay.
13           Q.      Did Plaintiff ever mention to you
14   during that incident that she believed this person
15   wanted to physically interact with her?
16           A.      That's what I believed she was
17   saying.
18           Q.      But she never mentioned that,
19   right?
20           A.      If you're being chased around a lab
21   and you complain about it, I would assume that
22   means that it's something that you didn't want to
23   happen.
24           Q.      But she never complained, to the
```

Page 92

```
 1    best of your knowledge, she never complained to
 2    the company?
 3          A.      She never complained to the
 4    company?
 5          Q.      She never made a report?
 6          A.      I don't know if she ever talked to
 7    Judy about it or not.  You'd have to ask her.
 8          Q.      And --
 9          A.      It's more likely she would have
10    talked to her manager about it because they did
11    get along.
12          Q.      So when Plaintiff came to you and
13    told you about the instance that she was chased
14    around, you thought that the person wanted to
15    physically interact with her, right?
16          A.      Yes.  And many of the things that
17    happened to her, I want to say again, she was --
18    she had a good relationship with her manager and
19    she told him about most of these things.  Maybe
20    you should depose him.
21          Q.      Okay.  But again, just to close
22    this off, she, Plaintiff, never told you that she
23    was aware that this person wanted to physically
24    interact with her, right?
```

JACQUELINE ACEY

Page 93

```
 1              A.      I assume that's what chased around
 2       means.
 3              Q.      I understand that, but Plaintiff
 4       never told you that, right?  You assumed that but
 5       she never told you --
 6              A.      She might have told her manager
 7       that.
 8              Q.      But she didn't --
 9              A.      You should depose the manager.  She
10       told him a lot of things that she wouldn't tell
11       me.
12              Q.      How are you aware of discussions
13       she had with the manager?
14              A.      She liked him and he seemed to be
15       on her side and she told him about many things.
16              Q.      Okay.  How do you know --
17              A.      She said -- she told me that.
18              Q.      Okay.  So it's fair to say she told
19       him things she didn't tell you?
20              A.      She was his -- he was her manager,
21       so he would be the proper person to tell, I would
22       think.
```

**PTE 9 (10/15/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (I)(6),** *originals filed in Doc 40-2 pp.* **101-124).**

6. **10/15/2021 Excited utterance and present sense impression from myself to my supervisor about Bogdan Proca's a retaliatory/unwanted behavior (Ex. 51-62) References: Doc 15 (¶79), 8-1 (¶28)).**

> **8:38:48 AM Assata:** Bogdan over here playing with my unfinished cabinet with a multimeter
> **8:39:08 AM Assata:** Connecting stuff that isn't properly hooked up yet., already heard a popping sound
> **8:39:36 AM Assata:** Also just moved my stuff to other side of cabinet to keep.wprkong and he decided to also move to that side someone come get this man
> **8:40:06 AM Assata:** If anything is broken later I'd blame him., but I guess it's better than him playing with the finished cabinets
> **8:41:11 AM Assata:** He just walked away.... after 5-7 minutes., mess
> **8:41:58 AM Joren:** The 150 in the back?
> **8:42:05 AM Assata:** Yes
> **8:42:31 AM Joren:** Ugh. Thanks for letting me know.

**8:43:06 AM Assata:** He literally saw me move all my stuff and Shen went o the other side right where the seat was so I refused to sit until he left.. I have threads to check

**8:44:15 AM Assata:** On an emotional level I'm annoyed at his rudeness. On a professional level im.hoping he didn't damage anything

**8:44:42 AM Joren:** Double agree. I'm planning to talk with him once I'm out of this terrible meetin

**8:49:18 AM Joren:** I need a beer. Please let me know if he ever does that again, he's been told.



**PTE 10 (04/11/2024 A. Acey Dep. pp.275-277).**

1          I think at the time we agreed that

2     if he kept being weird, it -- we would take

3     not of this behavior as a part of a pattern.

4          Q.    And did Bogdan continue being

5     weird?

6          A.    Yes.

7          Q.    And did you go to Jogan [sic]?

8          A.    Joren?

9          Q.    "Joren," excuse me.

10         A.    Yes.  I -- I messaged him when

11    Bogdan was, like -- there's -- there are

12    different instances, but the one that I can

13    remember is specifically the one in the

14    evidence where Bogdan basically -- he went to

15    the cabinets, and acted like he was

16    inspecting them, didn't speak to me.

17         And in order to do stuff at the

18    bottom, I have to sit on this, like,

19    low-riding scooter, which means I'm in a

20    squat.  I wear skirts, but I don't really

21    like being very low to the ground in front of

22    people who are standing up, particularly

23    people who I think are creepy, so what I

24    would do is in feeling self-conscious, I

Page 276

1    would move, you know, the cabinet's, like,
2    kind of shaped rectangularly, I would move to
3    the other side, and he would move to the
4    other side.

5          And, I mean, initially when he came
6    up, "Okay.  Whatever."  Like, he just stayed
7    there, and he wouldn't move.  And at another
8    point, I noticed him coming to the cabinet I
9    was working on, and he had, like, a
10   multimeter in his hand, and he poked one of
11   the tongs at one of the boxes and a spark
12   flew off, which made me worried about my job
13   because, again, I was responsible for the
14   repairs and the status of these cabinets.

15         So if he damaged anything and QA
16   found it or it went to a -- a supply -- a
17   client and malfunctioned, I felt that it
18   would reflect poorly on me.

19    Q.   Did -- did anything ever come of
20   that incident with the spark?  I mean, was it
21   rejected, did it become a problem?  I mean...

22    A.    I don't know what happened in the
23   further testing of that unit, but I know that
24   I messaged my boss about it right away, and

1  he said he would have a talk with the

2  Engineering folk.

3       Q.   What -- what was Bogdan's role?

4       A.   He -- I think he was a principal

5  engineer, Electrical Engineer II, I think he

6  was.

7       Q.   Where did he fit with regard to

8  supervision of you?  Did he -- was he in --

9  was he Joren's boss, or was he in charge of

10  some other department or section?

11      A.   No.  I mean the structure was --

12  was pretty horizontal at the company.

13  Principal engineer -- he didn't -- he wasn't

14  even in charge of the normal engineers.

15           If a junior electrical engineer

16  came, he could mentor them, but the manager

17  of the Electrical Engineers was Jerry Frank,

18  Vice President Ben Cohen.

19           My manager was Joren Wendschuh, and

20  I did not report to Bogdan.  I actually only

21  had to work with Bogdan one time, and even

22  then I was just supporting him with another

23  teammate.

**PTE 11 (12/10/2021 Text messages between myself and my husband pp.711(11:20:07 am-11:20:43 am), 715(13:22:12)-716(13:25:31)).**

12/10/2021 11:20:07

Assata (+17702311017)
Sam asked me to lunch again(well everyone generally, but looking at ne and was like please invite others I don't have time)

12/10/2021 11:20:15

Assata (+17702311017)
Mee looking at my timesheet priority list

12/10/2021 11:20:28

Assata (+17702311017)
I told him to ask Tina and that I have cabinets

12/10/2021 11:20:41

Assata (+17702311017)
Which is true but it's not like I wouldn't move it if I wanted to....

12/10/2021 11:20:43

Assata (+17702311017)
Mess

12/10/2021 13:22:12

Assata (+17702311017)
Im also glad you came with me to lunch

12/10/2021 13:22:33

You didn't make me feel weird at all

12/10/2021 13:22:39

Assata (+17702311017)
Bc all that about Sam sitting in the middle and riding I Bogdans car

12/10/2021 13:22:56

Assata (+17702311017)
And Sam asking intrusive Qs and Jorge joining in was stressfil

12/10/2021 13:23:02

Being around people can make me feel weird. You absolutely do not make me feel weird

12/10/2021 13:23:09

Assata (+17702311017)
Or Bogdan discussing local wives like it's a car and you can have multiple

12/10/2021 13:23:27

I like being around you too. I hope it offered some comfort

12/10/2021 13:23:52

Assata (+17702311017)
Or the waitress smiling at everyone else and maybe not responding to my thank you bc she ain't hear or maybe not

12/10/2021 13:24:18

Assata (+17702311017)
It was very comforting. I noticed these things but I dint dwell on them as an emergency bc I knew you were there too

12/10/2021 13:24:28

Assata (+17702311017)
Sam was prov sad that you rode in the middle

12/10/2021 13:24:30

Assata (+17702311017)
I wasn't

12/10/2021 13:24:59

Lol yeah. Me neither

12/10/2021 13:25:31

It was kinda fun. Sam is something else. "Did you emigrate?" Lmaooo

Exported from iPhone (F18DWA8P0DXW) on 4/6/2024 19:55:22 with iMazing by DigiDNA. Database date when extracted: 4/6/2024 19:42:05

Page 715 of 7194



12/10/2021 13:30:56

Let me know any time you want me to bail you out of something or go along someplace. I love being around you

12/10/2021 13:33:09

**PTE 12 (03/01/2022 Text messages between myself and my Husband pp.1847(12:18:46)-1848(12:23:03)).**

3/1/2022 12:18:46

Assata (+17702311017)
Sam trying to get me to lunch again

3/1/2022 12:19:00

Assata (+17702311017)
Nearly lied saying Tina is coming too then admitted he didn't ask her

3/1/2022 12:19:04

Lemme know if you need a bailout

3/1/2022 12:19:13

Assata (+17702311017)
Idk why he has to go with me and not just other folks at work

3/1/2022 12:19:34

Assata (+17702311017)
I don't mind inviting others to go with him. Since most folks here are men anyway and unlikely to be weirded out

3/1/2022 12:19:46

Assata (+17702311017)
I'm surprised he still asked after joren talked to his pll

3/1/2022 12:20:52

Assata (+17702311017)
Meh. I kinda feel mean for nit wanting to go. But um going to ignore for a while

3/1/2022 12:21:10

Assata (+17702311017)
He invited bearded guy

3/1/2022 12:21:19

Assata (+17702311017)
Not mustache man. But beard mam

Messages - Assata                                                                    +17176391313

3/1/2022 12:23:03

Don't feel bad



**PTE 13 (08/17/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (III)(2),** *originals filed in Doc 40-2 pp. 735-740).*

2. **08/17/2021 Excited utterance and present sense impression from myself to my supervisor about the inappropriate and condescending behavior of a white male Quality engineer, Robert Sweirzawski (aka Rob S or "Bob") during his inspection of my competed electrical cabinets (Ex. 364-366). References: ECF 8-1 (¶14-18, 120-121(b-d), ¶124-129, ¶175-177), Doc 15 (¶77-80).**

    **9:53:54 AM Assata:** typing an update on the Quentin cabinet

    **10:37:16 AM Assata:**

    Climate notes: What was left out of teamwork update

    Summary: It appeared as if Bob and Brenda(mostly Bob) was particularly nasty today- more focused on the drama and personal jabs of finding something new, rather than communicating with me effectively so that I can improve the cabinet—and having respectful/beneficial dialogue about completion stages and guildelines that I have.

    Current Response: Bob and Brenda are encouraged to voice concerns also to you and Maria, I will be intentional in my communications with them, will keep an eye out for weird comments and threshold if it becomes a larger issue

    Detailed examples:

1.
Bob called me from across the room that cabinet was not inspection ready and brought me over to ask what I saw wrong. He then(while laughing at me and encouraging Brenda to do the same) pointed out a scraper that I had laid there in case they wanted additional work done, he was mid lecture" when you say its ready for inspections...x.y..z.."
Before I clarified it is not post shipping prep. I dont believe he listened, be instead went into a debriefing on how we are all new, and we "all make mistakes"
2.
After giving my torque paint notes from Maria, Bob saw it as important to explain to me why torque paint is used and that it applies only to points that have been torqued, and that I need to follow my procedure, which I had quoted back to him.
3. Bob originally told me that the serial numbers were all wrong today. After reiterating to me unsolicited about what each item I had worked on was, he finally confirmed to me that the traveler just needed to be updated. Answered my question asking this with "Thats the best and neatest way"
**12:53:06 PM Joren:** Hmm. Thanks for the update on climate, ugh. Thanks. Next QA check, please include me on.



**PTE 14 (11/16/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (III)(11)(3:05PM-3:28:21PM),** *originals filed in Doc 40-2 pp.* **838-867).**



**3:05:50 PM Assata:** Hey, I'm thinking that the flow assembly that Rob flagged, the one. We did is the right one and that the 9thers ones angle is too harsh

**3:06:00 PM Assata:** At first I thought this put of sheer bias and labor

**3:10:39 PM Joren:** Please help me understand this, I'm sorry.

**3:14:07 PM Assata:** But after looking at both and considering the req of 1.75" on an angle, the top one looks right which means the angle on the other is off, and the angles on alot ofthe others are likely too large as well

**3:14:17 PM Assata:** Omw

**3:15:12 PM Joren:** Oh... Rob == Bob.

**3:15:51 PM Joren:** You're saying you think the other 150 flow assemblies are needing to be updated with reworked ones for the angle?

**3:16:03 PM Assata:** Correct

**3:16:37 PM Joren:** Ok. Please request from inventory, and send these back for repair after you get the first.

**3:24:59 PM Joren:** Thank you!

**3:25:39 PM Assata:** Ngl I did not type this messages. Teamwork prepopulating and accidental hand dial

**3:26:01 PM Assata:** [Direct response to message from 3:26:01PM] did not type this at al

**3:27:28 PM Assata:** But the answer is yes. Monday has assemblies: a and b 1 .Bob flagged assembly a which we made. But b looks wrong 2. Most of our assemblies look like b

**3:28:15 PM Assata:** To be clear you're saying request a replacement for b and then send b back

for test?
**3:28:21 PM Assata: 'Joren:** Why Rob and not Bob?' Typo



**PTE 15 (10/22/2021 and 10/28/2021 Emails and Teams Messages between myself, QA Team, and my Supervisor, Doc 40 Transcripts (III)(7-9),** *originals filed in Doc 40-2 pp. 763-771, 1723-1734*).

7. 10/22/2021 Adverse party statement from Quality Manager Joe Sokalski acknowledging my authoring of a report for quality escalation, as well as my submission of same report to the QA team and my supervisor. References: ECF 8-1(¶3, ¶6, ¶32-37, ¶134-163), Doc 15 (¶82-83), ECF 15-61, ECF 15-62, Doc 20 (¶8-49), ECF 20-5 to 20-16, ECF 20-21. Prior escalations: Ex. 850-855.

   5:35 PM Assata:

   Hey Joe, For your notice, two of the flow assemblies procured from PAI arrived with, missing parts, an extra part, and incorrect installs according to their assembly Doc(A-01720). I have attached labelled images for each item, as well as the windchill assembly Doc. Here they are

below:

Missing Parts

1. Both flow assemblies are missing 1 quick connect each, as denoted by page 5(step3) 2. Both Flow assemblies are missing

2 caps each as denoted by page 7(step 1).

Extra Parts

1. Of these two, the first flow assembly has an extra G fitting(0100005618) as denoted by page 4(steps 2 and 6).

Incorrect Install

1. With cap +quick disconnect added, the first and second flow assemblies are angled to cap heights of 3 % " and 4 % " respectively. The spec denoted on page 6(step 5) is 1 %" .

2.. The second flow assembly also arrived with a loose joint.

[Attachments -01720.pdf; Missing Parts 1 and 2-Caps and Quick Disconnects.png; Extra Parts 1-First Assembly Double Fittings.png; Incorrect Install 1-Second Assembly Cap Height.png; Incorrect Install 2-First Assembly Loose threads.png; Incorrect Install 1-First Assembly Cap Height.png]

**6:44 PM Joe S:** Thank you Assata. I will be sure to share this with PAI and correct for future builds.

8.   **10/25/2021 Present sense impression from myself to my supervisor of the former QA manager (Joseph Sokalski) assigning flow assembly compliance to Rob S. (Ex 378-379). References: ECF 8-1 (¶14-18, ¶120-121(b-d), ¶124-129, ¶175-177), Doc 15 (¶77-80).**

**2:35:48 PM Assata:** Joe's verbal response to flow assemblies is that he never read the email but sent it to Bob and sent Bob to PAI do check all the assemblies they have in inventory

**4:46:44 PM Assata:** Also I came to findyou to say that those flow assemblies are a nighmare and Im gonna try again tomorrow

9.   **10/28/2021 Present sense impression from myself to my supervisor about the difficulty and time we spent together correcting the misassembled assemblies for completion of an in-demand enclosure (Ex. 380-381). References: ECF 8-1 (¶14-18, ¶120-121(b-d), ¶124-129, ¶175-177), Doc 15 (¶77-80).**

**2:11:10 PM Assata:** I have so felt led to add the for the flow assembly Maria did agree that it was difficult and was curious why we didn't just make PAI fix them and give to us



**PTE 16 (12/14/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (III)(14),** *originals filed in Doc 40-2 pp.* **933-1089).**



14. **12/14/2021 Excited utterance. recorded recollection and present sense impression from myself to my supervisor regarding the antagonistic behavior of Rob S AND sexual harassment/coping concerns about Rob S, Taylor Johnson, and Daniel Winters (then-Supply chain manager) expecting me to do additional cleaning instead of Rob Rosenberger on a cabinet he was responsible for (Ex. 462-538). References: ECF 8-1 (¶14-18, ¶120-121(b-d), ¶124-129, ¶175-177), Doc 15 (¶77-80).**

    **9:21:12 AM Assata:** I feel like he's determined to waste my time

    **9:21:27 AM Assata:** *Attachment sent to Joren : Screenshot shows email from Assata Acey to QA team  at 8:58 AM and reply from Robert "Bob" Swierzawski at 9:11 AM:

    Morning All, The cable connectors for the ozteks in the the fortrum-oslo and Soltrans cabinets have all been checked, tightened and painted yesterday afternoon to indicate further loosening.

Please review and inform me of any further barriers to pre-test approval. Bob, Thank you for pointing this out!

Response from Bob: Come over and say Hi when you get a chance.

**9:21:46 AM Joren:** ... *box with shrunken text*

**9:21:52 AM Joren:** Please don't text and drive.

**9:22:47 AM Joren:** I'll follow up with him this morning, please hold off "coming over and saying hi..."

**10:21:06 AM Assata:** Do you have Busy work for basement?

**10:23:17 AM Joren:** Please pull the keys for the tool box

**10:23:25 AM Joren:** Open the Green cart over here on it's own.

**10:23:30 AM Joren:** Put away multimeter, probes, etc.

**10:24:11 AM Assata:** Kk. Also Bob emailed to say it's all a pass so need to avoid hovering while he avoids signing travelers so I can copy/notify rob

**10:25:03 AM Joren:** Please details? lost.

**10:25:17 AM Assata:** Bob likes to take time to sign travelers

**10:25:37 AM Assata:** Before my Thanksgiving trip he took a smoke break and various other things to avoid signing to where I spent an extra hour

**10:25:40 AM Assata:** Waiting on him

**10:25:51 AM Assata:** After the inspection

**10:26:33 AM Assata:** So it's easier for me to avoid pestering him be i know that will want to. Esp with Rob posting his test schedule emails in such a loud but harsh way

**10:27:00 AM Joren:** Gotcha, thank you.

**10:27:21 AM Assata:** Instead of coming across as effective communication, it feels like he wants to avoid talking to me when at all possible and only communicate when he needs something. And putting it over the travelers was much

**10:27:30 AM Joren:** Ughs. Yes.

**10:27:48 AM Assata:** And telling me all that just for the time almost implies other things

**10:28:01 AM Assata:** But yeah of course I'd want to tell him it's signed and he can leave me be

**10:28:08 AM Joren:** Would you please get the DT white sealing plug part number for Tina and message it to both of us? It should be in the wire cage - in a white plastic box, on the far left cage, top shelf

**10:37:13 AM Assata:** *unknown Attachment*

**10:37:22 AM Assata:** This is the container for dt plugs

**10:37:29 AM Assata:** There are a LOT of DT boxes.

**10:37:33 AM Assata:** Looking for sealing plugs

**10:37:44 AM Joren:** Possibly in the DT pins box - in the back row of boxes on the right, top

**10:37:49 AM Assata:** But this was the box labeled for connector plugs

**10:38:12 AM Joren:** fair... plugs =/= sealing plugs

**10:40:54 AM Assata:** Ok so the pins box doesn't have

**10:40:56 AM Assata:** It

**10:41:11 AM Assata:** Praise God the travelers are signed

**10:41:21 AM Assata:** I'm going to make copies

**11:01:18 AM Assata:** Copies made doors locked

**11:01:23 AM Assata:** Keys removed

**11:01:37 AM Joren:** Yay!!!

**11:01:46 AM Assata:** Thank you. Please ask Brian for help finding the DT plugs then.

**11:04:36 AM Assata:** Ok I've gone through nearly every box on the top left shelf of the cage and have found d no lugs

**11:04:39 AM Assata:** Plugs

**11:04:59 AM Assata:** Unless, these are items we require per assembly through inventory

**11:06:13 AM Assata:** The only th ing similar would be the super seal

**11:06:21 AM Assata:** Te super seal container

**11:06:26 AM Assata:** And it's very different

**11:06:39 AM Assata:** *unknown attachment*

**11:09:15 AM Assata:** Omar said brian had rhen last

**11:11:57 AM Assata:** Found it

**11:27:08 AM Joren:** Great!

**12:31:47 PM Assata:** Bob asked to see my BOM for the 75kw US

**12:33:05 PM Assata:** ANs now is walking around with my assembly doc

**12:33:10 PM Assata:** Eating lunch with it..

**12:34:08 PM Joren:** why are you so keen to give it up? ugh. dam it Bob

**12:35:16 PM Assata:** ... he asked nicely being nice to ppl should backfire

**12:35:27 PM Assata:** Hw told inventory they need to wipe down theb75 before shipping

**12:35:41 PM Assata:** Taylor and Daniel W gave me puppy dog eyes

**12:36:08 PM Assata:** At what point does Rob have ti to cabinets when he finishes testing? Do we all have to hand off clean cabinets?

**12:36:10 PM Joren:** Tell them to request it via the form...

**12:36:17 PM Assata:** Or is that inventories Job

**12:36:35 PM Joren:** Not our problem.

**12:36:45 PM Joren:** Test hands it off to shipping.

**12:37:02 PM Assata:** Even if it gets dirty during test?

**12:37:21 PM Joren:** Test's problem with Supply Chain.

**12:39:36 PM Assata:** alrighy I can wipe this one and tell them to work it out with Rob and them in the future

**12:39:53 PM Assata:** Bc I am a girl and it looks bad

**12:39:56 PM Joren:** Or just ask them to tell me.

**12:40:00 PM Joren:** WHAT?

**12:42:16 PM Assata:** Lol if it's not for my station than to defer to me for cleaning looks bad

**12:42:39 PM Assata:** #domesticity

**12:43:13 PM Assata:** Meh. I'm in an ok mood rn

**12:43:29 PM Joren:** I'm not

**12:45:43 PM Assata:** Not Bob coming back without my assembly to ssay "yeah assata the only thing this thing needs is vacuuming"

**12:45:52 PM Assata:** I'm going to start laughing at him

**12:46:11 PM Assata:** Best way to lighten up

**12:51:34 PM Assata:** I think he asked Omar what he did with moment his mother gave him □ Omar had to ask him a few times to repeat himself. He says he's fine tho

**12:54:50 PM Assata:** Bwhaha

**PTE 17 (04/07/2022 Teams Messages between myself and my Supervisor, Doc 40 Transcript (III)(18),** *originals filed in Doc 40-2 pp.* **1110-1121).**

18. **04/07/2022 Present sense impression from myself to my supervisor of seeing Rob S tampering with one of my builds before an inspection (Ex. 549-554). References: ECF 8-1 (¶4-6, ¶14-23, ¶120-121(b-d), ¶124-129, ¶175-177), Doc 15 (¶77-80).**

    **11:04:41 AM Assata:** Ci cern-1 saw Bob touching cables this morning while I chatted Maria.

    **11:04:57 AM Assata:** I've gone back and retightened stuff

    **11:05:01 AM Assata:** And locked that side

    **11:05:29 AM Assata:** Also Taylor has cabinet key on his desk. Idk y but I just hope Bob or others aren't using it

    **11:05:54 AM Joren:** Thank you. I'll bring this up with Joe.

    **11:08:09 AM Assata:** It was so quick. I'm going to try to check stuff like you said lat year and try

**PTE 18 (12/07/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (I)(11),** *originals filed in Doc 40-2 pp.* **173-192).**



11. **12/7/2021 Excited utterance from myself to my supervisor about unwanted touch from Mike Russell, who had tapped on my shoulder while grazing past me from behind in a standard-size walkway exhibit 87-96. References: ECF 8-1 (¶28, ¶175), ECF 15 (¶79), ECF 15-52, ECF 15-53.**

    **12:53:28 PM Assata:** Not Mike Russell tappi NV my shoulde *unknown Emoji*

    **12:53:30 PM Assata:** Mess

    **12:53:46 PM Assata:** Hallway ain't that small

    **1:15:20 PM Assata** If he touches me in rhough I will have to consider gutting with a dull spoon. But also I guess conspicuously and disconcertinglt discuss that I don't like being touched

    **1:27:57 PM Joren:** Please help me understand the sentence above, so I can help.

    **1:29:10 PM Assata:** I was saying if Mike touches me again I will be upset. But I will also express to him around witnesses in a way that can be insidiously uncomfortable for him that i don't like touch.

    **1:29:18 PM Assata:** Be negative reinforcement

    **1:30:04 PM Assata:** And be the third time I'd feel bad for myself to not snap..

    **1:30:08 PM Joren:** Okay. Thank you for spelling it out.

    **1:30:13 PM Assata:** Hoping he just doesn't at all

**PTE 19 (04/07/2022 Teams Messages between myself and my Supervisor, Doc 40 Transcript (I)(13),** *originals filed in Doc 40-2 pp.* **243-254).**

13. 04/7/2022 Present sense impression and excited utterance from myself to my supervisor about sexual behavior of engineer "Gary". Ex.122-127. References: ECF 8-1(¶28, 1¶75) Doc 15 (¶79).

**1:26:05 PM Assata:** When yalla re done pls don't forget to look at the rail hole

**1:54:07 PM Assata:** Gary keeps looking at me up and (middle?) Even when i had on a coat? I waved but he didn't say hi.. I think the staring has been mostly today. I hope he's OK

**2:22:08 PM Joren:** Rail hole?

**2:24:12 PM Assata:** You already did srry

**2:36:22 PM Joren:** No need to be sorry.

**2:36:24 PM Joren:** WTF Gary.



**PTE 20 (04/11/2024 A. Acey Dep. pp.**

**269(ll16)-272(ll21)).**

```
16        Q.   You also mentioned that you were
17   concerned about some of the questions or a
18   question that was raised during the diversity
19   and harassment training that was provided on
20   July 13th, what -- what are you saying there,
21   what --
22        A.   So she had had on the screen types
23   of, like -- I guess she was talking about,
24   like, sexual harassment.  I just remember
```

Page 270

```
 1   there were, like, circles on there, and I
 2   sat -- so the door was --
 3                THE VIDEOGRAPHER:  Your mic
 4            fell off.
 5                THE WITNESS:  Sorry.  Hold on.
 6                So, like, the door was, like,
 7            over here, and, then, I sat near
 8            the -- like, right in front of the
 9            door.
10                And the guy, Bogdan, was
11            there.  Judy was over there.  And
12            he was, I guess, talking about his
13            experience.  He came from, like,
14            Princeton or whatever doing -- as a
15            faculty member, I guess.
16                And he -- he was talking
17            about -- he made some weird joke
18            about liability as far as, like,
19            sexual harassment, but he also
20            asked Judy about, like,
21            supervisors, they -- like, their
22            subordinates because Judy was on
23            the topic of how, like, what the
24            company's policy is on dating at
```

Page 271

```
 1            the company, like, they don't
 2            encourage it, but they weren't,
 3            like, super against it, but for
 4            ethical reasons they prefer not to
 5            have people who work together in
 6            the same department.
 7                 She talked about her brother
 8            being the VP of Engineering, and
 9            how she -- she made a joke about
10            liking the boss in the room.
11                 But, anyway, the thing was
12            Bogdan -- he asked his question,
13            and she was -- she was saying that
14            they didn't have really any
15            examples of that.
16                 And, then, he pushed further,
17            and he was, like, you know, "It's
18            natural."
19                 The thing is he was -- you
20            know, like, on a diagonal from me,
21            and he had been smiling in my
22            direction for a while, even when I
23            wasn't speaking.  And when he
24            mentioned it being natural, he
```

1          wasn't looking at her.  It was,

2          like, 90-degree angle to him.  He

3          was looking more at me.

4              And it made me very

5          uncomfortable because it just

6          didn't make sense.  I couldn't

7          understand what made him think it

8          was natural, and I couldn't

9          understand why he kept smiling at

10         me when I wasn't speaking.

11   BY MR. SCHAUER:

12       Q.   Did you confront him?

13       A.   No.

14       Q.   Did you raise that fact with Judy

15   after the session was over saying, "Hey, this

16   guy, Bogdan, is kind of looking at me in a

17   way that's kind of creepy"?

18       A.   No.  I talked to her about him at

19   the 90-day check-in, which was at least three

20   months -- I guess since orientation wasn't

21   the first day, so what's that, like, two

22   months or so after orientation, after I felt

23   like it had built up.

**PTE 21 (08/30/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (III)(3), *originals filed in Doc 40-2 pp. 741-748*).**



3.  **08/30/2021 Present sense impression and excited utterance from myself to my supervisor about how Rob S' omitted my and a female engineer's notes his final report on a quality issue that we escalated, diminishing our involvement while referring to us as ladies (Ex. 367-370). References: ECF 8-1 (¶14-18, 120-121(b-d), ¶124-129, ¶175-177), Doc 15 (¶77-80).**

    **10:51:50 AM Assata:** Its been an actual Jumble of interactions and updates today(and its only 10:49!) . But Im typing up a summary of an improvement we found for the ozteks so I will send that first and circle back

    **11:44:04 AM Assata:** Here's the short

    Maria looked at the stuff, called Bob over and sadly true to his currently compiling algorithmic behavior, he mans-plained it.

    Context: This is algorithmic in context of his more damaging comments and condescending behavior towards me during the QA review of Quentin(ifyou recall, those climate notes).
    Situation Specific Points:

    1. I had expressed how excited I was to write the notes down so we wouldn't forget, and Maria told me to send them to Bob and he agreed. Instead he sent a one liner to Joe and cc'd us

    2. He also left out what had happened and

    3. Bob's delivery left holes in how far maria had actually looked into and thought through the issue

    Last point and overall effect

    4. Bob then called us ladies, which kinda underscored his behavior of not listening, not waiting for input that he agreed to receive, and inputting false information to the effect of misrepresenting an event.

    Resolution and reasoning

    1. The current resolution is to continue documenting and sending out communcations electronically, so that what was said and done can be clearly spelled out.

    Reasoning ; Comparing notes with Maria, we have each had experiences where Joe did not give benefit of the doubt for actions and thoughts taken towards an issue. Joe is filling in blanks

about what is not said(benefit of doubt not given), whereas Bob is overwriting what is said.
While these differences are notable on the scale of obvious to subtle, both would stand to
benefit from documentation
Open also to any supports you can imagine there and even in future case by case bases
**11:52:29 AM Joren:** Understood. Sorry this happened, was hoping to be there for the next QA
time.
**11:53:40 AM Assata:** it wasn't even an inspection



**PTE 22 (11/18/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (III)(13),** *originals filed in Doc 40-2 pp.* **900-932, 1737-1738).**



13. **11/18/2021 Present sense impression and excited utterance from myself to my supervisor of Rob S' passing of assemblies that are outside of Maria Tabbutt (the lead mechanical engineer for this unit)'s specifications and willful obstruction of the passing of my cabinet builds (Ex. 446-461). References: Ex. 857, ECF 8-1 (¶14-18, ¶120-121(b-d), ¶124-129, ¶175-177), Doc 15 (¶77-80).**

**11:40:11 AM Assata:** mark just brought flow assemblies(angle is still wrong) but apparently QA passed them which is whatever

**11:40:27 AM Joren:** Within Maria's tolerance?

**11:40:35 AM Assata:** gonna remove the other two and give to him

**11:41:05 AM Assata:** theyre within her new tolerance, theyre at leas .5" or more beyond the oriinal spec

**11:41:23 AM Assata:** idk how QA or even Mark isn't just looking at these and measuing

**11:41:33 AM Joren:** I'll talk with QA.

**11:41:41 AM Joren:** Appreciate it. Do you know who passed them from QA?

**11:42:45 AM Assata: *unproduced attachment***

**11:43:05 AM Assata:** But idk. Prob Bob be I showed Brenda how yesterday but I'll ask

**11:57:10 AM Assata:** it was bob [Bob S]

**11:58:28 AM Assata:**

1.I confirmed he had passed them.(i asked/showed brenda first and she ws fed uP)

1.5 I mentioned the latest email that went out on tolerance(he claims he never saw-this is

important)

2. I showed bob the item put it in position of the photo I sent you and cited the spec

3. he didnt believ me or eyes [bo]th and pulled a ruler off his desk

4. he feigned surprise that it was nearly 2.5" despite him placing ruler in wrong place

5. He then looked at me with a straight face nd said "it doesn't matter"

6. i reiterated the orignal email contents and what he did by failing the wrong assembly and he smiled at me saying "we didnt know" and asked me to to send him the other email

**12:05:57 PM Assata:** contradictions:

A("it doesn't matter")

1He was going to say the angle being off doesnt matter after citing an angle being wron[g] on one of the units.

2He went to PAI after angle and torque issues and said he had f[ai]led them due to this b[u]t will now say it doesnt matter

3He was privy to the initial email with all issues includng angle associated with the items and said it doe[sn't] matter

4he decided to either, not read the assembly doc these are assesed, to, or read it and ignored that part.

B("we didn't know")

1 .he had access to the assembly doc, should have read it and "he didn't know"

2. he had access to original email detailing this a s a c[au]se for concern and and "he didnt know"

Conclusion

This man has shown, by sheer ignorance or lack of weight on words of mine or Maria(misogyny) or some other issue, that he made his own decision about a spec and was "passing things" as he saw fit without communication, documents be damned.

Impact

This lessens the design, reliabilty and quality of products from the level that Momentum's tech/engineering/design teams can reach, down to the capabilities of one man, who doesnt communicate.

**12:07:06 PM Joren:** Thank you for the detailed explanation!

**12:07:22 PM Joren:** Sad that he's doing this. I'll address it too.

**12:07:32 PM Assata:** he was willing to have folks go in circles on his own incompetence. I like dan and seengn him around makes me more internally calm but ye that whole scenario is trash

**12:07:51 PM Joren:** Agreed.



**PTE 23 (10/22/2021-11/18/2021 Teams Messages between myself and Maria Tabbut, Doc 40 Transcript (III)(6), originals filed in Doc 40-2 pp. 757-762).**



QUICK-CONNECT SUBASSEMBLY
ANGLE

Was there an update to documentation, or how is this angle tolleranced now?

**Maria Tabbut**   2:35 PM
no updates to documentation yet

───────────────────────── Last read ─────────────────────────

**Maria Tabbut**   2:35 PM
I told Bob to keep within +~1/8"to1/4" -0"

CONFIDENTIAL



6. 10/22/2021 **Present sense impression from myself to Maria Tabbut (female senior mechanical engineer) regarding Rob S's preparedness (relative to Brenda Randolf, QA technician and the only other black woman employee) for his Quality inspection of my completed cabinets (Ex. 375-377). References: ECF 8-1 (¶14-18, ¶120-121(b-d), ¶124-129, ¶175-177), Doc 15 (¶77-80).**

   **2:51:55 PM Assata:** Hope in the checks have been restored. Rob came with a bowl of popcorn. But Brenda came with notes and assembly sheet so they're going through the steps praise God
   **2:54:17 PM Maria:** ahahaha

**PTE 24 (10/08/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (I)(5),** *originals filed in Doc 40-2 pp. 37-100).*

5. **10/08/2021 Excited utterance and present sense impression from myself to my supervisor about sexual harassment from Ron Turi's former assistant (Volans)**

(Ex. 19-50). References: Ex.842, ECF 15-51, Doc. 15 (¶79) ECF 8-1(¶28, ¶175)

**3:39:14 PM Assata:** Cat person keeps buying stuff and not asking me first

**3:39:29 PM Assata:** I just explained how weird it was and demanded their venmo

**3:40:05 PM Assata:** Also twice have been asked if I'm sick and why I'm covered with jacket etc

**3:40:37 PM Assata:** This is strange but also uncomfortable be halftime if I'm not cold the jacket is to cover my shoulders et c

**3:40:41 PM Assata:** A mess

**3:50:32 PM Joren:** Oh no.

**3:50:35 PM Joren:** Who's cat?

**3:50:43 PM Assata:** Car

**3:50:46 PM Assata:** Sorry

**3:50:57 PM Joren:** Ron's friend?

**3:51:06 PM Assata:** Yeth

**3:51:24 PM Joren:** WTF?

**3:51:32 PM Assata:** Same?

**3:52:01 PM Joren:** Random dude is buying you stuff and gifting you it? You don't want a "owe" feeling, so you want to pay them back?

**3:52:02 PM Assata:** To their credit they only asked about jacket once

**3:52:30 PM Joren:** Any examples?

**3:52:34 PM Assata:** Julian mentioned earlier so I was saying twice but it's also October

**3:53:15 PM Joren:** it is "normal" here, to be asked if you're cold, sorry Usually it's meant with

care.

**3:53:20 PM Assata:** He ordered those insert clips that go in the car, printed out a how to sheets and when I didn't give number he wrote out he link and left it in the cabinet

**3:53:23 PM Joren:** Examples of buying you stuff

**3:53:43 PM Joren:** hmm. wtf.

**3:53:51 PM Joren:** I'll have a conversation with Ron. Thanks.

**3:53:56 PM Assata:** Then gave me clips and info to return what i didn't use

**3:54:34 PM Assata:** Then today after asking if I was gonna buy the plastic covers and me saying no be it's not that damaged he went and told me he'd ordered those and what that cost and shipping was

**3:55:15 PM Assata:** And refused to let me Venmo him u til "we" installed In case it didn't fit be they would take "full responsibility" if it didn't work

**3:56:37 PM Assata:** And like Joren, being nice is one thing, doing research, meh, ordering and giving me parts to use Pushing it, asking for my number to share a how to video............leaving me a written note in cabinet for the link.....ordering more stuff after I said 1 didn't need to go through trouble and not letting me Pa[y] for it...

**3:57:11 PM Assata:** And THEN Comme ting on something covering me and Nanking ofthags why I'm covered when I'm already uncomfortable

**3:59:13 PM Assata:** I really don't want to hurt their feelings but they're also a grown adult

**3:59:32 PM Joren:** Yes. I'm reaching out to Ron about this currently.

**4:58:49 PM Joren:** Assata, No need to read this until you're back at work (certainly no need to spend the weekend (mentally) on it). Hey, had a talk with Ron. He suggested two paths, please let me know which one you are OK with.

1 - chatting with Ron, himself, to have Ron better understand the details, so they can be addressed directly (I don't have any issue with sitting in if it makes you feel more comfortable)
2 - him addressing it with Volan, SP?

He would like to understand a bit more, and some of that's your story to tell, if you want to. I said I'd ask you. He committed to action on this. We can also bring it up through Judy if you want - or anything else. I'm open to other ideas / paths. Whatever you are comfortable with, please let me know. I told Ron I'd let him know what you are comfortable with.

**4:59:04 PM Joren:** I hope this is helpful. If not, please let me know.



PTE 25 (04/09/2024 D. Hackman Dep. pp.

31(ll7)-32(ll20)).

```
 7        Q.    Okay.  What's the next memory you
 8   have?
 9        A.    Sure.  I remember there -- I had a
10   coworker named Bill Gallagher who was also an
11   electrical engineer.  He worked in my group.  I
12   believe after the 2016 presidential election, for
13   quite a while after that, he had as his computer
14   desktop an image of a woman in a very skimpy
15   bikini with a photoshopped head of Sarah Palin on
16   it.  And I heard him remark a couple times he
17   really loves that picture and thinks it's so cool
18   and funny.  I found it to be really distasteful
19   and inappropriate for work.
20              What else?
21              Relating to Bill Gallagher, one
22   time -- I don't remember when this happened,
23   actually.  It was probably within maybe the last
24   couple of -- maybe within the last year or two of
```

1   my employment there.  We had a lot of potential
2   investors, current investors, people like that
3   would come in and out frequently for meetings.
4   And one -- on one occasion one of the investors
5   who came in led Bill, Mr. Gallagher, to make some
6   comments about her appearance and that he found
7   her to be extremely physically attractive.

8          After she walked past our desks into
9   the conference room, shortly after he kind of came
10  walking by, like, making small talk with some of
11  us about, hey, did you get a load of that -- that
12  hot girl who just walked in?  Oh, man.  That kind
13  of thing.

14         So these are examples of -- these are
15  some examples, I guess, of sort of an attitude
16  that I have observed in some employees that don't
17  maybe paint their relationship to women in -- in
18  the best light.

19         I -- I can probably think of some
20  other examples to talk about.



```
 3              Okay.  So another example, I had a
 4   coworker, Mr. Haggerty.  On at least two occasions
 5   I heard him relate a joke to me.  He talked about
 6   how the company used to have an intern working
 7   with the electrical engineering team, and this
 8   intern was a young woman who I -- I can't recall
 9   her age.  She was probably college age.  And
10   Mr. Haggerty related that on one occasion he had
11   asked her to do some soldering for him.  And he
12   said that she was wearing shorts and open-toed
13   shoes.  He said that he told her that she should
14   spread her legs so that if any solder dripped, it
15   would drip onto the floor and not on to her legs.
16   And he then laughed about how he made a comment to
17   a very young woman about spreading her legs.
```

**PTE 27 (04/09/2024 D. Hackman Dep. pp.**

**123(ll4)-125(ll18)).**

```
 4   BY MS. ACEY:
 5        Q.    Did Mr. Wolgemuth ever disclose
 6   personal matters while at work?
 7             MR. LONGO:  Objection.  Form.
 8             THE WITNESS:  Frequent.  Frequently,
 9        yes.
10   BY MS. ACEY:
11        Q.    Can you give an example?
12             MR. LONGO:  Same objection.
13             THE WITNESS:  He would talk about his
14        family a lot and his wife and his children.
15        He would talk about projects he was doing,
16        working on at home.  Things like that.
17   BY MS. ACEY:
18        Q.    Did you ever find any of his
19   disclosures to be inappropriate for work?
20             MR. LONGO:  Objection.  Form.  And
21        beyond the scope of direct examination.
22             THE WITNESS:  I can't recall.  I
23        don't -- I don't remember.
24   BY MS. ACEY:
```

DANIEL HACKMAN

Page 124

```
1        Q.     Have I ever complained to you about
2   John Wolgemuth?
3        A.     Yes.
4        Q.     Do you recall what I was complaining
5   about?
6               MR. LONGO:  Objection.  Form.  And
7          beyond the scope.
8               THE WITNESS:  I remember you
9          complained about some comments he made about
10         his wife and, sort of, what her roles and
11         responsibilities as a wife aught to be.
12  BY MS. ACEY:
13       Q.     In this deposition were you asked to
14  testify to complaints that I have made to you that
15  related to sexual harassment?
16       A.     I believe that I testified about -- to
17  that effect a lot, yes.
18       Q.     Okay.  Have you heard -- did you ever
19  hear -- I'm sorry.
20              Is there anything in your experience
21  that you felt supported -- I'm sorry.
22              Can you just go into more -- do you
23  know what I was complaining to you about John
24  Wolgemuth with his -- I'm sorry.  I need to take a
```

DANIEL HACKMAN

Page 125

1    second because my brain is turning into mush.  One

2    second, everyone.

3              Did you ever hear or see anything

4    relating to -- no.  I just want to scratch that

5    question.

6              Has John Wolgemuth ever expressed his

7    views on his wife to you?

8              MR. LONGO:  Objection.  Form.  Beyond

9        the scope.

10             THE WITNESS:  I think he would make

11       some passing comments sometimes about --

12       about what he believed her appropriate role

13       as a wife and mother aught to be.  To go into

14       more detail, I guess, it would have been

15       comments like that -- it would have been

16       comments to the effect of that -- that she

17       should be content being a housewife and

18       making babies, basically.

**PTE 28 (09/09/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (I)(4), *originals filed in Doc 40-2 pp. 35-36*).**

4. 09/09/2021 Present sense impression from myself to my supervisor about gender concerns
towards Ron Turi
(Exhibit 18). References ECF 8-1 (¶ 175).
5:22:35 PM Assata: Jerry doesn't seem to want me alone with Ron... idk whag that's about

**PTE 29 (04/08/2024 M. Tabbut Dep. pp. 163(ll14)-166(ll1)).**

```
14          Q.      One second.  I'm trying to read my
15   notes.  Okay.  Earlier in the deposition, did you
16   testify to Rob S. not following specs -- not
17   following your specs?
18                  MR. LONGO:  Objection.  Form.
19                  THE WITNESS:  Yes.
20   BY MS. ACEY:
21          Q.      Okay.  So were there quality
22   checks done in the field?
23                  MR. LONGO:  Objection.  Form.
24                  THE WITNESS:  I don't believe so.
25   I don't remember.
```

Page 164

```
 1   BY MS. ACEY:
 2         Q.      Was anyone assigned -- oh, I'm
 3   sorry.
 4                 Were you aware of any connection
 5   between InductEV and PAI?
 6                 MR. LONGO:  Objection.  Form.
 7                 THE WITNESS:  Yes.
 8   BY MS. ACEY:
 9         Q.      Do you recall what PAI did?
10                 MR. LONGO:  Objection to form.
11                 THE WITNESS:  Yes.  They were a
12   contract manufacturer who built our coils and
13   cabinets.
14   BY MS. ACEY:
15         Q.      Did the quality team have any
16   interaction with PAI?
17                 MR. LONGO:  Same objection.
18                 THE WITNESS:  Yes.
19   BY MS. ACEY:
20         Q.      Do you recall any quality checks
21   over PAI's product?
22                 MR. LONGO:  Same objection.
23                 THE WITNESS:  I think there were,
24   but I don't know how much -- I don't know what was
25   checked there.
```

Page 166

1    most of the time it wasn't replied to.



# PTE 30 (04/12/2024 Judy Talis Certification).

## CERTIFICATION OF JUDITH TALIS

1.      I am a former employee of InductEV and Momentum Dynamics.

2.      On April 8, 2024, Ms. Acey asked me to answer the following questions, under oath:

Questions:

1. Is there any instance Ms. Talis can recall where she stuck up for or protected Ms. Acey from a racially charged action or comment while working for InductEV/Momentum Dynamics?

Answer:      Any incident involving Ms. Acey that was brought to my attention was investigated and documented. I do not recall the specifics, but the company's documents would reflect my personal involvement in the matter, if any.

2. Did Ms. Talis ever address or otherwise personally follow up on a statement made by Bob Sweirzawski, that I was from "the wrong side of the tracks"?

Answer:      I recall there was a matter in which Mr. Sweirzawski had some role. I do not recall the specifics regarding that matter or if it pertained to the statement referenced above. If that matter involved a complaint of some sort, it would have been investigated and documented by the company.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 4/9/2024.

Judith Talis

# PTE 31 (09/20/2021 90-day Check-in Invite Screenshot, doc. 111-1).



**PTE 32 (04/11/2024 A. Acey Dep p.283(ll4-19)).**

```
 4        Q.    Do -- do you know whether or not
 5   anyone in management, Joren, Ms. Talis, spoke
 6   with Bogdan about the things you've been
 7   describing?
 8        A.    I don't believe Joren spoke with
 9   Bogdan.  He would always report to me if he
10   ever did anything to help the situation, and
11   with Bogdan he did not, except for that --
12   that situation we just disclosed with the --
13   the multimeter.  That's when he made a
14   general comment to Engineers about touching
15   products, but it wasn't centered on Bogdan.
16             And I don't know if Judy ever spoke
17   to Bog- -- Bog- -- Mr. Proca because Judy, as
18   far as I knew, had waived off my complaint to
19   her.
```

**PTE 33 (04/11/2024 Acey A. Deposition pp. 101-103).**

Page 101

1        A.    If they can make a decision and
2    compare people in the same role with
3    different qualifications that are only
4    different in race, then, for me that's
5    racial.
6             At the same time when I told Judy
7    Talis about racial experiences, she chose not
8    to address it until, like, four months after
9    I told her.  So whatever harassment I
10   experienced, I continued to experience until
11   I could not work there anymore, until my
12   disability took over.
13            Same thing with sexual harassment.
14   Bogdan did all these things to me.  And when
15   I spoke to Judy Talis, she dismissed it.
16        Q.    What all did Bogdan do to you?
17        A.    Bogdan sat in the -- and I'm sorry
18   if I'm talking you off track of your
19   questions.
20        Q.    You are.
21        A.    But I'll answer this one as
22   succinctly as I can.
23            Bogdan by action he made
24   inappropriate comments during diversity

Page 102

1    training.  He's stared and leered at me at

2    several inappropriate times and he continued

3    to either invade my professional space and

4    cause me to feel physically unsafe.

5         Q.   Did you bring this concern up with

6    Joren?

7         A.   Yes.

8         Q.   Did he address it?

9         A.   He did his best.

10        Q.   Did it stop after Joren addressed

11   it?

12        A.   No.

13        Q.   You brought it up, you say, with

14   Ms. Talis?

15        A.   Yes.

16        Q.   And did it stop after you brought

17   the issue or concern up with Ms. Talis?

18        A.   No.

19        Q.   So how many times did you feel that

20   Mr. Bogdan was looking at you

21   inappropriately?

22        A.   Countless.

23        Q.   Okay.  How many -- what else is it

24   that Mr. Proca did that you feel, you know,

Page 103

 1   was harassment or created an offensive

 2   environment for you?

 3        A.    Those examples I just gave to you.

 4        Q.    Do you have any -- did Ms. Talis

 5   ask you to give you examples in writing of

 6   your concerns around that kind of thing?

 7        A.    Never.

 8        Q.    Okay.  Did you ever report these

 9   concerns in writing to Ms. Talis or to

10   Jor- -- Joren?

11        A.    They were written in those messages

12   to Joren, and they were conveyed orally to

13   Ms. Talis.

14        Q.    And these would be messages you

15   provided -- in your documents and things you

16   provided what you believe to be those

17   messages, correct?

18        A.    Um, that's the evidence you gave to

19   me.  I just copy pasted it into the

20   transcript.

21        Q.    My question is:  Did you provide

22   the evidence that you think supports your

23   claim?

24        A.    Oh, yes.

**PTE 34 (03/14/2024 Complaint, Doc 8-1 pp. 13-14).**

24. At one point, during my 90-day check in, I expressed concern about sexual harassment at work and how I appreciated having my supervisor's support.

25. After CAO admonished me for relying on my supervisor instead of her, I described an experience with a senior member of the electrical engineering team, Bogdan Proca, who had:

   a) Stared me down in orientation before commenting on relationships between subordinates and superiors being "natural".

   b) Compared me to dark chocolate in front of another colleague during a company ice cream day.

   c) Pursued me from across the lab while asking if we were the only employees left in the building.

2023-01782-CT

26. In response to the fear and discomfort I described, CAO launched into an anecdote about a male worker staring at a female worker's breast; how they became close friends after the female worker learned that the male's "unconscious staring" was caused by autism.

27. CAO's response stuck with me throughout my time at Defendant.

28. As I continued to hear sexist comments by Electrical Engineer John Wolgemuth and experience discomforting stares from Proca, no level of sexual harassment, even an "accidental" grazing by PCB designer Mike Russel felt significant enough to be taken seriously by HR.



# PTE 35 (04/28/2021 Interview Evaluation

# from Bruce Mitchell, Defendant's AA-9).



## Interview Evaluation Form

Candidate Name: Assata Acey

Interviewer: Bruce Mitchell

Position: Sr tech

Date: 4/28/2021

---

1.) **Culture Fit:** Candidate's beliefs and behaviors align with the company's core values and company culture.

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect culture fit)

1 ☐   2 ☐   3 ☐   4 ☐   5 ✓

Please comment on the reason for your rating:
Seems they have a good enginerring mindset of thinking how and why components work and understanding it. Expressed her interest in why material science and pyhics play a role in her interest of this job field

2.) **Skill/Competency Fit:** Do the skills the candidate will bring to the job align with the job competencies?

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect skillset)

1 ☐   2 ☐   3 ✓   4 ☐   5 ☐

Please comment on the reason for your rating:
Seems to be still honing and practicing her skills after graduation, possible she was limited on what she was allowed to do from previous employers but doesnt seem to fully fit the skills for a Sr tech role



EXHIBIT

AA-9

3.) **Technical Fit:** Does this candidate have the technical aptitude needed to succeed in this position?

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect technical fit)

1 ☐  2 ☐  3 ✓  4 ☐  5 ☐

Please comment on the reason for your rating:

would need to be trained still on certain technical abilities- seemed to have little tool knowledge and experience, wiring, cabeling stripping and crimping which are needed for a senior tech role

4.) **Overall Fit:** Average your ratings and please select yes or no on moving forward with this candidate.

Average Rating: 6/10

Yes ✓  No ☐

Overall Comments:

Had a great attitude and personality, willing to be hands on, be here in person everday which is what this team needs. Definitely seems to fit a enginerring postion instead of a senior tech role

**PTE 36 (04/11/2024 A. Acey Dep. pp. 24(ll9)-29(ll21), pp.83-88(ll10), pp.159(ll11-pp 161(ll20).**

```
 9              However, in a -- a subsequent round
10    of interviews, I was looked at by a former
11    co-worker, Omar Jackson, and I think it was
12    Bruce -- I don't know his last name.  It was
13    the guy I was supposed to replace.
14              And during the video interview at
15    that round, Bruce started asking me questions
16    that seemed to be answered on my résumé.
17    Basically, whether I knew how to use a hand
18    tool, if I had seen a screw driver, and the
19    contradiction seemed kind of obvious because
20    at that point I had already discussed with
21    him about, like, putting together lasers for
22    a lab, or even work I had done around the
23    house, as far as, like, cutting wood, sanding
24    wood, screwing things together, designing
```

Page 25

```
 1   things.
 2              And, so, that he would -- he would
 3   hear those examples and ask such a
 4   rudimentary question, it just didn't make
 5   sense to me.
 6        Q.   And you determined that at the time
 7   that you had this interview with Bruce?
 8        A.   I marked it as strange.  And, then,
 9   I spoke with -- I wasn't sure it was gender
10   or race, really.  So Bruce --
11        Q.   Well, do you think that both are
12   the same, or do you have some independent
13   sense that there was some kind of independent
14   discrimination -- and we'll include
15   harassment of you because of your race.
16        A.   Okay.
17        Q.   -- separate from that of gender, or
18   is -- are they all the same?
19        A.   In this specific instance, not
20   knowing Bruce, the only thing I could look at
21   in difference between me and him was that I
22   was black, and he was not and that I was a
23   woman, and his co-workers were all men.  His
24   supervisor was a man.
```

Page 26

1      Q.   Did you, then, from that -- those
2   facts infer that his question having had an
3   answer available in your résumé, and if he
4   had reviewed those and the other things that
5   you've identified, constituted possible
6   harassment or discrimination towards you
7   based on your race and gender?
8      A.   I wouldn't say it was harassment.
9   I -- I think it was discrimination.
10      Q.   "Discrimination"?
11      A.   So I marked it as biased.  He
12   didn't have any reasonable -- other --
13   usually, when I talk to someone and engage
14   with him and the only explanations I can come
15   to is either a lack of intellect or bias, I
16   tend to lean towards bias.  But also, like,
17   in my experience, women tend to be
18   stereotyped against knowing how to use tools.
19         And, so, it's not the first time
20   someone -- I mean, even -- I go to Lowe's
21   people.  Follow me at Lowe's.  I work on my
22   car.  People ask me if I need advice.
23         So, from my experience of that
24   pattern and the source of what he was

Page 27

1   commenting on and the information I presented
2   to him, and the differences I could note
3   between myself and him, that's what I found.
4   I mean, his co-worker, Omar Jackson, had no
5   problem, and Omar was also a man.
6          Q.   Well, is it your -- do you, then,
7   when you receive information or are spoken to
8   in a particular way by somebody or treated in
9   a particular way by somebody -- and we'll
10  stick to work situations --
11         A.   Okay.
12         Q.   -- do you disagree with what you're
13  hearing, or think it doesn't make sense, you
14  attribute it to either a lack of intelligence
15  or concentration or alternatively too bias?
16         A.   Can you repeat that question.
17         Q.   Well, I'm trying to understand your
18  testimony.  I think -- did you just tell us
19  that when somebody asks you something or
20  engages in conduct towards you that you feel
21  is unwarranted or possibly reflects
22  discrimination, that -- that your evaluation
23  is, "Well, is that either because of lack of
24  knowledge or intelligence or alternatively if

Page 28

1    it's not that, that it's bias"?

2         A.    Right.   If it comes down to those

3    two, then, I tend to lean towards bias.

4         Q.    And isn't that what -- that's --

5    that's in citing the questions from

6    Mr. Bruce -- or Bruce, I think, is his first

7    name, but in citing those questions you came

8    to the conclusion that that was probably one

9    of the first incidences of you being

10   subjected to discrimination based upon race

11   and gender at InductEV, because Mr. Bruce --

12   because Bruce, if he had read your résumé and

13   done his homework, would have known that you

14   have experience with power tools?

15        A.    Yes.   Or if he had just listened to

16   what I was saying in review of the résumé.

17        Q.    And, so, him asking about that,

18   most likely, was a result of bias towards you

19   based upon your gender and race?

20        A.    Yes.   I will also note that when he

21   asked about my use of power tools, it was

22   not -- I guess, people speak musically,

23   right, and -- and that tone is that -- the

24   words kind of go up and down in tone

1  sometimes to show a question or a comment.

2       And when he asked me if I had used

3  power tools, the way he had emphasized the

4  word and the way he had looked up gave me the

5  impression that it wasn't just a casual, "How

6  do you use it, do you know how to use it, I

7  forgot to ask you, but more so I don't

8  believe you've used it.  All this other stuff

9  you're saying is great, but can you do the

10  basics?"

11      Q.   And this Bruce, he was the person

12  you would be replacing?

13      A.   Yes.

14      Q.   All right.

15      And was he in any kind of a

16  position to decide at the end of the day

17  whether or not you got hired?

18      A.   At the time, I was not aware.  All

19  I knew was that these were some of the people

20  interviewing me as a part of InductEV's

21  hiring process for that role.

Page 83

```
 1        A.    Okay.

 2        Q.    Ms. Acey, I'm going to show you

 3   Exhibit AA-8, which appears to be an

 4   "Interview Evaluation Form," similar to the

 5   form that we just looked at.

 6              Interviewers are indicated as,

 7   "Omar and Bruce."

 8              Do you see that?

 9        A.    Yes.

10        Q.    And, basically, do you recall that

11   you had some kind of a interview or a session

12   with those two individuals on or about

13   April 28th, 2021, as part of your interview

14   process?

15        A.    Yes.  This is the interview I told

16   you about earlier with Bruce.

17        Q.    And if you look at the second page,

18   essentially, as far as comments go, the only

19   comment that's given is that you, "seem to

20   know what she's talking about.  I believe she

21   was transparent during the interview."

22              Do you see that?

23        A.    Yes.

24        Q.    And you received two 5s and a 4
```

Page 84

1   from Omar and Bruce, right?

2        A.   Yes.

3        Q.   Do you know if that was the

4   interview where Bruce asked you the questions

5   you talked about earlier regarding, you know,

6   use of tools, familiarity with tools, that

7   made you uncomfortable?

8        A.   Yes.

9        Q.   Okay.  But it doesn't appear that

10  he, you know, made any comment relative to

11  same, then, on this Evaluation Form, AA-8,

12  that were completed by Omar and him, right?

13       A.   No, it doesn't.

14       Q.   Okay.  Do you know somebody named

15  Bruce Mitchell, or did you work with someone

16  named Bruce Mitchell during your time at

17  InductEV?

18       A.   I don't think so, not by the name.

19       Q.   Okay.

20       A.   Maybe that was Bruce's last name.

21  I don't know.

22       Q.   Do you recall working at -- or at

23  least being interviewed by somebody named

24  Bruce?

Page 85

```
 1        A.   Yes.
 2        Q.   Okay.  And, now, these most recent
 3   exhibits that I've shown you are dated
 4   April 28, 2021.
 5             Is that a particular -- did you,
 6   you know, meet with these people that are
 7   identified on the evaluation forms for some
 8   kind of interview at that time?  And just to
 9   help you out, the Ryan Taggart form is --
10        A.   Right, I see it.
11        Q.   -- May 14th?
12        A.   Right.
13             Ryan Taggart was the final
14   interview.  Omar and Bruce interviewed me --
15   I think that was after the phone call with
16   Joren.  It was, yeah.  So it looks -- it
17   seems right, the date.
18        Q.   Okay.  All right.
19             Do you recall what was the format
20   of the interview that was held on or about
21   April 28th, 2021, which obstensibly these
22   comments originate from?
23        A.   Okay.  It was a virtual interview
24   over Zoom.  I had a series of interviews
```

Page 86

1   scheduled with Momentum on that day, and I
2   saw Omar and Bruce via Zoom.
3               They appeared, I guess, to be
4   sitting in their independent cubicles.  They
5   asked me questions, and that was it.
6                       -       -       -
7                       (Whereupon, Exhibit AA-9,
8               Momentum Interview Evaluation Form
9               Dated 4/28/21, was marked for
10              identification.)
11                      -       -       -
12  BY MR. SCHAUER:
13      Q.    So I'm going to show you Exhibit
14  AA-9.   AA-9 is, again, another Interview
15  Evaluation Form; Interviewer, Bruce Mitchell;
16  date, 4/28/21.
17      A.    (Witness reviews document.)
18      Q.    Now, with regard to the individual,
19  Bruce, that you've identified, do you have
20  any reason to believe that Bruce arbored any
21  particular animus against people of color or
22  women?
23      A.    Other than what I described to you
24  earlier, no.

1      Q.    Okay.

2      A.    I -- I didn't think he had any

3   animus towards people of color that I knew of

4   specifically.

5      Q.    Okay.  On the second page,

6   Paragraph 3, second page of Exhibit AA-9, the

7   comment says, "Would need to be trained still

8   on certain technical abilities- seemed to

9   have little tool knowledge and experience,

10  wiring, cabling, stripping and crimping,

11  which are needed" to a senior -- "for a

12  senior tech role."

13         Do you see that?

14      A.    Yes, I do.

15      Q.    And do you -- for the reasons

16  identified earlier, do you disagree with that

17  statement, or not?

18      A.    I disagree that those were needed

19  for the senior tech role.  I don't really

20  see -- I feel, like, most of it is

21  subjective.  I don't really think he was

22  wrong to say those things.  I don't think

23  they were objectively wrong, except for the

24  senior tech role, that's the one that

Page 88

1    didn't -- it doesn't click for me.

2            Q.    Well, in the fourth section of this

3    AA-9, the Interview Evaluation Form, it says

4    that, "had a great attitude and personality,

5    willing to be hands on, be here in person

6    every day, which is what the team needs.

7    Definitely seems to fit a engineering

8    position instead of a senior tech role."

9                 Do you see that?

10           A.    Yes, I do.



```
11        Q.   Did you come away from this
12   interview going like, "I don't know if I want
13   to work with this woman"?
14        A.   I did have doubts about the
15   company --
16        Q.   Okay.
17        A.   -- the entire company.
18        Q.   And did you express them to Joren
19   or anybody else?
20        A.   I complained about Bruce to Joren,
21   and I complained about Bruce to Judy, but she
22   writes about it as a joke in this interview
23   evaluation.
24             But other than that, I didn't,
```

Page 160

```
1    like, decide to tell them about
2    theirselves [sic], or anything like that, no.
3         Q.    She says, "She has been hands on at
4    her work."
5              Do you see that?
6         A.    Where -- I'm sorry.
7         Q.    On the next-to-the-last line of
8    A-11 -- AA-11-A?
9         A.    AA-11-A -- okay.
10        Q.    Do you see that?
11        A.    Yes.
12        Q.    Okay.  Now, that's not what you
13   complained about Bruce saying, right?
14             I mean, she says you've been hands
15   on in your work, right?
16        A.    Right.
17             She referred to Bruce as a joke in
18   Section 2.
19        Q.    Okay.
20        A.    Yeah.
21        Q.    Well, let's -- you don't have that
22   circled, so I was trying to save time and not
23   focus on it.  What -- what is it you're --
24   what's your -- the significant of you
```

Page 161

1    pointing out on Section 2 of the first page
2    of Exhibit AA-11 that -- this --
3          A.    Well, you --
4          Q.    -- she mentioned --
5          A.    Right.  She made a joke.  She
6    didn't -- well, sorry.  You're right.
7              She mentioned when the interview
8    team, which I assume to be Omar and Bruce,
9    asked her about her use of tools, as I
10   disclosed to you all earlier, she made a
11   joke.  She didn't think they understood.
12             That wasn't a joke.  I was
13   complaining about Bruce.  I actually
14   complained about Bruce to Joren.  He thought
15   it was strange.  I told Judy, and she writes
16   it as a joke.
17             I didn't circle it, because for me,
18   like, this -- the stuff I circled to me said
19   more about how she saw me.  This to me says
20   more about how she handles complaints.

**PTE 37 (02/11/2022 Teams Messages between myself and my Supervisor, Doc 40 Transcript (II)(27),** *originals filed in Doc 40-2 pp.* **614-636).**

27. **02/11/2022 Present sense impression and excited utterances from myself to my supervisor of the nature of why I needed to work from home as well as CAOs request to follow up on our discussion of racial harassment and her subsequent sexually inappropriate behavior (Ex. 306-316). References: ECF 8-1 (¶¶33-43), Doc 15 (¶¶77-80), ECF 15-48, ECF 15-54.**

**8:22:37 AM Assata:** A bit slow this morning. Woke up in hormonal nausea. Escalated and spent the last 15 mins in fetal position on the floor. Yay *sad emoji*

**8:22:54 AM Assata:** Will still sign in for meeting

**12:15:45 PM Assata:** Update:

I did not get better I am well Aqainted with Dan's Clorox

Judy randomly asked to follow up. She barely stopped herself from asking if I was pregnant. After the implicitly then obligatory explanation of hormonal nausea...

She doesn't understand why I won't take her recc for her or her daughters gynecologist

**12:17:23 PM Assata:** I am sitting in a sun spot armed witha bowl and a bag. Will report as work related projects become more developed

**12:24:11 PM Joren:** WTF Judy? Ugh.

**12:24:12 PM Assata:** Worse is that cat has taken over the bag

12:24:21 PM Assata: *unproduced attachment*
12:24:37 PM Joren: Awwww That's so cute!!!
12:24:59 PM Joren: Oh yay!
12:25:10 PM Joren: Take some time and rest though, please



**PTE 38 (11/16/2021 Teams messages between myself and my Supervisor, Doc 40 Transcript (III)(10), originals filed in Doc 40-2 pp.772-785).**

10. **11/16/2021 Present sense impression and recorded recollection form myself to my supervisor about the concern for and investigation of the integrity of QA checks due to unexplained changes found on cabinets that I had already submitted for inspection (Ex 382-388). ECF 8-1 (¶18, ¶120-121(b-d), ¶124-129, ¶175-177), Doc 15 (¶77-80).**

**7:56:53 AM Assata:** The joint that was loose was supposed to be at 70-ft lbs. When pressed, water comes out, which means it was flow tested and passed flow test before this.

I've seen Bob try in vain to loosen that amount and he wouldn't have been able to with a huge show of effort.

Possibilities

1. Was never tighten to 70 by pai and was tight enough to pass but just close to loosening(unlikely without tubingbtk bring it low to leaking)

2. Was tightened to 70, passed testing amd loosened afterwards without mention.

3.( Extremely unlikely) failed test and we forgot about it.

I would propose flow assemblies have high torque joints checked and marked before install to display any shifts that may happen during or after testing.

**8:04:48 AM Assata:** Talked to Taylor, he said they do have a AC cabinet and Julian is bringing it up now.

**8:08:34 AM Assata:** ok I told Julian it'd be better to just wait since we know we have it downstairs and he'd just have to bring it up.

**8:09:00 AM Assata:** Also mistakenly asked Rob if he'd know any reason or anyone who could loosen these and he is upset

**8:17:36 AM Assata:** Hasn't snapped at me but is upset.

I mean 70 ft lbs is alot to loosen,but even if it were at 40ft lbs, it would still be tampering.
Reason 1: if it were loose enough to be two hand turns from water. It would have become gradually looser as hoses were added and removed

Reason 2: we also have some handsy engineers/folks who aren't afraid to poke stuff for presentation, or risk damage of products through multimeter tests.

I still conclude this it is post test.

I think proactively to protect against post test, poor construction, and unforseen handlingit may be best to

1. check the 70ft torque-points upon receipt (construction)
2. have them painted (indicator of handling)
3. Seal the cabinets before inspection. (Tampering) These do not protect against anyone stepping into test bay after Rob leaves each day suggestions welcomed there.

**10:11:44 AM Joren:** "I would propose flow assemblies have high torque joints checked and marked before install to display any shifts that may happen during or after testing."

This is excellent. Please do this. We **have** seen some of this in the field also, so please do, and see if we can update the document as well.

# PTE 39 (04/03/2024 O. Jackson Dep. pp. 37(ll14)-38 (ll15)).

14          Q.    Mr. Jackson, did you ever observe

15   Ms. Acey being treated in a way that you thought was

16   not appropriate during your time at InductEV?

17          A.    I didn't see it, but I know she was

18   uncomfortable at times.  She -- you know, I could

19   tell she was uncomfortable.  I don't know why,

20   because I never asked; but I didn't see anything.

21   No.

22          Q.    Okay.  You didn't see anything, but you

23   saw that she appeared to be uncomfortable; right?

24          A.    Yes.  Yes.

25          Q.    What --

1          A.      I'm sorry.

2          Q.      What is it about what you saw with

3     respect to Ms. Acey's behavior that led you to

4     believe that she was uncomfortable?

5          A.      Because she -- I guess the way she sat

6     inside the -- the cabinet one day.  And she was just

7     in there, and she wouldn't say anything.

8                  I went and ask her how she was doing.

9     She ignore me.  She would always say something, but

10    that day she didn't.  All I know whether she had

11    problems -- I mean, Joren was the guy that she would

12    talk to.

13                 And so like, you know, I try to stay out

14    of things, so I never even asked.  And, you know,

15    just didn't ask.

**PTE 40 (02/23/2022 Teams and Text**

**Messages between myself and my Supervisor,**

**ECF 15-52(pp. 2-3) and ECF 15-53(pp. 2-3)).**









**PTE 41 (04/09/2024 D. Hackman Dep. pp.**

**49(ll19)-51(ll11)).**

```
19        Q.      Let's start with Sam Gallagher.

20                What did -- why did she complain to

21   you about Sam Gallagher?

22        A.      She complained that he -- she

23   complained that he seemed to be very forward with

24   her and almost as though he were trying to pursue
```

DANIEL HACKMAN

Page 50

1    her romantically.  Stopping by her desk often.

2    Inviting her to go with him to lunch often.  She

3    told me that he had made some off comments to her

4    before.

5         Q.    Like what?

6         A.    I remember she said before that he

7    made a comment that was kind of -- where he was

8    kind of talking down to her because he was an

9    electrical engineer and she was not -- she did not

10   have the title of engineer.  So she related a time

11   that she felt like he was kind of belittling her.

12             She told me about -- I can't remember

13   the specifics.  I just remember that she told me

14   about a time that he made -- well, she told me

15   about times that he made sexually suggestive

16   comments towards her.

17        Q.    Did she tell you what he said?

18        A.    She did.  I can't remember.

19        Q.    Did you ever -- were you present when

20   Mr. Gallagher asked Ms. Acey to go to lunch?

21        A.    Not really.

22        Q.    Okay.

23        A.    I believe there was one day -- there

24   was one day that I remember that I was sitting at

DANIEL HACKMAN

Page 51

```
 1   my desk, and Assata's desk was not too far away,
 2   and I noticed that -- that he -- that Sam and a
 3   couple others had kind of gathered around her
 4   desk.   And then she sent me a message shortly
 5   thereafter requesting that I accompany her to
 6   lunch with those individuals because she
 7   doesn't -- she didn't want to be alone with them.
 8        Q.      Okay.   So it sounds like in that
 9   specific instance there were multiple people there
10   at the desk; right?
11        A.      In that instance, yes.
```

# There is no PTE 42. PTE 42 was purposefully deleted.

# PTE 43 (09/01/2021 Apology Email and Meeting Screenshot, ECF 15-45).

 Gmail

Assata Acey <aceyassata@gmail.com>

---

## Fwd: Brian Kenney Teams Interview

**Assata Acey** <Assata.Acey@momentumdynamics.com>
To: Assata Acey <aceyassata@gmail.com>

5 May 2022 at 15:51

---

Get Outlook for Android

**Assata Acey | Technician**
**484-320-8222 ext 178**


**Momentum**®
Wireless EV Charging

**Connect**   LinkedIn | Website | Newsletter
**Media**     Taxis - NYTimes | Airport & Transit | Driver Experience

*Confidentiality Notice: The information, and any attachments and/or documents, transmitted by this email is intended for the addressee only and contains information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender immediately.*

---

**From:** Assata Acey
**Sent:** Wednesday, September 1, 2021 11:19:18 AM
**To:** Ryan MacKenzie <Ryan.MacKenzie@momentumdynamics.com>
**Cc:** Diana Wilmes <diana.wilmes@momentumdynamics.com>
**Subject:** RE: Brian Kenney Teams Interview

Hi Ryan,
After viewing your email today, I just right clicked my calendar to send an accept and didn't realize you had sent an email Monday(or that it was missed in a group of incoming emails) until it was mentioned to me.
Thank you for your coordination of the meeting, sorry for any issues this may have caused.

---

**From:** Ryan MacKenzie <Ryan.MacKenzie@momentumdynamics.com>
**Sent:** Wednesday, September 1, 2021 9:29 AM
**To:** Assata Acey <Assata.Acey@momentumdynamics.com>; Seth Wolgemuth <seth.wolgemuth@momentumdynamics.com>; Omar Jackson <omar.jackson@momentumdynamics.com>; Rob Rosenberger <rob.rosenberger@momentumdynamics.com>
**Subject:** Brian Kenney Teams Interview

Hi Team - Ben asked that I schedule a video call with all of you to speak with Brian Kenney. Please reach out to Ben directly if you cannot attend the interview or accept the invite if you're able to make it. I've attached his resume for reference.

Thanks, folks!

**Ryan MacKenzie | Talent Acquisition**

Momentum Dynamics Corporation
***Fueling the Future of Electric Transportation***

3 Pennsylvania Avenue, Malvern, PA 19355
(M) 609.488.0107

www.momentumdynamics.com

**Disclaimer and Confidentiality Notice:** This email, and any attachments and/or documents linked to this email, are intended for the addressee and may contain information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender



**Missed Email.PNG**
16K

# PTE 44 (10/05/2021-10/13/2021 Emails

# between myself and D. Wilmes (HR)).

# Fwd: Device Payment Agreement and Payoff receipt   Inbox

 **A**   **Assata Acey** Assata.Acey@momentumdynamics.com **via** mtmdy...    Mon, 2 May 2022, 15:31       
to me

Get Outlook for Android

**Assata Acey | Technician**
**484-320-8222 ext 178**


Wireless EV Charging

**Connect**   LinkedIn | Website | Newsletter
**Media**    Taxis - NYTimes | Airport & Transit | Driver Experience

*Confidentiality Notice: The information, and any attachments and/or documents, transmitted by this email is intended for the addressee only and contains information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender immediately.*

---

**From:** Assata Acey <Assata.Acey@momentumdynamics.com>
**Sent:** Wednesday, October 13, 2021 2:57:45 PM
**To:** Diana Wilmes <diana.wilmes@momentumdynamics.com>
**Cc:** Assata Acey <Assata.Acey@momentumdynamics.com>
**Subject:** Device Payment Agreement and Payoff receipt

I have attached the device Payment agreement which includes the original price of the phone. Because the agreement mentions installments, I think the payoff receipt can also be helpful.

---

**From:** Assata Acey <Assata.Acey@momentumdynamics.com>
**Sent:** Wednesday, October 13, 2021 1:49 PM
**To:** Diana Wilmes <diana.wilmes@momentumdynamics.com>
**Subject:** Phone payoff receipt.

As discussed, I did change phone providers and so will need to call the company to get record of the original phone purchase price.

In the meantime, I have attached the payoff receipt which shows most of the phones cost.

I do think it costs significantly less outside of Verizon.

Get Outlook for Android

---

**From:** Assata Acey <assataacey@gmail.com>
**Sent:** Wednesday, October 13, 2021, 1:13 PM
**To:** Assata Acey
**Subject:** Fwd: ASSATA, we received your device payment.

**EXTERNAL EMAIL**

---------- Forwarded message ----------
From: **Verizon Wireless** <VZWMail@ecrmemail.verizonwireless.com>
Date: Saturday, September 18, 2021
Subject: ASSATA, we received your device payment.
To: ASSATAACEY@gmail.com

 Keep this receipt for your record

**Shop**    **Support**    **My Verizon**

**Hi, ASSATA  |  Account number ending in: 1025-00001**

# Thanks for your device payment.

| | |
|---|---|
| **Payoff date:** | 09/18/2021 |
| **Confirmation:** | 02537D |
| **Device model:** | Samsung Galaxy S9+ 64GB in Lilac Purple |
| **Payment amount:** | $570.00 |
| **Payment method:** | test35 |
| **Account ending in:** | 9202 |

Your payment is being processed, closing out Agreement #1954350220. This payment may not appear immediately, as it will be reflected in the next billing cycle starting on 10/25/2021

Thanks for choosing Verizon.

# You're ready for an upgrade.

Check out some of our most popular devices.

**Shop now** >





**Phones**   **Tablets**   **Accessories**   **Plans**   **Verizon Up**

This receipt is not evidence of paying off a device until it's been processed in our billing system. You'll no longer be able to make monthly payments for this device and this payment cannot be reversed. If your payment is canceled, rejected or reversed by your credit card company, the full amount will appear on your next month's bill.

© 2021 Verizon Wireless

This email was sent to ASSATAACEY@GMAIL.COM. We respect your privacy. Please review our privacy policy. If you think this em was sent in error or you'd like to change how you receive your notifications, click here.

Verizon Wireless, One Verizon Way, Mail Code: 180WVB, Basking Ridge, NJ 07920

**2 attachments**  · Scanned by Gmail



**Device-Payment-A...**          Jaguar I-Pace with ...

( Reply )   ( Forward )   ☺

## Fwd: Phone purchase (with email images)  Inbox

 **Assata Acey** Assata.Acey@momentumdynamics.com via mtmdyn.on...    2 May 2022, 15:32    

to me

Get Outlook for Android

**Assata Acey | Technician**
**484-320-8222 ext 178**

**Momentum®**
Wireless EV Charging

**Connect**    LinkedIn  |  Website  |  Newsletter
**Media**      Taxis - NYTimes  |  Airport & Transit  |  Driver Experience

*Confidentiality Notice: The information, and any attachments and/or documents, transmitted by this email is intended for the addressee only and contains information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender immediately.*

---

**From:** Assata Acey <Assata.Acey@momentumdynamics.com>
**Sent:** Wednesday, October 6, 2021 11:27:50 AM
**To:** Assata Acey <Assata.Acey@momentumdynamics.com>
**Cc:** Diana Wilmes <diana.wilmes@momentumdynamics.com>
**Subject:** RE: Phone purchase (with email images)

I went back and downloaded the images that were blocked in the email and resaved as pdf.

**From:** Assata Acey
**Sent:** Wednesday, October 6, 2021 10:57 AM
**To:** Diana Wilmes <diana.wilmes@momentumdynamics.com>
**Subject:** RE: Phone purchase

Goodmorning Diana,
Please see attached, the digital receipt from the day of the order.

**From:** Diana Wilmes <diana.wilmes@momentumdynamics.com>
**Sent:** Tuesday, October 5, 2021 9:48 AM
**To:** Assata Acey <Assata.Acey@momentumdynamics.com>
**Subject:** RE: Phone purchase

Thanks Assata, We will definitely need an itemized receipt. But this will give me a starting point for my discussion with Tony on near misses, etc.


Thanks,


**Diana Wilmes, SHRM-CP | Operations & Human Resources Coordinator**
Diana.Wilmes@momentumdynamics.com

**Momentum Dynamics Corporation**

3 Pennsylvania Avenue, Malvern, PA 19355

484.375.9864

484.320.8222 Ext. 130 **| Momentum │ Who We Are**

*Creating the Future of Electric Vehicle Fueling.*


**Disclaimer and Confidentiality Notice:** This email, and any attachments and/or documents linked to this email, are intended for the addressee and may contain information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender.


**From:** Assata Acey <Assata.Acey@momentumdynamics.com>
**Sent:** Tuesday, October 5, 2021 9:19 AM
**To:** Diana Wilmes <diana.wilmes@momentumdynamics.com>
**Subject:** Phone purchase


Godmorming Diana,


Thank you for your patience with me in misplacing my receipt. I will send image of receipt as soon as I find it.


Attached is:

1. the transaction record with my credit card as well as

2. Screenshot of the replacement item purchased with its pretax price.

3. Shot of the "about-phone" section to confirm it as the replacement item


Hope these help,

# Transaction details





## $420.99
Sale



Sep 30, 2021  Transaction date

Oct 1, 2021  Posted date



Target
Malvern, PA 19355
(800) 440-0680

| | |
|---|---|
| Description | TARGET 00025379 |
| Also known as | Target |
| Merchant type | Discount stores |

| Method | In person |
| --- | --- |
| Card number | (...7117) |
| Category | Shopping |

Memo

Type here and press enter to save

|||     O     <



You're shopping (closes at 10pm):
**Philadelphia Bridesburg** ∨

Orders ∨ 

Target / Electronics / Cell Phones / Unlocked Cell Phones

# Samsung A42 5G Unlocked (128GB) - Black

Shop all Samsung







9:16

**< About phone**

# Assata's A42

**Edit**

| | |
|---|---|
| Phone number | 1-770-231-1017 |
| Model name | Galaxy A42 5G |
| Model number | SM-A426U1/DS |
| Serial number | R5CR90HBE1B |
| IMEI | 354049471192038 |

## Status information

## Legal information



Get Outlook for Android

**3 attachments** · Scanned by Gmail



Reply    Forward    

**PTE 45 (04/11/2024 A. Acey Dep. pp. 167(ll2)-168(ll20), 170(ll4)-173(ll19), 174(ll3)-176(ll21)).**

```
 2        A.    The problem with the cell phone
 3   reimbursement was never getting the money for
 4   the phone.  It was the fact that they made me
 5   provide all this documentation in a way that
 6   was very embarrassing.  It implied that they
 7   saw me in a less-than-truthful light.
 8             And, then, after I completed all
 9   that, told me that I would be the only
10   employee allowed to not have access to a
11   phone with the knowledge that at the time
12   they had made several complaints about me not
13   arriving to meetings on time, and without a
14   phone I can't see the time, so it -- it kind
15   of set me up for more complaints --
16        Q.    Well --
17        A.    -- and it didn't feel fair.
18             I tried to not get money for the
19   phone.  I told Diana several times, "I'll
20   just buy my own phone."
21             I didn't want to give them that,
22   and she just kept insisting and insisting
23   that I prove the phone.  She made me go back
24   to Target to get a false receipt just -- a
```

Page 168

1  mock receipt because I couldn't find the

2  receipt.

3       Q.   You -- oh, but that would -- you

4  don't think Ms. Talis did that to make sure

5  that you did get compensated for the loss of

6  your phone.

7       A.   No.

8       Q.   No, it wasn't for that.

9            It was because she just wanted to

10  put -- jump -- make you jump through hoops

11  because of your race and gender?

12       A.   Absolutely.  If she wanted to pay

13  me for the phone, she could have used the

14  receipt from Target that I sent to them.

15       Q.   Okay.

16       A.   They didn't -- they didn't believe

17  me.  They -- they wanted evidence that I even

18  brought or owned the phone that was broken,

19  which makes -- I -- I just don't get why they

```
 4          Q.    And were you allowed to use your
 5    cell phone in the shop after this incident?
 6          A.    Right after I confronted Judy about
 7    it, yes.
 8          Q.    So you were allowed to do that,
 9    right?
10          A.    But for al- -- almost a week, I
11    was -- there's a -- there's, like, a hazing
12    effect, if you consider it.
13          Q.    Okay.  So for a week you were
14    delayed in being allowed to use your -- a
15    cell phone in the workplace, correct?
16          A.    Yes.  It was made more difficult
17    for me to comply --
18          Q.    Okay.
19          A.    -- with the complaints made about
20    me by HR.
21          Q.    And you feel that -- you -- you
22    believe that this seven days or a week of not
23    being permitted to have your cell phone on
24    the shop floor was done for the purpose of
```

Page 171

1 making it more difficult for you to make

2 complaints to HR?

3          A.    (No response.)

4          Q.    I want to understand your

5 testimony.

6                I think that's what you just said,

7 isn't it?

8          A.    It made me anxious, because I was

9 focused on performing in response to these

10 complaints, and it made it harder for me to

11 comply.  It affected me emotionally.  But the

12 intent that I viewed was more so that of

13 intimidation.

14                I don't think they were trying to

15 really set me up to give them more

16 complaints.  It made me anxious, because of

17 that, but I believe that they did that to

18 harass me for complaining in the first place

19 because, again, when I offered to pay for my

20 own phone as an adult -- as a legal adult I,

21 wasn't allowed to get out of filling out this

22 form.

23                And it was very -- I was

24 embarrassed in the process.  It was a

Page 172

1  non-consensual process for an item that I had
2  already paid for over claims that I had
3  waived, so it didn't make sense.
4          I -- I didn't say, "you owe me this
5  phone because I broke it at work."
6          I let it go, so that I wouldn't
7  have been able to go back and sue them and
8  say, "Oh, you said you would give me this
9  phone," because I told them it was fine.  And
10  yet they forced me to go through this
11  process.
12          And, then, there's a context to
13  this.  The floor is dangerous.  My phone
14  broke because I was asked to move these --
15  these big old boxes that are over, like,
16  80 pounds, and the lift malfunctioned.
17          So, that lift, it -- it fell from
18  at least five feet, made a dent in the
19  cabinet.  And I think one of the pictures in,
20  you know, discovery somewhere.
21          But if it had fallen on me, I would
22  have been hurt, and I worked late.  So if I'm
23  alone and my phone isn't on the shop floor,
24  my desk is so many paces from that area.  How

Page 173

1    am I going to call somebody for help, like,

2    what am I going to do, what if --

3         Q.   Did that happen?

4         A.   Did it -- did I get hurt at work?

5         Q.   No, no.

6              I mean, you -- you had -- you

7    didn't have a phone for a week, right?

8         A.   Did it happen during that week that

9    I needed to call someone and couldn't.

10        Q.   Do you think that they

11   intentionally tried to put you in a position

12   on the floor where you didn't have a phone,

13   you might get hurt, and, so, too bad for

14   Ms. Acey.

15        A.   It was --

16        Q.   Do you think that was the intent?

17        A.   No.  I think the intent was an

18   attempt to int- -- to intimidate me and the

19   effects were reckless.



```
 3        Q.    Well, and -- and they did that
 4   based -- because of your race and gender, or
 5   is this an OSHA complaint we're talking
 6   about?
 7        A.    No --
 8        Q.    Okay.  So --
 9        A.    It's not OSHA.  They did it because
10   of my race and gender because they felt that
11   it was easier.  They thought it was better --
12   they thought it was more okay to treat me
13   like that.  They thought it was more okay to
14   treat me because I was black, because I was a
15   woman.
16             Actually, in the -- in some of the
17   notes in the recourse of me talking to Judy,
18   I quoted to Joren that she said that they
19   didn't think I was like that, as to imply
20   that they didn't think that I would be
21   offended, or that I would confront them about
22   that process, and -- and how they handled it.
23   And my impression is --
24        Q.    Mm-humm.
```

Page 175

1        A.    -- that assumption was based off of

2    race and gender.

3        Q.    Okay.  You mean the process to get

4    the reimbursement that they put you through?

5        A.    Oh, the process and the statement

6    that I wouldn't be allowed to have my phone.

7    I mean, Judy sat in the parking lot and

8    cried, and was like, "Oh, we didn't know you

9    were like that."

10            Like, what does that mean, like,

11    why can't you treat people --

12        Q.    Tell me about that conversation.

13        A.    Sure.  Judy is known to avoid

14    written discourse, which I think is shitty,

15    but whatever.

16        Q.    Tell me about the conversation in

17    the parking lot that you just --

18        A.    I am.

19        Q.    Please do.

20        A.    And she insisted -- I am -- because

21    I asked her to talk in the email.

22        Q.    Mm-humm.

23        A.    She refused.  And she -- because I

24    sent her the bullet of my understanding, what

Page 176

1   she was doing and what she said.

2          She said, "It doesn't represent
3   it."

4          I said, "Well, clarify."

5          And she refused to do it on the
6   record.  And she met me in the parking lot in
7   front of the company.  And when I started
8   taking notes, immediately she raised her
9   voice and asked me to "Please stop."

10         She started crying.  I don't even
11  know if she was really crying for real.  I
12  just know there was water coming from her
13  face.  And she said that she had never said,
14  that Diana twisted her words.

15         And she also said that she didn't
16  know I was, quote/unquote, "like that."

17         I can't remember everything off the
18  top of my head, but as soon as I got back to
19  my computer I told my boss what happened
20  because she was like so vehement against me
21  taking notes during the meeting.

**PTE 46 (10/25/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (II)(14),** *originals filed in Doc 40-2 pp.* **415-452).**

14. 10/25/2021 **Excited utterance and present sense impression from myself to my supervisor about adverse statements made about the nature of Jackson's work, and about CAOs public and implicit accusations of my stealing time (Ex. 208-225). Supporting Ex: 130-135 References: ECF 8-1 (¶110-111, ¶121((a)-(b)), ¶123).**

**10:01:04 AM Joren:** Assata Acey - 39.5h last week, is that right?

**10:33:52 AM Assata:** Hi I just saw this and yes

**10:34:47 AM Assata:** I talked to Judy again. She'd given me the impression before that vacation automatically prepopulates into gaps when it's under 40 hours, and that were only supposed to request vacation in 4hr increment

**10:36:17 AM Assata:** I didn't want to be dishonest or change it since I couldnt make up that extra 30 min

**10:36:43 AM Assata:** It's funny though be I thought she was going to tell me i need to stop doing overtime lol *laugh emoji*

**10:39:29 AM Assata:** I also talked to Julian and noticed he had gathered parts Brian asked for this morning. And was waiting for Brian to come back do he could deliver them(none of us could find Brian for a wee 30 min) It looks like he is getting parts the same day when given part numbers during business hours. I can still go with Brian to request parts from Julian but it's looking more like accuracy and not timing

**10:50:43 AM Joren:** Nope, OT is fine, if you're doing 2-3h / wk I don't need much, if you exceed that, just please let me know why. Thanks for checking in with Judy on that - appreciate it. Diana came to me about it, and I've currently ignored it, but eh. Is she saying you should put in for 1/2 day PTO to make up for the 30 minutes next time it happens?

**10:52:38 AM Joren:** Re:Julian - there's some other stuff going on too. I hear you, thank you for that information.

**10:53:46 AM Assata:** [Direct Reply to message from 10:50:43 AM 10/25/2021-See exhibit X]She's saying if I'm missing 30 mins I should put in 30mins vacation

**10:53:55 AM Joren:** !?!?!?!

**10:54:18 AM Assata:** And implied I could be overloading my overtime by moving time into the next week.

**10:54:49 AM Joren:** Wait what? Please explain this too.

**10:55:06 AM Assata:** Be since I'm full time hourly it's illegal for me to get paid less than 40 hours

**10:55:47 AM Assata:** [Direct Reply to message from 10:54:49 AM 10/25/2021-See exhibit X] Like as if I'm leaving 30 mkns off my ti.esheet to add to the next sheet to max out on overtime

**10:56:22 AM Assata:** Where in reality I leave around the same time whether i leave early or not and try not to do long weeks back to back

**10:56:44 AM Joren:** [Direct Reply to message from 10:55:47 AM 10/25/2021-See exhibit X] SO

possibly implying time "theft" but that's not what she's saying you should do, and that's not what you are doing, right?

**10:58:04 AM Assata:** She lightly implied it as If I would be more likely to do so out of ignorance of their system. 1 think 1 have enough overtime hours on my own to not need to add 30 mins....



**PTE 47 (07/07/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (II)(3),** *originals filed in Doc 40-2 pp.* **1544-1547).**

3. 07/07/2021 **Excited utterance, present sense impression and recorded recollection from myself to my supervisor about negative and seemingly derogatory comments from my coworkers (Ex. 764-765). References: 8-1 (¶ 5-6, 10, 105, 121(b)), ECF 15-36, ECF 15-37.**

**10:24:17 AM Assata:** Hi Joren?

I wanted to ask to meet with you but theres not really any private office space. So sorry for these long messages( abt 5 mins reading time)

**Purpose :**I wanted to check in and realign my sense of what I'm supposed to be doing/ because there's been some behaviors and comments that I have been mixing with me genuinely wanting to make sure I'm helping.

**Context**: My assessment was that I am supposed to be:

a) Learning about team processes through shadowing

b) Completing direct tasks as given by you (ie: cabinet fixes, helping out with boards)

c) Documenting my work/ supporting documentation so that any related errors found(BOM inconsistencies, wrong use of parts, inaccurate cabinet travelers etc)can be found and reviewed and prevented.

d) Running supports beyond the scope of direct tasks(ie: working with Seth to document/anticipate moving parts) to you

**Request:** I know theres definitely a learning curve to where I would be able to become more helpful over time as 1 learn more. But getting a sense from you with what I should be doing would help me provide the right support and be less confused

**Comments and Behaviors:**

a) "I dont build cabinets, that what we have you for. " (when I first met Taylor and was asking what he does) "I dont see why he doesn't just have you build cabinets" (After previewing the chart I was excited to present to him on Friday)

b) "As an assembler...you" — the beginning of many of Maria's sentences when I ask her about cabinets

c) Frank: "This is Assata. Shes a technician with a **Physics** degree... she'll be doing better things... Introducing a new hire with a smile.

**Effects:** There are other small actions and experiences but the effect is this \*\*After Taylors comments, I questioned even finishing typing stuff or doing organization, despite i) him being ok with my chart and description on last monday ii) Maria's input about the need for organization

and her intention with those carts **I get a vibe that writing down fixes to be considered for the cabinets, along with documenting feedback or BOM issues is unexpected and not "assembler" role?

**Request:** I know theres definitely a learning curve to where I would be able to become more helpful over time as I learn more. I know there's also career path stuff, but for here and now getting a sense from you with what I should be doing would help me provide the right support and be less confused. I am also a person and new and I just want to help

**11:06:23 AM Joren:** Assata,

First off- thank you for being open and letting me know! So sorry for how some of this is coming across. I've sent you an invite for tomorrow to sit down and discuss this - is that acceptable for you?

# PTE 48 (07/07/2021 Teams Messages between myself and my Supervisor, ECF 15-36 and 15-37).

7/7/2021 10:24 AM
Hi Joren?

I wanted to ask to meet with you but theres not really any private office space. So sorry for these long messages( abt 5 mins reading time)

**Purpose :**I wanted to check in and realign my sense of what I'm supposed to be doing/ because there's been some behaviors and comments that I have been mixing with me genuinely wanting to make sure I'm helping.

**Context :**
My assessment was that I am supposed to be:
a) Learning about team processes through shadowing
b) Completing direct tasks as given by you (ie: cabinet fixes, helping out with boards)
c) Documenting my work/ supporting documentation so that any related errors found(BOM inconsistencies, wrong use of parts, inaccurate cabinet travelers etc)can be found and reviewed and prevented.
d) Running supports beyond the scope of direct tasks(ie: working with Seth to document/anticipate moving parts) to you

**Request:** I know theres definitely a learning curve to where I would be able to become more helpful over time as I learn more. But getting a sense from you with what I should be doing would help me provide the right support and be less confused

**Comments and Behaviors:**
a) "I dont build cabinets, that what we have you for. " (when I first met Taylor and was asking what he does) "I dont see why he doesn't just have you build cabinets" (After previewing the chart I was excited to present to him on Friday)
b) "As an assembler...you" -- the beginning of many of Maria's sentences when I ask her about cabinets
c) Frank: "This is Assata. Shes a technician with a **Physics** degree... she'll be doing better things... "--Introducing a new hire with a smile.

**Effects:**
There are other small actions and experiences but the effect is this
**After Taylors comments,  I questioned even finishing typing stuff or doing organization, despite  i) him being ok with my chart

**Purpose :**I wanted to check in and realign my sense of what I'm supposed to be doing/ because there's been some behaviors and comments that I have been mixing with me genuinely wanting to make sure I'm helping.

**Context :**
My assessment was that I am supposed to be:
a) Learning about team processes through shadowing
b) Completing direct tasks as given by you (ie: cabinet fixes, helping out with boards)
c) Documenting my work/ supporting documentation so that any related errors found(BOM inconsistencies, wrong use of parts, inaccurate cabinet travelers etc)can be found and reviewed and prevented.
d) Running supports beyond the scope of direct tasks(ie: working with Seth to document/anticipate moving parts) to you

**Request:** I know theres definitely a learning curve to where I would be able to become more helpful over time as I learn more. But getting a sense from you with what I should be doing would help me provide the right support and be less confused

**Comments and Behaviors:**
 a) "I dont build cabinets, that what we have you for. " (when I first met Taylor and was asking what he does) "I dont see why he doesn't just have you build cabinets" (After previewing the chart I was excited to present to him on Friday)
 b) "As an assembler...you" -- the beginning of many of Maria's sentences when I ask her about cabinets
 c) Frank: "This is Assata. Shes a technician with a **Physics** degree... she'll be doing better things... "--Introducing a new hire with a smile.

**Effects:**
There are other small actions and experiences but the effect is this
\*\*After Taylors comments,  I questioned even finishing typing stuff or doing organization, despite  i) him being ok with my chart and description on last monday ii) Maria's input about the need for organization and her intention with those carts
\*\*I get a vibe that writing down fixes to be considered for the cabinets, along with documenting feedback or BOM issues is unexpected and not "assembler" role?

**Request:** I know theres definitely a learning curve to where I would be able to become more helpful over time as I learn more. I know there's also career path stuff, but for here and now getting a sense from you with what I should be doing would help me provide the right support and be less confused. I am also a person and new and I  just want to help

**PTE 49 (08/10/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (III)(1),** *originals filed in Doc 40-2 pp. 703-734).*



1. **08/09/2021 Adverse party statement from my supervisor to me about my assigned supervision of a white male field technician (Chris Schatz) and excited utterance and present sense impression of myself to my supervisor about my white coworkers' (Rob Rosenberg and Taylor Johnson's) opposition to/criticism of same (Ex. 348-363). References: ECF 8-1(5-6, 10-13, 121(b-d), 124-128), Doc 15 (77-78), ECF 15-43, ECF 15-44.**

   **1:00:35 PM Joren:** I'm sorry, I've lost track of his schedule. If he's in, please oversee his work getting the next 150 ready, or assisting you building the 75's / kitting them, alternately, point him at Seth to assist with tub cleanout.

   08/10/2021 exhibits 349-363

   **10:27:05 AM Joren:** What do you need to support you and Chris knocking out the 75, and getting any questions answered quickly to progress along with it?

**10:28:53 AM Assata:** Are you here or available for a team's call?

**10:29:30 AM Assata:** I think it would be easier to have a short chat

**10:30:59 AM Joren:** Okay. I'll see about setting up a meeting later today. I'm currently booked all morning.

**10:35:33 AM Assata:** Valid.. .1 think everything is on pace to be done one time. I had set daily goals for the august chunk of the priorities you sent(75 and the 150s.)

**10:37:12 AM Assata:** I am stressed from input from Rob and Taylor and trying to be fair with Chris. I did not expect chris to come right in and start working, but my plan today was to wrap up Quentin repairs and then join him on the 75

**10:41:19 AM Assata:** I think everything is set up to be done on time and checked. The difficulty for me is not kicking him off of a project I was looking forward to, where it seems folks either want me to be bulding directly or watching him while he builds. Because I want to make the most of the hands we have/an worried about hovering/crowding but am also secure that he won't always be around and I will be able to build additional cabinets

**10:41:22 AM Joren:** Okay. Please do see if Chris needs anything before wrapping up Quentin. Thank you.

**10:43:01 AM Assata:** Will do. we check in each morning and throughout the day. It is stressful with folks constantly giving me updates on what hes doing with underlying expectations? Trying to remain concrete

**10:44:01 AM Joren:** Not sure I follow your last message?

**10:46:40 AM Assata:** I dont know how to word it in text. But even though I set up steps to get things done in time, I feel like I've been getting carried away wanting to make sure I'm doing stuff correctly. Then Rob or Taylor have been coming to me mentioning "you know chris is doing...or chris is...shouldn't you..." And it gets really confusing as if nothing is in order or on schedule

**10:47:18 AM Joren:** ok

**10:47:19 AM Assata:** So I've been trying to ground myself by writing a daily checklist and crossing things out, and also not be weird or controlling towards chris over it.

**10:49:44 AM Joren:** Ok! Please see if you can get through today and well review later today

**10:51:56 AM Assata:** Sounds good!

**PTE 50 (10/07/2021) Teams Messages between myself and my Supervisor, Doc 40 Transcript (III)(4), *originals filed in Doc 40-2 pp. 749-752).***

4. 10/07/2021 Present sense impression from myself to my supervisor of Rob Rosenberger's criticism of the nature and scope of my work (Ex 371-372).  References: 8-1(¶6-7, ¶10-13, ¶120-121(b-d), ¶124-129), Doc 15 (¶77-80),

8:07:31 AM Assata: today Rob has informed me that I take too many notes, that quality should be taking those notes, that quality is a part of my job,, and then that they need to open a position for that.....

10:01:54 AM Joren: Sorry about Rob. Ugh.

**PTE 51 (04/21/2022 Teams Messages between myself and my Supervisor, Doc 40 Transcript (III)(19),** *originals filed in Doc 40-2 pp.* **1122-1154).**

19. 04/21/2022 **Present sense impression and excited utterance from myself to my supervisor about Rosenberg (white coworker) criticizing the PPE I qualified and ordered to my white male team member (technician, Brian Kenny) while refusing to acknowledge me (Ex. 555-570). References: ECF 8-1 (¶4-6, ¶10-13, ¶120-121(b-d), ¶124-129, ¶175-177), Doc 15 (¶77-80).**

   **3:28:16 PM Assata:** Lab coats are here

   **3:28:38 PM Assata: **unknown attachment****

   **3:29:14 PM Assata:** Rob asked brain what they were and ignored me when I said. As he walked past he expressed that no one's gonna wear them. It's only for a short procedure, so I'm gonna let that go

   **3:36:09 PM Joren:** They arrived today about noon. Julian asked me bout them. Just ignore the old grouch. 1 placed them on the rack in the back. Maybe we get a hanging rod for them. TBD. A basket for them when used was also placed in the back. Please find a nice spot for that where it's not in the general area and put up a sign to keep trash out that it's only for the company (robins?) clothing to be washed

   **3:39:33 PM Assata:** Clemens*

   **3:39:51 PM Assata:** Did you ever get to follow up with Harry or let it pass?

   **4:05:13 PM Assata:** Robs take on our team "on that team...Omar's the only one who really tries. I have no idea where Seth's at" At this point I wish there were sound barriers between us and test area.

   **4:05:46 PM Assata:** I'm hoping they're gone by the time I finish tubing so that I don't have to ask for the lift back for fans

   **4:06:26 PM Assata:** He's always making comments lke that. Face to face during meetings last year abd the one he left this year, and on his own 3 this past month. I think it's worse that he's

saying this regularly to other ppl. It makes any jokes they crack and laugh at after feel booty
**4:06:04 PM Joren:** Do you want to move the cabinet back to bear Darren?
**4:07:15 PM Assata:** I think so. Darren's nicer
**4:07:42 PM Joren:** Yup. Ok.
**4:07:59 PM Assata:** Is this laundry basket?
**4:08:27 PM Joren:** Thanks for letting me know. I'll have another conversation
**4:08:30 PM Joren:** Yes



**PTE 52 (01/28/2022 Teams Messages between myself and my Supervisor, Doc 40 Transcript (II)(21),** *originals filed in Doc 40-2 pp.* **515-569).**

21. **01/28/2022 Present sense impression and excited utterance from myself to my supervisor about a white (Brian Kenny) who used me to access the building, held the door open for a white woman, and then allowed the door to slam in my face, leaving me to carry the team's refreshments on my own (Ex. 257-283). References: ECF 8-1(¶39-40(c), 96, 110-111), Doc 15(¶77-78).**

    **8:16:24 AM Assata:** Brian w Parked at same time but went upstairs. Dan d is at his desk
    **8:16:56 AM Joren:** haha. Smart guy - he's going for the donuts.

**8:20:44 AM Assata:** Exactly!

**8:23:32 AM Assata:** So mi I sprint later

**8:23:41 AM Assata:** Brian is sipping coffee chatting with Bogdan

**8:24:03 AM Joren:** Lauren's almost there

**8:24:13 AM Assata:** I wish he'd try to set up instead of freaking out on the spot but oh well U maybe there's not much setup they can do without representation

**8:24:15 AM Joren:** Order is for "Dan Dufresne"

**8:24:33 AM Joren:** Oh, that Brian

**8:24:40 AM Assata:** How do I convince someone that I'm a white man and to trust with merchandise.

**8:25:04 AM Joren:** Honda Accord

**8:25:05 AM Joren:** Front door

**8:25:09 AM Assata: \*unspecified attachment\***

**8:25:26 AM Joren:** Uh oh! Julian got it? **\*box of shrunken text\***

**8:31:48 AM Assata:** Let's talk about how our Brian asked me to let him in so I unlocked the building door for him on the way up

**8:32:21 AM Assata:** But when coffee and donuts came this he held the door and wited outside twice for her to get the coffee in after the donuts

**8:32:37 AM Assata:** Then this flour basket took off

**8:32:50 AM Assata:** And I had to carry both coffee things and donuts but myself

**8:33:06 AM Assata:** And open the door alone

**8:33:37 AM Assata:** Julian had his own interpretation

**8:34:13 AM Assata:** Which had to do with the visible spectrum of light □ and how some folks absorb uv from the sun...

**8:34:34 AM Assata:** Lol the same.coffee he was gonna drink!! I told everyone he doesn't deserve donuts and gave him a peice of my mins

**8:34:48 AM Assata:** Given that he doesn't have a key rn, he's likepy outside sulking.

**8:47:51 AM Assata:** Apparently roasted him too hard he came back with wawa coffee

**8:49:49 AM Assata:** Idk why I thought Dan d. Would see me with the donuts. Only 2 were taken but he was lighthearted in his mention.

**8:57:53 AM Joren:** LOL WHAT?

**PTE 53 (10/08/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (II)(11), *originals filed in Doc 40-2 pp.* 1548-1573).**

11. **10/08/2021 Excited utterance of myself and my supervisor and his adverse party statements about coworker's safety accusations made against me in spite of my use of visual and verbal cues (at the time in question) (Ex. 766-778). References: ECF 8-1 (¶5, ¶48-50, ¶110-111), Doc 15 (¶77).**

**10:24:11 AM Joren:** Hey, could you please provide a bit more information on the light tower conversation?

**10:25:25 AM Joren:** I'm hearing some disturbing things about that, and need to squash this ASAP

**10:26:11 AM Joren:** This has now become a thing.

**11:12:51 AM Assata:** Just now seeing this

**11:13:02 AM Joren:** Oh, ok. Thanks.

**11:13:26 AM Joren:** Sorry, I thought you had seen this which is why you came over. What did you come over for?

**11:14:38 AM Assata:** I was just going to tell you how the pneumatic handle went

**11:15:23 AM Assata:** Thats why I was surprised *surprise emoji*when oh had me sit. Then i was 2orried Tina had died since I didn't help her with the lift

**11:15:51 AM Assata:** Then I was just irritated that ppl at work don't use eyes and ears *unhappy emoji*

**11:15:57 AM Assata:** But I'm chilling now.

**11:16:26 AM Assata:** Prepping cabinet for lunch time

**11:23:13 AM Joren:** Thank you.

**11:23:23 AM Joren:** Sorry about the hydraulic punch

**PTE 54 (11/17/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (II)(16),** *originals filed in Doc 40-2 pp.* **453-476).**

16. **11/17/2021 Present sense impression and excited utterance and recorded recollection from myself to my supervisor about the demeanor of two white, new, mechanical team coworkers and my referring to one of them (Tom Hornberger, senior R&D technician through July 2022) as "mustacio guy/mustache man" (Ex. 226-237). References: ECF 8-1 (¶39-40, ¶120), Doc. 15 (¶77).**

    **11:37:58 AM Assata:** Chris seems ok tho

    **11:38:22 AM Assata:** theres too manie chris, mikes, and daniels in this building

    **11:38:25 AM Joren:** Chris who is sitting at my bench?

    **11:38:26 AM Joren:** Yes.

    **11:39:12 AM Assata:** it was so weird. I told them i wa son your team and 1 sentence on what i do and the unfriendly one just smieled at me., like neither person said anything

    **11:39:41 AM Assata:** it was a weird, smug smile....when i came over i asked if they were new and he pinted out the nicer one as it being theri first day

    **11:40:44 AM Assata:** the weird thing about it all is Id already seen the brunette in kerrys cluster and he would never say hi back or maintain eye contact, so i figured he was aantisocial but....when i went over he was just smirking, anyway theres other things to worry about

    **11:41:13 AM Assata:** waiting for Maira to finish meetings to get an answer for the AC for VW and the Flow assembly angle

    **11:41:33 AM Joren:** [Direct Reply to message from 11:39:41 AM 11/17/2021-See exhibit X] mustachio guy?

**11:41:49 AM Assata:** mustacio guy—
**11:42:15 AM Joren:** Yeah, he's not really personable. Not really keen on him
**11:42:29 AM Assata:** ive seen him talk when he wants to



**PTE 55 (12/13/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (II)(17), *originals filed in Doc 40-2 pp.* 1620-1631).**

17. 12/13/2021 Excited utterance, present sense impression from myself to my supervisor and his adverse party statement regarding the presence and nature of a cartoon pinned onto my cubicle's outer wall (Ex 802-807). References: ECF 8-1 (¶39-41, ¶121(d), ¶124-128, ECF 15-34, ECF 15-35, Doc 15(¶77-78).

   **3:10:30 PM Assata**: Do you think I should Frame my degree and print my six Sigma/project management certs and frame yhem at my desk?

   **3:10:58 PM Assata**: I think perhaps not but the jok e that's been pinned outside my cubicle feels only specific since no one else has admitted to majoring in physics here

   **3:12:48 PM Joren**: I think you should a **copy** of your degree for sure.

   **3:12:56 PM Joren**: Not sure I follow the second statement there.

   **5:00:03 PM Joren**: Yeah, that's rather odd of a "post".

   **5:32:17 PM Assata**: No one else majored in physics



**PTE 56 (12/13/2021 Screenshot Teams messages between myself and my Supervisor, ECF 15-34 and 15-35(p.2)).**



5/16/23, 10:48 AM   Case 2:23-cv-01438-GEKP Document 15-35   Filed 05/16/23   Page 2 of 3   Screenshot_2021...img.jpg — Powered by Box



5/16/23, 10:48 AM     Case 2:23-cv-01438-GEKP Document 15-36 Filed 05/16/23 Page 2 of 3.jpg powered by Box

degree and print my six Sigma/project management certs and frame yhem at my desk?

I think perhaps not but the jok e that's been pinned outside my cubicle feels only specific since no one else has admitted to majoring in physics here

———————————— Last read ————————————

Type a message

**PTE 57(02/18/2022 Teams Messages between myself and my Supervisor, Doc 40 Transcript (II)(32),** *originals filed in Doc 40-2 pp.* **1604-1619).**



32. 02/18/2022 Present sense impression from my supervisor to me regarding his attempts at addressing a coworker (Jorge Rive) from a separate team who had insisted on my accounting for my work time despite my explicit discomfort (Ex. 794-801). References: ECF 8-1(¶5-6, ¶40(b), ¶121(b), ¶124-128), Doc 15 (¶77-78).

> **5:01:01 PM Joren:** FYI - talked with Jorge about grilling you on where have you been. Let me know if it comes up ever again.
>
> His 'defense" was you were a bit stand offish when asked about how VW was going and that you weren't sure if you could talk with him about it because of past defense contractors you've worked with.
>
> Again, let me know if it ever comes up again.
>
> **5:01:30 PM Assata:** Not pressing further be he felt slighted
>
> **5:02:49 PM Joren:** To be clear -1 don't mind you talking about what you're working on with a full time employee of MD.
>
> If it's ever in question, feel free to direct them to me.
>
> To be clear about above - that does not mean I want you to feel obligated to talk about it either.
>
> **5:04:25 PM Assata:** I see. Defense as far as saying that my discomfort is only due to defense and

not due to feeling uneccesarityl scrutinized.

**5:04:44 PM Assata:** Regardless of his stance, I appreciate you following up for me and letting me know what to do in future

**5:05:05 PM Joren:** That's why you're hearing about it. I heard you after the Brian thing and I'm trying to be better

**5:06:37 PM Joren:** It's not a strong suit of mine -1 often just "get things done" but like to stay out of the lime light, and saying "hey, 1 got this done, this is the outcome" feels some like I'm tooting my own horn - not something I like / do well.

Regardless of that - I'm working on following up and back.

**5:06:46 PM Joren:** Cool!



# PTE 57b (02/24/2022Teams Messages between myself and my Supervisor, *Doc 40-2 pp. 691-702*).

Exhibit 342- 02-24-2022 Jorge
PM 5-34-49 INDUCTEV
INITDISCL011955.pdf

Message

| | |
|---|---|
| **From:** | Assata Acey [Assata.Acey@momentumdynamics.com] |
| **Sent:** | 2/24/2022 5:34:49 PM |
| **To:** | Joren Wendschuh [joren.wendschuh@momentumdynamics.com] |

Jorge was loudly discussing me to someone at the end of day earlier this week. He's since cooled off

INDUCTEV INITDISCL011955

# Exhibit 343- 02-24-2022 Jorge PM 5-34-58 INDUCTEV INITDISCL011471.pdf

Message

**From:**   Assata Acey [Assata.Acey@momentumdynamics.com]
**Sent:**   2/24/2022 5:34:58 PM
**To:**   Joren Wendschuh [joren.wendschuh@momentumdynamics.com]

Thabk you for checking

Exhibit 344- 02-24-2022 Jorge
PM 5-35-39 INDUCTEV
INITDISCL003190.pdf

Message

| | |
|---|---|
| **From:** | Joren Wendschuh [joren.wendschuh@momentumdynamics.com] |
| **Sent:** | 2/24/2022 5:35:39 PM |
| **To:** | Assata Acey [Assata.Acey@momentumdynamics.com] |

Sure thing. Ugh. WTF.

Content of loud discussing?

# Exhibit 345- 02-24-2022 Jorge PM 5-35-45 INDUCTEV INITDISCL009006.pdf

Message

**From:** Joren Wendschuh [joren.wendschuh@momentumdynamics.com]
**Sent:** 2/24/2022 5:35:45 PM
**To:** Assata Acey [Assata.Acey@momentumdynamics.com]

Jorge just left.

# Exhibit 346- 02-24-2022 Jorge PM 5-51-27 INDUCTEV INITDISCL006707.pdf

Message

**From:** Assata Acey [Assata.Acey@momentumdynamics.com]
**Sent:** 2/24/2022 5:51:27 PM
**To:** Joren Wendschuh [joren.wendschuh@momentumdynamics.com]

Eagle out!

INDUCTEV INITDISCL006707

Exhibit 347- 02-24-2022 Jorge
PM 5-51-54 INDUCTEV
INITDISCL012349.pdf

Message

| | |
|---|---|
| **From:** | Assata Acey [Assata.Acey@momentumdynamics.com] |
| **Sent:** | 2/24/2022 5:51:54 PM |
| **To:** | Joren Wendschuh [joren.wendschuh@momentumdynamics.com] |

Also, it was something about collaborating with others and why it's important to share information but he was talking to a bug didn't or whoever else would listen to him so I didn't really care

INDUCTEV INITDISCL012349

**PTE 58 (11/09/2021 Teams Messages between myself and my Supervisor, Doc 40 Transcript (II)(9, 12-13, 15),** *originals filed in Doc 40-2 pp.* **365-367, 387-414, 1574-1595).**



9. 08/09/2021 **Recorded recollection from myself to my supervisor regarding statements made about Julian Jackson (now- laid off black male warehouse associate) by his direct supervisor (Taylor Johnson) (Ex. 183). References: ECF 8-1 (¶110-111, ¶121, ¶123).**

**9:13:43 AM Assata:** I will check with Julian...Taylor has warned me that when getting parts from Julian to not let him order anything but send an email to purchasing so its documented, so I may ask both and let him do his delegation thing?

12. 10/20/2021 **Present sense impression and excited utterance/complaint from myself to my supervisor about Julian Jackson's statements to me on Jackson's access to his own work assignments (Ex. 194-199). References: ECF 8-1 (¶110-111, ¶121(b), ¶123).**

   **3:06:54 PM Assata:** After double searching the kit for the gasket, I ha e put in my first parts request. I hope using form doesn't mean things will be slower

   **4:06:40 PM Assata:** Supply chain emails only go to Taylor and Daniel according to Julian

   **4:06:57 PM Assata:** He is certain that they don't go to him and didn't know we were gonna skip him part numbers anymore

   **\*Time unproduced\*PM Joren:** It's intentional [\*unproduced image\*]

   **5:28:26 PM Assata:** Can slow things down, but I'll try to put requests in earlier?

   **6:23:09 PM Assata:** Julian also mentioned that when he is given items from the request form, instead of receiving the form, Taylor reads the numbers aloud to him or send them in a team's message. I don't understand how he is set up for success when there's another level between what is sent inand what hes receiving

   **6:28:37 PM Assata:** Because if I get the wrong part I would look at Julian . But, from this email, they will be trying to match the number I give against their BOM

13. 10/21/2021 **Excited utterance/complaint from myself to my supervisor and my supervisor's adverse party statements about Julian Jackson's access to his own work assignments (Ex. 200-207). References: ECF 8-1 (¶110-111, ¶121(b), ¶123).**

   **9:50:48 AM Assata:** what I want to say is professionally, if there should be a collated record of whenever Julian gives the wrong thing, he should also have a record of instructions given to him

   **9:50:58 AM Joren:** [Direct Reply to message from 4:06:57 PM 10/20/2021-See exhibit X] He didn't know we were changing things - because we're not "really" - I'm just providing the old

form so that if someone needs it, it's available.
**9:51:12 AM Joren:** [Direct Reply to message from 9:50:48 AM 10/21/2021-See exhibit X] Agreed.
**9:51:33 AM Joren:** [Direct Reply to message from 6:23:09 PM 10/20/2021-See exhibit X] Agreed - it's a strange operating way.
**9:51:43 AM Assata:** [Direct Reply to message from 9:50:58 AM 10/21/2021-See exhibit X] So im not supposed to use form to request individual parts
**9:51:55 AM Assata:** ?
**10:02:20 AM Joren:** You can or cannot, up to you.

15. **11/09/2021 Present sense impression and excited utterance/complaint from myself to my supervisor about Julian Jackson's statements to me on why his seating was changed and my supervisor's adverse party statements regarding same (Ex. 779-789). References: ECF 8-1 (¶¶110-111, ¶121(b), ¶123).**

**3:42:11 PM Assata:** Julian said Daniel had him in the front be he thought hed be "more effective/productive" up there. It's giving "assata" talks to much vibes but like directed at him., says hes happy he still works here, grr

**3:43:26 PM Assata:** Quote of cable shield

**3:57:07 PM Joren:** https://www.mcmaster.com/clip-nuts/

**3:58:56 PM Joren:** [Direct Reply to message from 3:42:11 PM 11/09/2021-See exhibit X] Hmm strange. A lot of weird going on around that. Not sure why.

**3:59:00 PM Assata:** [Direct Reply to message from 3:57:07 PM 11/09/2021-See exhibit X] low, floating nut, or enclosed nut?

**3:50:18 PM Joren:** [Direct Reply to message from 3:43:26 PM 11/09/2021-See exhibit X] Haven't heard anything more, but 1 think Harry's working it. Thanks for finding it!

**3:59:40 PM Assata:** [Direct Reply to message from 3:58:56 PM 11/09/2021-See exhibit X] its feeling like the flag i raised when the requisition email stuf was coming out.

**4:00:08 PM Joren:** [Direct Reply to message from 3:59:00 PM 11/09/2021-See exhibit X] not low. Not floating., not snap in.

**PM Joren:** [Direct Reply to message from 3:59:40 PM 11/09/2021-See exhibit X] Separate things though.

PTE 59 (04/03/2024 O. Jackson Dep. pp.

72(ll16)-73(ll14)).

| 16 |  | Q. | Did you ever witness any employee at |
| 17 | InductEV be criticized for being lazy? |
| 18 |  | A. | Yeah.  Julian -- they was saying he was |
| 19 | lazy; he wasn't moving fast enough. |
| 20 |  | Q. | So I understand your testimony, you |
| 21 | witnessed Julian be criticized as lazy? |
| 22 |  | A. | Yes. |
| 23 |  | Q. | How did you witness that?  Did you hear |
| 24 | it? |
| 25 |  | A. | Yes, I did. |

Omar Jackson - by Mr. Longo

Page 73

```
 1          Q.      Do you recall who said that?
 2          A.      Trying to think about who would have
 3   said that.  I know it was said, though.
 4          Q.      At the time --
 5          A.      I don't remember who said it; but I know
 6   it was said.  I remember it being like, you know,
 7   when you hear it, and then you see it.  Yeah.  It's
 8   like, okay, he just takes his time.
 9          Q.      At the time you heard that, did you
10   think the criticism had anything to do with race?
11          A.      No.
12          Q.      Did you have any reason to think it had
13   anything to do with race?
14          A.      No.
```

**PTE 60 (01/25/2022 Teams Messages between myself and my Supervisor, Doc 40 Transcript (II)(20),** *originals filed in Doc 40-2 pp. 507-514).*

20. 01/25/2022 Present sense impression and excited utterance from myself to my supervisor about
Tom Hornberger (senior R&D technician through July 2022, aka "mustacio guy/mustache man")
passionately calling Julian Jackson (black warehouse associate) lazy (Ex. 253-256). Supporting
exhibits (Ex. 226-237). References: ECF 8-1 (¶39-40, ¶120, ¶123(b)), Doc. 15 (¶77).

3:49:22 PM Joren: Assembly VA Connector subassembly P-002092-Tool VA HV Connector
assembly fixture - do you have a photo of this?

3:49:32 PM Joren: Either way, go save BACON

3:49:37 PM Assata: not folks at wok getting mad about the gaage door and calling Julian lazy
behind it.like hes the only one using the door/leaving it open and all uses are just to bring foklift
in vs in and out o waiting fo vendors to unload... yikes. of couse it was mustache man.

3:49:43 PM Assata: goign to save bacon!

**PTE 61 (09/14/2022 Teams Messages between members of the Electrical Engineering Team, Doc 40-2, pp. 1711-1712).**

Exhibit 844- 09-14-2022 Steve
Comments on attendance of
other Black Employees- Omar
Jackson IMG_2112.PNG

09:56



## Electrical Team >
10 participants

**Chat**                    Files

Jerry F.



Good morning. Reid is
the ER waiting for the
decide if he needs sur
spinal issue. He is in g
a bit bored and after a
night, very tired, so go
him

PTE 62 (09/14/2022 Text Messages between myself and my Supervisor, Doc 40-2 pp. 1715-1718).

# Exhibit 846- 09-15-2022 Steve Comments on Black Employee Screenshot_20230526_072737 _Messages.jpg



7:27

# < J Joren(boss) ∨

What's that printed bo

Sep 15, 2022

Its called

Does **Omar** tak

6:58 AM

6:59 AM

lol. Ok. I won't answer.

# Exhibit 847- 09-15-2022 Steve Comments on Black Employee Screenshot_20230526_072743 _Messages.jpg

7:27 

< **J** **Joren(boss)** ∨



nar, ● Steve ✏ Chat Files +

**Steve Brown** 8/10 7:48 AM 🔥 1 👍 1
Omar could you please come to our shop, I have a question about the SMGA I brought in to tune the antennas. Thanks.
Oh.....IT'S HUMP DAY!

August 11

**Steve Brown** 8/11 8:49 AM
Greetings Gentleman! The SMGA #10000006210018220001 that I had in our shop for antenna tuning is completed as far as the antenna tuning. This unit had a bad potting pour and also Mike H. had carved out an area of the potting to get to the connection of the RX2 antenna cable where it connects down in the potting onto a surface mounted RF connector to remove the Zero Ohm resistor that was causing a short indication at the OPUS connector for antenna RX2. The short RF coaxial cable from the RX2 antenna connector into the potting needs to be secured via some sort of potting since it is free hanging due to the carving out of the potting and for reliability. I would like to know how this is to be accomplished and is this unit going to be used as an engineering unit instead of a production unit due to the outcome of the potting process. Please inform, thank you gentleman.

8/11
Tha

Yesterday

**Steve Brown** Yesterday 8:27 AM 👍 1
Hey Omar, guess what day it is.....HUMP DAY!

**PTE 63 (04/03/2024 O. Jackson Dep. pp. 55(ll4-12), 66 (ll11-16), 99 (ll18-24)).**

4          Q.      Did you ever talk to Ms. Acey about

5     these interrogatories?

6          A.      I can't recall.  Is that Steve Brown?

7     Who is Steve Brown?  I don't even know him.

8                  I can't recall somebody saying I was

9     lazy, in other words being lazy.

10         Q.      We're gonna walk through this.

11         A.      Okay.  I'm sorry.  I'm sorry.  I went

12    ahead.

| 18 | Q.      If you found out that one of your |
|----|----|
| 19 | teammates was in the ER, would you respond -- I mean, |
| 20 | would you say that they were a slacker? |
| 21 | MR. LONGO:   Objection.   Form. |
| 22 | A.      No; but knowing Steve, we joked a lot. |
| 23 | So Steve -- that's the demeanor, how Steve -- I'm |
| 24 | sure Steve was joking there, as well. |
| 25 | Q.      I want to scroll down.   So the next |

**PTE 64 (01/04/2022 Text messages between myself and my Husband p. 1284 (11:45:06)).**



1/4/2022 11:45:06

Assata (+17702311017)

Today I got accused of dating a white man by Omar as an explanation or
me being out of touch with how folks are treated at work.

1/4/2022 11:45:32



**PTE 65 (04/03/2024 O. Jackson Dep. pp.**

**93(ll8)-94(ll19), 96(ll-97(ll).**

```
 8        Q.      The next paragraph says:  At least what
 9   I'm seeing, Omar has been with us almost two years
10   now.  And with his experience, he would have been
11   brought in as a senior technician, had he not been
12   out of the market for a number of years.
13            Is that what you see on your screen?
14        A.      Yes.
15        Q.      I just want to hone in on this portion
16   of this email.
17            Do you know what Joren is referring to
18   when he says you were, "out of the market?"
19        A.      Yeah.  I wasn't in the field.  I took
20   myself out when I quit my job.
21            I was tennis coach for four years, three
22   years.  I wasn't working in the industry.  So when I
23   did get back into the industry, I was working odd
24   jobs.  So that was the first or second electronics
25   job I got.
```

 1          Q.      So you're saying during this gap, were
 2      you unemployed, or were you employed?
 3          A.      I was you could say both, a little of
 4      both.  I was employed.  Then I was unemployed.  Well,
 5      I was unemployed for some time, then I found some
 6      work.  And then it was -- it was odd jobs, like I
 7      said.  And then I found some work at this place
 8      called Faro, F-A-R-O, Technology.
 9          Q.      Is Faro Technology -- was Faro
10      Technology the employer that you had right before
11      going to InductEV?
12          A.      Yes.
13          Q.      How long did you work with them?
14          A.      A year.
15          Q.      Okay.  So would you say at the time that
16      you applied to work with InductEV, you had 20 years
17      experience, or more than 20 years experience?
18          A.      Yes.
19              MR. LONGO:  Objection.  Form.

```
 8                  When you applied to work with InductEV,
 9       did you provide your years of experience?
10              A.     Yes.
11              Q.     Did you discuss your experience with
12       them?  I mean, was there any interview?
13              A.     Yes.
14              Q.     Did you discuss your experience in the
15       interview?
16                     MR. LONGO:  Objection to form.
17              A.     Yes, I guess I did, if they asked.
18              Q.     Have you ever held -- I'm sorry.
19                     Prior to -- during your work at CTDI,
20       did you ever receive a supervising role?
21              A.     Yes.  I was.
22              Q.     What was the name of that role?
23              A.     That was -- I forget what they called
24       it.  It was a manager account.  All I know I was --
25       it was -- I was a section head that ran a department.
```

Omar Jackson - by Ms. Acey

Page 97

| | | |
|---|---|---|
| 1 | Q. | How many people did you supervise? |
| 2 | A. | Between 15 to 20 people. |
| 3 | Q. | How long had you held that role? |
| 4 | A. | Four years. |
| 5 | Q. | Did you disclose this when you applied? |
| 6 | A. | Yes. |



**PTE 66 (09/03/2021 Promotions Email Thread between Supervisor, HR exec, CEO, and VP of engineering, ECF 20-9).**

| | |
|---|---|
| **From:** | Judy Talis |
| **To:** | Andrew Daga |
| **Cc:** | Ben Cohen |
| **Subject:** | RE: Draft promotion request - feedback appreciated. |
| **Date:** | Friday, September 3, 2021 3:11:09 PM |

Ben,

Andy and I discussed we would like to promote both ███ and Omar to Senior Technicians. They will get a 15% increase each. This will not impact their annual increase at all.

We can discuss on Tuesday about communicating the promotion.

Thanks,

Judy

**Judith Talis | Chief Administrative Officer**
Momentum Dynamics Corporation
*Fueling the Future of Electric Transportation*

3 Pennsylvania Avenue, Malvern, PA 19355
(M) 610.613.1449
www.momentumdynamics.com

Disclaimer and Confidentiality Notice: This email, and any attachments and/or documents linked to this email, are intended for the addressee and may contain information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender.

**From:** Andrew Daga <andrew.daga@momentumdynamics.com>
**Sent:** Friday, September 3, 2021 10:33 AM
**To:** Judy Talis <judy.talis@momentumdynamics.com>
**Subject:** Re: Draft promotion request - feedback appreciated.

I agree on both.

Are you in office today?  If not we can get on teams. I have my regular meeting with Tony Suflet at 11 this morning

**Andrew W Daga | President and CEO**
**Momentum Dynamics Corporation**
**Fueling the Future of Electric Transportation**
3 Pennsylvania Avenue, Malvern, PA 19355
(O) 484.320.8222 Extension 121
(M) 610.764.5491

Disclaimer and Confidentiality Notice: This email, and any attachments and/or documents linked to this email, are intended for the addressee and may contain information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender.

**From:** Judy Talis <judy.talis@momentumdynamics.com>

CONFIDENTIAL

INDUCTEV INITDISCL000311

**Date:** Friday, September 3, 2021 at 9:47 AM
**To:** Andrew Daga <andrew.daga@momentumdynamics.com>
**Subject:** FW: Draft promotion request - feedback appreciated.

I agree we should promote ███ and Omar. We can speak about this when you have a moment.
Thanks,
Judy

**Judith Talis | Chief Administrative Officer**
Momentum Dynamics Corporation
*Fueling the Future of Electric Transportation*

3 Pennsylvania Avenue, Malvern, PA 19355
(M) 610.613.1449
www.momentumdynamics.com

Disclaimer and Confidentiality Notice: This email, and any attachments and/or documents linked to this email, are intended for the addressee and may contain information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender.

**From:** Ben Cohen <ben.cohen@momentumdynamics.com>
**Sent:** Thursday, September 2, 2021 9:16 PM
**To:** Judy Talis <judy.talis@momentumdynamics.com>
**Cc:** Joren Wendschuh <joren.wendschuh@momentumdynamics.com>
**Subject:** Fwd: Draft promotion request - feedback appreciated.

Hi Judy,

I think Joren states this well.  I recommend we promote both Omar and ███ .

**From:** Joren Wendschuh <joren.wendschuh@momentumdynamics.com>
**Sent:** Thursday, September 2, 2021 7:29 PM
**To:** Ben Cohen
**Subject:** Draft promotion request - feedback appreciated.

Ben,

I'm recommending out of cycle promotions for both ███████ and Omar J. based on the conversation with yourself and Judy last week, incrementing their titles to Senior Technicians.

Omar has been with us almost two years now, and with his experience, he would have been brought in as a senior technician, had he not been out of the market for a number of years. He's a valued and motivated team member, able to operate autonomously on projects - and

CONFIDENTIAL                                             INDUCTEV INITDISCL000312

has come up to speed quickly from his initial hire.



Please feel free to ask any questions or follow up, but strongly encourage that we consider promoting both Omar and ▮▮▮▮. I would like them to be recognized for their strong contributions to this company and their work efforts.   Thank you!

Sincerely,

Joren Wendschuh

INDUCTEV INITDISCL000313

**PTE 67 (04/11/2024 A. Acey Dep. pp.**

**107(ll10)-115(ll14).**

10  BY MR. SCHAUER:

11      Q.   To the best of your recollection,

12  what part of Mr. Jackson's testimony

13  demonstrated to you that, in fact, he did

14  feel that he was discriminated against by

15  InductEV based upon his race?

16      A.   In the beginning when he said that

17  he felt, like, he should have been promoted

18  already and he was asking and he didn't feel,

19  like, he was appreciated.

20      Q.   And, so, you connect that statement

21  to 'it must have been because of his race"?

22      A.   I believe that --

23      Q.   I'm asking you if you connect his

24  statement that he should have been promoted

Page 108

1  sooner to his race.

2        That's a "yes" or no question,

3  please.

4        A.   I'm confused.

5        Q.   Why?

6        A.   Are you asking me whether his

7  statement supports that?

8        Q.   I asked you why you made the

9  statement that you felt based on the

10 testimony of Mr. Jackson that he felt he had

11 been discriminated against by InductEV on the

12 basis of his race.  And you said, "Yes."

13       A.   Okay.  So, yes, I connected that

14 statement to race, yes.

15       Q.   And it was your conclusion having

16 heard that statement that that was because

17 InductEV discriminated against him based on

18 his race --

19       A.   Yes.

20       Q.   -- despite Mr. Jackson's testimony

21 that he did not feel that he had been --

22       A.   Yes.

23       Q.   -- discriminated.

24            In fact, Mr. Jackson said InductEV

Page 109

1   saved his life, didn't he?

2        A.   Yes, he did.

3        Q.   Okay.  And, obviously, to state the

4   obvious, I mean, your race doesn't change

5   over the employment, right?

6        A.   Right.

7        Q.   Okay.  So -- all right.

8             Is that -- and that's your basis

9   for belief that Mr. Jackson was discriminated

10  against based on that?

11       A.   No.

12       Q.   Okay.  Have you just given me your

13  basis of his experience, and having not been

14  hired in as a senior technician at the very

15  beginning; is that -- is that what you think

16  was the wrong that was done to Mr. Jackson

17  based upon his work experience?

18       A.   Not completely, no.

19       Q.   Okay.  Well, does -- had -- did he

20  ever share with you any information other

21  than that, that, you know, and said, "Hey, I

22  saw that when you first got there," you know,

23  "Here's how I feel about the placements, you

24  know, just be careful."

Page 110

```
 1              Did he tell you something along
 2   that?
 3       A.   Yes.
 4       Q.   What did he say?
 5       A.   Mr. Jackson told me a lot of
 6   things, and he always told me to keep my head
 7   down.  He always talked about racism at work,
 8   and he always emp- -- he always emphasized
 9   never confronting people about being racist,
10   because he believed, at least as what he told
11   me, that complaining about race in a public
12   way or to people who can control your
13   employment will affect your professional, I
14   guess, opportunities, your ability to make
15   money.
16       Q.   Well, that's his opinion, right?
17       A.   Yes.
18       Q.   And did he say to you that, "Well,
19   and beyond the fact that there might be
20   people here who don't like to be" -- "to have
21   discussions around racism.  In fact, I have
22   been discriminated against, and I've been
23   harassed here at InductEV based upon my
24   race"?
```

Page 111

```
 1        A.   Yes.
 2        Q.   Well, what is your basis for saying
 3   that, other than what -- is there anything in
 4   addition to what you just said, his advice to
 5   you?
 6        A.   I mean, there are times when I
 7   would have problems.
 8             So Omar Jackson treated me like one
 9   of his daughters.  His daughters are a little
10   bit younger than me.  And whenever I had
11   problems at work, he would always ask me how
12   I was, and try to encourage me.
13             When I had problems with HR, he
14   told me that they had done the same thing
15   with him, because he was taking -- like, I
16   guess he wanted to take -- use his vacation
17   to do every other Friday off, and HR was
18   asking various personal questions that he
19   felt they didn't have the -- that they didn't
20   have the right to.
21        Q.   So you felt it was inappropriate
22   for HR to inquire into his reasons for
23   wanting every other Friday off?
24        A.   I mean, the -- yeah.  I mean, those
```

Page 112

1   were his vacation days.

2        Q.   And what was your vacation issue or

3   your issue with HR around taking time off,

4   that I guess you went to him with a problem?

5        A.   No, it wasn't for that.  He gave --

6   that was his antidote.  I was just asking

7   trouble with HR.

8             But, yeah, he always encouraged me,

9   and he gave examples and he often stated that

10  things were different for people of a

11  different race.  But he also -- also

12  vehemently encouraged me to, quote/unquote,

13  keep my head down.

14       Q.   Did he give you examples of

15  specific impacts on his terms and conditions

16  of employment at InductEV that he felt were

17  clearly directed to his race?

18       A.   Attorney Schauer, during mediation,

19  May Mon Post told me -- I guess to make me

20  feel bad -- that she -- they disclosed the

21  pay of Omar and Seth.

22             And when Omar was a normal

23  technician, he still didn't make what Seth

24  made.  And when they were promoted, even in

Page 113

1  the promotion he was given --

2      Q.   Do you all the facts surrounding --

3           THE COURT REPORTER:   I can

4           only do two people -- one person at

5           a time.

6  BY MR. SCHAUER:

7      Q.   So you -- you're aware of the all

8  facts involving the employment of,

9  compensation of, experience, et cetera,

10  dealings with management of Seth and

11  Mr. Jackson, or not?

12      A.   That's what why I asked for it,

13  yes, because I knew that data and I knew that

14  evidence existed.

15      Q.   Well, let's talk about you, then,

16  because we've heard from Mr. Jackson, and he

17  didn't seem to share that opinion, except

18  that in the deposition, is that fair, except

19  for, I think, the statement you said he made

20  early on.

21      A.   No.   He also disclosed the second

22  statement that he told you guys that he

23  recanted, but he also destroyed his

24  credibility in that by stating that he wasn't

Page 114

1    involved in the interview that precipitated
2    that conversation, which is recorded in
3    discovery.
4         Q.    So are we supposed to believe
5    Mr. Jackson or not believe Mr. Jackson?
6         A.    I think you should believe the
7    evidence.
8         Q.    No.   My question isn't the
9    evidence.
10             My question is --
11        A.    The answer is no.
12        Q.    Okay.   So we don't believe
13   Mr. Jackson.
14             I believe at the end of his
15   deposition, you made a statement to the
16   effect that you didn't feel so good or feel
17   so well, why was that?
18        A.    Because it broke my heart.   I mean,
19   this guy -- in my mind, he was treated
20   unfairly.   He was entitled to anything to
21   backpay to the fact that he was denied a
22   designation for no other reason than
23   someone's bias impression of his experience
24   or lack thereof when it was objectively well

Page 115

```
 1   beyond the scope of the formal requirements.
 2              No one ever told him those formal
 3   requirements.  And it's -- it's fine.  It's
 4   fine to not promote someone who fits the
 5   formal requirements.  That's subjective.
 6              My problem is that they denied him
 7   on the basis of experience.  They denied me
 8   on the basis of experience.
 9              We are black, and they allowed Seth
10   to be promoted, and he deserved it, but he
11   didn't fit the formal requirements, and they
12   were willing to break the formal requirements
13   for a white man, but not for me and not for
14   Omar.  And Omar deserved it more.
```



**PTE 68 (09/04/2022 Text messages between myself and my Husband p. 2798).**

9/14/2022 10:23:33

Assata (+17702311017)

Its me laughing bc omar takes all his pto whenever he can bc he doesnt trust yall one bit. He is old school black and ive had many chats with him.

Old school black profrssiinal is do your job krep your head down try not to get exploited and usr every benefit you get bc youre prkbably jot paid and cant count on being valued

9/14/2022 10:23:56

Duncan and theo have both been sleeping on my bed lately. Then when morning comes, theo is usually downstairs on the couch and duncan is under the bed... I wonder if I kick them in my sleep or something 😅

9/14/2022 10:24:08

Assata (+17702311017)

He was the first person to tell me stop writing in reasons on my pto reqhest bc folks dont nerd yo kniw what im foing

9/14/2022 10:24:45

Assata (+17702311017)

Lol you might. Or they may like sleeping with you symbolicalky but want to watch the rest of the house. Their sleep schedukes are different

9/14/2022 10:25:04

Assata (+17702311017)

They listen tonthe earth mire than human routines allow and light is also changibg

9/14/2022 10:25:04

Yeah i can agree with that. For me it's usually just "I have an appointment" or "I need to tend to some personal matters".

9/14/2022 10:25:26

Assata (+17702311017)

I wastelling judy when i was prepping for thanksgiving food

9/14/2022 10:25:37

Assata (+17702311017)

Pie day plans

9/14/2022 10:25:49

Assata (+17702311017)

Everything had a reason and notr and she was commenting

9/14/2022 10:25:53

That's a bit of an over-share 😬

9/14/2022 10:26:09

Nah I'm teasing

9/14/2022 10:26:10

Assata (+17702311017)

I was being harassed

Exported from iPhone (F18DWASP0DXW) on 4/6/2024 19:55:22 with iMazing by DigiDNA. Database date when extracted: 4/6/2024 19:42:06

Page 2796 of 7194

**PTE 69 (04/03/2024 O. Jackson Dep. pp. 33 (ll2-23), 38 (ll2-15), 40 (ll1-18)).**

3    dispute at work?

4         A.    Oh, no.   I had no dispute at work.

5    Honestly, I -- I don't -- I shouldn't get into that

6    part.   I shouldn't get into that part.

7         Q.    What do you mean?

8         A.    The company -- I feel like the company

9    saved my life; you know, because they gave me a job

10   when I was down, when my wife was down.   I was

11   depressed at that time at the job.   So that's why I

12   had my headphones on.   That's why I stayed to myself.

13         That's why I just came and I did my

14   work.   So I came five o'clock in the morning, opened

15   the shop up.   They trusted me enough to give me the

16   key to open the shop.   Everybody had the key, but I

17   turned the alarms and stuff off.

18         You know, that company helped me, so

19   that's how I feel about the company.   Whether they

20   was going in a different direction -- I just didn't

21   see my family being able to eat later.   That's how I

22   felt, so I had to find a new job.

23         Q.    Understood.

2      Q.      What is it about what you saw with

3   respect to Ms. Acey's behavior that led you to

4   believe that she was uncomfortable?

5      A.      Because she -- I guess the way she sat

6   inside the -- the cabinet one day.  And she was just

7   in there, and she wouldn't say anything.

8              I went and ask her how she was doing.

9   She ignore me.  She would always say something, but

10  that day she didn't.  All I know whether she had

11  problems -- I mean, Joren was the guy that she would

12  talk to.

13             And so like, you know, I try to stay out

14  of things, so I never even asked.  And, you know,

15  just didn't ask.

Omar Jackson - by Mr. Longo

Page 40

1      Q.      Is there anything during your time
2   working at InductEV with Ms. Acey that would have
3   suggested to you that Ms. Acey would have filed a
4   lawsuit against the company?
5      A.      I know -- I did hear things like her and
6   Judy didn't -- they weren't on the same page, or -- I
7   did hear things that her and Judy weren't like
8   friends.
9              They went -- like I said, I didn't know
10  why.  I didn't know what was going on.
11     Q.      Who did you hear that from?
12     A.      Just the talk on the floor, the talk on
13  the floor.
14     Q.      Do you recall --
15     A.      I can't recall.  I just know I heard it
16  on the floor.  And I was just like, wow.
17             Like I said, I just tried to stay out of
18  things.  I really did.  No.  I can't.

# PTE 70 (04/08/2024 M. Tabbut Dep.

# pp.25(ll21)-27 (ll7)).

15                     I think other things, I had heard
16    racist comments from people in the past which were
17    frustrating to me and I didn't love.  Yeah, I
18    think it was, you know, kind of -- they touted a
19    family culture, but it was very much just too
20    personal in a lot of ways, I think.
21          Q.     Okay.  With respect to the racist
22    comments that you have heard, can you be specific?
23    What comments have you heard -- did you hear?
24          A.     Yeah.  Yeah, so one that I had
25    heard -- I won't name names, but, yeah, one was we

Page 26

1   had a vendor come. I think he was, like, a

2   technician or something, black man, and someone

3   said, "You know, I didn't realize we were this far

4   down south," because there was, you know, a black

5   guy working in the office.  So that was one

6   comment I had heard.

7               Another one I heard was, "I can

8   call them the "N" word because I've grown up with

9   black people."  And I think they said the "N" word

10  a couple times.  So that was frustrating.  Those

11  are the two biggest examples that I can give you.

12  But, yeah, kind of stuff that I had heard

13  throughout my career there, just two concrete

14  examples that I'll never forget.

15        Q.      The first comment you mentioned --

16        A.      Uh-hmm.

17        Q.      -- the not being this far south;

18  who made that comment?

19        A.      Yeah, I'd like not to say.  I

20  think just I had felt like I had handled that and

21  told them how I felt about that comment.  I called

22  them out immediately on it but, yeah, but, I don't

23  know.

24        Q.      Ms. Tabbut, unfortunately, the way

25  the deposition process works is there are very few

Page 27

1   instances in which you can refuse not to answer a
2   question.  So would you please --
3          A.      Chris Williams.
4          Q.      When Chris Williams made that
5   comment, where was that comment made?
6          A.      In the office just, you know, kind
7   of out in the open.  He was at a desk that I was
8   close to.
9          Q.      And who was he making that comment
10  to?
11         A.      I think he was just saying it out
12  loud to a few people that were in the area.
13         Q.      Do you remember who else was there
14  in area?
15         A.      At this point, I don't, no, but I
16  was there.

# PTE 71 (04/08/2024 M. Tabbut Dep.

# P27(ll17)-35).

```
17          Q.      Do you remember when that comment
18     was made?
19          A.      No, it was a few years ago now.
20     It was probably, like, the middle of my time
21     there, so I'd say three or four years ago.
22          Q.      Was it before Ms. Acey joined the
23     company?
24          A.      Yes.
25          Q.      With respect to that comment made
```

Page 28

1    by Mr. Williams, as you've testified to, do you
2    know whether -- do you know whether that comment
3    was reported to anybody?

4            A.      I did not report it.  I will say
5    when I worked there, I was kind of terrified of
6    everything.  I didn't think I had confidence when
7    I was a younger or a junior engineer to really
8    call people out on that kind of stuff.  I think it
9    took me a while to feel like I could say those
10   things, but I did tell him in person that that is
11   a comment that cannot be said out loud, because
12   that's something I'm not speaking.

13                   I do remember him saying that
14   Maria's going -- Maria's the one that keeps me in
15   check, but, you know, I was pretty frustrated by
16   it, like, you can't make a comment and, you know,
17   just it was a frustrating thing to hear.  But I
18   had called him out on it, but, no, I did not
19   report it.  I don't think I had the confidence yet
20   to kind of do those things.

21            Q.      I think you testified earlier that
22   that comment was made because there were -- there
23   was a tech who came into InductEV who, I think you
24   testified, was black?

25            A.      Uh-hmm.  Correct.

Page 29

1  Q.   Can you describe the circumstance
2  to me?  How do you know that the comment he made
3  was directed towards the tech?
4  A.   Because he looked right at him and
5  basically, like, it was very -- it was very
6  obvious what that comment was directed towards.
7  He may have even mentioned the vendor of that
8  thing.  It was a while ago.  I think everyone
9  knew.
10  Q.   Can you recall what made it so
11  obvious?  In your words.
12  A.   Yeah.  I think I remember him kind
13  of looking over that way in the direction of the
14  vendor and saying that comment, to which I was
15  pretty shocked by and I -- I don't know.  I would
16  say that comment and hearing that and just I
17  immediately knew what he was talking about.
18  Q.   Do you think others understood his
19  comment the same way?
20  A.   I would assume so, yes.  Do I
21  remember that?  No, but for me personally, yes.
22  Q.   Okay.  Do you know whether anyone
23  else spoke to Mr. Williams with respect to that
24  comment?
25  A.   No, I was the only one that said

Page 30

1    something about it.

2         Q.      The other comment or, I guess,

3    instance you described earlier was a situation in

4    which the "N" word was used.

5         A.      Uh-hmm.

6         Q.      Do you remember --

7         A.      Yes.

8         Q.      -- who made that comment?

9         A.      Chris Williams.

10        Q.      Can you describe how Mr. Williams

11   made that comment?

12        A.      I don't remember the context.

13   Again, it was four or five years ago, before

14   Ms. Acey started working here.  I don't remember

15   what we were talking about, but it was something

16   about that Chris had grown up in a black

17   neighborhood and then, for whatever reason, he

18   made that comment, so...

19        Q.      When you say for whatever reason,

20   do you not know why he made that comment?

21        A.      Yeah, at this point I don't

22   remember, but I do remember the comment, like,

23   that I can never forget, so...

24        Q.      I know you said you called out

25   Mr. Williams for the first comment.  Did you do

Page 31

1    the same for the second comment?
2         A.        That one I didn't.  That had
3    happened earlier. I think, again, I was kind of
4    too stunned to even say anything.  I, yeah, I
5    think I just kind of was, like, quiet and then
6    left after that.
7         Q.        The comment with Mr. Williams
8    saying the "N" word, that occurred before the
9    comment about being down south?
10        A.        Yeah, yeah, that occurred before
11   the other one.
12        Q.        So both predated Ms. Acey's
13   employment?
14        A.        That's correct, yeah.
15        Q.        Were there any managers present
16   for either of these two comments?
17        A.        I don't believe so, no.
18        Q.        Do you know whether the second
19   comment was reported?
20        A.        No, I don't think either of them
21   were.  If anyone were to report it, it probably
22   would have been me, and I didn't do that, so...
23        Q.        Why didn't you report it?
24        A.        Again, early on in my career, I
25   think my confidence level was pretty low.  There

Page 31

```
 1    the same for the second comment?
 2         A.      That one I didn't.  That had
 3    happened earlier. I think, again, I was kind of
 4    too stunned to even say anything.  I, yeah, I
 5    think I just kind of was, like, quiet and then
 6    left after that.
 7         Q.      The comment with Mr. Williams
 8    saying the "N" word, that occurred before the
 9    comment about being down south?
10         A.      Yeah, yeah, that occurred before
11    the other one.
12         Q.      So both predated Ms. Acey's
13    employment?
14         A.      That's correct, yeah.
15         Q.      Were there any managers present
16    for either of these two comments?
17         A.      I don't believe so, no.
18         Q.      Do you know whether the second
19    comment was reported?
20         A.      No, I don't think either of them
21    were.  If anyone were to report it, it probably
22    would have been me, and I didn't do that, so...
23         Q.      Why didn't you report it?
24         A.      Again, early on in my career, I
25    think my confidence level was pretty low.  There
```

Page 32

1   were a lot of things that took me a while to, you

2   know, speak up on later in my career.

3          Q.      Okay.   Were there any other

4   comments predating Ms. Acey's employment that you

5   can think of?

6          A.      Those are the main ones that I can

7   think of, just from, you know, my career there

8   that were, I would say, extremely racist.  But,

9   yeah, I know there was always a lot of political

10  talk, those kinds of things, that were touted by

11  people or, you know, just spoken about that I

12  don't think anyone would appreciate, you know,

13  stuff like that, too, so...

14         Q.      With respect to the comments we've

15  discussed, when you say those are the main ones,

16  are there other comments you can think of that

17  predated Ms. Acey's employment?

18         A.      No concrete examples that I can

19  give you, I will say that, but I -- that had

20  always kind of been the culture of people just

21  said whatever they wanted and typically,

22  unprofessional, is how I would say a lot of my

23  career at Momentum would be with certain

24  employees.  And, yeah, again, I can't give a

25  concrete answer but, or, you know, a concrete

Page 33

1    example other than the two I gave you, but it

2    happened a lot before and during Ms. Acey's

3    employment.

4         Q.     And I'm understanding you're

5    saying that you can't give concrete examples

6    beyond the two, but you're saying it happened a

7    lot.  What happened a lot?

8         A.     Just did -- the way that people

9    would make unprofessional statements or comments

10   day to day in the employment term that I think

11   left me uncomfortable sometimes and feeling like I

12   couldn't work there and want to be there, so...

13        Q.     Right.  And my question deals with

14   the specifics of those statements, so can we walk

15   through those statements?

16        A.     Sure.

17        Q.     So other than the two statements

18   that you have testified to earlier, what other

19   remarks, comments, statements did you hear during

20   your time at InductEV?

21        A.     Sorry.  Give me one second.

22        Q.     Take your time.

23               MR. LONGO:  Madam court reporter,

24   note that the witness has turned her camera off,

25   please.

Page 34

1                    MS. ASSATA:  Mr. Longo, I would
2    like to request after the question that we take a
3    10-minute break or so, if that's okay with you.
4                    MR. LONGO:  I would like to go
5    until at least 11.
6                    THE WITNESS:  I understand.
7                    MS. ASSATA:  I understand that.  I
8    just -- if the witness appears emotionally
9    disturbed after the question, I'd like to offer
10   them a break.  I'm not sure it would be helpful to
11   have them transcribed while they're crying.
12                   MR. LONGO:  Why don't we take --
13                   THE WITNESS:  I can finish your
14   question, if that's what you need but, yeah, maybe
15   a break or two would be...sorry, it -- yeah,
16   sorry.  Seven years at InductEV was a lot, so I'm
17   just kind of reliving some stuff so, sorry.
18   BY MR. LONGO:
19        Q.      That's okay.  We will get through
20   the question and we'll take a short break; okay?
21        A.      Yeah, sure.
22        Q.      So other than the two comments
23   that you testified to earlier, help me understand
24   other comments, remarks, things that you heard
25   during your time at InductEV, starting from the

1   beginning.

2        A.        Yeah, I mean, another example that

3   I can remember, at least politically, was when

4   COVID was happening and coworker, Rob Rosenberger,

5   was frustrated and talking about that it was

6   China's fault because of COVID and he was running

7   around the office just kind of saying that it was

8   China's fault, kind of going into that.  I do

9   remember that comment as well.

10                That was not reported, but it's

11  something I started to argue with him about and

12  just decided I need to walk away, because, you

13  know, there's -- political conversations are not

14  something I want to get into at work and fight

15  about, so I stepped away from that, but that was

16  another example.  Yeah, those, I would say, are

17  the biggest examples I can think of right now that

18  have kind of, you know, remained in my head of

19  things.  But, yeah, like I said, I'm sure there's

20  probably more and, if I think of them, I'll let

21  you know.

22                MR. LONGO:  Let's take a 10-minute

23  break and meet back here at 11:00.

24                MS. ASSATA:  Sounds good.

25                MR. LONGO:  Thank you.

**PTE 72 (02/14/2022 CAO email commenting on my complaints, Doc 73-3, p. 11; Various dates, HR Training Emails, Doc 73-3 pp. 43-51).**

   **Gmail**

Assata Acey <aceyassata@gmail.com>

---

## Fwd: Per our Discussion

---

**Assata Acey** <Assata.Acey@momentumdynamics.com>                           29 April 2022 at 10:37
To: Assata Acey <aceyassata@gmail.com>


**Assata Acey | Technician**
**484-320-8222    ext 178**

**Momentum®**
Wireless EV Charging

**Connect**     LinkedIn  |  Website  |  Newsletter
**Media**       Taxis - NYTimes  |  Airport & Transit  |  Driver Experience

*Confidentiality Notice: The information, and any attachments and/or documents, transmitted by this email is intended for the*
*addressee only and contains information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves*
*as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or*
*copying is prohibited. If you have received this communication in error, please contact the original sender immediately.*

---

**From:** Judy Talis <judy.talis@momentumdynamics.com>
**Sent:** Monday, February 14, 2022, 10:45 AM
**To:** Assata Acey <Assata.Acey@momentumdynamics.com>
**Subject:** Per our Discussion

Assata:

Thanks again for spending time with me last week to share your concerns. In follow-up, you raised a general concern
surrounding behavior that you believe constitutes unconscious bias. During our meetings, I asked if there were
specific individuals or incidents about which you were making a complaint and/or needed to be addressed and you
responded no, but added that there were interactions that you have had with other employees that you believe
might be useful to incorporate into future company training.

In response, I would like to invite you to send me some brief notes concerning these examples and I will certainly
review them for inclusion into our upcoming workplace training. You may send those to me at your convenience and
I will let you know if I have any questions or need additional discussion with you.

Thank you for sharing your thoughts and input. Additionally, if you at any time believe that there are matters which
you believe violate our policies against harassment or discrimination, please let me know immediately.

Regards,
Judy


**Judith Talis | Chief Administrative Officer**
Momentum Dynamics Corporation
***Fueling the Future of Electric Transportation***

Exhibit 17- 2022- Talis Announces Company

Wide Diversity Training for September While I

am Still Employed



cv-10:22 📧 🎵 ⚙️ Document 7🔋📶 📶📶 03/31/24   Pa

← 🎤 🗑 🗄 ⋮

**Mandatory Training for All Employees**

JT **Judy Talis**                                    10:14 AM
Alex Kmetz, Alexa Heisler, + 80              ⋮

Team,

As we move into the last part of 2022 and look ahead to next year, we continue to look for ways to build the company into an even stronger organization and workplace.  Part of that work involves sharing our continued commitment to respect, inclusion and diversity for all personnel, and learning how to interrupt behaviors and practices that interfere with that pledge.

To that end, we are continuing our interactive training session and discussion for all employees on Diversity and Inclusion: Creating a Workplace Culture of Belonging, which will focus on our individual and collective responsibilities to build a diverse, fair, and respectful environment.  These live sessions will be conducted through virtual platforms and led by the company's trusted and highly qualified external trainer, Janeen Olsen Dougherty, together with me. All employees will be required participate in

↩ ⌄   Reply to all

Ⅲ            ○            ‹

# Exhibit 18- 2022- Talis Announces Company

# Wide Diversity Training for September

# While I am Still Employed



10:23

To that end, we are continuing our interactive training session and discussion for all employees on Diversity and Inclusion: Creating a Workplace Culture of Belonging, which will focus on our individual and collective responsibilities to build a diverse, fair, and respectful environment.  These live sessions will be conducted through virtual platforms and led by the company's trusted and highly qualified external trainer, Janeen Olsen Dougherty, together with me. All employees will be required participate in these sessions and our leaders will also participate in an additional program focusing on their added responsibilities.

Each of you will receive information about the timing and logistics of your session and all employees will be required to attend their designated session in order to allow the company to complete this critical priority before year-end.  We recognize the many competing priorities and time pressures that we all face, and you may need to move other meetings to accommodate these sessions. We thank you in advance for your continued shared stewardship of our workplace and the individual employees and perspectives that contribute to its success.

***You will receive a Teams Meeting Invite. If you cannot attend on your designated time slot and were unable***

Reply to all

Exhibit 19- 2022 Talis Announces Company

Wide Diversity Training for September

While I am Still Employed



10:23 📷 ✔ ∞                 🔋 ≼! ᴸᵀᴱ ⊾⊿ 8%▮          Case

← 🎤 🗑 🗄 ⋮

_**attend on your designated time slot and were unable**_
_**to move around your schedule, please reach out to**_
_**me directly or Diana and we will assign you to another**_
_**session. Please note that non-supervisor roles will be**_
_**dismissed from training after 2 hours while**_
_**supervisor roles will continue for the last hour of the**_
_**session. Dates and times below:**_

Tuesday, September 13th : Employees from 1 PM to
3PM / Supervisors until 4PM

Thursday, September 15th: Employees from 9 AM to
11 AM/ Supervisors until 12PM

Wednesday, September 21st : Employees from 9 AM
to 11 AM / Supervisors until 12 PM

Wednesday, September 28th : Employees from 1 PM
to 3 PM/ Supervisors until 4PM

**Judy Talis | Chief Administrative Officer**
**O: 484-320-8222 ext 128**
**M: 610-613-1449**

Wireless EV Charging

**Connect**   LinkedIn | Website | Newsletter
**Media**     Taxis - NYTimes | Airport & Transit | Driver Experience

_Confidentiality Notice: The information, and any attachments and/or documents,_

⤺ ⌄   Reply to all

|||          ○          ‹

Exhibit 20- 2022 Wilmes Announces New Dates

for Diversity Training While I am Still

Employed



8:29

Case 2::

**Mandatory Training - Diversity and Inclusion: Creating a Workplace Culture of Belonging**

**Diana Wilmes**                                          4:12 PM
Bob Kacergis, Assata Acey, + 16

Team,

We are going to be merging this training with one of the other three dates. If you have a specific date/time that works best, feel free to send that over to me. The dates/times to choose from are:

Tuesday, September 13th : Employees from 1 PM to 3PM / Supervisors until 4PM

Thursday, September 15th: Employees from 9 AM to 11 AM/ Supervisors until 12PM

Wednesday, September 21st : Employees from 9 AM to 11 AM / Supervisors until 12 PM

Thanks,
Diana

**Diana Wilmes SHRM-CP | Oper**
**O: 484-320-8222 ext 130**
**M: 484-375-9864**

↰ ∨   Reply to all

Exhibit 21- 2022- Wilmes Announces Training as

rescheduled to November While I

am Still Employed

Exhibit 21- 2022- Wilmes Announces Training as

rescheduled to November While I

am Still Employed

**PTE 73 (02/23/2022 Teams Messages between myself and my Supervisor, Doc 40 Transcript (II)(30), o*riginals filed in Doc 40-2 pp. 637-640).***

30. **02/15/2022 Adverse party statements between CAO and my supervisor about meeting to discuss the racial experiences I shared in my meeting with CAO (Ex. 317-318). References: ECF 8-1 (¶40(b), ¶42, ¶96-103), Doc 15 (¶77-78), ECF 15-49.**

**8:06:01 PM Judy:** Sure I will be in tomorrow. I also want to speak to you about Assata and some things she shared with me. My calendar is up to date but regardless I will find time for you

**8:11:00 PM Joren:** Thank you. I'll see about booking a room if that's all right.

Re:Assata, okay, I appreciate it.

**PTE 74 (02/10/2022 Text messages between myself and my Husband pp.1672-1673).**

2/10/2022 16:07:49

I get what the sentiment that Judy expressed about wondering if x, y, or z is always racism or if questionable behavior is caused by something else. For me, I generally like to give people the benefit of the doubt and examples of really minor stuff that you've told me about have happened to me too at various times. Obviously in my case race wouldn't have been the motivation of certain behavior. But the thing I've learned recently is that I have suuuuch a different perception of race and we've talked about this before. I get to go out of my house and basically never have to worry if someone is being racist towards me and I never feel unsafe. When someone has a lifetime of experiences feeling unsafe and being forced to make judgment calls about a person and his/her behavior in the moment to inform your decision making as it relates to your safety, it changes things! It's something I can't relate to at all.

But, yeah, it may be true that not all questionable behavior you experience may be due to racism. It could be due to any number of things ranging from racism to the person didn't eat breakfast that day and their in a funk. But you're not gonna be in a position where you're likely to give someone the benefit of the doubt because of what I mentioned earlier! And that doesn't take into account the sociology angle that you talked about either.

I think Judy was looking for some reassurance or comfort of, "yeah it's true that maybe not everything I'm talking about comes from racism but..." even if you went on to rebut the premise, she would have latched on to the pragmatic statement that "it might not always be racism" and she probably wouldn't have heard the rest of what you said after that anyway. It may be true that not everything is about race, but it wouldn't be helpful in this case for her to hear that, because it almost isn't the point. The point should be that you don't have the benefit of giving people the benefit of the doubt like she does because of a lifetime of experiencing racism and the cost of being wrong--if you give the wrong person the benefit of the doubt and are wrong about it, it could be a fatal mistake.

Anyway, looking at it from that angle has really helped me understand things differently. I suspect a lot of others would also be like, "I have no problem giving whomever the benefit of the doubt so why can't you seem to do that too?" It's shitty because it makes you feel like something must be wrong with you, but they'd respond exactly the same way if they had the experiences you've had.

2/10/2022 16:11:09

Idk, it's a tough thing. People like Judy want to be comforted that things "aren't all THAT bad." And maybe sometimes stuff isn't all that bad but other times it is. Or, rather, maybe it's just this: sometimes there's nothing for the discomfort. Sometimes there's no comfort to be had. One might just have to sit in it and accept it and realize there is no magic pill to make it feel better. Well I love you

2/10/2022 16:12:19

This VW meeting is really slow lol. A lot of it could be addressed off-line in individual calls, but oh well

2/10/2022 16:12:46

Assata (+17702311017)

I mean ots fine bc with her I'm not trying to co Vince her of race. Im trying to discuss consequences of company looking bad, or possible lawsuits of a hotter headed employee gets offended in future

2/10/2022 16:13:14

Assata (+17702311017)

Otherwise it gets long and convoluted. And I can do that with you when I have energy I. But I'm not overly invested on her

2/10/2022 16:13:26

Assata (+17702311017)

Lol to meeting

2/10/2022 16:14:36

Assata (+17702311017)

Idk why we even have received 2:55 meeting when there's a separate chat and other meetings. They need to ha e one meeting with the MD folks who need to respond. And delegation to anyone who folks want to give less info to.

2/10/2022 16:14:46

Assata (+17702311017)

It's almost like having a fake meeting lol 😊

2/10/2022 16:14:54

Yeah I get you

2/10/2022 16:14:59

Lol yeah

2/10/2022 16:15:09

Assata (+17702311017)

Also I love you too

2/10/2022 16:15:58

I also want to back up and validate what you said re how you had to be super composed and talk slowly and deliberately despite feeling emotional and how that really sucked...

2/10/2022 16:16:19

I think it definitely is partly (or largely) cultural

2/10/2022 16:17:13

Assata (+17702311017)

And um yeah I think the thing about is everything racism is a natural response to a world where there's much more racial instances than someone imagined happening at one time.

It's often a redundant approach bc of the thousands of black folks who decide they are the problem or that other blacks are the problem and deal with chronic stress and anxiety of questioning if it's all in their head.

So usually every instance blk individuals are thinking if it's just them, and the stuff they express is after such thought

2/10/2022 16:17:39

Again, an example of where I'm not affected because the pa deutsch culture is very stoic and calm and reserved--like what you're describing on steroids. Blerg. Fine for me but shitty for you. Feels bad

Exported from iPhone (F18DWASP0DXW) on 4/6/2024 19:55:22 with iMazing by DigiDNA. Database date when extracted: 4/6/2024 19:42:05

Page 1673 of 7194

**PTE 75 (02/15/2022 Teams Messages between myself and my Supervisor, Doc 40 Transcript (II)(31),** *originals filed in Doc 40-2 pp.* **641- 676).**

31. 02/15/2022 **Excited utterance from myself to my supervisor about CAO's prior response to my shared racial experiences and his adverse party statement and present sense impression about CAO's interest in following up with him about these things (in addition to project management duties for a team deliverable) (Ex.319-336). References: ECF 8-1 (¶42, ¶96-103, ¶134-163), Doc 15 (¶77-78), ECF 15-62-15-63, Doc 20 (¶8-49), ECF 20-5 to 20-16, ECF 20-21.**

  **8:14:56 PM Joren:** Please do a review of all fixtures and tooling needs for a lie / cc va outside of the BoM, and provide a list. Looking for what fixturing we need to have more of if we're looking to run more builds in parallel. Is that something you'd be okay putting together a draft for by mid day Thursday?

  Also, Judy wants to talk to me about some things regarding Assata. Please let me know anything you think I need to before going into a meeting with her tomorrow.

  **8:19:30 PM Assata:** I can't im

  agine what: either she wants to ask you what doctor I'm using, whether the nausea subsided, complain about me discussing racism at work with you vs her, ask if I'm starting trouble, asking for tips be I explained you have 50% of company's black women and 33% of companies black population where several groups go without women at all, maybe she wa to to know why I don't

enthusiastically jump at her emails

**8:20:19 PM Assata:** Vould be a feeler to see how I'm "adjusting" to racial thi gs at work or if I'm viewing everything as racist. At this point over a movie suggestion it's giving borderline harassment

**8:20:50 PM Assata:** But ye that's all I can anticipate her asking

**8:22:25 PM Joren:** Okay. No worries! I don't have more context but will fill you in where I can.

**8:22:52 PM Assata:** [Direct response to message from 8:14:56 PM] I can try to parse my notes for info on fixtures that aren't in BOM/are used in house

**8:24:45 PM Joren:** If I had to hazard a guess I'm on Jorge.

That would be cool too. Please start with ones on the document and then feel free to add ones in your notes too. There's questions to what would we need to have in house to run three builds in parallel.

**8:25:37 PM Assata:** That or to ask where I keep my notes when I report ppl doing weird stuff

**8:26:35 PM Assata:** Fair. Plausible deniability though. T don't know!

**8:27:42 PM Joren:** Please try and let it go, don't let her wreck your evening by letting her take up space in your head rent free.

**8:27:46 PM Assata:** She's been almost anxiously asking for those I guess to con ince herself that it's not alot or not too detailed and I simply ha e opted to not dredge my social logs for everyone at work to her

Bc  1: it's labor, 2:she keeps calling it optional 3: she works better trying to avoid issues than when she thinks she Cana she's stuff

**8:28:00 PM Assata:** And nope she doesn't

**8:28:42 PM Joren:** She Cana she's stuff?

**8:29:02 PM Assata:** Lol

**8:29:10 PM Assata:** I read this in my head

**8:29:29 PM Assata:** When she thinks she can assess or judge things on her own

**8:29:53 PM Joren:** Ah. Yes

**8:30:40 PM Joren:** And goodnight. Salad time

**PTE 76 (04/11/2024 A. Acey Dep. pp. 161(ll4)-164).**

45.  On April 18 I emailed CAO to request access to unpaid time off and complained that the current PTO policy placed ill people on a short track for probation and encouraged employees to prioritize attendance over safe execution of tasks.

46.  During CAO's insisted in-person meeting to discuss these concerns off record, I again shared my impression about a safety infraction where I:

   a)  Sought and received permission from Test Bay employees to view a model on behalf of a mechanical engineering employee.

   b)  Briefly approached the model while keeping my hands raised and exaggerated standing as far away as possible.

   c)  Responded to another employee's assertion of the dangerous voltage level in stating, "I know".

47.  The safety report made about me had suggested that I was combative towards the Rob member when he tried to keep me from "touching" the high voltage model.

48.  In my review, I expressed frustration that the accusations:

   a)  Were patently false.

   b)  Contrasted verbal or visual cues before and while viewing the model.

49.  I also expressed concern that bias had motivated the misconception, since:

   a)  My perceived noncompliance contrasted with the electrical safety etiquette I had demonstrated over my time at the company.

   b)  Those who were accusing me routinely ignored the safety rules and each other's noncompliance.

   c)  My experience in high voltage testing, which I discussed with Rob when he interviewed me, contrasted the reckless behavior others had expected of me, as I was

trained to operate with voltages more than 30x of what the Test department was using.

50. HR responded to my concern about the bias behind the dismissed report and the stress it had caused me by stating that no one would have seen my resume to know my qualifications.



**PTE 77 (Complaint doc 8-1, ll45-50).**

```
 4          Q.    -- she mentioned --
 5          A.    Right.  She made a joke.  She
 6   didn't -- well, sorry.  You're right.
 7              She mentioned when the interview
 8   team, which I assume to be Omar and Bruce,
 9   asked her about her use of tools, as I
10   disclosed to you all earlier, she made a
11   joke.  She didn't think they understood.
12              That wasn't a joke.  I was
13   complaining about Bruce.  I actually
14   complained about Bruce to Joren.  He thought
15   it was strange.  I told Judy, and she writes
16   it as a joke.
17              I didn't circle it, because for me,
18   like, this -- the stuff I circled to me said
19   more about how she saw me.  This to me says
20   more about how she handles complaints.
21          Q.    Do you agree with your
22   grandmother's testimony that you opined to
23   her that Ms. Talis doesn't know anything
24   about Human Resources?
```

Page 162

1        A.    I didn't say she didn't know

2    anything.   I just felt like --

3        Q.    What did you tell your grandmother?

4        A.    -- she didn't know enough.

5        Q.    What did you tell your grandmother?

6        A.    I told my grandmother she did not

7    know enough, and I could not understand --

8    the things she was doing.   It -- it just --

9    it didn't just feel wrong.   It just didn't

10   feel smart.

11          I mean, for someone who cares about

12   their company, she -- she just -- she did a

13   lot of stuff that just didn't make sese.

14       Q.    Okay.   And your default, again, is,

15   if that's what taking place by somebody in a

16   position like that, who ostensibly was

17   trained like that, is to believe that there

18   must be some element of racial or gender bias

19   involved?

20       A.    Yes.   I mean, she's smart enough to

21   read the law.   She -- she went to school

22   somewhere.   I mean, I've talked to her.   She

23   seems coherent, so I don't understand why she

24   would do things that are facially unethical.

1   and whether I saw racism everywhere.  It just

2   felt like she was trying to psych me out.

3          And that type of behavior, if it

4   were to offend the wrong -- someone other

5   than me, someone more reckless than me -- I

6   personally felt that it -- it just felt dumb.

7   Like, I just don't understand.

8          Like, all she had to do to protect

9   the company was say that she -- was start the

10  training, or say that she would address some

11  of the people I talked to her about, but --

12  and even if she was ineffective and

13  insincere, it would have protected her, but

14  she chose not to do it.

15          I just can't understand that.  From

16  a point of intelligence, I just don't get it.

17  It doesn't make sense.

18      Q.   So, for example, her failure to

19  adopt ideas you provided to her relative to

20  celebrating Black History Month is -- would

21  be something that falls under the category of

22  what you've just identified, right?

23      A.   No.

**PTE 78 (12/2021 Company Handbook p. 9**

**("Reporting of Harassment"), AA-19).**

depending on the totality of the circumstances, including the severity of the conduct and its pervasiveness:

- Unwanted sexual advances, whether they involve physical touching or not.
- Sexual epithets, jokes, written or oral references to sexual conduct, gossip regarding one's sex life, comments about an individual's body, comments about an individual's sexual activity, deficiencies, or prowess.
- Displaying sexually suggestive objects, pictures, or cartoons.
- Unwelcome leering, whistling, brushing up against the body, sexual gestures, or suggestive or insulting comments.
- Inquiries into one's sexual experiences; *and*
- Discussion of one's sexual activities.

All employees should take special note that, as stated above, retaliation against an individual who has complained about sexual harassment and retaliation against individuals for cooperating with an investigation of sexual harassment complaint is unlawful and will not be tolerated at Momentum Dynamics.

**REPORTING OF HARASSMENT**

Any employee who believes he or she has been subject to or witnessed illegal discrimination, including sexual or other forms of unlawful harassment, is required to make a complaint. You may complain directly to your immediate supervisor or department manager, the CEO, or any other member of management with whom you feel comfortable bringing such a complaint. Similarly, if you observe acts of discrimination toward or harassment of another employee, you are required to report this to one of the individuals listed above.

No reprisal, retaliation, or other adverse action will be permitted or taken against an employee for making a complaint or report of discrimination or harassment or for assisting in the investigation of any such complaint or report. Any suspected retaliation or intimidation should be reported immediately to one of the persons identified above.

All complaints will be investigated promptly and, to the extent possible, with regard for confidentiality. If the investigation confirms conduct contrary to this policy has occurred, the company will take immediate, appropriate, corrective action, including discipline, up to and including immediate termination.

**RELIGIOUS ACCOMMODATIONS**

The Company will make every effort to accommodate an Employee's sincerely held religious beliefs and/or practices, unless to do so creates an undue hardship, which includes but is not limited to, unreasonable expense or difficulty, or unreasonable interference with the safe and efficient operation of the workplace. Where time off is a reasonable accommodation, the Company may require exempt Employees to make up the time at some other mutually convenient time. Any absence of a non-exempt Employee will qualify as PTO and will be deducted from the Employee's PTO bank accordingly. If a non-exempt Employee does not have any accrued PTO available at the time of the absence, the

**PTE 79 (06/2021 assigned onboarding schedule and Anti-harassment Training Title Page).**



**Onboarding Schedule**
**EMPLOYEE:  Assata Acey**
**LOCATION: Momentum Dynamics Conference Room**

**Monday, June 14th**

_____

| | |
|---|---|
| 9:00 AM to 9:30 AM | Office Tour, i-9, Covid-19 Protocols, Parking Map, Collection Voided Check |
| | Diana Wilmes, Operations & HR Coordinator |
| | |
| 9:30 AM to 10:30 PM | Computer Setup |
| | Zack McCook, Manager, Information Technology |
| | |
| 10:30 AM to 12:00 PM | BambooHR, 2021 Benefits Presentation, Handbook Overview, HR Connection |
| | Judy Talis, Chief Administrative Officer |
| | |
| 12:00 PM to 1:00 PM | Lunch with Manager/Team |
| | Joren Wendschuh, Manager, Product Introduction |
| | |
| 1:00 PM to EOD | Introductions, Safety Briefing & Management Meeting |
| | Joren Wendschuh, Manager, Product Introduction |

**Tuesday, June 15th**
| | |
|---|---|
| 10:00 AM to 11:00 AM | Security Awareness Training |
| | Zack McCook, Manager, Information Technology |

**Thursday, July 8th**
| | |
|---|---|
| 1:00 PM to 3:00 PM | Diversity & Harassment Training |
| | Judy Talis, Chief Administrative Officer |

**Wednesday, July 14th**
| | |
|---|---|
| 1:00 PM to 2:00 PM | Patent Training |
| | Matt Ward, IP Manager |

**TBD**
| | |
|---|---|
| 1:00 PM to 2:00 PM | Intro to Momentum Dynamics with Bob Kacergis |
| | Bob Kacergis, Chief Commercial Officer |

**Momentum Dynamics Corporation**
3 Pennsylvania Avenue, Malvern, PA 19355-2417  USA
484.320.8222



# Momentum Dynamics

**Diversity & Harassment**

**Creating a Whole and Inclusive Workplace**

Janeen Olsen Dougherty    Judy Talis, CAO
Grey Street Legal, LLC     Momentum Dynamics Corp.

This Seminar is timely given the conversations taking place in this country about issues of social justice, equality and race
In order to keep everyone safe, we are conducting this seminar virtually, but there are opportunities for you to participate.
Encourage questions and remind everyone that we need their participation in order to provide full credit.

**PTE 80 (03/02/2022 Teams Messages between myself and my Supervisor, Doc 40 Transcript (III)(15),** *originals filed in Doc 40-2 pp.* **1632-1669).**

15. **03/02/2022 Excited utterance and present sense impression from myself to my supervisor about internal stress and barriers caused by the racial and gender harassment I experienced at work AND his adverse party statement of sending emails to the supply team through him to cope with some of these issues (Ex 808-826). References: ECF 8-1 (¶121, ¶124-129, ¶175-176), Doc 15(¶77-80).**

    **4:03:31 PM Assata:** re uniforms: how to get around it being a weekly charge?

    **4:03:46 PM Assata:** Do I ask hary to purchase and coordinate?

    **4:04:15 PM Joren:** Sure please.

    **4:06:07 PM Joren:** And put in as "approval needed"

    **4:34:58 PM Assata:** im so scared to send this email

    **4:35:06 PM Joren:** Which one?

    **4:35:09 PM Joren:** Wait

    **4:35:12 PM Assata:** for lab uniforms

    **4:35:19 PM Joren:** Ok. Pass through me then.

    **4:35:46 PM Joren:** Just do everything as you would, just remove purchasing from the to line

    **4:38:55 PM Assata:** done

    **4:49:34 PM Joren:** I've noticed that the last 2-3 days you've been super aversive, in a lot of ways.

    **4:50:45 PM Assata:** idk if its more or if Im being honest about why some tasks take longer

    **4:52:04 PM Assata:** I also feel partially responsible for ppl hurting my feelings-like I should make it easier for them not to—I really want everyone to be happy and not just me. Jorges thoughts got unde my skin a bit and the world always screams about the perspective of the oppressive person in a situation

    **4:53:16 PM Joren:** [*unproduced image*] You should not have to defend yourself for being uncomfortable. You're a human being with inherent value!

    **4:53:22 PM Assata:** ["]**Joren Wendschuh** You're saying you're stressing out over things much more often in the last few days. Some things you didn't worry about before, outwardly["]. yes. like Im trying hard to be honest about my blockers so stuff can get done. 1 am also more invested in how everyone feels. I think being more overwhelmed allows me to care less about others

    **4:53:38 PM Assata:** ["]**Joren Wendschuh** 😕 You should not have to defend yourself for being uncomfortable. You're a human being with inherent value!["] noted, will try to balance myself

    **4:53:50 PM Assata:** I am going on a tip to my fav cupcake shop soon

    **4:53:54 PM Joren:** By **default** you have value and should be treated with respect, and your boundaries honored

**PTE 81 (04/18/2024 A. Acey Dep. pp. 69(ll3)-70(ll5)).**

```
 3            Q.      Is it fair to say that a
 4     certain amount of your therapy was also
 5     dedicated to, you know, issues involving your
 6     relationship with your eventual husband, I
 7     guess, Mr. Hackman?
 8            A.      Yes.
 9            Q.      Okay.
10            A.      We argued a lot about race and
11     my experiences at work as well.
12            Q.      Well, when you say you argued
13     a lot about race, did he not have quite the
14     same view of race-based treatment of you as
15     you did?
16            A.      Yes.  When we started working
17     -- well, when I started telling him about
18     these things around October of 2021, how
19     stressed I felt about HR and the people at
20     work, he asked me if I thought I might be
21     depressed, and I was angry because I felt like
22     my emotional response to what people were --
23     to my perceived treatment was normal.
24                    And we argued about race a lot.
```

ASSATA ACEY

Page 70

1    I mean, he grew up in a mostly homogenous
2    area, German settlers.  He's Pennsylvania
3    Dutch.  They're from Ephrata.  You know, he
4    grew up on a farm.  So we had very different
5    experiences regarding race and ideas on race.



ASSATA ACEY

Page 70

1    I mean, he grew up in a mostly homogenous

2    area, German settlers.  He's Pennsylvania

3    Dutch.  They're from Ephrata.  You know, he

4    grew up on a farm.  So we had very different

5    experiences regarding race and ideas on race.



**PTE 82 (04/09/2024 D. Hackman Dep. pp. 43 (ll16)- p45 (ll23).**

```
16          Q.      During your time at Momentum did you
17   notice behavioral changes in Ms. Acey?
18              In other words, was Ms. Acey acting
19   different?
20          A.      Is your question did I notice a change
21   in her over time while she was employed there?
22          Q.      Let me strike the question.
23              When you and Ms. Acey worked together
24   at Momentum, did you notice Ms. Acey's attitude
```

DANIEL HACKMAN

Page 44

1    toward work change?

2         A.    Can -- can I ask a clarifying

3    question?

4         Q.    Sure.

5         A.    Do you mean her attitude towards the

6    actual work that she's doing, or do you mean her

7    attitude as it relates to how she feels about the

8    company or her coworkers?

9               Do -- do you understand the

10   distinction?

11        Q.    Yes.

12              I'm asking generally.

13              Did you notice her -- her attitude

14   change; yes or no?

15        A.    Yes.

16        Q.    Okay.   How did her attitude change,

17   specifically?

18        A.    Specifically.   She -- around the time

19   that I first met her, I observed her to be -- I

20   would qualify it as vivacious and outgoing, almost

21   bubbly in her personality.   I've known her -- I --

22   I knew her to be very hardworking.   She would

23   often work very late and put in overtime hours.

24              As time went on, I noticed a very

DANIEL HACKMAN

Page 45

1    marked difference in -- in her general demeanor

2    and wellbeing.  I observed over time that she

3    became less energetic, complained of feeling

4    unwell, complained of having headaches, complained

5    of feeling vertiginous or dizzy.  As time went on,

6    the number of times that she vented complaints or

7    upset or frustration, disappointment, about

8    treatment from her coworkers increased, as well.

9        Q.    Okay.  When did you and Ms. Acey start

10   dating?

11       A.    You're going to get me in trouble.  It

12   would have been shortly after we, like, had our

13   first conversation at work, which that -- that

14   occurred on the -- I believe the 27th of October,

15   2021, and we would have started dating shortly

16   thereafter.  Within a number -- within a couple of

17   weeks, probably, of that.

18       Q.    At -- at -- at any point from when you

19   first started dating Ms. Acey to the -- to when

20   you left InductEV, were there ever situations in

21   which your relationship with Ms. Acey would be

22   strained for any reason?

23       A.    Yes.

PTE 83 (11/12/2021 Multi-Switch Emergency Stopcircuit Final Board Schematic; 09-24-2021 Cost-Tiered Primer Surface Energy Consult; 01/10/2022 Laser Classification Calculation; 11/30/2022 Coil Connector Limits Test Plan).



| | |
|---|---|
| **From:** | Jerry Frank |
| **Sent:** | Friday, September 24, 2021 1:03 PM |
| **To:** | Assata Acey |
| **Cc:** | Ben Cohen; Joren Wendschuh |
| **Subject:** | Thank you |

Assata,

Thank you for the suggestions. I appreciate the thoughtful and well-reasoned response. Luckily, it looks like OPS just got word that the product hold on the primer is over and we will be getting our supplies on Monday.

Again, many thanks.

Assata's response begins here -

Hi,

I know your original question was about increasing surface energy. As an alternative to changing the primer,(which would take more investigation), I have three suggestions to maximize the surface energy, which may be more accessible( some may also be used together) hope it helps.

**A. Reduce condensation**

*Application:* Consider applying primer(and Epoxy) in a dry environment. Consider a dehumidifier, or even connecting one to a pressure controlled chamber.

*Reasoning: Synthesis*

1. The synthesis of organosilanes often leads to a byproduct of water. Every reaction can go backwards, so removing water from the environment will keep the primer concentrated

2. Organosilanes can also react to metals to create water..a dry environment can aslo combat this and avoid condensate layers that could bond in between layers and weaken a bond over time.

**B. Apply Heat**

*Application:* Finding out a sweet spot between max heating temp and cure time needed to apply primer

*Reasoning: Weak Boundary Layer Theory, and chemistry*

1. Weak Boundary Layer: Microscopic openings/ridges in the silicon as well as rigidity to applied primer can create small failures along the boundary between layers. Decreasing viscosity will allow the primer to seep into those imperfections. This can also be effective as a method when adding epoxy between primer layers.

2. Chemistry: Two major methods to lower viscosity include heat and adding solvents. A useful solvent would have to be thoroughly researched and possibly made. Commonly used solvents(alcohol based) can mix well but decrease long-term performance, encourage cracks, and vastly increase curing time.

**C. Controlled Apply Pressure**

*Application:* Consider pressurizing silicone with similar set up used in air bubble removal, with nitrogen gas.

*Reasoning:*

1. Applied pressure can increase bond strength, but also important not to push the primer out and inadvertently thin its layer.

2. Using nitrogen will allow for a more controlled method than the bricks, without introducing additional moisture from air.

1

D. **Consider Interlocking**

*Application:* Consider 3D printing a a very shallow/very thin mold to overlay the silicone while it sets (can be tricky)
*Reasoning: Mechanical interlocking*

1. The surface will already not be smooth, having strategic ridges will enhance the chemical bonding
2. An acute-angled dovetail pattern will add to bonding strength in every direction, and not just the direction of the applied force.

**Jerry Frank |** Electrical Engineering Manager
**Momentum Dynamics Corporation**

3 Pennsylvania Avenue, Malvern, PA 19355
OFFICE   484.320.8222 | **Momentum** | **Who We Are**
Jerry.Frank@MomentumDynamics.com

*Grand Prize winner of the 2015 SAFE Energy Security Prize*

**Disclaimer and Confidentiality Notice:** This email, and any attachments and/or documents linked to this email, are intended for the addressee and may contain information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender.

## Product (1/4)

lens type- would inform the spot size/intensity from a specific distance.
not so much the only source of that combo, but a calibrated source to
provide that intensity evenly across the spot diameter

365 nm Wavelength:

| Spot Diameter | 3mm | 4mm | 6mm | 8mm | 10mm |
|---|---|---|---|---|---|
| Light Intensity | 13,000 mW/cm² | 7,300 mW/cm² | 3,250 mW/cm² | 1,800 mW/cm² | 1,200 mW/cm² |
| Irradiation Distance | 10mm | 12mm | 20mm | 25mm | 30mm |

*full product PDF can be found in folder.

## UV Laser Max Energy (2/4)

For the 365nm laser with 10m dot, the power is 1,200mW/cm²
this is 1.2W/cm²

For a dot of 10mm diameter, this leads an area of $pi*r^2$ =pi(5mm)²=78.54mm²
which is 0.7854cm² because 1cm²=100mm²

Power output is then
(0.7854cm²) *1.2W/cm²=0.9425W=**0.9425J/s**

→ For an exposure of 30 mins, or 1800s this becomes 0.9425*1800=**1696.5J** for max Exposure
  during 30 mins of application.
  *this is the estimated time for 8 beads of glue, each needing 3 angles of applied UV, for 60s per
  angle
→ For an exposure of 8 minutes, or 480s, this becomes 0.9425*480=**452.4J**
  *This is the estimated time for if each bead gets 1 spot on 60-sec curing or
  we purchase 2 more lasers to position over bead at different angles and run simultaneously.

**the latter case could counteractively also multiply the exposure amounts.

## AEL Limits for 365nm UV light exposure (3/4)

According to 3.2.3.4.1, Class 1 AEL= MPE*area of limiting aperture. These are based on energy effecting
unaided eye.

From Tables 5a, 8a/b:
MPE for eyes with 365nm for +=10s is **0.9958J/cm²**,
*MPE for skin is 1J/cm², but eye-MPE is used in classification

Limiting (AEL) aperture diameter with 365nm for +=10s is 3.5mm. The corresponding area is
pi (0.5*3.5mm)²= **0.096cm²**

Therefore, our class 1 AEL= 0.9958*0.096=**0.095597J**

*Aperture and MPE for t>10s are applied due to 60s needed for glue to cure under UV.

## Classification (4/4)

Class 1 AEL is 0.095597J/cm$^2$.

- → Because max intended exposure at 30mins (1696.5J) or 8min (452.4J) exceeds the range of 1-5x class 1 AELs (0.0956-0.47799J), **both Class 1, Class1m and Class 3R are out**
  *Uses sections 3.3.3.1 and 3.3.1.2
- → Because our wavelength is beyond visible spectrum, **Class 2, and Class 2M are out**
  *Uses section 3.3.2
- → Because laser power-calculated as 0.9425W for 10mmdiameter spot- is greater than 0.5W AND energy at t=0.25s- calculated as 0.25s*0.9425=0.2356- is greater than 0.125J
  The laser **does not qualify for Class 3B designation and MUST be classified as a class 4 laser.**
  *Uses sections 3.3.3.2 and 3.3.4

Chart from Laser safety facts, uses their own calculations from ANSI for visible spectrum lasers and adds visualization to class 4 designation



**Eye injury hazard**

*Eye injury hazard descriptions above are valid for for exposures relatively close to the laser. Because the beam spreads, less light will enter the pupil at greater distances. The hazard decreases the farther a person is from the laser, and the shorter the exposure time (e.g., do not deliberately look or stare into the beam). For example, a 1mW Class 2 laser beam is eye safe for unintentional exposures after about 2 ft (7 m), a 5mW Class 3R beam is eye safe after about 52 ft (16 m), a 500 mW Class 3B beam is eye safe after about 520 ft (160 m), and a 1500 mW Class 4 beam is eye safe after about 900 ft (275 m). (Calculations are for visible light, a 1 milliradian beam, and a 1/4 second Maximum Permissible Exposure limit.)

*It is important to note that:

1. our power is 0.9425 W over given area.
2. LEDs tend to be less harmful due to being an extended source instead of point source, however
3. The rules for lasers in the UV range are more stringent than that of visible range

*Notes 2 and 3 in reference to section 3.3.3.2, and the full 136 ansi standard, respectively.

Functionality definitions and test notes:
1.protect the device from obvious failure points
2. Funtionality should be determined by providing usuall inputs to device and monitoring its outputs. further investigation can go into doing this under load
3. Testing should not expose the wirin that would be othrwise binded to the bus. Temperature/sand/heat may exceed normal conditions but should not contact sample parts that wouldnt otherwise "see" these effects.
4. Average amounts for sand testing should be average(max sand experience)

Simulate measured impact.


1.enviromental deterioration
heat, temperature( how long will it take for heat and moisture to brek=ak down device performance)

(hot salt bath, cold salt bath)
answers the questons of:
how quickly hot watre will detiorate stuff
how quickly cold+moisture will effect product
these baths could have massage/vibration pads underneath to provide accelerated results
samples should be placed in an enclosed (dehumidified?) chamber/alowed to dry out for several days before functionality testing. cycles may be repeated to reasonable testing or until samples fail.




2. Sand-wash


-Have item in a fixed position/cover parts that would normally be connected tot he bus
either, fill container with sand, glue a harness to edge of washing mashine and mix that way or
create wind in a closed environment--better for realisticfunctionality testing
do 3and 3
3 samples get cleaned, 3 samples do not
 test above av
av
under aver max sand impact levels
method 2: take a clear enclosed plastic tub, attach harness to hold sample to wall fof said tub, hook a fan to the bottom and sea area. maintin a, abv av, and uder av concentration of sand per volume of air and low air around evice to simulate sand corrosion.
may be effective to position device the way it would be on buss.. so that it is angled in the way it would be towards the road etc


3. Current

-quick and dirty testing (2 samples) will each be stepped up in increments of 0.2normal current from 40% to 200% or resonable high flunctucation, 1s applied current, then functionality checked.

-(4 samples) samples shall have 40% 80% 100% current applied over 3 days, with dailiy functionality check to see if theres any deterioration.

Functionality definitions and test notes:

1.protect the device from obvious failure points

2. Funtionality should be determined by providing usuall inputs to device and monitoring its outputs. further investigation can go into doing this under load

3. Testing should not expose the wirin that would be othrwise binded to the bus. Temperature/sand/heat may exceed normal conditions but should not contact sample parts that wouldnt otherwise "see" these effects.

4. Average amounts for sand testing should be average(max sand experience)

Simulate measured impact.

1.enviromental deterioration

heat, temperature( how long will it take for heat and moisture to brek=ak down device performance)

(hot salt bath, cold salt bath)

answers the questons of:

how quickly hot watre will detiorate stuff

how quickly cold+moisture will effect product

these baths could have massage/vibration pads underneath to provide accelerated results

samples should be placed in an enclosed (dehumidified?) chamber/alowed to dry out for several days before functionality testing. cycles may be repeated to reasonable testing or until samples fail.

2. Sand-wash

-Have item in a fixed position/cover parts that would normally be connected tot he bus

either, fill container with sand, glue a harness to edge of washing mashine and mix that way or

create wind in a closed environment--better for realisticfunctionality testing

do 3and 3

3 samples get cleaned, 3 samples do not

 test above av

av

under aver max sand impact levels

method 2: take a clear enclosed plastic tub, attach harness to hold sample to wall fof said tub, hook a fan to the bottom and sea area. maintin a, abv av, and uder av concentration of sand per volume of air and low air around evice to simulate sand corrosion.

may be effective to position device the way it would be on buss.. so that it is angled in the way it would be towards the road etc

3. Current

-quick and dirty testing (2 samples) will each be stepped up in increments of 0.2normal current from 40% to 200% or resonable high flunctucation, 1s applied current, then functionality checked.

-(4 samples) samples shall have 40% 80% 100% current applied over 3 days, with dailiy functionality check to see if theres any deterioration.

# PTE 84 (04/09/2024 D. Hackman Dep. pp. 106(ll16)-110).

```
16    BY MS. ACEY:
17        Q.    Mr. Hackman, have you seen this
18    picture before?
19        A.    Yes.
20              MR. LONGO:  Objection.  Form.  Beyond
21        the scope of direct examination.
22              THE WITNESS:  Yes.
23    BY MS. ACEY:
24        Q.    Did you ever see this in person?
```

DANIEL HACKMAN

Page 107

```
 1                 MR. LONGO:  Same objection.
 2                 THE WITNESS:  Yes.
 3    BY MS. ACEY:
 4        Q.    Do you -- when did you see this in
 5    person?
 6        A.    I -- oh, I think that was -- that was
 7    probably the end of October, maybe the beginning
 8    of November, of 2021; I think.
 9        Q.    Do you know who drew this?
10        A.    You did.
11        Q.    Do you know who made the design in
12    this image?
13                 MR. LONGO: Objection.  Form.  Beyond
14        the scope of direct examination.
15                 THE WITNESS:  Yes, I believe you did.
16    BY MS. ACEY:
17        Q.    And do you know what this design was
18    for?
19                 MR. LONGO:  Objection.
20                 THE WITNESS:  I believe this was --
21        God.
22    BY MS. ACEY:
23        Q.    Do you recall what the design is for,
24    Mr. Hackman?
```

DANIEL HACKMAN

Page 110

1    looks like a power distribution scheme providing

2    three phase AC power to what we refer to as the

3    GEMS, the ground electronics modules.

4         Q.    Okay.  I'm going to stop sharing my

5    screen.

6              Do you recall anything about a UV

7    project?

8              MR. LONGO:  Objection.  Form.

9              THE WITNESS:  Can you state that

10       again?

11   BY MS. ACEY:

12        Q.    Do you recall anything about a "UV

13   project"?

14        A.    Yes.

15             MR. LONGO:  Same objection.

16             THE WITNESS:  Yes.

17   BY MS. ACEY:

18        Q.    Were you involved in this project?

19        A.    Informally, yes.

20        Q.    Did this project involve calculations?

21        A.    Yes.

22        Q.    Who completed those calculations?

23        A.    You did.

**PTE 85 (12/04/2021 Performance Evaluation Excerpt, Doc 20-17 p.2).**


**Momentum®**
Wireless EV Charging

## 2021 ANNUAL PERFORMANCE MANAGEMENT

**CAREER DEVELOPMENT AND GOALS:**

Where do you want to grow in your career? How can we help you get there through education/training, experiences?

> **[Growth]**
> With momentum Dynamics, I am seeking to deepen my hands-on skills and continue gathering information from my team and surrounding coworkers on issues in the assembly and problem-solving process.
> 1. I want to know the implications of various designs, not just theoretically, but how:
>    - they translate to assembly steps
>    - how these steps along with formal collaborative lines can inform labor times, longevity, quality
> 2. I want to learn more about how we channel concerns and how it can affect the way product knowledge travels from hands on parts of the company to theoretical parts.
> 3. Beyond this I am excited to view and learn the backend lifecycle of these products:
>    - how they are tested and repaired after delivery, and
>    - the performance factors that can uphold an image of reliability and value in Momentum's products
> 4. Further still, I am interested in building my theoretical knowledge in the materials science aspect of engineering.
>
> **[Help]**
> I feel that much of my goals can be met through observing and gathering information from my position over time, in addition to training. I know there can be conferences and or formal training around topics like efficiency, collaboration, innovative team structures and I would be open to those. So long as my role and compensation continue to match my tasks, I am excited to continue my pursuit of growth at Momentum Dynamics.

What do you consider to be your most important goals in the next year?

> My goals in the next year are to:
> a) do my part to get cabinet builds/assembly docs as streamlined and close to target as possible
> b) develop more hands -on knowledge of product to learn more about the experiences of other sub-assemblies from my team
> c) continue to document new and old issues as they come to my attention to save time/money and enact improvement
> d) continue to support a positive work environment by doing my part for inter and intrateam coordination

# PTE 86 (02/09/2022 Email from myself to my Supervisor). Add text message

Message

| | |
|---|---|
| **From:** | Assata Acey [Assata.Acey@momentumdynamics.com] |
| **Sent:** | 1/10/2022 6:36:38 AM |
| **To:** | Joren Wendschuh [joren.wendschuh@momentumdynamics.com] |

1.Today I want to update the math for the math for the actual energy out put of the laser,

2. Add safety rules for signage amd how to navigate the room

3. Add safety rules for skin exposure and required visor shade

4. Put aside procedural suggestions/changes for not being in the room. *
Should I call Jed and ask about possibility of using 2 lasers and leaving room etc or is that something you want to discuss with Jerry Frank

5. Update the ppe paragraph for the laser with refences and updated PPE specs

6.add photos

7. Research and type up description for process engineer

**Assata Acey | Technician**
**484-320-8222 ext 178**

**Momentum**®
Wireless EV Charging

**Connect**  LinkedIn | Website | Newsletter
**Media**  Taxis - NYTimes | Airport & Transit | Driver Experience

*Confidentiality Notice: The information, and any attachments and/or documents, transmitted by this email is intended for the addressee only and contains information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender immediately.*

**From:** Assata Acey
**Sent:** Sunday, March 27, 2022 9:51 PM
**To:** Joren Wendschuh <joren.wendschuh@momentumdynamics.com>
**Subject:** RE: 2022 work plan notes

Alrighty, I revisited this , boiled stuff into concise wording and meditatively tweaked it towards tasks I enjoy and feel confidence and excitement towards doing. I think there may be additional untyped benefits to some competencies (ie: dept information can also inform improvement of documentation), but I tried to focus on the emphasis of each additional task, as documentation review is a task each tech is involved in.(it also seemed to clutter the document) Let me know what you think!

**From:** Assata Acey
**Sent:** Wednesday, February 9, 2022 4:40 PM
**To:** Joren Wendschuh <joren.wendschuh@momentumdynamics.com>
**Subject:** 2022 work plan notes

**Assata Acey | Technician**
**Momentum Dynamics Corporation**
**Fueling the Future of Electric Transportation**
3 Pennsylvania Ave, Malvern, PA 19355

**One attachment** · Scanned by Gmail



W **PIT New Role Desc…**

 **Assata Acey** Assata.Acey@momentumdynamics.com via mtmdyn.o…   9 May 2022, 00:24      
to me

**PTE 87 (02/10/2022 ANSI Safety lens calculation; 02-16-2022 ANSI Laser PPE and Administrative Controls Determination; 02-24-2022 Corrective Procedure; 03/27/2022 JIRA Roadmap Presentation Notes).**

lens shade has to do with wavelength and OD
From 4.6.2.5.1, we get eqn fo OD:
H=potential eye exposure level, *same units as MPE
D_lambda=optical density
l     = limiting apeture
tau=transmittance of filter at wavelength
D_lambda=$\log_{10}[(H/MPE)]$=-$\log_{10}[tau]$
This is also reeated as eqn B98 on page 182

*According to Table 4, There are charted values for 400-1400nm,
but wavelengths outside of that must be calculated.

Finding H-
H-for wort case OD calc is equal to radiant energy/limiting apeture area
this is equal to the intensity of the laser
Our laser intensity is given as 1.2W//cm^2
*this is is also in line with 4.6.2.5.1 ule that H be in the same units as MPE (W/cm^2), and defined as Exposue
Finding MPE
4.6.2.5.2 (3) p46
Diffuse viewing criteria:
For an extended source like LED, or diffuse beam reflection with
intermediate viewing time(ie optical alignment), MPE should be based on max viewing
time in an 8 hour period

Laser Safety Notes P.2 PPE
***general Info
4.6.1 p42
The preferred to enclose the beam path/equiment as this will
minimize the hazard.
-PPE(goggles, barriers, window, clothing) are to rotect against
unavoidable direct or reflected beams above MPE.
-Some class 4 lasers cannot be made safe, and instead can damage PPE
**Envionmental safety info
4.6.2.1 p42
protection sfor class 4 lasers/laser systems to be a
dministratively required. use should be enforced when
ppe/engineering/procedure can't be tweaked to avoid exposure>MPE

Eyewear:
- can include goggles, face shield, spectacles or prescription
eyewear for E<=MPE
-should withstand direct or diffusely scattered beams.with a
specified damage threshold >= worst case exposure durign use
-Should request test data from eyewer manufactures(esp for
nonlinear effects like saturable absortion)

4.6.2.2
-UV lasers/systems require "particular care" including, creation
of hazardous biproducts(ex: ozone, skin sensitizing agents, LGACs)
--need beam shields and clothing to reduce to E<MPE
-both eye and skin protection needed for open beam Class 4 and 3b UV
lasers
***General info
4.6.2.4 p44
eye protecition selection should consder:
laser powerand/or pulse energy, wavelength of output, potential for
multi-wavelength operation, worst case radiant exposure,
exposure time criteria, MPE, optical density of eyewear filters at
output wavelengths, angular dependence of protection, requirement
 for antifog design/coatings, degredation of filter
media(ex: photobleaching), material resitance to trauma and
shock(ANSI Z87.1-2003), radiant exposure and time factor combos
 where safety filter characteristic change, need for side siel
protection/prescription glasses, maximum peipheral requirement,
 "visible light transmission, requirement and assesment of the
effect of eyewear on task perforance"
*************calculations info
4.6.2.5.1
Optical density goes by the wavelength and not the
laser(ex:tunable lasers may have different densities)
-indirect viewing can be usefull oavoid tons of
eyewear(imag converters/closed circuit tv)
H=potential eye exposure level, *same units as MPE
$D\_lambda$=optical density
$D\_f$= limiting apeture
tau=transmittance of filter at wavelength
$D\_lambda = \log\_10[(H/MPE)] = -\log\_10[tau]$

*when laser beam<D_f, H= average beam energy over apature
*dont do this where beam diameter<D_f

Table 4 has optical densities for H/MPE values

4.o.2.5.2 p45
Duration of intended use is the time factor in MPE equation
a filter material's OD calculation
subsections (1)-(3) are time facto criteria for classes 3B and 4
4.6.2.5.2(1)
visible criteria:for lasers 400-700nm not intended for long tem
exposure, 0.25s is the time used in MPE eqn bc the human aversion
time for bright light is first line of defense
4.6.2.5.2(2)
Near infrared criteria: when point source 700-1400nm laser isnt
intded fo long exposure, 10s exposure time is ealisti for MPE
bc of natural eye motions. backed by 8.2.2
4.6.2.5.2 (3) p46
Diffuse viewing criteria:
For an extended source like LED, or diffuse beam reflection with
intermediate viewing time(ie optical alignment), MPE should be based on max viewing
time in an 8 hour period
*for a 400-700nm extended souce with no intent of long term viewing, t=600s,
which is ok t value for alignment, but should be increased if used for sugery
*see section 8.1 for extended source criteria

-if Extended souce beam is too small for section 8.1[or angular
ce size<amm from distance r],inverse square law relationship
can be combined with point souce citeria for
E=rho phicos(theta) pi(r^2)
E= irradiance at distanc r from diffuse surface.
phi=laser output rho=reflection coefficient of the surface,
theta=viewing angle relative to normal of the surface
(4) if long term exposure/30,000=24hrs is possible,
it should be used as t for MPE except for UV, where according to
section 8.2.3.1, additivity can happen
4.6.2.6
OD should be weighted with folks need to see the laser
********* Labeling and inspection and standads of Eyewear
4.6.2.7
eyewear should be labeled by OD and wavelength for protection
*4.6.5 and 4.6.5.1 say labels should be permanent
4.6.2.8 p46
clean per manufacturer specs
check annualy in attenuation material fo pitting, crazing,
discoloration, cracking etc,mechanical integrity of frame,
leaks/damage in coating
-disgard or test suspicious eyewear
4.6.2.9 p47
vear companies must povide wavelength and OD, laser safety
d..d, as expressed in Appendix C (ex:damage threshold), and
Manufactures reccs for shelf life, storage, cleaning and use

*****Envionemental Safety Barriers

hazard level, but is used to convey policies of the facility to
protect persons and property
*according to 4.7.3.3, for signs outside a tempoay lase area
ie: during periods of sevice
*4.7 dictates design of signs, but 4.3.10.2 and 4.3.11.1 say where to post
*where to post is also summarized in table 11

4.7.4 Sign information and Warnings p50
4.7.4.1-Signal word(danger, caution, notice) goes in uppe panel
4.7.4.2
Signs should have space for following info(whether printed or handwritten):
a) Relevant protective instructions and actions should begin above
the tail of sunburst(position 1)
ex: laser eyewear require, knock befoe entering, Invisible laser Radiation
*class based guildlines in 4.7.5(1) a-e can also go in position 1
b)The type of laser or, walvength, pulse duration or max input
should go below the tail(position 2)
c)class of laser/system should go in position 3(we dont know
where that is, guess is nea the top of text)
4.7.4.3 and 4.7.5.1
signs should be conspicously located/displayed where onlookes will be best warned

4.7.5 p51 Equipment Label Requirements
(1) position 1 can also hold:
 "Laser Radiation - Do Not Stare into Beam"-Class 2 laser/systems
"Laser radiation - Do Not Stare into Beam or View Directly w/Optical
Instuments"-Class 2M and applicable Class 3R
"Lase Radiation - Avoid Direct Eye Exposure"-Class 3R
"Laser Radiation - Avoid Direct Exposure to Beam"-Class 3B
"Laser Radiation - Avoid Eye or Skin Exposure to Direct or Scattered Radiation
(2) and (3) repeat what is in 4.7.4.2
*position 1 standards can be satisfied by FLPPS(Federal Lase PRoduct Performance Standard
 or IEC 60825-1 or lates revision
4.7.6
any signs that comply with a previous standad is considered in
compliance of this standard

# Oztek Re-Alignment Procedure, Notes, and Reference

| Dept | Product Introduction |
|---|---|
| Created | 10/20/2021 |
| Revised | 02/24/2022 |
| Recorder | Assata Acey |

## Primary Procedure

1. Loosen, but do not remove, the eight screws that secure the fan assembly to the base plate and cover.
2. Remove the warranty void stickers on either side, exposing two of the ten side screws.
3. Loosen, but do not remove, the screws that were just uncovered along with the other screws on sides of the top cover fan assembly (a total of ten screws). There are six on one side and four on the other.
4. With those screws relaxed, try to apply the necessary pressure to the cover (likely downward) such that the mounting ears can be secured without struggle using the supplied screws to the specified torque of 16 in-lb. If alignment difficulty persists, continue to step 4. If not, skip to step 9.
6. Loosen, but do not remove, the eight screws that secure the front panel assembly to the base plate and cover.
7. Try again to shift the cover so as to align and secure the mounting ears to the intended locations at 16 in-lb using the supplied screws.
8. If unsuccessful, then this unit must return to Oztek under RMA.
9. If successful, with the mounting ears now installed, tighten all the top cover side screws to 16 in-lb. Tighten all the front panel and fan assembly screws to 22 in-lb.
10. Tighten all the front panel and fan assembly screws to 22 in-lb.
11. Notify Oztek of the serial number of the unit such that we can record in our serial number archives that we have authorized you to do so.

## Procedure Notes:

A. **After consulting with Seth, neither one of us could identify an additional 4 screws beyond the ten that were mentioned. As such, I truncated the original step 5:**

5. Loosen, but do not remove, the remaining four screws along the sides of the top cover (there are two left per side).

B. **An alternate interpretation of the inconsistency would create the following procedure:**

1. Loosen, but do not remove, the eight screws that secure the fan assembly to the base plate and cover.
2. Remove the warranty void stickers on either side, exposing two of the ten side screws.
3. Loosen, but do not remove, the screws on left and right sides of the top cover fan assembly. Leave out the two closest to the front on each side for a total of 6 screws loosened (out of the ten total counting each side.
4. With those screws relaxed, try to apply the necessary pressure to the cover (likely downward) such that the mounting ears can be secured without struggle using the supplied screws to the specified torque of 16 in-lb. If alignment difficulty persists, continue to step 4. If not, skip to step 9.
5. Loosen, but do not remove, the remaining four screws along the sides of the top cover
6. Loosen, but do not remove, the eight screws that secure the front panel assembly to the base plate and cover.
7. Try again to shift the cover so as to align and secure the mounting ears to the intended locations at 16 in-lb using the supplied screws.
8. If unsuccessful, then this unit must return to Oztek under RMA.
9. If successful, with the mounting ears now installed, tighten all the top cover side screws to 16 in-lb.
10. Tighten all the front panel and fan assembly screws to 22 in-lb.
11. Notify Oztek of the serial number of the unit such that we can record in our serial number archives that we have authorized you to do so.

## Reference information

For supplies already in your possession which are undamaged, but suffering from this misalignment problem, we may be able to guide your personnel through adjustment in such a manner as to avoid the shipping headache and not compromise the warranty. If you are interested, here is what we would propose:

1. Loosen, but do not remove, the eight screws that secure the fan assembly to the base plate and cover.
2. Loosen, but do not remove, the ten screws along the sides of the top cover nearest to the fan assembly. There are six on one side and four on the other.
3. With those screws relaxed, try to apply the necessary pressure to the cover (likely downward) such that the mounting ears can be secured without struggle using the supplied screws to the specified torque of 16 in-lb. If alignment difficulty persists, continue to step 4. If not, skip to step 9.
4. Remove the warranty void sticker, notifying Oztek of the serial number of the unit such that we can record in our serial number archives that we have authorized you to do so.
5. Loosen, but do not remove, the remaining four screws along the sides of the top cover. There are two left per side.
6. Loosen, but do not remove, the eight screws that secure the front panel assembly to the base plate and cover.
7. Try again to shift the cover so as to align and secure the mounting ears to the intended locations at 16 in-lb using the supplied screws.
8. If unsuccessful, then this unit must return to Oztek under RMA.
9. If successful, with the mounting ears now installed, tighten all the top cover side screws to 16 in-lb.
10. Tighten all the front panel and fan assembly screws to 22 in-lb.

Figure 1. John Moisan, Quality Manager (Oztek) Aug 30, 2021

Jira is Big. Purpse of These notes is to explain use--and possibilities for use-- to organize
and communicate team priorities

Task levels/Board Types
1. Boards are for Projects, Not Team??
2. Teams can be attached to Project Boards which display epics, issues,and child issues
 in priority order, based on status, and filtered at the viewers discretion
3. You can change the name of a item type on a board.(ie, child task and applicable fields can be changed to "subtask")
4. Theres alot of boards, but right now I'm reccomending Kanban
5. When an accident occus, you can change a subtask to a parent task.

General viewing
1. Whatever Key you put in for Project Type will become the label number for each subtask
2. Can change board view to group by assignee, epic, etc
3. Grouping by subtask will allow subtask//child issues to be seen in the board as well
4. Once a task has beeen assigned to someone, their Jira picture will appear in the bottom
5. right corner of the task "card"

Epics
1. You have to go to the "Roadmap" to creat an Epic
2. If you click the down arrow by Epic(below board name, left of board memeber pictures), you can select or deselect
which projects you want to look at right now
3. Roadmaps can also show, given the timing of each related task, what the timeline
is for an epic

Issues
1. If you hover over the issue tree, it will tell you how many childtask/how
many have been completed
2. If you click on an issue, you can assign an epic,add comments, or even creat a child task
3. you can set up contraints, contingences, relationships between issues
4. You can link child tasks together, but they may not automatically show up in search bar;
you'll have to type a good chunk of its name to select it

Interactions
1. May aslo suffice to import issues from ther projects into
Team Jira board as an Epic or parent issue

Notes:
1 At some point may have to go in and sort existing itms in current board
2 Reccomending Names chart doc to help folks see which names mean the sam thing from
Teamworks name to different terms in Jira for Navigability

# PTE 88 (04/09/2024 D. Hackman Dep. pp.

# 110(ll6)-116(ll14))

```
 6              Do you recall anything about a UV

 7    project?

 8              MR. LONGO:  Objection.  Form.

 9              THE WITNESS:  Can you state that

10       again?

11    BY MS. ACEY:

12       Q.   Do you recall anything about a "UV

13    project"?

14       A.   Yes.

15              MR. LONGO:  Same objection.

16              THE WITNESS:  Yes.

17    BY MS. ACEY:

18       Q.   Were you involved in this project?

19       A.   Informally, yes.

20       Q.   Did this project involve calculations?

21       A.   Yes.

22       Q.   Who completed those calculations?

23       A.   You did.

24       Q.   Did you ever present calculations --
```

DANIEL HACKMAN

Page 111

1   I'm sorry.

2           I want to go back.

3           Do you know who assigned those

4   calculations to me?

5               MR. LONGO:  Objection.  Form.  Beyond

6       the scope of direct examination.

7               THE WITNESS:  I think it was either --

8       I think it was either -- I -- I don't know.

9       I think it was probably is Joren Wendshuh or

10      Jerry Frank.

11  BY MS. ACEY:

12      Q.      Did you present any calculations to

13  Mr. Wendshuh?

14      A.      No.

15      Q.      For the record, Mr. Hackman, have you

16  been asked during this deposition to testify to

17  the scope my work with InductEV?

18      A.      No, I don't think so.

19      Q.      Have you been asked during this

20  deposition about my impressions of whether my work

21  was appropriate for my role at InductEV?

22      A.      Okay.

23      Q.      Did you produce any documentation for

24  that project?

DANIEL HACKMAN

Page 112

1       A.      No.

2       Q.      To your knowledge, who was in charge

3   of the project?

4       A.      I believe -- I believe you were the

5   one tasked with it, which, I guess, would put you

6   in charge.

7               If you're asking who gave you the

8   directive to work on it, it would be either Joren

9   or -- it was probably Joren.  I believe Jerry

10  Frank had a little bit of involvement or interest

11  in it, but you didn't report to him.  You reported

12  to Joren.

13      Q.      Do you recall earlier in this

14  deposition being asked to look at Interrogatories

15  submitted from myself to the defendant?

16      A.      Yes.

17      Q.      Can you recall what was written in

18  reference to you on those Interrogatories?

19      A.      Something about Sam Gallagher and

20  sexual harassment and the -- the nature of the

21  work, and I think there was something else, but I

22  don't recall.

23      Q.      Were you asked to interpret what was

24  meant by the term "nature of the work" --

```
 1        A.    I don't recall --
 2        Q.    -- as you --
 3        A.    -- I don't recall if I was asked to or
 4   if I offered that, but I think I made a comment
 5   about that, yes.
 6        Q.    Okay.  Were you aware of any materials
 7   being purchased for their UV project?
 8             MR. LONGO:  Objection.  Form.  Beyond
 9        the scope.
10             THE WITNESS:  I -- I am aware of it,
11        yes.
12   BY MS. ACEY:
13        Q.    Who sourced those materials?
14        A.    You did.
15        Q.    Were you aware of any technicians
16   undertaking similar projects?
17        A.    No.
18        Q.    Can you describe the liability of the
19   calculations done in the UV project?
20             MR. LONGO:  Objection.  Form.  Beyond
21        the scope.
22             THE WITNESS:  Yes.  There was a--
23        there could have been grave consequence to
24        health and safety had that work not been done
```

DANIEL HACKMAN

Page 114

1          or not been done well.   Mostly with respect

2          to eye safety.

3    BY MS. ACEY:

4         Q.     Can you go into further detail?

5                What -- what -- what would be the

6    danger?

7         A.     So --

8         Q.     Yeah.

9         A.     I -- I recall that the project related

10   to high power laser -- high power UV diodes that

11   offered significant health and safety risks.

12   Because -- because of the intensity of the lights,

13   any speculative reflection from that source that

14   reaches somebody's eye could cause permanent

15   damage or blindness.   And so understanding the --

16   understanding what is required to ameliorate that

17   risk, I believe, was largely the scope of work

18   that you did in proposing appropriate personal

19   protective equipment.

20        Q.     Were you aware of anyone else at

21   InductEV who would be comfortable completing those

22   calculations?

23        A.     I would.   An engineer.   An engineer.

24   An optomechanical engineer or an electrical

DANIEL HACKMAN

Page 115

1    engineer would probably be comfortable doing that.

2         Q.     Did InductEV have an optomechanical

3    engineer?

4         A.     No.

5         Q.     Were you aware of any educational or

6    experience qualifications that I would have for

7    completing those calculations?

8         A.     I'm sorry.  Can you restate the

9    question?

10        Q.     Were you aware of any educational or

11   experience qualifications that I would have --

12        A.     Yes.

13        Q.     -- for completing those calculations?

14        A.     Yes.

15             MR. LONGO:  Objection.  Form.  Beyond

16        the scope of direct.

17             THE WITNESS:  You acquired a Bachelor

18        of Science in Physics and worked in -- worked

19        with a professor -- you did research in

20        optics and lasers.

21   BY MS. ACEY:

22        Q.     Were you aware of anyone else at the

23   company who did research or had experience in

24   optics or lasers, as you put it?

DANIEL HACKMAN

Page 116

```
 1              MR. LONGO:   Objection.
 2              THE WITNESS:   I have some experience
 3        in optics and lasers, but other than that,
 4        no.
 5   BY MS. ACEY:
 6        Q.    Okay.  So to clarify, you said you
 7   were the only other person that you were aware of?
 8        A.    Yes.
 9        Q.    Okay.  Did you testify earlier that --
10   actually, I'm sorry.
11              Were you aware of any technicians
12   doing similar projects?
13              MR. LONGO:   Objection.  Form.
14              THE WITNESS:   No.  The answer the no.
```

**PTE 89 (02/04/2022 Teams Messages between myself and my Supervisor, Doc 40 Transcript (II)(22),** *originals filed in Doc 40-2 pp.* **570-571).**

22. **02/04/2022 Recorded recollection from myself to my supervisor of a discussion I had the previous Tuesday with my supervisor about the feasibility of the current workplace culture, and my personal goals (Ex. 284). References: ECF 8-1(¶120-122), Doc 15 (¶77).**

   **2:10:42 PM Assata:** Message from Tuesday: Hey, erm idk how or whether to say this but I think I may be irreparably unhappy with work as it currently exists

   There's a lot of things I enjoy about work and moments where I feel happy here; wonder if a remedy is needed at all.

   However I have decidely shifted from(how or whether to try) to get more happiness out of work to making room for the other goals/life aspects(house education, personal care) that make me happy.

   For that major purpose, I think working part time or on a 3day wfh 2day in-house schedule would be best for me.

   Anticipated benefits are: 1.cut down opportunities for stressful interactions with others

2. Grant me more time and flexibility to wrap up crucial home repairs
3. grant me more time and flexibility to shift back towards my masters degrees
4. Grant me more flexibility to schedule and do my best work I consistent and not stressful environment vs being distracted by emotions, settings
I totally get if there s not role for that in the team etc bit I also have considered this and wanted to at least let you know where I stand.



**PTE 90 (03/10/2022 Teams meeting Scheduled between myself and my Supervisor).**

## Formalizing Job Structure/Requirements



Assata Acey
Required ● Joren Wendschuh

✓ Accept ✓   ? Tentative ✓   ✕ Decline ✓   🕓 Propose New Time ✓

Thu 3/3/2022 3:12 PM

🕓 Thursday, March 10, 2022 12:30 PM-1:30 PM   📍 Preferably Teams.

1.Review Documentation/Definition needs to formalize role
2. Review scope of work/Reasonable Outcomes of each focus area
3. Discuss as necessary to draft Documentation

_____

## Microsoft Teams meeting

**Join on your computer or mobile app**
**Click here to join the meeting**

Learn More | Meeting options

_____

# PTE 91 (02/2022-04/2022 Emails between myself and my Supervisor).

## FW: 2022 work plan notes

 **Assata Acey** Assata.Acey@momentumdynamics.com via mtmd...  Sun, 27 Mar 2022, 21:54  
to me

**Assata Acey | Technician**
**484-320-8222 ext 178**

**Momentum**®
Wireless EV Charging

**Connect**   LinkedIn  |  Website  |  Newsletter
**Media**       Taxis - NYTimes  |  Airport & Transit  |  Driver Experience

*Confidentiality Notice: The information, and any attachments and/or documents, transmitted by this email is intended for the addressee only and contains information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender immediately.*

**From:** Assata Acey
**Sent:** Sunday, March 27, 2022 9:51 PM
**To:** Joren Wendschuh <joren.wendschuh@momentumdynamics.com>
**Subject:** RE: 2022 work plan notes

Alrighty, I revisited this , boiled stuff into concise wording and meditatively tweaked it towards tasks I enjoy and feel confidence and excitement towards doing. I think there may be additional untyped benefits to some competencies (ie: dept information can also inform improvement of documentation), but I tried to focus on the emphasis of each additional task, as documentation review is a task each tech is involved in.(it also seemed to clutter the document) Let me know what you think!

**From:** Assata Acey
**Sent:** Wednesday, February 9, 2022 4:40 PM
**To:** Joren Wendschuh <joren.wendschuh@momentumdynamics.com>
**Subject:** 2022 work plan notes

**Assata Acey  |  Technician**
**Momentum Dynamics Corporation**
**Fueling the Future of Electric Transportation**
3 Pennsylvania Ave, Malvern, PA 19355

**2 attachments** · Scanned by Gmail


  PIT New Role Desc...


  Jaguar I-Pace with ...

 **Assata Acey** Assata.Acey@momentumdynamics.com via mtm...  Wed, 20 Apr 2022, 12:05  
to me

**Assata Acey | Technician**
**484-320-8222 ext 178**

**Momentum**®
Wireless EV Charging

**Connect**   LinkedIn  |  Website  |  Newsletter
**Media**       Taxis - NYTimes  |  Airport & Transit  |  Driver Experience

*Confidentiality Notice: The information, and any attachments and/or documents, transmitted by this email is intended for the addressee only and contains information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender immediately.*

**From:** Assata Acey
**Sent:** Wednesday, April 20, 2022 12:05 PM
**To:** Joren Wendschuh <joren.wendschuh@momentumdynamics.com>
**Subject:** RE: 2022 work plan notes

Beh humbug

**From:** Assata Acey
**Sent:** Friday, April 15, 2022 4:44 PM
**To:** Joren Wendschuh <joren.wendschuh@momentumdynamics.com>
**Subject:** RE: 2022 work plan notes

Revised document attached

**From:** Assata Acey <Assata.Acey@momentumdynamics.com>
**Sent:** Wednesday, April 13, 2022 3:39 PM
**To:** Assata Acey <Assata.Acey@momentumdynamics.com>
**Subject:** Re: 2022 work plan notes

Get Outlook for Android

---

**One attachment** · Scanned by Gmail



 **Humbug Thesis.docx**

  

**Assata Acey** <aceyassata@gmail.com>
to Daniel

Wed, 20 Apr 2022, 12:09

I sent thus to Joren as a response to his questions. I somewhat feel like a life trajectory is personal and shouldn't be required to be compensated for work.(he almost tried to talk me out of my masters degree today ionlikethat) or to discuss viable job options ik a company as is.

---------- Forwarded message ----------
From: **Assata Acey** <Assata.Acey@momentumdynamics.com>
Date: Wednesday, 20 April 2022
Subject: FW: 2022 work plan notes
To: Assata Acey <aceyassata@gmail.com>

**Assata Acey | Technician**
**484-320-8222 ext 178**


Wireless EV Charging

**Connect** LinkedIn | Website | Newsletter
**Media** Taxis - NYTimes | Airport & Transit | Driver Experience

**PTE 92 (04/18/2024 A. Acey Dep p. 171 (ll7-16)).**

```
 7              Q.      "I think I'm gonna go in for my
 8      meeting and update my resume to send to Joren
 9      while at work."
10                      What's that about?
11              A.      I mean, it's a continuation.
12      We'd been talking about this job title and
13      looking at this job title.  The discussions
14      about the job opening and title, description
15      did not conclude when I had complained about
16      disability or anything else, so --
17              Q.      Well, let's go to the top of
18      the next page, Ms. Acey.
```

**PTE 93 (04/11/2024 A. Acey Dep. p. 151(ll15)-153(ll19)).**

15  BY MR. SCHAUER:

16      Q.   Did anyone ever tell you that you

17  were not going to be able to -- I know it

18  didn't happen as -- as you wanted it to, but

19  did anyone ever tell you that you would never

20  be anything other than a technician at

21  InductEV?

22      A.   Omar told me that I would never

23  make what the other employees were making.

24      Q.   Did Omar -- is Omar your boss?

Page 152

```
 1        A.    No.

 2        Q.    Is Joren your boss?

 3        A.    Yes.

 4        Q.    Was Omar involved in decisions

 5   relative to promotions at InductEV?

 6        A.    Not my promotion, no.

 7        Q.    Right.  Sure.

 8              You talked to Joren about career

 9   path, didn't you?

10        A.    I did.

11        Q.    Okay.  Did he ever tell you that

12   there's no way he would make a black woman

13   other anything other than a technician here?

14        A.    No.

15        Q.    In fact, he was encouraging, wasn't

16   he?

17        A.    Yeah.

18        Q.    He was, right?

19              Did Ms. Talis ever tell you,

20   there's no way that -- you know, you're ever

21   going to be allowed to be anything, did she

22   tell you the explicitly that there's no way

23   that you're going to ever have a position at

24   InductEV other than as a technician?
```

```
1        A.    Joren said there was a process
2   engineer role.  He asked me to write a job
3   description.  I submitted it.  We met over it
4   several times, and three months after that,
5   even to the point of my disability, it was
6   never pushed further.
7             He kept saying there was something
8   wrong with the description.  I need to add
9   more duties.  And I could not understand if
10  he was saying that I could be promoted,
11  especially since I disclosed to him that I
12  was interested in just stepping away from the
13  company altogether.  I couldn't understand
14  those statements.
15       Q.    So you couldn't understand Joren's
16  explanation to you of --
17       A.    But his actions.
18       Q.    -- the delay?
19       A.    Yes.
```

**PTE 94 (04/08/2022 Teams Messages between myself and my Supervisor, Doc 40 Transcript (IV)(3)(7:45 AM-8:02 AM),** *originals filed in Doc 40-2 pp.* **1241-1248).**

3. **04/08/2022 Present sense impression from myself to my supervisor about continuing in-person duties, the progression of my illness, and dissatisfaction with the misclassification of my role (Ex. 603-622). References: Ex.859-860, ECF 8-1(¶3, ¶6, ¶32-37, ¶44, ¶136-164), Doc 15 (¶¶82-84), ECF 15-59-ECF 15-63, Doc 20 (¶8-49).**

   **6:12:18 AM Joren:** Are you okay?

   **6:17:43 AM Assata:** Yep

   **6:25:46 AM Joren:** Lol. Too late.

   **6:36:32 AM Assata:** Rip

   **6:36:37 AM Assata:** Ruined sleep for everyone

   **7:05:14 AM Assata:** Can you follow your with harry about that extra mount I never received?

   **7:05:22 AM Assata:** Follow up with Harry

   **7:05:30 AM Joren:** I can...

   **7:05:57 AM Assata:** Be I'd be asking twice

   **7:06:19 AM Joren:** I can. Would you want me to?

   **7:45:40 AM Assata:** Good article that also highlights rhe importance of formalized roles
   https://www.huffpost.com/entry/invisible-work-women-
   office_n_624c4effe4b0d8266ab18824?utm_source=Sailthru&utm_medium=email&utm_campai
   gn=Momingfl&7-22&utm_term=us-morning-email

   **7:58:59 AM Joren:** Hm ok please email

   **8:00:55 AM Assata:** Email?

   **8:02:16 AM Joren:** Yes.

   **8:02:35 AM Assata:** What am I emailing. If it's Harry I'd rather go without

   **8:02:48 AM Joren:** The link...

   **8:03:20 AM Assata:** But also joren I am very dizzy m and my legs are folding when I walk. I'm going to try to take a nap(in my car) and then head to our meeting. If I didn't feel better I'll probably go home and do online work there (set me cabinet goal for wed)

   **8:03:38 AM Joren:** Uh. Yeah. Go home.

**PTE 95a (04-20-2022 Emails between myself, my Supervisor, and D. Hackman).**



W **Humbug Thesis.docx**

---

 **Assata Acey** <aceyassata@gmail.com>     20 Apr 2022, 12:09       
to Daniel

I sent thus to Joren as a response to his questions. I somewhat feel like a life trajectory is personal and shouldn't be required to be compensated for work.(he almost tried to talk me out of my masters degree today ionlikethat) or to discuss viable job options ik a company as is.

---------- Forwarded message ----------
From: **Assata Acey** <Assata.Acey@momentumdynamics.com>
Date: Wednesday, 20 April 2022
Subject: FW: 2022 work plan notes
To: Assata Acey <aceyassata@gmail.com>

**Assata Acey | Technician**
**484-320-8222 ext 178**

**Momentum**®
Wireless EV Charging

**Connect**  LinkedIn | Website | Newsletter
**Media**    Taxis - NYTimes | Airport & Transit | Driver Experience

*Confidentiality Notice: The information, and any attachments and/or documents, transmitted by this email is intended for the addressee only and contains information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender immediately.*

**2 attachments** · Scanned by Gmail



W **Humbug Thesis.docx**        ▶ Jaguar I-Pace with ...

---

 **Assata Acey** <aceyassata@gmail.com>     20 Apr 2022, 12:11
to Daniel

This was the JD

**One attachment** · Scanned by Gmail



W **PIT New Role Desc...**

# PTE 95b (04/2022 Supervisor feedback).

 **Assata Acey** Assata.Acey@momentumdynamics.com **via** mtmdyn.on...  9 May 2022, 00:18   
to me

**One attachment** · Scanned by Gmail



W **Humbug Thesis.docx**

 **Assata Acey** Assata.Acey@momentumdynamics.com **via** mtmdyn.on...  9 May 2022, 00:19   
to me

**One attachment** · Scanned by Gmail



W **PIT New Role Desc...**

 **Assata Acey** Assata.Acey@momentumdynamics.com **via** mtmdyn.onmicr... 9 May 2022, 00:21   
to me

**Assata Acey | Technician**
**484-320-8222 ext 178**

**Momentum®**
Wireless EV Charging

**Connect** LinkedIn | Website | Newsletter
**Media** Taxis - NYTimes | Airport & Transit | Driver Experience

*Confidentiality Notice: The information, and any attachments and/or documents, transmitted by this email is intended for the addressee only and contains information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender immediately.*

**From:** Assata Acey <Assata.Acey@momentumdynamics.com>
**Sent:** Monday, April 4, 2022 12:04 PM
**To:** Joren Wendschuh <joren.wendschuh@momentumdynamics.com>
**Subject:** Re: 2022 work plan notes

Documenting what we know as a dept, tips and methods tech use in assemblies that aren't in conflict with assembly steps etc--can also be used to improve the assembly docum3nts.

Get Outlook for Android

**From:** Joren Wendschuh <joren.wendschuh@momentumdynamics.com>
**Sent:** Monday, April 4, 2022 11:30:19 AM
**To:** Assata Acey <Assata.Acey@momentumdynamics.com>
**Subject:** Re: 2022 work plan notes

Assata,

Thank you for doing this!  Well done.  Glad to hear you modified it to have excitement.  That was the intent!

Please help me understand:

> I think there may be additional untyped benefits to some competencies (ie: dept information can also inform improvement of documentation), but I tried to focus on the emphasis of each additional task, as documentation review is a task each tech is involved in.(it also seemed to clutter the document)

**Joren Wendschuh | Manager, Product Introduction**
**484-320-8222 ext 143**

**Momentum**®
Wireless EV Charging

**Connect**   LinkedIn  |  Website  |  Newsletter
**Media**   Taxis - NYTimes  |  Airport & Transit  |  Driver Experience

Confidentiality Notice: The information, and any attachments and/or documents, transmitted by this email is intended for the addressee only and contains information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender immediately.

**From:** Assata Acey <Assata.Acey@momentumdynamics.com>
**Sent:** Sunday, March 27, 2022 21:50
**To:** Joren Wendschuh <joren.wendschuh@momentumdynamics.com>
**Subject:** RE: 2022 work plan notes

Alrighty, I revisited this , boiled stuff into concise wording and meditatively tweaked it towards tasks I enjoy and feel confidence and excitement towards doing. I think there may be additional untyped benefits to some competencies (ie: dept information can also inform improvement of documentation), but I tried to focus on the emphasis of each additional task, as documentation review is a task each tech is involved in.(it also seemed to clutter the document)
Let me know what you think!

**Assata Acey | Technician**
**484-320-8222 ext 178**

**Momentum**®
Wireless EV Charging

**Connect**   LinkedIn  |  Website  |  Newsletter
**Media**   Taxis - NYTimes  |  Airport & Transit  |  Driver Experience

Confidentiality Notice: The information, and any attachments and/or documents, transmitted by this email is intended for the addressee only and contains information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender immediately.




 **Assata Acey** Assata.Acey@momentumdynamics.com via mtmdyn.on...    9 May 2022, 00:21
to me

# PTE 96 (08/03/2022 Notice of Charge AND

# 08/15/2022 JIRA Notification)

| From: | Joren Wendschuh (Jira) |
|---|---|
| To: | Assata Acey |
| Subject: | [JIRA] (project ) (GA2CE) Project moved to trash |
| Date: | Monday, August 15, 2022 11:59:28 AM |
| Attachments: | jira-generated-image-static-footer-desktop-logo-531d1a6c-d2b4-4fb2-ad51-2fc3352db192 |

**EXTERNAL EMAIL**

Joren Wendschuh moved this project to trash on 15/08/2022 15:59:20 .

The project, including all its issues, components, attachments, and versions will be available in the trash for 60 days after which it will be permanently deleted.

**Only Jira admins can restore the project.**

## project

Get Jira notifications on your phone! Download the Jira Cloud app for **Android** or **iOS**

This message was sent by Atlassian Jira (v1001.0.0-SNAPSHOT#100204-sha1.948b370)

# PTE 97 (04/28/2021 Interview Evaluations from both Supervisor and CAO, ECF 20-5, ECF 20-7)



## Interview Evaluation Form

**Candidate Name:** Assata Acey

**Interviewer:** Joren Wendschuh

**Position:** Sr Tech

**Date:** 4-28

_____

1.) **Culture Fit:** Candidate's beliefs and behaviors align with the company's core values and company culture.

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect culture fit)

1 ☐   2 ☐   3 ☐   4 ☐   5 ☑

Please comment on the reason for your rating:

Loves to learn and explore and do research.  Interested in everything!
Passionate about science and trying things.

2.) **Skill/Competency Fit:** Do the skills the candidate will bring to the job align with the job competencies?

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect skillset)

1 ☐   2 ☑   3 ☐   4 ☐   5 ☐

Please comment on the reason for your rating:

I think Assata is a bit of a unique person for this role, and I would look to more
as a technician ("title") coming on board, unless Omar & Seth are Sr's.
Brings a unique "science and engineering" background and knowledge to the
job - would expect to be doing some borderline engineering work, while learning
some of the "Sr" tech side of things at least in our niche.

INDUCTEV INITDISCL000139

3.) **Technical Fit:** Does this candidate have the technical aptitude needed to succeed in this position?

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect technical fit)

1 ☐   2 ☐   3 ☐   4 ☑   5 ☐

Please comment on the reason for your rating:

Aptitude yes - willing and interested from what I can see in an interview. Excited about work and wanting to overcome.

4.) **Overall Fit:** Average your ratings and please select yes or no on moving forward with this candidate.

Average Rating: 3.5

Yes ☑ No ☐

Overall Comments:

Looking to move forward pending interview debrief and others thoughts. That is, move forward to an in person "shadow" / meet / greet / on site "interview".

CONFIDENTIAL                                    INDUCTEV INITDISCL000140



## Interview Evaluation Form

**Candidate Name:** Assata Acey

**Interviewer:** Judy Talis

**Position:** Senior Technician

**Date:** 4/28/2021

---

1.) **Culture Fit:** Candidate's beliefs and behaviors align with the company's core values and company culture.

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect culture fit)

1 ☐   2 ☐   3 ☐   4 ✓   5 ☐

Please comment on the reason for your rating:

Candidate has a very innovative take on her work. She has always looked beyond the task and thinks out of the box. It is in her nature. She gave several examples of schooling where she would be given an assignment and she would complete it but then go beyond that initial assignment and look at it from different angles. She thinks MD is somewhere that can be valued. Having said that she understands the need to do her job as asked as well.

2.) **Skill/Competency Fit:** Do the skills the candidate will bring to the job align with the job competencies?

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect skillset)

1 ☐   2 ☐   3 ☐   4 ✓   5 ☐

Please comment on the reason for your rating:

While she may not have the exact skills we are looking for she is certainly capable with her background on learning them. She mentioned when the interview team asked her about her use of tools, she made a joke she didn;t think they understood, but she has a strong grasp of the tools of the trade. In her job at comcast she got one day of training shadowing someone and then was left to do the job including writing of results of testing she was doing. Seems capable.

3.) **Technical Fit:** Does this candidate have the technical aptitude needed to succeed in this position?

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect technical fit)

1 [ ]   2 [ ]   3 [✓]   4 [ ]   5 [ ]

Please comment on the reason for your rating:

4.) **Overall Fit:** Average your ratings and please select yes or no on moving forward with this candidate.

Average Rating: ___4.0___

Yes [✓] No [ ]

Overall Comments:

Assata is an out of box thinker. I of course addressed the fact that she has an engineering degree and did she see this technician role as a way to get into the company. She feels the technician role is fundamental to engineering. The lines can be blurry for an entry level engineering and the hands on components will make her a better engineer. She enjoys the job. She would eventually like to

INDUCTEV INITDISCL000144

**PTE 98 (03/18/2024 Defendant's Answers (ll144-145); 03/28/2024 P. Rensel Dep. p. 10; 04/08/2024 M. Tabbut Dep. p. 25; Various Employee Profiles).**

144.    Despite this, I was not among the four employees reclassified between 12/20/2022

and 03/20/2022, with attention to company needs, and preexisting qualifications, and job tasks:

Diana Wilmes (White, female), Taylor Johnson (White, male), Harry Nask (White, male), and

Andrea Neff (White, female).

**ANSWER:     Denied. Defendant specifically denies that Plaintiff was qualified for**

**reclassification. By way of further response, Defendant specifically denies that the decision**

**not to reclassify Plaintiff was due to race or sex.**

145.    Within 4 years before and sometime after my employment, Bill Gallagher (White,

male) was reclassified from his role of Principal Electrical Engineer to Principal Test Engineer,

and Senior Technician, Rob Rosenberger (White, male) reclassified from Product Introduction to the Testing Team and Daniel Schwartz (White male) was promoted to vice president of Supply Chain.

**ANSWER**:   Admitted.



10

```
 1    BY MS. ACEY:
 2    Q.       What was your role at Induct EV?
 3    A.       Could you put a timeframe to that
 4    question?
 5    Q.       What was your initial role at Induct
 6    EV?
 7    A.       HR Director.
 8    Q.       What was your final role at Induct EV?
 9    A.       I don't recall my title when I left.
10    Q.       DO YOU recall any changes to your
11    title?
12    A.       There were changes to my title.
13    Q.       Which changes do you recall?
14    A.       I was hired as the HR Director.  My
15    title changed a few times.
16    Q.       What did your title change to?
17    A.       I honestly don't recall.  I --
18    Q.       Would you describe -- oh, I'm sorry.
19    A.       I am trying to remember.  I had several
20    titles while I was there; I don't recall.
21    Q.       Would you normally describe yourself --
22    just, actually, before I ask this question, I
23    just want to be clear that it is meant
24    objectively, and not necessarily to be
```

Page 22

1        A.        Yeah, so for this company, we had
2    electrical cabinets that took the power from your
3    grid, basically, and then converted it to allow it
4    to charge to our coil.  So, basically, a big
5    electrical cabinet you might see on the side of
6    the road by traffic lights, that kind of thing.
7    And, yeah, just all the big metal box that holds a
8    bunch of electrical components in it.
9        Q.        Did you ever hold any other roles
10   at InductEV besides mechanical engineer?
11       A.        Basically, mechanical engineer has
12   been my role since then, full time.
13       Q.        When you joined as a mechanical
14   engineer, were you, like, an introductory level
15   engineer or did your role kind of stay the same
16   throughout the entirety of your time?
17       A.        Yeah, role moved up as the years
18   went on to senior mechanical engineer, just kind
19   of gained more job roles in those, as I moved up.
20   Because, yeah, I was pretty junior.  My title
21   wasn't junior mechanical engineer, but it was
22   mechanical engineer from the start and moved up to
23   senior, I think, about four, five years in.
24       Q.        With respect to mechanical
25   engineering, is there any type of licensure that's

         

Home | My Network | Jobs | Messaging | Notifications | Me ▼ | For Business ▼   Retry Prem month fre



## Kyle Abramowitz · 2nd
Embedded Software Engineering


- MachineQ, a Comcast Company


- Drexel University

Philadelphia, Pennsylvania, United States · Contact info

398 connections

 Maria Tabbut, Ryan Taggart, and 11 other mutual connections

Message   ( **Connect** )   ( More )

## Highlights

 **You both worked at InductEV**
You both worked at InductEV in June 2021

( 🔒 Message )

## About

Motivated to make the world a better place through intelligent use of technology while learning as much as I can in the process.

## Activity
401 followers

**Kyle hasn't posted yet**
Recent posts Kyle shares will be displayed here.

Show all activity →

## Experience

 **IOT Architect II**
MachineQ, a Comcast Company · Contract
Mar 2023 - Present · 1 yr 7 mos
Philadelphia, Pennsylvania, United States

♡ Bluetooth Low Energy, Go (Programming Language) and +4 skills

 





## Dan Hackman · 2nd

Senior Electrical Engineer at MOBILion Systems



- MOBILion Systems, Inc.



- Penn State University

United States · **Contact info**

46 connections

Maria Tabbut, Joren Wendschuh, and 6 other mutual connections

Connect    ( Message )    ( More )

## Highlights

 **You both worked at InductEV**
You both worked at InductEV from June 2021 to September 2022

🔒 Message

## About

I love to experiment with concepts at the intersections of the sciences (Energy, Optics, Circuitry, Chemistry Programming).

## Activity

47 followers

**Dan hasn't posted yet**
Recent posts Dan shares will be displayed here.

Show all activity →

## Experience

 **Senior Electrical Engineer**
MOBILion Systems, Inc. · Full-time
Apr 2023 - Present · 1 yr 6 mos
Chadds Ford, Pennsylvania, United States · On-site

 **InductEV**
9 yrs 10 mos

**Principal Electrical Engineer**

Full-time

Jan 2018 - Mar 2023 · 5 yrs 3 mos

• Delivered and polished various project milestones by generating product designs, design reviews, documentation, test ...

♡ Prototyping, Electro-mechanical Troubleshooting and +18 skills

### Project Engineer

Jun 2013 - Jan 2018 · 4 yrs 8 mos

•Momentum Dynamics Corporation is now known as InductEV
•Devised designs for wireless charger prototypes in collaboration with...

♡ Prototyping, Electro-mechanical Troubleshooting and +12 skills



### Electrical Engineer

InductEV

Jun 2011 - Jan 2013 · 1 yr 8 mos

• 1st employee of the company.
• Worked under guidance of chief scientist and late co-founder (Bruce...

♡ Prototyping, Electro-mechanical Troubleshooting and +10 skills

## Education



### Penn State University

Bachelor of Science - BS, Engineering Science and Mechanics

Received: B.S. Engineering Science and Mechanics with Concentration in Semiconductors...

♡ Computer-Aided Design (CAD) and Chemistry

## Projects

### Computer Design

•Custom 8-bit microprogrammed TTL computer with custom CPU and custom instruction set architecture...

♡ Computer-Aided Design (CAD), Research and +3 skills

### Light Microscope

• Diffraction-limited Light microscope capable of brightfield, darkfield, polarized light, DIC, phase contrast and fluorescence microscopy...

♡ Research, Supplier Sourcing and +4 skills

Show all 5 projects →

## Skills

### SOP Authoring

 2 experiences at InductEV

### FLIR

 3 experiences at InductEV

Show all 23 skills →

## Recommendations


**InductEV**
Full-time · 8 yrs 3 mos
On-site

### Engineering Architect
Jan 2023 - Present · 1 yr 9 mos
King of Prussia, Pennsylvania, United States

### Principal Power Electronics Engineer
Sep 2017 - Jan 2023 · 5 yrs 5 mos
Malvern, Pennsylvania, United States

### Senior Power Electronics Engineer
Jul 2016 - Aug 2017 · 1 yr 2 mos
Malvern, Pennsylvania, United States


**Princeton Power Systems**
3 yrs 4 mos

### Senior Engineer - Mechanical Group Manager
Jul 2014 - Jun 2016 · 2 yrs
Lawrenceville, NJ

Principle Engineer for DRI-10, GTIB-30 and bi-directional charging station (CA30/CA15/CA10) product lines. Lead development for product lines in...

### Electrical Engineer
Apr 2013 - Jun 2014 · 1 yr 3 mos
Lawrenceville, NJ

As a member of the Engineering Team at Princeton Power Systems I assist in both electrical and mechanical design for various projects. I am the Produc...

### Engineering Consultant
Mar 2013 - Mar 2013 · 1 mo

Work remotely with a project team to assist in the completion of key circuit boards.


### Junior Engineer
Souriau
May 2010 - Jan 2013 · 2 yrs 9 mos
York, Pennsylvania

Developed Integrated PCB Designs for Cable Assemblies
Mechanical, Electrical and Chemical Testing

### Intern
Mount Joy Wire
Jun 2007 - Aug 2007 · 3 mos

Production Line Quality Control and RMA Tracking
Product Material Testing...


**Maintenance Worker**
Philhaven Hospital
Jun 2006 - Aug 2006 · 3 mos

General Building Maintenance and Landscaping

## Education


**Messiah University**
B.S. Engineering, Electrical & Mechanical
2009 - Dec 2012


**Embry-Riddle Aeronautical University**
BE, Aerospace Engineering

 

     
Home   My Network   Jobs   Messaging   Notifications   Me ▾   For Business ▾

 
Retry Prer
month fre

 **Anthony Calabro**
Chief Product Officer at InductEV Wireless Char...

( More )   ( Message )   Connect

←   Experience

 **InductEV** 
10 yrs 1 mo

### CTO & Chief Product Officer
Full-time
Nov 2022 - Present · 1 yr 11 mos
Philadelphia, Pennsylvania, United States

**Skills:** Electric Vehicles · Electrification · Wireless charging · Charging · Vehicle charging · Chargers · Product Strategy

### CTO
Full-time
Nov 2021 - Dec 2022 · 1 yr 2 mos

Momentum Dynamics is the global leader, developer and technology provider of fast, efficient autonomous wireless charging systems for all types of electrical vehicles including automobiles, buses, last-mile delivery, heavy trucks, and industrial equipment.

**Skills:** Electric Vehicles · Electrification · Wireless charging · Charging · Vehicle charging · Chargers · Product Strategy

### Vice President of Software Systems
Aug 2017 - Nov 2021 · 4 yrs 4 mos
Malvern, PA

**Skills:** Electric Vehicles · Electrification · Wireless charging · Charging · Vehicle charging · Chargers

### Principal Software Engineer
Sep 2014 - Aug 2017 · 3 yrs
Malvern, Pa

Momentum Dynamics' high-power wireless charging system delivers energy to electric vehicles via induction ten times faster than plug-in chargers and can help accelerate consumer EV adoption.

**Skills:** Electric Vehicles · Electrification · Wireless charging · Charging · Control Systems · Vehicle charging · Chargers

 ### Principal Software Engineer
Humanistic Robotics, Inc
Jul 2012 - Sep 2014 · 2 yrs 3 mos
Philadelphia, pa

**Skills:** Electrification · Control Systems

### Software Engineer
Lockheed Martin Space Systems Company
2009 - Jul 2012 · 3 yrs 7 mos
Newtown, Pa

Software Engineer

**Skills:** Control Systems

 ### Embedded Software Engineer
Lockheed Martin
Jan 2006 - Jul 2012 · 6 yrs 7 mos

Software Engineer

Brian Wisniewski commented on a post • 6mo

Congratulations Ben!

Show all comments →

## Experience

 **Senior Embedded Software Engineer**
Lockheed Martin · Full-time
Mar 2023 - Present · 1 yr 7 mos

 **Momentum Dynamics**
Full-time · 1 yr 10 mos

**Senior Embedded Software Engineer**
May 2022 - Feb 2023 · 10 mos
United States

**Embedded Software Engineer**
May 2021 - May 2022 · 1 yr 1 mo
Malvern, Pennsylvania, United States

 **LHP Engineering Solutions**
6 yrs 3 mos
Columbus, IN

**Senior Software Engineer**
May 2015 - May 2021 · 6 yrs 1 mo

Accountable for developing software solutions for highly technical
challenges that face LHP's diverse clientele utilizing modern technology,...

**Embedded Controls Intern**
Mar 2015 - May 2015 · 3 mos

As part of my internship, I completed an intensive 6 week apprenticeship in
embedded control systems specifically related to the automotive industry...

 **Teaching Assistant**
Lehigh University
Sep 2013 - Jan 2015 · 1 yr 5 mos
Packard Laboratory

ME 242: System Dynamics & ME 343: Control Systems
As a teaching assistant at Lehigh Universities, I gained invaluable experienc...

 **Temple University**
1 yr 5 mos
Greater Philadelphia Area

**Teaching Assistant**
Sep 2011 - Sep 2012 · 1 yr 1 mo

Assisted teaching freshman engineering students introduction to
engineering prototyping, including elementary SolidWorks CAD software...

**Undergraduate Lab Technician**
May 2011 - Sep 2011 · 5 mos

As an engineering lab technician, I had the unique opportunity to be one of
two students who worked closely with university personnel to reinvent...

 **News Center**
It is one thing as an engineering freshman to learn to
concepts of civil, electrical and mechanical engineering;...

Show all 9 experiences →

(8) Experience | FRANK MCMAHON | LinkedIn

          

 **FRANK MCMAHON**
SVP, Research & Development at Momentum ...

More  | ⏱ Pending  | Message

← Experience

 **Momentum Dynamics**
7 yrs 1 mo

### SVP, Research & Development
Full-time
Jul 2020 - Present · 4 yrs 3 mos
Malvern, Pennsylvania, United States

InductEV, formally known as Momentum Dynamics, develops high power inductive charging systems and technologies for the automotive and transportation industries. Its proven Wirelesss Power Transfer (WPT) technology allows electric vehicles to be connected to the electrical power grid without the use of cables or wires and can safely transmit electrical energy through air, water, and ice at power levels ranging from tens of kilowatts to hundreds of kilowatts.

Served as the head of Research & Development, directing a team of engineers and technicians in developing advanced technologies for incorporation into the InductEV high power inductive charging product portfolio, including:
- Inductively coupled communication system
- Integrated antennas
- Vehicle alignment systems
- Artificial Intelligence (AI)
- Machine Learning (ML)
- Sensor Fusion
- Thermal Imaging
- High-power inductive charging coil
- Thermal management
- Synchronous rectification electronics
- Foreign Object Detection (FOD)
- Living Object Detection/Protection (LOD/LOP)
- Electromagnetic modeling
- Cost reduction technologies (molding, casting)

Served as the Technical Lead and strategist for InductEV Intellectual Property (e.g. patents, trade secrets)

Served as the Technical Lead and strategist for InductEV Standards efforts

Developed strategy and directed efforts for Radio Frequency (RF) emissions testing (conducted and radiated) of the high-power WPT system for compliance with US and EU regulatory requirements

Developed a Systems Engineering organization within Momentum Dynamics that focuses on formal generation and management of system architectures and requirements for the product portfolio.

**Skills:** Leadership · Reliability · Simulations · Collaborative Style · Problem Solving · Agile & Waterfall Methodologies · Engineering Leadership · Prototyping · Engineering · Design for Manufacturing · Strategic Thinking · Cross-functional Team Leadership · Annual Budgeting · Critical Thinking · Executive Management

### Vice President Research And Development
Full-time
Dec 2018 - Jul 2020 · 1 yr 8 mos
Malvern, United States

**Skills:** Engineering Management · Leadership · Reliability · Simulations · Collaborative Style · Problem Solving · Agile & Waterfall Methodologies · Engineering Leadership · Prototyping · Engineering · Research and

Development (R&D) · Design for Manufacturing · Strategic Thinking · Cross-functional Team Leadership · Annual Budgeting · Product Development · Critical Thinking · Executive Management · System Architecture · Technical Leadership

### Director, Research & Development

Full-time
Apr 2018 - Dec 2018 · 9 mos
Malvern, PA

Skills: Engineering Management · Leadership · Reliability · Simulations · Collaborative Style · Problem Solving · Design Documents · Agile & Waterfall Methodologies · Engineering Leadership · Prototyping · Engineering · Research and Development (R&D) · Design for Manufacturing · Strategic Thinking · Cross-functional Team Leadership · Annual Budgeting · Product Development · Critical Thinking · Printed Circuit Board (PCB) Design · System Architecture · Technical Leadership

### Senior Product Realization Engineer

Sep 2017 - Apr 2018 · 8 mos
Malvern, PA

Joined MDC in September 2017 as a Senior Product Realization Engineer responsible for taking the conceptual ideas for an inductively coupled communications link and developing it into a mature product. The equipment enables secure, low-latency, point-to-point full-duplex communication between the power delivery electronics and the vehicle electronics.

Skills: Leadership · Simulations · Collaborative Style · Problem Solving · Design Documents · Agile & Waterfall Methodologies · Engineering Leadership · Prototyping · Engineering · Research and Development (R&D) · Design for Manufacturing · Product Development · Critical Thinking · Printed Circuit Board (PCB) Design · Technical Leadership

### Invested Time in Family and Community

Dec 2014 - Aug 2017 · 2 yrs 9 mos
Malvern, PA

Invested time in raising my teenage children, encouraging and facilitating their interests in music, scouting, church, sports, and service activities. Provided cultural opportunities for them via international travel. Hiked and backpacked domestically.
Volunteer with Boy Scouts of America: Committee Member, Religious & Service Coordinator, Assistant Scoutmaster, Merit Badge Counselor, Quartermaster
Participated in and provided technical guidance for numerous Eagle Scout projects that benefited local schools, churches, animal shelters, parks, and trails.


### Director, Systems Engineering & Architecture

TruePosition
Jul 2007 - Nov 2014 · 7 yrs 5 mos
Berwyn, PA

Served as Director of Systems Engineering & Architecture within the Product Development organization. Directed team of highly-skilled systems engineers in developing use cases from feature or product-level requirements and turning them into specific system and component requirements for hardware and software teams to implement.

- 2014 Leadership Award
- Product ideation and concept development
- User story and use case development
- Specifications and requirements generation for network servers, mobile phones, and custom HW
- Test cases and analysis for product verification
- UMTS, LTE, CPRI, E-CID
- Agile and "waterfall" project management environments
- Customer focus

Rejoined TruePosition as Principal Systems Engineer in July 2007, tasked with

         

Home   My Network   Jobs   Messaging   Notifications   Me ▾   For Business ▾   Retry Prem month fre



## Jason Stolnis ✅ · 2nd
VP, Engineering at InductEV



- InductEV



- Drexel University

West Chester, Pennsylvania, United States · Contact info

500+ connections

 Maria Tabbut, Ryan Taggart, and 13 other mutual connections

Connect    ( Message )    ( More )

## Highlights

 **You both worked at InductEV**
You both worked at InductEV from June 2021 to September 2022

 ( 🔒 Message )

## About

Experienced Project Engineer and Systems Engineering Manager with a demonstrated history of working in the aviation and aerospace industry. Skilled in Systems Engineering, Project Engineering, Project Management and Engineering Management. Strong engineering professional with a BS focused in Electrical and...

## Activity
698 followers

Jason Stolnis commented on a post · 6mo

Great to have you onboard Jason! Welcome to the team

Jason Stolnis commented on a post · 7mo

Congrats Brett

Show all comments →

## Experience

 **InductEV**
4 yrs 8 mos

### VP of Engineering
Full-time
Nov 2022 - Present · 1 yr 11 mos

♡ Contract Requirements

### Director, Systems Engineering
Full-time
Nov 2021 - Nov 2022 · 1 yr 1 mo
Malvern, Pennsylvania, United States

♡ Contract Requirements

### Principal Systems Engineer
Feb 2020 - Nov 2021 · 1 yr 10 mos



### Boeing
17 yrs 2 mos

### H-47 Chinook Systems Engineering Manager
Full-time
Apr 2017 - Feb 2020 · 2 yrs 11 mos
Greater Philadelphia Area

Managing team of 18 Systems Engineers supporting the H-47 Chinook
helicopter program. Supporting all phases of the program lifecycle;...

♡ Contract Requirements

### H-47 System Safety Engineering Manager
Oct 2016 - Apr 2017 · 7 mos
Philadelphia, PA

Managing the team of system safety engineers on the H-47 Chinook
spanning development, production and fleet sustainment programs. Ensur...

♡ Contract Requirements

### Project Engineer - Multi-Disciplinary
Full-time
2003 - Apr 2017 · 14 yrs 4 mos
Philadelphia, PA

September 2012 - Present
Project Engineer for US Army CH-47 Block II development program. ...

♡ Contract Requirements

### Intern & Assistant Audio Engineer
Big Sky Audio
1997 - 2000 · 3 yrs

## Education



### Drexel University
BS, Electrical and Electronics Engineering
1998 - 2003

## Skills

### Contract Requirements
 5 experiences across InductEV and 2 other companies

### Engineering
Endorsed by David Gambill and 2 others who are highly skilled at this



Amardent - Our Products
amardent.com

7C                                                              6 comments

Jerry Frank reposted this • 9mo

So proud of my kids new product! He's on the way to changing dentistry! For the good!

Amardent - Our Products
amardent.com

16                                                              3 comments

Show all posts →

## Experience

 **Senior Electrical Engineer**
DPI UAV Systems
Jan 2023 - Present · 1 yr 9 mos
Philadelphia, Pennsylvania, United States

Extending humanity's reach with unmanned helicopters.

 **Momentum Dynamics**
Full-time · 3 yrs 4 mos

**Manager of Electrical Engineering**
Jan 2020 - Jan 2023 · 3 yrs 1 mo
Malvern, PA

Working on the next generation in wireless charging for the transportation market.

**Principal Electrical Engineer**
Oct 2019 - Jan 2020 · 4 mos

**Sr. Pulse Power Engineer**
Silicon Power Corporation
Dec 2017 - Oct 2019 · 1 yr 11 mos
Malvern, PA

Design and develop high voltage pulse power equipment for commercial, industrial and military application.

 **Advanced Plasma Solutions Co. Inc**
3 yrs 2 mos
Malvern, PA

**Senior High Voltage Systems Engineer**
Dec 2015 - Nov 2017 · 2 yrs

Responsible for the design and implementation of power systems for non-thermal plasma reactors. This includes gliding arc, dielectric barrier...

**High Voltage Systems Engineer**
Oct 2014 - Nov 2017 · 3 yrs 2 mos

Design power systems for non-thermal plasma processing equipment.

**Electronics Engineer**
Performance Controls, Inc.
May 2012 - Oct 2014 · 2 yrs 6 mos
Montgomeryville, PA

Design and develop power electronics in support of precision motion control systems and world class MRI gradient amplifiers. ...



### Sr Mechatronics Engineer
Burro · Full-time
Jun 2023 - May 2024 · 1 yr
Philadelphia, Pennsylvania, United States · On-site



### Mechanical Design Engineer
Kratos Defense and Security Solutions · Full-time
Nov 2022 - Jun 2023 · 8 mos
Dallastown, Pennsylvania, United States · On-site



### InductEV
7 yrs 7 mos

#### Mechanical Engineer
Full-time
Jan 2020 - Jul 2022 · 2 yrs 7 mos
Malvern, Pennsylvania, United States

• Led a multidisciplinary team through design, testing, and manufacture of several new IP68 thermal imaging and wireless power management...

♡ Design for Manufacturing, Computer-Aided Design (CAD) and +11 skills

#### Mechanical Engineering Co-op
2017 - 2020 · 3 yrs
Malvern, Pennsylvania, United States

• Designed, tested, and manufactured vehicle based IP67 high-power management and control modules....

♡ Computer-Aided Design (CAD), Product Management and +8 skills

#### Mechanical Engineering Intern
2015 - 2017 · 2 yrs
Malvern, Pennsylvania

• Worked in Solidworks routing low voltage and high voltage wiring for on vehicle charging units ...

♡ Computer-Aided Design (CAD), SOLIDWORKS and +9 skills

## Education



### Rochester Institute of Technology
Bachelor's Degree, Mechanical Engineering
2014 - 2019

♡ Arduino IDE, Confluence and +8 skills

## Licenses & certifications

### OSHA 30
360training
Issued Jun 2022

### EIT
Pennsylvania State Registration Board for Professional Engineers
Issued Mar 2021

## Projects

**Dividr**
Feb 2016 - Jun 2018

 **Senior Technician - Product Testing and Development**
Greene Tweed · Full-time
Jan 2024 - Present · 9 mos
Kulpsville, Pennsylvania, United States · On-site

**InductEV (momentum dynamics)**
Full-time · 2 yrs 7 mos
Malvern, Pennsylvania, United States

**Lead Technician/production**
Dec 2022 - Jan 2024 · 1 yr 2 mos
On-site

• Direct and manage a production team of 15 members, ensuring a 95% on-time delivery rate of specialized wireless electronic systems. ...

♡ Engineering, Wire and +1 skill

**Field Technician /Manufacturing Technician**
Jul 2021 - Jan 2024 · 2 yrs 7 mos

Commission and maintain 15 wireless charging sites around the country and provided highly technical troubleshooting for customers and other field...

 **Fatigue and Fracture Technician**
Laboratory Testing Inc. · Full-time
Aug 2019 - May 2022 · 2 yrs 10 mos
hatfield

-Troubleshoot, service and repair hydraulic pumps and servo hydraulic test frames. To include making cables and troubleshooting electronic controller...

 **Hydraulic Technician**
Chant Engineering Co. Inc.
Sep 2018 - Aug 2019 · 1 yr
chalfont

- Build hydraulic, mechanical and electrical components to engineering prints...

 **Maintenance Technician**
Penn Color, Inc.
Jul 2018 - Sep 2018 · 3 mos
Hatfield

Handle all request by supervisors or crew members for machines that have had issues. Diagnose and repair electrical, hydraulic and mechanical issues...

Show all 9 experiences →

## Education

 **Montgomery County Community College**
Bachelor of Engineering - BE, Electrical and Electronics Engineering
Aug 2022 - Aug 2025
Grade: 3.4

 **Lansdale School of Business**
Associate's degree, Network and System Administration/Administrator
2013 - 2016

Classes: network security, Active directory, windows server, network infrastructure, SQL, computer hardware, adobe InDesign, accounting, writt...

## Licenses & certifications

 **CompTIA A+**
CompTIA

 

       

Home    My Network    Jobs    Messaging    Notifications    Me ▾    For Business ▾    Retry Prer month fre



**Diana Wilmes, SHRM-CP**
Director of People at InductEV, Inc.

( More )    Message

← **Experience**



**InductEV**
5 yrs 6 mos

**Director of People Operations**
Full-time
Jul 2023 - Present · 1 yr 3 mos
King of Prussia, Pennsylvania, United States · Hybrid

**Skills:** Employee Counseling · Confidentiality · Employee Management ·
Emotional Intelligence · Operations · Organization Skills · LOA ·
Compensation · Reporting

**People Ops Manager**
Full-time
Jan 2023 - Jul 2023 · 7 mos
King of Prussia, Pennsylvania, United States

**Skills:** Employee Counseling · Communication · Employee Benefits ·
Confidentiality · Employee Management · Emotional Intelligence ·
Operations · Organization Skills · LOA · Human Resources Information
Systems (HRIS) · Compensation · Reporting · U.S. Family and Medical Leave
Act (FMLA)

**Senior Human Resources Generalist**
Full-time
Dec 2022 - Jan 2023 · 2 mos

**Skills:** Communication · Employee Benefits · Confidentiality · Employee
Management · Emotional Intelligence · Organization Skills · LOA · Human
Resources Information Systems (HRIS) · Reporting · U.S. Family and Medical
Leave Act (FMLA)

**Operations & HR Generalist**
Full-time
Nov 2021 - Dec 2022 · 1 yr 2 mos
United States

**Skills:** Communication · Employee Benefits · New Hire Orientations ·
Confidentiality · Emotional Intelligence · Organization Skills · LOA · Human
Resources Information Systems (HRIS) · Reporting · U.S. Family and Medical
Leave Act (FMLA)

**Operations & HR Coordinator**
Apr 2019 - Nov 2021 · 2 yrs 8 mos

**Skills:** Communication · Employee Benefits · New Hire Orientations ·
Confidentiality · Emotional Intelligence · Organization Skills · LOA · Human
Resources Information Systems (HRIS) · Reporting · U.S. Family and Medical
Leave Act (FMLA)



**Accounts Payable Specialist**
IMA Consulting
Jul 2017 - Dec 2018 · 1 yr 6 mos
Chadds Ford, Pennsylvania

(Acquired by Revint Solutions)

**Skills:** Communication · Confidentiality · Organization Skills



**Accounts Payable Specialist**
Revint Solutions



# Payroll Status Change Request Form

**Momentum** Wireless Power

Employee Name: **Taylor Johnson**          Employee #: **241**

**Employment/Compensation Change:**

| New Hire | ☑ Promotion | ☐ Termination |

☑ Merit Increase      ☐ Re-Evaluation of Job      ☐ Voluntary   ☐ Involuntary

☐ Bonus      ☐ Increased Responsibilities      ☑ Other _____

☐ Leave

☐ FMLA      ☐ STD      ☐ LTD      ☐ Military

**Current Annual Salary/Hourly Rate:** ▰▰▰▰

**Hourly Rate/Bi-Weekly Change:** From: ▰▰▰      To ▰▰▰      Eff. Payroll Date: **05/14/2021**

☑ Hourly      ☐ Biweekly

**Current Annual Salary/Hourly Rate:** _____

**Hourly Rate/Bi-Weekly Change:** From: ____      To: ____      Eff. Payroll Date: ____

☐ Hourly      ☐ Biweekly

**Bonus Amount:** _____

**Job Title Change:**      To: _____      Eff. Date: _____
**Dept. Change:**      To: _____      Eff. Date: _____

**Part Time/Full Time Change:**      ☐ Part time to Full time      ☐ Full time to Part time

Effective Payroll Date: _____

**Supervisor Change:**      From: ____      To: ____      Eff. Payroll Date: ____

**Comments:**

Approved (increase+promotion t▰▰▰ additional per hour); _____

_____

_____

**Approval Signature:** See Signed Docusign - SignedEE Comp Merit Inc FORAPPROVAL PDF - Approved April 2021
Title _____      Date: _____

| From: | Patti Rensel |
|---|---|
| To: | Diana Wilmes |
| Subject: | pay increases eff 11 /21 and for payroll today |
| Date: | Monday, December 5, 2022 10:54:24 AM |
| Attachments: | Salary increases on 12 5 effective 11 21 for payroll .xlsx |

The attached pay increases have been approved, effective 11/21 and to be implemented today.

**REDACTED**

Taylor Johnson, title change to Warehouse and Logistics Lead,

**REDACTED**

Please let me know if you have any questions.  Please don't change Bamboo HR for **REDACTED** Taylor and don't change their signatures until I get back to you.  Thanks

**Patti Rensel**

**HR, Director**

**O: 484-320-8222 ext. 156**

**M: 609-980-9339**

**InductEV™**

**Wireless EV Charging**

f/k/a Momentum Dynamics

*Connect*  LinkedIn | Website | Newsletter

*Media*  Taxis - NYTimes | Airport & Transit | Driver Experience

Confidentiality Notice: The information, and any attachments and/or documents, transmitted by this email is intended for the addressee only and contains information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender immediately.

  Home  My Network  Jobs  Messaging  Notifications  Me ▾ For Business ▾  Retry Prer month fre



## Jennifer Steiner · 2nd
Systems and Test Engineering Manager at InductEV



- InductEV



- Widener University

Conshohocken, Pennsylvania, United States · **Contact info**

440 connections

 Maria Tabbut, Ryan Taggart, and 10 other mutual connections

Connect    ( **Message** )    ( More )

## Highlights

 **You both worked at InductEV**
You both worked at InductEV from June 2021 to September 2022

 ( 🔒 Message )

## Activity
442 followers

**Jennifer hasn't posted yet**
Recent posts Jennifer shares will be displayed here.

Show all activity →

## Experience

 **InductEV**
4 yrs

### Systems and Test Engineering Manager
Full-time
Jan 2023 - Present · 1 yr 9 mos
On-site

♡ Strategic Thinking, Program Management and +5 skills

### Sustaining Engineering Manager
Full-time
Jan 2022 - Jan 2023 · 1 yr 1 mo

♡ Strategic Thinking, Program Management and +7 skills

**Technical Project Manager**
Oct 2020 - Jan 2022 · 1 yr 4 mos

♡ New Product Rollout, Strategic Thinking and +10 skills

---

**Senior Design and Developement Electrical Engineer**
Lutron Electronics
Jan 2014 - Oct 2020 · 6 yrs 10 mos

♡ Agile PLM, New Product Rollout and +14 skills

---

**Lutron Electronics**
4 yrs 8 mos

**Design and Development Engineer**
Jun 2010 - Jan 2013 · 2 yrs 8 mos

♡ Agile PLM, New Product Rollout and +11 skills

**Project Engineer**
Jun 2008 - Jun 2010 · 2 yrs 1 mo

♡ Agile PLM, Program Management and +3 skills

## Education



**Widener University**
Bachelor's degree, Electrical and Electronics Engineering
2004 - 2008

## Skills

**Agile PLM**

3 experiences at Lutron Electronics

**Program Management**

 6 experiences across InductEV and 2 other companies

Show all 48 skills →

## Interests

**Companies**   Schools


**Lutron Electronics**
90,178 followers

( + Follow )


**Widener University**
45,923 followers

( + Follow )

Show all companies →

Resource Allocation · Python (Programming Language) · Scrum · Microsoft Power BI · Quantitative Analytics · Business Strategy · Business Modeling · Program Management · Internet Security · Strategic Leadership · Software Deployment · Agile Leadership · Business Process · Stakeholder Engagement · Creative Problem Solving · Analytical Skills · Basic Accounting · Clear Communications · Operations Management · User Requirements · Technical Writing · Analytical Reasoning · Machine Learning · Team Building · Change Management · Walkthroughs · Critical Thinking · Presentation Skills · Communication

 **InductEV**
Full-time · 2 yrs 8 mos
Greater Seattle Area · Remote

### Principal Strategy Consultant
Oct 2019 - Jun 2020 · 9 mos

Demonstrated expertise in strategy and technology by providing cutting-edge insights on emerging technologies and cyber threats to enable the company to mitigate risks and bolster their competitive edge. Conducted in-depth research to deliver real-time information on innovative solutions, empowering the organization to make informed decisions and accelerate innovation.

Assessed the company's strategy and identified roadblocks faced by city and municipality customers, leading to the development of a sustainability framework that integrated environmental, social, and governance (ESG) considerations into the company's long-term strategy to enhance overall corporate responsibility.

Provided guidance on the utilization of data analytics tools to monitor and evaluate KPIs, enabling the company to make informed, real-time decisions to optimize strategic initiatives.

Performed in-depth trend analysis on EV van and truck adoption in a 400k vehicle fleet (1% EVs), resulting in productive discussions with 4 potential delivery partners, perfectly aligning with the company's expansion goals.

Provided strategic insights and recommendations for continued expansion into the EV bus market comprising 39% of 600k buses, leading to discussions with multiple municipal bus services laying the foundation for potential future partnerships.

**Skills:** Written Communication · Problem Solving · Business-to-Business (B2B) · Global Strategy · Operational Excellence · Product Management · Microsoft PowerPoint · Product Requirement Definition · Stakeholder Management · Analytics · Strategic Initiatives · Executive Support · Technical Proficiency · Innovation Management · Operations · Microsoft Office · Business Analytics · Cybersecurity · Performance Metrics · Product Marketing · Information Technology · Attention to Detail · Product Strategy · Data Visualization · Strategic Thinking · Product Cost Analysis · Financial Analysis · Process Improvement · Process Management · Strategic Marketing · Microsoft Excel · Quantitative Analytics · Business Strategy · Adaptability · Business Modeling · Strategic Leadership · Hardware Development · Business Process · Strategic Planning · Stakeholder Engagement · Pricing Strategy · Creative Problem Solving · Analytical Skills · Basic Accounting · Clear Communications · Business Development · Strategic Partnerships · User Requirements · Technical Writing · Analytical Reasoning · Technical Presentations · Key Performance Indicators · Teamwork · Management Consulting · Documentation · Venture Capital · Conflict Management · Interpersonal Skills · Critical Thinking · Go-to-Market Strategy · Presentation Skills · Communication

### Sr. Business Strategist
Nov 2017 - Oct 2019 · 2 yrs

Drove strategic initiatives to propel business growth and establish a competitive advantage. Assisted with comprehensive strategic planning efforts to develop and execute market entry strategies, resulting in successful company expansion.

Conducted in-depth market analysis and competitive intelligence to identify emerging trends and opportunities, enabling the company to attract new customers and achieve revenue growth.


**InductEV**
Full-time · 3 yrs 8 mos
On-site

### Director, Project Management Office
Nov 2021 - Mar 2023 · 1 yr 5 mos
Malvern, PA

Established a Project Management Office (PMO) at the company to define
and maintain industry best practice standards for project manag   ...see more

♡ Cross-functional Team Leadership, Resource Allocation and +18 skills

### Senior Technical Project Manager
Aug 2019 - Nov 2021 · 2 yrs 4 mos
Malvern, Pennsylvania, United States

Created, monitored, and controlled schedules and task activities for Gen 2
product development, field deployment, and production project   ...see more

♡ Cross-functional Team Leadership, Resource Allocation and +16 skills


**REALTOR®**
Long & Foster Companies
Feb 2018 - Sep 2020 · 2 yrs 8 mos
Doylestown, PA

The Long & Foster family consists of real estate professionals across the
Mid-Atlantic and Northeast, from North Carolina to New Jersey. It is a fami...

♡ Resource Allocation, Process Improvement and +9 skills


**Engineering Program Manager at Northrop Grumman**
Aerotek
Oct 2018 - Aug 2019 · 11 mos
Sykesville, MD

As a contractor through Aerotek, I worked at Northrop Grumman Power &
Control Systems in Sykesville, Maryland as an Engineering Program Manag...

♡ Cross-functional Team Leadership, Resource Allocation and +11 skills


**Cobham**
8 yrs 1 mo
Lansdale, PA

### Senior Manager, Electrical Engineering and Engineering Operations
2015 - 2017 · 2 yrs

Senior Functional Engineering manager for the Engineering Operations
department providing product development process management,...

♡ Cross-functional Team Leadership, Resource Allocation and +13 skills

### Engineering Project Manager, Lowell Business Transition
2014 - 2015 · 1 yr

Led the successful transition of the Engineering business from Lowell, MA to
the Lansdale, PA, San Jose, CA, Exeter, NH, and Clearwater, FL facilities....

♡ Cross-functional Team Leadership, Resource Allocation and +14 skills

### Manager, Test & Technical Support
2009 - 2014 · 5 yrs

Functional manager for the Test & Technical Support (TTS) Engineering
department providing line management and technical leadership resulting...

♡ Cross-functional Team Leadership, Resource Allocation and +9 skills



I'm happy to share that I'm starting a new position as User Acceptance Testing Specialist at Burro!

31

12 comments

Show all posts →

## Experience



**User Acceptance Testing Specialist**
Burro · Full-time
Feb 2024 - Present · 8 mos
Philadelphia, Pennsylvania, United States · Hybrid



**InductEV**
Full-time · 2 yrs 8 mos
Malvern, Pennsylvania, United States

**Field Service Lead**
Sep 2022 - Sep 2023 · 1 yr 1 mo
Hybrid

**Electro Mechanical Technician**
Feb 2021 - Oct 2022 · 1 yr 9 mos



**Maintenance Supervisor**
Timberlane, Inc. · Full-time
Feb 2016 - Nov 2019 · 3 yrs 10 mos
Montgomeryville, PA

♡ Preventive Maintenance, Maintenance & Repair and +3 skills

**Cell Technician**
Mars Drinks UK Limited · Full-time
Feb 2009 - Jan 2016 · 7 yrs
West Chester, Pennsylvania, United States

♡ Safety Management Systems, Training and +4 skills



**Brewery Mechanic**
Victory Brewing Company · Full-time
Aug 2007 - Nov 2009 · 2 yrs 4 mos
Downingtown, Pennsylvania, United States

## Education



**Montgomery County Community College**
Electrical and Electronics Engineering
2020 - 2022
Grade: 4.0



**Universal Technical Institute, Inc.**
Associate's degree, Automobile/Automotive Mechanics Technology/Technician
2008 - 2009
Grade: 4.0

Show all 3 educations →

## Skills

Troubleshooting



**Momentum.**
Wireless EV Charging

**JOB TITLE:** Mechanical Buyer

**JOB SUMMARY:** We are seeking a highly skilled, organized Mechanical Buyer to join our growing company. Your responsibility will be the development of approved suppliers and managing the procurement of mechanical parts, examples: low, medium, high precision machined parts that are milled or turned; castings, injection molding, movement devices, sheet metal, weldment fabrications, or anything else that is mechanical in nature. Excellent organizational skills combined with a proficiency in new technologies are highly valued in this position.

**ESSENTIAL FUNCTIONS/RESPONSIBILITIES:**

- Develop new suppliers and work with Engineering on new technologies.
- Act as primary interface for Momentum Dynamics to communicate to suppliers the needs and expectations of product quality, delivery performance and overall company goals.
- Manage suppliers to provide continuous quality, delivery, and cost improvements.
- Interface with Engineering to ensure an accurate and timely implementation of new parts, revisions, or other tasks required to source the item.
- Process purchase orders, requisitions, and requests for quote for mechanical components.
- Produce and maintain all reports.
- Arrange and attend meetings.
- Negotiate agreements with suppliers to provide continuous improvements in quality, delivery, cost, and collaboration.
- Generally, help with larger purchases, reviews, and inventory matters.
- Ability to independently develop solutions to complex or unique assignments involving Mechanical items.

**KNOWLEDGE, SKILLS AND ABILITIES:**

- Knowledge of mechanical production processes and volume purchases
- Must be proficient at matching a supplier capability to the drawing requirements
- Ability to read and interpret mechanical drawings of a complex nature
- Ability to quickly adapt to changing conditions and solve problems immediately
- Excellent documentation, report writing and communication skills

**EDUCATION AND EXPERIENCE:**

- 5 years of previous experience in procurement of custom mechanical parts
- Proficient computer skills, including Microsoft Office Suite
- Able to multitask, prioritize, and manage time efficiently
- Strong organizational skills
- Ability to physically stand, bend, squat, and lift up to 25-30 pounds

**TRAVEL REQUIREMENTS:**

- Negligible

Momentum Dynamics Corporation is the global leader in high-power wireless charging for electric vehicles. The company's proprietary magnetic induction system offers commercial and passenger electric and hybrid vehicles the ability to charge their batteries under all weather conditions with completely automatic operation. Drivers no longer need to plug their vehicles into a charging station, and can charge routinely to achieve a full charge, and also "opportunistically" while traveling from destination to destination to achieve longer vehicle driving ranges. Momentum's systems for electric vehicles have been demonstrated with multiple vehicle types and can be installed at prices comparable to Level 3 plug-in public chargers. This technology is compatible with today's electric vehicle technology but is designed to meet the needs of tomorrow's more advanced vehicles.



**Momentum**
Automated Wireless Charging

April 28, 2021

Mr. Harry Nask
30 Walden Way
Coatesville, PA 19320

Dear Harry,

We are pleased to offer you a position with Momentum Dynamics Corporation (the "Company"), as Senior Mechanical Buyer.  Should you decide to join us on the terms and conditions outlined in this offer, your anticipated official start date will be Monday, May 17, 2021.

The position of Senior Mechanical Buyer is an exempt position. Your initial Base Salary will be paid at the rate of ████████ biweekly payroll, annualized at ████████ per year. Your Base Salary will be payable in accordance with the Company's normal payroll procedures in effect at the time. The Company currently pays salary on a biweekly basis over 26 pay periods each year.

In addition, subject to the approval of the Company's Board of Directors and subject to you returning the signed Non-Disclosure, Non-Compete, and Confidential Information Invention Assignment Agreement on or before your start date, you will be eligible to participate in the Company's Incentive Stock Option (ISO) plan. The award and issuance of any stock options is subject to the availability of stock options and approval of the Company's Board of Directors and will be subject to the terms of all applicable plans and granting documents. You should note that the Company may modify job titles, salaries, and benefits from time to time as it deems appropriate.

The Company is excited about you joining and we look forward to a beneficial and productive relationship. Nevertheless, you should be aware that your employment with the Company is for no specified period and constitutes at-will employment. As a result, you are free to resign at any time, for any reason or for no reason. Similarly, the Company is free to conclude its employment relationship with you at any time, with or without cause, and with or without notice. We request that, in the event of resignation, you give the Company at least two weeks' notice.

The Company reserves the right to conduct background investigations and/or reference checks on all its potential employees as well as on any current employees prior to your start or periodically where such clearances are necessary for the Company's operations. Your job is therefore contingent upon a clearance of such a background investigation and/or reference check, if any.

For purposes of Federal immigration law, you will be required to provide to the Company documentary evidence of your identity and eligibility for employment in the United States. Such documentation must be provided to us within three (3) business days of your date of hire, or our employment relationship with you may be terminated.  Please bring with you on your first day your driver's license or U.S. Passport and original Social Security Card or other proof of your eligibility to work in the United States.

**Momentum Dynamics Corporation**
3 Pennsylvania Avenue, Malvern, PA 19355-2417 USA
484.320.8222

CONFIDENTIAL
Momentum Dynamics Corporation

We also require that you, if you have not already done so, disclose to the Company any and all agreements relating to your prior employment that may affect your eligibility to be employed by the Company or limit the manner in which you may be employed. It is the Company's understanding that any such agreements will not prevent you from performing the duties of your position and you represent that such is the case. Moreover, you agree that, during the term of your employment with the Company, you will not engage in any other employment, occupation, consulting or other business activity directly related to the business in which the Company is now involved or becomes involved during the term of your employment, nor will you engage in any other activities that conflict with your obligations to the Company. Similarly, you agree not to bring any third-party confidential information to the Company, including that of your former employer, and that in performing your duties for the Company you will not in any way utilize any such information.

As a Company employee, you will be expected to abide by the Company's rules and standards as they are communicated to you during your employment.

As a condition of your employment, you are also required to sign and comply with the attached Non-Disclosure, Non-Compete, and Confidential Information Invention Assignment Agreement (the "Agreement") that requires, among other provisions, the assignment of patent rights to any invention made during your employment at the Company, and non-disclosure of Company proprietary information.

In the event of any dispute or claim relating to or arising out of our employment relationship, with the sole exception of any claims for injunctive relief for violation or threatened violation of the Agreement), you and the Company agree that any and all such disputes (each an "Arbitrable Dispute") shall be fully and finally resolved by binding arbitration in Philadelphia, Pennsylvania before a single arbitrator pursuant to the American Arbitration Association Employment Rules for employment disputes. For the avoidance of doubt, an Arbitrable Dispute shall include, but is not limited to, disputes or claims regarding the terms and conditions of your employment with the Company, claims for harassment or discrimination and claims relating to the separation of your employment with the Company. You agree that, by arbitrating all Arbitrable Disputes, you are waiving any and all rights to a jury trial. Arbitration shall be conducted by a single neutral and the parties shall each bear their own costs and attorneys' fees. The Company and you further irrevocably consent to the jurisdiction of the state and federal courts located in the Commonwealth of Pennsylvania for the purposes of deciding any claim for injunctive relief for any violation or alleged violation of the Agreement.

Notwithstanding the foregoing, you will also be able to participate in the Company's benefit offerings as they exist from time to time and subject to the terms and conditions of each applicable plan. The Company's current offerings which will be available to you include the following:

- You will be eligible to participate in the Company's medical, dental, vision and other benefits as defined during onboarding.
- You will be eligible to participate in the Momentum Dynamics 401K plan, currently available through Vanguard.
- The Company will offer you 19 days of PTO and National holidays as defined in our employee manual.

CONFIDENTIAL

INDUCTEV INITDISCL019251

CONFIDENTIAL
Momentum Dynamics Corporation

To accept the Company's offer, please sign, and date in the space provided below, scan to judy.talis@momentumdynamics.com and return an original copy by regular mail or in person. We will also need a signed copy of the Agreement returned no later than Friday, April 30, 2021.

This letter, along with any agreements relating to proprietary rights between you and the Company, sets forth the terms of your employment with the Company and supersedes any prior representations or agreements including, but not limited to, any representations made during your recruitment, interviews or pre-employment negotiations, whether written or oral. This letter, including, but not limited to, it's at-will employment provision, may not be modified or amended except by a written agreement signed by the Chief Executive Officer of the Company and you. This offer of employment will terminate, without further action by the Company, if it is not accepted, signed, and returned by Friday, April 30, 2021.

We look forward to your favorable reply, and to working with you at Momentum Dynamics Corporation.

Very truly yours,

Andrew Daga, President and CEO

Accepted By: _____

Date: 4/28/21

Page 3 of 3

(6) Daniel Winters | LinkedIn



**Planning Intern**
Town of Ithaca · Internship
Jun 2024 - Aug 2024 · 3 mos
On-site

### Momentum Dynamics
Full-time · 3 yrs 7 mos

**VP, Supply Chain**
Aug 2022 - Feb 2023 · 7 mos

Set overall direction for Supply Chain collaboration in the Sales, Finance,
Operations, and Manufacturing Planning (S&OP) process...

**Supervisor, Purchasing & Inventory Control**
Aug 2019 - Aug 2022 · 3 yrs 1 mo
Malvern, PA

Set the vision and strategy for Demand Planning, Purchasing and Inventory
Control...



**Sr. Procurement Associate**
Witmer Public Safety Group, Inc
Nov 2017 - Aug 2019 · 1 yr 10 mos

Managed existing vendor relationships and fostered new partnerships
Maintained pricing and item details...



**Operations Intern**
Solidarity Bridge
Jan 2016 - May 2016 · 5 mos
Evanston, IL

Managed Inventory Optimization Project, including organizing and tracking
inventory and restructuring the use of space...

Show all 7 experiences →

## Education



**Cornell University**
Master's degree, City/Urban, Community and Regional Planning
Aug 2023 - May 2025



**Arizona State University**
Global Health
2014 - 2016

The BA in global health is a transdisciplinary degree program designed for
students who seek a broad and flexible set of skills for understanding...

## Volunteering

**Volunteer**
Jesus Nino Center -- Quito, Ecuador
Mar 2014 - Apr 2014 · 2 mos
Children

• Taught English to impoverished Spanish-speaking children
• Assisted teachers with classroom management ...

## Skills

**Military Training**

⚎ 2 endorsements



IEEE Transportation Electrification Certificate



1 page

34                                                                    3 comments

Daniel Schwartz posted this • 9mo

Science, data, and art coming together to create an incredibly cool and refreshing
take on conceptualizing electricity. ...                              ...show more

Watch electricity hit a fork in the road at half a billion frames per sec...
youtube.com

6

Daniel Schwartz reposted this • 10mo

InductEV is hiring a Data Analyst! This role will play a crucial part in analyzing and
extracting valuable insights from the extensive data sets generated by o  ...show more

**Data Analyst**
Job by InductEV
King of Prussia, Pennsylvania, United States (On-site)

11                                                                    3 comments

Show all posts →

## Experience



**InductEV**
Full-time · 2 yrs 9 mos

**Director of Customer Success**
Sep 2022 - Present · 2 yrs 1 mo
King of Prussia, Pennsylvania, United States

♡ Management, Business Development and +8 skills

**Manager of Technical Support**
Jan 2022 - Sep 2022 · 9 mos
Malvern, Pennsylvania, United States

♡ Business Initiatives, Management and +3 skills

**Field Service Manager**
GO2POWER · Full-time
Feb 2020 - Jan 2022 · 2 yrs
Feasterville Trevose, Pennsylvania

• Led field service and technical support operations for a $30M company,
supervising four internal technicians and over a dozen third-party...

♡ Business Initiatives, Management and +5 skills



Modular Inverter Startup
Technical Support: 267-525-4230 x4275 215-244-4201
x4263 Bypass Alarm and Trip Alarm Checks:...

**Applications Engineer**
Lutron Electronics
Jun 2017 - Feb 2020 · 2 yrs 9 mos
Coopersburg, Pennsylvania

- Successfully completed highly selective and intensive 10-month rotational
leadership program focused on developing project management, time...

♡ Business Initiatives, Management and +5 skills



2018 Lutron Construction Design and Development
Recruiting

**PTE 99 (02/16/2022 Text Message from Joren Wendschuh, ECF 15-49(p.2)).**

5/16/23, 10:27 AM     Case 2:23-cv-01438-GEKP-2022088ment 15-42ed Filed 05/16/23.jpg Page 2 of Box



# PTE 100 (Cohen's 2018 and 2019 Overall Manager Comments of B. Gallagher).

## 2019 ANNUAL PERFORMANCE MANAGEMENT



**Momentum**
Wireless Power

Manager evaluation

Bill works well with others in the organization. He interacts with a lot of different people and communicates well and has a generally positive attitude and good working relationships.

| AGILITY | Is readily adaptable to change and open to new ideas. Welcomes new or changing responsibilities, handles pressure well and can easily adjust or transition current plans to meet changing needs. |
| --- | --- |

Employee self-evaluation

I started at MD designing all parts of the wireless charging system. As we added personnel, my focus evolved to GA electronics design and development.

In early 2019, the need arose for a person to do system testing, design integration, and troubleshooting of all Gen II HW and SW. I gladly accepted that role, and (I think) did a decent job in adapting. I will gladly accept more responsibility in a managerial role of Testing and QA.

Manager commenting on employee's demonstration of above competency:

Bill has shown his willingness and capabilities in contributing to the company in many roles over the years. Even while system test, integration and troubleshooting was his main focus this year, he also supported GA design with the build, test and verification of new processor modules for the GA controller.

### OVERALL MANAGER COMMENTS:

Bill will be formerly taking over the test department in 2020 and I'm looking to Bill to develop standard Design and Production test plans, organize where to store test results, develop weekly test reports and generally make sure we are testing for as many hours a day as possible. I'm looking to Bill to take more responsibility for the testing drive the process more in 2020. We are integrating on vehicles with 350V, 450V, 540V and 730V nominal battery voltage systems and we need to do continuous testing at these voltages with varying air gaps and offsets. I'm looking forward to working with Bill to get the test department organized for successful design quality assurance in 2020. I'm also looking forward to having Bill work with Production to make sure appropriate production test setups and test plans are developed. Bill has put more safety features into our test setups and I'm looking to Bill to formalize those procedures including verifying proper assembly of new units prior to testing as much as is possible. We had a few failures in 2019 that were probably avoidable. This was not Bill's fault, but I'm looking to Bill to formally add another layer of procedure for testing new product. This may include working with our new SCM QA Manager to come up with production procedures and checklists as well as development procedures and checklists.

EMPLOYEE SIGNATURE: _____

MANAGER SIGNATURE: _____

DATE: 1 | 10 | 2020 _____

## 2018 ANNUAL PERFORMANCE MANAGEMENT



**Momentum**
Wireless Power

Manager evaluation

Bill is always even tempered and works well with the rest of the team. I would like to see Bill take more of a lead on test engineering in 2019. Bill has not really been performing at a Principal level. As a Principal Engineer, Bill could provide the focus on our test infrastructure. Working with the rest of the team to figure out what equipment we need and how we can automate more of our testing. In 2019 we will be moving to contract manufacturing and we could use a problem-solving engineer working to make our testing processes extensible to a contract manufacturer.

| INITIATIVE | Takes independent action including seeking out new responsibilities or opportunities. Supports an environment that encourages improvement, innovation and challenging traditional approaches. |
|---|---|

Employee self-evaluation

I have tried to seek out, take on, and complete design tasks as needed to help the team finish up the Gen II boards. To do this, I have had to come up to speed on the Gen II designs, and learn how to use OrCAD PCB Editor.

I am looking forward to integration, testing, and troubleshooting of the Gen II system. This is my favorite part of the design cycle – reaping the rewards of our labor – making and seeing the system work!

Manager commenting on employee's demonstration of above competency:

I would like to see Bill work with John W on the testing and debugging of the Gen II system. This would help in getting more focus on the design testing and get a head start on writing production test procedures and automating some of the production testing.

**OVERALL MANAGER COMMENTS:**

Bill has contributed in several areas in 2018 including design support for some of the Gen II board designs as well as some research in FOD. Bill has not been performing at a Principal level in 2018 and requires more supervision than should be necessary. I'd like to have Bill take a leadership role for our Design Verification testing/Debug as well as our Production Test infrastructure development in 2019, but this can be discussed in the review.

EMPLOYEE SIGNATURE: _____

MANAGER SIGNATURE: _____

DATE: 1/14/2019

**PTE 101 (04/03/2024 O. Jackson Dep. pp.
73(ll19)-75(ll23)).**

```
19        Q.      I'm gonna scroll down.  Okay.

20                I'm going to direct your attention to

21   paragraph 148.  Do you see that?

22        A.      Yes.

23        Q.      I'm going to read this paragraph.

24                Omar Jackson is a former black male

25   coworker who at the time held 20 years of experience
```

 1    and held roles beyond the requirements of the formal
 2    role, yet was only promoted after controversy
 3    surrounding hiring process for a senior technician.
 4              Did I read that correctly?
 5         A.    You read it correctly.  Yes.
 6         Q.    Do you agree with that statement?
 7         A.    I didn't get it until I started saying
 8    something.  Yes.  That's how I feel.  Yes.
 9         Q.    Okay.  Let's just take the statement
10    piece-by-piece.
11              You held 20 years of experience;
12    correct?
13         A.    Yes.
14         Q.    You held roles beyond that of your --
15    one second, please.  Strike that.  Okay.
16              You held roles beyond the formal
17    requirements of your position.
18              Do you know what plaintiff -- do you
19    know what Ms. Acey is referring to here?
20         A.    Like I guess she was thought I was doing
21    more at that job where I was doing.  I was asked to
22    do that work.  So that's the only thing I can think
23    of.  That's just my thought.
24         Q.    Did you feel that way at the time?
25         A.    Yeah.  I mean, when I said I needed the

Omar Jackson - by Mr. Longo

Page 75

1   raise, yeah.  I told you that from the door.  I told
2   you that I should have got that when I came through
3   the door.
4          Q.     Understood.
5                 But you didn't think that you were not
6   getting any raise; right?
7          A.     No.  I thought they were dragging their
8   feet.
9          Q.     Now, when Ms. Acey refers to
10  controversy, do you know what she's referring to?
11         A.     There was no controversy whether I was
12  gonna be a senior tech or not.  It was just when they
13  was gonna pay me.
14         Q.     So you're not aware of any controversy?
15         A.     No, because I talked to Joren
16  extensively about it.  He saw me working on it.
17         Q.     You testified earlier, in your view, you
18  were promoted because of your extensive experience;
19  right?  Because you work hard; right?
20         A.     Correct.
21         Q.     You made that clear to InductEV during
22  your time working for InductEV; right?
23         A.     Yup.

PTE 102 (04/03/2024 O. Jackson Dep. pp. 88(ll18)-94(ll19)).

| | |
|---|---|
| 18 | Q. Mr. Jackson, how long had you been |
| 19 | working for Momentum? I mean -- I'm sorry. |
| 20 | Mr. Jackson, you described asking to be |
| 21 | promoted to senior role; is that true? |
| 22 | A. Yes. |
| 23 | Q. Okay. How long had you been working at |
| 24 | M.D. before you first asked to be promoted? |
| 25 | MR. LONGO: Objection. Form. |

Omar Jackson - by Ms. Acey

Page 89

1      A.      Actually, I don't recall.

2      Q.      Are you aware if you had been working

3   there for more than three months before you asked to

4   be promoted?

5      A.      No.  I know I didn't ask that soon.

6      Q.      Okay.  When you first asked to be

7   promoted, what was the -- did you get a response from

8   management?

9      A.      Yes.  Jorge said he's working on it.

10     Q.      Did he give you any -- any indication

11  that there would be a delay?

12             MR. LONGO:  Objection.

13     A.      I can answer?

14     Q.      Yes.

15     A.      Was there gonna be a delay?  He said he

16  was working on it and talking to HR in the process

17  trying to get us raises.

18     Q.      Did he give you any reasons -- in

19  Joren's communications to you, did you perceive any

20  reason that your promotion would be delayed?

21             MR. LONGO:  Objection.  Form.

22     A.      No.  He just said he was trying to get

23  it done.

24     Q.      Okay.  I'd like to show -- I'm gonna

25  show Exhibit-55 that had been filed in this case as

Page 90

1    Document 15-59.  One second.  Okay.

2              So I'm gonna read what the exhibit is

3    showing from here.  It says:  Experience -- and again

4    this exhibit was filed -- I'm sorry.  I'm having some

5    trouble moving this tool bar.

6              It was filed May 16, 2023.  So going

7    back, it says:  Cleveland Cliffs, shift manager

8    October 2022 to present.  Is that where you work?  Is

9    that your role?

10        A.    Yes.

11        Q.    To both questions?

12        A.    That's not my role anymore.  I got

13   promoted.

14        Q.    Okay.  And then it also says -- so I

15   know you testified that you were promoted to senior

16   technician.  But is this date November 2019 to

17   October '22, is this accurate for how long -- is this

18   accurate for your start and end dates with Momentum?

19        A.    Yes.

20              MR. LONGO:  Objection to form.

21        Q.    Okay.  And then it shows under

22   education, RETS Electronics, industrial electronics

23   technologist.  Is this also what you see on this

24   exhibit?

25        A.    Yes.

Omar Jackson - by Ms. Acey

Page 91

1      Q.    Is that accurate?

2      A.    Yes.  I was a computer technician, as

3   well.

4      Q.    Okay.  Thank you.

5            Were you -- I'm gonna stop sharing this

6   exhibit.

7            Were you aware of the years of

8   experience that Seth Wolgemuth had?  Were you aware

9   how many years of experience Seth Wolgemuth had?

10           MR. LONGO:  Objection.  Form.

11     A.    No.

12     Q.    Do you know how many years of experience

13  Seth Wolgemuth had when he was promoted?

14           MR. LONGO:  Objection.  Form.

15     Q.    You can answer the question,

16  Mr. Jackson.

17     A.    I said, no.

18     Q.    All right.  I'd like -- I'm gonna start

19  showing I think it is called Document 20-9 from the

20  case record.  Please bear with me.

21           So this document was filed June 16,

22  2023.  It was produced by the defendant.  I believe

23  that to be the Bates number.  All right.

24           Mr. Jackson, I'm gonna read this.  And I

25  just want you to confirm if I'm reading it correctly.

Page 92

1          Ben, Andy and I discussed we should

2     promote both blank and Omar to senior technician; is

3     that correct?

4          A.     Yes.

5               MR. LONGO:  Objection.

6               Ms. Acey, can you identify who the email

7     is between?

8               MS. ACEY:  Sure.  This part of the

9     exhibit shows the email from Judy Talis to former CEO

10    Andrew Daga.  And I believe it was vice president of

11    engineering, Ben Cohen, and who is also Judy Talis'

12    brother.

13         Q.     Mr. Jackson, were you aware of any other

14    employees being promoted to senior technician around

15    that -- are you aware of any other employees being

16    promoted to senior technician?

17         A.     No.

18               MR. LONGO:  Objection.  Form.

19         Q.     I'm gonna scroll down further.  I'm

20    gonna scroll down to I guess this is -- I'm trying to

21    figure out where I want to start from.  Sorry, guys.

22               Okay.  So this part of the exhibit shows

23    an email from Joren Wendschuh sent to Ben Cohen on

24    September 2, 2021.  I'm gonna read this out loud and

25    I just want you to confirm if this is what you are

Omar Jackson - by Ms. Acey

Page 93

1    also seeing on your screen.

2              Ben, I'm recommending out of cycle

3    promotions for both blank and Omar J, based on the

4    conversation with yourself and Judy last week,

5    incrementing their titles to senior technicians.

6              Is that what you see on your screen?

7         A.    Yes.

8         Q.    The next paragraph says:  At least what

9    I'm seeing, Omar has been with us almost two years

10   now.  And with his experience, he would have been

11   brought in as a senior technician, had he not been

12   out of the market for a number of years.

13             Is that what you see on your screen?

14        A.    Yes.

15        Q.    I just want to hone in on this portion

16   of this email.

17             Do you know what Joren is referring to

18   when he says you were, "out of the market?"

19        A.    Yeah.  I wasn't in the field.  I took

20   myself out when I quit my job.

21             I was tennis coach for four years, three

22   years.  I wasn't working in the industry.  So when I

23   did get back into the industry, I was working odd

24   jobs.  So that was the first or second electronics

25   job I got.

Omar Jackson - by Ms. Acey

Page 94

1       Q.    So you're saying during this gap, were

2 you unemployed, or were you employed?

3       A.    I was you could say both, a little of

4 both. I was employed. Then I was unemployed. Well,

5 I was unemployed for some time, then I found some

6 work. And then it was -- it was odd jobs, like I

7 said. And then I found some work at this place

8 called Faro, F-A-R-O, Technology.

9       Q.    Is Faro Technology -- was Faro

10 Technology the employer that you had right before

11 going to InductEV?

12       A.    Yes.

13       Q.    How long did you work with them?

14       A.    A year.

15       Q.    Okay. So would you say at the time that

16 you applied to work with InductEV, you had 20 years

17 experience, or more than 20 years experience?

18       A.    Yes.

19       MR. LONGO: Objection. Form.

# PTE 103 (Descriptions of Senior and General Tech Roles with Resumes of O. Jackson and S. Wolgemuth)



**JOB TITLE:** Technician
**REPORTS TO:** Manufacturing Manager
**DEPARTMENT:** Productive Introduction
**JOB CATEGORY:** Technician

**JOB SUMMARY:**
Provides hands-on support in design and development efforts. Performs functions associated with all manufacturing operations, including working with engineers in set-up and calibration tasks, as well as performing rework and quality testing related to the production of parts, components, subassemblies and final assemblies. Develops and maintains methods, operation sequence and processes in the manufacture or fabrication of parts, components, subassemblies and final assemblies. Team member that contributes, advises and interfaces with engineering in coordinating the release of new products.

**ESSENTIAL FUNCTIONS/RESPONSIBILITIES**:
- Hands-on technical contributor for the hardware development organization.
- Collaboration with engineers throughout the Development, Test, Manufacturing, and Operations organizations to effectively identify and help resolve hardware design issues and assist in driving these issues to closure.
- Contribute in efforts to define and write test plans and reports.
- Develop and document fixes for equipment configuration issues and make recommendations for enhancements.
- Effectively document technical issues, test and measurement results, proposed solutions, etc.
- Develop and follow established processes and procedures.
- Participate in technical reviews.
- Provide regular status and progress towards milestones with team leads.
- Perform functional or parametric testing of electronic circuit boards or assemblies.
- Use schematic analysis combined with standard electronic test techniques to perform failure analysis and root cause determination to a component level.
- Perform component-level repair on these assemblies using both SMT and through-hole rework techniques.
- Assist the Engineering staff as necessary in the design, fabrication, or validation of new production test fixtures.

**KNOWLEDGE, SKILLS AND ABILITIES:**
- Ability to follow and assist in the development of processes and procedures.
- Ability to lead and motivate a team environment.
- Capable of reaching technical decisions within the scope of responsibilities.
- Must have ability to mentor and lead more junior technicians.
- Experience in cable design and assembly
- Proficient in use of small hand tools (e.g., pliers, screwdrivers, nut drivers)
- Able to troubleshoot independently to the component level, locating advanced manufacturing defects or defective components



- Test & debug electronics with an oscilloscope, multimeter, function generator and other electronic lab equipment.
- Build and rework prototype surface mount PCBA's, mixed-technology PCBA's and cable assemblies.
- Visually inspect work with a sharp eye for quality.
- Organize BOM's, order and manage electronic materials to support prototype builds.
- Create accurate written records of work.
- Maintain a clean, orderly and professional work environment and comfortable working in a shop/laboratory environment

**CORE COMPENTENCIES:**

- INNOVATION: Generates new and creative ideas, products or methods. Shows great initiative and will readily challenge the status quo. Not afraid to take professional risk and supports change and solves problems creatively.
- INTEGRITY: Is trustworthy and honorable, displays professionalism, discretion, and sound judgment. Deals with others in a straightforward and honest manner, is accountable for actions, maintains confidentiality and supports company values. Inspires trust and behaves in a way that earns and maintains the respects of others.
- QUALITY OF WORK: Maintains high standards and delivers on time what was promised while adding value beyond what was expected. Is attentive to detail and accuracy – does it right the first time. Looks for improvements continuously, seeks to find the root cause of any problems or issues in a commitment to excellence.
- TEAMWORK: Is an honest and dependable team player who contributes to group collaboration and shows empathy and respect for others. Builds and maintains good working relationships. Actively solicits feedback from peers and other team members when planning and making significant decisions. Provides insight and readily shares their knowledge and experience. As a leader understands and advocates that the best solutions come from working collaboratively – establishes an atmosphere of trust, championing issues and sharing successes.
- INITIATIVE: Takes independent action including seeking out new responsibilities or opportunities. Supports an environment that encourages improvement, innovation and challenging traditional approaches.

**EDUCATION AND EXPERIENCE:**

- Associates degree, completion of electronic technology certification, or equivalent technical experience.
- 8+ years' experience in a test environment for emerging technology.

**TRAVEL REQUIREMENTS:**

- Minimal travel.

INDUCTEV INITDISCL000261



**PHYSICAL REQUIREMENTS:**
- Must be able to lift, stand for periods of time and work in a  laboratory environment.

INDUCTEV INITDISCL000262



**JOB TITLE:** Senior Technician
**REPORTS TO:** Manufacturing Manager
**DEPARTMENT:** Productive Introduction
**JOB CATEGORY:** Technician

**JOB SUMMARY:**
Provides hands-on support in design and development efforts. Performs functions associated with all manufacturing operations, including working with engineers in set-up and calibration tasks, as well as performing rework and quality testing related to the production of parts, components, subassemblies and final assemblies. Develops and maintains methods, operation sequence and processes in the manufacture or fabrication of parts, components, subassemblies and final assemblies. Team member that contributes, advises and interfaces with engineering in coordinating the release of new products.

**ESSENTIAL FUNCTIONS/RESPONSIBILITIES:**
- Hands-on technical contributor for the hardware development organization.
- Collaboration with engineers throughout the Development, Test, Manufacturing, and Operations organizations to effectively identify and help resolve hardware design issues and assist in driving these issues to closure.
- Contribute in efforts to define and write test plans and reports.
- Develop and document fixes for equipment configuration issues and make recommendations for enhancements.
- Effectively document technical issues, test and measurement results, proposed solutions, etc.
- Develop and follow established processes and procedures.
- Participate in technical reviews.
- Provide regular status and progress towards milestones with team leads.
- Perform functional or parametric testing of electronic circuit boards or assemblies.
- Use schematic analysis combined with standard electronic test techniques to perform failure analysis and root cause determination to a component level.
- Perform component-level repair on these assemblies using both SMT and through-hole rework techniques.
- Assist the Engineering staff as necessary in the design, fabrication, or validation of new production test fixtures.

**KNOWLEDGE, SKILLS AND ABILITIES:**
- Ability to follow and assist in the development of processes and procedures.
- Ability to lead and motivate a team environment.
- Capable of reaching technical decisions within the scope of responsibilities.
- Must have ability to mentor and lead more junior technicians.
- Experience in cable design and assembly
- Proficient in use of small hand tools (e.g., pliers, screwdrivers, nut drivers)
- Able to troubleshoot independently to the component level, locating advanced manufacturing defects or defective components



- Test & debug electronics with an oscilloscope, multimeter, function generator and other electronic lab equipment.
- Build and rework prototype surface mount PCBA's, mixed-technology PCBA's and cable assemblies.
- Visually inspect work with a sharp eye for quality.
- Organize BOM's, order and manage electronic materials to support prototype builds.
- Create accurate written records of work.
- Maintain a clean, orderly and professional work environment and comfortable working in a shop/laboratory environment

**CORE COMPENTENCIES:**

- INNOVATION: Generates new and creative ideas, products or methods. Shows great initiative and will readily challenge the status quo. Not afraid to take professional risk and supports change and solves problems creatively.
- INTEGRITY: Is trustworthy and honorable, displays professionalism, discretion, and sound judgment. Deals with others in a straightforward and honest manner, is accountable for actions, maintains confidentiality and supports company values. Inspires trust and behaves in a way that earns and maintains the respects of others.
- QUALITY OF WORK: Maintains high standards and delivers on time what was promised while adding value beyond what was expected. Is attentive to detail and accuracy – does it right the first time. Looks for improvements continuously, seeks to find the root cause of any problems or issues in a commitment to excellence.
- TEAMWORK: Is an honest and dependable team player who contributes to group collaboration and shows empathy and respect for others. Builds and maintains good working relationships. Actively solicits feedback from peers and other team members when planning and making significant decisions. Provides insight and readily shares their knowledge and experience. As a leader understands and advocates that the best solutions come from working collaboratively – establishes an atmosphere of trust, championing issues and sharing successes.
- INITIATIVE: Takes independent action including seeking out new responsibilities or opportunities. Supports an environment that encourages improvement, innovation and challenging traditional approaches.

**EDUCATION AND EXPERIENCE:**

- Associates degree, completion of electronic technology certification, or equivalent technical experience.
- 8+ years' experience in a test environment for emerging technology.

**TRAVEL REQUIREMENTS:**

- Minimal travel.

INDUCTEV INITDISCL000258



**PHYSICAL REQUIREMENTS:**
- Must be able to lift, stand for periods of time and work in a  laboratory environment.

INDUCTEV INITDISCL000259

# Omar Jackson
Coatesville, PA

Authorized to work in the US for any employer

## Work Experience

### Senior Technician
Momentum Dynamics  -  Malvern, PA
November 2019 to Present

I'm a senior technician have a minimum dynamics young start up company. As the company grows on learning more and leading the other technicians and I see your tech. I was the lead technician on several of the projects here and continue to be the lead technician in my department

### Opto Techican
FARO Technologies  -  Exton, PA
November 2018 to Present

Build test and repair laser projectors.

### Assembler
LCR Embedded Systems, Inc  -  Norristown, PA
January 2018 to October 2018

Worked 8 months for assembly company

### Head Boys and Girls tennis coach
Bishop Shanahan High School  -  Downingtown, PA
July 2014 to October 2017

I became the head coach of the varsity girls and boys tennis teams at Bishop Shannahan High School. I was reponseable for two teams of kids with 25 kids per team.

### Sports Coordinator / Supervisor
YMCA  -  Coatesville, PA
June 2014 to May 2015

I created and supervied a youth tennis program for kids 15 years old and under. I also help coordinate the sports program and scheduling.

### Supervisor
CTDI
August 1995 to May 2014

Test and repaired units, surface mount and through hole
soldering, and troubleshot on component level before becoming supervisor of the modification department.I became supervised the modification department 2008-2014 that was my last six with the company. Lead a floor of 30+ people during day shift in the modification department.

Supervisor August 1995- May 2014
(Under Nathanial Whitaker 484-716-8980)

## Education

**Other**

## Skills

- LEADERSHIP SKILLS (Less than 1 year)
- Soldering
- Assembly Line
- Assembly Worker
- Clean Room
- Solder

## Certifications and Licenses

**Driver's License**

## Additional Information

SKILLS
❖ Works well with children
❖ Works well with others and works diligently in groups/teams
❖ Managing skills
❖ Leadership skills

# Seth Wolgemuth

Phoenixville, PA

## Work Experience

### Senior Technician
InductEV f/k/a Momentum Dynamics  -  Malvern, PA
October 2021 to Present

• Utilized previous experience and in depth product knowledge to support R&D,
Engineering, and manufacturing teams in process optimization and communicated opportunities for
product improvement and cost optimization.
• Supported engineering teams by drafting test and assembly processes for pilot systems transitioning
to manufacturing.
• Worked with business development and operations for assembly timelines as well as demonstrations
for training and advertisements to investors.
• Sat on the safety committee and coordinated with the company executives and facilities manager to
update company wide safety policies and implement facility updates.

### Electronics Technician
InductEV f/k/a Momentum Dynamics  -  Malvern, PA
May 2017 to October 2021

• Lead technician in fabrication, assembly, and testing of pilot and prototype electrical and mechanical
assemblies.
• Hands on PCB work, harness design, and assembly in automotive and commercial applications.
• On-site install and system service for OEM pilot systems for customers operating on a global scale.

### Electrical Apprentice
Nolt Electric Inc  -  Mount Joy, PA
August 2014 to May 2017

• Worked on-call support for multiple industrial facilities.
• Performed in solo and group electrical installations.
• Responsible for in-home service calls and fleet maintenance.

### Working Foreman
Wolgemuth Construction  -  Elizabethtown, PA
May 2013 to August 2014

• Managed multiple projects and day-to-day scheduling.
• Tasked in all phases of construction, remodeling, maintenance, and service..

### General Labor
Wolgemuth Construction  -  Elizabethtown, PA
January 2008 to August 2012

• Quickly learned and performed tasks in a cooperative team environment.
• Operated light and medium duty equipment for residential and commercial projects.

## Education

**Lower Dauphin High School**  -  Hummelstown, PA
September 2015 to March 2017

## Skills

- Innovation
- Collaborative Leadership
- Industrial Technology
- Fabrication Light and Medium Duty Equipment
- Power and Hand Tools
- Soldering Cable Harness Work
- Problem Solving
- Manufacturing
- 3D Printing
- Engineering Safety Compliance
- Documentation
- JHA and Root Cause Analysis
- Lean Manufacturing Construction
- Time Management
- Pneumatic Systems
- ESD Control

## Certifications and Licenses

**AED Certification**

**First Aid Certification**

**CPR Certification**

**PTE 104 (05/2021 and 09/2022 Hiring evaluations and Emails amongst CAO, VP Engineering and CEO, ECF 20-6 and 20-10).**



**Momentum**
Wireless Power

## Interview Evaluation Form

**Candidate Name:** Assata Acey

**Interviewer:** Benjamin Cohen

**Position:** PI Senior Technician

**Date:** 05/14/2021

---

1.) **Culture Fit:** Candidate's beliefs and behaviors align with the company's core values and company culture.

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect culture fit)

1 ☐   2 ☐   3 ☐   4 ☑   5 ☐

Please comment on the reason for your rating:

Assata has a very interesting background and interests. She seems to be very curious and is looking to work in a company that has technology that interests her. I believe her interest in finding better ways to do things would be a benefit to the Product Introduction team.

2.) **Skill/Competency Fit:** Do the skills the candidate will bring to the job align with the job competencies?

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect skillset)

1 ☐   2 ☐   3 ☐   4 ☑   5 ☐

Please comment on the reason for your rating:

I cannot speak directly to her technician skills, however, with her strong background in Physics and her experience in various types of lab environments, I believe she has the skills and competency required for this job.

3.) **Technical Fit:** Does this candidate have the technical aptitude needed to succeed in this position?

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect technical fit)

1 ☐   2 ☐   3 ☐   4 ✔   5 ☐

Please comment on the reason for your rating:

I did not directly test her on technician skills as other were doing that. Through our conversations, she seems to be a very intelligent person and has a very curious mind. I think she would make a good problem solver.

4.) **Overall Fit:** Average your ratings and please select yes or no on moving forward with this candidate.

Average Rating: 4

Yes ✔  No ☐

Overall Comments:

I would want to hear from the team on how she did with technician tasks, but I think she would be an asset to the Product Introduction team. Her long term goals are to be a "patent scientist" which I believe means that she enjoys solving problems in unique ways that can lead to patents. I think we should ~~also run her resume past Frank McMahon for his team if Product Introduction~~

INDUCTEV INITDISCL000152

| From: | Judy Talis |
|---|---|
| To: | Andrew Daga |
| Cc: | Ben Cohen |
| Subject: | RE: Draft promotion request - feedback appreciated. |
| Date: | Friday, September 3, 2021 3:11:09 PM |

Ben,

Andy and I discussed we would like to promote both Seth and ███ to Senior Technicians. They will get a 15% increase each. This will not impact their annual increase at all.

We can discuss on Tuesday about communicating the promotion.

Thanks,

Judy

**Judith Talis** | Chief Administrative Officer
Momentum Dynamics Corporation
*Fueling the Future of Electric Transportation*

3 Pennsylvania Avenue, Malvern, PA 19355
(M) 610.613.1449
www.momentumdynamics.com

Disclaimer and Confidentiality Notice: This email, and any attachments and/or documents linked to this email, are intended for the addressee and may contain information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender.

**From:** Andrew Daga <andrew.daga@momentumdynamics.com>
**Sent:** Friday, September 3, 2021 10:33 AM
**To:** Judy Talis <judy.talis@momentumdynamics.com>
**Subject:** Re: Draft promotion request - feedback appreciated.

I agree on both.

Are you in office today?  If not we can get on teams. I have my regular meeting with Tony Suflet at 11 this morning

**Andrew W Daga | President and CEO**
**Momentum Dynamics Corporation**
**Fueling the Future of Electric Transportation**
3 Pennsylvania Avenue, Malvern, PA 19355
(O) 484.320.8222  Extension 121
(M) 610.764.5491

Disclaimer and Confidentiality Notice: This email, and any attachments and/or documents linked to this email, are intended for the addressee and may contain information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender.

**From:** Judy Talis <judy.talis@momentumdynamics.com>

**Date:** Friday, September 3, 2021 at 9:47 AM
**To:** Andrew Daga <andrew.daga@momentumdynamics.com>
**Subject:** FW: Draft promotion request - feedback appreciated.

I agree we should promote Seth ▓▓▓▓. We can speak about this when you have a moment.
Thanks,
Judy

**Judith Talis |** Chief Administrative Officer
Momentum Dynamics Corporation
*Fueling the Future of Electric Transportation*

3 Pennsylvania Avenue, Malvern, PA 19355
(M) 610.613.1449
www.momentumdynamics.com

Disclaimer and Confidentiality Notice: This email, and any attachments and/or documents linked to this email, are intended for the addressee and may contain information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender.

**From:** Ben Cohen <ben.cohen@momentumdynamics.com>
**Sent:** Thursday, September 2, 2021 9:16 PM
**To:** Judy Talis <judy.talis@momentumdynamics.com>
**Cc:** Joren Wendschuh <joren.wendschuh@momentumdynamics.com>
**Subject:** Fwd: Draft promotion request - feedback appreciated.

Hi Judy,

I think Joren states this well.  I recommend we promote both ▓▓▓▓ and Seth.

**From:** Joren Wendschuh <joren.wendschuh@momentumdynamics.com>
**Sent:** Thursday, September 2, 2021 7:29 PM
**To:** Ben Cohen
**Subject:** Draft promotion request - feedback appreciated.

Ben,

I'm recommending out of cycle promotions for both Seth W. and ▓▓▓▓ based on the conversation with yourself and Judy last week, incrementing their titles to Senior Technicians.

██████████████████████████.

Seth has been with us for about 5 years - starting with us as a technician, he has greatly matured and currently is our SME on both GA and VA coil production, operating independently and providing guidance and training to our manufacturing team and CMs.  With his current level of experience and his intimate knowledge of our product, I feel he has certainly earned his spot as a senior tech here at MD.

Please feel free to ask any questions or follow up, but strongly encourage that we consider promoting both ████ and Seth.  I would like them to be recognized for their strong contributions to this company and their work efforts.   Thank you!

Sincerely,

Joren Wendschuh

CONFIDENTIAL                                             INDUCTEV INITDISCL000403

**PTE 105 (04/11/2024 A. Acey Dep. p. 88(ll2-ll19)).**

```
 2          Q.    Well, in the fourth section of this
 3    AA-9, the Interview Evaluation Form, it says
 4    that, "had a great attitude and personality,
 5    willing to be hands on, be here in person
 6    every day, which is what the team needs.
 7    Definitely seems to fit a engineering
 8    position instead of a senior tech role."
 9                Do you see that?
10          A.    Yes, I do.
11          Q.    Thoughts on that comment?
12          A.    No.   I mean, I think Ryan said the
13    same thing.   Rob Rosenberger says the same
14    thing, and HR saw all of these.   That's what
15    happened.
16          Q.    Well, do you know -- well, what was
17    the position you were interviewing for?
18          A.    I was interviewing for senior
19    technician.
```

**PTE 106 (12/2021 Company Handbook, p. 6 ("Equal Employment Opportunities"), AA-19).**



### EMPLOYMENT MISSION AND PHILOSOPHY

Momentum Dynamics Corporation ("Momentum" or the "Company") strives to provide a productive workplace for all of its employees. Momentum Dynamics seeks personnel who are committed to providing a superior product and service, following Momentum Dynamics' policies and procedures, respecting the rights of fellow employees, and creating a workplace free of harassment, discrimination, or other wrongdoing.

## GENERAL POLICIES

### EQUAL EMPLOYMENT OPPORTUNITIES

Momentum Dynamics is committed to a workplace free from discrimination and harassment, where employees treat each other with respect, dignity and courtesy. We provide equal employment opportunities to all employees and applicants for employment without regard to race, color, ancestry, national origin, gender, sexual orientation, marital status, religion, age, disability, gender identity, results of genetic testing, service in the military or other group or characteristic protected by law. Equal employment opportunity applies to all terms and conditions of employment, including hiring, placement, promotion, termination, layoff, recall, transfer, leave of absence, compensation, and training.

Any employees with questions or concerns about equal employment opportunities in the workplace are encouraged to bring these issues to the attention of the CEO. The company will not allow any form of retaliation against individuals who raise issues of equal employment opportunity. If an employee feels he or she has been subjected to any such retaliation, he or she should bring it to the attention of the CEO to be investigated and appropriate action, up to and including termination if found to be in violation of this policy.

### AMERICANS WITH DISABILITIES ACT (ADA) AND REASONABLE ACCOMODATION

Momentum Dynamics is committed to compliance with all state and federal laws providing for nondiscrimination in employment against qualified individuals with disabilities, including the Americans with Disabilities Act ("ADA"). To ensure equal employment opportunities to qualified individuals with a disability, the company will make reasonable accommodations for the known disability of an otherwise qualified individual, unless undue hardship on the operation of the business would result.

Employees who may require a reasonable accommodation should communicate their request to their supervisor. If the employee feels uncomfortable making the request to their supervisor, the request should be communicated to the CAO or designate. The company will require, where appropriate, the submission of relevant medical documentation up to and including a medical examination. Requests will be reviewed, and a decision will be made as soon as the company can reasonably ascertain eligibility.

6

**PTE 107 (12/2021 Company Handbook, p. 17 (bottom portion), AA-19).**



**Momentum®**
Wireless EV Charging

Upon hire, employees will receive information regarding the specific health and dental plans available and the necessary enrollment forms that must be completed and returned to Human Resources.

### CONTINUATION OF INSURANCE (COBRA)
The Consolidated Omnibus Budget Reconciliation Act (COBRA) entitles employees and their eligible dependents to continue health care coverage in specific situations. Employees should contact Human Resources regarding possible COBRA rights if their employment with Momentum Dynamics ends.

Under COBRA, employees should notify the Director of Human Resources if coverage is lost due to one of the following:

- The death of an employee's spouse covered under the health care coverage;
- Termination of spouse's employment (for reasons other than gross misconduct) or reduction in spouse's hours of the eligible employee;
- Divorce or legal separation of the eligible employee from the employee's spouse;
- The employee's spouse becomes eligible for Medicare; or
- Dependent children cease dependent status under the health care plan.

Employees, who choose continuation due to any reason listed above, are afforded the opportunity to maintain continuation coverage for 36 months, unless the employee lost group coverage because of termination of employment or reductions in hours. In that case, the required continuation coverage is 18 months.

An employee who elects continued coverage under COBRA is required to pay the full monthly premium plus an administration fee. The employee's continued coverage through Momentum Dynamics would cease when he/she may be covered for similar insurance under another group plan due to re-employment, re-marriage, Medicare, etc., or for failure to make monthly premium payments in the required plan time.

### 401(K) RETIREMENT AND SAVINGS PLAN
A 401(k) Retirement Plan is available, through payroll deduction, to full time and part-time (more than 1000 hours per year) employees.

- Minimum age: Twenty-one (21)
- Eligibility: Immediately

Eligible employees may enroll in the 401 (k) plan at any time at the rate of their choosing.  The employee may change this rate at any time up to the maximum dollar amount defined by the United States Internal Revenue Service (IRS).  There is currently a company match but the company reserves the right to implement or have no discretionary match as it may determine each year at its sole discretion.

**PTE 108 (12/2021 Company Handbook, p. 20 ("Short Term Disability"), AA-19).**



If and when workers' compensation is paid to an Employee for missed work time that has already been covered by paid leave (PTO), the Employee shall make payment of said workers' compensation to Momentum Dynamics.

Employees who have questions concerning the payment of worker's compensation benefits are encouraged to contact Human Resources.

**PARENTAL LEAVE**
The company parental leave policy provides for (5) five days of Parental Leave for new parents in addition to other paid leave. New fathers and adoptive/foster mothers and fathers are eligible to take this leave within 3 months of the birth or adoption/foster placement of a child. For birthmothers, any additional paid leave over the parental leave is covered under the company's Short-Term Disability (STD)/Long-Term Disability (LTD)policy and duration of the leave will be determined within the terms of the STD/LTD policy.

**SHORT TERM AND LONG-TERM DISABILITY (STD and LTD)**
Short-term and long-term disability benefits are provided at no cost to the employee. You are eligible for this benefit if you are classified by the company as a full-time employee who is regularly scheduled to work 30 hours per week and become disabled from a non-occupational injury or illness. Coverage is provided based on the terms of the insurance. For copies of the requirements and payments available please see Human Resources as soon as possible once a potential leave is identified.

After the claim's manager determines eligibility, the plan will provide a percentage of base salary for a determined time based on the plan requirements. PTO will not accrue while receiving benefits under this plan. Questions regarding eligibility and coverage under this plan will be determined by the benefits provider.

**BEREAVEMENT LEAVE**
Upon the death of an employee's child, spouse, parent, in-law, grandparent, grandchild, brother or sister, an employee will, upon request, be granted bereavement time off from work to attend to those matters which arise from and are directly related to the death of such relative. MD will pay full-time employees up to 3 days of bereavement time off. MD will pay part-time employees 1 day of bereavement time off. Requests for bereavement time off must be submitted to Human Resources, which may request confirmation of the need for leave under this policy.

**JURY DUTY LEAVE**
Employees called to serve on a jury panel must notify their supervisor within 24 hours after receiving jury duty notice and must provide a copy of their jury summons at that time. Employees will not suffer any loss of pay for a maximum of (2) two days per calendar year while on jury duty leave. Unless mandated by law, the remainder of the jury duty leave will be unpaid. To be paid for jury duty leave, the company requires proof of jury duty attendance. While on jury duty leave, the company expects that the employee will report to work on any day that the employee is released from jury duty before 1:00 P.M.

**PTE 109 (04/18/2024 A. Acey Dep. pp. 57-65, 93-98, 129(ll16)-130 (ll9), 242(ll10)-243(ll20)).**

1     A.     Okay.  So I did feel

2  embarrassed, and I did feel like there was a

3  large emotional component to what I

4  experienced.  Actually, we're not even -- at

5  this time and even at the beginning of my

6  disability, we were still unsure how big a

7  role stress played in a lot of my symptoms.

8            Actually, a lot of the

9  neuroscientists, the neurosurgeons I saw were

10 confused about how much of my symptoms were

11 affected by the pituitary gland and how much

12 of them were affected by stress and lifestyle,

13 things like that.

14     Q.     Is that the reason why you went

15 to see a therapist?  I think it's -- I

16 apologize -- Ms. Malloy?

17     A.     Ms. Chantele -- yeah,

18 Dr. Chantele -- Ms. Mallory, Mallory.

19     Q.     Mallory.

20     A.     M-A-L-L-O-R-Y.  No.  I went to

21 see her -- so I have this -- I always had like

22 a premise that if I was suicidal I would do

23 everything in my power to get support, and

24 that weekend I was suicidal, so I disclosed it

Page 58

1    to my doctor so I could be accountable to her,

2    and I went to therapy right away.  That was --

3    my first therapy session was June 22nd of

4    2022.

5              Q.    Okay.  And did the work you did

6    with Ms. Mallory address any issues that you

7    felt that you had visited upon you during your

8    employment at InductEV?

9              A.    Absolutely.  I think about 60

10   or more percent of the notes that were

11   disclosed in discovery are related to my

12   employment and my ability to cope with it,

13   and, yes.  Actually, I was on suicide watch

14   this week, and Dr. Flom increased my

15   medication yet again.  My husband has been

16   terrified, and he has been -- he took off this

17   week to stay home so that he could watch me

18   and keep me from driving because I have

19   intrusive thoughts.  So that is the truth of

20   it unfortunately.

21             Q.    Do you claim that that is

22   inspired because of what happened at InductEV

23   or because of issues associated with dealing

24   with the lawsuit?  Or do you see those as the

1   same?

2           A.      They're entrenched for me.

3           Q.      Well, let's separate out -- I

4   will agree with you that there are several

5   references in your doctor's notes, and I'm not

6   going to make those an exhibit because --

7           A.      I understand.

8           Q.      -- I don't feel they need to

9   float in the permanent -- but I will suggest

10  to you that there are repeated references in

11  the notes that you are experiencing stress or

12  some kind of anxiety because of things that

13  happened in the lawsuit or having to work on

14  the lawsuit; is that fair?

15          A.      Yes.

16          Q.      Okay.   Are you familiar with

17  having reviewed those notes where there is any

18  specific incident that occurred at work, for

19  example, dealing with Jorge or Brian Kenney or

20  Tom Hornberger or Judy Talis?

21                  Do you see any of those

22  reflected in the notes of, you know,

23  Ms. Mallory?

24          A.      So I think the notes from

1   August to -- let me try and make sure because
2   she did actually end up quitting, so I'm
3   trying to remember which January I'm trying to
4   talk about.

5              So, yeah, around that August up
6   to January of 2024, August 2022 to
7   January 2024, and then there was another
8   period between -- around the same time, so
9   it's kind of weird.  Between November of 2022
10  and March of 2023, because -- specifically
11  because January 2022, March 2023 is when I was
12  writing the Complaint.

13             And the reason that I struggled
14  with it is because when I write these I end up
15  reliving them.  And so the work that was done
16  on the case per se wasn't necessarily about --
17  in therapy about having emotions.  It was
18  about dealing with the memories and writing --
19  'cause I wrote the Complaint generally from
20  memory.  So dealing the memories of the things
21  that happened and dealing with the details.

22             And that came back again that
23  August of 2022 because -- oh, 2023, I'm sorry,
24  you guys -- because as we discussed, not in

1   the deposition, but the discovery was in a

2   different order.  There were conversations.

3   And so basically what I was doing is going

4   into painful things that I could remember,

5   words I could remember, dates I could

6   remember, and then searching for those dates

7   and reconstructing those transcripts.

8              And then when I would do that,

9   I would often think more of suicide, and I

10  would feel terrible about myself.  I didn't

11  think I'd be able to do it.

12             So from that time, I think

13  November of 2023, to January where I was able

14  to get out document 40, I was absolutely

15  battling with reading these things and feeling

16  them all over again and feeling like I was

17  there all over again.  I think she reckoned it

18  -- or likened it to PTSD.

19             Oftentimes I was told by my

20  therapist to take multiple breaks to practice

21  different coping skills.  It was bad.  I mean,

22  I was crying in front of my son.  It was

23  rough.  But, yeah, so that's why I would say

24  that had more to do with those memories in

Page 62

1    that those documents required me to engage

2    with those memories and not necessarily like

3    legal precedent and things like that.

4              Actually, I think that's around

5    the time I started getting medicated for the

6    depression, was around that August, September

7    of 2023, because of those thoughts.

8         Q.    Had you ever been diagnosed or

9    have you suffered from major depressive

10   disorder prior to your work at InductEV?

11        A.    No.

12        Q.    Do you believe or been

13   diagnosed that you suffered from anxiety prior

14   to working at InductEV?

15        A.    Yes, generalized anxiety.  It

16   was never considered serious enough to pursue

17   treatment, but it was on my file around the

18   time that I got reviewed for attention

19   deficit.

20        Q.    I'm going to show you a

21   document that has been marked -- and this way

22   we can refer to it without using it as an

23   exhibit -- in the lower right-hand corner it's

24   Bates stamped with a long word, but the number

Page 63

1  is 18789, in the lower right-hand corner.

2                    And I'll describe it while you

3  look at it.  It appears to be notes from your

4  visit with Dr. Mallory.  It says June 18 of

5  2022.

6                    Do you see that?

7            A.      I'm looking for it.  Oh, there

8  we are.

9            Q.      At the top.

10           A.      June 18th.  That's interesting.

11           Q.      I'm not really worried if the

12  date's the 18th or the 20th, but I do want to

13  go down to the history of present illness.

14  "Patient is 24 years female who presents with

15  complaints of depression and anxiety."

16                    Do you see that?

17           A.      Yes.

18           Q.      "Patient reports managing an

19  illness which has been challenging."

20           A.      Yes.

21           Q.      It describes, "patient has a

22  pituitary tumor that could impact her vision,"

23  correct?

24           A.      Yes.

ASSATA ACEY

Page 64

1          Q.       "Patient reports this increases
2    her anxiety since she has a difficult time
3    staying focused at work due to concerns about
4    making a mistake."
5                   Do you see that?
6          A.       Yes.
7          Q.       "Patient reports challenges
8    with medical professionals which have been
9    making her avoid going to the doctor."
10                  Do you see that?
11         A.       Yes.
12         Q.       Did you have some kind of an
13   interaction with a specific male doctor that
14   caused you concerns?
15         A.       Not at that time, but -- boy,
16   I'm sorry.  I did have a large concern with a
17   male doctor three months after this, but I
18   think I have negative experiences with male --
19   and this is in June.  I think I had negative
20   experiences with male and female doctors at
21   this point.
22         Q.       "Patient also reports
23   challenges with feeling unsupported at work."
24                  Do you see that?

1          A.      Yes.

2               Q.      "Patient reports experiencing

3    mood shifts throughout the day," correct?

4          A.      Yes.

5               Q.      And in part, if anything I'm

6    telling you is something that you didn't tell

7    her, please let me know.

8                        "Patient reports experiencing a

9    deal of traumatic experiences throughout the

10   course of her life."

11         A.      Yes.

12              Q.      "Patient believes experiencing

13   racial trauma impacts her ability to connect

14   with others."

15         A.      Yes.

16              Q.      "Patient reports maladaptive

17   coping skills, typically avoidance and

18   sleeping."

19         A.      Absolutely.   Yes, that is very

20   accurate.   I love to avoid people who stress

21   me out.

22              Q.      I'm going to give you -- let me

23   give you this packet, Ms. Acey.   Those are the

24   notes that have been produced by your --

ASSATA ACEY

Page 93

```
1              Q.      Is it fair to say that if the
2     mediation had resolved the case and the case
3     was over -- and I'm not saying it wasn't --
4     but if the case had stopped at that point you
5     would not have been required to do all these
6     filings and all this work and reliving all
7     these experiences?
8                      Is that fair?  I mean, there
9     would have been no reason.
10             A.      If the case had --
11             Q.      If the case -- you know, if
12    there was a -- if the case -- you know, if the
13    case had gone away, it went away.  I don't
14    want to get into the semantics about a
15    settlement or not.  We'll talk about that.
16                     But, you know, if the case
17    wasn't in existence, if your claims and the
18    prosecution of your claim against InductEV did
19    not happen and stopped as of say
20    September 19th of 2022, you would not have
21    experienced what you've been describing as
22    this trauma all this time, the things that you
23    talked with your counselor about, right,
24    related to your work at InductEV.  You said
```

1   working on the case triggers, you know, things

2   for you throughout this counseling.

3           A.      I think that I would still feel

4   the symptoms of this, but I think that it may

5   not have continued to be escalated to the

6   point of suicidal ideation.  I think that the

7   issue in June would still have occurred, but

8   the issues tracking those episodes after the

9   case had started would not have happened.

10          Q.      You wouldn't have needed to go

11  back and review text messages or Teams

12  messages or attempt to develop arguments

13  around your claims if the case had been gone

14  and hadn't continued past the last week in

15  September of 2022, correct?

16          A.      Right.

17          Q.      Okay.  So at a certain level

18  you chose to proceed with your case?

19          A.      I did choose to proceed.

20          Q.      Right.  And in the course of

21  that, resulting in reliving moments that you

22  would prefer not to?

23                  THE VIDEOGRAPHER:   Your mic

24          dropped.

ASSATA ACEY

Page 95

```
 1                THE WITNESS:  Oh, I'm sorry.
 2           I'm waiting for your mic to go on and
 3           my mic is on.
 4                So I don't think that the
 5           second time of reliving things was my
 6           choice.  I think that was just the
 7           nature of how the evidence was spread
 8           out.
 9   BY MR. SCHAUER:
10           Q.    You were compelled to do it?
11           A.    To reorganize it, absolutely,
12   yes.
13           Q.    No.  You were compelled to
14   continue the case after September of 2022
15   because of, you know -- you know, you had a
16   choice to sign a release and settle the case.
17                You had a choice, correct?
18           A.    I did have a choice to sign a
19   release and settle the case.
20           Q.    Did you say you did or didn't?
21           A.    I did.
22           Q.    Okay.  And you did and you
23   chose not to?
24           A.    Yes, I did.
```

Page 96

```
 1              Q.      Okay.  I just want to
 2    understand how you viewed this.
 3              A.      I believed that most of these
 4    stressors were not in my control, and I don't
 5    believe that they're a standard buy-in to
 6    pursuing the case.  Actually, I believed at
 7    most times that the case would be settled
 8    again.
 9                      Like when I sent the draft of
10    the claim, I think in March 10th or 13th,
11    before filing it I thought they'd read it and
12    say, hey, you know, maybe we should just solve
13    this.  I mean, when I rejected the first
14    offer, I think I increased it to like 150,000.
15    I stopped at what I thought would be more
16    fair, and they didn't want to do that.  It's
17    not really my problem.
18              Q.      Well, you could have chose to
19    accept some number.
20              A.      To accept --
21              Q.      You didn't want to accept it,
22    correct?
23              A.      No, I didn't.
24              Q.      So your option was to pursue
```

Page 97

```
 1   the case was --
 2            A.      And if I had not accepted it --
 3            Q.      You're cutting me off.
 4            A.      I'm sorry.  I'm copying you.
 5   What were you saying?
 6            Q.      You chose not to accept it, and
 7   as a result the litigation has ensued.  We're
 8   here today because the case didn't resolve in
 9   the end of September, correct?
10            A.      Yes.
11            Q.      You had to relive all these
12   moments you talked about, for example,
13   document 40, since that time, correct?
14            A.      Well, we're not really here
15   'cause the case didn't settle in September.
16   We're here because I felt that the company was
17   trying to bully me and behaving unethically in
18   their attempt to settle the case.  I mean --
19            Q.      I'm not getting into the whos
20   and whys and was it a good settlement, not a
21   settlement, and what it should have been
22   settled for.
23                    The fact is this case exists
24   because it didn't get resolved at the end of
```

ASSATA ACEY

Page 98

1  September, correct, of 2022?

2           A.      No.

3           Q.      No?

4           A.      If I never thought that I had

5  been bullied or whatever I would not have

6  looked at the laws related to these claims.  I

7  would not have filed this suit.  I mean,

8  really --

9           Q.      What are you talking about?

10 Are you talking about being bullied at the

11 time of the mediation or are you talking about

12 --

13          A.      After the mediation -- I mean,

14 she threatened to sue me.  I mean, at that

15 point I felt like that was it.  Like it has to

16 be -- this needs to clarified in court.

17                 She said if I didn't remove my

18 EEOC -- even if I let the EEOC continue their

19 investigation she said whatever the EEOC did,

20 any inconvenience it caused the company, she

21 was going to pursue me legally for it.  That's

22 what the e-mail said.

23          Q.      Did she ever file a complaint

24 against you?

```
16    related to my stuff.  But I just figured, you
17    know what, if they can do this, then I'll just
18    ignore the fact of the stuff that they're
19    doing right now and we'll just be gone.
20         Q.    So when you agreed on the
21    $50,000, there was no --
22         A.    Are we going to continue to
23    object to that question?
24         Q.    Go ahead.  You can, you can.
```

ASSATA ACEY

Page 130

1    I'll read it from your e-mail each time if you

2    would like, but that's going to be very

3    cumbersome.

4              A.       It was from the mediation.

5                        - - -

6              (The court reporter requests

7              that the parties do not speak

8              simultaneously.)

9                        - - -



```
10            Q.      And do you have any direct
11   evidence of that or is it mostly inferred?
12            A.      Mostly circumstantial, yes.
13            Q.      And that would be, as we
14   discussed last time, given facts and
15   circumstances and Diana Wilmes' position and
16   reasonable level of intelligence, you believe
17   that because she did what she did and you
18   think that here, you know, it's not
19   appropriate or you didn't like it, it's
20   reflective then of some kind of racial or
21   gender animus; is that correct?
22            A.      I think that's noncorrect.  I
23   think in this case it has more to do with how
24   she treated other coworkers.  When I was
```

ASSATA ACEY

1    comparing, when I took my aspirins, and even

2    my teammates, former teammates, nobody had

3    been -- complained, remembered being

4    complained about by Diana for those small

5    things she complained about me.

6              Q.      Well, she checked with your

7    boss; isn't that correct?

8                      That's what she did; is that

9    right?

10             A.      Yes.

11             Q.      Okay.   Does any of that show up

12   in your evaluation review?   Do you recall

13   being dinged for missing meetings?   No, you

14   didn't.   You weren't, were you?

15             A.      You know what I thought or I

16   recall.   I'm sorry, Attorney Schauer, I don't

17   think it's appropriate --

18             Q.      I'll strike the question.   I'll

19   strike the question.   It's getting long in the

20   day.   Okay.

**PTE 110 (04/18/2024 A. Acey Dep. Video cc**

**10:59:29-11:02:57, 11:12:41-11:19:09,**

**11:36:00-11:37:17, 11:54:05-11:54:34,**

**3:00:00-3:01:50).**

This Exhibit is Produced outside of the
Appendix

# PTE 111 (08/28/2024 Defendant Email).

 Gmail

Assata Acey <aceyassata@gmail.com>

## Subpoenas for trial

**Schauer, Randall C.** <RSchauer@foxrothschild.com>
To: Assata Acey <aceyassata@gmail.com>
Cc: "Longo, Alberto" <ALongo@foxrothschild.com>, "Hanley, Krista M." <KHanley@foxrothschild.com>

28 August 2024 at 16:34

Ms. Acey: Thank you for sending.

If your failure to create a new position to your liking, promote, hire claims survive



**PTE 112 (03/27/2024 J. Acey Dep. pp. 50-51).**

JACQUELINE ACEY

Page 50

```
 1          A.      Yes.
 2          Q.      When's the last time she reached
 3    out to talk to you about this case?
 4          A.      When you've upset her.
 5          Q.      What was that?
 6          A.      When you have upset her.
 7          Q.      When was that?
 8          A.      I think the last time you had a
 9    meeting you were yelling at her or something and
10    she was upset about that.
11          Q.      How did she reach out?  Was it over
12    the phone?  She called you?
13          A.      It was over the phone.
14          Q.      What did she tell you?
15          A.      That you yelled at her and she was,
16    you know, sick and she was depressed and she was
17    very upset.
18          Q.      When she said you, did she identify
19    who she was referring to?
20          A.      You.  She was referring to you, the
21    lawyer.
22          Q.      Me?
23          A.      Yes.
24          Q.      What did she tell you?
```

JACQUELINE ACEY

Page 51

```
 1          A.      I just listen.  I listen to
 2   Assata.  She talks and I listen to how she feels.
 3   She's talking it out.
 4          Q.      You don't respond to her at all?
 5   You don't tell her --
 6          A.      What can I say, not my case.  I'm
 7   not a lawyer.
 8          Q.      Do you ever say, you know, Assata
 9   it's going to be okay or do you offer any type of
10   response to what she's saying other than just
11   listening?
12          A.      I think I said that you should not
13   take a meeting.  That you should do everything in
14   the legal setting and maybe yelling would not
15   occur.
16          Q.      Do you use any type of social media
17   page?
18          A.      I have a Facebook page, but I don't
19   really use it.  Mostly, I just send happy
20   birthdays to people that I'm friends with.  I
21   don't post much.  I think no, not much at all.
22          Q.      And you wouldn't have posted about
23   anything here, right?
24          A.      Absolutely not.
```

# PTE 113 (04/09/2024 D. Hackman Dep. p. 93).

*\*All evidence listed on page 1 of Doc 92-2 (appendix of Doc 92 motion for partial Summary judgement) is also intended to be presented at trial with exhibits 1-17 becoming PTE 114-PTE 130 respectively, (with Ex 1 of Doc 92 starting as PTE 114).*

DANIEL HACKMAN

Page 93

```
 1              She talked about, I mean, a whole
 2    manner of things.  She has talked about how --
 3    she's talked about how she sometimes receives
 4    emails from Defendant's counsel that she thinks
 5    are kind of mean; I guess.  You know, she told me
 6    one time I think that it was during a phone call
 7    that she had with -- I think it was probably with
 8    Attorney Schauer she said that, you know, he was,
 9    like, raising his voice at her and that made her
10    really upset.
11              Those are -- those are the examples
12    that come to mind.
13       Q.    And what do you tell her when Ms. Acey
14    gives you these examples?
15       A.    I tell her that -- that it's
16    unfortunate.  That's -- and I tell her that it's
17    unfortunate that it's too bad, that I'm sorry
18    she's having to deal with all of this stuff.  I
19    tell her that I'm going to be there for her.  That
20    I love her, that I support her, and that we'll get
21    through it.
22       Q.    Do you ever encourage her to take
23    certain actions with respect to Defendant or
24    counsel for Defendant?
```

**PTE 114 (Defendant's Production,**

**INDUCTEV INITDISCL019275.xlsx).**

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Job Title | Department | Incumbent Name | Last Name | Incumbent Salary | Salary Range/ Mid Point |
| 2 | PCB Designer, R&D Projects | Operations | | | $ 85,000 | $ 80,000 |
| 3 | IP Manager | Operations | | | $ 168,680 | $ 150,000 |
| 4 | Senior R&D Designer | Operations | | | $ 102,805 | $ 100,000 |
| 5 | Senior Electronics Technician | Operations | | | $ 74,963 | $ 80,000 |
| 6 | Sr. Systems & Compliance Eng | Operations | | | $ 95,000 | $ 125,000 |
| 7 | Technician | Operations | | | $ 72,716 | $ 70,000 |
| 8 | Electrical Engineer (II) | Operations | | | $ 77,100 | $ 100,000 |
| 9 | Principal Research Engineer | Operations | | | $ 168,071 | $ 150,000 |
| 10 | Senior CAD Technician | Operations | | | $ 65,625 | $ 80,000 |
| 11 | Senior RF Technician | Operations | | | $ 43,680 | $ 80,000 |
| 12 | Principal Embedded SW Engin | Operations | | | $ 135,637 | $ 150,000 |
| 13 | Prinicipal Design Egineer | Operations | | | $ 154,534 | $ 150,000 |
| 14 | Lead Technician | Operations | | | $ 80,000 | $ 100,000 |
| 15 | CHIEF SCIENTIST | Operations | | | $ 150,000 | $ 150,000 |

| | G | H | I | J |
|---|---|---|---|---|
| 1 | Proposed Increase Amount | | Proposed or Current Salary | Salary Grade |
| 2 | | | | 3 |
| 3 | | | | 6 |
| 4 | | | | 4 |
| 5 | | | | 3 |
| 6 | | | | 5 |
| 7 | | | | 2 |
| 8 | | | | 4 |
| 9 | | | | 6 |
| 10 | | | | 3 |
| 11 | | | | 3, part time |
| 12 | | | | 7 |
| 13 | | | | 6 |
| 14 | | | | 4 |
| 15 | | | | 6 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ASSATA ACEY

Plaintiff,

v.

INDUCTEV

Defendant.

Case No.: 2:23-cv-01438

Judge Paul S. Diamond

### Plaintiff's Response to Defendant's Statement (Doc 131-3) -- in Opposition to Defendant's Motion for Summary Judgement (Doc 131)

I, Plaintiff, submit the following answers to the Defendant's statement of facts (131-3):

1.     Plaintiff Assata Acey ("Plaintiff") began working as a Product Introduction Technician with Defendant on June 14, 2021. (Schauer Dec. at Ex. 1 at 200:6-9).

**PLAINTIFF'S ANSWER: Admitted.**

2.     On May 8, 2022, Plaintiff filed a complaint with the Pennsylvania Human Relations Commission ("PHRC") followed by an amended complaint with the PHRC on June 21, 2022. (Schauer Dec. at Exs. 8 and 9).

**PLAINTIFF'S ANSWER: Admitted.**

3.     Both PHRC complaints were served on Defendant under a cover letter dated June 22, 2022. (Schauer Dec. at Ex. 10).

**PLAINTIFF'S ANSWER: Admitted.**

4.     The PHRC determined it lacked jurisdiction over Plaintiff's

complaints and indicated that the case would be transferred to the United States Equal Employment Opportunity Commission ("EEOC") (*Id.*)

**PLAINTIFF'S ANSWER: Admitted.**

5.    On September 19, 2022, a mediation (the "Mediation") occurred to resolve Plaintiffs' complaints with the EEOC. (Schauer Dec. at Ex. 2, 125:18-23, 190:23-191:2).

**PLAINTIFF'S ANSWER: Admitted.**

6.    It was agreed during the Mediation that Plaintiff would resign from her employment in exchange for $50,000. (Schauer Dec. at Ex. 13; Ex. 3, 14:4-9).

**PLAINTIFF'S ANSWER: Denied. This alleged agreement was never finalized-verbally or otherwise. Defendant cites my grandmother's deposition. Both Plaintiff's email and her grandmother's testimony state that the defendant's production of a contract was a condition precedent (obligation that would only finalize the Defendants alleged agreement once the contract had been received and signed). Plaintiff's grandmother testified that the Defendant violated the agreement of a condition precedent by firing the plaintiff and trying to release her claims before a contract had been received and signed.  Doc 131-7, 16:5-17:18. Doc 131-17. Exhibit 1 (03/27/2024 J. Acey Dep. 28:16-29:7).**

7.    It was agreed during the Mediation that Plaintiff would provide Defendant with a verification form from a medical provider on or before

September 23, 2022. (Schauer Dec. at Ex. 13; Ex. 3, 16:19-24).

**PLAINTIFF'S ANSWER: Admitted.**

8.     It was agreed during the Mediation that Plaintiff would execute a general release, a non-disparagement and confidentiality, and Defendant agreed to provide    a    neutral    reference.    (Schauer    Dec.    at    Ex.    13).

**PLAINTIFF'S                          ANSWER:                     Denied.**
**Both Plaintiff's email and her grandmother's testimony state that the defendant's production of a contract was a condition precedent (obligation that would only finalize the Defendants alleged agreement once the contract had been received and signed). Plaintiff's grandmother testified that the Defendant violated the agreement of a condition precedent by firing the plaintiff and trying to release her claims before a contract had been received and                                                                    signed.**
**Doc 49, pp. 5-6. Doc 131-7, 16:5-17:18, Exhibit 1, 28:16-29:7. Doc 131-17.**

9.     Plaintiff admits: "In mediation I did agree to a verbal agreement in which I would resign and dismiss existing claims(prior to Sep 19) in return for a settlement amount of 50,000 from Momentum Dynamics Corp" and that "I was of *impression* that anything tentatively discussed would be bound by a formal written contract."    (Schauer    Dec.    at    Ex.    13,    Ex.    17).

**PLAINTIFF'S ANSWER: Denied. Defendant's quoted "admission" continues to be incomplete, as determined by the court on pp.5-6 of Doc 49. Both Plaintiff's email and her grandmother's testimony state that the defendant's production of a contract was a condition precedent (obligation that would**

**only finalize the Defendants alleged agreement once the contract had been received and signed). Plaintiff's grandmother testified that the Defendant violated the agreement of a condition precedent by firing the plaintiff and trying to release her claims before a contract had been received and signed. 03/27/2024 J. Acey Dep. excerpts: Doc 131-7, 16:5-17:18; Exhibit 1, 28:16-29:7.                    Doc                    131-17.**

10.     In exchange for these terms, within thirty (30) days of the execution of a written settlement agreement, Defendant agreed to pay Plaintiff $50,000 (less ordinary deductions as required, if applicable). (*Id.*).

**PLAINTIFF'S ANSWER: Denied.**

**Both Plaintiff's email and her grandmother's testimony state that the defendant's production of a contract was a condition precedent (obligation that would only finalize the Defendants alleged agreement once the contract had been received and signed). Plaintiff's grandmother testified that the Defendant violated the agreement of a condition precedent by firing the plaintiff and trying to release her claims before a contract had been received and signed.**

**03/27/2024 J. Acey Dep. excerpts: Doc 131-7, 16:5-17:18; Exhibit 1, 28:16-29:7. Doc 131-17.**

11.     Plaintiff's grandmother, Jacqueline Acey, attended the Mediation with Plaintiff. (Schauer          Dec.          at          Ex.          3,          12:8-11.)

**PLAINTIFF'S ANSWER**: **Admitted.**

12. Jacqueline Acey testified "[t]here was a verbal agreement that [Plaintiff] would resign and dismiss existing claims in return for a settlement amount of $50,000 dollars from dyn – Momentum Dynamics, Corporation, but the agreement was never received and never executed." (*Id.* at 14:4-9).

**PLAINTIFF'S ANSWER**: **Admitted.**

13. Jacqueline Acey did not recall any details of her conversation with Plaintiff about being harassed on the basis of race and did not recall Plaintiff mentioning racism in the workplace. *Id.* at 69:6-9, 71:2-23.

**PLAINTIFF'S ANSWER**: **Admitted.**

14. Former HR director, Patti Rensel also attended the mediation. (*Id.* at Ex. 4, 6:10-12).

**PLAINTIFF'S ANSWER**: **Admitted.**

15. During Plaintiff's deposition of Ms. Rensel, Ms. Rensel testified that she recalled a verbal agreement being entered in which Plaintiff was "asked to resign from employment in exchange for compensation." (*Id.* at 7:3-13).

**PLAINTIFF'S ANSWER**: **Admitted.**

16. On September 27, 2022, Plaintiff received a copy of a settlement agreement from Defendant. (*Id.* at Ex. 13).

**PLAINTIFF'S ANSWER**: **Admitted**

17. Plaintiff refused to execute the settlement agreement, repudiated her oral agreement with Defendant, and demanded $130,000 to resolve her claims. (*Id.*).

**PLAINTIFF'S ANSWER: Denied. The defendant's alleged agreement was never finalized-verbally or otherwise. Defendant cites my grandmother's deposition. Both Plaintiff's email and her grandmother's testimony state that the defendant's production of a contract was a condition precedent (obligation that would only finalize the Defendants alleged agreement once the contract had been received and signed). Plaintiff's grandmother testified that the Defendant violated the agreement of a condition precedent by firing the plaintiff and trying to release her claims before a contract had been received and**         **signed.**

**03/27/2024 J. Acey Dep. excerpts: Doc 131-7, 16:5-17:18; Exhibit 1, 28:16-29:7 ; Doc 131-17.**

18.    On October 24, 2022, Plaintiff filed an Amended Charge of Discrimination with the EEOC asserting discriminatory terms, conditions, and privileges of employment based on race and gender, harassment based on race and gender, retaliation for protesting ADA/PTO policy, discriminated based on disability, and retaliation for filing an EEOC complaint. (Schauer Decl. at Ex. 16.)

**PLAINTIFF'S ANSWER: Admitted.**

19.    Plaintiff filed a Complaint in the Court of Common Pleas of Chester County Pennsylvania on or about March 10, 2023, asserting twenty claims for alleged discrimination and/or retaliation in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e), Section 1981 of the Civil Rights Act of 1990 (42 U.S.C. § 1981), The Americans with Disabilities Act of 1990 (42 U.S.C. § 12101), The

Pennsylvania Human Relations Act (43 Pa. Stat. Ann. § 962.1) and one claim for Intentional Infliction of Emotional Distress under Pennsylvania law. Notice of Removal (ECF No. 1) at Ex., A ("Compl.").

**PLAINTIFF'S ANSWER: Admitted.**

20. On April 14, 2023, Defendant removed Plaintiff's Complaint to the United States District Court for the Eastern District of Pennsylvania. Notice of Removal (ECF No. 1).

   **PLAINTIFF'S ANSWER: Admitted.**

21. April 27, 2023, Defendant moved to dismiss Plaintiff's Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Defendant's Motion to Dismiss (ECF No. 10).

   **PLAINTIFF'S ANSWER: Admitted.**

22. On February 27, 2024, the Honorable Judge Gene E.K. Pratter, U.S.D.J. issued an order granting in part and denying in part Defendant's Motion to Dismiss. Feb. 27, 2024 Memorandum (ECF No. 49).

   **PLAINTIFF'S ANSWER: Admitted.**

23. The District Court dismissed Counts I, II, III, IV, IX, XIV, and XX of Plaintiff's Complaint with prejudice. Feb. 27, 2024 Order (ECF No. 50).

   **PLAINTIFF'S ANSWER: Admitted.**

24. The District Court also dismissed Counts XIII, XV, and XVI without prejudice. *Id.*

   **PLAINTIFF'S ANSWER: Admitted.**

25. The District Court denied Defendant's Motion with respect to Counts V, VI, VII,

VIII, X, XI, XII, XVII, XVIII, and XIX and the parties proceeded with discovery on those claims. *Id.*

**PLAINTIFF'S ANSWER: Denied. The defendant continued to use discovery time to address her clams of disability discrimination. Doc 136, p. 3. Doc 136-1, Doc 136-2.**

26. The Senior Technician role at InductEV requires at least "8+ years' experience in a test environment for emerging technology." (Schauer Dec. at Ex. 14).

    **PLAINTIFF'S ANSWER: Admitted.**

27. It is undisputed that Plaintiff did not possess at least "8+ years' experience in a test environment for emerging technology" at the time she applied for the introduction product technician position. (Schauer Dec. at Ex. 1, 100:7-18; Ex. 14.

    **PLAINTIFF'S ANSWER: Admitted.**

28. Plaintiff acknowledged during her deposition that the senior technician role requires 8+ years of experience. (*Id.* at Ex. 1, 71:13-24, 72:13-19).

    **PLAINTIFF'S ANSWER: Denied. Plaintiff claimed to recall a requirement of 6-8years during her deposition. Doc 131-5, 71:13-24, 72:13-19**.

29. Plaintiff further acknowledged that she does not possess the requisite 8+ years of experience to qualify for a senior technician role. (*Id.* at 100:7-11).

    **PLAINTIFF'S ANSWER: Admitted.**

30. The written comments of multiple evaluators involved in interviewing and the hiring of Plaintiff were very positive regarding several aspects of her education and experience, as well as future at InductEV, but also recognized Plaintiff lacked the

skills and abilities required of a senior technician role. (*Id.* at Ex. 11.)

**PLAINTIFF'S ANSWER: Admitted**

31. Plaintiff received an Annual Performance Review in which she received no negative comments and acknowledges that she needs to "deepen her hands-on skills." (Schauer Dec. at Ex. 15).

**PLAINTIFF'S ANSWER: Denied. Page 5 of Defendant's Exhibit shows my manager's states goal that I "Integrate better within the team, and read the room for when to wrap up a tangent". Doc 131-19, p. 5.**

32. Plaintiff did not indicate that her growth plans included promotion in her Annual Performance Review. *Id.*

**PLAINTIFF'S ANSWER: Denied. Plaintiff indicated a desire to be compensated or promoted in proportion to her work within InductEV, under a subsection that she self-titled as "help".Doc 131-19, p.3**

33. Plaintiff received a review by Seth Wohlgemuth, Plaintiff's supervisor, and in her deposition could not identify anything in that review that she believed reflected animus toward black people or women. (Schauer Dec. at Ex. 1, 191:23- 193:19).

**PLAINTIFF'S ANSWER: Admitted with the following exception: as a technician or senior technician, Seth Wolgemuth was not my supervisor. Doc 131-18.**

34. Plaintiff did not believe Mr. Wohlgemuth harbored any animus toward her based on gender or race. (*Id.* at 194:14-21).

**PLAINTIFF'S ANSWER:   To the extent this paragraph refers to Seth**

**Wolgemuth, it is admitted. To the extent this paragraph refers to John Wolgemuth, it is denied.**

35. Nor could Plaintiff identify anything in Rob Rosenberger's review that reflected animus toward her based on race or gender. (*Id.* at 187:22-189:16).

**PLAINTIFF'S ANSWER: Admitted.**

36. Plaintiff acknowledged that those who were promoted to senior technician roles possessed more experience than her. (*Id.* at 100:7-23).

**PLAINTIFF'S ANSWER: Admitted.**

37. Plaintiff alleged that black employees such as her and Omar Jackson were criticized as lazy due to race. Compl., ¶ 123.

**PLAINTIFF'S ANSWER: Admitted.**

38. Mr. Jackson was never called lazy or criticized based on race at InductEV. (Schauer Dec. at Ex. 5, 71:9-73:18).

**PLAINTIFF'S ANSWER: Denied.**

39. Plaintiff also alleged that Mr. Jackson was promoted only after controversy surrounding the hiring process for a senior technician, despite possessing 20 years of experience. Compl., ¶ 148.

**PLAINTIFF'S ANSWER: Admitted.**

40. Plaintiff identified Mr. Jackson as a witness with knowledge of the facts relating to her case, explaining that Mr. Jackson was the "first and only promoted black employee in defendant's history, originally denied senior title due to 'employment gap'. Also experienced scrutiny from HR and comments from coworkers. Present

for a deal of criticism [Plaintiff] received from Rob Rosenberg and other coworkers. First/only employee to tell [Plaintiff] of suspected racial differences in pay. Knowledge of [Plaintiff's] work on the UV project. Witness to his own starting and ending pay as technician and senior technician while at MD." Schauer Decl. at Ex. 12.

**PLAINTIFF'S ANSWER: Admitted.**

41.   Mr. Jackson had no idea why Plaintiff identified him as a witness with knowledge of the facts relating to her case. (Schauer Dec. at Ex. 5, 54:1-5).

**PLAINTIFF'S ANSWER: Admitted.**

42.   Mr. Jackson testified that he never heard Rob Rosenberger say anything relating to race at InductEV. (*Id.* at 58:12-14).

**PLAINTIFF'S ANSWER: Admitted.**

43.   Mr. Jackson testified that he had no reason to think that Rob Rosenberger had any racial animus toward him. (*Id.* at 58:15-59:1).

**PLAINTIFF'S ANSWER: Admitted.**

44.   Mr. Jackson testified that he is not aware of any racial differences in pay at InductEV. (*Id.* at 60:14-16).

**PLAINTIFF'S ANSWER: Admitted.**

45.   Mr. Jackson testified that did not know what Plaintiff meant by "employment gap," stating "There was no employment gap." (*Id.* at 56:7-16).

**PLAINTIFF'S ANSWER: Admitted.**

46.   Mr. Jackson testified that he did not recall any specific conversations with Plaintiff

regarding differences in pay other than one instance in which he "was speaking out of anger" while describing his pay and role at InductEV in relation to his race. (*Id.* at 47:5-48:5).

**PLAINTIFF'S ANSWER: Admitted.**

47.   Mr. Jackson acknowledged that he had twenty years of experience and was promoted and received a pay raise at InductEV due to his extensive experience. (*Id.* at 75:11-6).

**PLAINTIFF'S ANSWER: Denied. An admission is not the same as an acknowledgement of an allegation as a fact. This is for the factfinder.**

48.   Mr. Jackson was unaware of any "controversy" surrounding his promotion and disagreed with the allegations in Plaintiff's Complaint that he was promoted only after controversy. (*Id.* at 75:9-20, 76:4-6).

**PLAINTIFF'S ANSWER: Admitted.**

49.   Mr. Jackson testified that he never experienced any comments from co- workers that he deemed inappropriate or suggestive of racial animus. (*Id.* at 63:6- 12).

**PLAINTIFF'S ANSWER: Admitted.**

50.   Mr. Jackson could not identify a single example where he felt criticized due to race while employed at InductEV. (*Id.* at 72:13-15).

**PLAINTIFF'S ANSWER: Denied. Doc. 137, pp. 64-65, 267-271.**

51.   Mr. Jackson could not identify anything that he would describe in his own words as harassment at InductEV. (*Id.* at 73:15-18).

**PLAINTIFF'S ANSWER: Denied. Doc. 137, pp. 64-65, 267-271**

52. Mr. Jackson testified that Plaintiff's co-workers "thought [Plaintiff] didn't do her job." (*Id.* at 63:9-16).

**PLAINTIFF'S ANSWER: Admitted.**

53. Mr. Jackson testified that he attended a meeting during which Rob Rosenberger indicated that he "didn't think [Plaintiff] was getting the work done fast enough" and would make his opinion known during meetings. (*Id.* at 57:14-25).

**PLAINTIFF'S ANSWER: Admitted.**

54. Mr. Jackson testified that Rob Rosenberger's opinions were made "inside these meetings. On the floor, Rob would never say anything to me or Assata, no. Everything was said in the meetings that I witnessed." (*Id.* at 57:14-21).

**PLAINTIFF'S ANSWER: Admitted.**

55. Mr. Jackson testified that Rob Rosenberger "was a senior technician" and would have been the one to know whether Plaintiff was completing work in a timely manner. (*Id.* at 57:22-58:5).

**PLAINTIFF'S ANSWER: Admitted.**

56. Mr. Jackson testified that InductEV "saved [his] life . . . because they gave [him] a job when [he] was down, when [his] wife was down. (*Id.* at 33:8-12).

**PLAINTIFF'S ANSWER: Admitted.**

57. Mr. Jackson testified that the company "trusted [him] enough to give [him] the key to open the shop" and that the "company helped [him]. (*Id.* at 33:13- 17).

**PLAINTIFF'S ANSWER: Admitted.**

58. Mr. Jackson testified that he was not aware of any practice of limiting employees

based     on     race     at     InductEV.     (*Id.*     at     77:6-9).

**PLAINTIFF'S ANSWER: Admitted.**

59.   Mr. Jackson did not have a single example where he felt criticized due to race. (*Id.* at                                          72:13-15).

**PLAINTIFF'S ANSWER: Denied. What Mr. Jackson could recall at the time of deposition does not disprove what knowledge he did or did not have. That is a conclusion for a fact-finder.**

60.   Mr. Jackson did not witness anything he considered to be "pervasive racial harassment."                    (*Id.*                    at                    70:8-15).

**PLAINTIFF'S ANSWER:  Doc. 137, pp. 64-65, 267-271.**

61.   Mr. Jackson testified that he applied for the role of product introduction technician and was not surprised when he received that role because that was the role he applied          for.          (*Id.*          at          77:10-22).

**PLAINTIFF'S ANSWER: Admitted.**

62.   Mr. Jackson testified that his subsequent promotion to senior product technician was due to him showing the company that he was qualified for that position. (*Id.* at 77:21-78:2).

**PLAINTIFF'S ANSWER: Admitted.**

63.   Mr. Jackson testified that he has no reason to believe that InductEV made decisions       based       on       race.       (*Id.*       at       82:15-20).

**PLAINTIFF'S ANSWER: Admitted.**

64.   Mr. Jackson had no knowledge of Plaintiff's claim that she was allegedly compared     to     chocolate     ice     cream.     (*Id.*     at     50:13-15,     81:22-23).

**PLAINTIFF'S ANSWER: Denied. What Mr. Jackson could recall at the time of deposition does not disprove what knowledge he did or did not have. That is a conclusion for a fact-finder.**

65.   Mr. Jackson had no knowledge of Plaintiff's claim that she was allegedly told she was from the wrong side of the tracks. (*Id.* at 50:18-22).

**PLAINTIFF'S ANSWER: Denied. What Mr. Jackson could recall at the time of deposition does not disprove what knowledge he did or did not have. That is a conclusion for a fact-finder.**

66.   Mr. Jackson testified that Rob Rosenberger, a senior technician, complained that Plaintiff did not complete tasks in a timely manner. (*Id.* at 57:9 to 58:14).

**PLAINTIFF'S ANSWER: Admitted.**

67.   Joren Wendschuh wrote in a 2021 annual performance review dated February 6, 2022 that Plaintiff needed to "grow their soldering and assembly skills," "integrate better within the team," learn to read "the room for when to wrap up a tangent," "work toward providing clear and concise feedback and status updates where needed" and "integrate the new software into their daily routine." (Schauer Decl. at Ex.                                   15,                                   p.                                   4).

**PLAINTIFF'S ANSWER: Admitted**

68.   Plaintiff did not disagree with Mr. Wendschuh, stating that in the 2021 performance review that she was "challenged with learning more about the product and processes and people surrounding its development" and that she was "seeking to      deepen"      her      "hands-on      skills."      (*Id.*      at      pp.      1-2).

**PLAINTIFF'S ANSWER: Denied. Plaintiff did not receive her supervisor's comments until after she submitted her self-review portion. Doc 131-19, p. 6. Exhibit 2 (11/15/2021, performance review process and deadlines).**

69.   Mr. Wedschuh stated in his Interview Evaluation Form that Plaintiff "[l]oves to learn" and "[b]rings a unique 'science and engineering' background and knowledge to the job." (Schauer Dec. at Ex. 11, p. 13). **PLAINTIFF'S ANSWER: Admitted.**

70.   Mr. Wedschuh further indicated that Plaintiff was a "bit of a unique person" for the role, and that he would want to classify Plaintiff as a technician, "unless Omar & Seth are Sr.'s [*sic*]." (*Id.*). **PLAINTIFF'S ANSWER: Admitted.**

71.   Mr. Jackson and Seth Wohlgemuth were promoted to senior technician at the same time, despite Mr. Wohlgemuth having been with InductEV longer. (Schauer Dec. at Ex. 5, 46:6-9). **PLAINTIFF'S ANSWER: Admitted**

72.   Omar Jackson testified that Mr. Wohlgemuth had a unique knowledge about the products and InductEV and that Mr. Wohlgemuth earned his promotion. (*Id.* at 101:24-102:4). **PLAINTIFF'S ANSWER: Admitted**

73.   Plaintiff testified that Mr. Wohlgemuth deserved the promotion. (Schauer Dec. at Ex. 1, 115:9-11). **PLAINTIFF'S ANSWER: Admitted**

74.   Plaintiff identified Maria Tabbutt as the "[o]nly supervising female mechanical engineer. Responsible for the Assembly Documents of the 150 and 75kW US and EU cabinets. Knows of some of the Quality and Documentation related work conducted by me during employment with Defendant. Experienced scrutiny and less cooperation from male employees including Bogdan Proca, Rob Rosenberg, and men on the QA team. Listened to locker room talk from John Wolgemuth. Told during performance evaluations that she could not document her supervision of design engineer despite acting as their supervisor without full pay. First/only employee to tell me of gender differences in pay. Received weekly meetings with HR when they complained about hostile environment caused by new Manager which included performance evaluation issue. Witness to her own starting and ending pay and related negotiations while working at MD." Schauer Decl. at Ex. 12.

**PLAINTIFF'S ANSWER: Admitted**

75.   Ms. Tabbutt had no understanding of Plaintiff's sexual harassment claims. (Schauer Dec. at Ex. 6, 86:14-22).

**PLAINTIFF'S ANSWER: Denied. Exhibit 3 (04/08/2024 M. Tabbut Dep. pp. 118(ll11)-119)).**

76.   Ms. Tabbutt testified that, "Firsthand, I don't believe I had witnessed anything" when asked whether she had witnessed anything at InductEV that she understood to be animus toward Plaintiff based on sex. (Id. at 97:16-21).

**PLAINTIFF'S ANSWER: Admitted**

77.   Ms. Tabbutt further confirmed that she did not "remember witnessing anything"

she understood to be sexual harassment directed toward Plaintiff. (Id. at 97:22-98:2).

**PLAINTIFF'S ANSWER: Admitted**

78. Ms. Tabbutt did not even remember hearing about anything prior to looking at a subpoena relating to this case. (Id. at 98:3-6).

**PLAINTIFF'S ANSWER: Admitted.**

79. When asked whether Ms. Tabbutt saw "anything at InductEV . . . that would help [her] understand Ms. Acey's claim with respect to being harassed on the basis of sex," Ms. Tabbutt responded "No." (Id. at 99:9-13).

**PLAINTIFF'S ANSWER: Admitted**

80. Ms. Tabbutt also had no knowledge of the allegations giving rise to Plaintiff's race-based claims. (Id. at 94:14-96:7).

**PLAINTIFF'S ANSWER: Denied. Exhibit 4 (04/08/2024 M. Tabbut Dep pp. 65-67).**

81. Ms. Tabbutt could not identify anything that "suggested Ms. Acey was subject to a culture [of] harassment on the basis of her gender." (Id. at 142:17-21).

**PLAINTIFF'S ANSWER: Denied. Ms. Tabutt testified to being ignored by the male manager of the QA dept, which supports plaintiff's allegations of a company culture of gendered harassment. Doc 137, pp. 106-109.**

82. Plaintiff alleged in paragraph 175 of her complaint that, "[a]s a woman employee, [she] was subjected to a workplace culture and harassment on the basis of [her] gender." Compl., ¶ 175.

**PLAINTIFF'S ANSWER: Admitted.**

83.   Plaintiff alleged in paragraph 176 of her complaint that [t]his harassment included

targeted opposition, inappropriate office jokes, and unwanted touching from [h]er

colleagues." Compl., ¶ 176.

**PLAINTIFF'S ANSWER: Admitted.**

84.   Ms. Tabbutt never witnessed Plaintiff being touched by any colleagues. (Schauer

Dec. at Ex. 6, 143:1-3).

**PLAINTIFF'S ANSWER: Admitted**

85.   Ms. Tabbutt never witnessed Plaintiff listen to an inappropriate office joke. (Id. at

143:8-10).

**PLAINTIFF'S ANSWER: Admitted.**

86.   Ms. Tabbutt had no understanding of what Plaintiff meant by "targeted

opposition." (Id. at 143:4-7).

**PLAINTIFF'S ANSWER: Admitted.**

87.   Ms. Tabbutt did not remember witnessing anything she considered to be sexual

harassment directed toward Plaintiff. (Id. at 142:1-145:17).

**PLAINTIFF'S ANSWER: Admitted.**

88.   In fact, Ms. Tabbutt, a female employee, had no understanding of the allegations in

paragraphs 175 and 176 of Plaintiff's Complaint. (Id. at 143:12-19).

**PLAINTIFF'S ANSWER: Denied. Exhibit 3 (04/08/2024 M. Tabbut Dep. pp.**

**118(ll11)-119)).**

89.   Plaintiff also alleged that she felt the experiences she faced were due to her gender

(Compl., ¶ 12), and further alleged that her suspicions grew when coworker Rob

Rosenberger "muttered 'bitch' under his breath," which Plaintiff understood to be directed toward Ms. Tabbutt. Compl., ¶ 13.

**PLAINTIFF'S ANSWER: Admitted.**

90. Plaintiff's Complaint acknowledges that Mr. Rosenberger did not use the term "bitch" toward her. See id.

**PLAINTIFF'S ANSWER: Denied. Compl., ¶ 13. Doc 131-6, p.39.**

91. Ms. Tabbutt testified that no one ever referred to her as a "bitch" during her time at InductEV. (Schauer Dec. at Ex. 6, 131:12-15, 132:19-133:7).

**PLAINTIFF'S ANSWER: Admitted.**

92. Ms. Tabbutt also testified that when she did hear Mr. Rosenberger use the term "bitch," it was when he was working on difficult projects and would use the term "this thing's a bitch" or "that's a bitch" and that she has used the term in her lifetime and in a similar context. (Id. at 131:21 to 134:22).

**PLAINTIFF'S ANSWER: Admitted**

93. Ms. Tabbutt testified that Mr. Rosenberger never referred to her as a "bitch." (Id. at 133:5-9).

**PLAINTIFF'S ANSWER: Admitted.**

94. Daniel Hackman, Plaintiff's coworker who she later married and no longer works at InductEV, could not identify anything he observed suggesting racial animus toward Plaintiff. (Schauer Dec. at Ex. 7, 43:1-15, 69:14-19).

**PLAINTIFF'S ANSWER: Denied. Defendant's counsel asked Mr. Hackman only to identify racial animus (towards me) that he witnessed at InductEV. Doc 131-11, 43:1-24, 69:1-24.**

95. Mr. Hackman could not identify anything he witnessed that suggesting Plaintiff was discriminated against based on race. (Id. at 36:14-22, 42:8-15).

**PLAINTIFF'S ANSWER: Admitted**

96. Mr. Hackman could not identify a specific example of anything he witnessed suggesting that Plaintiff was subject to sexual harassment at work. (Id. at 42:16-43:15).

**PLAINTIFF'S ANSWER: Denied. Doc 137, pp. 156-159.**

97. Mr. Hackman agreed that he did not witness a single instance of racial or sexual animus directed toward Plaintiff during his time at InductEV. Id.

**PLAINTIFF'S ANSWER: Admitted**

98. None of Plaintiff's witnesses could identify conduct suggesting racial animus toward Plaintiff. (Schauer Dec. at Ex. 1, 132:7-16; Ex. 7, 42:8-15; Ex. 6, 94:14-96:7; Ex. 5, 38:20-21, 67:6-18).

**PLAINTIFF'S ANSWER: Denied. At minimum, one of my witnesses were able to identify conduct which has been argued in my complaint to suggest racial animus towards me. Exhibit 5 (04/09/2024 D. Hackman Dep. pp-63-66). Exhibit 4 (04/08/2024 M. Tabbut Dep pp. 65-67).**

99. Rob Rosenberger provided a positive review of Plaintiff in the written notes of her interview, describing her as "very intelligent," and "very enthusiastic and outgoing" with an "excellent technical aptitude." (Schauer Decl. at Ex. 11, pp. 1-2).

**PLAINTIFF'S ANSWER: Admitted**

100. Rob Rosenberger recognized that Plaintiff lacked experience and "might not be happy in a Technician based on her comment that "she wanted to learn as a Technician before moving into an Engineering position." (Id. at p. 1).

**PLAINTIFF'S ANSWER: Admitted**

101. Bruce Mitchell noted that Plaintiff was "still honing and practicing her skills after graduation, possible she was limited on what she was allowed to do from previous employers but doesnt [sic] seem to fully fit the skills for a Sr tech role." (Id. at p. 11).

**PLAINTIFF'S ANSWER: Admitted**

102. Bruce Mitchell also observed that Plaintiff "would need to be trained still on certain technical abilities" and that she "seemed to have little tool knowledge and experience, wiring, cabling stripping and crimping which are needed for a senior tech role." (Id. at p. 12).

**PLAINTIFF'S ANSWER: Admitted**

103. Bruce Mitchell further stated that Plaintiff had a "good engineering [sic] mindset of thinking how and why components work and understanding it" and that she "seems to fit an engineering [sic] position instead of a senior tech role." (Id. at pp. 11-12).

**PLAINTIFF'S ANSWER: Admitted**

104. Ryan Taggart indicated that Plaintiff "struggled with a drill and center punch" and that she "did not know which direction to put the drill in to [sic] drill a hole." (Id.

at                                            p.                                           6).

**PLAINTIFF'S ANSWER: Admitted**

105.   Mr. Taggart also found that Plaintiff lacked "experience with hand tools and will
       need a lot of time and attention to hone her knowledge into practical experience."
       (Id. at p. 7).

       **PLAINTIFF'S ANSWER: Denied. Taggart's statement is not a finding of fact.
       Doc 131-15, p.7. Exhibit 6 (04/11/2024 A. Acey Dep pp. 77-80).**

106.   Plaintiff began to think she was suffering discrimination between April 25, 2022
       and May 4, 2022 when Ms. Judy Talis, InductEV's Chief Administrative Officer,
       told Plaintiff she needed to make up time off due to alleged disability by using
       PTO.       (Schauer       Dec.      at      Ex.      1,      45:20-49:18)
       **PLAINTIFF'S ANSWER: Denied. Defendant's allegation relies on my
       response to their question of when I felt both discrimination and the ability to
       *pursue/prove* these claims in court. The defendant explicitly asserted this
       question to be distinguished from (a question of) when I began to feel I was
       being discriminated against.  Doc 131-5, pp 3-5.**

107.   Judy Talis, InductEV's Chief Administrative Officer provided several positive
       reviews    of    Plaintiff.    (Schauer    Dec.    at    Ex.    11,    p.    3).
       **PLAINTIFF'S ANSWER: Denied. Defendant's production of one review does
       not prove their conclusion of it as "positive", nor does it evidence the existence
       of other reviews, positive or otherwise. Doc 131-15, p.3. Exhibit 7 (04/11/2024
       A. Acey Dep. pp. 132-138).**

108.   In an April 28, 2021 Interview Evaluation Form, Ms. Talis noted that Plaintiff "has

a very innovative take on her work" and "has always looked beyond the task and thinks out of the box." (Id.).

**PLAINTIFF'S ANSWER: Admitted**

109. Ms. Talis also noted that while Plaintiff "may not have the exact skills we are looking for she is certainly capable with her background o[f] learning them." (Id.).

**PLAINTIFF'S ANSWER: Admitted**

110. Yet Plaintiff testified that most of her allegations of improper treatment based on race and gender focused on Judy Talis. (Schauer Dec. at Ex. 1, 116:12-19).

**PLAINTIFF'S ANSWER: Admitted**

111. Plaintiff testified that Ms. Talis' April 28, 2021 evaluation reflects racial or gender bias. (Id. at 130:24-135:6).

**PLAINTIFF'S ANSWER: Admitted**

112. There is nothing in Plaintiff's April 28, 2021 evaluation form reflecting racial or gender bias. (Schauer Decl. at Ex. 11).

**PLAINTIFF'S ANSWER: Denied. Excerpt of 04/11/2024 A. Acey Dep., pp. 132-138.**

113. Plaintiff testified that the series of messages contained in Doc. 15 (ECF No. 40) captures her belief that she was accused of stealing time at InductEV. (Schauer Dec. at Ex. 2, 226:8-12, 243:21-245:23).

**PLAINTIFF'S ANSWER: Admitted**

114. Plaintiff was not accused of stealing time during her employment. Doc.15 (ECF No. 40) at p. 22, ¶ 14.

**PLAINTIFF'S ANSWER: Denied. Doc 40, section (II)(14).**

115. Plaintiff missed meetings at InductEV. Id. at p. 16, ¶ 2; id. at p. 17.

     **PLAINTIFF'S ANSWER: Denied. Defendant relies on a document where I admit to missing a meeting. This is not an admission of missing meetings in plural. Doc 40, pp 16-17.**

116. Plaintiff produced no evidence of any "sabotage" by any coworkers.

     **PLAINTIFF'S ANSWER: Denied. Doc 137, pp. 45-52, 72-73. Doc 40-2 pp. 1090-1095.**

117. Plaintiff produced no evidence of derogatory jokes by any coworkers.

     **PLAINTIFF'S ANSWER: Denied. Doc 137, pp. 59-61, 211-214. Doc 40-2, pp. 1711-1712, 1715-1718.**

118. Plaintiff testified that the message: "This is Assata. She's a technician with a Physics degree . . . she'll be doing better things . . ." is evidence of a "derogatory comment[] from [her] coworkers." (Schauer Dec. at Ex. 2, 226:13-18, 230:12-231:10).

     **PLAINTIFF'S ANSWER: Admitted.**

119. Plaintiff further testified that that message bothered her because the message was "making a big deal to a stranger about my role and my degree . . . like I was some commodity, and it made me feel uncomfortable," despite acknowledging that this message was not an attempt to "belittle [her]." (Id. at 231:8-10).

     **PLAINTIFF'S ANSWER: Admitted.**

120.   Plaintiff produced no evidence to support her allegation that she was told she is from          "the          wrong          side          of          the          tracks."

**PLAINTIFF'S ANSWER: Admitted.**

121.   Plaintiff could not remember the details of her allegation that she was compared to chocolate ice cream or dark chocolate. (Schauer Dec. at Ex. 1, 274:4- 15).

**PLAINTIFF'S ANSWER: Denied. 04/11/2024 A. Acey Dep. Excerpts: Doc 137, pp12-13, 16-17(at 273:8-274:10, 291:1-292:20).**

122.   Plaintiff testified that the "exact words" were more accurately recounted to [her] boss" but she can't remember his direct quotes right now." Id.

123.   Plaintiff recounted the alleged comparison in Doc. 15 (ECF No. 40) at p. 11, ¶ 2.
**PLAINTIFF'S ANSWER: Admitted**

124.   Plaintiff produced no other evidence of ever being compared to chocolate ice cream          or          dark          chocolate.

**PLAINTIFF'S ANSWER: Admitted**

125.   Plaintiff could not explain her allegation that she was tapped on the shoulder and grazed   by   a   Mike   Russel.   (Schauer   Dec.   at   Ex.   2,   218:3-219:8).

**PLAINTIFF'S ANSWER: Denied. Plaintiff gave the explanations the Defendant asked for regarding her allegation of Mike Russel tapping her shoulder and grazing her form/body. Doc 131-6, 218:13-24.**

126.   Plaintiff testified that Mr. Russel walked past her in a hallway that was roughly six-feet          wide.          (Id.          at          219:9-17).

**PLAINTIFF'S ANSWER: Admitted**

127.   Plaintiff testified that Mr. Rosenberger used the word "bitch" in front of her and not          toward          her.          (Id.          at          256:16-23).

**PLAINTIFF'S ANSWER: Denied. To the extent defendant construes that I said Rosenberg did not call me a "bitch", this statement is denied. Doc 131-6, p.39.**

128. In or about February 2022, Plaintiff met with Judy Talis, then Human Resource Director, and discussed a number of concerns she had regarding occurrences in the InductEV workplace, none of which involved facially discriminatory or hostile and offensive statements or behaviors. (Id. at 40:18 – 44:18; 45:1-56:14).

**PLAINTIFF'S ANSWER: Admitted**

129. Despite Plaintiff's belief that any work performed outside of her job description was outside of her contract, Plaintiff acknowledged that she was an at- will employee and provided no evidence that she was forced to take on additional labor due to any purported harassment based on race. (Schauer Dec. at Ex. 1, 143:2-144:15).

**PLAINTIFF'S ANSWER: Denied. Doc 137 pp. 335-348, 353-371. Plaintiff's Trial claims ("behavior-non promotion" claims 1-9, "motivations-non promotion" claims 1-14).**

130. On May 16, 2022, Plaintiff left active employment on a non-work- related disability. (Schauer Dec. at Ex. 2, 28:18-23).

**PLAINTIFF'S ANSWER: Admitted**

131.   Plaintiff continues receiving full time disability benefits from InductEV's long
term disability insurance provider and testified in she is not making a claim for lost
wages.                    (Id.                  at                26:24-28:17).

**PLAINTIFF'S ANSWER: Denied. Plaintiff testified that she was not making
a claim "at that time". Doc 131-6, 28:12-17.**

132.   Plaintiff felt that Judy Talis acted improperly and displayed sex discrimination
when she recommended that Plaintiff might want to visit her daughter's
gynecologist and "barely stopped herself from asking if [she] was pregnant." (Id. at
251:10                                     –                                255:9).

**PLAINTIFF'S ANSWER: Admitted**

Sincerely,

Assata Acey Hackman /s/

Assata Acey (Pro Se)

5121 Brown St,

Philadelphia, PA, 19139

770-231-1017

aceyassata@gmail.com

Date: 09/10/2024

# Exhibits for Plaintiff's Response to doc 131-3

**Exhibit 1 (03/27/2024 J. Acey Dep. 28:16-29:7).**

1    she started working with Momentum?

2         A.     No, I don't know.

3         Q.     And it's your testimony today that

4    you have no sense of what those illnesses could

5    be, just that they exist.

6         A.     Yes.  I have no sense of what they

7    could be because her doctors didn't even know what

8    they could be, so she was in the process of

9    finding out what all those illnesses amounted to

10   and the doctor that she has now is helping her to

11   copy and to label the illnesses.

12        Q.     Understood.  Thank you.  After the

13   mediation, did you notice any change in Ms. -- in

14   the Plaintiff's behavior?

15        A.     No.

16        Q.     I think we touched on this earlier,

17   so forgive me if it's duplicative, but did you

18   discuss the details of mediation with Plaintiff

19   after it ended?

20        A.     Just the -- just the information

21   that you read, the first in the first paragraph.

22   That was the meat of it.

23               They had a mediation.  It was

24   agreed that she would get 50,000 dollars and

JACQUELINE ACEY

Page 29

1     upon -- and she would resign once the agreement

2     was executed and we never discussed anything

3     further than that.

4                    We thought it was over, but the

5     agreement never came and she was let go before the

6     agreement was executed which was not agreed to and

7     then this started.

8          Q.     Do you remember how did you speak

9     to Plaintiff after mediation?  Was it over the

10    phone?

11         A.     Yes.  It would have to be over the

12    phone.  I wasn't there.

13         Q.     When you say over the phone, what

14    do you mean, like actually orally over the phone

15    or --

16         A.     Orally, over the phone.

17         Q.     I'm assuming you have a cell phone?

18         A.     I do.

19         Q.     Do you text with your cell phone?

20         A.     Yes, I do.

21         Q.     Do you text the Plaintiff?

22         A.     No, not about this.

23         Q.     Have you ever texted the Plaintiff?

24         A.     Yes.

**Exhibit 2 (11/15/2021, performance review process and deadlines).**

 Gmail

Assata Acey <aceyassata@gmail.com>

## Fwd: 2021 Performance Review Process Begins!

1 message

**Assata Acey** <Assata.Acey@momentumdynamics.com>
To: Assata Acey <aceyassata@gmail.com>

29 April 2022 at 10:40

Get Outlook for Android

**Assata Acey | Technician**
**484-320-8222 ext 178**


Wireless EV Charging

**Connect**   LinkedIn | Website | Newsletter
**Media**     Taxis - NYTimes | Airport & Transit | Driver Experience

*Confidentiality Notice: The information, and any attachments and/or documents, transmitted by this email is intended for the addressee only and contains information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender immediately.*

**From:** Judy Talis <judy.talis@momentumdynamics.com>
**Sent:** Monday, November 15, 2021 1:26:17 PM
**To:** MD Employees <MDEmployees@momentumdynamics.com>
**Subject:** 2021 Performance Review Process Begins!

Team,

It's that time of year again! The Performance Review process is to ensure all employees have an opportunity to discuss job, career goals and performance. This is an opportunity to step back from the day-to-day tasks to review past year's accomplishments and set clear goals for the future. Our

employees are at the core of Momentum Dynamics, and to be successful we all need to know how we are doing, how to improve as well as speak to accomplishments and how we would like to develop professionally. This process allows employees and their managers to look back on all that

they have accomplished over the past year.

### *All employees that started on or before 10/1/21 are eligible to participate.*

### PART ONE:  EMPLOYEE SELF EVALUATION

The process starts with each employee completing their self-evaluation on the 2021 Performance Evaluation Form

- (see attached Performance Form or go to ☐ 2021 Performance Evaluation Form and click on box to left of form then select download).

Page 1: Prepare a summary of accomplishments, challenges, and strengths.

Page 2: Comment on your key career development and goals.

Page 3: Complete all sections under Core Competencies/factors by discussing how you demonstrated or progress made under the Employee Self Evaluation section.

1. ***Send a copy of your form to your manager AND copy Diana or Judy in Human Resources***

***All completed self-evaluations need sent to the employees immediate supervisor by 12/6/21.***

**PART TWO: MANAGER EVALUATION**

Manager will complete the supervisor comments and overall comments **by 1/7/2022 and return to HR for review.**

Meetings will be scheduled to discuss the final review with each employee.

Please feel free to reach out if you have any question or concerns.

**Judith Talis | Chief Administrative Officer**

Momentum Dynamics Corporation
***Fueling the Future of Electric Transportation***

3 Pennsylvania Avenue, Malvern, PA 19355
(M) 610.613.1449

www.momentumdynamics.com

**Disclaimer and Confidentiality Notice:** This email, and any attachments and/or documents linked to this email, are intended for the addressee and may contain information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender.

📄 **MDPerformanceReviewForm2021.docx**
96K

# Exhibit 3 (04/08/2024 M. Tabbut Dep. pp. 118(ll11)-119)).

Page 118

1    immediately.  So, I guess, yeah, that kind of

2    falls under less cooperation.

3         Q.      Okay.  Do you have any

4    understanding of why there would be less

5    cooperation among team members?

6         A.      No.

7         Q.      Do you have an understanding as to

8    why there would be less corporation in your

9    specific instance with your QA team?

10        A.      No.

11        Q.      The next sentence reads:  Listen

12   to locker room talk from John Wolgenmuth.

13        A.      Uh-hmm.  Yes.  Sorry.

14        Q.      Pardon me?

15        A.      I said uh-hmm, but I'm saying yes,

16   I agree with what you're reading.

17        Q.      I understand.  Do you know what

18   Ms. Acey is referring to there?

19        A.      Not a specific thing that we might

20   agree on, but I've -- I don't know.  Definitely

21   heard John talk about things, like, talking about

22   his kids or his wife or, you know, getting alone

23   time, things, that kind of stuff I've heard him

24   say kind of comments that are maybe a little less

25   professional or maybe TMI in some ways.

1       Q.       Okay.

2       A.       I don't know exactly which ones

3    he's referring to, but...

4       Q.       You mentioned earlier, I believe

5    you said we would agree or, I mean, the things

6    you've just described, are those things that you

7    would understand as locker room talk?

8       A.       Maybe, I mean, yeah, I guess

9    locker room talk I think of as, or I guess what

10   people think of as saying things and probably even

11   about women, okay, stuff that they would only want

12   a male coworker to hear and not their female

13   coworkers to hear.

14      Q.       You believe the definition of the

15   locker room talk, as you have just provided, do

16   the things that you mentioned you heard John

17   talking about fall within that definition, talking

18   about his kids?

19      A.       I mean, not to the full extent of

20   that, no, I guess not.

21      Q.       How about the other things you

22   mentioned with respect to John Wolgenmuth?

23      A.       I would say not fully to the

24   definition that I had.

25      Q.       Okay.  So are you aware, based on

**Exhibit 4 (04/08/2024 M. Tabbut Dep pp. 65-67).**

Page 65

```
 1    you know, my own life into control and not be laid
 2    off and, you know, kind of determine where I go
 3    next.
 4           Q.      Okay.  Any other main reasons, if
 5    you will?
 6           A.      Those are the biggest ones.
 7           Q.      I just want to jump back a minute.
 8    Forgive me.
 9                   With respect to your conversations
10    with Ms. Acey, I think you said there were -- were
11    there any other conversations you had with
12    Ms. Acey regarding Ms. Talis, other than what
13    you've already testified to?
14           A.      Not that I can remember right now.
15           Q.      Okay.  I think, initially, you had
16    also mentioned Rob Rosenberger?
17           A.      Yeah.
18           Q.      Can you describe -- can you
19    explain your conversations with Mr. Acey with
20    respect to Rob Rosenberger?
21           A.      Yeah, I mean, I think I remember a
22    lot of her discussions, you know, with her about
23    him was just in the way that he treated her and,
24    yeah, I would just say in the way that he treated
25    her.
```

Page 66

```
 1        Q.      When you say the way Rob treated
 2   Ms. Acey, did Ms. Acey tell you that Rob treated
 3   her a certain way?
 4        A.      She might have.  I don't quite
 5   recall, but I know I can say even just witnessing
 6   it just in terms of how frustrated he would be in
 7   a conversation with her, leaving a conversation,
 8   you could see how he was frustrated and, you know,
 9   kind of muttering under his breath about something
10   or just saying "Agh".  Yeah, so I could even see
11   it in the way that he was probably treating her.
12        Q.      Okay.  When you say witnessed it
13   and these frustrations Rob had with Ms. Acey, do
14   you have any idea why he was frustrated?
15        A.      I don't know.
16        Q.      No, you don't know as in you have
17   no idea?
18        A.      Yeah, I don't know why he gets
19   frustrated or acts certain ways around people, you
20   know, but I think I could tell that he did not
21   like Assata just by kind of the way he acted
22   towards her and the way he talked to her is not
23   like, you know, you would talk to a coworker,
24   typically.
25        Q.      Can you be a bit more specific?
```

Page 67

1   How did he act towards Ms. Acey?

2           A.      Yeah, he would get frustrated,

3   just kind of making like verbal sounds like just

4   "Agh" or just walking away or maybe just mutter

5   something about Assata as he's walking by.

6   Because he was often kind of working right in

7   front of my desk, so I would kind of see a lot of

8   that stuff.

9           Q.      Okay.  But do you know why he

10  would have gotten frustrated with her?

11          A.      No.

12          Q.      And when he muttered things, do

13  you have any idea what he would mutter or why he

14  would mutter it?

15          A.      No, I don't remember.  I think the

16  one thing I do remember is when Assata was in -- I

17  think had to take some time off, like, medically

18  or work from home, I do remember he was always,

19  like, "Where's Assata?  Why isn't she here?  She

20  should be doing that stuff."  I do remember him

21  saying like "What the hell, she's never here,"

22  so...

23          Q.      Would you say that Ms. Acey held a

24  role at InductEV that would require her to be in?

25          A.      I think at the time, I think it

# Exhibit 5 (04/09/2024 D. Hackman Dep. pp-63-66)

DANIEL HACKMAN

Page 63

1    A.    I think her chief complaints stems
2  mostly from the fact that she was not -- or that
3  he was not her supervisor.  That wasn't within his
4  role and responsibilities to -- to be worried
5  about whether or not she is doing her job.
6    Q.    Did Ms. Acey explain to you why she
7  felt that way?
8    A.    She -- I think she ex- -- expressed
9  feeling as though -- I think she expressed feeling
10 as though he would more often question whether she
11 was doing useful work or whether she was getting
12 her work done or questioning what work is she
13 doing more than he would with other coworkers.
14   Q.    Did she ever explain to you why she
15 thought that was the case?
16   A.    I -- I think -- I think the answer is
17 that these were observations that she made in her
18 interactions with Rob and --
19   Q.    Yeah -- sorry.  I didn't mean to cut
20 you off.
21   A.    No, that's okay.
22   Q.    And my question is, specifically, did
23 she ever explain to you, based on those
24 observations, she felt the way she felt?

DANIEL HACKMAN

Page 64

1       A.      I don't know how I can better answer

2    the question.  I -- I feel like I did.  Because

3    she -- she said that she observed a discrepancy in

4    his demeanor around her and his interests in the

5    work she was doing or she was doing work at all,

6    versus the way he -- he was, you know, towards the

7    other people on that team.  She felt that there

8    was a disparity.

9       Q.      Okay.  And my question pertains

10   particularly to the disparity.

11              What about the disparity led her to

12   believe that there were differences in the way

13   that she was being treated versus the way somebody

14   else was being treated?

15              What was that disparity based on

16   specifically?

17              Do you know?

18       A.      Oh, I understand.  I understand.

19              I don't know personally.  She -- she

20   has -- she claims that it is -- that it's largely

21   based on her being a woman, maybe to a lesser

22   extent, or maybe to some extent also that she's --

23   that she's black.  That -- that was the conclusion

24   that she came up.

DANIEL HACKMAN

Page 65

```
1      Q.      Okay.  Did she explain how she came to
2   that conclusion?
3      A.      I think she did.  I can't -- I can't
4   recall what her argument was, but I believe she
5   did try to explain the reasoning.  I don't
6   remember -- I don't remember the details, though.
7      Q.      When she tried to explain the
8   reasoning to you, do you remember what you
9   thought?
10     A.      Yes.  Yes.  I remember -- I remember
11  initially thinking that -- I remember initially
12  thinking that I couldn't tell one way or the other
13  if this sort of disparate treat- -- disparate
14  treatment was based on race or sex or if it was
15  based on something else.  I remember thinking that
16  I didn't have enough information to judge on my
17  own.
18     Q.      The -- the -- the words "disparate
19  treatment," as you just used them --
20     A.      Okay.
21     Q.      -- again, that's coming from not your
22  observations --
23     A.      Correct.
24     Q.      -- right, but from what Ms. Acey told
```

1    you?

2         A.      That's right.

3         Q.      And the conclusions that Ms. Acey told

4    you with respect to how she felt she were -- she

5    was being treated; right?

6         A.      That's right.

7         Q.      You don't recall any of the specific

8    details as to why she felt she was being treated a

9    certain way other than the conclusion and it was

10   because she is black and a woman; correct?

11        A.      I think that's correct, yes.

12        Q.      All right.

13        A.      Yeah, I can't recall specifics.

14        Q.      With respect to Bill Gallagher, who is

15   the last person you identified among the one, two,

16   three, four, five people earlier who you

17   identified as treating Ms. Acey in a particular

18   way that led to her behavioral change, what about

19   Bill Gallagher did Ms. Acey complain to you about?

20        A.      Oh, my.  The only thing that I can

21   remember right now is one time when she did her

22   hair, she said that the following day that Bill

23   approached her and said something to the effect

24   of, oh, so it is a weave.  That's -- that's

# Exhibit 6 (04/11/2024 A. Acey Dep pp. 77-80).

Page 77

1    AA-7?

2         A.    AA-7, Page 2.

3         Q.    Paragraph 3.

4         A.    I found it.  I found it.

5         Q.    Do you have any reason to disagree

6    with the observation or comment inserted

7    there by Mr. Taggart?

8         A.    Yes.

9         Q.    And what -- what do you disagree

10   with?

11        A.    So I did have experience with hand

12   tools.  I mean, I replaced the surface mount

13   in my car, so I had to use some type of hand

14   tools for that.

15        Q.    Did you have hand -- experience

16   with hand tools in an industrial or assembly

17   or I'm not sure what word to describe the

18   workplace there as, but did you have

19   experience with hand tools of a nature that

20   were utilized at InductEV as you came to

21   learn it during your employment?

22        A.    Yes.  So with Comcast, we were

23   responsible for constructing our own test

24   labs, sometimes putting together jigs, using

Page 78

1   scrills -- "scrills" -- using screws and
2   things.   And I mean it was -- it was fun.
3            And at the same time, even with
4   Dupont, I had to use hand tools, because I
5   was constructing circuit boards for these --
6   for these -- what they're called --
7   prototypes to be tested in, so I had to use
8   tools all throughout.
9            But if you're talking about even
10  more specified industrial use, at CTDI, which
11  is a contractor for Comcast, I was over --
12  I -- I mean, there were so many repairs to
13  set top boxes, boxes of that nature, taking
14  out hard drives, putting them back together,
15  reconstructing, you know, cell phone cameras.
16           It just didn't -- I mean, not cell
17  phone cameras.   What was it -- like, those
18  security cameras that Comcast gives -- door
19  bell cameras.   There we go.
20           So, yes, I -- I have extensive
21  experience with hand tools.
22      Q.   So you would disagree with the
23  observations of Mr. Taggart?
24      A.   Yes.

Page 79

1      Q.   Okay.  Do -- do you recall, did you
2  view individually with Mr. Taggart, or, you
3  know, because there's other individuals.
4      A.   Um...
5      Q.   Do you -- do you know the way in
6  which Mr. Taggart, you know, would have been
7  able to interact or did interact or, you
8  know, speak with you to form the comments
9  that are completed on AA-7?
10     A.   So I've participated in a process
11 like this before under Joren.  What we were
12 told is that we each get, like, ten minutes
13 of someone, pick an assessment, have them do
14 it, and judge based off of that assessment if
15 they're ready or -- for the job, or if it --
16 and sometimes, you know, you ran out of time.
17          Ryan was with me by hisself.  He
18 took me to some area in the gray spot, and
19 showed me one of their, like, assembly
20 instructions, and, then, handed me a -- in my
21 words, they're, like, doing weird things --
22 handed me a drill that's supposed to go
23 through metal.
24          And he was just like, "Here have at

Page 80

1    4."
2              There wasn't any context, and he's
3    right, I was very confused.
4         Q.   And, by the way, you do speak
5    quickly, so the person to your right, the
6    court reporter --
7         A.   I'm sorry.
8         Q.   -- would not mind if you slowed
9    down, also.
10             THE WITNESS:   Please tell me
11             if you need me to repeat anything.
12             I'm so sorry.
13             MR. SCHAUER:   Okay.   All
14             right.   I'll try and keep this
15             moving.
16                  -    -    -
17             (Whereupon, Exhibit AA-8,
18             Momentum Wireless Power Interview
19             Evaluation Form, was marked for
20             identification.)
21                  -    -    -
22    BY MR. SCHAUER:
23         Q.   Exhibit -- I'm going to show you a
24    document that's Exhibit AA-8.

**Exhibit 7 (04/11/2024 A. Acey Dep. pp. 132-138).**

Page 132

1 discriminatory animus on the part of
2 Ms. Talis towards you?
3          A.     Attorney Schauer, if I can clarify,
4 I actually meant to start, like, here
5 (witness indicating) with the word, "she."
6          Q.     Okay.  That's -- that's fine.
7                 "She understands the needs to do
8 her job as asked as well."
9                 Tell me how that reflects some kind
10 of gender or animus -- I'm going to -- I'm
11 going to -- I'll use a more general word,
12 improper animus on the part of Ms. Talis?
13          A.     Okay.  For me it -- it connects
14 more to a statement, like, "Don't get ahead
15 of yourself."  It connected more to ideas
16 of -- I guess, condescension.
17                 I know historically when people
18 talk about forms of racial expressions with
19 black people, one of them was criticizing
20 them as being, like, "uppity," or "more
21 puffed up than they ought to be."
22                 And when emphasized my ability to
23 do my job as asked, it kind of implied a
24 desire to go beyond the job task, or to be --

Page 133

1    to think that -- it just -- it just felt
2    condescending.  I'll just leave it there.
3         Q.   Do you think that that sentence had
4    nothing to with the sentences that go before
5    it in the comment section of Paragraph 1?
6         A.   I think it's connected in her train
7    of thought, but that's about it.
8         Q.   Well, her train of thought is what
9    this case is pretty much about, isn't it,
10   Ms. Acey?
11             I mean, she's the -- she's the
12   primary focus of your claims of gender and
13   race discrimination and harassment, isn't
14   she?
15        A.   So the first question, "her train
16   of thought," I believe the focus of this
17   Complaint is part of her thoughts, not
18   everything that she thought.
19             And the second one --
20        Q.   Okay.
21        A.   -- you asked if the -- the
22   claims -- the claims are based on -- on her
23   actions and her thoughts, yes.
24        Q.   Okay.  So her train of thought,

Page 134

1   you're saying this last sentence isn't
2   connected to the prior or -- or the last
3   sentence of Box 1 in Paragraph -- of
4   Exhibit AA-11 -- AA-11, is separate and apart
5   from and reflects, you know, some kind of
6   separate idea or thinking of Ms. Talis?
7        A.   Yes.  Especially since --
8        Q.   Okay.
9        A.   -- the sentence starts with having
10  said that, which tells me that she wants to
11  set aside what she said at the beginning.
12       Q.   Oh, it doesn't mean that
13  incorporating everything else that was said,
14  in addition you understand the need to do
15  your job as asked as well.
16            You -- you don't read it that way,
17  do you?
18       A.   No.  I read it as positive, my
19  qualifications, against -- or my
20  impressions --
21       Q.   Okay.
22       A.   -- of my qualifications against my
23  ability to do the job as asked.
24       Q.   Is that, in part, because you

Page 135

```
 1   believe that Ms. Talis is fundamentally
 2   has -- harbors gender or race animus?
 3        A.   Yes, at least subconsciously.
 4        Q.   Okay.  And this is an example of
 5   that, right?
 6        A.   Sure, yes.
 7        Q.   Okay.  Let's go to, I guess, the
 8   next place you have circled is, "She feels
 9   the technician role is fundamental to
10   engineering."
11             Do you see that?
12        A.   Yes.
13        Q.   Is that something you said, or
14   something you communicated?  It may not be
15   those exact words --
16        A.   Sure.
17        Q.   -- but is that something that you
18   said?
19        A.   Sure.  Yeah, I communicated
20   something like that.
21        Q.   Okay.  Well, let's -- let's go
22   through that -- let's go through that
23   additional comment from Ms. Talis.
24        A.   Sure.
```

Page 136

1      Q.    "Assata is an out of box thinker."

2            Do you think that's a negative

3  comment?

4      A.    No.

5      Q.    It's a positive thing, isn't it?

6      A.    Right.

7      Q.    Okay.  "I of course addressed the

8  fact that she has an engineering degree and

9  did she see this technician role as a way to

10  get into the company."

11            Do you recall her asking if this is

12  a way for you to -- to get into the company?

13      A.    No.

14      Q.    So you're saying that she made that

15  up?

16      A.    I'm saying that she paraphrased it

17  differently.

18      Q.    Well, what is your recollection of

19  what was discussed at this interview that may

20  have led Ms. Talis to say that you -- you

21  know, the -- the idea that you have an

22  engineering degree that, you know, is not --

23  you know, exists, and ask you whether you saw

24  this technician role as a way to get into the

Page 137

```
 1    company.
 2             Was there anything discussed that
 3    could lead to even that conclusion that you
 4    recall?
 5        A.   There is something discussed that
 6    could lead to that conclusion.
 7        Q.   What is that?
 8        A.   She kind of gave me the third
 9    degree about if they give me a job, how soon
10    I would demand a promotion.
11        Q.   Did she say "demand"?  Is that the
12    word she used?
13        A.   She used the word similar to that
14    connotation.
15        Q.   Did she say --
16        A.   Require.
17        Q.   Did she -- you know, "I demand you
18    tell me when you would want a promotion"?
19        A.   No.
20        Q.   Okay.
21        A.   She was concerned that I would
22    demand a promotion.
23        Q.   Did she say, "I'm concerned that
24    you will demand a promotion"?
```

Page 138

1         A.    She said, "Will you."   "If we do
2    this, will you" --
3         Q.    Did she say, "Will you?"   Did she
4    use the term, "demand" --
5         A.    No.
6         Q.    -- to you?
7         A.    No, she didn't use the term,
8    "demand."
9         Q.    Well, what did --
10        A.    I don't know what she said
11   specifically.  I just remember that it was in
12   that connotation of the word, "demand."
13        Q.    Well, could it also have been in
14   the connotation as written here in her
15   evaluation --
16        A.    No.
17        Q.    -- that's not possible, right?
18        A.    No.
19        Q.    Okay.  And, by the way, I mean,
20   InductEV is -- I'll refer to it as a startup
21   company; is that fair to say?
22        A.    Yes.
23        Q.    It hasn't been around.  It's not
24   like Comcast or Dupont.  It hasn't been

# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

## Case No. 24-1521

### Assata Hackman, Appellant v. InductEV, Appellee

### Appeal from the Orders of Hon. Gene E. K. Pratter, U.S.D.J

### In the United States District Court of the Eastern District of Pennsylvania

### Brief of Appellant, Assata Hackman (Pro Se)



## Questions Submitted on Appeal

Firstly, I apologize to the court for filing this brief after the deadline, as I am currently (thankfully) recovering from a (now) 10-day sinus infection.

In the interest of everyone's time I submit two appellate questions:

1. Whether the defects of my complaint count I (and therewith counts III, IV, and IX) is curable,

2. Whether I should be permitted to amend counts I, III, IV, and IX under the precedents set by this court.

## Background

1. I filed my complaint March 14, 2023, in state court alleging 20 violations of federal, state, and common law against defendant/my former employer InductEV.

2. After removal to federal court and motion to dismiss, the district court dismissed (among others) complaint counts I, III, IV and IX which claimed that I had been intentionally subjected to workplace racial harassment, and that I had been intimidated from making further complaints of workplace racial harassment. (Appendix p. 3)

3. Those counts were dismissed with prejudice and the motion to reconsider was also dismissed with prejudice; therefor I sent notice of appeal. (Appendix, pp. 1-2)

4. When I realized that the appeal could be affected by the lack of entry of final judgement-, I motioned to either be allowed to amend those counts or for entry of final judgement. (Appendix, pp. 62-87)

5. That FRCP 54 motion was denied as moot. (Appendix p. 5).

6. In my appellate research, after learning the fatality of not including a directly proposed amendment with a request to amend, I filed an explicit motion and proposed amendment under FRCP 15(b) rehashing the analysis from the FRCP 54 motion. (Appendix, pp.88-100)

7. Today, that motion is still pending before the district court.

## Argument-Jurisdiction and interlocutory Appeals

While I suspect the district courts dismissals with prejudice of complaint counts and the motion to reconsider are still appealable, I do not believe the appellate court can do much until the district court rules on the FRCP 15 motion. However, in the interest of efficiency, (whether I be mistaken or the FRCP 15 motion is denied before this court reviews my brief) I want to submit the issue. So that the upcoming trial and summary judgment deadline can be used to decide all meritorious claims- as preferable to seeking an additional trial later through appeal.

## Argument-Applicable Tests

## Question I

1. As of yet, I am unaware of receiving any declaration from the district court that those complaint counts (I, III, IV, and IX) are uncurable.

2. According to those precedents set forth in *Garrett v. Wexford Health* (quoting *Shane v. Fauver*) 938 F.3d 69, 81 n.16 (3d Cir. 2019); *Phillips v. County of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008); and *Alston v. Parker* 363 F.3d 229 (3d Cir. 2004):

    ""We have held that even when a plaintiff does not seek leave to amend, if a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile."

    Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004)

3. However, in so far as they fail to elucidate the factual basis for intentional intimidation or failure to address complaints--I believe this is cured by evidentiary analysis and additional facts stated in my FRCP 54 motion and/or proposed amendment.

## Question II

1. It is my understanding that this court reviews section 1981 claims under the same framework as title VII claims of intentional race discrimination- and that for such claims based on circumstantial evidence- the third circuit uses McDonnell-Douglas framework:

"The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (p.802).

2. This framework has been distilled to the showing of (i) belonging to protected class; (ii) engaging in a protected activity; (iii) suffering adverse action; and (iv) establishing respondeat superior liability.

3. My second question before this court requires the determination of my claims' alleged adverse actions.

4. I posit that refusal to conduct any corrective action is distinguished from refusal of a discrete method of correction (punitive actions, effective grievance process, responsive company training) because it goes beyond respondeat superior liability to establish an explicit permission on a hostile work environment (that is sufficient to alter one's condition of employment).

5. I believe that hostile work environments are often argued alternatively to adverse action, but an employer's action that appears to expressly permit a

hostile work environment should meet the threshold for an adverse action
because of its power to both enable further harassment and to dissuade future
complaints.

6.  This was briefly discussed in *Woodson v. Scott Paper Co.*:

> "We have held that "an atmosphere of condoned [racial] harassment in a
> workplace increases the likelihood of retaliation for complaints in individual
> cases." Glass v. Philadelphia Elec. Co., 34 F.3d 188, 195 (3d Cir. 1994)
> (internal quotation marks omitted); Aman, 85 F.3d at 1086." *Woodson v.*
> *Scott Paper Co.,* 109 F.3d 913, 922 (3d Cir. 1997)

7.  In conclusion, Ms. Talis' condoning of workplace racial harassment is an action
establishing not only the employer's liability for the harassment but also Ms.
Talis' intent to intimidate me from making further complaints. (Complaint ¶¶
124-124, Appendix pp. 41-42) (Complaint ¶¶ 42, 50, Appendix pp. 38-39) (Ex.
17-21 of Motion for Entry of Final Judgment, Appendix pp. 75-86)

8.  Recognition of the establishment of such intent enhances the level of her other
"adverse action"- denying the existence of any complaint to one that would
deter a reasonable employee from making future complaints of discrimination.

I have attached the relevant pages of the complaint background (Appendix pp. 36-
39), complaint count (Appendix pp. 40-42) and proposed amendment (Appendix
pp. 88-100), and leave all determinations to the court.

If you find in my favor, I ask that you remand the district court's dismissal of those counts with prejudice with instruction to permit the proposed count amendment.

Sincerely,

Assata Sabara Acey Hackman (Pro Se)

Date: 04/30/2024

# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

## Case No. 24-1521

Assata Hackman, Appellant v. InductEV, Appellee

Appeal from the Orders of Hon. Gene E. K. Pratter, U.S.D.J

In the United States District Court of the Eastern District of Pennsylvania

### Appendix Volume 1

### Vol. 1 Table of Contents

1. Notice of Appeal pp. 1-2

2. Order dismissing complaint counts p. 3

3. Order dismissing Motion to Reconsider p. 4

4. Order dismissing Motion to Amend Order or for Entry of Final Judgement p. 5

5. Memorandum for order dismissing complaint counts pp. 6-27

6. Memorandum for order dismissing motion to reconsider pp. 28-31

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ASSATA ACEY, | : | |
| | : | |
| Plaintiff | : | |
| v. | : | |
| | : | Notice of Appeal |
| | : | |
| INDUCTEV, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | No. 2:23-1438 |

### Notice of Appeal

Notice is hereby given that Assata Acey, plaintiff in the above-named case, hereby appeals to the United States Court of Appeals for the Third Circuit from an order denying my motion for reconsideration with prejudice (Doc 59) entered in this action on the 14th day of March, 2024 and from its parent order dismissing my complain charges I, III, IV, and IX with prejudice (Doc 50) entered in this action on the 28th day of February, 2024, generally on issues of:

- Whether the third circuit precedent for Pro Se litigants would have permitted me to have an opportunity to amend those dismissed charges.
- Whether half of the evidence referenced in my motion for reconsideration qualified as new evidence, having been introduced through supporting briefs—as having been received from the Defendant during post-complaint discovery.
- Whether the analysis (or lack thereof) of evidence presented in my supporting briefs (Doc 20, Doc 40) and re-presented in my motion for reconsideration, in support of my proposed conclusions of the court, can be remedied in an amended complaint.

Sincerely,

/s/ Assata Acey Hackman

Assata Acey Hackman (Pro Se)

5121 Brown St,

Philadelphia, PA 19139

accyassata@gmail.com

770-231-1017

Date: 03/20/2024

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| ASSATA ACEY, | | : | |
| | *Plaintiff* | : | **CIVIL ACTION** |
| v. | | : | |
| | | : | |
| INDUCTEV, | | : | |
| | *Defendant* | : | **No. 23-1438** |

## ORDER

AND NOW, this 27th day of February 2024, upon consideration of Plaintiff's Motion

for Summary Judgment (Doc. No. 5) and Defendant's Motion to Dismiss for Failure to State a

Claim (Doc. No. 10), for the reasons explained in the accompanying memorandum, it is hereby

**ORDERED** as follows:

1. Plaintiff's Motion for Summary Judgment (Doc. No. 5) is **DENIED**;

2. Defendant's Motion to Dismiss (Doc. No. 10) is **GRANTED IN PART** and **DENIED
   IN PART** as follows:

   a. Counts I, II, III, IV, IX, XIV, and XX are **DISMISSED WITH PREJUDICE;**

   b. Counts XIII, XV, and XVI are **DISMISSED WITHOUT PREJUDICE;**

   c. The Motion to Dismiss (Doc. No. 10) is **DENIED** with respect to Counts V,
      VI, VII, VIII, X, XI, XII, XVII, XVIII, and XIX.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| ASSATA ACEY, | | : | |
| | *Plaintiff* | : | CIVIL ACTION |
| | v. | : | |
| | | : | |
| INDUCTEV, | | : | |
| | *Defendant* | : | No. 23-1438 |

## ORDER

AND NOW, this ___ day of March 2024, upon consideration of Plaintiff's Motion for

Reconsideration (Doc. No. 51), it is **ORDERED** that the Motion for Reconsideration (Doc. No.

51) is **DENIED WITH PREJUDICE.**

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ASSATA ACEY, | : | |
| *Plaintiff* | : | **CIVIL ACTION** |
| v. | : | |
| | : | |
| INDUCTEV, | : | |
| *Defendant* | : | No. 23-1438 |

## O R D E R

AND NOW, this 10th day of April 2024, upon consideration of Plaintiff's Rule 54 Motion

(Doc. No. 73), it is hereby **ORDERED** that the Rule 54 Motion (Doc. No. 73) is **DENIED AS**

**MOOT.**[1]

BY THE COURT:

s/ Gene E.K. Pratter
**GENE E.K. PRATTER**
UNITED STATES DISTRICT JUDGE

---

[1] Plaintiff has filed an interlocutory appeal from both the Court's partial grant of Defendant's motion to dismiss and the Court's denial of Plaintiff's motion to reconsider the same. Notice of Appeal at 1, Doc. No. 67. The Third Circuit Court of Appeals sent Plaintiff a letter advising that her appeal "will be submitted to a panel of this Court for possible dismissal due to a jurisdictional defect." Rule 54 Motion, Ex. 1 at 14, Doc. No. 73. Plaintiff's Rule 54 Motion is "a response to that letter." *Id.* ¶ 3. The Court does not rule on litigants' responses to letters they receive from the Third Circuit Court of Appeals. The appellate jurisdiction of the Third Circuit Court of Appeals over Plaintiff's appeal is a matter to be determined by the Third Circuit Court of Appeals alone.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ASSATA ACEY, | : | |
| *Plaintiff* | : | CIVIL ACTION |
| v. | : | |
| | : | |
| INDUCTEV, | : | |
| *Defendant* | : | No. 23-1438 |

## MEMORANDUM

PRATTER, J.                                      FEBRUARY 27, 2024

Assata Acey filed a pro se complaint alleging employment discrimination by her former

employer, InductEV. InductEV advances three basic arguments in support of its motion to dismiss

Ms. Acey's complaint: (1) Ms. Acey released her claims in a settlement agreement; (2) Ms. Acey

has not administratively exhausted her claims; and (3) each of Ms. Acey's 20 counts fails to state

a claim upon which relief can be granted. The Court cannot conclude at this early stage whether a

settlement agreement exists between Ms. Acey and InductEV, or whether her amended complaint

before the Equal Employment Opportunity Commission (EEOC) is sufficient to exhaust her

claims. However, 10 of Ms. Acey's 20 claims fail to state a claim upon which relief can be granted.

Thus, the Court grants in part and denies in part InductEV's motion to dismiss the pro se complaint.

### BACKGROUND

When Ms. Acey started working for InductEV as a Product Introduction Technician in May

2021, she was the only African American woman in a workplace of about 80 employees. She avers

that she should have been hired as a Senior Technician, but she did not originally suspect that

racial or sex-based bias tainted InductEV's hiring process.

At some point during her employment, anonymous complaints were lodged about Ms.

Acey. Ms. Acey viewed these complaints as unfair and became concerned that she was being

racially stereotyped by her coworkers. This concern grew when one colleague publicly joked that

Ms. Acey was from "the wrong side of the tracks" and another publicly compared her to dark chocolate during a company ice cream day. Ms. Acey also allegedly overheard a "Black philanthropy coordinator" express concern about how few Black employees were at InductEV. Ms. Acey communicated her concerns to her supervisor, who worked with her to create a plan to reduce tensions.

Ms. Acey also became concerned that she was being "targeted" at work for being a woman. For example, she once perceived that a team member muttered "bitch" at her under his breath, and she also noticed that male colleagues were uncooperative with both her and another female colleague. Additionally, she avers that a male colleague at one point "accidental[ly] graz[ed]" her. After InductEV's head of Human Resources responded to Ms. Acey's concerns with an anecdote that Ms. Acey found unhelpful, Ms. Acey did not feel that her concerns were "significant enough to be taken seriously by [Human Resources]."

By the end of 2021, Ms. Acey believed that her duties exceeded the scope of her title and "felt that this was due to race and gender." She communicated her concerns to her supervisor and proposed potential job titles, but her role did not change. Around this time, Ms. Acey was told by someone working in Human Resources that the spelling of her name did not matter, and she was prohibited from carrying her cell phone in the laboratory at work.

In early 2022, Ms. Acey's colleagues had allegedly become so uncooperative with her that her emails to the team were screened by her supervisor, who approved Ms. Acey's emails before disseminating them to her colleagues. During this period, Ms. Acey created a "curated movie list for Black History Month," which the Human Resources Director declined to share with Ms. Acey's colleagues. In a meeting about that decision, Ms. Acey complained about several instances of "hostility" towards her by white colleagues, including a door slammed in her face, notes snatched

2

from her hands, and criticism leveled against her in a team group chat. In a follow-up meeting, Ms. Acey felt nauseated, and the HR Director allegedly asked whether she was pregnant and recommended a gynecologist to Ms. Acey. In April 2022, Ms. Acey also complained to HR about a safety report made against her by a colleague, which Ms. Acey believed to be motivated by bias.

Also in April 2022, Ms. Acey "experienced an onset of symptoms that would later become a chronic condition," which eventually required her to take an unpaid medical leave beginning on May 16. Ms. Acey disapproved of InductEV's policy about time off from work, which initially required her to use paid time off (PTO) instead of immediately starting unpaid leave. After HR denied her initial request for unpaid leave, Ms. Acey "resolved to evaluate [her] experiences in totality" and filed a complaint with the Pennsylvania Human Relations Commission (PHRC).

In early June, before InductEV was served with Ms. Acey's PHRC complaint, InductEV asked her to sign a form before her leave could be extended longer than one month. Ms. Acey was concerned that much of the form she was asked to sign was blank, but InductEV declined to fill in the form until after she signed it. It is unclear whether Ms. Acey signed this form.

The PHRC determined that it lacked jurisdiction over Ms. Acey's case and transferred it to the EEOC in late June. The parties privately mediated the dispute on September 19, 2022. A tentative agreement was discussed whereby InductEV would pay Ms. Acey $50,000 in return for her resignation and the release of her claims, but no final agreement was reduced to writing. At the end of the mediation, the mediator allegedly told Ms. Acey that her tentative agreement with InductEV was not final.

On September 27, Ms. Acey was presented with a written settlement agreement that was "sent concurrently with [her] being locked out of company databases." Ms. Acey refused to sign this agreement. However, InductEV insisted that the settlement agreement had been finalized,

3

declined to allow Ms. Acey to start work again, and allegedly threatened to sue Ms. Acey if she did not withdraw her pending complaint before the EEOC.

On October 24, 2022, Ms. Acey filed an amended complaint before the EEOC. Her amended complaint averred five categories of violations: (1) discriminatory terms, conditions, and privileges of employment based on race and gender; (2) harassment based on race and gender; (3) retaliation for protesting InductEV's PTO policy; (4) discrimination based on disability; and (5) retaliation for filing an EEOC complaint.

On December 16, 2022, the EEOC issued Ms. Acey a Notice of Right to Sue, informing her that she had 90 days to file a lawsuit against InductEV. Exactly 90 days later, on March 14, 2023, Ms. Acey filed a complaint against InductEV in the Court of Common Pleas of Chester County. Ms. Acey's complaint alleges 20 counts against InductEV, including: violations of Title VII for racial and sex-based discrimination and retaliation (Counts I, V, VII, X, XVIII); violations of the Pennsylvania Human Relations Act (PHRA) for racial, sex-based, and disability-based discrimination and retaliation (Counts II, III, VI, XI, XII, XIV, XVI, XVII, XIX); various violations of the Civil Rights Act of 1866 (Counts IV, VIII, IX); violations of the Americans with Disabilities Act (ADA) (Counts XIII, XV); and intentional infliction of emotional distress (Count XX). InductEV removed the case to federal court in April and timely filed a motion to dismiss Ms. Acey's complaint.[1]

---

[1]    Ms. Acey filed a pro se motion, styled a motion for summary judgment, on April 24, 2023, ten days after InductEV filed its removal notice. Mot. for Summary Judgment, Doc. No. 5. The opening line of this motion reads: "Due to Defendant's failure to plead, I, Assata Acey am asking for an order granting Summary Judgment according to the undisputed facts of my complaint[.]" *Id.* at 1. Because Ms. Acey's predicate for filing this motion was InductEV's putative failure to plead, the Court construes this as a motion for default judgment and denies it as premature. The Court granted InductEV's motion for an extension of time to respond to Ms. Acey's complaint, Order of April 26, 2023, Doc. No. 7, and InductEV timely filed its motion to dismiss by the Court-ordered deadline of April 27. Doc. No. 10. The Court mooted Ms. Acey's motion to vacate this extension and expressly permitted InductEV's motion to dismiss. Order of May 1,

4

## LEGAL STANDARD

At the motion to dismiss stage, the Court must accept factual allegations as true, but it is not "compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (internal citations and quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## DISCUSSION

InductEV's motion to dismiss advances three arguments: (1) Ms. Acey released her claims as part of a binding settlement agreement; (2) Ms. Acey failed to exhaust her claims before the EEOC; and (3) Ms. Acey failed to state claims upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court addresses each argument in turn.

### I.   InductEV has not demonstrated the existence of a binding settlement agreement.

Ms. Acey has specifically, plausibly, and clearly pled that she did not conclude a final settlement agreement with InductEV. Compl. ¶¶ 66-72, 82-84, Doc. No. 1-2. At the Rule 12 stage, the Court must accept these allegations as true. *Baraka*, 481 F.3d at 195. InductEV attempts to demonstrate the existence of a settlement agreement by pointing to language from a September 27, 2022 email from Ms. Acey, which reads: "I did agree to a verbal agreement in which I would resign and dismiss existing claims . . . in return for a settlement amount of [$]50,000[.]" Mem. of

---

2023, Doc. No. 13. Because InductEV timely responded to Ms. Acey's complaint, her motion for default judgment is denied.

L. in Supp. of Mot. to Dismiss at 11, Doc. No. 10 (quoting Compl. ¶ 266, Doc. No. 1-2). However, the next sentence of Ms. Acey's email reads, "The execution of this agreement was contingent on a contract that included agreeable material terms." Compl. ¶ 266, Doc. No. 1-2. In context, this email suggests that the putative settlement agreement between Ms. Acey and InductEV may have been subject to a condition precedent, namely a writing containing agreeable terms. *See Am. Diabetes Ass'n v. Friskney Family Tr., LLC*, 177 F. Supp. 3d 855, 877 (E.D. Pa. 2016) (quoting *Acme Markets, Inc. v. Fed. Armored Exp., Inc.*, 648 A.2d 1218, 1220 (Pa. Super. Ct. 1994)) ("[A] condition precedent may be defined as a condition which must occur before a duty to perform under a contract arises."). The Court expresses no opinion at this early stage about either whether a binding settlement agreement was reached or whether any such agreement was subject to a condition precedent. Ms. Acey has pled that no agreement was reached, and the evidence before the Court of a binding agreement is equivocal. The Court takes Ms. Acey's allegation as true.

InductEV's conclusory assertion that Ms. Acey "developed" *post hoc* reasons that she was not bound by her putative settlement agreement fails to persuade the Court, especially in the absence of a writing memorializing the agreement. Of course, a binding settlement agreement may exist absent a writing, *Commerce Bank v. First Union Nat'l Bank*, 911 A.2d 133, 147 (Pa. Super. Ct. 2006), and InductEV is free to gather evidence of a binding oral agreement for the Court to consider at summary judgment. However, accepting the allegations of the complaint as true, the Court declines to find that Ms. Acey's claims are barred by a settlement agreement.

Thus, the Court denies InductEV's motion to dismiss insofar as it relies on the existence of a binding settlement agreement in this matter.

II. **InductEV has failed to demonstrate Ms. Acey's failure to exhaust.**

InductEV further argues that Ms. Acey failed to exhaust her administrative remedies under Title VII, the ADA, and the PHRA. However, the exhaustion section of InductEV's motion to

6

dismiss focuses entirely on the deficiencies of Ms. Acey's original complaint before the EEOC, *not* her more comprehensive amended EEOC complaint. *See* Reply in Further Supp. of Mot. to Dismiss at 2, Doc. No. 17. InductEV's reply brief invites the Court to strictly construe the factual allegations contained in Ms. Acey's amended EEOC complaint in order to conclude that the allegations contained in her judicial complaint are not "fairly within the scope of [her] prior EEOC complaint." *Larochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 699 (E.D. Pa. 2016) (quoting *Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir. 1984)). The Court declines the invitation.

The Court analyzes EEOC charges with the awareness that they "are most often drafted by one who is not well versed in the art of legal description." *Hicks v. ABT Assocs., Inc.*, 572 F.2d 960, 965 (3d Cir. 1978); *Houle v. Walmart Inc.*, 447 F. Supp. 3d 261, 276 (M.D. Pa. 2020). Thus, "the scope of the original charge should be liberally construed." *Hicks*, 572 F. 2d at 965. The touchstone for determining whether a plaintiff has exhausted administrative remedies is whether the factual allegations of the judicial complaint are "fairly within the scope of" the liberally construed EEOC complaint. *Parsons v. City of Phila. Coordinating Off. Drug & Abuse Programs*, 822 F. Supp. 1181, 1184 (E.D. Pa. 1993). Finally, because failure to exhaust is an affirmative defense, the defendant "bears the burden of pleading and proving" the plaintiff's failure to exhaust. *Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997); *see also Walker v. Wetzel*, No. 20-4460, 2022 WL 17650456, at *1 (E.D. Pa. Dec. 13, 2022) (citing *Jones v. Bock*, 549 U.S. 199, 212, 216-17 (2007)) ("Failure to exhaust is an affirmative defense the defendant must plead and prove, not a pleading requirement for the plaintiff.").

InductEV has not met its burden. Ms. Acey's amended EEOC complaint avers that InductEV both discriminated against her on the basis of race, sex, and disability and then retaliated against her for filing an EEOC complaint. InductEV's motion to dismiss analyzed the wrong

EEOC complaint, and its reply brief tried to remedy this mistake with conclusory statements that Ms. Acey's amended EEOC complaint was insufficient for exhaustion purposes. *See, e.g.,* Reply in Further Supp. of Mot. to Dismiss at 4-5, Doc. No. 17 (quoting the amended EEOC complaint and asserting without citation to authority that "these narrow and particular allegations are not reasonably related to the dozens . . . of race and gender based allegations in Plaintiff's Complaint"). The mistaken motion and conclusory brief fail to prove that Ms. Acey did not exhaust.

Thus, the Court denies InductEV's motion to dismiss insofar as it relies upon Ms. Acey's alleged failure to exhaust administrative remedies.

### III.   Failure to state a claim pursuant to Rule 12(b)(6)

InductEV moves to dismiss each of Ms. Acey's 20 counts for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court grants InductEV's motion in part and denies it in part.

To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal,* 556 U.S. at 678 (internal quotation marks omitted). The Court accepts the complaint's factual allegations as true, but mere "bald assertions" or "legal conclusions" are insufficient. *Mores v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir. 1997).

#### A.   Ms. Acey's Title VII and PHRA Discrimination and Hostile Work Environment Claims

Ms. Acey avers four violations of Title VII for race and sex-based discrimination (Counts I, V, VII, and X). She also avers five violations of the PHRA for race and sex based discrimination (Counts II, III, VI, XI, XII). The Court dismisses Counts I, II, and III with prejudice. Although Counts X, XI, and XII do not adequately allege sex-discrimination claims, they sufficiently allege hostile work environment claims to survive InductEV's motion to dismiss.

8

To state a claim for discrimination under Title VII, a plaintiff must demonstrate: (1) that she "is a member of a protected class;" (2) that she was qualified for the position she sought to attain or retain; (3) that she "suffered an adverse employment action;" and (4) that "the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). "Generally, claims brought under the PHRA are analyzed under the same standards as their federal counterparts." *Kroptavich v. Pa. Power & Light Co.*, 795 A.2d 1048, 1055 (Pa. Super. Ct. 2002).

### 1. Counts I, II, and III do not state a claim for either discrimination or hostile work environment.

Ms. Acey's first count, "Discriminatory Intimidation for Opposing Unlawful Racial Harassment," avers a Title VII violation based on Ms. Acey's belief that InductEV's efforts to reduce racial bias were insufficient, and HR declined to take her suggestions for improving them. Compl. ¶¶ 90-102, Doc. No. 1-2. Her second count, "Aiding and Abet[t]ing Unlawful Employment Discrimination," avers a PHRA violation and relies on the same allegations as Count I. Similarly, Count III, "Discriminatory Intimidation on the Basis of Opposing Forbidden Racial Discrimination," avers a PHRA violation based on InductEV declining to share Ms. Acey's movie list for Black History Month with her colleagues. *Id.* ¶ 110.

The Court of Appeals for the Third Circuit has "defined an adverse employment action under Title VII as an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Magerr v. City of Philadelphia*, No. 15-4264, 2016 WL 1404156, *5 (E.D. Pa. Apr. 11, 2016) (internal quotation marks omitted) (quoting *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)). As the Supreme Court has explained, "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly

9

different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus.,
Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). However, "[w]hat constitutes an 'adverse employment
action' in the context of a discrimination case is not to be determined on a 'one-size-fits-all basis.'"
*Daniels v. Sch. Dist. of Phila.*, 982 F. Supp. 2d 462, 479 (E.D. Pa. 2013) (quoting *Jones v. Sch.
Dist. of Phila.*, 198 F.3d 403, 411 (3d Cir. 1999)). Instead, the elements of a prima facie
discrimination case under Title VII and the PHRA "depend on the facts of the particular case."
*Jones*, 198 F.3d at 411.

Ms. Acey has failed to plead that InductEV took an adverse employment action against her
when the human resource department declined to take her recommendations regarding employee
programming. Ms. Acey was hired as a technician, and the conditions of her job as a technician
were not altered in any tangible way when InductEV did not take its technician's advice about how
to reduce racial bias in the workplace. Her pay, position, and benefits remained the same, and she
has not averred that her responsibilities involved participating in the creation of content for
employee programming of any kind. Thus, Ms. Acey has not stated a claim for discrimination in
Counts I, II, or III of her complaint.

Construing Ms. Acey's pro se complaint liberally, these same counts could also aver hostile
work environment claims against InductEV. To establish a hostile work environment claim under
Title VII, Ms. Acey must show: (1) that she suffered intentional discrimination because of her race
or sex; (2) that this discrimination was severe or pervasive; (3) that the discrimination
detrimentally affected the plaintiff; (4) that the discrimination would detrimentally affect a
reasonable person of the same race or sex in the plaintiff's position; and (5) that *respondeat
superior* liability exists. *Burgess v. Dollar Tree Stores, Inc.*, 642 F. App'x 152, 154-55 (3d Cir.
2016) (quoting *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir.

2009)); *Williams v. Mercy Health Sys.*, 866 F. Supp. 2d 490, 501 (E.D. Pa. 2012) (citing *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 267 (3d Cir. 2001)).

Ms. Acey has failed to plead a claim for a hostile work environment because she has not pled that she suffered intentional discrimination when InductEV declined to follow her advice about employee programming. "Discriminatory intent has been defined as proof of an actual motive; [it is] not a legal presumption drawn from a factual showing of anything else than actual motive." *Wise v. Ridgewood Corp.*, No. 06-CV-1344 (FSH), 2008 WL 11510332, at *3 (D.N.J. Feb. 11, 2008) (citing *Pullman-Standard v. Swint*, 456 U.S. 273, 290 (1982)). In these counts, Ms. Acey merely makes conclusory statements that InductEV intentionally discriminated against her. *See, e.g.*, Compl. ¶¶ 102, 107, 114-15. However, the Court is not required to accept legal conclusions as true at the motion to dismiss stage. *Baraka*, 481 F.3d at 195. Ms. Acey has simply averred that she made suggestions about programming to reduce racial bias at InductEV, and InductEV did not take her suggestions. Notwithstanding her bare assertions that InductEV declined with the intent to discriminate against her, Ms. Acey has failed to plead any facts that lend this account credibility. Therefore, Ms. Acey has not stated a claim for relief on the basis of a hostile work environment.

Thus, the Court dismisses Counts I, II and III with prejudice for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

### 2. Counts V and VI state a claim for hostile work environment.

The Court construes Ms. Acey's fifth count, "Racial Harassment as a Discriminatory Condition of Employment in Violation of Title VII," as a hostile work environment claim. Count V avers that Ms. Acey experienced "ongoing and pervasive racial harassment as a condition of [her] employment at [InductEV]." Compl ¶ 120, Doc. No. 1-2. In support, Ms. Acey alleges that she was: accused of stealing time and missing meetings, subject to criticism for her work

11

attendance and work ethic, sabotaged by coworkers, and the butt of jokes about studying physics and coming from "the wrong side of the tracks." *Id.* ¶ 121. A senior co-worker of Ms. Acey's at InductEV also "[c]ompared [her] to dark chocolate in front of another colleague during a company ice cream day." *Id.* ¶ 25. Tensions between Ms. Acey and her coworkers allegedly forced Ms. Acey to undertake "additional labor," including documenting her work for her teammates and getting manager approval before sending emails to her teammates. *Id.* ¶¶127-28. Ms. Acey's sixth count of the same name reproduces her fifth count as a violation of the PHRA.

Ms. Acey has sufficiently pled hostile work environment claims against InductEV based on racial discrimination. The Court notes that most of Ms. Acey's work experiences are not facially related to race. *Cf. Chandler v. La-Z-Boy, Inc.*, 621 F. Supp. 3d 568, 574 (E.D. Pa. 2022) ("The taunts from Chandler's colleagues . . . do not support her claim because those taunts, on their face, were not racially based, and there are no facts alleged that otherwise suggest that they were racially motivated"). However, Ms. Acey's pro se complaint avers that these experiences were based on "prevailing racial stereotypes," and she supports that averment by alleging that other Black employees of InductEV were also subject to unfair criticism based on the same racial stereotypes. Compl. ¶ 123, Doc. No. 2-1. "[A]n unpleasant isolated incident" would be insufficient to sustain a hostile work environment claim. *Chandler*, 621 F. Supp. 3d at 573 (quoting *Hoff v. Spring House Tavern*, No. 13-0662, 2013 WL 2434615, at *4 (E.D. Pa. June 5, 2013). But multiple racially discriminatory jokes, some from a senior InductEV employee, comparing Ms. Acey to chocolate ice cream and suggesting that she is from the "wrong side of the tracks," in a workplace where Black workers are routinely subjected to unfair criticism and disproportionate obstacles to their employment as a result of their race could sustain a hostile work environment claim.

Thus, the Court denies InductEV's motion to dismiss Counts V and VI.

12

### 3. Count VII states a claim for employment discrimination under Title VII.

The Court construes Ms. Acey's seventh count, "Discriminatorily Limited Opportunity on the Basis of Race in Violation of Title VII," as a discrimination claim for the failure of InductEV to promote Ms. Acey due to her race. The Court denies InductEV's motion to dismiss Count VII.

Ms. Acey avers that, although she was assigned all the responsibilities of a Senior Technician, she was designated a Technician only, which limited her compensation. Compl. ¶¶ 146, 160, Doc. No. 1-2. This designation was cited by InductEV when Ms. Acey's request for a raise was denied. *Id.* ¶ 160. Ms. Acey points out that seven white colleagues were promoted by InductEV during and around the time of her employment, but she was not promoted to Senior Technician, even though she was already fulfilling all of the duties of the senior role. *Id.* ¶¶ 144-46. She also notes that only one Black employee of InductEV has been promoted in the company's 12-year history. *Id.* ¶ 151.

The Court finds that Ms. Acey has sufficiently pled, at the Rule 12 stage, a claim for employment discrimination based on InductEV's failure to promote her. Ms. Acey has pled that she was qualified for the position of Senior Technician and received less pay because she was designated as a Technician instead. Failure to promote constitutes an adverse employment action under Title VII. *Barnes v. Nationwide Mut. Ins. Co.*, 598 F. App'x 86, 90 (3d Cir. 2015) (citing 42 U.S.C. § 2000e-2(a)(1)). The disproportionate promotion of white employees instead of Black employees at InductEV, paired with Ms. Acey's allegations of both personal racial discrimination and her observations about the treatment of Black colleagues at InductEV, "could give rise to an inference of intentional discrimination." *Makky*, 541 F.3d at 214.

Thus, the Court denies InductEV's motion to dismiss Count VII.

13

### 4. Counts X, XI, and XII do not state a claim for intentional discrimination on the basis of sex.

Ms. Acey's tenth, eleventh, and twelfth counts aver intentional discrimination on the basis of sex in violation of Title VII and the PHRA. To state a claim for sex discrimination under Title VII, a plaintiff must demonstrate: (1) that she is a member of a protected class; (2) that she was qualified for the position she sought to attain or retain; (3) that she suffered an adverse employment action; and (4) that the action occurred under circumstances that could give rise to an inference of intentional discrimination. *Makky*, 541 F.3d at 214. "Generally, claims brought under the PHRA are analyzed under the same standards as their federal counterparts." *Kroptavich*, 795 A.2d at 1055.

Ms. Acey does not aver that she suffered an adverse employment action under circumstances that could give rise to an inference of discrimination. She disapproved of InductEV's training for employees about sexual harassment. *See* Compl. ¶¶ 177-83. She avers that colleagues discriminated against her on the basis of sex by staring at her, commenting on her physical activity, asking whether all other employees had left, brushing against her in an open corridor, and "behav[ing] lewdly towards [her.]" *Id.* ¶¶ 184, 190. Ms. Acey was dissatisfied with the response of human resources when she complained about this behavior. *Id.* ¶¶ 189-91. However, Ms. Acey's supervisor "went out of his way to redirect" a colleague "when he stared at [Ms. Acey's] backside" and asked another colleague's supervisor to stop pressuring Ms. Acey to attend group lunches with him. *Id.* ¶ 190, 192. Because none of these averments identify an adverse employment action, Ms. Acey's claims for sex discrimination under Title VII and the PHRA fail to state a claim pursuant to Rule 12(b)(6).

### 5. Counts X, XI, and XII do state a claim for hostile work environment.

Construing Ms. Acey's pro se complaint liberally, these same three counts could also be understood to aver a hostile work environment claim. To establish a hostile work environment

14

claim under Title VII, Ms. Acey must show: (1) that she suffered intentional discrimination because of her sex; (2) that this discrimination was severe or pervasive; (3) that the discrimination detrimentally affected her; (4) that the discrimination would detrimentally affect a reasonable person of the same sex in the plaintiff's position; and (5) that *respondeat superior* liability exists. *Burgess*, 642 F. App'x at 154-55 (quoting *Huston*, 568 F.3d at 104); *Mercy Health*, 866 F. Supp. 2d at 501 (citing *Abramson*, 260 F.3d at 267). As the Third Circuit Court of Appeals has explained, "[a]n employer is not always vicariously liable for a hostile work environment." *Hitchens v. Montgomery County*, 278 F. App'x 233, 235 (3d Cir. 2008 ) (alteration in original) (quoting *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293 (3d Cir. 1999)). An employer is only liable for a hostile work environment "for an actionable hostile environment *created by a supervisor* with immediate (or successively higher) authority over the employee." *Id.* at 235-36 (emphasis added) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)).

The Court finds that Ms. Acey has sufficiently pled a claim for a hostile work environment based on sex discrimination. Ms. Acey was "admonished" to bring sexual harassment concerns to Judy Talis, InductEV's Chief Administrative Officer. Compl. ¶ 185. However, when Ms. Acey complied, Ms. Talis, a C-level officer of the company, allegedly dismissed her concerns, discouraged Ms. Acey from bringing further details about sexual harassment to her attention, refrained from investigating, and "did not act in good faith to . . . prevent further instances of harassment." *Id.* ¶¶ 185-89, 191. This left Ms. Acey uncertain about how to communicate her concerns about sexual harassment at InductEV. *Id.* ¶ 190. By contrast, Ms. Acey pled that, when she complained about her colleagues to her supervisor, he "went out of his way" to address her concerns. However, she was instructed not to bring these concerns to her helpful supervisor. Instead, she was to bring them to the allegedly dismissive Chief Administrative Officer, Ms. Talis.

15

To the extent that the significant sexual harassment alleged by Ms. Acey was the result of Ms. Talis' dismissive response to Ms. Acey's concerns, Ms. Acey has adequately pled a hostile work environment claim under Title VII to survive InductEV's motion to dismiss.

The Court denies InductEV's motion to dismiss Counts X, XI, and XII.

### B. Ms. Acey's ADA and PHRA Claims for Disability Discrimination

Ms. Acey brings four counts against InductEV for disability-based discrimination. However, Ms. Acey has not alleged with specificity that she is disabled within the meaning of the Americans with Disabilities Act. The Court dismisses Counts XIII, XV, and XVI without prejudice and grants Ms. Acey leave to amend. Count XIV is dismissed with prejudice.

#### 1. Counts XIII, XV, and XVI do not sufficiently plead ADA violations to survive a motion to dismiss.

Ms. Acey has not adequately pled an ADA violation or PHRA violation based on disability discrimination to survive a motion to dismiss. A plaintiff bringing a discrimination claim under the ADA must show that she is "(1) disabled within the meaning of the ADA, (2) can perform essential functions of her job with or without reasonable accommodation, and (3) suffered an adverse employment action as a result of discrimination based on her disability." *Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 137 (E.D. Pa. 2020) (internal quotation marks omitted) (quoting *Drummer v. Trustees of Univ. of Pennsylvania*, 286 F. Supp. 3d 674, 682 (E.D. Pa. 2017). "Generally, claims brought under the PHRA are analyzed under the same standards as their federal counterparts." *Kroptavich*, 795 A.2d at 1055. A plaintiff averring discrimination under the ADA "need not affirmative[ly] plead each prime facie element, but rather must simply state facts sufficient to indicate that discovery can reasonably be expected to lead to evidence satisfying the claim's elements." *Triangle Doughnuts*, 472 F. Supp. 3d at 137 (citing *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016)).

Ms. Acey's pro se complaint does not sufficiently allege that she is disabled within the meaning of the ADA. She has vaguely averred that in April 2022 she "experienced an onset of symptoms that would later become a chronic condition." Compl. ¶ 44, Doc. No. 1-2. Her complaint is written in the first person and proceeds to refer to "my disability." *See id.* ¶¶ 69, 214, 220, 226. The ADA defines an "individual with a disability" as someone who has "(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) has a record of such an impairment, or (3) is regarded as having such an impairment." *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007) (citing 29 U.S.C. § 705(20)(B)). Ms. Acey's complaint contains vague allegations relating to her putative disability but does not contain sufficient factual matter for the Court to determine whether she qualifies as disabled under the ADA. Whatever her disability may be, the Court does construe her complaint to aver that Ms. Acey could return to work if provided an accommodation in the form of medical leave. *See* Compl. ¶ 73 (stating that Ms. Acey provided a return to work letter from her doctor).

With respect to the third element of an ADA claim, Ms. Acey has averred her dissatisfaction with the procedures InductEV employed to determine her eligibility for medical leave. Compl. ¶¶ 205-13. She vaguely asserts InductEV's request that she sign a blank form "would provide fraudulent aid to [her] being terminated on the basis of [her] disability." Compl. ¶¶ 205-14. The Court liberally construes the pro se complaint to aver that InductEV fired Ms. Acey because of her disability. At the motion to dismiss stage, this satisfies "the post-*Twombly* pleading standard[,]" which "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements." *Connelly*, 809 F.3d at 789 (3d Cir. 2016) (quoting *Phillips v. County. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (internal

17

quotation marks omitted)). However, Ms. Acey will need to produce further evidence of discrimination based on disability through the discovery process.

The Court dismisses Counts XIII, XV, and XVI without prejudice and grants Ms. Acey leave to amend her complaint to address the deficiency as to the first element of a claim of disability discrimination.

### 2. Count XIV does not state a claim upon which relief can be granted.

Ms. Acey's fourteenth claim avers that InductEV's Chief Administrative Officer, Ms. Talis, aided and abetted InductEV's discriminatory termination of Ms. Acey by undertaking a course of action in Ms. Talis' role as InductEV's Chief Administrative Officer. Compl. ¶¶ 221-26. However, a defendant "cannot aid and abet its own unlawful conduct." *Hewitt v. BS Transp. of Ill., LLC*, 355 F. Supp. 3d 227, 239 (E.D. Pa. 2019). Ms. Talis could not have aided and abetted InductEV's alleged discrimination while acting as an agent of InductEV itself.

Thus, the Court dismisses Count XIV with prejudice.

### C. Ms. Acey's Retaliation Claims

The Court construes Ms. Acey's seventeenth, eighteenth, and nineteenth counts as Title VII retaliation claims.[2] The elements of a Title VII retaliation claim are: (1) the plaintiff "engaged in activity protected by Title VII; (2) the employer took adverse employment against her; and (3) there was a causal connection between her participation in the protected activity and the adverse

---

[2] To the extent that Count XVII, "Attempting to Coerce Unlawful Discrimination—Constructive Termination," alleges a constructive discharge claim, it is dismissed. There are two elements of a constructive discharge claim: "A plaintiff must prove first that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign. But he must also show that he actually resigned." *Green v. Brennan*, 578 U.S. 547, 555 (2016). Ms. Acey has not pled that she resigned but that she was terminated. Compl. ¶ 261, Doc. No. 1-2. Thus, she has not pled a claim for constructive discharge.

employment action." *Selvato v. SEPTA*, 658 F. App'x 52, 56 (3d Cir. 2016) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).

Ms. Acey engaged in activity protected by Title VII by filing an EEOC complaint, and she has pled that InductEV terminated her after she exercised that right. InductEV argues that it never fired Ms. Acey but merely acted on her putative agreement to resign in exchange for $50,000. However, the Court has already explained that it cannot conclude at this stage whether an agreement was actually reached. Simply put, Ms. Acey has pled that she filed an EEOC complaint and engaged in mediation with InductEV that did not yield a final agreement. Eight days later, InductEV allegedly fired her. This so-called termination may have in fact been in accordance with a settlement agreement reached during mediation, but Ms. Acey has plausibly pled that she was terminated eight days after her EEOC mediation failed to yield any such agreement. The Court also notes Ms. Acey's allegation that InductEV told her she would be sued if she did not withdraw her EEOC complaint.

Thus, the Court denies InductEV's motion to dismiss Counts XVII, XVIII, and XIX.

### D. Alleged Violations of 42 U.S.C. § 1981

Ms. Acey's fourth, eighth, and ninth counts aver violations of 42 U.S.C. § 1981. To state a claim under § 1981 based on race, a plaintiff must allege: "(1) that plaintiff is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute, which includes the right to make and enforce contracts[.]" *Jordan v. Staffing Plus, Inc.*, 315 F. Supp. 3d 844, 847 (E.D. Pa. 2018) (citing *Brown v. Philip Morris Inc.*, 250 F.3d 789, 797 (3d Cir. 2001)).

#### 1. Unequal Pains

Counts IV and IX aver that Ms. Acey's efforts to oppose racial harassment were an "unequal pain" imposed upon her in violation of § 1981(a). Compl. ¶¶ 117, 172. The statute reads:

19

> All persons within the jurisdiction of the United States shall have
> the same right in every State and Territory to make and enforce
> contracts, to sue, be parties, give evidence, and to the full and equal
> benefit of all laws and proceedings for the security of persons and
> property as is enjoyed by white citizens, and shall be subject to like
> punishment, pains, penalties, taxes, licenses, and exactions of every
> kind, and to no other.

42 U.S.C. § 1981(a). Ms. Acey argues that "had [she] not been Black[,] [she] would not have had

to oppose racial harassment," which constitutes "an unequal pain compared to White citizens."

Compl. ¶ 117, Doc. No. 1-2. The Court understands the averred "unequal pain" to be that Ms.

Acey recommended changes to InductEV's employee programming with respect to race, which

InductEV declined to follow. However, as discussed above, Ms. Acey has not pled that she

suffered intentional discrimination when InductEV declined to follow her advice about employee

programming. Thus, Ms. Acey has not pled that InductEV intentionally discriminated against her

in the course of her efforts to oppose racial harassment.

The Court grants InductEV's motion to dismiss Counts IV and IX with prejudice.

### 2. Right to Make and Enforce Contracts

Count VIII avers that Ms. Acey's "right to make and enforce contracts" pursuant to §

1981(b) was infringed when InductEV declined to promote her. Compl. ¶¶ 165-66. The statute

defines the right to make and enforce contracts as including: "the making, performance,

modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms,

and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Ms. Acey seizes on the

statutory word "modification," arguing that InductEV's failure to promote her constituted a denial

of her right to modify her contract. *See* Compl. ¶¶ 165-66.

InductEV summarily asserts that this count should be dismissed because the paragraphs

that appear underneath it in Ms. Acey's pro se complaint are "vague and conclusory allegations

that do not suffice under Rule 8." However, InductEV ignores Ms. Acey's allegations elsewhere

20

relating to white colleagues who were promoted during the relevant time period, *see id.* ¶¶ 144-46, the dearth of promoted Black employees at InductEV, *see id.* at ¶ 151, and the mismatch between her qualifications and responsibilities on the one hand and her formal designation and pay on the other, which InductEV cited to deny her a raise, *see id.* at ¶¶ 146, 160. As the Court has already explained, these averments "could give rise to an inference of intentional discrimination." *Makky*, 541 F.3d at 214. Facially, Ms. Acey has plausibly pled that she was discriminated against on the basis of her race when she was prevented from engaging in contract-modification, an activity specifically enumerated in § 1981.

Thus, the Court denies InductEV's motion to dismiss Count VIII.

### E. **Intentional Infliction of Emotional Distress**

Ms. Acey's twentieth count avers that InductEV is liable for intentional infliction of emotional distress, or IIED. To state a claim for intentional infliction of emotional distress, a plaintiff must plead that the defendant's conduct: (1) was "extreme and outrageous," (2) was "intentional or reckless," and (3) caused severe emotional distress. *Jordan v. Pa. State Univ.*, 276 A.3d 751, 775 (Pa. Super. Ct. 2022) (quoting *Madreperla v. Williard Co.*, 606 F. Supp. 874, 879-90 (E.D. Pa. 1985)). To satisfy the first element of an IIED claim, the conduct alleged must be "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting *Rineheimer v. Luzerne Cty. Cmty. Coll.*, 539 A.2d 1298, 1305 (Pa. 1988)).

The Court does not minimize either the importance or severity of Ms. Acey's claims. However, she has not averred misconduct by InductEV that rises to the level of atrocity required to support an IIED claim. "[R]acial discrimination alone does not meet the 'extreme and outrageous conduct' standard necessary to state a claim for intentional infliction of emotional distress." *Jackson v. Lehigh Valley Physicians Grp.*, No. 08-3043, 2009 WL 229756, at *9 (E.D.

Pa. Jan. 30, 2009) (quoting *Hargraves v. City of Philadelphia*, No. 05-CV-4759, 2007 WL 1276937, at *3 (E.D. Pa. Apr. 26, 2007). In support of her IIED claim, Ms. Acey avers that InductEV has failed to fulfill its obligation to "work[] in good faith to prevent, address[,] or eliminate unlawful discrimination[.]" Compl. ¶ 279, Doc. No. 1-2. However, the Court cannot conclude that a company with room to improve its employee programming about combating workplace bias has gone "beyond all possible bounds of decency" by failing to do so. *Jordan*, 276 A.3d at 775. Thus, Ms. Acey has not plausibly pled a claim for IIED.

The Court grants InductEV's motion to dismiss Count XX with prejudice.

## CONCLUSION

Ms. Acey has plausibly pled claims for discrimination and a hostile work environment based on race; a hostile work environment based on sex; retaliation for exercising rights protected by Title VII; and a claim for racial discrimination under § 1981. InductEV has not demonstrated either the existence of an enforceable settlement agreement or that Ms. Acey failed to exhaust her claims. Pursuant to Rule 12(b)(6), the Court dismisses Counts I, II, III, IV, IX, XIII, XIV, XV, XVI, and XX. The Court grants Ms. Acey leave to amend her complaint to address deficiencies in those counts dismissed without prejudice, namely Counts XIII, XV, and XVI. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ASSATA ACEY, | : | |
| *Plaintiff* | : | **CIVIL ACTION** |
| v. | : | |
| | : | |
| INDUCTEV, | : | |
| *Defendant* | : | **No. 23-1438** |

## MEMORANDUM

PRATTER, J.                                                      MARCH __12__, 2024

InductEV allegedly discriminated against Assata Acey on the basis of race, sex, and disability during her term of employment. Ms. Acey's original complaint contained 20 counts, and InductEV filed a motion to dismiss. The Court dismissed half of Ms. Acey's counts, and Ms. Acey filed a motion to reconsider regarding five of the dismissed counts. The Court denies Ms. Acey's motion to reconsider.

### LEGAL STANDARD

"The purpose of a motion for reconsideration . . . is to correct manifest errors of law or fact or to present newly discovered evidence." *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (quoting *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985)). The party seeking reconsideration "must show that (1) there has been 'an intervening change in controlling law,' (2) new evidence is available, and/or (3) there is a 'need to correct a clear error of law or fact to prevent manifest injustice.'" *Davender v. Warden Fairton FCI*, 757 F. App'x 74, 77 (3d Cir. 2018) (quoting *Max's Seafood Café*, 176 F.3d at 677).

1

## DISCUSSION

Ms. Acey asks the Court to reconsider in part its partial grant of the motion to dismiss filed by InductEV. Specifically, she asks the Court to reconsider its dismissal of Counts I, III, IV, IX, and XX. Mot. for Recons. ¶¶ 3–4, Doc. No. 51.

Ms. Acey's motion does not argue either that the law controlling this case has changed or that new evidence is available. Because she has neither demonstrated clear factual or legal error in the Court's opinion nor identified any manifest injustice in the Court's partial grant of InductEV's motion to dismiss, the Court denies her the motion for reconsideration.

### I.   Discrimination Claims

Counts I and III could be construed as averring discrimination or hostile work environment claims. *See* Mem. Op. at 9–10, Doc. No. 49. The Court dismissed the discrimination claims insofar as Ms. Acey failed to plead that InductEV took an adverse employment action against her. *Id.* at 10. Ms. Acey's motion highlights her averment that she "relayed specific instances of racial harassment" and then received an email "claiming [she] had not provided specific instances." Mot. for Recons. ¶ 8, Doc. No. 51. However, when an employee receives an email that describes a meeting otherwise than they recall that meeting, no "tangible employment action constitut[ing] a significant change in employment status" has occurred. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). Thus, Ms. Acey has failed to demonstrate a clear error of law or fact with respect to these discrimination claims.

### II.   Hostile Work Environment and § 1981 Claims

The Court dismissed the hostile work environment claims conceivably brought under Counts I and III, as well as the § 1981 claims brought under Counts IV and IX, insofar as Ms. Acey failed to plead that InductEV intentionally discriminated against her on the basis of race after the aforementioned meeting. *See* Mem. Op. at 10–11, 19–20, Doc. No. 49. Though Ms. Acey avers

2

that the aforementioned email "was sent with the intent and effect of intimidating [her] for opposing racial discrimination," Mot. for Recons. ¶ 8, Doc. No. 51, the Court is not required to accept legal conclusions couched as factual averments at the Rule 12 stage, *see Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Ms. Acey asserts that the only "logical purpose" for sending an email that did not accord with her recollection was to "convey to [her] that they were purposefully ignoring [her] allegations." Mot. for Recons. ¶ 8, Doc. No. 51. But this rigid interpretation ignores Ms. Acey's own allegations that, after Ms. Acey shared instances of discrimination with her employer, her employer asked to "clarify details" about those instances and requested notes about that discrimination to improve future trainings. Compl. ¶¶ 97–98, Doc. No. 1-2. In light of these allegations, Ms. Acey has failed to demonstrate a clear error of fact or law simply because the Court declined to adopt her legal conclusion about the allegedly discriminatory intent behind this email.

Ms. Acey also appears to suggest that the Court's reasoning with respect to her hostile work environment claims based on sex discrimination should apply equally to her claims based on race discrimination. *See* Mot. for Recons. ¶ 10, Doc. No. 51. In support, she vaguely references four supposed facts "from the Case records" without explanation. *Id.* ¶ 11. This conclusory argument fails to identify any "clear error of law or fact," much less a manifest injustice. *See Davender*, 757 F. App'x at 77.

The Court denies Ms. Acey's motion to reconsider its dismissal of Counts I, III, IV, and IX.

### III.    Intentional Infliction of Emotional Distress

Ms. Acey contends that the Court erred by dismissing her claim for intentional infliction of emotional distress ("IIED") under Count XX. Mot. for Recons. ¶¶ 13–15, Doc. No. 51. She

3

appears to assert that all of her averments against InductEV collectively make out a claim for IIED. *See id.* ¶ 15. Specifically, Ms. Acey avers she was "subjected to an egregious and ongoing combination of various forms of unlawful harassment" at the hands of InductEV. Compl. ¶ 278, Doc. No. 1-2. However, to state a claim for IIED, a plaintiff must plead conduct that is "outrageous in character and . . . *extreme in degree.*" *Jordan v. Pa. State Univ.*, 276 A.3d 751, 775 (Pa. Super. Ct. 2022) (emphasis added) (quoting *Rinehimer v. Luzerne Cty. Cmty. Coll.*, 539 A.2d 1298, 1305 (Pa. Super. Ct. 1988)). Averring *many* grievances against a defendant in a lengthy complaint is insufficient to make out a claim for IIED because IIED requires the plaintiff to aver *extreme* conduct. Though Ms. Acey vaguely invokes the entirety of her complaint, she has failed to demonstrate a clear error of fact or law with respect to the Court's analysis of Count XX. *Davender*, 757 F. App'x at 77.

The Court denies Ms. Acey's motion to reconsider its dismissal of Count XX.

## CONCLUSION

Ms. Acey has not met her burden. The Court therefore denies her motion to reconsider. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

4

# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

## Case No. 24-1521

Assata Hackman, Appellant v. InductEV, Appellee

Appeal from the Orders of Hon. Gene E. K. Pratter, U.S.D.J

In the United States District Court of the Eastern District of Pennsylvania

### Appendix Volume 2

**pp. 32-100**

### Vol. 2 Table of Contents



1. **Relevant Docket Entries pp. 32-36**

2. **Relevant Complaint Background (Compl. ¶¶ 38-50, 120-126) pp. 37-40**

3. **Complaint Count I pp. 41-43**

4. **Complaint Count III pp. 44-45**

5. **Complaint Count IV pp. 46-47**

6. **Complaint Count IX pp. 48-49**

7. **Motion to Reconsider pp. 50-53**

8. **Motion for Entry of Final Judgement pp. 54-62**

9. **Partial Appendix from Motion for Entry of Final Judgment (Items 4-6 and 18-27) pp. 63-88**

10. **Motion for Leave to amend pp. 89-101**

APPEAL,PS-C

# United States District Court
## Eastern District of Pennsylvania (Philadelphia)
### CIVIL DOCKET FOR CASE #: 2:23-cv-01438-GEKP

ACEY v. INDUCTEV
Assigned to: DISTRICT JUDGE GENE E.K. PRATTER
Case in other court: COURT OF COMMON PLEAS OF
          CHESTER COUNTY, 23-01782-CT
          US COURT OF APPEALS, 24-01521
Cause: 28:1441 Notice of Removal- Civil Rights Act

Date Filed: 04/14/2023
Jury Demand: None
Nature of Suit: 442 Civil Rights:
Employment
Jurisdiction: Federal Question

**Plaintiff**

ASSATA ACEY

represented by **ASSATA ACEY**
5121 Brown Street
Philadelphia, PA 19139
Email: ACEYASSATA@GMAIL.COM
PRO SE



**Defendant**

**INDUCTEV**

represented by **Alberto Longo**
Fox Rothschild LLP
980 Jolly Road, Suite 110
Blue Bell, PA 19422
610-397-3933
Fax: 610-397-0450
Email: alongo@foxrothschild.com
*ATTORNEY TO BE NOTICED*

**RANDALL C. SCHAUER**
FOX ROTHSCHILD LLP
747 CONSTITUTION DR
SUITE 100
EXTON, PA 19341
610-458-4967
Email: rschauer@foxrothschild.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/27/2024 | 50 | MEMORANDUM ORDER THAT PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 5 ) IS DENIED. DEFENDANT'S MOTION TO DISMISS (DOC. NO. 10 ) IS GRANTED IN PART AND DENIED IN PART AS OUTLINED HEREIN. SIGNED BY DISTRICT JUDGE GENE E.K. PRATTER ON 2/27/24. 2/28/24 ENTERED AND COPIES E-MAILED.(amas) (Entered: 02/28/2024) |
| 02/28/2024 | 51 | MOTION FOR RECONSIDERATION, WITH VERIFICATION OF SERVICE, FILED BY ASSATA ACEY. (Attachments: # 1 COVER PAGE)(amas) (Entered: 02/29/2024) |
| 02/29/2024 | 52 | ORDER THAT DEFENDANT'S MOTION FOR SANCTIONS (DOC. NO. 29) IS DENIED WITHOUT PREJUDICE. PLAINTIFFS FIRST MOTION FOR PROTECTIVE ORDER (DOC. NO. 33) IS DENIED. THE PARTIES ARE INSTRUCTED TO WORK TOGETHER TO SCHEDULE THE DEPOSITION OF ASSATA ACEY, WHICH MUST TAKE PLACE ON OR BEFORE APRIL 12, 2024. PLAINTIFFS FIRST MOTION FOR SANCTIONS (DOC. NO. 42), PLAINTIFFS SECOND MOTION FOR SANCTIONS (DOC. NO. 43), AND PLAINTIFFS THIRD MOTION FOR SANCTIONS (DOC. NO. 44) ARE DENIED AS MOOT. PLAINTIFFS MOTION FOR ECF ACCESS (DOC. NO. 38) IS DENIED. |

| | | |
|---|---|---|
| | | PLAINTIFFS SECOND MOTION FOR PROTECTIVE ORDER (DOC. NO. 41) IS DENIED. DEFENDANT'S MOTION TO STRIKE (DOC. NO. 46) IS DENIED AS MOOT.SIGNED BY DISTRICT JUDGE GENE E.K. PRATTER ON 2/28/24.2/29/24 ENTERED AND COPIES E−MAILED.(amas) (Entered: 02/29/2024) |
| 02/29/2024 | 53 | AMENDED SCHEDULING ORDER THAT ALL DISCOVERY SHALL BE COMPLETED BY 4/12/24. DAUBERT MOTIONS AND ANY MOTIONS FOR SUMMARY JUDGMENT SHALL BE FILED BY 6/28/24. PLAINTIFF'S PRETRIAL MEMORANDA SHALL BE FILED BY 7/26/24. DEFENDANTS PRETRIAL MEMORANDA SHALL BE FILED BY 8/2/24. A FINAL PRETRIAL CONFERENCE WILL BE HELD ON 9/5/24, AT 10:00 AM, IN COURTROOM 10B. THE CASE WILL BE PLACED ON THE COURT'S TRIAL POOL LIST ON 9/10/24. FURTHER INFORMATION AND DEADLINES OUTLINED HEREIN. SIGNED BY DISTRICT JUDGE GENE E.K. PRATTER ON 2/28/24. 2/29/24 ENTERED AND COPIES E−MAILED.(amas) (Entered: 02/29/2024) |
| 03/04/2024 | 54 | REQUEST FOR THE PRODUCTION OF DOCUMENTS AND THINGS, FILED BY ASSATA ACEY. (Attachments: # 1 Certificate of Service, # 2 COVER PAGE)(amas) (Entered: 03/05/2024) |
| 03/07/2024 | 55 | MOTION TO COMPEL DEPOSITION filed by ASSATA ACEY.. (Attachments: # 1 Exhibit, # 2 COVER LETTER)(bw) (Entered: 03/08/2024) |
| 03/11/2024 | 56 | RESPONSE to Motion re 55 MOTION to Compel filed by INDUCTEV. (SCHAUER, RANDALL) (Entered: 03/11/2024) |
| 03/12/2024 | 57 | ORDER THAT THE MOTION TO COMPEL DEPOSITION (DOC. NO. 55 ) IS DENIED AS MOOT. SIGNED BY DISTRICT JUDGE GENE E.K. PRATTER ON 3/12/24.3/12/24 ENTERED AND COPIES E−MAILED.(amas) (Entered: 03/12/2024) |
| 03/12/2024 | 58 | MEMORANDUM. SIGNED BY DISTRICT JUDGE GENE E.K. PRATTER ON 3/12/24. 3/13/24 ENTERED AND COPIES E−MAILED.(amas) (Entered: 03/13/2024) |
| 03/12/2024 | 59 | MEMORANDUM ORDER THAT PLAINTIFF'S MOTION FOR RECONSIDERATION (DOC. NO. 51 ) IS DENIED WITH PREJUDICE. SIGNED BY DISTRICT JUDGE GENE E.K. PRATTER ON 3/12/24. 3/13/24 ENTERED AND COPIES E−MAILED.(amas) (Entered: 03/13/2024) |

APPEAL,PS-C

# United States District Court
## Eastern District of Pennsylvania (Philadelphia)
### CIVIL DOCKET FOR CASE #: 2:23-cv-01438-GEKP

ACEY v. INDUCTEV
Assigned to: DISTRICT JUDGE GENE E.K. PRATTER
Case in other court:  COURT OF COMMON PLEAS OF
CHESTER COUNTY, 23-01782-CT
US COURT OF APPEALS, 24-01521
Cause: 28:1441 Notice of Removal- Civil Rights Act

Date Filed: 04/14/2023
Jury Demand: None
Nature of Suit: 442 Civil Rights:
Employment
Jurisdiction: Federal Question

**Plaintiff**

ASSATA ACEY

represented by **ASSATA ACEY**
5121 Brown Street
Philadelphia, PA 19139
Email: ACEYASSATA@GMAIL.COM
PRO SE

V.

**Defendant**

INDUCTEV

represented by **Alberto Longo**
Fox Rothschild LLP
980 Jolly Road, Suite 110
Blue Bell, PA 19422
610-397-3933
Fax: 610-397-0450
Email: alongo@foxrothschild.com
*ATTORNEY TO BE NOTICED*

**RANDALL C. SCHAUER**
FOX ROTHSCHILD LLP
747 CONSTITUTION DR
SUITE 100
EXTON, PA 19341
610-458-4967
Email: rschauer@foxrothschild.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/31/2024 | 73 | RULE 54 MOTION, FILED BY ASSATA ACEY. (Attachments: # 1 Text of Proposed Order, # 2 VERIFICATION OF SERVICE, # 3 APPENDIX, # 4 COVER PAGE)(amas) (Entered: 04/01/2024) |
| 04/04/2024 | 74 | ORDER THAT PLAINTIFFS MOTION TO COMPEL PRODUCTION, TO PERMIT DEPOSITIONS, AND FOR SANCTIONS (DOC. NO. 60) IS DENIED. INSOFAR AS PLAINTIFFS MOTION (DOC. NO. 60) SEEKS TO COMPEL THE PRODUCTION OF DOCUMENTS, THE MOTION (DOC. NO. 60) IS DENIED WITHOUT PREJUDICE AS PREMATURE. INSOFAR AS PLAINTIFFS MOTION (DOC. NO. 60) SEEKS TO PERMIT DEPOSITIONS, THE MOTION (DOC. NO. 60) IS DEEMED MOOT. INSOFAR AS PLAINTIFFS MOTION (DOC. NO. 60) ASKS THE COURT TO SANCTION DEFENSE COUNSEL, THE MOTION (DOC. NO. 60) IS DENIED WITHOUT PREJUDICE. SIGNED BY DISTRICT JUDGE GENE E.K. PRATTER ON 4/4/24.4/4/24 ENTERED AND COPIES E-MAILED.(amas) (Entered: 04/04/2024) |
| 04/04/2024 | 75 | ORDER THAT PLAINTIFFS MOTION TO COMPEL DEPOSITION (DOC. NO. 65), IS DEEMED MOOT.SIGNED BY DISTRICT JUDGE GENE E.K. PRATTER ON 4/4/24.4/4/24 ENTERED AND COPIES E-MAILED.(amas) (Entered: |

| | | |
|---|---|---|
| | | 04/04/2024) |
| 04/05/2024 | 76 | MOTION TO RECONSIDER DOC 74, WITH VERIFICATION, FILED BY ASSATA ACEY.(amas) (Entered: 04/05/2024) |
| 04/05/2024 | 79 | USCA Appeal Fees received $ 605 receipt number 20019034 re 67 Notice of Appeal filed by ASSATA ACEY (sbt) (Entered: 04/10/2024) |
| 04/08/2024 | 77 | RESPONSE in Opposition re 70 MOTION for Sanctions *and Cross Motion for Sanctions* filed by INDUCTEV. (Attachments: # 1 Brief Defendant's Opposition to Plaintiff's Motion to Impose Sanctions, Schedule a Hearing, and Issue an Order to Produce Witnesses and Cross Motion for Sanctions, # 2 Exhibit A − Confirming Depos Heisler and Rensel, # 3 Exhibit B − Ltr to Ms. Acey re Representation, # 4 Exhibit C − Plff Response to 3−14−23 Ltr, # 5 Exhibit D − Email re Protective Order, # 6 Exhibit E − Plff Late 3−15−23 email, # 7 Exhibit F − Heisler Transcript, # 8 Exhibit G − Rensel and Heisler Corr., # 9 Exhibit H − Talis Communications, # 10 Exhibit I − 3−8−23 Corr., # 11 Exhibit J − July 2023 Ntc of Depo, # 12 Exhibit K − Plff Refusal to Sit for Depo, # 13 Exhibit L − Ms. Acey re 3rd Party Ltrs, # 14 Exhibit M − 3rd Party Ltr, # 15 Exhibit N − Acey Response re 3rd Party Ltrs, # 16 Exhibit O − Production Subpoena, # 17 Text of Proposed Order)(SCHAUER, RANDALL) (Entered: 04/08/2024) |
| 04/09/2024 | 78 | REPLY TO DOC. 77 , FILED BY ASSATA ACEY. (Attachments: # 1 VERIFICATION, # 2 COVER PAGE)(amas) (Entered: 04/10/2024) |
| 04/10/2024 | 80 | ORDER THAT PLAINTIFFS DISCOVERY MOTION (DOC. NO. 70), DEFENDANTS CROSS MOTION FOR SANCTIONS (DOC. NO. 77), AND PLAINTIFFS MOTION TO RECONSIDER (DOC. NO. 76) ARE DENIED AS OUTLINED HEREIN. IF PLAINTIFF BELIEVES THAT DEFENDANT HAS WITHHELD INFORMATION TO WHICH PLAINTIFF IS LEGALLY ENTITLED, PLAINTIFF SHALL, ON OR BEFORE APRIL 15, 2024, SUBMIT A MEMORANDUM OF NO GREATER THAN THREE (3) DOUBLE−SPACED PAGES WITH ONE−INCH MARGINS SUCCINCTLY DESCRIBING WITH SPECIFICITY THE INFORMATION THAT PLAINTIFF SEEKS FROM DEFENDANT, BUT THAT DEFENDANT HAS FAILED TO PROVIDE. PLAINTIFF MAY NOT ATTACH ANYTHING TO THIS THREE−PAGE MEMORANDUM. IF PLAINTIFF SUBMITS THE MEMORANDUM DESCRIBED IN PARAGRAPH 3(A), DEFENDANT SHALL, ON OR BEFORE APRIL 19, 2024, SUBMIT A MEMORANDUM OF NO GREATER THAN FIVE (5) DOUBLE−SPACED PAGES WITH ONE−INCH MARGINS SUCCINCTLY ADDRESSING WITH RESPECT TO EVERY ITEM OF INFORMATION SOUGHT BY PLAINTIFF, ETC. SIGNED BY DISTRICT JUDGE GENE E.K. PRATTER ON 4/10/24.4/11/24 ENTERED AND COPIES E−MAILED.(amas) (Entered: 04/11/2024) |
| 04/10/2024 | 81 | ORDER THAT PLAINTIFFS RULE 54 MOTION (DOC. NO. 73) IS DENIED AS MOOT. SIGNED BY DISTRICT JUDGE GENE E.K. PRATTER ON 4/10/24.4/11/24 ENTERED AND COPIES E−MAILED.(amas) (Entered: 04/11/2024) |
| 04/15/2024 | 82 | RESPONSE TO DOC 70, FILED BY ASSATA ACEY. (Attachments: # 1 COVER PAGE)(amas) (Entered: 04/16/2024) |
| 04/19/2024 | 83 | Memorandum re 70 MOTION for Sanctions *in Response to Plaintiff's Response to Doc 70 Pursuant to the Court's April 10, 2024 Order* filed by INDUCTEV. (Attachments: # 1 Verification)(SCHAUER, RANDALL) (Entered: 04/19/2024) |
| 04/22/2024 | 84 | MOTION FOR LEAVE TO AMEND, FILED BY ASSATA ACEY. (Attachments: # 1 EXHBIT, # 2 VERIFICATION, # 3 Text of Proposed Order, # 4 COVER PAGE)(amas) (Entered: 04/22/2024) |

32. Before the end of 2021, it became clear that the nature of my job duties was objectively more advanced than the formal designation of my role.

33. After tasks of organizing meetings to formalize the relationship between Quality and Mechanical departments, providing theoretical chemical consultation to maximize product use, and drafting circuitry for an upcoming high stakes project, it became clear that my task types were not aligned with my job classification- and as the one of the lower-ranking members of my team, I felt that this was due to race and gender.

34. I made sure to document these contributions in my performance review while hinting my desire to be properly compensated for future advanced duties.

35. I also took the time to communicate the concerns of being misclassified to my supervisor- even going so far as to send potential job titles and descriptions in line with current duties.

36. Despite this I continued to find myself completing advanced tasks such as, providing ANSI compliant calculations, documentation, and PPE procurement for laser usage—all without any change in role.

37. This continued until my leave of absence.

38. Between January and April of 2022, lack of cooperation from colleagues who had criticized me grew to be so great that my supervisor had to have me submit emails to him so that he could forward them to others with his stamp of approval—instead of the teamwide procedure of emailing others directly and cc-ing him as needed.

39. On February 7, 2022, in a meeting held by CAO to explain why we couldn't share my curated movie list for Black History Month-- I discussed recent experiences and why I saw the need for an ongoing diversity initiative.

*2023-01782-CT*

40. These experiences included:

   a) Witnessing a White employee complaining to two other non-Black employees, that Julian needed to "get off his lazy ass" to close a garage door sooner.

   b) An event where one of those same witnessing employees had unrelentingly questioned me to regarding my job tasks and how I was "spending my time" while supporting a project at a location where they had been unable to surveil me.

   c) Various acts of hostility towards me by a White team member including:

      i)    Snatching my notes from my hands to prevent me from describing our joint project to supervising engineer.

      ii)   Slamming a door in my face, after holding open the door for a White woman

      iii)  Criticizing me in our shared team group chat with disproportionate and inappropriate fierceness.

41. Immediately following our meeting, I summarized its content to my supervisor in a Teams message.

42. In the days following, HR chose to call me again to confirm details, before emailing that I had not reported any events and was invited to recount details in writing along with suggestions for the annual diversity training.

43. Upon hearing I was working from home with nausea during one of the confirmation calls, CAO asked if I was pregnant and doubled down in suggesting that I see her daughter's gynecologist.

44. Around April 18, 2022, I experienced an onset of symptoms that would later become a chronic condition.

45. On April 18 I emailed CAO to request access to unpaid time off and complained that the current PTO policy placed ill people on a short track for probation and encouraged employees to prioritize attendance over safe execution of tasks.

46. During CAO's insisted in-person meeting to discuss these concerns off record, I again shared my impression about a safety infraction where I:

    a) Sought and received permission from Test Bay employees to view a model on behalf of a mechanical engineering employee.

    b) Briefly approached the model while keeping my hands raised and exaggerated standing as far away as possible.

    c) Responded to another employee's assertion of the dangerous voltage level in stating, "I know".

47. The safety report made about me had suggested that I was combative towards the Rob member when he tried to keep me from "touching" the high voltage model.

48. In my review, I expressed frustration that the accusations:

    a) Were patently false.

    b) Contrasted verbal or visual cues before and while viewing the model.

49. I also expressed concern that bias had motivated the misconception, since:

    a) My perceived noncompliance contrasted with the electrical safety etiquette I had demonstrated over my time at the company.

    b) Those who were accusing me routinely ignored the safety rules and each other's noncompliance.

    c) My experience in high voltage testing, which I discussed with Rob when he interviewed me, contrasted the reckless behavior others had expected of me, as I was

trained to operate with voltages more than 30x of what the Test department was using.

50. HR responded to my concern about the bias behind the dismissed report and the stress it had caused me by stating that no one would have seen my resume to know my qualifications.

51. I was also reassured, during our 04/18/2022 meeting, that I would be allowed to take unpaid time following the communication of my conditions and, that there was an option to modify my role or tasks in a way that fit me and the company.

52. I immediately recounted these reassurances to my supervisor in hopes that it would be of use to another chronically ill team member.

53. Despite this, I was informed only 2 days before close of the pay period that my accommodations would only take place in the next pay period.

54. This caused me to immediately stay after hours while symptomatic to make up time taken to go to two doctor's appointments that day.

55. HR continued to affirm that I was denied unpaid time by emailing before the weekend and calling after I asked my supervisor to inform them of my abnormal MRI results—to request that I submit a PTO request for "missing time".

56. The trauma of being harassed by HR while simultaneously coming to terms with my sudden regard as having a serious illness was so jarring, that I resolved to evaluate my experiences in totality.

57. Finding several instances where I was treated below the legal standard, and holding no faith that these issues would cease to occur without further action, I filed a complaint to the PHRC office.

had I been White; Defendant has intentionally violated 42 U.S.C. § 1981, ; therefore, I

demand judgment in my favor and against the defendant, in an undetermined award

amount together with all applicable equitable relief, compensatory and punitive damages,

as well as any other relief designated by the court.

<div align="center"><u>COUNT V:</u></div>

# RACIAL HARASSMENT AS A DISCRIMINATORY CONDITION OF EMPLOYMENT

## IN VIOLATION OF TITLE VII OF THE CIVIL

### RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-2 (a)(1)

120. As a Black employee, I experienced ongoing and pervasive racial harassment as a
condition of my employment at Defendant.

121. This harassment included:

    a)    Enhanced scrutiny from HR and their false accusations me of stealing time
and purposefully missing meetings.

    b)    Anonymous and direct coworker criticisms of my work attendance, work
ethic, bathroom breaks frequency.

    c)    Hostile sabotage from coworkers where my access to work tools and
equipment, or my ability to get completed build approved were greatly
affected.

    d)    Written and verbal jokes- including a comic posted on my cubicle about a
hypothetical "phizzics" degree, and one employee's joke about me being on
the wrong side of the tracks.

122. Because of the race-specific element to my harassment, my White coworkers did not
have to endure it as a condition of employment; it is a discriminant condition and an

"unequal pain" that is explicitly written in the purpose of the Civil Rights Act of 1866, 42
U.S.C. §1981 (a).

123. The racial basis of these experience is informed by circumstantial evidence and
prevailing racial stereotypes:

    a)    Harassment described in paragraph 121 was based on adopted racial
          stereotypes of Black people being lazy or untrustworthy.

    b)    Black employees such as me, Omar Jackson, and Julian Jackson were each
          criticized as lazy on occasions where the reasoning or veracity was inaccurate
          or disproportionate.

124. HR did not act in good faith to investigate or prevent further instances of harassment.

125. The only person who acted in good faith to alleviate harassment was my supervisor and
unfortunately his actions were not sufficient nor was his role designed to alleviate and
prevent ongoing racial harassment.

126. Drawing forth the allegations of my previous counts, the company knowingly and
recklessly enabled an environment of racial discrimination by:

  a) Failing to proactively address workplace culture and attitudes before it produced further
  harassment.

  b) Choosing not to maintain a reasonably nonhostile communication channel to
  communicate and address ongoing issues.

  c) Knowingly acting to intimidate me from bringing further complaints.

127. This harassment was significant to prompt my having to plan how to document my work
and progress for my teammates to view (on the teamwork site, before the company ever

*2023-01782-CT*

88. Despite my reasonings, respondent continued to argue the finality of tentative settlement

terms, and on 10/27/2022 asserted that they would pursue me for any and all legal

damages if I did not halt the EEOC investigation that had been reinitiated by our assigned

EEOC mediator.

89. These threats caused me to feel reasonable distress, in addition to any PTSD I was facing

from recounting my workplace experiences.

### III. LEGAL ARGUMENT

### COUNT I:

## DISCRIMINATORY INTIMIDATION FOR OPPOSING UNLAWFUL RACIAL

### HARASSMENT

### IN VIOLATION OF TITLE VII OF THE CIVIL

### RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-3 (a)

90. Racial tension is a common and expected workplace issue, to the extent that Employers

have been encouraged to proactively empower employees to minimize illegal

discrimination.

91. Generally, all of Defendant's employee education and communication regarding civil

rights compliant behavior, policy and practices were relegated to an annual 3–6-hour

training period and state regulated posters in the breakroom. Defendant abstained from

perennial company-wide events or communications to advise employees of civil rights

compliant behavior, or of any open-door policy or complaints process.

92. While the annual meetings satisfy state requirements in frequency and duration, the spirit

of the law, and its intent of limiting harassment on bases that included race, was

*2023-01782-CT*

recklessly discarded by the refusal proactively assess and regulate the understanding of employees, even when concerning ideas had been brought in training.

93. Before my 02/14/2022 meeting, I had described my experiences with racial bias with CAOon two occasions:

    a) I had described previous racial experiences during new employee orientation, to help colleagues around a compliance concept.

    b) I had described concerns brought to me in an offsite lunch with colleagues-where they raised questions around what constituted racial bias.

94. On both occasions there was no acknowledgement for the need for more company-led education; I was instead encouraged that contributions that I could give to employee understanding were welcome-on a volunteer basis.

95. Because I had been explicitly informed by CAO that any input that I volunteered towards employee education would be welcome, I set aside my time over the weekend to detail a voluntary diversity exercise for staff and presented it to CAO via email, and with reference to perceived business advantages and it being Black History Month.

96. On 02/07/2022, I relayed specific instances of racial harassment detailed instances of harassment I experienced from coworkers and why I felt the current diversity training was not effective. This was in the same 73-minute meeting CAO had initiated to inform me that neither my emailed activity nor any mention of Black History Month would be communicated on the company list serv.

97. On 02/11/2022 CAO called me, for 16 minutes, to "clarify details" of recounted experiences.

*2023-01782-CT*

98. On 02/14/2022, I received an email claiming that I had not provided specific instances and requesting "brief notes" for use in training. This claim directly contradicted the duration and content of my meetings with CAO and enhanced then chronic, symptoms of anxiety and demoralization.

99. The person emailing had to be aware of the contradiction because they had been present for our meetings, knew first-hand the number of examples I had given, and had acknowledged the degree of detail through their reasoning for follow up in paragraph 97.

100. There would be no logical purpose to knowingly present false information except to convey to me that they were purposefully ignoring my allegations.

101. Such a conveyance was successful in making me feel like my suggestions, motivating complaints, and the trauma and trepidation involved in recounting them were being cast aside on purpose.

102. I aver the communication of paragraph 98 was sent with the intent and effect of intimidating me for opposing racial discrimination, and aiding administration in maintaining false images of both taking racial discrimination seriously and welcoming employee feedback.

103. By diligently and purposefully intimidating me in discrimination to my having opposed racial harassment, Defendant intentionally violated 42 U.S.C. §2000e-3(a); therefore, I demand judgment in my favor and against the defendant, in an undetermined award amount together with all applicable affirmative action, compensatory and punitive damages as granted under 42 U.S.C §2000e–7, and 42 U.S.C. §1981a(a)(1), as well as any other relief designated by the court.

defendant, in an undetermined award amount together with all applicable affirmative

action, as granted under 43 P.S.§ 962, as well as any other relief designated by the court.

### COUNT III:

## DISCRIMINATORY INTIMIDATION ON THE BASIS OF OPPOSING FORBIDDEN RACIAL DISCRIMINATION, IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS

### ACT, 43 P.S. § 955 (d)

108. I invoke the allegations from counts I and II.

109. Corrective action can take various form including employee discipline, education, and training.

110. When I sent my movie list on 02/07/2022, I made clear my intent of training Defendant employees to view Black people, thereby Black colleagues beyond the scope of harmful racial stereotypes.

111. It became clear that I was advocating employee training as a corrective and or preventative action when I contextualized my suggestion with racial harassment I had witnessed and experienced at work.

112. A reasonable person would have understood that I was opposing unlawful racial harassment once it became clear that I was advocating what I saw as corrective action to prevent further racial harassment.

113. Workplace racial harassment is a condition of employment that operates with discrimination on the basis of race and is accordingly declared unlawful in 43 P.S. § 955 (a).

114. Incorporating paragraphs 108-113 with the arguments for counts I and II, I allege that
Defendant willfully engaged in the adverse action of intimidation, AND that this action
was done with discriminatory basis of my having opposed workplace racial
discrimination, which is declared unlawful by 43 P.S.§ 955 (a).

115. By diligently and purposefully intimidating me in discrimination to my having opposed
racial harassment, Defendant intentionally violated 43 P.S. § 955 (d); therefore, I demand
judgment in my favor and against the defendant, in an undetermined award amount
together with all applicable affirmative action, as granted under 43 P.S.§ 962, as well as
any other relief designated by the court.

## COUNT IV:

## INTENTIONAL UNEQUAL PAINS-INTIMIDATION IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1866; 42 U.S.C. § 1981

116. Calling forth the allegations of counts I-III, I suffered discrimination for opposing
unlawful practices when Defendant purposefully intimidated me via email in response to
my complaints of workplace racial harassment.

117. Discrimination for opposing a racial harassment is an unequal pain compared to White
citizens because had I not been Black, I would not be engaged in the behavior that
Defendant's discrimination was predicated upon; had I not been Black I would not have
had to oppose racial harassment.

118. Therefore, , by extension, the pain of intimidation was unequal to that which White
citizens are subjected to because but for my being Black I would not have suffered it.

119. By diligently and purposefully intimidating me in discrimination to my having opposed
racial harassment towards me, Defendant subjected me to pains I would not have faced

114. Incorporating paragraphs 108-113 with the arguments for counts I and II, I allege that Defendant willfully engaged in the adverse action of intimidation, AND that this action was done with discriminatory basis of my having opposed workplace racial discrimination, which is declared unlawful by 43 P.S.§ 955 (a).

115. By diligently and purposefully intimidating me in discrimination to my having opposed racial harassment, Defendant intentionally violated 43 P.S. § 955 (d); therefore, I demand judgment in my favor and against the defendant, in an undetermined award amount together with all applicable affirmative action, as granted under 43 P.S.§ 962, as well as any other relief designated by the court.

<div align="center">

### COUNT IV:

### INTENTIONAL UNEQUAL PAINS-INTIMIDATION IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1866; 42 U.S.C. § 1981

</div>

116. Calling forth the allegations of counts I-III, I suffered discrimination for opposing unlawful practices when Defendant purposefully intimidated me via email in response to my complaints of workplace racial harassment.

117. Discrimination for opposing a racial harassment is an unequal pain compared to White citizens because had I not been Black, I would not be engaged in the behavior that Defendant's discrimination was predicated upon; had I not been Black I would not have had to oppose racial harassment.

118. Therefore, , by extension, the pain of intimidation was unequal to that which White citizens are subjected to because but for my being Black I would not have suffered it.

119. By diligently and purposefully intimidating me in discrimination to my having opposed racial harassment towards me, Defendant subjected me to pains I would not have faced

had I been White; Defendant has intentionally violated 42 U.S.C. § 1981, ; therefore, I

demand judgment in my favor and against the defendant, in an undetermined award

amount together with all applicable equitable relief, compensatory and punitive damages,

as well as any other relief designated by the court.

## COUNT V:

# RACIAL HARASSMENT AS A DISCRIMINATORY CONDITION OF EMPLOYMENT

## IN VIOLATION OF TITLE VII OF THE CIVIL

## RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-2 (a)(1)

120.  As a Black employee, I experienced ongoing and pervasive racial harassment as a
      condition of my employment at Defendant.

121.  This harassment included:

    a)    Enhanced scrutiny from HR and their false accusations me of stealing time
      and purposefully missing meetings.

    b)    Anonymous and direct coworker criticisms of my work attendance, work
      ethic, bathroom breaks frequency.

    c)    Hostile sabotage from coworkers where my access to work tools and
      equipment, or my ability to get completed build approved were greatly
      affected.

    d)    Written and verbal jokes- including a comic posted on my cubicle about a
      hypothetical "phizzics" degree, and one employee's joke about me being on
      the wrong side of the tracks.

122.  Because of the race-specific element to my harassment, my White coworkers did not
      have to endure it as a condition of employment; it is a discriminant condition and an

169. By following an unwritten policy of intentional racial bias, Defendant limited my
     contract benefits and privileges with discrimination to my race; Defendant has violated
     42 U.S.C. § 1981, ; therefore, I demand judgment in my favor and against the defendant,
     in an undetermined award amount together with all applicable equitable relief,
     compensatory and punitive damages, as well as any other relief designated by the court.

## COUNT IX:

## INTENTIONAL UNEQUAL PAINS- RACIAL HARASSMENT IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1866; 42 U.S.C. §1981

170. 42 U.S.C. §1981 (a) states that all persons within U.S. jurisdiction shall be subject to like
     pains as White citizens.

171. Calling forth previous allegations, I experienced harassment that was based in racial bias
     and stereotypes that would not have applied to me had I been White.

172. This harassment was an unequal pain; and when formally made aware, Defendant
     intentionally and willfully chose to aid these practices and discriminate against me for
     reporting them.

173. The actions have perpetuated undue emotional turmoil, including anger, depreciating
     self-image, self-doubt, and general trauma that has:

     a) Physically manifested in headaches, panic attacks

     b) Contributed to my major depressive episode of June 2022.

     c) Contributed to my need for and attendance of therapy since June 2022.

174. By knowingly subjecting me to an environment of racial harassment as a condition of my
     employment, Defendant has violated 42 U.S.C. § 1981, ; therefore, I demand judgment in
     my favor and against the defendant, in an undetermined award amount together with all

applicable equitable relief, compensatory and punitive damages, as well as any other
relief designated by the court.

## COUNT X:

## DISCRIMINATORY CONDITIONS-SEXUAL HARASSMENT
## IN VIOLATION OF TITLE VII OF THE CIVIL
## RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-2 (a)(1)

175. As a woman employee, I was subjected to a workplace culture and harassment on the
basis of my gender.

176. This harassment included targeted opposition, inappropriate office jokes, and unwanted
touching from my colleagues.

177. Generally, all of Defendant's employee education and communication regarding civil
right compliant behavior, policy and practices were relegated to annual 3–6-hour training
period and state regulated posters in the breakroom. Defendant abstained from perennial
events or communications to advise employees of civil rights compliant behavior, or of
any open-door policy or complaints process.

178. New employees received an identical separate training in lieu of general annual training.

179. While the annual meetings satisfy state requirements in frequency and duration, the spirit
of the law, and its intent of limiting harassment on bases that included race, was
recklessly discarded by the refusal proactively assess and regulate the understanding of
employees, even when concerning ideas had been brought in training.

180. During my new member orientation, Bogdan Proca stated, within a related question (the
question was how Defendant dealt with families and couples operating within the
company), that romantic involvement between bosses and subordinates was natural.

2023-01782-CT

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

ASSATA ACEY,                              :
                                          :    **CIVIL ACTION**
            *Plaintiff*                    :
            v.                             :
                                          :
                                          :
INDUCTEV,                                  :
                                          :
            *Defendant.*                   :
                                          :
                                          :    **No. 2:23-01438-GEKP**

### Motion for Reconsideration

I, the plaintiff, submit this motion for reconsideration of complaint claims I, III, IV, IX and XX due to their merits and distinctive details in the Courts' memorandum (Doc 49).

### Background

1. The Court's dismissal of Counts I and III was expressed as a dismissal of the basis that "InductEV's efforts to reduce racial bias were insufficient, and HR declined to take [my] suggestions for improving them" (p. 9, Section III(A)(1) of Doc 49).

2. The Court's dismissal of counts IV and IX cite the same reasons for dismissal that were expressed for I and III (p. 19, Section III(D)(1) of Doc 49).

3. However, counts I, III, IV and IX pled as based on InductEV's choice to dismiss, discourage, and refrain from formal investigation of my racial harassment complaints (Compl. ¶¶96, 98-102, Doc 1-2).

4. The court's dismissal of count XX relies on precedent that racial discrimination alone cannot rise to the tort of IIED (Doc 49 Section E (p. 21-22)).

5. However, count XX invokes as its basis all preceding counts of discrimination, including race, sex, and retaliation (Compl ¶278, Doc 1-2).

### Legal Argument

6. The Dismissal of Counts I and III was expressed as a dismissal of the basis that "InductEV's efforts to reduce racial bias were insufficient, and HR declined to take [my] suggestions for improving them" (p. 9, Section III(A)(1) of Doc 49).

7. However, that was not the basis for these claims; they were based on InductEV's choice to dismiss, discourage, and refrain from formal investigation of my racial harassment complaints.

8. It is stated in my complaint lines 96, 98-102:

" 96. On 02/07/2022, **I relayed specific instances of racial harassment detailed instances of harassment I experienced from coworkers** and why I felt the current diversity training was not effective. This was in the same 73-minute meeting CAO had initiated to inform me that neither my emailed activity nor any mention of Black History Month would be communicated on the company list serv."

"98. On 02/14/2022, I received an email **claiming that I had not provided specific instances** and requesting "brief notes" for use in training. This claim directly contradicted the duration and content of my meetings with CAO and enhanced then chronic, symptoms of anxiety and demoralization.

99. The person emailing had to be aware of the contradiction because they had been present for our meetings, knew first-hand the number of examples I had given, and had acknowledged the degree of detail through their reasoning for follow up in paragraph 97.

100. There would be no logical purpose to knowingly present false information except to convey to me that they were purposefully ignoring my allegations.

101. Such a conveyance was successful in making me feel like my suggestions, motivating complaints, and the trauma and trepidation involved in recounting them were being cast aside on purpose.

102. I aver the **communication of paragraph 98 was sent with the intent and effect of intimidating me for opposing racial discrimination**, and aiding administration in maintaining false images of both taking racial discrimination seriously and welcoming employee feedback" (Compl. ¶¶96, 98-102, Doc 1-2).

9. As stated in the complaint, while my meeting with HR was initially scheduled regarding my suggestions, when prompted, I chose to complain to them about my experiences of racial harassment.

10. Put this way, I believe these complaints reach the same four-point threshold expressed by the court for sexual harassment: However, when Ms. Acey complied, Ms. Talis, a C-level officer of the Company, allegedly **dismissed** her concern, **discouraged** Ms. Acey from bringing further details about sexual harassment to her attention, **refrained** from investigating, and 'did not act in good faith to… **prevent** further instances of harassment'." (p. 15 of Doc 40 Section III(A)(5)).

11. In support of this, I have outlined the following from the Case records:

a) 02/10/2022 Present sense impression from myself to my supervisor regarding content discussed with CAO and the resolutions she disclosed to me (Ex. 303-305 of Doc 40 (p. 28, Doc 40), (p. 608-613 of Doc 40-2)). References: 15 (¶¶77-78), ECF 15-47

b) 02/11/2022 Adverse Party Statement from CAO to me requesting a follow up on our meeting about my racial experiences at work (Ex. 308 of Doc 40 (p. 29, Doc 40) (p. 618-619 of Doc 40-2)). References: Doc 15 (¶¶77-78)

c) 02/14/2022 HR Denial of Direct Complaints (ECF 15-50).

d) 02/16/2022 HR meeting [with supervisor regarding complaints] confirmed (ECF 15-49).

12. Because the dismissal of Counts IV and IX hinges on the same misunderstanding, I request that the court reconsider their dismissal as well; the unequal pains averred are not that HR did not take my suggestions, but the pains averred are those of intimidation/discouragement/dismissal of complaints and the resulting aftermath of continued workplace racial harassment.

13. Finally, the court's dismissal of count XX relies on precedent that racial discrimination alone cannot rise to the tort of IIED (Doc 49 Section E (p. 21-22)).

14. However, count XX does not allege to reach the tort of IIED on racial discrimination **alone.**

15. By invoking all previous allegations in the complaint (Compl ¶278, Doc 1-2), count XX avers that the defendant has engaged in various torts of racial sexual and disability discrimination towards me in addition to retaliation—and that this "combination" (Compl ¶278, Doc 1-2) of discrimination (for **one** employer to **consecutively and concurrently** place upon **one** employee) is outrageous.

### Prayer of Relief

I respectfully request that the court reconsider its order dismissing complaint counts I, III, IV, IX, XX and issue a subsequent order denying the Defendant's motion to dismiss with respect to those counts.

Sincerely,

/s/ Assata Acey Hackman

Assata Acey Hackman (Pro Se)

5121 Brown St,

Philadelphia, PA 19139

aceyassata@gmail.com

770-231-1017

Date: 2/28/2024

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ASSATA ACEY, | : | |
| | : | CIVIL ACTION |
| *Plaintiff* | : | |
| v. | : | |
| | : | |
| INDUCTEV, | : | |
| | : | |
| *Defendant.* | : | |
| | : | |
| | : | No. 2:23-1438 |

### Rule 54 Motion

I, the Plaintiff, submit this motion to the court to gain:

a) An Amended order that revokes the Dismiss of my complaint counts I, III, IV, and IX OR

b) An Amended order that dismisses my Complaint counts without prejudice OR

c) An entry of final judgement dismissing those claims.

### Background

1. On 03/20/2024, I filed a Notice of Appeal to the third circuit court, from this court's orders dismissing my complaint counts (I, III, IV, and IX) and my motion to reconsider with prejudice (Doc 68).

2. On 03/29/2024, I received and reviewed a letter concerning this court's continued jurisdiction over those counts due to FRCP 54(b):

> "**When an action presents more than one claim for relief**—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, **the court may direct entry of a final judgment as to one or more, but fewer than all, claims** or parties only if the court expressly determines that there is no just reason for delay. **Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any

time before the entry of a judgment adjudicating all the claims and all the parties' rights
and liabilities."

(Ex. 1, Notice from Third Circuit Court of Appeals, Appendix p. 2).

3. This motion is written as a response to that letter.

4. On February 27, 2024, this court entered an order dismissing my complaint counts I-IV,
   IX, XIII, XIV, XV, XVI, and XX (Doc 49).

5. Of those counts dismissed, only counts XIII, XV and XVI were dismissed without
   prejudice.

6. The court's order did not dismiss the entire complaint; 10 complaint counts were not
   dismissed.

7. In its opening section, the court's memorandum/Opinion acknowledged that:

   "...Ms. Acey complained about "hostility" towards her by white colleagues,
   including a door slammed in her face, notes snatched from her hands, and
   criticism leveled against her in a team group chat." (Doc 49, p. 2)

8. Regarding its dismissal of Counts I and III, the court stated:

   "In these counts, Ms. Acey merely makes conclusory statements that InductEV
   intentionally discriminated against her...Ms. Acey has simply averred that she
   made suggestions about programming to reduce racial bias at InductEV, and
   InductEV did not take her suggestions." (Doc 49, p.10)

9. In lines 39-41 of my complaint, within the background, I had stated:

   "39. On February 7, 2022, in a meeting held by CAO...I discussed recent
   experiences and why I saw the need for an ongoing diversity initiative.

   40. These experiences included:

      a) witnessing a white employee complain to two other non-black
      employees, that Julian needed to 'get off his lazy ass' to close a garage
      door sooner.

      b) an event where one of those same witnessing employees had
      unrelentingly questioned me to regarding my job tasks and how I was
      'spending my time' ...

41. Immediately following our meeting, I summarized its content to my supervisor in a Teams message."

(Compl. 39-41, Doc 8-1). (Appendix p. (xx-xx)

10. In Count I of my complaint, I had stated:

"On 02/07/2022, I relayed specific instances of racial harassment [that I had] experienced from coworkers and why I felt the current diversity training was not effective...On 02/14/2022, I received an e-mail claiming that I had not provided specific instances and requesting brief notes for use in training...The person emailing had to be aware of the contradiction because they had been present for our meetings, knew first-hand the number of examples I had given..."

(Compl. ¶¶96, 98-99, Doc 8-1). (Appendix, pp. 5-6)

11. Regarding its dismissal of counts IV and IX, the court stated: "The court understands the averred 'unequal pain' to be that Ms. Acey recommended changes to InductEV's employee programming with respect to race, which InductEV declined to follow". (Doc 58, p. 20).

12. On 02/28/2024, I submitted a motion to reconsider. (Doc 51).

13. On 03/12/2024, the court entered its dismissal of my motion to reconsider "with prejudice." (Doc 58).

14. Regarding complaint counts I, III, IV and IX, the court stated: "Ms. Acey asserts that the only 'logical purpose' for sending an email that did not accord with her recollection was to 'convey to [her] that they were purposefully ignoring [her] allegations...In support, she vaguely references four supposed facts "from the Case records" without explanation. This conclusory argument fails to identify any 'clear error of law or fact' much less manifest injustice." (Doc 58, p. 3).

15. The court gave no expression as to whether those defects in the pleadings for I, III, IV, IX or XX could be cured by the supply of additional facts—no such expression was found in the order that dismissed those complaint counts (Doc 49) and no such expression was found in the order dismissing the motion to reconsider (doc 58).

16. "02/14/2022 HR Denial of Direct Complaints (ECF 15-50)", as referenced in my motion to reconsider ¶11(c), is an email sent by Judy Talis to me on 02/14/2022 wherein she stated:

> "In follow-up, you raised a general concern surrounding behavior that you believe constitutes unconscious bias. During our meetings, I asked if there were specific individuals or incidents about which you were making a complaint and/or needed to be addressed and you responded no, but added that there were interactions that you have had with other employees that you believe
>
> might be useful to incorporate into future company training.
>
> In response, I would like to invite you to send me some brief notes concerning these examples and I will certainly review them for inclusion into our upcoming workplace training. You may send those to me at your convenience and I will let you know if I have any questions or need additional discussion with you."

(ECF 15-50, Appendix p. 11)

17. On 02/23/2022, the following messages were exchanged between myself and my supervisor whilst discussing the transfer of a bookshelf from our department to another department:

> 12:02:38 PM Assata Acey: Judy looked me in eye and asked if I'd d[o]ne anything fun over weekend
>
> 12:02:50 PM Assata Acey: Meh [b]ut also confirmed diversity training is in summerb
>
> 12:03:12 PM Joren Wendschuh: Sounds good.
>
> 12:04:20 PM Joren Wendschuh: Which shelving?
>
> 12:04:44 PM Joren Wendschuh: (Color)
>
> 12:04:48 PM Assata Acey: black
>
> 12:05:00 PM Joren Wendschuh: on back wall, or next to Ron Lab[?]
>
> 12:05:10 PM Assata Acey: also she came to me apparently seconds after chatting dan so idk abt the weekend comment but whatever
>
> 12:05:34 PM Assata Acey: "it doesn't appear as if they using it""
>
> 12:05:39 PM Assata Acey: a lot
>
> 12:06:15 PM Joren Wendschuh: haha. Well. 1 can accept giving the shelving itself up,

but not the space itself. Certainly can share the shelving, as it comes apart.

12:06:24 PM Joren Wendschuh: [quoting/responding to message from 12:05:10 PM] ew.

12:07:56 PM Assata Acey: hes "her new favorite person now" and apparently the new plug for lab glasses

12:08:09 PM Assata Acey: meh.. as long as she doesnt revisit the gyno offer, im good

(Ex. 2-16, Appendix pp. 13-41).

18. Summer months are generally understood to be June, July and august, yet I had complained to HR in February.

19. As of the date on my going on short term disability leave (05/16/2022) the proposed company-led diversity training had not yet occurred. (Compl. ¶58, Doc 8-1).

20. The first company wide diversity training, after my February 2022 complaint, did not occur until November 2022, after being announced for September 2022.
(Ex. 17-21, Various emails from Judy Talis and Diana Wilmes announcing diversity Training dates for September and rescheduling for November, Appendix pp. )

21. "02/16/2022 HR meeting [with supervisor regarding complaints] confirmed (ECF 15-49)", as referenced in my motion to reconsider, is a screenshot of a text message that my supervisor sent to me on February 16, 2022, stating: "Also had a conversation with Judy. She explained about the Tom issue on January 25th at 3:00 pm. I'm sorry, I didn't consciously process it, as I have no recollection on it at all…"

(Appendix pp. 43-51)

22. In Part II (20) of Doc 40, I compiled exhibits (of Teams messages between myself and my supervisor on 01/25/2022) produced by the Defendant into the following transcript:

**"01/25/2022 Present sense impression and excited ut[t]erance from myself to my supervisor about Tom Hornberger (senior R&D technician through July 2022, aka "mustacio guy/mustache man") passionately calling Julian Jackson (black warehouse associate) lazy (Ex. 253-256). Support[i]ng exhibits (Ex. 226-237). References: ECF 8-1 (¶39-40, ¶120, ¶123(b)), Doc. 15 (¶77).**
3:49:22 PM Joren: Assembly VA Connector subassembly P-002092-Tool VA HV Connector

assembly fixture - do you have a photo of this?

3:49:32 PM Joren: Either way, go save BACON

3:49:37 PM Assata: not folks at wok getting mad about the ga[r]age door and
calling Julian lazy

behind it.like hes the only one using the door/leaving it open and all uses are just
to bring fo[r]klift

in vs in and out o waiting fo vendors to unload... yikes. of couse it was mustache
man.

3:49:43 PM Assata: goign to save bacon!"

(Part II 20 of Doc 40, Appendix p. 56)

23. In Part II (30) of Doc 40, I compiled exhibits (of Teams messages sent between Judy
Talis and Joren Wendschuh on 02/15/2022) produced by the Defendant into the following
transcript:

> **02/15/2022 Adverse party statements between CAO and my supervisor about
> meeting to discuss the racial experiences I shared in my meeting with CAO
> (Ex. 317-318). References: ECF 8-1 (¶40(b), ¶42, ¶96-103), Doc 15 (¶77-78),
> ECF 15-49.**
>
> 8:06:01 PM Judy: Sure I will be in tomorrow. I also want to speak to you about
> Assata and some
>
> things she shared with me. My calendar is up to date but regardless I will find
> time for you
>
> 8:11:00 PM Joren: Thank you. I'll see about booking a room if that's all right.
> Re:Assata, okay, I appreciate it".
>
> (Part II 30 of Doc 40, Appendix p. 58).

24. According to the evidence, Talis' discussion of my complaint made to her occurred
exactly one day after her email to me, and involved details even my manager had "no
recollection of" (involving an event reported to him over Teams in passing almost 1
month prior); less than two weeks from the date of my complaints to her or her discussion
with my supervisor, Judy announced to me that she was planning to do Training at least 3
months into the future; the company did not conduct any training until at least November

2022.

## Legal Argument

25. Through its precedential ruling of *Casey Doley v. John Wetzel Et al,* the third Circuit has continued to uphold a longstanding precedent of generally dismissing Pro Se complaints **with leave to amend**: "Further, the District Court made no finding as to whether amendment would be inequitable or futile, and thus erred in dismissing the Complaint without leave to amend". (US Court of Appeals for the Third Circuit, Case 19-1684, Doc 57, p. 12).

26. Similarly, no such argument of futility or inequitability was presented in either Doc 49 or Doc 58 (Court's orders dismissing complaint counts and subsequent motion to reconsider with prejudice).

27. I understand the court's orders (Doc 49 and 58) as an assertion that my complaint counts (I, III, IV, and IX) were deficient of two requirements:
    a) Regarding complaint counts I, III, and IV: pleading of n action or omission through which my employer **intentionally** discouraged me from/intimidated me against making complaints about racial harassment.
    b) Regarding complaint count and IX: pleading of an action or omission through which my employer **intentionally** subjected me to racial harassment.

28. I believe that these defects can be cured through analysis of the evidence discussed in lines 13-14, 17-18, and 19-20 of this motion.

29. I moreover believe that third circuit precedent demands that the order dismissing those counts with prejudice (Doc 49) be amended to reflect a dismissal **without prejudice**; fulfilling this demand would allow the deficiencies in those complaint counts to be cured.

30. The evidence I presented in my motion to reconsider was not available at the time my complaint was filed (03/14/2023).

31. Those documents discussed in ¶¶14, 17, 19-20 provide corroboration to those documents I had already possessed (discussed in lines ¶¶13, 18) and were provided by the Defendant in discovery productions on or after Juine 5, 2024 (at least 2.5 months after my complaint was filed in state court).

32. While my complaint was written primarily from memory and whatever evidence I had retained, I was not able to recall or find the evidence for the specific dates of those reported instances, or timing of the proposed HR training.

33. The inclusion of this "new" evidence is critical to my complaint because it addresses the missing element of time.

34. The relevance of following lines to the charges of my complaint is made possible/credible only through this "new" evidence.

35. It is unreasonable that a trained HR executive would receive a complaint of ongoing racial harassment and competently deduce that it would be sufficient to wait four or more additional months before addressing this harassment (through company-wide training).

36. It is also unreasonable to expect that an employee who is actively seeking ways to reduce their experiences of workplace racial harassment would be encouraged, after expressing her concerns to her employer, by her employer's communication that no corrective action would be taken for at least four months.

37. It is further unreasonable to expect that the employers claim of a non-specific complaint, construed as viable reason to avoid any formal investigation or acknowledgement of a complaint being made, would do anything but add to the impression of the employer's disregard and indignation towards the complaint.

38. In order to lie (in regard to any specific issue), a person must both know the truth, and know that they are saying something other than the truth.

39. Ms. Talis' ability to recall and discuss details (from 02/11/2022 my meeting with her) that even my supervisor "had no recollection" of, (such as which employee had made inflammatory statements and the date and time those statements were made), suggests that she was, in fact, aware that I was "complain[ing]" of "specific" experiences. (Appendix pp. 11, 54).

40. Within that lens, Ms. Talis's averment that I had given no "specific individuals or incidents" is shown for what it was: a blatant lie. (Appendix p.11).

41. Talis' lie did nothing but:

a) Present Ms. Talis as though she were welcoming additional complaints and details of my experiences of racial bias at InductEV.

b) Enhance the intimations of discouragement and disappointment that comes with news of no immediate response to an identified problem.

42. Ms. Talis, being positioned to benefit from the former effect and foresee the latter effect, made the uncompassionate choice to make that statement while knowing that it was untrue.

<div align="center">Prayer of Relief</div>

In light of these facts and arguments, I am requesting that the court either:

a) enter an order, amending its prior order so that my complaint counts I, III, IV, and IX are dismissed without prejudice OR

b) if the court finds that to be unjust, direct the entry of final judgment dismissing those complaint counts so that jurisdictional defect of my appeal can be cured.

<div align="center">Sincerely,</div>

/s/ Assata Acey Hackman

Assata Acey Hackman (Pro Se)

5121 Brown St,

Philadelphia, PA 19139

aceyassata@gmail.com

770-231-1017

Date: 03/31/2024

ECF 15-50- 02/14/2022 HR Denial of Direct

Complaints

M Gmail

Assata Acey <aceyassata@gmail.com>

## Fwd: Per our Discussion

Assata Acey <Assata.Acey@momentumdynamics.com>
To: Assata Acey <aceyassata@gmail.com>

29 April 2022 at 10:37

**Assata Acey | Technician**
**484-320-8222    ext 178**

**Momentum®**
Wireless EV Charging

**Connect**    LinkedIn | Website | Newsletter
**Media**      Taxis - NYTimes | Airport & Transit | Driver Experience

*Confidentiality Notice: The information, and any attachments and/or documents, transmitted by this email is intended for the addressee only and contains information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender immediately.*

**From:** Judy Talis <judy.talis@momentumdynamics.com>
**Sent:** Monday, February 14, 2022, 10:45 AM
**To:** Assata Acey <Assata.Acey@momentumdynamics.com>
**Subject:** Per our Discussion

Assata:

Thanks again for spending time with me last week to share your concerns. In follow-up, you raised a general concern surrounding behavior that you believe constitutes unconscious bias. During our meetings, I asked if there were specific individuals or incidents about which you were making a complaint and/or needed to be addressed and you responded no, but added that there were interactions that you have had with other employees that you believe might be useful to incorporate into future company training.

In response, I would like to invite you to send me some brief notes concerning these examples and I will certainly review them for inclusion into our upcoming workplace training. You may send those to me at your convenience and I will let you know if I have any questions or need additional discussion with you.

Thank you for sharing your thoughts and input. Additionally, if you at any time believe that there are matters which you believe violate our policies against harassment or discrimination, please let me know immediately.

Regards,
Judy

**Judith Talis | Chief Administrative Officer**
Momentum Dynamics Corporation
***Fueling the Future of Electric Transportation***

3 Pennsylvania Avenue, Malvern, PA 19355

(M) 610.613.1449

www.momentumdynamics.com

**Disclaimer and Confidentiality Notice:** This email, and any attachments and/or documents linked to this email, are intended for the addressee and may contain information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If you have received this communication in error, please contact the original sender.

Exhibit 2- 02-2-23-2022 Present Sense

Impression PM 12-02-38 INDUCTEV

INITDISCL009825

Message

From:     Assata Acey [Assata.Acey@momentumdynamics.com]
Sent:     2/23/2022 12:02:38 PM
To:       Joren Wendschuh [joren.wendschuh@momentumdynamics.com]

Judy looked me in eye and asked if I'd dine anything fun over weekend

CONFIDENTIAL

Exhibit 3- 02-23-2022 Present Sense Impression

PM 12-02-50 INDUCTEV INITDISCL012160

Message

| | |
|---|---|
| **From:** | Assata Acey [Assata.Acey@momentumdynamics.com] |
| **Sent:** | 2/23/2022 12:02:50 PM |
| **To:** | Joren Wendschuh [joren.wendschuh@momentumdynamics.com] |

Meh hut also confirmed diversity training is in summerb

CONFIDENTIAL

INDUCTEV INITDISCL012160

Message

**From:**    Assata Acey [Assata.Acey@momentumdynamics.com]
**Sent:**    2/23/2022 12:07:56 PM
**To:**    Joren Wendschuh [joren.wendschuh@momentumdynamics.com]

hes "her new favorite person now" and apparently the new plug for lab glasses

CONFIDENTIAL

INDUCTEV INITDISCL002210

Exhibit 16- 02-23-2022 Present Sense

Impression PM 12-08-09 INDUCTEV

INITDISCL002163

Message

**From:**   Assata Acey [Assata.Acey@momentumdynamics.com]
**Sent:**   2/23/2022 12:08:09 PM
**To:**   Joren Wendschuh [joren.wendschuh@momentumdynamics.com]

meh.. as long as she doesnt revisit the gyno offer, im good

CONFIDENTIAL

Exhibit 17- 2022- Talis Announces Company

Wide Diversity Training for September While I

am Still Employed

10:22

← 🎤 🗑 🗄 ⋮

**Mandatory Training for All Employees**

JT **Judy Talis**                        10:14 AM
Alex Kmetz, Alexa Heisler, + 80              ⋮

Team,

As we move into the last part of 2022 and look ahead to next year, we continue to look for ways to build the company into an even stronger organization and workplace. Part of that work involves sharing our continued commitment to respect, inclusion and diversity for all personnel, and learning how to interrupt behaviors and practices that interfere with that pledge.

To that end, we are continuing our interactive training session and discussion for all employees on Diversity and Inclusion: Creating a Workplace Culture of Belonging, which will focus on our individual and collective responsibilities to build a diverse, fair, and respectful environment. These live sessions will be conducted through virtual platforms and led by the company's trusted and highly qualified external trainer, Janeen Olsen Dougherty, together with me. All employees will be required participate in

↩ˇ  Reply to all

Ⅲ        ◯        ‹

Exhibit 18- 2022- Talis Announces Company

Wide Diversity Training for September

While I am Still Employed



10:23 🖼 ☑ ∞            📷 📶 📶 📶 8%🔋

←                    🎤  🗑  🗄  ⋮

session and discussion for all employees on
Diversity and Inclusion: Creating a Workplace Culture
of Belonging, which will focus on our individual and
collective responsibilities to build a diverse, fair, and
respectful environment.  These live sessions will be
conducted through virtual platforms and led by the
company's trusted and highly qualified external
trainer, Janeen Olsen Dougherty, together with
me. All employees will be required participate in
these sessions and our leaders will also participate
in an additional program focusing on their added
responsibilities.

Each of you will receive information about the timing
and logistics of your session and all employees will
be required to attend their designated session in
order to allow the company to complete this critical
priority before year-end.  We recognize the many
competing priorities and time pressures that we all
face, and you may need to move other meetings to
accommodate these sessions. We thank you in
advance for your continued shared stewardship of
our workplace and the individual employees and
perspectives that contribute to its success.

***You will receive a Teams Meeting Invite. If you cannot
attend on your designated time slot and were unable***

↩ ⌄   Reply to all

|||            ◯            ‹

Exhibit 19- 2022 Talis Announces Company

Wide Diversity Training for September

While I am Still Employed

10:23 🖼 ✅ 📼          🔲 📶 📶 ⊿ 8%🔋

←                          🎤   🗑   🗄   ⋮

_attend on your designated time slot and were unable_
_to move around your schedule, please reach out to_
_me directly or Diana and we will assign you to another_
_session. Please note that non-supervisor roles will be_
_dismissed from training after 2 hours while_
_supervisor roles will continue for the last hour of the_
_session. Dates and times below:_

Tuesday, September 13th : Employees from 1 PM to
3PM / Supervisors until 4PM

Thursday, September 15th: Employees from 9 AM to
11 AM/ Supervisors until 12PM

Wednesday, September 21st : Employees from 9 AM
to 11 AM / Supervisors until 12 PM

Wednesday, September 28th : Employees from 1 PM
to 3 PM/ Supervisors until 4PM

**Judy Talis | Chief Administrative Officer**
**O: 484-320-8222 ext 128**
**M: 610-613-1449**

**Momentum**
Wireless EV Charging

**Connect**   LinkedIn | Website | Newsletter
**Media**     Taxis - NYTimes | Airport & Transit | Driver Experience

_Confidentiality Notice: The information, and any attachments and/or documents,_

↰ ⌄   Reply to all

          |||          ◯          ‹

Exhibit 20- 2022 Wilmes Announces New Dates

for Diversity Training While I am Still

Employed

8:29 M  🔇 📶 18%

Mandatory Training - Diversity and Inclusion: Creating a Workplace Culture of Belonging

**Diana Wilmes**                                    4:12 PM
Bob Kacergis, Assata Acey, + 16

Team,

We are going to be merging this training with one of the other three dates. If you have a specific date/time that works best, feel free to send that over to me. The dates/times to choose from are:

Tuesday, September 13th : Employees from 1 PM to 3PM / Supervisors until 4PM

Thursday, September 15th: Employees from 9 AM to 11 AM/ Supervisors until 12PM

Wednesday, September 21st : Employees from 9 AM to 11 AM / Supervisors until 12 PM

Thanks,
Diana



**Diana Wilmes SHRM-CP | Opera**
**O: 484-320-8222 ext 130**
**M: 484-375-9864**

Momentum

↩ ∨  Reply to all

|||       ◯       ‹

Exhibit 21- 2022- Wilmes Announces Training as

rescheduled to November While I

am Still Employed

2:47 🔘 📩                      📶 📶 50% 🔋

←        🎤   🗑️   🗄️   ⋮

## Diversity and Inclusion Training to be postponed

 **Diana Wilmes**                    2:33 PM
MD Employees                    ⋮

Team,

Due to our current workload demand, we have made the decision to postpone the Diversity & Inclusion trainings that were scheduled for this month. The training will be rescheduled for November. Please be on the lookout for a new invitation shortly.

Thank you.

**Diana Wilmes  SHRM-CP | Operations and HR Generalist**

**O: 484-320-8222 ext 130**
**M: 484-375-9864**

**Momentum**
Wireless EV Charging

**Connect**   LinkedIn | Website | Newsletter
**Media**      Taxis - NYTimes | Airport & Transit | Driver Experience

*Confidentiality Notice: The information, and any attachments and/or documents, transmitted by this email is intended for the addressee only and contains information that is confidential, proprietary, privileged, or otherwise protected by law. This notice serves as a confidentiality marking for the purpose of any confidentiality or nondisclosure agreement. Any dissemination, distribution, or copying is prohibited. If*

↩ ∨   Reply to all

|||        ◯        ‹

ECF 15-49- 02/16/2022 HR meeting [with

supervisor regarding complaints] Confirmed

< **Joren(boss)**
  12:44 PM, Feb 16

Also had a conversation with Judy. She explained about the Tom issue on <u>January 25th</u> at 3pm. I'm sorry, I didn't consciously process it, as I have no recollection on it at all. Other instances yes, but not that one. Also discussed some re future promotions for you and career path. The conversation from last week did not get talked about. That's still between us and we should work out where we are with that a bit more this week, maybe just a brief written email rewriting job description and responsibilities so that we're both in agreement.

Excerpt- Part II 20 of Doc 40

Case: 24-1521   Document: 12-2   Page: 57   Date Filed: 05/01/2024
Case 2:23-cv-01438-GEKP   Document 73-3   Filed 03/31/24   Page 56 of 58

Case 2:23-cv-01438-GEKP   Document 40   Filed 01/30/24   Page 25 of 53

11:53:35 AM Joren: bKM?

11:54:54 AM Joren: [Direct response to message from 11:48:11 AM] Fair for 2nd question, mostly. What about "How does this benefit the company?" "How does this grow the company?" (How does this benefit the shareholders? and grow the valuation of the company)

12:43:52 PM Assata: [Direct response to message from 11:53:35 AM] Typo

12:46:22 PM Assata: I mean she could use the same argument as the diversity training.
But it's also shown that supporting and encouraging differences in company can serve to attract, retain and improve the effective/collaborative use of di erse talent

12:47:51 PM Joren: Think the diversity training is not just a legal liability token activity? (really, just curious what you think)

12:49:04 PM Assata: I mean yeah, but they also sell it be it looks good.
Hr exists to keep compa y from being sued.
But they also ha e a hand or u terest in talent retention and attracting more ppl of different backgrounds to aevomish more., or they should

12:49:40 PM Assata: Also Dan and I made kettle and traditional popcorn from scratch and it was fun!!

12:54:11 PM Joren: Don't get me wrong. I support your thoughts and idea here, I think having answers to these questions in your initial communications to HR would go a long way.
Keep it short - at most 1/3 page if printed, (not including list).
Possibly include attachment with movie titles and 2-3 sentence summary of movie (and if available on netflix, Hulu, etc., where people can find it - since things like "Blockbuster" aren't a thing any more. *box of shrunken text*)
I'm not dismissing the idea, or saying don't do it. Just give it the best shot of success.
Interesting. I made popcorn last night using a hot air popper (best way ever). Second best way is in a pan / kettle :) Awesome!
Microwave or bagged popcorn doesn't even hold a candle to either of the above.

20. 01/25/2022 Present sense impression and excited utterance from myself to my supervisor about Tom Hornberger (senior R&D technician through July 2022, aka "mustacio guy/mustache man") passionately calling Julian Jackson (black warehouse associate) lazy (Ex. 253-256). Supporting exhibits (Ex. 226-237). References: ECF 8-1 (¶39-40, ¶120, ¶123(b)), Doc. 15 (¶77).

3:49:22 PM Joren: Assembly VA Connector subassembly P-002092-Tool VA HV Connector assembly fixture - do you have a photo of this?

3:49:32 PM Joren: Either way, go save BACON

3:49:37 PM Assata: not folks at wok getting mad about the gaage door and calling Julian lazy behind it.like hes the only one using the door/leaving it open and all uses are just to bring foklift in vs in and out o waiting fo vendors to unload... yikes. of couse it was mustache man.

3:49:43 PM Assata: goign to save bacon!

21. 01/28/2022 Present sense impression and excited utterance from myself to my supervisor about a white (Brian Kenny) who used me to access the building, held the door open for a white woman, and then allowed the door to slam in my face, leaving me to carry the team's refreshments on my own (Ex. 257-283). References: ECF 8-1(¶39-40(c), 96, 110-111), Doc 15(¶77-78).

8:16:24 AM Assata: Brian w Parked at same time but went upstairs. Dan d is at his desk

8:16:56 AM Joren: haha. Smart guy - he's going for the donuts.

Excerpt- Part II 30 of Doc 40

Case: 24-1521    Document: 12-2    Page: 59    Date Filed: 05/01/2024
Case 2:23-cv-01438-GEKP    Document 73-3    Filed 03/31/24    Page 58 of 58

Case 2:23-cv-01438-GEKP    Document 40    Filed 01/30/24    Page 29 of 53

12:24:21 PM Assata: *unproduced attachment*

12:24:37 PM Joren: Awwww That's so cute!!!

12:24:59 PM Joren: Oh yay!

12:25:10 PM Joren: Take some time and rest though, please

28. **02/11/2022 Present sense impression, excited utterance and adverse party statements between my supervisor and Diana Wilmes regarding white technician Steve Brown's interest in my attendance and the possibility of negative rumors being spread about me (Ex. 790-791).**
Supporting exhibits: Ex. 844-849. References: ECF-8-1 (¶110-111, ¶121(b), ¶123), Doc 15 (¶77-78).
8:40:58 AM Diana Wilmes: Hey Joren, I heard Steve Brown asking Rob if they had seen Assata lately. Sounded like Rob hadn't seen her in a while. And come to think of it, I haven't seen her lately either. Is she working downstairs or from home? Not sure why he was asking but if someone comes and asks me, I just want to know something to say. Hopefully she is not sick.
9:01:43 AM Joren: Diana, Yeah, I'm frustrated with the rumor mill here at work. [*unproduced image*] A lot of people saying bad things about people.
Assata has been doing some research and writing up procedures, because of this. I'm letting her work from home to do them, as there's little reason to be in the office to just be on the computer.
Thanks for reaching out. Hope that helps?

29. **02/11/2022 Adverse Party Statement from CAO to me requesting a follow up on our meeting about my racial experiences at work (Ex. 308). References: ECF 8-1(¶42-43), Doc 15 (¶77-78).**
9:38:52 AM Judy: do you have a sec for a quick teams call. Had a quick question

30. **02/15/2022 Adverse party statements between CAO and my supervisor about meeting to discuss the racial experiences I shared in my meeting with CAO (Ex. 317-318). References: ECF 8-1 (¶40(b), ¶42, ¶96-103), Doc 15 (¶77-78), ECF 15-49.**
8:06:01 PM Judy: Sure I will be in tomorrow. I also want to speak to you about Assata and some things she shared with me. My calendar is up to date but regardless I will find time for you
8:11:00 PM Joren: Thank you. I'll see about booking a room if that's all right.
Re:Assata, okay, I appreciate it.

31. **02/15/2022 Excited utterance from myself to my supervisor about CAO's prior response to my shared racial experiences and his adverse party statement and present sense impression about CAO's interest in following up with him about these things (in addition to regular project management duties for a team deliverable) (Ex.319-336). References: ECF 8-1 (¶42, ¶96-103, ¶134-163), Doc 15 (¶77-78), ECF 15-62-15-63, Doc 20 (¶8-49), ECF 20-5 to 20-16, ECF 20-21.**
8:14:56 PM Joren: Please do a review of all fixtures and tooling needs for a lie / cc va outside of the BoM, and provide a list. Looking for what fixturing we need to have more of if we're looking to run more builds in parallel. Is that something you'd be okay putting together a draft for by mid day Thursday?
Also, Judy wants to talk to me about some things regarding Assata. Please let me know anything you think I need to before going into a meeting with her tomorrow.
8:19:30 PM Assata: I can't im
agine what: either she wants to ask you what doctor I'm using, whether the nausea subsided, complain about me discussing racism at work with you vs her, ask if I'm starting trouble, asking for tips be I explained you have 50% of company's black women and 33% of companies black population where several groups go without women at all, maybe she wa to to know why I don't

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ASSATA ACEY, | : | |
| | : | CIVIL ACTION |
| Plaintiff | : | |
| v. | : | |
| | : | |
| | : | |
| INDUCTEV, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | No. 2:23-1438 |

### FRCP 15(a)(2) Motion for Leave to Amend

Without fully understanding dismissal of claims with prejudice, beyond the indication that those claims are dismissed without leave to amend—but knowing that failure to provide the proposed amendment can be fatal to a request for leave to amend—I submit this motion to clarify to the court my intended amendment of count I of my complaint- which I believe by incorporation would also amend Counts III, IV and IX and XX of my complaint. I also apologize if this motion is redundant but need a clear record as to whether the court is inclined to permit the proposed amendment.

### Method of incorporation

- ¶ (108) of Count III: "I invoke the allegations from counts I and II".
- ¶ (116) of Count IV: "Calling forth the allegations of counts I-III, I suffered discrimination for opposing unlawful practices when Defendant purposefully intimidated me via email in response to my complaints of workplace harassment".
- ¶ (171) of Count IX: "Calling forth previous allegations, I experienced harassment that was based in racial bias and stereotypes that would not have applied to me had I been white".

- **¶ (278) of Count XX** (precedented by Hoy v. Angelone, 720 A.2d 745, 754 (Pa. 1998), weight of retaliation in IIED): "Bringing forth all previous allegations, I was subjected to an egregious and ongoing combination of various forms of unlawful harassment that was intentionally, aided, escalated, or enacted by Defendant".

<h3 style="text-align:center">Summary of Proposed Amendment</h3>

- Remove lines 94-102 of the original count, insert lines 94a-127a (provided below).

<h3 style="text-align:center">Proposed Amendment for Count I of my Complaint</h3>

94a.    At that time, no disclosure of planned company-wide training was made to me.

95a. On 02/10/2022, In response to my suggestion of movies to endorse for black history month, I met with Ms. Talis and discussed the company's declination to endorse the list as well as my reasons for suggesting it (in which I complained of my experiences of racial harassment at InductEV).

96a. During my meeting with Ms. Talis she continued, as with the sexual harassment complaints, to diminish my complaints, even as far as to insist that I was seeing every action as racism.

96a. Immediately after meeting with Ms. Talis, I reported the company's declination, and the content of my complaints to my supervisor via teams messaging:

**3:08:40 PM Assata:** Judy has decided to make everyone redo diversity training and plans to teach mustache mam how to not risk company lawsuit. She may be reaching put to you abt Brian (I've explained that it's been handled etc but she was clear she wanted something easy to try)
We can't have movies be they ain't got a program to promote each holiday etc(idk why they don't start with this konth)
**3:23:27 PM Joren:** That's grea tt ohear.

*p.28 of Doc 40, collection of Teams Messages between Myself and Joren Wendschuh from pp.608-611 of Doc 40-2*

97a. Because the meeting had also upset me, I then discussed her criticisms with my then-

boyfriend (now husband) over the phone and then via text:

2/10/2022 16:15:58

I also want to back up and validate what you said re how you had to be
super composed and talk slowly and deliberately despite feeling
emotional and how that really sucked...

2/10/2022 16:16:19

I think it definitely is partly (or largely) cultural

2/10/2022 16:17:13

Assata (+17702311017)

And um yeah I think the thing about is everything racism is a natural
response to a world where there's much more racial instances than
someone imagined happening at one time.

It's often a redundant approach bc of the thousands of black folks who
decide they are the problem or that other blacks are the problem and
deal with chronic stress and anxiety of questioning if it's all in their head.

So usually every instance blk individuals are thinking if it's just them, and
the stuff they express is after such thought

*p. 2(bottom half) of Ex. 1, Post meeting (with Ms. Talis)-Post call (with Mr. Hackman) Text Messages between myself and Mr.
Hackman on 02/10/2022 about Ms. Talis' critique of my complaints, excited utterance/timely account.*

99a. on 02/14/2022, after her perceived "philosophical" critique of my complaints of workplace

racial harassment, Ms. Talis sent me the following email:

**From:** Judy Talis <judy.talis@momentumdynamics.com>
**Sent:** Monday, February 14, 2022, 10:45 AM
**To:** Assata Acey <Assata.Acey@momentumdynamics.com>
**Subject:** Per our Discussion

Assata:

Thanks again for spending time with me last week to share your concerns. In follow-up, you raised a general concern surrounding behavior that you believe constitutes unconscious bias. During our meetings I asked if there were specific individuals or incidents about which you were making a complaint and/or needed to be addressed and you responded no, but added that there were interactions that you have had with other employees that you believe might be useful to incorporate into future company training.

In response, I would like to invite you to send me some brief notes concerning these examples and I will certainly review them for inclusion into our upcoming workplace training. You may send those to me at your convenience and I will let you know if I have any questions or need additional discussion with you.

Thank you for sharing your thoughts and input. Additionally, if you at any time believe that there are matters which you believe violate our policies against harassment or discrimination, please let me know immediately.

Regards,
Judy

*p.1 of Doc 15-50, Follow up Email Ms. Talis sent to me, 02/14/2022 (redlines added for focus)*

100a. On the surface, the email appeared inviting, but I understood Ms. Talis' email as a claim

that I had:

1) made no complaint of racial harassment or discrimination, and

2) declined to render **any** specific events or persons with whom I have had trouble.

101a. Her email devasted but did not surprise me, as it only underlined my suspicion that she

would allow her personal definition of racial bias and her views of my experiences to determine

whether she professionally acknowledged my complaints or supported/created any

administrative record of my having complained.

102a. On 02/15/2022, one day after her email, Ms. Talis arranged a meeting with my supervisor

through private message, indicating her intent to discuss my complaints:

Case 2:23-cv-01438-GEKP   Document 40-2   Filed 01/30/24   Page 638 of 1818

Message
_____

From:      Judy Talis [judy.talis@momentumdynamics.com]
Sent:      2/15/2022 8:06:01 PM
To:        Joren Wendschuh [joren.wendschuh@momentumdynamics.com]

Sure I will be in tomorrow. I also want to speak to you about Assata and some things she shared with me. My calendar is up to date but regardless I will find time for you.

*p. 638 of Doc 40-2 Teams message/adverse party Statement Sent by Judy Talis to Joren Wendschuh*

103a. On the afternoon of the alleged meeting date, and in response to the content discussed with

Ms. Talis, Mr. Wendschuh **texted me the following apology:**

| Received | 02/16/2022 12:44:08 PM | Joren(boss) (+1203300399 0) | Also had a conversation with Judy. She explained about the Tom issue on January 25th at 3pm. I'm sorry, I didn't consciously process it, as I have no recollection on it at all. Other instances yes, but not that one. Also discussed some re future promotions for you and career path. The conversation from last week did not get talked about. That's still between us and we should work out where we are with that a bit more this week, maybe just a brief written email rewriting job description and responsibilities so that we're both in agreement. |

*p. 1(bottom messages) of Ex. 2 Text Message sent from Joren Wendschuh to my Phone on 02/16/2022, highlighter added for emphasis.*

104a. The details of Mr. Wendschuh's apology ("Tom issue on January 25th at 3pm") led me to

believe that Ms. Talis had been able to recall, identify and **explain** at least one **specific**

issue/incident (also occurring at a **specific** time and concerning a **specific** individual) that I had

complained to her about in our meeting (Ex 2).

105a. Furthermore, it implied that Ms. Talis had been able to recall, identify, and discuss this

incident while Mr. Wendschuh had "no recollection on it at all" (Ex. 2).

106a. Ms. Talis' ability, criticism, and clandestine actions caused me to view her email's

underlying claim as more than a subjective viewpoint or honest mistake.

107a. In our 02/10/2022 and 02/11/2022 meetings, I had told Ms. Talis how those incidents I

complained about impacted me emotionally, and that (through my proposed movie list) I was

actively seeking ways to decrease the racial harassment I felt and witnessed at work.

108a. These details had also been supported through the email she had responded to, in which I

presented the movie list as a way to retain diverse staff, encourage collaboration and to "support

diversity and growing beyond our personal experiences":

**From:** Assata Acey <Assata.Acey@momentumdynamics.com>
**Sent:** Monday, February 7, 2022 10:06:42 AM
**To:** Judy Talis <judy.talis@momentumdynamics.com>
**Cc:** Joren Wendschuh <joren.wendschuh@momentumdynamics.com>
**Subject:** BHM Movie reccomendations

Hi Judy, I hope this email finds you well. I'm unsure what Momentum's stance is on black history month, or if this is
even appropriate.
However, I wanted to recommend 14 movies to consider watching for Black History Month-to support diversity and
growing beyond our personal experiences.
I believe this continuous growth enhances collaboration, as well as attractiveness, and retention of diverse talent
pools.
Through their historical or anthropological elements of Black culture and varied levels of seriousness and
lightheartedness, these movies showcase give a curated and varied view of black American experiences.
Names and short summaries below.

*p.2(top of page) of Ex. 3, email from myself to Judy Talis on 02/07/2022*

109a. Ms. Talis knew (or should have known) her email would be distressing because it alleged

the uncomfortable time I had spent (explaining incidents of workplace harassment and engaging

her criticisms of whether I viewed everything through a racial lens) as less than a complaint of

workplace racial harassment.

110a. In addition to her knowing exclusion of my complaint of Tom Hornberger's behavior, Ms.

Talis' email also invited me to provide "brief notes" (p. 1 of Doc 15-50).

111a. However, my negative experiences---disclosing complaints to her, reading that these

disclosures were still being held as insufficient to amount a complaint, and hearing of her

convenient ability to recall with my manager—caused me to view her invitation as insincere.

112a. It appeared that Ms. Talis had already understood my complaints and that, accordingly,

repeating myself in contradiction of her would only anger her.

113a. The risk of openly contradicting and or offending a C-level employee (Ms. Talis being the
acting Chief Administrative Officer), after they had already criticized my complaints and
revisited those details with my manager, that risk seemed both pointless and damaging.

114a. Intimidation is about power; Ms. Talis knew I had complained of specific incidents, I was
the only other witness to my complaining of the incidents to her; Ms. Talis, holding significant
power over my employment, compensation and future promotions insisted that no record existed
and then challenged me to disagree; I did not accept the challenge.

115a. The only evidenced corrective action by Ms. Talis (that could be applied to all my
complaints to her) was her emailed commitment to plan a company-wide diversity training (p.1
of Doc 15-50).

116a. While acceptable on its face, Ms. Talis communicated the timing of this plan for diversity
training (that it would occur at least 4 months after my having complained to her) off-record, by
approaching me on 02/23/2022 while I was alone in my work area:

12:02:38 PM Assata Acey: Judy looked me in eye and asked if I'd d[o]ne anything fun
over weekend

12:02:50 PM Assata Acey: Meh [b]ut also confirmed diversity training is in summerb

12:03:12 PM Joren Wendschuh: Sounds good.

*p.4 of Doc 73, Collection of Teams Messages between Myself and Joren Wendschuh on 02/23/2022 from pp. 13-38
of Doc 73-3*

Messages - Assata

+17176391313

2/23/2022 11:56:55

Assata (+17702311017)

If this is what barreness is like I double down on my desire to not make
children

2/23/2022 11:57:09

Judy just stopped by my desk...
"really quiet and meek schoolgirl voice" "Dannnnn... do you maybe have
extra safety glasses--the kind you gave to Mike that are orange and low-
profile."
"hands her a pair, not saying a word"
"Thaaaaaanks you're my favorite person now."

2/23/2022 11:57:19

2/23/2022 11:58:05

What does it have to do with making children? I don't think I follow

2/23/2022 12:00:37

You want something from wawa?

2/23/2022 12:03:14

Assata (+17702311017)

Judy came by and asked me just jiw if I'd been doing my fun 5hings this
past weekend

2/23/2022 12:03:29

Assata (+17702311017)

Also states to bring shorts in summer

*p. 1 of Ex. 4 Text Messages between Myself and Daniel Hackman on 02/23/2022, Timely Account*

119a. Her expressed timeline, and choice to express this to me directly, confirmed my suspicion

that she wanted me to be personally aware that she neither saw my concerns as needing

immediate correction, nor felt that the impact of those experiences was worth any timely

correction.

120a. Ms. Talis' choice to communicate off-the record (and without witnesses or written

memoranda) also led me to believe that she was purposefully presenting a false impression of

concern and earnestness in her email.

121a. I tried to move on from Ms. Talis's response to my complaints, and I continued to reach

out to my boss for moral support, but my experiences of workplace racial harassment continued

to affect me and my work for the defendant:

4:03:46 PM Assata: Do I ask hary to purchase and coordinate?
4:04:15 PM Joren: Sure please.
4:06:07 PM Joren: And put in as "approval needed"
4:34:58 PM Assata: im so scared to send this email
4:35:06 PM Joren: Which one?
4:35:09 PM Joren: Wait
4:35:12 PM Assata: for lab uniforms
4:35:19 PM Joren: Ok. Pass through me then.
4:35:46 PM Joren: Just do everything as you would, just remove purchasing from the to line
4:38:55 PM Assata: done
4:49:34 PM Joren: I've noticed that the last 2-3 days you've been super aversive, in a lot of ways.
4:50:45 PM Assata: idk if its more or if Im being honest about why some tasks take longer
4:52:04 PM Assata: I also feel partially responsible for ppl hurting my feelings-like I should make
it easier for them not to—I really want everyone to be happy and not just me. Jorges thoughts
got unde my skin a bit and the world always screams about the perspective of the oppressive
person in a situation

*p. 42 of Doc 40, Collection of Teams Messages between me and Joren Wendschuh on 04/07/2022 from pp.1632-1659 of Doc 40-2*

Message

From:      Assata Acey [Assata.Acey@momentumdynamics.com]
Sent:      3/22/2022 3:16:47 PM
To:        Joren Wendschuh [joren.wendschuh@momentumdynamics.com]

Rob took my tools from my workstatoin yesterday morning and watched me look for them until i took them
from tool area and reused. I was actiively using them

*p. 1095 of Doc 40-2 Teams Message from myself to Joren Wendschuh on 03/22/2022*

122a. Through her educational/experiential background, Ms. Talis knew her duty to investigate

and enact corrective action for complaints of workplace racial harassment.

123a. She has also stated in her 04/12/2024 affidavit that any involvement she had in my claims would be documented in the Defendant's records:

## CERTIFICATION OF JUDITH TALIS

1.    I am a former employee of InductEV and Momentum Dynamics.

2.    On April 8, 2024, Ms. Acey asked me to answer the following questions, under oath:

### Questions:

1. Is there any instance Ms. Talis can recall where she stuck up for or protected Ms. Acey from a racially charged action or comment while working for InductEV/Momentum Dynamics?

Answer:        Any incident involving Ms. Acey that was brought to my attention was investigated and documented. I do not recall the specifics, but the company's documents would reflect my personal involvement in the matter, if any.

*Ex. 5 Judy Talis' affidavit- Adverse Party Statement on 04/12/2024, highlighter added for focus.*

124a. Being that discovery has passed and the defendant has failed to produce any records of investigations, it is concluded that either no formal investigation of my concerns was conducted, or these records are being unlawfully withheld by the defendant.

125a. I therefore conclude that Ms. Talis either failed to investigate these claims, or that any records of her investigations would show them to be inadequate or otherwise flawed.

126a. I attribute my continued experience of harassment to the fact that from the date that I complained to the date that I left on disability leave, Ms. Talis failed to properly investigate or take corrective action on my complaints.

127a. The "committed" and "acceptable" company-wide diversity training did not occur until November of 2022, three months after Ms. Talis was terminated by the defendant, two months and after I had been terminated.

[Rest of Original Count Continues]

103. By diligently and purposefully intimidating me against making further complaints of racial

harassment, the Defendant intentionally violated 42 U.S.C. §2000e-3(a); therefore, I demand

judgment in my favor and against the defendant, in an undetermined award amount together with

all applicable affirmative action, compensatory and punitive damages as granted under U.S.C.

§2000e-7, and 42 U.S.C. §1981a(a)(1), as well as any other relief designated by the court.

Sincerely,

/s/ Assata Acey Hackman

Assata Acey Hackman (Pro Se)

5121 Brown St,

Philadelphia, PA 19139

aceyassata@gmail.com

770-231-1017

Date: 04/22/2024

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| ASSATA ACEY, | | : | |
| | *Plaintiff* | : | **CIVIL ACTION** |
| v. | | : | |
| | | : | |
| INDUCTEV, | | : | |
| | *Defendant* | : | **No. 23-1438** |

## O R D E R

**AND NOW**, this 1st day of May 2024, upon consideration of Plaintiff's Motion for Leave

to Amend (Doc. No. 84), it is hereby **ORDERED** that the Motion (Doc. No. 84) is **DENIED**.[1]

**BY THE COURT:**

**/s/ Karen Spencer Marston for Gene E.K Pratter**
**GENE E.K. PRATTER**
UNITED STATES DISTRICT JUDGE

---

[1]     The plaintiff seeks leave to amend Counts I, III, IV, IX, and XX of her complaint. Mot. for Leave to Amend at 1–2, Doc. No. 84. The Court previously dismissed with prejudice Counts I, III, IV, IX, and XX. Feb. 27, 2024 Order ¶ 2(a), Doc. No. 50. Because the Court dismissed with prejudice the same causes of action that the plaintiff seeks leave to amend, the Court denies the motion for leave to amend.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| **ASSATA ACEY** | | : | |
| | **Plaintiff,** | : | |
| | | : | |
| **v.** | | : | **Civ. No. 23-1438** |
| | | : | |
| **INDUCTEV** | | : | |
| | **Defendant.** | : | |
| | | : | |

## ORDER

On February 27, 2024, Judge Pratter (late of this Court) dismissed *pro se* Plaintiff Assata

Acey's disability claims without prejudice. (Doc. Nos. 49, 50.) Acey now moves to amend her

Complaint to revive those claims and supplement several of her remaining claims. (Doc. Nos. 97,

105.) InductEV opposes her Motions, which I will deny. (Doc. Nos. 101, 106.)

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On March 10, 2023, Acey brought discrimination claims against InductEV in the

Philadelphia Common Pleas Court. (Doc. No. 1.) InductEV removed, after which Acey moved

for summary judgment, which Judge Pratter treated as a Motion for Default Judgment. (Doc. Nos.

1, 5.) On April 27, 2023, InductEV moved to dismiss all claims. (Doc. No. 10.) Judge Pratter

issued a scheduling order, setting the discovery deadline as September 15, 2023. (Doc. No. 14.)

The Parties proceeded with discovery, during which the Parties filed numerous discovery motions.

(Doc. Nos. 19, 21, 26, 29, 33, 41, 42, 43, 44, 46, 55, 61, 65, 70.) On November 6, 2023, Judge

Pratter lifted all pending deadlines. (Doc. No. 36.)

On February 27, 2024, Judge Pratter denied Acey's motion for default judgment

("summary judgment") and granted in part and denied in part InductEV's Motion to Dismiss.

(Doc. Nos. 49, 50.) She dismissed several claims with prejudice, dismissed Acey's three disability claims without prejudice, and granted Acey leave to amend her disability claims. (Id.) Judge Pratter did not, however, provide a deadline for amendment. (Id.) Acey moved for reconsideration, which Judge Pratter denied. (Doc. Nos. 51, 58, 59.) Acey also filed a notice of appeal, which the Third Circuit dismissed for lack of appellate jurisdiction. (Doc. Nos. 67, 68, 107.) On February 29, 2024, Judge Pratter issued an amended scheduling order, requiring discovery be completed by April 12, 2024. (Doc. No. 53.)

On April 22, 2024, Acey moved for leave to amend the claims dismissed with prejudice, which Judge Pratter denied. (Doc. Nos. 84, 87.) On May 6, 2024, Judge Marston held a status hearing on Judge Pratter's behalf, during which she informed Acey that "it's a little late to be amending claims." (Doc. Nos. 88, 93.) Judge Marston issued a second amended scheduling order, extending the discovery deadline to June 12, 2024 and moving the summary judgment deadline for settlement purposes. (Doc. Nos. 90, 93.) The same day, Acey filed a Motion for Partial Summary Judgment, which she has since amended. (Doc. Nos. 89, 92.)

On May 21, 2024, this case was reassigned to me. (Doc. No. 95.) On May 24, 2024, Acey moved to amend the Complaint to revive the disability claims that had been dismissed without prejudice. (Doc. No. 97.) InductEV opposes the Motion. (oc. Nos. 101, 106.) On June 3, 2024, Acey submitted another Motion to Amend, in which she seeks to supplement her existing retaliation claims. (Doc. No. 105.)

## II.    LEGAL STANDARDS

Leave to amend should be "freely given when justice so requires." Fed. R. Civ. P. 15(a). "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410,

1434 (3d Cir.1997); see Foman v. Davis, 371 U.S. 178, 182 (1962). "[P]rejudice to the non-moving party is the touchstone for the denial of an amendment." Cornell & Co. v. Occupational Safety & Health Review Comm'n, 573 F.2d 820, 823 (3d Cir. 1978).

### III.   DISCUSSION

InductEV argues that amendment should be denied because amendment would be futile, is unduly delayed, and would be prejudicial. (Doc. Nos. 101, 106.)

### A.  Futility

"[F]utility of amendment is a sufficient basis to deny leave to amend." Great W. Mining & Min. Co. v. Fox Rothschild LLP, 615 F.3d 159, 175 (3d Cir. 2010). "'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." Id. "The standard for assessing futility is the 'same standard of legal sufficiency as applies under [Federal] Rule [of Civil Procedure] 12(b)(6).'" Id. (quoting Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000)). "Accordingly, if a claim is vulnerable to dismissal under Rule 12(b)(6), but the plaintiff moves to amend, leave to amend generally must be granted unless the amendment would not cure the deficiency." Id.

#### 1.   Disability Claims

To make out an ADA discrimination claim, Acey must allege that: (1) she is disabled under the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, either with or without a reasonable accommodation; and (3) she suffered an adverse employment decision due to the discrimination. Shaner v. Synthes (USA), 204 F.3d 494, 500 (3d Cir. 2000). Pennsylvania courts generally interpret the PHRA in accordance with the ADA.

Judge Pratter dismissed Acey's claims because she did not sufficiently allege that she has

a disability. A plaintiff is disabled under the ADA if she: (1) has "a physical or mental impairment that substantially limits one or more" of her "major life activities"; (2) has "a record of such an impairment"; or (3) is "regarded as having such an impairment." Eshleman v. Patrick Indus., Inc., 961 F.3d 242, 245 (3d Cir. 2020) (quoting 42 U.S.C. § 12102).

In her initial Complaint, Acey repeatedly stated that she had a "disability" without providing any specifics of the disability, its symptoms, and the limitations it caused. (Doc. No. 49 at 17.) Contrary to InductEV's assertions, Acey's proposed amendments remedy this deficiency. She alleges specific symptoms—dizziness, migraines, heat flashes, nausea, vertigo, and pituitary macroadenoma—provides medical records, and identifies particular tasks her symptoms substantially limit. (See Doc. No. 97.) These allegations are sufficient to plead that she is disabled under the ADA.

InductEV urges that amendment is nonetheless futile because Acey does not amend her allegations that InductEV fired her because of her disability. InductEV conflates Acey's 12(b)(6) burden with her burden on summary judgment. Although Judge Pratter noted that Acey "will need to produce further evidence of discrimination based on disability through the discovery process," she held that Acey adequately alleged that InductEV terminated Acey because of her disability for purposes of a 12(b)(6). (Doc. No. 49 at 17-18.) Additional allegations are thus unnecessary.

In sum, amendment of Acey's disability claims would not be futile.

    *2.   Retaliation Claims*

By contrast, amendment of Acey's retaliation claims would be futile or unnecessary. To plead Title VII retaliation, a plaintiff must allege that: "(1) she engaged in a protected activity

under Title VII; (2) the employer took an adverse action against *her*; and (3) there was a causal connection between the employee's participation in the protected activity and the adverse employment action." Barnett v. New Jersey Transit Corp., 573 F. App'x 239, 244 (3d Cir. 2014) (emphasis added).

To the extent that Acey seeks to amend her existing claims to add additional support, amendment is unnecessary. As Judge Pratter already ruled, Acey's retaliation claims were sufficiently pled. (Doc. No. 49 at 18-19.)

Insofar as Acey seeks to bring new retaliation claims, these claims fail. Her husband's termination is not an adverse employment against *her*. See Barnett v. New Jersey Transit Corp., 573 F. App'x 239, 245 (3d Cir. 2014). Moreover, Acey lacks standing to bring these claims *on behalf of* her husband. See id. (plaintiff "lacks standing to bring a discrimination claim on behalf of" her terminated husband). He must bring his own claims of retaliation, presumably in a separate lawsuit.

Accordingly, I will deny Acey's Motion as futile.

## B.    Prejudice and Undue Delay

"Delay alone is not sufficient to justify denial of leave to amend." Arthur v. Maersk, Inc., 434 F.3d 196, 204 (3d Cir. 2006) (citing Adams v. Gould Inc., 739 F.2d 858, 868 (3d Cir.1984)). "[H]owever, at some point, . . . delay will become 'undue,' placing an unwarranted burden on the court . . . [and] an unfair burden on the opposing party." Cureton v. Nat'l Collegiate Athletic Ass'n, 252 F.3d 267, 273 (3d Cir. 2001). "When a party fails to take advantage of previous opportunities to amend, without adequate explanation, leave to amend is properly denied." Arthur, 434 F.3d at 204; see also Cureton, 252 F.3d at 273 ("[T]he question of undue delay requires that

we focus on the movant's reasons for not amending sooner.").

Acey's Motions to Amend come over one year after she filed her Complaint, and three months after Judge Pratter ruled on InductEV's Motion to Dismiss. Judge Pratter clearly identified the deficiency in Acey's disability claims, and the facts necessary to cure this deficiency were known to Acey long before initiating this action. (Doc. No. 49 at 16-17.) Judge Marston told Acey "it was a little late to be amending claims." (Doc. No. 93.) Yet, Acey moved to amend without providing any explanation or justification for her delayed motions.

Indeed, this is not Acey's first motion to amend since Judge Pratter's ruling; Acey moved to amend on April 22, 2024. (Doc. No. 88.) She could have amended these other claims at that point. She did not. Acey provides no adequate explanation for her "fail[ure] to take advantage of [this] previous opportunit[y] to amend." Cureton, 252 F.3d at 273. Nor does she provide any justification for her failure to submit a new motion until the end of a twice-extended discovery deadline, and until after she filed a since-amended Motion for Partial Summary Judgment. See McCarthy v. Komori America Corp., 200 F.R.D. 507, 509 (E.D. Pa. 2001) (denying motion to amend where facts were known to plaintiffs months before filing motion, twice-extended discovery deadline had passed, and plaintiffs failed to provide justification for delay).

Given this undue delay, InductEV argues that it would be prejudiced by amendment because it conducted discovery, including Acey's deposition, "with the Complaint as it exists." (Doc. No. 101 at 7.) Plaintiff already sat for two days of depositions in April, and thousands of documents have been exchanged. The discovery deadline—which has been extended twice—is less than a week away. Although Acey responds that InductEV already sought discovery from her medical providers on these claims, she does not suggest that additional discovery is unnecessary.

(See Doc. No. 103 at 1.) InductEV sought this information *before* the claims were dismissed. Discovery has progressed, however, and depositions have been taken subsequent to dismissal of these claims. InductEV had no reason to address these issues and seek additional information in the depositions and discovery requests after the disability claims' dismissal. Reviving these claims would thus require me to extend discovery for the third time, resulting in additional costs to InductEV. See Hewlett–Packard Co. v. Arch Assocs. Corp., 172 F.R.D. 151, 155 (E.D.Pa.1997) ("[A]llowing amendment of [defendants'] remaining claims . . . would clearly lead to further delay and an additional round of time-consuming discovery."); McKnight v. Sch. Dist. of Phila., No. 00-573, 2001 WL 74772, at *2 (E.D. Pa. Jan. 29, 2001) ("[B]ecause discovery in this case has closed and the Plaintiff and all relevant witnesses have been deposed, . . . allowing the Plaintiff to now amend his Complaint . . . would significantly prejudice [Defendants'] ability to prepare a defense in this case.").

In light of Acey's unexplained delay and the prejudice to InductEV, I will not allow amendment.

## IV.    CONCLUSION

In sum, I will deny Acey's Motions to Amend as futile, unduly delayed, and prejudicial.

\*                  \*                  \*

**AND NOW**, this 10th day of June, 2024, it is hereby **ORDERED** that Acey's Motions to Amend (Doc. Nos. 97, 105) are **DENIED**.

**AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*
_____
Paul S. Diamond, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ASSATA ACEY** | | : |
| | **Plaintiff,** | : |
| | | : |
| **v.** | | :      **Civ. No. 23-1438** |
| | | : |
| **INDUCTEV** | | : |
| | **Defendant.** | : |
| | | : |

## O R D E R

*Pro se* Plaintiff Assata Acey seeks reconsideration of my Orders denying her Motion to Amend her Complaint and Motion for an Evidentiary Hearing. (Doc. No. 111.) She also seeks a certificate of appealability respecting the denial of Acey's Motion to Reconsider the dismissal of Counts I, III, IV, IX, and XX. (Doc. No. 112.) I will deny both Motions.

## I.    MOTION FOR RECONSIDERATION

"Before entertaining a motion for reconsideration of an interlocutory order, the movant must . . . establish good cause for why the court should revisit its prior decision." Qazizadeh v. Pinnacle Health Sys., 214 F. Supp. 3d 292, 295 (M.D. Pa. 2016) (citing Confer v. Custom Eng'g Co. Emp. Health Benefit Plan, 760 F. Supp. 75, 77 (W.D. Pa. 1991)). "The purpose of a motion to reconsider is to 'correct manifest errors of law or fact or to present newly discovered evidence,' not to re-argue the issue." Frederick v. Se. Pa. Transp. Auth., 926 F. Supp. 63, 64 (E.D. Pa. 1996) (quoting Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985)). Where evidence is not newly discovered, a party may not submit that evidence in support of a motion for reconsideration." Zlotnicki, 779 F.2d at 909. It is a "well-settled rule that reconsideration is improper when a party should have raised an argument earlier." Sarpolis v. Tereshko, 625 F. App'x. 594, 599 (3d Cir. 2016). "Because of the interest in finality, however, courts should grant motions for reconsideration sparingly." Am. Guarantee & Liab. Ins. Co. v. Fojanini, 99 F. Supp.

2d 558, 561 (E.D. Pa. 2000).

Acey provides no change in controlling law, newly discovered evidence unavailable at the time I ruled, or clear error of law or fact. Instead, she submits evidence and argument not included in her original discovery motion but available to her at the time I denied that Motion. Because this evidence is not "newly discovered," it does not warrant reconsideration. See Zlotnicki, 339 F.2d at 909. Reconsideration is not properly a means to correct earlier mistakes. See Kennedy Indus., Inc. v. Aparo, No. 04-5967, 2006 WL 1892685, at *1 (E.D. Pa. July 6, 2006) ("A litigant that fails in its first attempt to persuade a court to adopt its position may not use a motion for reconsideration either to attempt a new approach or correct mistakes it made in its previous one.").

Acey's Motion to Reconsider her Motion to Amend is also meritless. She improperly presents new arguments and excuses for failing to amend and has not demonstrated any error in my Order. As I explained in denying her Motion, the only deficiency Judge Pratter identified is one that could have been corrected the same day with information Acey then possessed—her symptoms and the tasks her systems substantially limit. (See Doc. No. 109; see also Doc. No. 49.) Accordingly, her attempt to amend the Complaint was unduly delayed. (See Doc. No. 109). Moreover, given the drawn out discovery and scheduling in this case and approaching summary judgment deadline, amendment would prejudice InductEV. (See id.)

I will thus deny Acey's Motion for Reconsideration.

## II.   MOTION FOR CERTIFICATE OF APPEALABILITY

Acey also moves for a certificate of appealability so that she may file an interlocutory appeal of the Order and Memorandum denying her Motion for Reconsideration. (Doc. No. 112.)

I *may* grant a certificate appealability when the Order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal

from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Thus, certification under § 1292(b) is only proper when "(1) the issue involve[s] a controlling question of law; (2) as to which there are substantial grounds for difference of opinion; and (3) an immediate appeal of the order may materially advance the ultimate termination of the litigation." Simon v. United States, 341 F.3d 193, 199 (3d Cir. 2003). Even where the three criteria are met, however, certification rests within my sound discretion. See Bachowski v. Usery, 545 F.2d 363, 368 (3d Cir. 1976) ("The certification procedure is not mandatory; indeed, permission to appeal is wholly within the discretion of the courts, even if the criteria are present."); L.R. v. Manheim Twp. Sch. Dist., 540 F. Supp. 2d 603, 608 (E.D. Pa. 2008) (quotations omitted) ("The statutory factors, however, are merely a guide for the Court's discretion."). "The burden is on the party seeking certification to demonstrate that exceptional circumstances justify a departure from the basic policy against piecemeal litigation and of postponing appellate review until after the entry of a final judgment." L.R., 540 F. Supp. at 608.

Acey has not met her burden; indeed, her motion does no more recite § 1292(b). Even so, certification is not appropriate. First, a question that "appears to be a controlling question of law" but nevertheless presents a question "about a court's application of the facts of the case to the established legal standards are not controlling questions of law for purposes of section 1292(b)." Glover v. Udren, No. 08-990, 2013 WL 3072377, at *2 (W.D. Pa. June 18, 2013) (citation omitted). Acey does not suggest that Judge Pratter applied the wrong law on reconsideration.

For the same reason, there are no substantial grounds for difference of opinion here. There is a "substantial ground for difference of opinion" when the matter involves "one or more difficult and pivotal questions of law not settled by controlling authority." Kao v. CardConnect Corp., No. 16-5707, 2019 WL 2615720, at *4 (E.D. Pa. June 26, 2019) (quoting McGillicuddy v. Clements,

746 F.2d 76, 76 n.1 (1st Cir. 1984). I "should not certify questions of relatively clear law merely because the losing party disagrees with [its] analysis." In re Chocolate Confectionary Antitrust Litig., 607 F. Supp. 2d 701, 706 (M.D. Pa. 2009). That is the case here.

Finally, certification would not advance the ultimate termination of litigation. I may consider whether appeal would "(1) obviate the need for trial; (2) eliminate complex issues, thereby greatly simplifying the trial; or (3) eliminate issues thus making discovery much easier and less costly." Wheeler v. Beard, No. 03-4826, 2005 WL 2108702, at *3 (E.D. Pa. Aug. 31, 2005) (citation omitted). Here, Acey seeks to revive dismissed claims rather than eliminate issues. Moreover, certification does not materially advance termination where, as here, "the case would . . . remain in the same procedural posture." Kao, 2019 WL 2615720, at *5. Rather than advance the ultimate termination of this case, appeal would further draw out this case.

I will thus deny Acey's Motion.

<div align="center">*   *   *</div>

**AND NOW**, this 16th day of August, 2024, it is hereby **ORDERED** that Acey's Motion for Reconsideration (Doc. No. 111) and Motion for a Certificate of Appealability (Doc. No. 112) are **DENIED**. Acey's Motion to Seal Doc. No. 111-3 (Doc. No. 113) is **GRANTED**. The Clerk of Court is **DIRECTED** to seal Doc. No. 111-3.

<div align="center">

**AND IT IS SO ORDERED.**

</div>

/s/ Paul S. Diamond
_____
Paul S. Diamond, J.

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ASSATA ACEY,** | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| *v.* | : | |
| **INDUCTEV,** | : | |
| *Defendant.* | : | **No. 2:23-01438-PD** |

### Motion for Clarity

I, plaintiff, present this motion *(bearing 2 questions)* to better understand how the court desires to hear from the mediators.

The court's order (Doc 157) states an expectation to hear from the mediators who worked with the parties during their 2022 mediation. Those mediators are identified as Tracy Hornig and Barbara Foxman.

1. Due to red-tape and mediator neutrality requirements, Plaintiff asks for clarity as to whether the court is:

-ordering the mediators themselves to attend

-ordering the parties to produce the mediators

-requesting the mediators' attendance

2. Plaintiff also asks whether notarized affidavits from each mediator, and sealed submission of the mediators' notes would alternatively satisfy the court.

Sincerely,

Assata Acey Hackman /s/

Assata Hackman (Pro Se)

5121 Brown St,

Philadelphia, PA, 19139

770-231-1017

aceyassata@gmail.com

Date: 10/23/2024



Eagleview Corporate Center
747 Constitution Drive, Suite 100
P.O. Box 673
Exton, PA  19341
📞 610.458.7500  🖨 610.458.7337

RANDALL C. SCHAUER
Direct No: 610.458.4967
Email: rschauer@foxrothschild.com

October 23, 2024

**Via Electronic Case Filing**

The Honorable Paul S. Diamond
United States District Court for the
Eastern District of Pennsylvania
14614 U.S. Courthouse
601 Market Street
Courtroom 14-A
Philadelphia, PA  19106

**Re:**    *Assata Acey v. InductEV (Case No.: 23-cv-01438)*

Dear Judge Diamond:

Counsel for Defendant, InductEV, f/k/a Momentum Dynamics Corporation, asks whether the Order of October 22, 2024 cancelling the Final Pretrial Conference and directing the holding of an Evidentiary Hearing has an effect on any other of the dates and obligations of the parties under the Second Amended Scheduling Order dated August 22, 2024 (Doc. 130).

Thank you for your attention.

Respectfully submitted,

Randall C. Schauer

RCS
cc:    Assata Acey (aceyassata@gmail.com)
       Alberto M. Longo, Esq.

A Pennsylvania Limited Liability Partnership

California    Colorado    Delaware    District of Columbia    Florida    Georgia    Illinois    Massachusetts    Minnesota    Missouri
Nevada    New Jersey    New York    North Carolina    Oklahoma    Pennsylvania    South Carolina    Texas    Washington

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASSATA ACEY | Case No.: 2:23-cv-01438 |
| Plaintiff, | Judge Paul S. Diamond |
| v. | |
| INDUCTEV | |
| Defendant. | |

### RESPONSE OF DEFENDANT
### TO PLAINTIFF'S MOTION FOR CLARITY

InductEV, f/k/a Momentum Dynamics Corporation ("Defendant") responds to Plaintiff's Motion for Clarity (Doc. 158) as follows:

Defendant objects to presentation of the mediators' testimony or evidence the hearing scheduled for November 13, 2024 at 11:00 a.m. by use of notarized Affidavits.

Defendant is willing to serve the mediators with the Court's Order of October 22, 2024 stating the Court's expectation that they will attend the hearing scheduled for November 13, 2024 at 11:00 a.m. (or such other Order as the Court may enter);

as well as a subpoena for the attendance of both Mediators at said hearing.

Respectfully submitted,

FOX ROTHSCHILD LLP

/s/ Randall C. Schauer
Randall C. Schauer, Esq. (ID No. 34273)
Alberto M. Longo, Esq. (ID No. 328893)
Fox Rothschild LLP
Eagleview Corporate Center
747 Constitution Drive, Suite 100
Exton, PA  19341-0673
Tel – (610) 458-4967
rschauer@foxrothschild.com
alongo@foxrothschild.com
Attorneys for Defendant
InductEV

Dated:  October 23, 2024

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on October 23, 2024, a true and correct

copy of the foregoing document was served on Plaintiff via electronic mail per the

address contained on the docket in this matter.

**FOX ROTHSCHILD LLP**

*/s/ Randall C. Schauer*
Randall C. Schauer, Esquire
*Attorney for Defendant, InductEV*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASSATA ACEY | Case No.: 2:23-cv-01438 |
| Plaintiff, | Judge Paul S. Diamond |
| v. | |
| INDUCTEV | |
| Defendant. | |

### ORDER

**AND NOW,** this _____ day of October, 2024, upon consideration of
Plaintiff's Motion for Clarity (Doc. No. 158) and the Defendant's response thereto,
the Court denies Plaintiff's Motion and directs Defendant to serve a copy of the
Court's Order of October 22, 2024 directing the attendance of the mediators on the
mediators in accordance with the Federal Rules of Civil Procedure for service of
subpoenas.

BY THE COURT:

_____

DIAMOND, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ASSATA ACEY | Case No.: 2:23-cv-01438 |
| Plaintiff, | |
| v. | Judge Paul S. Diamond |
| INDUCTEV | |
| Defendant. | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 25, 2024, a true and correct copy of the Court's October 23, 2024 Order was served on Mediators Tracy Hornig and Barbara Foxman via electronic mail, both of whom confirmed receipt of same.

FOX ROTHSCHILD LLP

/s/ *Randall C. Schauer*
Randall C. Schauer

*Attorney for Defendant*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ASSATA ACEY, | : | CIVIL ACTION |
| | : | |
| *Plaintiff* | : | |
| | : | |
| *v.* | : | |
| | : | |
| INDUCTEV, | : | |
| | : | |
| *Defendant.* | : | No. 2:23-01438-PD |

## Motion to Permit Disclosure

I, plaintiff, present this motion to permit mediators' private disclosure of their

recollection of mediation to both parties.

I have done my best to inform mediators of every order concerning their attendance

before the court's denial of my motion for clarification. The entire Email

correspondence is attached with this motion.

This morning, at least one mediator has indicated possibility of disclosing to both

parties with permission from the court.

Having recalled the mediation in my complaint and in deposition, I do now

explicitly state my prior allegation that defendant and or their former counsel knew

that there was no binding agreement at mediation and chose to convey the existence

of one to coerce me into signing a written agreement and as their strongest defense
to this litigation.

Even if it were not central to this case, this is a serious matter of attorney conduct
that should be clarified.

To this end, it is unlikely that the case will settle without both parties being made
**explicitly** aware of what the mediators and their notes recall as to if a final
agreement was reached. Especially since the defendant has changed counsel since
mediation. It is believed that the weight of their testimony would be considered due
to their position as neutral parties.

Sincerely,

Assata Acey Hackman /s/

Assata Hackman (Pro Se)

5121 Brown St,

Philadelphia, PA, 19139

770-231-1017

aceyassata@gmail.com

Date: 11/13/2024

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ASSATA ACEY | Case No.: 2:23-cv-01438 |
| Plaintiff, | |
| v. | Judge Paul S. Diamond |
| INDUCTEV | |
| Defendant. | |

## INDUCTEV'S MOTION FOR SUMMARY JUDGMENT

Defendant, InductEV ("Defendant") respectfully moves this Court for entry of summary judgment in its favor and against Plaintiff, Assata Acey ("Plaintiff") on all claims pursuant to Rule 56 of the Federal Rules of Civil Procedure because there is no dispute as to any material fact and Defendant is entitled to judgment as a matter of law. In support of its Motion, Defendant relies on the attached Memorandum of Law and Statement of Undisputed Material Facts and exhibits thereto, which are incorporated herein by reference.

**FOX ROTHSCHILD LLP**

*/s/ Randall C. Schauer*
Randall C. Schauer (ID No. 34273)
Alberto M. Longo (ID No. 328893)
Eagleview Corporate Center
747 Constitution Drive, Suite 100
Exton, PA  19341-0673
Tel – (610) 458-7500
Fax – (610) 458-7337

rschauer@foxrothschild.com
alongo@foxrothschild.com
*Attorneys for Defendant*

Date:  August 23, 2024

2

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 23, 2024, a true and correct copy of the foregoing document was served on all parties via electronic mail per the addresses contained on the docket in this matter.

**FOX ROTHSCHILD LLP**

*/s/ Randall C. Schauer*
Randall C. Schauer, Esquire
*Attorney for Defendant, InductEV*

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| ASSATA ACEY | Case No.: 2:23-cv-01438 |
| Plaintiff, | |
| v. | Judge Paul S. Diamond |
| INDUCTEV | |
| Defendant. | |

### ORDER

AND NOW, this__day of _____, 2024, upon consideration of Defendant InductEV's Motion for Summary Judgment, Plaintiff's response thereto, and any reply, it is hereby **ORDERED** that Defendant's Motion is **GRANTED**.

It is further **ORDERED** that judgment is entered in favor of Defendant and against Plaintiff on Counts V, VI, VII, VIII, X, XI, XII, XVII, XVIII, and XIX of Plaintiff's Complaint.

**IT IS SO ORDERED.**

_____

DIAMOND, J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ASSATA ACEY

                Plaintiff,

v.

INDUCTEV

                Defendant.

Case No.: 2:23-cv-01438

Judge Paul S. Diamond

---

## DEFENDANT INDUCTEV'S MEMORANDUM OF LAW IN
## SUPPORT OF SUMMARY JUDGMENT

---

**FOX ROTHSCHILD LLP**

*/s/ Randall C. Schauer*
Randall C. Schauer (ID No. 34273)
Alberto M. Longo (ID No. 328893)
Eagleview Corporate Center
747 Constitution Drive, Suite 100
Exton, PA  19341-0673
Tel – (610) 458-7500
Fax – (610) 458-7337
rschauer@foxrothschild.com
alongo@foxrothschild.com
*Attorneys for Defendant*

Date:  August 23, 2024

# TABLE OF CONTENTS

Page

I.     INTRODUCTION .......................................................................................... 1

II.    STATEMENT OF FACTS ............................................................................ 2

III.   STANDARD OF REVIEW ........................................................................... 3

IV.   LEGAL ARGUMENT ................................................................................... 3

     A.     Plaintiff cannot establish a prima facie case of discrimination under Title VII or Section 1981 of the Civil Rights ............................. 3

         1.     Plaintiff is not qualified for a senior technician role at InductEV ................................................................................... 5

         2.     Plaintiff has no evidence of intentional race or sex discrimination at InductEV ......................................................... 7

         3.     Even assuming Plaintiff made prima facie showing of discrimination (she has not), several legitimate non-discriminatory reasons exist for InductEV not hiring or promoting Plaintiff as senior technician, which Plaintiff cannot demonstrate were pretext ............................................. 10

     B.     Plaintiff's hostile work environment claims fail because Plaintiff cannot establish that she was subjected to an offensive or hostile work environment based on race or sex, much less one where the actions complained of were severe or pervasive. ................................ 11

         1.     There is no evidence that Plaintiff was subjected to a hostile or offensive environment based on race or sex, let alone one where the cited offensive behavior is "severe or pervasive" .... 12

     C.     Summary Judgment is appropriate because Plaintiff agreed to release her claims and resign in exchange for $50,000 during mediation .............................................................................................. 21

     D.     Plaintiff's retaliation claims fail because Plaintiff agreed to resign and therefore, no adverse action was taken against Plaintiff .............. 23

i

E.    Plaintiff's claim for punitive damages is unwarranted ........................24

V.    CONCLUSION..............................................................................................25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acosta v. Fairmount Foundry, Inc.*,
391 F.Supp.3d 395 (E.D. Pa. 2019) ........................................................ 25

*Alers v. City of Philadelphia*,
919 F.Supp.2d 528 (E.D. Pa. 2013) ........................................................ 14, 17

*Barnees v. Nationwide Mut. Ins. Co.*,
598 F.App'x. 86 (3d Cir. 2015) ........................................................ 5

*Blango v. City of Philadelphia*,
643 F.Supp.3d 535 (E.D. Pa. 2022) ........................................................ 11, 14, 17, 20

*Briscella v. Univ. of Penn. Health Sys.*,
2018 WL 6413305 (E.D. Pa. Dec. 4, 2018) ........................................................ 7

*Brown v. J. Kaz, Inc.*,
581 F.3d 175 (3d Cir. 2009) ........................................................ 5

*Burgess v. Dollar Tree Stores, Inc.*,
642 F.App'x 152 (3d Cir. 2016) ........................................................ 19

*Burton v. Teleflex Inc.*,
707 F.3d 417 (3d Cir. 2013) ........................................................ 4

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........................................................ 3

*Fuentes v. Perskie*,
32 F.3d 759 (3d Cir. 1994) ........................................................ 4

*Groeber v. Friedman & Schuman, P.C.*,
555 F.App'x 133 (3d Cir. 2014) ........................................................ 8

*Halsey v. Pfeiffer*,
750 F.3d 273 (3d Cir. 2014) ........................................................ 4

*Harris v. Forklift Sys., Inc.*,
  510 U.S. 17 (1993)..............................................................................................11

*Hein v. PNC Fin. Servs. Grp., Inc.*,
  511 F.Supp.2d 563 (E.D. Pa. 2007).....................................................................3

*Hunter v. Trustees of Univ. of Pa.*,
  2021 WL 1424710 (E.D. Pa. Apr. 15, 2021)......................................................21

*Huston v Proctor & Gamble Paper Prods. Corp.*,
  568 F.3d 100 (3d Cir. 2009) ..............................................................................19

*Jones v. Sch. Dist. of Phila.*,
  198 F.3d 403 (3d Cir. 1999) ................................................................................8

*Kolstad v. American Dental Ass'n*,
  527 U.S. 526 (1999)...........................................................................................24

*Koschoff v. Henderson*,
  109 F.Supp.2d 332 (E.D. Pa. 2000)....................................................................21

*Kroptavich v. Pa. Power & Light Co.*,
  795 A.2d 1048 (Pa. Super. Ct. 2002)....................................................................4

*Makky v. Chertoff*,
  541 F.3d 205 (3d Cir. 2008) ........................................................................3, 4, 7

*Mazzella v. Koken*,
  739 A.2d 531 (Pa. 1999).....................................................................................23

*McDonnel Douglas v. Green*,
  411 U.S. 792 (1973).............................................................................................3

*Medcalf v. Trustees of Univ. of Penn.*,
  2003 WL 21843201 (3d Cir. Jul. 30, 2003).........................................................24

*Nelson v. Upsala Coll*,
  51 F.3d 383 (3d Cir. 1995) .................................................................................24

*Nitkin v. Main Line Health*,
  2021 WL 5631717 (E.D. Pa. Nov. 29, 2021) ......................................................24

*Perry v. Harvey*,
 332 F.App'x 728 (3d Cir. 2009) .......................................................................... 21

*Satterwite v. Montgomery County*,
 497 F.App'x 247 (3d Cir. 2012) ........................................................................ 4, 6

*Selvato v. SEPTA*,
 658 F.App'x 52 (3d Cir. 2016) ............................................................................ 23

*Smith v. City of Easton*,
 2008 WL 2704570 (E.D. Pa. Jul. 7, 2008) ............................................................ 7

*St. Mary's Honor Ctr. v. Hicks*,
 509 U.S. 502 (1993) .............................................................................................. 4

*Steele v. Pelmore Laboratories, Inc.*,
 725 F.App'x 176 (3d Cir. 2018) ............................................................................ 4

*Walden v. Saint Gobain Corp.*,
 323 F.Supp.2d 637 (E.D. Pa. 2004) ...................................................................... 3

*Zong v. Lynch*,
 2014 WL 4722625 (E.D. Pa. Sept. 22, 2014) ................................................. 22, 23

**Statutes**

29 U.S.C. § 28 et seq. ............................................................................................... 1

42 U.S.C. § 1981 ............................................................................................. *passim*

42 U.S.C. § 1981(b)(1) ............................................................................................ 24

42 U.S.C. §§ 2000e - 2000e17 ........................................................................ *passim*

## I. INTRODUCTION

This is a case where Plaintiff Assata Acey ("Plaintiff") makes a variety of race and sex-based discrimination claims premised on facially neutral activities, or a failure of Defendant InductEV ("InductEV" or "Defendant") to act on what she believes are constructive comments that she attributes to racial or gender bias, or retaliatory behavior, on the part of the Defendant. Discovery has demonstrated that: the "facts" relied on by Plaintiff in the Complaint are not what are cited in the Complaint; Plaintiff's claim of bias is a product of her own lens distorting facially neutral actions or statements of the Defendant or co-workers who failed to do something she thought they should do, should have done, or with which she disagreed, as *ipso facto* racial or gender animus. For example, Plaintiff relies on the company's handling of reimbursement for replacement of her cell phone damaged at work; InductEV's failure to hire or promote her into a Senior Technician role she was admittedly not qualified for; applying its policy requiring use of PTO if an employee is out disability-related and wants pay for a full week of work; routine administration of FMLA paperwork; InductEV failing to supplement its DEI program by circulating a list of books and movies she requested; and the anonymous posting of a cartoon in her workspace referencing her degree in physics.

Nor have the comparators or witnesses Plaintiff identified in discovery as supporting her claim done so. To the contrary, depositions of those witnesses

confirm that there was no discriminatory treatment of Plaintiff, no comparators, and no pattern or practice of racial or gender discrimination at InductEV.

Plaintiff's race discrimination claims based on Defendant's failure to hire or promote Plaintiff to senior technician fail because she has not produced any evidence suggesting that Defendant's decisions were based on race, and Plaintiff's admitted lack of experience and qualifications prevented her from obtaining a senior technician role. Plaintiff's hostile work environment claims based on race or sex fail because she cannot establish that she was subject to a hostile or offensive environment, let alone one that was severe or pervasive in that regard.

Finally, Plaintiff's retaliation claims fail because she was never terminated but rather voluntarily agreed during mediation to resign and release her claims in exchange for $50,000 as Plaintiff admitted in writing, and her grandmother and other direct witnesses confirmed in their depositions. Plaintiff relies on the mistaken legal premise that the settlement reached at mediation is unenforceable because it needed to be reflected in a writing—a condition never agreed to when accepting the offer and agreeing to resign—and has developed no evidence demonstrating her verbal agreement to accept $50,000 is not enforceable.

## II.    STATEMENT OF FACTS

Defendant incorporates by reference the Statement of Undisputed Material Facts ("SUMF") filed contemporaneously with this Motion.

III.    **STANDARD OF REVIEW**

Summary judgment "is appropriate 'if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" *Hein v. PNC Fin. Servs. Grp., Inc.*, 511 F.Supp.2d 563, 565 (E.D. Pa. 2007). "The moving party must initially show the absence of any genuine issue of material fact." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). "This requirement upholds the 'underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense." *Id.* (alteration in original) (citing *Walden v. Saint Gobain Corp.*, 323 F.Supp.2d 637, 641 (E.D. Pa. 2004)).

IV.    **LEGAL ARGUMENT**

A.    **Plaintiff cannot establish a prima facie case of discrimination under Title VII or Section 1981 of the Civil Rights**

To prevail on her claims under Title VII and 42 U.S.C. § 1981, ("Section 1981") Plaintiff must show that (1) she "is a member of a protected class"; (2) that she was qualified for the position she sought to attain or retain; (3) that she "suffered an adverse employment action"; and (4) that "the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (citing *McDonnel Douglas v. Green*, 411 U.S. 792, 802 (1973)). Plaintiff must meet this initial burden to survive

summary judgment. *See Satterwite v. Montgomery County*, 497 F.App'x 247, 249 (3d Cir. 2012).

"If a plaintiff establishes a prima facie case of discrimination, then an inference of discriminatory motive arises and the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse employment action." *Makky*, 541 F.3d at 214 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993)). "If the defendant does so . . . the burden shifts back to the plaintiff to show . . . pretext for intentional discrimination." *Id.* (citing *St. Mary's Honor Ctr*, 509 U.S. at 507-08). "[A]n inference [of pretext] based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment." *Steele v. Pelmore Laboratories, Inc.*, 725 F.App'x 176, 179 (3d Cir. 2018) (alterations in original) (quoting *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014)). Rather, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Burton v. Teleflex Inc.*, 707 F.3d 417, 427 (3d Cir. 2013) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)).

"Generally, claims brought under the PHRA are analyzed under the same standards as their federal counterparts." *Kroptavich v. Pa. Power & Light Co.*, 795

4

A.2d 1048, 1055 (Pa. Super. Ct. 2002). And "the substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII." *Barnees v. Nationwide Mut. Ins. Co.*, 598 F.App'x. 86, 89 (3d Cir. 2015) (quoting *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009)).

### 1.   *Plaintiff is not qualified for a senior technician role at InductEV*

Plaintiff alleges that Defendant's failure to hire or promote her into a senior technician role was because of intentional discrimination. Plaintiff's claims fail because she lacked both the skill sets and "8+ years [of] experience in a test environment" required for the senior technician role. SUMF, ¶¶26-29. Plaintiff acknowledges that those employees who *were* promoted to senior technicians in prior years possessed significantly more experience than she had. SUMF, ¶36.

During the hiring process multiple evaluators documented that Plaintiff lacked the technical skills required for the senior technician role. SUMF, ¶¶99, 103. One evaluator stated that Plaintiff "doesn't seem to fully fit the skills for a Sr tech role….would need to be trained still on certain technical abilities—seemed to have little tool knowledge and experience, writing, cabling, stripping and crimping which are needed for a senior tech role….Definitely seems to fit a [sic] enginerring [sic] position instead of a senior tech role." SUMF, ¶¶101-103. Another evaluation stated that Plaintiff "struggled" with simple drilling, "did not know which direction to put

5

the drill in to drill a hole" and "will need a lot of time and attention to hone her knowledge into practical experience." SUMF, ¶¶104-105. When confronted with these evaluations, Plaintiff was unable to substantiate that the evaluators harbored animus toward her based on race or gender SUMF, ¶¶33-35.

Rob Rosenberger, whom Plaintiff alleges "made comments about the nature and scope of [her] work" (Compl., ¶ 5) provided a positive evaluation of Plaintiff, describing her as "very intelligent," "very enthusiastic and outgoing" and having "excellent technical aptitude." SUMF, ¶99. But that Plaintiff "lack[s] experience" and "might not be happy in a Technician position" based on her comment that "she wanted to learn as a Technician before moving into an Engineering position." SUMF, ¶100. Similarly, Supervisor Joren Wendschuh explained in his evaluation that Plaintiff "[l]oves to learn" and "[b]rings a unique 'science and engineering' background and knowledge" to InductEV; however, he would look to classify Plaintiff as a technician, "unless Omar & Seth are Sr's." SUMF, ¶69.

Plaintiff's inability to establish that she was qualified for a senior technician role is dispositive of her Title VII claim. In *Satterwhite*, the Third Circuit affirmed summary judgment for the employer on the sole basis that the plaintiff failed to present evidence of her qualifications for the positions sought. 497 F.App'x. at 248. Just as the plaintiff could not satisfy the job description in *Satterwhite*, Plaintiff here cannot satisfy the basic criteria for a senior product technician at InductEV which,

6

as Plaintiff admits, required "8+ years [of] experience in a test environment." SUMF,

¶¶26-28.  Plaintiff cannot establish a prime facie case under Title VII, Section 1981,

or the PaHRA based on a failure to hire as or promote to senior technician.

### 2. *Plaintiff has no evidence of intentional race or sex discrimination at InductEV*

Plaintiff is unable to establish that she did not receive the senior technician

position under "circumstances that could give rise to an inference of intentional

discrimination." *Makky*, 541 F.3d at 214.  In support of this claim, Plaintiff primarily

relies on her view of the treatment of various black or female colleagues which are

unsupported by evidence. Indeed, there is not a single document supporting

Plaintiff's allegations. Nor could any of Plaintiff's witnesses identify any conduct

suggesting racial animus toward Plaintiff, or themselves. SUMF, ¶98. Nor does

Plaintiff have any evidence reflecting obvious, or even veiled, race or gender

animus.  That too is dispositive.  *See Briscella v. Univ. of Penn. Health Sys.*, 2018

WL 6413305, at *6 (E.D. Pa. Dec. 4, 2018)

Plaintiff also relies on employees who were promoted in entirely distinct

positions, over remote time frames, as indicative of racial discrimination against her

in her role as introduction technician (Compl., ¶ 144), yet Plaintiff does not identify

a single InductEV employee, with her experience, who was white, who was

promoted over her to the role of senior tech. This also is dispositive. *See Smith v.*

*City of Easton*, 2008 WL 2704570, at *8 (E.D. Pa. Jul. 7, 2008) (finding plaintiff

failed to show "similarly situated individual from a non-protected class was given the position" and granting summary judgment to employer). "Without proof that someone similarly situated was treated more favorably, [Plaintiff] is left only with her subjective belief that race played a role in [InductEV]'s employment decisions" which is "not sufficient to establish an inference of discrimination." *Groeber v. Friedman & Schuman, P.C.*, 555 F.App'x 133, 135 (3d Cir. 2014) (citing *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir. 1999)).

One of Plaintiff's "comparators," Omar Jackson, a black male who had significantly more experience than Plaintiff, and Seth Wohlgemuth, a white male, who had been employed by Defendant longer than Mr. Jackson were promoted to senior tech roles at the same time. SUMF, ¶71. Despite, as Mr. Jackson testified, Mr. Wohlgemuth, having "unique knowledge about the products at InductEV" and being with the company longer. SUMF, ¶¶71-72. Plaintiff acknowledged that Mr. Wohlgemuth had been with InductEV during the entirety of Plaintiff's employment and testified that "he deserved" the promotion. SUMF, ¶73.

Mr. Jackson also disclaimed Plaintiff's allegations that he endured or observed mistreatment at InductEV due to race. Mr. Jackson could not even understand why Plaintiff identified him as a witness in discovery. SUMF, ¶41. He further explained that he (1) did not believe InductEV made any decisions regarding his employment based on race (SUMF, ¶63); (2) was unaware of any practice of

8

limiting employees based on race (SUMF, ¶58); (3) never understood any criticism he witnessed to be racial (SUMF, ¶60); and (4) did not have a single example where he felt criticized due to race. SUMF, ¶59. He also knew nothing about Plaintiff's allegations that InductEV criticized him or other black employees as "lazy" (SUMF, ¶38) and did not witness anything he considered to be "pervasive racial harassment" at InductEV. SUMF, ¶60.

Nor did Plaintiff's other purported witnesses support her claim of race discrimination. Plaintiff's husband Daniel Hackman, who she met at InductEV was identified as a witness to racial comments made by coworkers, but when asked to identify instances of "racially denigrating" behavior responded: "I can't say that I have memories of witnessing or observing anything as far as race is concerned." SUMF, ¶95. Nor could he provide any "specific concrete examples" when asked, explaining: "I don't think I personally, witnessed anything that -- no I don't think so." *Id.*

Plaintiff's colleague Maria Tabbutt could not identify anything she "understood to be racial animus toward Ms. Acey." SUMF, ¶98. And while Plaintiff's grandmother, Jacqueline Acey, vaguely recalled Plaintiff discussing her race claims, she could not identify any details of those conversations (SUMF, ¶13) and did not recall Plaintiff ever mentioning experiencing "racism in the workplace" prior to filing her Complaint. *Id.*

9

Because Plaintiff cannot show she was qualified for a senior technician role and cannot show that she suffered adverse employment action under circumstances giving rise to discrimination, Plaintiff cannot establish a prima facie case of discrimination under Title VII ,Section 1981 or the PaHRA.

> **3.    Even assuming Plaintiff made prima facie showing of discrimination (she has not), several legitimate non-discriminatory reasons exist for InductEV not hiring or promoting Plaintiff as senior technician, which Plaintiff cannot demonstrate were pretext**

Defendant's legitimate and non-discriminatory reasons for not hiring Plaintiff as a senior technician are simple.  Plaintiff lacked the requisite skills and experience for that position—at time of hire, and during employment. *See*, Section IV.A.2, *supra*.  On February 6, 2022, Joren Wendschuh wrote in Plaintiff's 2021 annual performance review that Plaintiff needed to "grow her soldering and assembly skills," "integrate better with the team," learn to read "the room for when to wrap up a tangent," "work toward providing clear and concise feedback and status updates where needed" and "integrate the new software into their daily routine." SUMF, ¶67. Plaintiff agrees, stating in the same February 2, 2022 review that "I am challenged with learning more about the product and processes and people surrounding its development," and "I am seeking to deepen my hands-on skills…" SUMF ¶68. Finally, to the extent Plaintiff attempts to rely on Mr. Jackson's promotion

experience as circumstantial evidence of racism at InductEV, any such reliance is misplaced as explained above.

In the absence of any evidence remotely suggesting that the reasons Plaintiff was not hired or promoted are pretextual, setting aside Plaintiff's inability to produce evidence supporting a prima facie case, summary judgment is appropriate on Plaintiff's Title VII Section 1981 and PHRA failure to promote claim. This Court should grant summary judgment in favor of InductEV on Counts VII, and VIII.

**B.    Plaintiff's hostile work environment claims fail because Plaintiff cannot establish that she was subjected to an offensive or hostile work environment based on race or sex, much less one where the actions complained of were severe or pervasive.**

To survive summary judgment on her hostile work environment claims, Plaintiff must "adduce evidence to allow a jury to find: (1) she suffered intentional discrimination because of her race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person of the same race in the same position; and (5) the existence of respondent superior liability." *Blango v. City of Philadelphia*, 643 F.Supp.3d 535, 542 (E.D. Pa. 2022).

"Title VII is violated if an employee is subjected to a workplace 'permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S.

11

17, 21 (1993)). "The workplace must be objectively hostile or abusive, meaning a reasonable person would find it to be so." *Id.* "Normal, facially-neutral, supervisory management tasks of checking in . . . reorganization, or criticisms cannot be the basis of a hostile work environment claim." *Id.*

> ### 1. *There is no evidence that Plaintiff was subjected to a hostile or offensive environment based on race or sex, let alone one where the cited offensive behavior is "severe or pervasive"*

Plaintiff's claims of a hostile and offensive environment involve facially neutral occurrences informed by her penchant to attribute race or gender animus to occurrences she finds fault with or dislikes, but which do not reflect nor are based on, such animus. Plaintiff has failed to adduce any evidence of intentional discrimination based on race or sex. Wholly lacking are the racial epithets and/or slurs, sexist and/or misogynistic comments, and other typical hallmarks of these claims.

In allowing Plaintiff's hostile environment claims to survive Defendant's Motion to Dismiss, the Court cited seven allegations in Plaintiff's Complaint that if supported by evidence thereof, may state a claim: that Plaintiff (1) was accused of stealing time and missing meetings; (2) subject to criticism for her work; (3) sabotaged by coworkers; (4) the butt of jokes about studying physics; (5) told she was from "the wrong side of the tracks"; (6) compared to dark chocolate; and (7)

forced to undertake additional labor. *See* Memorandum (ECF No. 49) at p. 12. There is no evidentiary support for these allegations in the record.

Instructive to this claim is Plaintiff's answer when asked at her deposition taken on April 11, 2024, when it had first occurred to her that she was the victim of discrimination at InductEV. Plaintiff said it was not until between April 25 and May 4 of 2022, when Ms. Talis told her she needed to make up for time off due to disability by using PTO - thinking it may be disability discrimination. SUMF, ¶106. This answer coming almost two years after her last day of active employment and identifying a period just before she went out on disability on May 16, 2022, *and after the now claimed occurrence of various grievances regarding workplace events occurring prior to April 25, 2024*. By inference, Plaintiff's belief that she was discriminated against on race or sex first occurred to her after May 4, 2022, and well after the events occurred. *Id.*

Plaintiff's Third Brief in Support of Doc. 15 organizes Plaintiff's best evidence based on the following categories: gender/sexual discrimination, sexual and racial discrimination, and disability discrimination. A review of this evidence confirms that summary judgment is appropriate in Defendant's favor on all of Plaintiff's claims. For example, listed under evidence of "Race Discrimination" is a message from Diana Wilmes that reads: "Assata, your lunch was delivered." Doc. 15 at p. 16, ¶ 1.

As for the individual events cited by Plaintiff, the Court need not look beyond Plaintiff's Third Brief in Support of Doc. 15 (ECF No. 40) to dispel the unfounded accusation that Plaintiff was accused of stealing time at InductEV. *Id.* (ECF No. 40) at p. 22, ¶ 14. Plaintiff testified that the series of messages in Doc. 15 substantiates this allegation. SUMF, ¶¶113-114. A simple review of this "evidence" confirms that is not the case, as it is Plaintiff who claims she is being accused of stealing time based on innocuous discussions regarding her timesheet. *Id.* No InductEV employee accuses Plaintiff of anything. *Id.* It is also a fact that Plaintiff did miss meetings. SUMF, ¶115. There is nothing discriminatory about informing an employee about a missed meeting. *See Blango*, 643 F.3d at 546.

Second, Plaintiff's generalized allegation that she was subject to "criticism" is unpersuasive. Mere allegations of "unfounded criticism" do not suffice for hostile work environment claims. *Id.* at 543 ("intentional discrimination necessary for proceeding to trial on a hostile work environment claim must be *because of her race.*" (emphasis in original)). Courts are not "keen on crediting or classifying facially neutral comments as direct evidence of hostile work environment"—as Plaintiff asks this Court to do. *Id.* And the Court already recognized that "most of [Plaintiff]'s work experiences are not facially related to race." Memorandum (ECF No. 49) at p. 12. *See also Alers v. City of Philadelphia*, 919 F.Supp.2d 528, 546 (E.D. Pa. 2013).

14

Third, Plaintiff has produced no evidence of any "sabotage" by any coworkers, nor does the occurrence of same, standing alone, reflect race or gender animus by co-workers InductEV.

Fourth, Plaintiff has not produced any evidence of any denigrating or derogatory jokes made to her by any co-workers or substantiated her allegations about a comic posted to her cubicle. Compl., ¶ 121(d). Plaintiff instead points to a message that reads: "This is Assata. She's a technician with a **Physics** degree . . . she'll be doing better things . . ." as apparent evidence of a "derogatory comment[] from [her] coworkers." Doc. 15 (ECF No. 40) at p. 17, ¶ 3. Plaintiff testified that this message bothered her because the message was "making a big deal to a stranger about [her] role and my degree . . . like [she] was some commodity, and it made [her] feel uncomfortable," despite acknowledging that the message was not an attempt to "belittle [her]." SUMF, ¶119. Plaintiff cannot credibly maintain that such an innocuous comment supports a hostile work environment claim based on race or sex.

Fifth, while Plaintiff alleges a colleague joked about her being from "the wrong side of the tracks" Plaintiff produced no evidence of this comment and when, how, or the context in which it was supposedly made. SUMF, ¶120.

Sixth, it is simply untrue that Plaintiff was compared to dark chocolate. When asked to explain this alleged comparison during her deposition, Plaintiff testified that she was having a "fun conversation" during which the "topic of ice cream came up

15

and he was looking at me and he mentioned dark chocolate. The exact words he stated were probably more accurately recounted to my boss, I believe, like, a day or two after…but I can't remember his direct quotes right now." SUMF, ¶¶121-124 (emphasis added). Plaintiff did in fact document this interaction to her boss which does not support her allegation. On July 27, 2021, Plaintiff wrote:

> **9:06:05 PM Assata:** ok retyping… On my way home friday, I mentally flagged another statement that I had blocked out. During icecream, i had asked chis what flavor he got, to which he said "chocolate. I'm a simple man." I then turned and asked the folks behind and to the left of us what flavor they got/was it the same. Bogdan who was closest, responded that he was getting "dark chocolate, if they have it." before proceeding into his track questions. Im not sure about the statement, when chris subsequently went in I [assumed] it was the sun, and it may have been. But I've also never hear anyone order dark choc[o]late ice cream. Regardless, after a full weekend, I definitely feel like there isnt too much overlap where ill have to seen Bogdan often. I'm probabl[y] going to politely avoid him|

*See* Doc. 15 (ECF No. 40) at p. 11, ¶2. Hence Plaintiff's own testimony and contemporaneous description of the cited occurrence demonstrate that **_no_** "comparison to dark chocolate" ever occurred. SUMF, ¶124.

Seventh, Plaintiff alleges that a hostile and offensive environment was created because she was forced to undertake additional labor such as documenting her work for teammates and getting approval before sending emails to her teammates. Yet, Plaintiff's evidence shows that she did much if not all of this through her own volition—not due to any purported harassment based on race. SUMF, ¶129. Indeed, Plaintiff seemed to feel that any work other than what is in her job description was outside her "contract." *Id.*

Nor can Plaintiff demonstrate respondeat superior liability for the now complained of behaviors. Certain facially neutral behaviors Plaintiff did not like she addressed with her Supervisor, Joren Wendschuh. *See generally,* Doc. 15 (ECF No. 40) at pp. 11-53. However, when asked about concerns brought to the attention of InductEV's director of HR, Judy Talis, during a meeting called to address same in February 2022, Plaintiff she simply recounts the complaints above, but nothing to put the company on notice of what are now her claims or that they were evidence of racial or sex harassment. SUMF, ¶128. Nor can Plaintiff point to a written communication of alleged pervasive or severe occurrences creating a hostile or offensive environment. *Id.*

Despite the force and conviction with which Plaintiff makes her allegations, discovery shows that there is no evidence to support her claims of harassment based on race. This case is similar to *Alers*, where the Court determined that "underwhelming, facially neutral incidents" were insufficient to create a triable issue for the jury. 919 F.Supp.2d at 546; *see also Blango*, 643 F.3d at 546. Plaintiff's claims here are equally deficient. Accordingly, the Court should reach the same result and enter summary judgment in Defendant's favor on this claim.

Plaintiff's sex-based hostile work environment claims also fail. Plaintiff identified her husband, Mr. Hackman, as a witness "to sexual harassment," but when asked to provide "a specific example of something [he] witnessed that suggests that

17

[Plaintiff] was subject to sexual harassment at work" he responded, No, the answer is no, I cannot." When asked: "it is fair to say that you did not witness a single instance of racial or sexual animus directed toward [Plaintiff] during your time at InductEV" Mr. Hackman responded, "I think that's fair to say." SUMF, ¶¶94-97.

Maria Tabbutt also testified (many times) that she did not remember witnessing anything she considered to be sexual harassment directed toward Plaintiff. SUMF, ¶76. When asked if she remembered seeing *anything* that would help understand Ms. Acey's claim," Ms. Tabbutt responded: "No." SUMF, ¶79.

Plaintiff's documentary evidence is no more useful. Plaintiff presented myriad evidence in Doc. 15 purporting to substantiate her sexual harassment claims. *See* Doc. 15 (ECF 40) at pp. 11-16. Even viewing this "evidence" in the light most favorable to Plaintiff, her claims cannot survive. For instance, Plaintiff asserts that she was tapped on the shoulder and grazed by a "Mike Russel," to which she responded by threatening to "gut[] him with a dull spoon." Doc. 15 (ECF 40) at p. 15. But when asked to clarify this interaction at her deposition, Plaintiff testified "it's hard to describe …without using physics, but the surface, the surface of my form, he brushed across that." SUMF, ¶125. According to Plaintiff, Mr. Russel walked past her in a hallway that was roughly six feet wide. SUMF, ¶126. There is nothing about this interaction that requires "physics" or reflects "intentional discrimination because of sex"—much less discrimination that is so "severe and

pervasive" that it would detrimentally affect a reasonable person in Plaintiff's position. *Burgess v. Dollar Tree Stores, Inc.*, 642 F.App'x 152, 154-55 (3d Cir. 2016) (quoting *Huston v Proctor & Gamble Paper Prods. Corp.*, 568 F. 3d 100, 104 (3d Cir. 2009)).

Other underwhelming intentionally misconstrued allegations include that co-workers were staring at Plaintiff, that Judy Talis displayed sex discrimination when she recommended that Plaintiff might want to visit her daughter's gynecologist and "barely stopped herself from asking if [she] was pregnant," and that Mr. Rosenberger allegedly called her a "bitch"—even though Plaintiff clarified that Mr. Rosenberger used the word "bitch" "in front of [Plaintiff]" and not at her. SUMF, ¶¶127, 132. Plaintiff's testimony about Mr. Rosenberger's alleged use of the term "bitch" is consistent with Ms. Tabbutt's testimony that Mr. Rosenberger used the word "bitch" in the context of "this thing's a bitch" or "that's a bitch" when working on product. SUMF, ¶¶89-93. *None* of this supports a hostile work environment claim.

Plaintiff also alleges that Judy Talis, InductEV's Chief Administrative Officer, dismissed her concerns of sexual harassment—but presents no concrete facts to support these allegations beyond her conclusory testimony that Ms. Talis was dismissive. *See* Doc. 15 (ECF No. 40). Plaintiff also testified that most of her claims of improper treatment based on race and gender focused on Judy Talis. SUMF, ¶110. To that end, Plaintiff was asked during her deposition to identify the

sections of Judy Talis' April 28, 2021, hiring evaluation form that Plaintiff believes reflected racial or gender animus by Ms. Talis. SUMF, ¶111. Plaintiff responded by circling Ms. Talis' comments that Plaintiff: (1) "understands the need to do her job as asked"; (2) "feels the technician role is fundamental to engineering"; (3) "enjoys the job"; (4) "is not in a rush to get to the next step"; and (5) "truly sees this as part of her journey." SUMF, ¶¶111-112.

When asked to explain how Ms. Talis' evaluation feedback reflects animus, Plaintiff explained "For me it -- it connects more to a statement, like "Don't get ahead of yourself." It connected to ideas of -- I guess, condescension." SUMF, ¶98. Plaintiff then testified that Ms. Talis' feedback reflects her subconscious gender or racial animus. SUMF, ¶111. Whatever Plaintiff's tortured interpretation of Ms. Talis' feedback may be, surely a facially neutral evaluation cannot constitute evidence of an objectively hostile work environment. *Blango*, 643 F.3d at 546.

Plaintiff also claims Ms. Talis discriminated against her by not adopting as part of InductEV's voluntary non-discrimination policy and diversity training Plaintiff's suggested movie recommendations regarding Black history month. According to Plaintiff, the movies "highlight subtle racism . . . and give a curated, varied and nontraumaporn view of black American experiences." Doc. 15 (ECF No. 40) at p. 24, ¶ 18. Plaintiff also testified that she first began to think she was suffering

20

from harassment when Ms. Talis told her she needed to make up time off by using PTO. SUMF, ¶106.

In sum there is no triable claim for hostile work environment based on sex or race and courts do not hesitate to enter summary judgment under those circumstances. *See Perry v. Harvey*, 332 F. App'x 728, 731-33 (3d Cir. 2009) (finding patently racist remarks in the workplace like describing men of color as "dumb and useless" did not rise to the level of severe or pervasive conduct necessary to create a hostile work environment); *Hunter v. Trustees of Univ. of Pa.*, 2021 WL 1424710, at *8 (E.D. Pa. Apr. 15, 2021) (finding no hostile work environment claim where the employer criticized an employee relying on a racial trope about angry black women, called her "low" and "low down dirty," and joked her son would likely need to be bailed out of jail); *see also Koschoff v. Henderson*, 109 F.Supp.2d 332, 346 (E.D. Pa. 2000). Judgment should be entered for Defendant on Counts V, VI, X, XI, and XII.

### C. Summary Judgment is appropriate because Plaintiff agreed to release her claims and resign in exchange for $50,000 during mediation

Despite the dearth of facts supporting Plaintiff's claims, it is undisputed that Plaintiff agreed to release her claims against Defendant and resign in exchange for $50,000. SUMF, ¶6. Plaintiff admits: "In mediation I did agree to a verbal agreement in which I would resign and dismiss existing claims (prior to Sep 19) in return for a

21

settlement amount of 50,000 from Momentum Dynamics Corp." SUMF, ¶9. Plaintiff later writes to her father that "I was of *impression* that anything tentatively discussed would be bound by a formal written contract." [emphasis added] but does not offer evidence that her agreement to resign was in any sense tentative. *Id.*

Plaintiff's grandmother who attended the mediation testified "[t]here was a verbal agreement that she would resign and dismiss existing claims in return for a settlement amount of $50,000 dollars . . . but the agreement was never received and never executed." SUMF, ¶12. Unbeknownst to Plaintiff's grandmother, Plaintiff *did* receive a written agreement for her signature. SUMF, ¶16. Plaintiff simply never signed it, demanded more money, and elected to proceed with this litigation notwithstanding an enforceable agreement and resolution being reached. SUMF, ¶¶15, 17. Former HR director Patti Rensel, deposed on a notice from Plaintiff, testified that Plaintiff agreed in mediation "to resign from employment in exchange for compensation." SUMF, ¶15.

Plaintiff has not offered, and cannot offer, any evidence to refute her own admissions and the above testimony. Plaintiff instead relies on her misunderstanding that the agreement needed to be in writing to be enforceable. But under Pennsylvania law, "[w]here [as here] a settlement agreement contains all the requisites for a valid contract, a court must enforce the terms of the agreement." *Zong v. Lynch*, 2014 WL 4722625, at *4 (E.D. Pa. Sept. 22, 2014). "Th[at] is true even if the terms of the

agreement are not yet formalized in writing." *Id.* (citing *Mazzella v. Koken*, 739 A.2d 531, 536 (Pa. 1999)).

Judge Pratter already recognized that "a binding settlement agreement may exist absent a writing, and InductEV is free to gather evidence of a binding oral agreement for the Court to consider at summary judgment." That evidence exists.[1] To the extent Plaintiff purports to allege the existence of some condition precedent— that is, a signed written agreement as a condition to resolution, Plaintiff has produced *no* evidence that any such condition exists or ever existed between the parties. Plaintiff argument is akin to claiming that she had her fingers crossed behind her back when she agreed to accept $50,000, resign, and release her claims.

**D.      Plaintiff's retaliation claims fail because Plaintiff agreed to resign and therefore, no adverse action was taken against Plaintiff**

To prevail on her retaliation claims, Plaintiff must prove that she (1) "engaged in activity protected by Title VII; (2) the employer took adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Selvato v. SEPTA*, 658

---

[1] Defendant is willing to stand by this agreement despite the significant expenses incurred defending this litigation, and the lack of past or future wage loss. As for wage loss, on May 16, 2022, after 11 months of work Plaintiff left active employment on a non-work-related disability. SUMF, ¶130. She continues receiving full time disability benefits from InductEV's long term disability insurance provider and testified in her deposition that she is not claiming wage loss. SUMF, ¶131.

23

F.App'x 52, 56 (3d Cir. 2016) (quoting *Nelson v. Upsala Coll*, 51 F.3d 383, 386 (3d Cir. 1995)).

Plaintiff cannot prevail on her retaliation claims because she cannot establish that she did not resign, or that InductEV's belief that she had was based on something other than her agreement to do so. See, preceding Section C. Plaintiff has introduced no evidence that the parties agreed to any condition precedent of a written agreement during mediation. Plaintiff resigned, deciding later to renege and demand more money. Defendant's acceptance of her resignation and agreement to pay her money is not retaliation. Accordingly, Counts XVII, XVIII, and XIX fail.

### E.    Plaintiff's claim for punitive damages is unwarranted

Punitive damages may be "recovered in claims under Title VII for cases involving intentional discrimination 'where the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or reckless indifference to the federally protected rights of an aggrieved individual.'" *Medcalf v. Trustees of Univ. of Penn.*, 2003 WL 21843201, at *6 (3d Cir. Jul. 30, 2003) (quoting *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 534 (1999)); 42 U.S.C. § 1981(b)(1). "The focus of malice and reckless indifference to support a punitive damages award is on the actor's state of mind; the mere existence of a civil rights violation is not a guarantee of eligibility for punitive damages." *Nitkin v. Main Line Health*, 2021 WL 5631717, at *7 (E.D. Pa. Nov. 29, 2021)

24

(quoting *Acosta v. Fairmount Foundry, Inc.*, 391 F.Supp.3d 395, 406-07 (E.D. Pa. 2019)).

Plaintiff demands punitive damages based on what she perceives (but objectively is not) discriminatory conduct. Plaintiff has presented no evidence that Defendant engaged in discriminatory practice or practices nor acted with malice or reckless indifference to Plaintiff's federally protected rights. No damages—let alone punitive damages—are appropriate in this case.

## V.   CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court enter summary judgment in its favor on Plaintiff's claims.

**FOX ROTHSCHILD LLP**

*/s/ Randall C. Schauer*
Randall C. Schauer (ID No. 34273)
Alberto M. Longo (ID No. 328893)
Eagleview Corporate Center
747 Constitution Drive, Suite 100
Exton, PA  19341-0673
Tel – (610) 458-7500
Fax – (610) 458-7337
rschauer@foxrothschild.com
alongo@foxrothschild.com
*Attorneys for Defendant*

Date:  August 23, 2024

25

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASSATA ACEY | Case No.: 2:23-cv-01438 |
| Plaintiff, | |
| v. | Judge Paul S. Diamond |
| INDUCTEV | |
| Defendant. | |

**INDUCTEV'S STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56(c) and Section VI., C. of this Court's Policies and Procedures, Defendant InductEV ("Defendant"), through its undersigned counsel, Fox Rothschild LLP, hereby submits this Statement of Undisputed Material Facts and accompanying exhibits.

1.     Plaintiff Assata Acey ("Plaintiff") began working as a Product Introduction Technician with Defendant on June 14, 2021. (Schauer Dec. at Ex. 1 at 200:6-9).

2.     On May 8, 2022, Plaintiff filed a complaint with the Pennsylvania Human Relations Commission ("PHRC") followed by an amended complaint with the PHRC on June 21, 2022. (Schauer Dec. at Exs. 8 and 9).

3.     Both PHRC complaints were served on Defendant under a cover letter dated June 22, 2022.  (Schauer Dec. at Ex. 10).

4.     The PHRC determined it lacked jurisdiction over Plaintiff's complaints and indicated that the case would be transferred to the United States Equal Employment Opportunity Commission ("EEOC") (*Id.*)

5.     On September 19, 2022, a mediation (the "Mediation") occurred to resolve Plaintiffs' complaints with the EEOC. (Schauer Dec. at Ex. 2, 125:18-23, 190:23-191:2).

6.     It was agreed during the Mediation that Plaintiff would resign from her employment in exchange for $50,000. (Schauer Dec. at Ex. 13; Ex. 3, 14:4-9).

7.     It was agreed during the Mediation that Plaintiff would provide Defendant with a verification form from a medical provider on or before September 23, 2022. (Schauer Dec. at Ex. 13; Ex. 3, 16:19-24).

8.     It was agreed during the Mediation that Plaintiff would execute a general release, a non-disparagement and confidentiality, and Defendant agreed to provide a neutral reference. (Schauer Dec. at Ex. 13).

9.     Plaintiff admits: "In mediation I did agree to a verbal agreement in which I would resign and dismiss existing claims(prior to Sep 19) in return for a settlement amount of 50,000 from Momentum Dynamics Corp" and that "I was of *impression* that anything tentatively discussed would be bound by a formal written contract." (Schauer Dec. at Ex. 13, Ex. 17).

2

10.     In exchange for these terms, within thirty (30) days of the execution of a written settlement agreement, Defendant agreed to pay Plaintiff $50,000 (less ordinary deductions as required, if applicable). (*Id.*).

11.     Plaintiff's grandmother, Jacqueline Acey, attended the Mediation with Plaintiff. (Schauer Dec. at Ex. 3, 12:8-11.)

12.     Jacqueline Acey testified "[t]here was a verbal agreement that [Plaintiff] would resign and dismiss existing claims in return for a settlement amount of $50,000 dollars from dyn – Momentum Dynamics, Corporation, but the agreement was never received and never executed." (*Id.* at 14:4-9).

13.     Jacqueline Acey did not recall any details of her conversation with Plaintiff about being harassed on the basis of race and did not recall Plaintiff mentioning racism in the workplace. *Id.* at 69:6-9, 71:2-23.

14.     Former HR director, Patti Rensel also attended the mediation. (*Id.* at Ex. 4, 6:10-12).

15.     During Plaintiff's deposition of Ms. Rensel, Ms. Rensel testified that she recalled a verbal agreement being entered in which Plaintiff was "asked to resign from employment in exchange for compensation." (*Id.* at 7:3-13).

16.     On September 27, 2022, Plaintiff received a copy of a settlement agreement from Defendant. (*Id.* at Ex. 13).

3

17.     Plaintiff refused to execute the settlement agreement, repudiated her oral agreement with Defendant, and demanded $130,000 to resolve her claims. (*Id.*).

18.     On October 24, 2022, Plaintiff filed an Amended Charge of Discrimination with the EEOC asserting discriminatory terms, conditions, and privileges of employment based on race and gender, harassment based on race and gender, retaliation for protesting ADA/PTO policy, discriminated based on disability, and retaliation for filing an EEOC complaint. (Schauer Decl. at Ex. 16.)

19.     Plaintiff filed a Complaint in the Court of Common Pleas of Chester County Pennsylvania on or about March 10, 2023, asserting twenty claims for alleged discrimination and/or retaliation in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e), Section 1981 of the Civil Rights Act of 1990 (42 U.S.C. § 1981), The Americans with Disabilities Act of 1990 (42 U.S.C. § 12101), The Pennsylvania Human Relations Act (43 Pa. Stat. Ann. § 962.1) and one claim for Intentional Infliction of Emotional Distress under Pennsylvania law. Notice of Removal (ECF No. 1) at Ex., A ("Compl.").

20.     On April 14, 2023, Defendant removed Plaintiff's Complaint to the United States District Court for the Eastern District of Pennsylvania. Notice of Removal (ECF No. 1).

4

21.     On April 27, 2023, Defendant moved to dismiss Plaintiff's Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Defendant's Motion to Dismiss (ECF No. 10).

22.     On February 27, 2024, the Honorable Judge Gene E.K. Pratter, U.S.D.J. issued an order granting in part and denying in part Defendant's Motion to Dismiss. Feb. 27, 2024 Memorandum (ECF No. 49).

23.     The District Court dismissed Counts I, II, III, IV, IX, XIV, and XX of Plaintiff's Complaint with prejudice.  Feb. 27, 2024 Order (ECF No. 50).

24.     The District Court also dismissed Counts XIII, XV, and XVI without prejudice.  *Id.*

25.     The District Court denied Defendant's Motion with respect to Counts V, VI, VII, VIII, X, XI, XII, XVII, XVIII, and XIX and the parties proceeded with discovery on those claims.  *Id.*

26.     The Senior Technician role at InductEV requires at least "8+ years' experience in a test environment for emerging technology." (Schauer Dec. at Ex. 14).

27.     It is undisputed that Plaintiff did not possess at least "8+ years' experience in a test environment for emerging technology" at the time she applied for the introduction product technician position. (Schauer Dec. at Ex. 1, 100:7-18; Ex. 14.

28.     Plaintiff acknowledged during her deposition that the senior technician role requires 8+ years of experience. (*Id.* at Ex. 1, 71:13-24, 72:13-19).

29.     Plaintiff further acknowledged that she does not possess the requisite 8+ years of experience to qualify for a senior technician role. (*Id.* at 100:7-11).

30.     The written comments of multiple evaluators involved in interviewing and the hiring of Plaintiff were very positive regarding several aspects of her education and experience, as well as future at InductEV, but also recognized Plaintiff lacked the skills and abilities required of a senior technician role.  (*Id.* at Ex. 11.)

31.     Plaintiff received an Annual Performance Review in which she received no negative comments and acknowledges that she needs to "deepen her hands-on skills." (Schauer Dec. at Ex. 15).

32.     Plaintiff did not indicate that her growth plans included promotion in her Annual Performance Review. *Id.*

33.     Plaintiff received a review by Seth Wohlgemuth, Plaintiff's supervisor, and in her deposition could not identify anything in that review that she believed reflected animus toward black people or women. (Schauer Dec. at Ex. 1, 191:23-193:19).

34.     Plaintiff did not believe Mr. Wohlgemuth harbored any animus toward her based on gender or race. (*Id.* at 194:14-21).

6

35.     Nor could Plaintiff identify anything in Rob Rosenberger's review that reflected animus toward her based on race or gender. (*Id.* at 187:22-189:16).

36.     Plaintiff acknowledged that those who were promoted to senior technician roles possessed more experience than her. (*Id.* at 100:7-23).

37.     Plaintiff alleged that black employees such as her and Omar Jackson were criticized as lazy due to race. Compl., ¶ 123.

38.     Mr. Jackson was never called lazy or criticized based on race at InductEV. (Schauer Dec. at Ex. 5, 71:9-73:18).

39.     Plaintiff also alleged that Mr. Jackson was promoted only after controversy surrounding the hiring process for a senior technician, despite possessing 20 years of experience. Compl., ¶ 148.

40.     Plaintiff identified Mr. Jackson as a witness with knowledge of the facts relating to her case, explaining that Mr. Jackson was the "first and only promoted black employee in defendant's history, originally denied senior title due to 'employment gap'. Also experienced scrutiny from HR and comments from coworkers. Present for a deal of criticism [Plaintiff] received from Rob Rosenberg and other coworkers. First/only employee to tell [Plaintiff] of suspected racial differences in pay. Knowledge of [Plaintiff's] work on the UV project. Witness to his own starting and ending pay as technician and senior technician while at MD." Schauer Decl. at Ex. 12.

7

41.    Mr. Jackson had no idea why Plaintiff identified him as a witness with knowledge of the facts relating to her case. (Schauer Dec. at Ex. 5, 54:1-5).

42.    Mr. Jackson testified that he never heard Rob Rosenberger say anything relating to race at InductEV.  (*Id.* at 58:12-14).

43.    Mr. Jackson testified that he had no reason to think that Rob Rosenberger had any racial animus toward him. (*Id.* at 58:15-59:1).

44.    Mr. Jackson testified that he is not aware of any racial differences in pay at InductEV.  (*Id.* at 60:14-16).

45.    Mr. Jackson testified that did not know what Plaintiff meant by "employment gap," stating "There was no employment gap." (*Id.* at 56:7-16).

46.    Mr. Jackson testified that he did not recall any specific conversations with Plaintiff regarding differences in pay other than one instance in which he "was speaking out of anger" while describing his pay and role at InductEV in relation to his race. (*Id.* at 47:5-48:5).

47.    Mr. Jackson acknowledged that he had twenty years of experience and was promoted and received a pay raise at InductEV due to his extensive experience. (*Id.* at 75:11-6).

48.    Mr. Jackson was unaware of any "controversy" surrounding his promotion and disagreed with the allegations in Plaintiff's Complaint that he was promoted only after controversy. (*Id.* at 75:9-20, 76:4-6).

8

49.     Mr. Jackson testified that he never experienced any comments from co-workers that he deemed inappropriate or suggestive of racial animus. (*Id.* at 63:6-12).

50.     Mr. Jackson could not identify a single example where he felt criticized due to race while employed at InductEV. (*Id.* at 72:13-15).

51.     Mr. Jackson could not identify anything that he would describe in his own words as harassment at InductEV. (*Id.* at 73:15-18).

52.     Mr. Jackson testified that Plaintiff's co-workers "thought [Plaintiff] didn't do her job." (*Id.* at 63:9-16).

53.     Mr. Jackson testified that he attended a meeting during which Rob Rosenberger indicated that he "didn't think [Plaintiff] was getting the work done fast enough" and would make his opinion known during meetings. (*Id.* at 57:14-25).

54.     Mr. Jackson testified that Rob Rosenberger's opinions were made "inside these meetings. On the floor, Rob would never say anything to me or Assata, no. Everything was said in the meetings that I witnessed." (*Id.* at 57:14-21).

55.     Mr. Jackson testified that Rob Rosenberger "was a senior technician" and would have been the one to know whether Plaintiff was completing work in a timely manner. (*Id.* at 57:22-58:5).

56.     Mr. Jackson testified that InductEV "saved [his] life . . . because they gave [him] a job when [he] was down, when [his] wife was down. (*Id.* at 33:8-12).

9

57.     Mr. Jackson testified that the company "trusted [him] enough to give [him] the key to open the shop" and that the "company helped [him]. (*Id.* at 33:13-17).

58.     Mr. Jackson testified that he was not aware of any practice of limiting employees based on race at InductEV. (*Id.* at 77:6-9).

59.     Mr. Jackson did not have a single example where he felt criticized due to race. (*Id.* at 72:13-15).

60.     Mr. Jackson did not witness anything he considered to be "pervasive racial harassment." (*Id.* at 70:8-15).

61.     Mr. Jackson testified that he applied for the role of product introduction technician and was not surprised when he received that role because that was the role he applied for. (*Id.* at 77:10-22).

62.     Mr. Jackson testified that his subsequent promotion to senior product technician was due to him showing the company that he was qualified for that position. (*Id.* at 77:21-78:2).

63.     Mr. Jackson testified that he has no reason to believe that InductEV made decisions based on race. (*Id.* at 82:15-20).

64.     Mr. Jackson had no knowledge of Plaintiff's claim that she was allegedly compared to chocolate ice cream. (*Id.* at 50:13-15, 81:22-23).

65.   Mr. Jackson had no knowledge of Plaintiff's claim that she was allegedly told she was from the wrong side of the tracks. (*Id.* at 50:18-22).

66.   Mr. Jackson testified that Rob Rosenberger, a senior technician, complained that Plaintiff did not complete tasks in a timely manner. (*Id.* at 57:9 to 58:14).

67.   Joren Wendschuh wrote in a 2021 annual performance review dated February 6, 2022 that Plaintiff needed to "grow their soldering and assembly skills," "integrate better within the team," learn to read "the room for when to wrap up a tangent," "work toward providing clear and concise feedback and status updates where needed" and "integrate the new software into their daily routine." (Schauer Decl. at Ex. 15, p. 4).

68.   Plaintiff did not disagree with Mr. Wendschuh, stating that in the 2021 performance review that she was "challenged with learning more about the product and processes and people surrounding its development" and that she was "seeking to deepen" her "hands-on skills." (*Id.* at pp. 1-2).

69.   Mr. Wedschuh stated in his Interview Evaluation Form that Plaintiff "[l]oves to learn" and "[b]rings a unique 'science and engineering' background and knowledge to the job." (Schauer Dec. at Ex. 11, p. 13).

11

70.     Mr. Wedschuh further indicated that Plaintiff was a "bit of a unique person" for the role, and that he would want to classify Plaintiff as a technician, "unless Omar & Seth are Sr.'s [*sic*]." (*Id.*).

71.     Mr. Jackson and Seth Wohlgemuth were promoted to senior technician at the same time, despite Mr. Wohlgemuth having been with InductEV longer. (Schauer Dec. at Ex. 5, 46:6-9).

72.     Omar Jackson testified that Mr. Wohlgemuth had a unique knowledge about the products and InductEV and that Mr. Wohlgemuth earned his promotion. (*Id.* at 101:24-102:4).

73.     Plaintiff testified that Mr. Wohlgemuth deserved the promotion. (Schauer Dec. at Ex. 1, 115:9-11).

74.     Plaintiff identified Maria Tabbutt as the "[o]nly supervising female mechanical engineer. Responsible for the Assembly Documents of the 150 and 75kW US and EU cabinets. Knows of some of the Quality and Documentation related work conducted by me during employment with Defendant. Experienced scrutiny and less cooperation from male employees including Bogdan Proca, Rob Rosenberg, and men on the QA team. Listened to locker room talk from John Wolgemuth. Told during performance evaluations that she could not document her supervision of design engineer despite acting as their supervisor without full pay. First/only employee to tell me of gender differences in pay. Received weekly

12

meetings with HR when they complained about hostile environment caused by new Manager which included performance evaluation issue. Witness to her own starting and ending pay and related negotiations while working at MD." Schauer Decl. at Ex. 12.

75.     Ms. Tabbutt had no understanding of Plaintiff's sexual harassment claims. (Schauer Dec. at Ex. 6, 86:14-22).

76.     Ms. Tabbutt testified that, "Firsthand, I don't believe I had witnessed anything" when asked whether she had witnessed anything at InductEV that she understood to be animus toward Plaintiff based on sex. (Id. at 97:16-21).

77.     Ms. Tabbutt further confirmed that she did not "remember witnessing anything" she understood to be sexual harassment directed toward Plaintiff. (Id. at 97:22-98:2).

78.     Ms. Tabbutt did not even remember hearing about anything prior to looking at a subpoena relating to this case. (Id. at 98:3-6).

79.     When asked whether Ms. Tabbutt saw "anything at InductEV . . . that would help [her] understand Ms. Acey's claim with respect to being harassed on the basis of sex," Ms. Tabbutt responded "No." (Id. at 99:9-13).

80.     Ms. Tabbutt also had no knowledge of the allegations giving rise to Plaintiff's race-based claims. (Id. at 94:14-96:7).

13

81.     Ms. Tabbutt could not identify anything that "suggested Ms. Acey was subject to a culture [of] harassment on the basis of her gender." (Id. at 142:17-21).

82.     Plaintiff alleged in paragraph 175 of her complaint that, "[a]s a woman employee, [she] was subjected to a workplace culture and harassment on the basis of [her] gender." Compl., ¶ 175.

83.     Plaintiff alleged in paragraph 176 of her complaint that [t]his harassment included targeted opposition, inappropriate office jokes, and unwanted touching from [h]er colleagues." Compl., ¶ 176.

84.     Ms. Tabbutt never witnessed Plaintiff being touched by any colleagues. (Schauer Dec. at Ex. 6, 143:1-3).

85.     Ms. Tabbutt never witnessed Plaintiff listen to an inappropriate office joke. (Id. at 143:8-10).

86.     Ms. Tabbutt had no understanding of what Plaintiff meant by "targeted opposition." (Id. at 143:4-7).

87.     Ms. Tabbutt did not remember witnessing anything she considered to be sexual harassment directed toward Plaintiff. (Id. at 142:1-145:17).

88.     In fact, Ms. Tabbutt, a female employee, had no understanding of the allegations in paragraphs 175 and 176 of Plaintiff's Complaint. (Id. at 143:12-19).

89.     Plaintiff also alleged that she felt the experiences she faced were due to her gender (Compl., ¶ 12), and further alleged that her suspicions grew when

14

coworker Rob Rosenberger "muttered 'bitch' under his breath," which Plaintiff understood to be directed toward Ms. Tabbutt. Compl., ¶ 13.

90.     Plaintiff's Complaint acknowledges that Mr. Rosenberger did not use the term "bitch" toward her. See id.

91.     Ms. Tabbutt testified that no one ever referred to her as a "bitch" during her time at InductEV. (Schauer Dec. at Ex. 6, 131:12-15, 132:19-133:7).

92.     Ms. Tabbutt also testified that when she did hear Mr. Rosenberger use the term "bitch," it was when he was working on difficult projects and would use the term "this thing's a bitch" or "that's a bitch" and that she has used the term in her lifetime and in a similar context. (Id. at 131:21 to 134:22).

93.     Ms. Tabbutt testified that Mr. Rosenberger never referred to her as a "bitch." (Id. at 133:5-9).

94.     Daniel Hackman, Plaintiff's coworker who she later married and no longer works at InductEV, could not identify anything he observed suggesting racial animus toward Plaintiff. (Schauer Dec. at Ex. 7, 43:1-15, 69:14-19).

95.     Mr. Hackman could not identify anything he witnessed that suggesting Plaintiff was discriminated against based on race. (Id. at 36:14-22, 42:8-15).

96.     Mr. Hackman could not identify a specific example of anything he witnessed suggesting that Plaintiff was subject to sexual harassment at work. (Id. at 42:16-43:15).

15

97.    Mr. Hackman agreed that he did not witness a single instance of racial or sexual animus directed toward Plaintiff during his time at InductEV. Id.

98.    None of Plaintiff's witnesses could identify conduct suggesting racial animus toward Plaintiff. (Schauer Dec. at Ex. 1, 132:7-16; Ex. 7, 42:8-15; Ex. 6, 94:14-96:7; Ex. 5, 38:20-21, 67:6-18).

99.    Rob Rosenberger provided a positive review of Plaintiff in the written notes of her interview, describing her as "very intelligent," and "very enthusiastic and outgoing" with an "excellent technical aptitude." (Schauer Decl. at Ex. 11, pp. 1-2).

100.   Rob Rosenberger recognized that Plaintiff lacked experience and "might not be happy in a Technician based on her comment that "she wanted to learn as a Technician before moving into an Engineering position." (Id. at p. 1).

101.   Bruce Mitchell noted that Plaintiff was "still honing and practicing her skills after graduation, possible she was limited on what she was allowed to do from previous employers but doesnt [sic] seem to fully fit the skills for a Sr tech role." (Id. at p. 11).

102.   Bruce Mitchell also observed that Plaintiff "would need to be trained still on certain technical abilities" and that she "seemed to have little tool knowledge and experience, wiring, cabling stripping and crimping which are needed for a senior tech role." (Id. at p. 12).

103.    Bruce Mitchell further stated that Plaintiff had a "good enginerring [sic] mindset of thinking how and why components work and understanding it" and that she "seems to fit an enginerring [sic] position instead of a senior tech role." (Id. at pp. 11-12).

104.    Ryan Taggart indicated that Plaintiff "struggled with a drill and center punch" and that she "did not know which direction to put the drill in to [sic] drill a hole." (Id. at p. 6).

105.    Mr. Taggart also found that Plaintiff lacked "experience with hand tools and will need a lot of time and attention to hone her knowledge into practical experience." (Id. at p. 7).

106.    Plaintiff began to think she was suffering discrimination between April 25, 2022 and May 4, 2022 when Ms. Judy Talis, InductEV's Chief Administrative Officer, told Plaintiff she needed to make up time off due to alleged disability by using PTO. (Schauer Dec. at Ex. 1, 45:20-49:18)

107.    Judy Talis, InductEV's Chief Administrative Officer provided several positive reviews of Plaintiff. (Schauer Dec. at Ex. 11, p. 3).

108.    In an April 28, 2021 Interview Evaluation Form, Ms. Talis noted that Plaintiff "has a very innovative take on her work" and "has always looked beyond the task and thinks out of the box." (Id.).

17

109.   Ms. Talis also noted that while Plaintiff "may not have the exact skills we are looking for she is certainly capable with her background o[f] learning them." (Id.).

110.   Yet Plaintiff testified that most of her allegations of improper treatment based on race and gender focused on Judy Talis. (Schauer Dec. at Ex. 1, 116:12-19).

111.   Plaintiff testified that Ms. Talis' April 28, 2021 evaluation reflects racial or gender bias. (Id. at 130:24-135:6).

112.   There is nothing in Plaintiff's April 28, 2021 evaluation form reflecting racial or gender bias. (Schauer Decl. at Ex. 11).

113.   Plaintiff testified that the series of messages contained in Doc. 15 (ECF No. 40) captures her belief that she was accused of stealing time at InductEV. (Schauer Dec. at Ex. 2, 226:8-12, 243:21-245:23).

114.   Plaintiff was not accused of stealing time during her employment.  Doc. 15 (ECF No. 40) at p. 22, ¶ 14.

115.   Plaintiff missed meetings at InductEV. Id. at p. 16, ¶ 2; id. at p. 17.

116.   Plaintiff produced no evidence of any "sabotage" by any coworkers.

117.   Plaintiff produced no evidence of derogatory jokes by any coworkers.

118.   Plaintiff testified that the message: "This is Assata. She's a technician with a Physics degree . . . she'll be doing better things . . ." is evidence of a

"derogatory comment[] from [her] coworkers." (Schauer Dec. at Ex. 2, 226:13-18, 230:12-231:10).

119.   Plaintiff further testified that that message bothered her because the message was "making a big deal to a stranger about my role and my degree . . . like I was some commodity, and it made me feel uncomfortable," despite acknowledging that this message was not an attempt to "belittle [her]." (Id. at 231:8-10).

120.   Plaintiff produced no evidence to support her allegation that she was told she is from "the wrong side of the tracks."

121.   Plaintiff could not remember the details of her allegation that she was compared to chocolate ice cream or dark chocolate. (Schauer Dec. at Ex. 1, 274:4-15).

122.   Plaintiff testified that the "exact words" were more accurately recounted to [her] boss" but she can't remember his direct quotes right now." Id.

123.   Plaintiff recounted the alleged comparison in Doc. 15 (ECF No. 40) at p. 11, ¶ 2.

124.   Plaintiff produced no other evidence of ever being compared to chocolate ice cream or dark chocolate.

125.   Plaintiff could not explain her allegation that she was tapped on the shoulder and grazed by a Mike Russel. (Schauer Dec. at Ex. 2, 218:3-219:8).

126.   Plaintiff testified that Mr. Russel walked past her in a hallway that was roughly six-feet wide. (Id. at 219:9-17).

127.   Plaintiff testified that Mr. Rosenberger used the word "bitch" in front of her and not toward her. (Id. at 256:16-23).

128.   In or about February 2022, Plaintiff met with Judy Talis, then Human Resource Director, and discussed a number of concerns she had regarding occurrences in the InductEV workplace, none of which involved facially discriminatory or hostile and offensive statements or behaviors. (Id. at 40:18 – 44:18; 45:1-56:14).

129.   Despite Plaintiff's belief that any work performed outside of her job description was outside of her contract, Plaintiff acknowledged that she was an at-will employee and provided no evidence that she was forced to take on additional labor due to any purported harassment based on race. (Schauer Dec. at Ex. 1, 143:2-144:15).

130.   On May 16, 2022, Plaintiff left active employment on a non-work-related disability. (Schauer Dec. at Ex. 2, 28:18-23).

131.   Plaintiff continues receiving full time disability benefits from InductEV's long term disability insurance provider and testified in she is not making a claim for lost wages. (Id. at 26:24-28:17).

132.   Plaintiff felt that Judy Talis acted improperly and displayed sex discrimination when she recommended that Plaintiff might want to visit her daughter's gynecologist and "barely stopped herself from asking if [she] was pregnant." (Id. at 251:10 – 255:9).

**FOX ROTHSCHILD LLP**

By: */s/ Randall C. Schauer*
Randall C. Schauer, Esquire
Alberto M. Longo, Esquire
Eagleview Corporate Center
747 Constitution Drive, Suite 100
Exton, PA  19341-0673
Tel – (610) 458-4967
Fax – (610) 458-7337
rschauer@foxrothschild.com
alongo@foxrothschild.com

*Attorneys for InductEV*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ASSATA ACEY | Case No.: 2:23-cv-01438 |
| Plaintiff, | |
| v. | Judge Paul S. Diamond |
| INDUCTEV | |
| Defendant. | |

## DECLARATION OF RANDALL C. SCHAUER

I, Randall C. Schauer, do hereby state and declare as follows:

1.     I am an attorney duly licensed to practice law in Pennsylvania and the United States District Court for the Eastern District of Pennsylvania. I am a partner at the law firm of Fox Rothschild LLP and submit this declaration in support of the Motion for Summary Judgment of Defendant InductEV ("Defendant"). I have personal knowledge of the matters contained in this declaration and, if called and sworn as a witness, I could and would competently testify to all the matters contained herein.

2.     Attached hereto as "**Exhibit 1**" are true and accurate excerpts of the 4/11/2024 deposition of Assata Acey.

3.    Attached hereto as "**Exhibit 2**" are true and accurate excerpts of the 4/18/2024 deposition of Assata Acey.

4.    Attached hereto as "**Exhibit 3**" are true and accurate excerpts of the deposition of Jacqueline Acey.

5.    Attached hereto as "**Exhibit 4**" are true and accurate excerpts of the deposition of Patty Rensel.

6.    Attached hereto as "**Exhibit 5**" are true and accurate excerpts of the deposition of Omar Jackson.

7.    Attached hereto as "**Exhibit 6**" are true and accurate excerpts of the deposition of Maria Tabbutt.

8.    Attached hereto as "**Exhibit 7**" are true and accurate excerpts of the deposition of Daniel Hackman.

9.    Attached hereto as "**Exhibit 8**" is a true and accurate copy of the Plaintiff's May 8, 2022 complaint to the Pennsylvania Human Relations Commission ("PHRC").

10.    Attached hereto as "**Exhibit 9**" is a true and accurate copy of Plaintiff's June 21, 2022 amended complaint to the PHRC.

11.    Attached hereto as "**Exhibit 10**" is a true and accurate copy of the June 22, 2022 PHRC Cover Letter.

2

12.     Attached hereto as **"Exhibit 11"** are true and accurate copies of Plaintiff's Interview Evaluation Forms.

13.     Attached hereto as **"Exhibit 12"** are true and accurate copies of Plaintiff's Third Response to Defendant's First Set of Interrogatories to Plaintiff

14.     Attached hereto as **"Exhibit 13"** is a true and accurate copy of Exhibit AA-27 introduced during Plaintiff's deposition.

15.     Attached hereto as **"Exhibit 14"** is a true and accurate copy of AA-6 introduced during Plaintiff's deposition.

16.     Attached hereto as **"Exhibit 15"** is a true and accurate copy of AA-20 introduced during Plaintiff's deposition.

17.     Attached hereto as **"Exhibit 16"** is a true and accurate copy of Plaintiff's Amended Charge of Discrimination filed with the EEOC.

18.     Attached hereto as **"Exhibit 17"** is a true and accurate copy of AA-32 introduced during Plaintiff's deposition.


Executed this 23rd day of August, 2024

/s/     *Randall C. Schauer*
Randall C. Schauer

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 23, 2024, a true and correct

copy of the foregoing document was served on all parties via electronic mail per the

addresses contained on the docket in this matter.

FOX ROTHSCHILD LLP

*/s/ Randall C. Schauer*
Randall C. Schauer, Esquire
*Attorney for Defendant, InductEV*

4

# EXHIBIT 1

Page 1

1          IN  THE  UNITED  STATES  DISTRICT  COURT
        FOR  THE  EASTERN  DISTRICT  OF  PENNSYLVANIA

2                        -      -      -

3   ASSATA  ACEY,              :    No.  2023-cv-01438

                              :

4              Plaintiff,:

                              :

5       v.                     :

                              :

6   INDUCTEV,                  :

                              :

7              Defendant.:

8                        -      -      -

9                    April  11,  2024

10                       -      -      -

11                    Oral  deposition  of  ASSATA

12            ACEY,  taken  pursuant  to  Notice,

13            held  at  Fox  Rothschild,  747

14            Constitution  Drive,  Suite  100,

15            Exton,  Pennsylvania  19341,

16            beginning  at  approximately  9:10

17            a.m.,  before  Mary  Hammond,  a

18            Registered  Professional  Reporter

19            and  Notary  Public  in  the  state  of

20            Pennsylvania.

21

22

23      Job  No.  CS6582623

24

Page 45

1   you try and direct your answers, as best you

2   can, directly to the question I'm asking you.

3       A.   Yes.

4       Q.   At what point in your employment at

5   InductEV did you determine that you felt you

6   had a claim that you could submit to the

7   Courts with respect to discrimination or

8   harassment on the basis of your gender or

9   race, at what point?

10          Not each incident, or what's the

11  first thing that happened that made you think

12  maybe you would, but at what point did you

13  determine that, "I'm" -- "I'm getting

14  discriminated against or harassed here on the

15  basis of my race or gender, and I think I

16  have a claim with the Courts"?

17      A.   Okay.  So I think that's a

18  different question.  I'm going to take a

19  minute to process that.

20          At what point did I think I had an

21  actionable claim on gender or race?

22          I didn't think I had an actionable

23  claim until maybe -- when was that -- oh, my

24  goodness, this is tricky.  When did I

Page 46

1   think...

2           It would have to be maybe the first

3   time that I thought Judy was just blatantly

4   not following protocol.  That would probably

5   be -- the phone incident, yeah.  So I -- I

6   had my phone broken.  But that's not race, is

7   it, completely.  Based on -- I felt like the

8   phone incident was too mirky, but that was

9   the first time I considered having an

10  actionable claim against the company.

11  Period.

12          The first time I thought I had --

13      Q.    Well, I'm asking you for an

14  actionable claim under Title 7.

15      A.    Yes.

16      Q.    I don't care if you think that

17  somehow they didn't get paid when they

18  should, or whatever --

19      A.    Right.

20      Q.    -- with regard to the phone.

21          I'm asking you:  At what point, you

22  know, did you wake up in the morning and go,

23  "I think I'm getting discriminated against or

24  harassed at work, and I think I have a claim

Page 47

1    that I could go to Court with, if I chose to

2    do so" --

3         A.    Okay.

4         Q.    -- based upon race or gender?

5         A.    Attorney Schauer, I think you've

6    interrupted my answers quite a few times

7    already.

8              Is that something that you intend

9    on doing?

10        Q.    I will if I need -- well, I

11   apologize if I do so, but --

12        A.    So you're okay with doing that.

13        Q.    I have seven hours.  I have seven

14   hours, and I want to get this deposition

15   completed in that time.

16        A.    Okay.

17        Q.    And I apologize if we do that.  I

18   apologize ahead, but...

19              So my question is:  It's roughly a

20   date, a month, or a day, at which point you

21   decided, or woke up in the morning, as an

22   example, and said -- or were at work and

23   said, "I'm being discriminated against or

24   harassed here, based on my race or gender,

Page 48

1  and I have a claim under the" -- "Title 7

2  under the law"?

3       A.   Okay.  Yeah.

4            I didn't really look at the claims

5  in a legal sense for race or gender until

6  maybe, like, April -- somewhere between

7  April 25th and May 4th.

8       Q.   And if it's fair, what, if

9  anything, happened between May 25th [sic] and

10  May 4th that caused you or was the final

11  straw, if you will, that caused you to

12  determine that you may have a claim for race

13  or gender discrimination or harassment under

14  Title 7 against InductEV?

15       A.   I'm trying to follow your words.

16            Okay.  So what happened that made

17  me think to file.

18       Q.   What happened between April 5th and

19  May 4th?

20       A.   Yes.  I have to repeat it because

21  when you're talking, I'm listening to your

22  volume and looking at your face, and, so, I

23  have to remember the words.  And every time

24  you re-start, I lose my train of thought, so

Page 49

```
 1    I'm trying to get the answer as specifically
 2    as you requested it in respect to your time.
 3            So what happened that made me think
 4    at that point that I -- that I needed to
 5    sue -- that I had the right to sue under
 6    those claims.
 7            Judy Talis -- there -- there was a
 8    dispute.  Judy Talis called me while I was
 9    home, basically telling me that the evidence
10    that I had, disability was not enough, and
11    that she needed to take out PTO to make up
12    for my time off of work.
13        Q.   And you believe she did that
14    because of your race or gender or both?
15        A.   I believe that she did that because
16    of race and gender, possibly also disability,
17    since it related to disability more
18    specifically.
19        Q.   Well, briefly -- and we'll get into
20    this in more detail later, but I -- I take
21    that you did not want to have to utilize PTO
22    at the time that Ms. Talis told you you had
23    to?
24        A.   That's correct.
```

Page 71

```
 1            for identification.)
 2                    -    -    -
 3   BY MR. SCHAUER:
 4      Q.    I will show you what we've marked
 5   as Exhibit AA-6.  I'll ask you to take a
 6   moment, review that exhibit.  After you've
 7   had an opportunity to review it, I -- my
 8   question to you will be:  Does this or is
 9   this the job description for the senior
10   technician position that you applied for?
11      A.    (Witness reviews document.)
12            No.
13      Q.    Okay.  Did you receive or have in
14   your possession at the time you interviewed
15   for your position at InductEV a copy of a job
16   description?
17      A.    Yes.
18      Q.    And do you think -- and this one's
19   different?
20      A.    The one I had says, I believe, six
21   to eight years experience in a test
22   environment.  This one says, "8+."
23            I mean, everything else, I would
24   assume, is identical.
```

Page 72

1      Q.    Well, take a moment and look at it.

2      A.    (Witness complies.)

3            I mean, the front is the same.

4   Everything else looks identical.

5      Q.    You mentioned that there -- you --

6   you recall that there was a different -- your

7   requirement in the -- the job description

8   that you had seen?

9      A.    Right.  I mean, I could be wrong.

10  I can't verify it.

11     Q.    I'm not -- I'm not trying to trick

12  you.

13            I'm asking:  Do you have a

14  different recollection of the job requirement

15  that was on the job description you reviewed

16  when you were applying for the job of senior

17  tech?

18     A.    Right.  Asked and answered.  Yes.

19  Six to eight on the experience.

20     Q.    Thank you.

21            Sometimes I miss things thinking

22  about the next question, so I apologize if I

23  repeat a question, or go over ground that was

24  covered.

Page 100

```
 1   too, that you're going, "Here's what they
 2   did, here's what they knew.  Here's what I
 3   thought should happen.  I can't think of any
 4   explanation other than race and gender"?
 5               I'm trying to understand your
 6   claim.
 7        A.   Right.  So the problem is -- they
 8   had a similar situation.  I was told when I
 9   got hired, that I couldn't be given the
10   senior tech role because I didn't have enough
11   years experience, right.
12        Q.   Okay.
13        A.   Okay.  That's their rule.  That's
14   their policy.  But, then, when they promoted
15   Seth and Omar, Omar had more than 20 years
16   experience, and since the job descriptions
17   are the same he was supposed to be hired with
18   that designation.
19        Q.   We're talking about you.
20        A.   And they didn't -- and they
21   promoted him at the same time as Seth.  Seth
22   was white, and he did not fit the full
23   description.
24        Q.   Do you know if all --
```

Page 115

1    beyond the scope of the formal requirements.

2          No one ever told him those formal

3    requirements.  And it's -- it's fine.  It's

4    fine to not promote someone who fits the

5    formal requirements.  That's subjective.

6          My problem is that they denied him

7    on the basis of experience.  They denied me

8    on the basis of experience.

9          We are black, and they allowed Seth

10   to be promoted, and he deserved it, but he

11   didn't fit the formal requirements, and they

12   were willing to break the formal requirements

13   for a white man, but not for me and not for

14   Omar.  And Omar deserved it more.

15        Q.   At the time of Mr. Jackson's

16   promotion, had he been in the eng- -- the

17   field for six to eight years after the break?

18        A.   Not after the break, no.

19        Q.   Correct.

20        And I think you -- the

21   understanding you had was he didn't come in

22   as a senior technician because of the break

23   in his service of some five or six years,

24   correct, isn't that your understanding?

Page 116

```
1        A.    Yes.
2        Q.    And that's what you feel was
3   unfair, right?
4        A.    Absolutely.
5        Q.    Okay.  And you weren't there for
6   his interview or anything like that, were
7   you, when he was hired, right?
8        A.    No.
9        Q.    Okay.
10       A.    I got to put these back on because
11  I can't really see without them, but...
12       Q.    Is it fair to say that pretty much
13  the focus of your claims of improper
14  treatment because of your race and gender
15  center upon Judy Talis?
16       A.    Judy Talis?
17       Q.    Yeah, sorry.
18       A.    It's okay.
19             Yes.  Most of them, yes.
20             Actually, I think the biggest legal
21  one is her, yes.
22       Q.    What's the biggest legal one?
23       A.    I mean, I experienced harassment,
24  but I think the only -- the biggest thing
```

Page 125

```
 1       Q.   And you've also recently filed a
 2   Rule 54 Motion to -- I'm not sure what the
 3   purpose of that is.
 4       A.   Oh, okay, yeah.  Yes.
 5       Q.   I'm not sure what the purpose is,
 6   you know, but that also is a document that
 7   contains emails, evidence ostensibly in
 8   support of your claims, correct?
 9       A.   Yes.
10       Q.   And you're saying there's still
11   more that you're sitting on?
12       A.   Yes.
13       Q.   Okay.  Do you have any idea what
14   those might be?
15       A.   They're probably mostly just emails
16   or text messages, either from Judy or Joren,
17   I think.  Yeah, I think so.
18       Q.   Do you have any emails that -- on
19   the face of the email, do you remember the
20   judge's decision or the judge said, you know,
21   that the plaintiff is citing interactions or
22   communications that are not -- you know, do
23   not racially reflect gender or racial animus,
24   do you remember that?
```

Page 130

```
 1          A.    (Witness complies.)
 2                    MR. SCHAUER:  Okay.  Why don't
 3              you take your bathroom break.
 4                    THE WITNESS:  Thank you.
 5                    MR. SCHAUER:  And, then, we'll
 6              talk a little more about Exhibit
 7              AA-11.
 8                    We're off the record.
 9                    THE WITNESS:  Okay.
10                    THE VIDEOGRAPHER:  The time is
11              now 11:47 a.m.  We are going off
12              the video record.  This concludes
13              Media Unit Number 2.
14                       -    -    -
15                    (Whereupon, there was a brief
16              recess held off the video record.)
17                       -    -    -
18                    THE VIDEOGRAPHER:  Stand by.
19                    The time is now 11:51 a.m.  We
20              are going back on the video record.
21              This will begin Media Unit
22              Number 3.
23     BY MR. SCHAUER:
24          Q.    Before the break, Ms. Acey, you
```

Page 131

```
1    were asked to mark the portions of
2    Exhibit AA-11 and AA-11-A, Judy Talis'
3    evaluation, from April 28th, 2021, that you
4    believe reflect racial or gender bias or
5    animus or the part of Ms. Talis relative to
6    you and your career at InductEV.
7             Is it -- do I fairly state what you
8    were asked to do?
9         A.   Yes.
10        Q.   And did you do that?
11        A.   Yes.
12        Q.   And are you satisfied that you have
13   fully done that?
14        A.   I believe so, yes.
15        Q.   You weren't -- you weren't rushed
16   or anything.
17             You had enough time to do that?
18        A.   Oh, I have, yes.
19        Q.   Okay.   So the first portion that
20   you wrote on is in Paragraph 1, a phrase near
21   the end.   At the first section it says, "her
22   job as asked as well."
23             Tell me how that reflects or
24   relates or reflects -- excuse me, reflects
```

Page 132

1   discriminatory animus on the part of

2   Ms. Talis towards you?

3       A.   Attorney Schauer, if I can clarify,

4   I actually meant to start, like, here

5   (witness indicating) with the word, "she."

6       Q.   Okay.  That's -- that's fine.

7            "She understands the needs to do

8   her job as asked as well."

9            Tell me how that reflects some kind

10  of gender or animus -- I'm going to -- I'm

11  going to -- I'll use a more general word,

12  improper animus on the part of Ms. Talis?

13      A.   Okay.  For me it -- it connects

14  more to a statement, like, "Don't get ahead

15  of yourself."  It connected more to ideas

16  of -- I guess, condescension.

17            I know historically when people

18  talk about forms of racial expressions with

19  black people, one of them was criticizing

20  them as being, like, "uppity," or "more

21  puffed up than they ought to be."

22            And when emphasized my ability to

23  do my job as asked, it kind of implied a

24  desire to go beyond the job task, or to be --

Page 133

```
 1   to think that -- it just -- it just felt
 2   condescending.  I'll just leave it there.
 3        Q.   Do you think that that sentence had
 4   nothing to with the sentences that go before
 5   it in the comment section of Paragraph 1?
 6        A.   I think it's connected in her train
 7   of thought, but that's about it.
 8        Q.   Well, her train of thought is what
 9   this case is pretty much about, isn't it,
10   Ms. Acey?
11             I mean, she's the -- she's the
12   primary focus of your claims of gender and
13   race discrimination and harassment, isn't
14   she?
15        A.   So the first question, "her train
16   of thought," I believe the focus of this
17   Complaint is part of her thoughts, not
18   everything that she thought.
19             And the second one --
20        Q.   Okay.
21        A.   -- you asked if the -- the
22   claims -- the claims are based on -- on her
23   actions and her thoughts, yes.
24        Q.   Okay.  So her train of thought,
```

Page 134

1   you're saying this last sentence isn't
2   connected to the prior or -- or the last
3   sentence of Box 1 in Paragraph -- of
4   Exhibit AA-11 -- AA-11, is separate and apart
5   from and reflects, you know, some kind of
6   separate idea or thinking of Ms. Talis?
7           A.   Yes.  Especially since --
8           Q.   Okay.
9           A.   -- the sentence starts with having
10  said that, which tells me that she wants to
11  set aside what she said at the beginning.
12          Q.   Oh, it doesn't mean that
13  incorporating everything else that was said,
14  in addition you understand the need to do
15  your job as asked as well.
16               You -- you don't read it that way,
17  do you?
18          A.   No.  I read it as positive, my
19  qualifications, against -- or my
20  impressions --
21          Q.   Okay.
22          A.   -- of my qualifications against my
23  ability to do the job as asked.
24          Q.   Is that, in part, because you

Page 135

1  believe that Ms. Talis is fundamentally

2  has -- harbors gender or race animus?

3       A.   Yes, at least subconsciously.

4       Q.   Okay.  And this is an example of

5  that, right?

6       A.   Sure, yes.

7       Q.   Okay.  Let's go to, I guess, the

8  next place you have circled is, "She feels

9  the technician role is fundamental to

10 engineering."

11          Do you see that?

12      A.   Yes.

13      Q.   Is that something you said, or

14 something you communicated?  It may not be

15 those exact words --

16      A.   Sure.

17      Q.   -- but is that something that you

18 said?

19      A.   Sure.  Yeah, I communicated

20 something like that.

21      Q.   Okay.  Well, let's -- let's go

22 through that -- let's go through that

23 additional comment from Ms. Talis.

24      A.   Sure.

Page 143

1          A.    No.   I mean --

2          Q.    Did anyone require you to -- you --

3    you -- I think one of your complaints is that

4    you did work that was other than what you

5    understand to be the job of a technician.

6              Did anyone else do that, to your

7    knowledge?

8          A.    Do what?

9          Q.    Do work outside of the job

10   description of whatever their job was.

11         A.    Not that I knew of.

12         Q.    Was it -- did -- did -- did you

13   enjoy work that you say you did outside of

14   your job description?

15         A.    Yeah, I -- I liked -- I liked the

16   work.  I like working.

17         Q.    Did you find it to be interesting?

18         A.    Yeah.

19         Q.    Okay.  So your issue isn't with the

20   work that you were doing outside of what you

21   felt was your actual job description.  It's

22   the fact that you think that you had a

23   contract that said you only had to do certain

24   things; is that right?

Page 144

1        A.    Yes.

2        Q.    Okay.  You were -- do you -- are

3   you familiar with the concept of an at-will

4   employee?

5        A.    Yes.

6        Q.    Okay.  Were you an at-will

7   employee?

8        A.    I think so.  I think this is an

9   at-will state.

10       Q.    But you didn't have a contract that

11  said you'll be there for a year or two years

12  unless you or -- (Inaudible) something?

13       A.    Oh, yeah, I think the -- the offer

14  of employment says, "at-will."  So, yes, I

15  was at-will.

16       Q.    Okay.  Okay.  So let's keep going

17  here.

18             And, then, there's a statement,

19  "She feels the technician role is fundamental

20  to engineering."

21             Now, did you say that?  You have it

22  circled.

23             Did you say that sentence?

24       A.    That "the technician role is

Page 187

1   to them that I wanted to become a patent
2   scientist.
3           Q.    Any chance that, perhaps,
4   Mr. Rosenberger may have been being a little
5   defensive about him being a technician, and
6   you with the qualifications and things that
7   you have?
8           A.    I mean --
9           Q.    If you know.
10          A.    I don't know.  I mean, he -- he
11  showed signs of insecurity with other people,
12  so it's possible.
13          Q.    I don't know him.
14          A.    I've -- I've worked with him.  I've
15  seen him.  His desk was right next to mine.
16  I know when he would start smoking, because I
17  would smell it.  I remember his hands, his
18  glasses, his wife, even though I've never met
19  her.  I've just heard the calls.
20          Q.    All right.
21          A.    Yeah.
22          Q.    Did you have any reason to believe
23  that Mr. Rosenberger -- well, Mr. Rosenberger
24  is also a senior technician or was.

1      A.    Yeah.

2      Q.    Was he involved in -- you know,

3   really involved in the decision to hire you

4   or not in the sense of management?

5      A.    He wasn't management.  But when we

6   decided to hire someone after a job process,

7   everyone waited.  And I believe his or a

8   teammate's notes are written in the manager's

9   evaluations as well.

10     Q.    Okay.  All right.

11           Well, you've seen these documents,

12  so I'll move forward, I believe.

13                    -    -    -

14           (Whereupon, Exhibit AA-13,

15           Momentum Wireless Power Interview

16           Evaluation Form, was marked for

17           identification.)

18                    -    -    -

19  BY MR. SCHAUER:

20     Q.    Let me show you Exhibit AA-13.

21  This is the Interview Evaluation Form by

22  Mr. Rosenberger, dated --

23     A.    Yes.

24     Q.    -- May 14, 2021.

Page 189

1          You see that?

2      A.   Yes.

3      Q.   Okay.   And I think you said that

4  you had seen this document in the production

5  that's been made in this case?

6      A.   Yes.

7      Q.   Is there anything that you can

8  point to me in this document --

9      A.   Yes.

10     Q.   -- Exhibit AA-13, that you believe

11 reflects some kind of animus towards you

12 based upon race or gender?

13     A.   No.

14          (Witness reviews document.)

15          I do believe it was an insincere

16 evaluation, but I don't see any animus on it.

17     Q.   You think it was insincere?

18     A.   Yes.

19     Q.   Well, what -- what -- what's your

20 basis for that conclusion?

21     A.   One day when the contention with

22 Rob was a little bit bigger, he gave me this

23 evaluation as proof that he didn't have any

24 hard feelings against me, but it's also in

Page 190

```
 1   the messages of me overhearing Judy arguing
 2   with him about what he wanted to put in
 3   someone else's performance evaluation and
 4   telling him what he can't put in it.
 5          So, for my knowledge, I just
 6   believe it's too probable that it wasn't
 7   sincere, especially the way that he -- he
 8   treated me, and -- yes.
 9       Q.   Are you saying that he essentially
10   was kind of doing a little CYA --
11       A.   Yes.
12       Q.   In the back --
13       A.   Yes.
14       Q.   -- against what might come later?
15       A.   I don't even know if it's a "might
16   come later."  I don't know if he felt guilty.
17   I just know one day he handed it to me, and
18   intimated it as proof that he never had hard
19   feelings against me.
20          I mean, at one point, he gave me a
21   red cabbage.  I think that's also in the
22   messages.  I was very confused.  But, again,
23   I assumed it was in the same direction.
24       Q.   Just briefly, he just gave you a
```

1  red cabbage?

2       A.   Yes.   One day instead of yelling at

3  me or criticizing me, he presented me with

4  this random red cabbage.   I was very

5  confused.   I think I messaged my boss and

6  asked him if it was poisoned.   Now, that's

7  probably not rational, but I was confused.   I

8  mean, he just...

9       Q.   Well, what was the context in which

10 he gave you a red cabbage?

11      A.   The same context as this evaluation

12 form, I guess.   Just trying to make it seem

13 like he wasn't mad at me, or, like, he was --

14 maybe he felt guilty, I don't know.   I don't

15 even eat red cabbage, um, so I don't know.

16      Q.   Did he give a red cabbage to

17 anybody else in the office --

18      A.   No.

19      Q.   -- if you know?

20           MR. SCHAUER:   Let's look at

21           the -- next, we have an evaluation

22           here.

23           We'll mark it as Exhibit

24           AA-14.

```
 1                      -    -    -    -
 2                    (Whereupon, Exhibit AA-14,
 3            Momentum Wireless Power Interview
 4            Evaluation Form, was marked for
 5            identification.)
 6                      -    -    -    -
 7   BY MR. SCHAUER:
 8        Q.   I apologize.
 9             On this one, I apparently did not
10   capture the portion in -- in the comments
11   section.  I guess I have to figure that out
12   at some point in time.
13        A.   That's all right.
14        Q.   So, tell me, Seth Wolgemuth --
15        A.   Wolgemuth.
16        Q.   Okay.  He was a senior technician?
17        A.   He started off as a normal one.  He
18   was promoted around, like, November.  They
19   sent out a company email to welcome him, I
20   think.
21        Q.   Okay.  It says that as of May 17th,
22   2021, he was -- oh, his position -- he was
23   promoted with Omar; is that right?
24        A.   Yes.  So this is the position --
```

Page 193

1    that's the position he was interviewing me

2    for.

3          Q.    Yeah.  All right.

4                So have you or did you have the

5    opportunity to review this particular review

6    form in the course of receiving the discovery

7    in this case?

8          A.    Yes.

9          Q.    And take your time and look at it

10   now, and, as well, based upon your prior

11   review of the document, was there anything in

12   here that you feel particularly reflects some

13   kind of, you know, animus towards blacks or

14   women?

15         A.    (Witness reviews document.)

16               No.

17         Q.    Do you think his review was

18   sincere?

19         A.    Absolutely.

20         Q.    Was -- I was going to say, "Seth."

21               Was he there the whole time that

22   you worked at InductEV?

23         A.    Yes.

24         Q.    Let's go to the last -- Section 4.

Page 194

```
 1          A.    (Witness complies.)
 2          Q.    There he says, "My only real
 3    concern is her not being satisfied in this
 4    position and leaving us without an
 5    experienced tech in the role a year from
 6    now."
 7                Do you see that?
 8          A.    Yes.
 9          Q.    That -- you were comfortable with
10    that assessment made by Seth?
11          A.    Yes.   It's almost -- it's very
12    close to the discussion I had with Judy
13    beforehand.
14          Q.    Okay.   Did you have any reason to
15    believe, based upon your time working at
16    InductEV, that Mr. Wolgemuth harbored any
17    particular animus towards you based upon
18    gender or race?
19          A.    I wouldn't call it animus.   He was
20    protective if somebody appeared to be biased,
21    but he's also a very quiet, very kind person.
22                MR. SCHAUER:   And Exhibit
23                AA-15.
24                       -    -    -
```

Page 200

1          A.    Yes.

2          Q.    -- which is an offer letter for you

3     to begin on June 7, 2021.

4               Do you see that?

5          A.    Yes.

6          Q.    I also believe that it -- was at

7     some point the letter modified to have you

8     start on June 14th, 2021?

9          A.    Yes, it did.

10         Q.    But other than that change -- and I

11    apologize for not having that exact document,

12    but other than that change, is the offer

13    letter that you received and accepted from

14    InductEV the same as Exhibit AA-16?

15         A.    No.    They changed the date, and I

16    think they changed the hourly rate.    I'm not

17    sure.    I -- I know there was some negotiation

18    of the hourly rate, and she updated the

19    offer.

20         Q.    Do you recall what the hourly rate

21    was that you received when you began at

22    InductEV?

23         A.    I want to say $34 per hour.

24         Q.    And were you an hourly non-exempt

Page 274

```
 1              And he asked about, you know,
 2   whether I run, and I was excited.  I was,
 3   like, "Well, you know, not" -- "not as much."
 4              But I -- you know, I thought it was
 5   a fun conversation, but when he found out
 6   that I didn't run, he looked -- he started
 7   frowning, almost in a cartoonish way, but I
 8   guess he wasn't happy.  And I guess the topic
 9   of ice cream came up and he was looking at me
10   and he mentioned dark chocolate.
11              The exact words he stated were
12   probably more accurately recounted to my
13   boss, I believe, like, a day or two after we
14   had teams, but I can't remember his direct
15   quotes right now.
16         Q.   When you say you shared his comment
17   that bothered you with your boss, do you
18   know, did Joren speak with Bogdan?
19         A.   No.  He just said it was weird, and
20   that he had noticed a creepy vibe from him
21   before.  And we agreed that if it ever came
22   up for me to have to work with Bogdan or be
23   in the same room, he would support me keeping
24   a healthy distance.
```

# EXHIBIT 2

Page 1

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

3                         - - -

4    ASSATA ACEY,                 :

                                  :

5            Plaintiff,     : No. 2023-CV-01438

                                  :

6            vs.                  :

                                  :

7    INDUCTEV,                    :

                                  :

8            Defendant.     :

9                         - - -

10              THURSDAY, APRIL 18, 2024

11                        - - -

12

13           Videotaped Deposition of ASSATA ACEY,

14    taken at Fox Rothschild, 747 Constitution Drive,

15    Suite 100, Exton, Pennsylvania, commencing at 9:21

16    a.m., before Lauren Sweeney, a Court Reporter and

17    Notary Public.

18                         - - -

19

20

21

22

23       Job No. CS6660747

24

ASSATA ACEY

Page 26

```
 1          Q.      Okay.  I'll suggest to you --
 2    I'm not giving you legal advice -- that one of
 3    the elements of a claim is lost wages.
 4          A.      Yes, that's the compensatory,
 5    yes.
 6          Q.      And just for what it's worth, I
 7    generally understand compensatory damages to
 8    be more along the lines of embarrassment, pain
 9    and suffering, distress, you know, that kind
10    of thing.
11          A.      Oh, I see.
12          Q.      You know, not something that
13    can be quantified, you know, by some
14    calculation of numbers.
15                  Okay?  Do you understand that?
16          A.      Yes.
17          Q.      So let's talk about wage loss.
18                  As of the end of September of
19    2022 --
20          A.      Yes.
21          Q.      -- at or around the time of the
22    mediation, if that helps fix it for you, you
23    were on disability.
24                  Did you continue to receive
```

ASSATA ACEY

Page 27

1  short-term disability after September 19th of
2  2022?
3           A.      Yes.   Well, long-term but
4  disability.
5           Q.      All right.  And how long did
6  you remain on long-term disability?
7           A.      I am on long-term disability.
8           Q.      So you continue to receive
9  long-term disability payments?
10          A.      Yes.
11          Q.      Have you worked at all since
12 the end of September of 2022?
13          A.      No.
14          Q.      Are you capable of working in
15 your mind?
16          A.      Not at this moment, no.
17          Q.      How much do you receive in
18 long-term disability payments each month?
19          A.      I think it's 3,600.  It's like
20 43,000 a year.
21          Q.      What were you making roughly a
22 year -- well, in the year that you worked for
23 InductEV?
24          A.      Gross?

ASSATA ACEY

Page 28

1          Q.      Yes.

2          A.      Okay.  So somewhere around

3    76,000.

4          Q.      Do you know how much longer,

5    assuming that you qualify for them, how much

6    longer you would be eligible to receive

7    long-term disability benefits?  The rest of

8    your life, another two years, another six

9    years, another three months?  Something along

10   that, that's what I'm looking for.

11         A.      I don't know.

12         Q.      And you're not making any claim

13   for back wages in this case, that is wages

14   that you earned prior to your separation from

15   InductEV that you're claiming were not paid to

16   you by InductEV; is that correct?

17         A.      Not at this time, no.

18         Q.      Well, you last actively --

19   well, I guess, sometime -- you began receiving

20   short-term disability, if I recall, sometime

21   in April of 2022; is that correct?

22         A.      May 16th.

23         Q.      May 16th.  Okay.

24                 And prior to that time were you

ASSATA ACEY

Page 40

1      Q.      Well, do you know when that
2   happened roughly?
3      A.      Around the time I gave to you,
4   probably like late January between February.
5   It had to be before the meeting with Judy
6   because I was worried that if I had complained
7   about that whatever work he tried to do on a
8   promotion would just never happen.
9      Q.      I'm sorry, when you say you
10  were afraid that if you complained about
11  "that," what is that?  Not being properly
12  titled and compensated?
13     A.      Talking about race or --
14  talking about race or telling her that she had
15  to do something about the racial environment
16  at work.
17     Q.      Let's get back to that.
18             What exactly did you tell Judy
19  in this meeting that you're referring to?
20     A.      Okay.  So I told her that she
21  -- it was a very painful meeting.
22     Q.      What did you tell her in the
23  meeting, Ms. Acey?
24     A.      I'm trying to get to it.

ASSATA ACEY

Page 41

```
 1              Q.      Well, you can think --
 2              A.      I'm trying to -- I have to
 3    speak it out because if I meditate all you're
 4    going to get is just utters and pained faces.
 5                    But what I'm trying to say is
 6    -- when I'm trying to remember that meeting it
 7    was painful.  And I talked to her about my --
 8    she told me about the movie and about how they
 9    can't do a movie list for black history month
10    because they didn't do anything for Jewish
11    history month, they don't have anymore -- or
12    Jewish, you know, holidays, things like that,
13    and they don't have a professional available
14    to provide planning, you know, so that every
15    -- so like every group would feel embraced
16    equally.
17                    And I believe at some point she
18    gave me the floor to describe why I felt it
19    was so important because of the comments I had
20    made in my e-mail about attracting diverse
21    talent and things like that, and I just went
22    in and I explained to her about my experiences
23    with my coworkers, that I felt like there was
24    general bias.
```

ASSATA ACEY

Page 42

1           But I also gave her some

2    examples that I felt were less messy and more

3    objective.  So I told her that Jorge had been

4    asking me about what I was doing when I was

5    working in the basement, asking me in the

6    frame of, you know, accounting for my time,

7    and that I had stated, you know, to him that I

8    was uncomfortable and that I didn't want to

9    talk about it in detail, but he was asking me,

10   and he just kept pursuing it as though he felt

11   he was entitled.

12           And I explained to her how I

13   had felt that my coworkers were being

14   hypervigilant of me, the things that I did,

15   how long I spoke, and things like that, and I

16   also went into an example about my coworker,

17   Brian Kenney, who I think like within two

18   weeks before that meeting he had -- there was

19   an incident where he basically asked me to use

20   my key pass to let him into the building, and

21   once I did so to pick up donuts for the team

22   -- that was my errand -- he opened the door

23   for the lady who was delivering the donuts two

24   times -- the lady happened to be white -- and

1   once I had picked up the donuts and the coffee
2   jugs the best I could 'cause my hands were
3   full he had taken off.
4                      Well, this was at the front
5   office, and the place I was going was the
6   basement, so I had to walk down the hill by
7   myself, and I had explained to her how blatant
8   that felt because I had just watched him give
9   attentive support to somebody who was a
10  different race than me.
11                     And then his teammate, who he
12  relied on to get access to the building, I
13  explained that to her.  I had also explained
14  issues working with him and his complaints
15  about me.
16                     Then I think the third issue I
17  talked to her about was recently overhearing
18  one of the newer workers complaining about
19  Julian Jackson basically saying he should get
20  off his lazy A-S-S in reference to his regular
21  work where he would have to open the garage
22  door to receive or take out deliveries and how
23  this person had stated this in front of two
24  other coworkers who were also nonblack.  I

ASSATA ACEY

Page 44

1   believe it was Jorge -- I don't remember the

2   other person -- and how they had both felt

3   uncomfortable and just walked away from him at

4   that point.

5              And I had expressed concern to

6   her that these -- that at least situations

7   like that were more inflammatory and that I

8   felt like if someone was more easily offended

9   they would attempt to sue the company over

10  stuff like that because I wanted her to feel

11  some type of interest in reducing these

12  things.

13             And that's basically what I

14  disclosed.  She asked me a bunch of questions,

15  and I answered them.  But, yeah.

16             THE VIDEOGRAPHER:  Excuse me,

17        Ms. Acey, could you readjust your mic

18        so it's sticking up this way as

19        opposed to in your --

20                    - - -

21             (There was a discussion held

22        off the record.)

23                    - - -

24  BY MR. SCHAUER:

ASSATA ACEY

Page 45

```
 1              Q.      Let's go -- you gave an
 2      example.  You said a coworker talking about
 3      Julian.
 4                      Did you actually overhear that
 5      comment or did somebody tell you about it?
 6              A.      I was sitting at my desk and I
 7      overheard the comment.
 8              Q.      And who said it?
 9              A.      It was this guy named Tom
10      Hornberger.
11              Q.      And who were the other
12      coworkers who you say were present when he
13      made that comment that didn't say anything?
14              A.      Jorge Ribe.  That's R-I-B-E.
15      The "E" has an apostrophe over it.  And I
16      don't know who the third person is.  I can't
17      remember who the third person is.
18              Q.      Brian Kenney, you say that on
19      the morning of the incident you're describing
20      with Brian Kenney he had purchased donuts for
21      the office or the coworkers.
22                      Is that what happened?
23              A.      No.  Joren had ordered donuts
24      in exchange for everyone having to be in the
```

ASSATA ACEY

Page 46

1  basement early, and I had volunteered to go to

2  the front to pick them up.

3       Q.      And was -- did Brian Kenney,

4  was he bringing them in from the parking lot?

5  I'm trying to understand just what the

6  circumstances were, what was the physical

7  situation you're describing.

8       A.      The front is here.  The porch

9  is here.  The basement is here, downhill.  I

10 was coming out.  Brian -- and, I'm sorry, it

11 wasn't a card, it was a key.  Brian didn't

12 bring his key that day, so he was basically

13 relying on me in that moment to let him in

14 front of the building, 'cause you needed a key

15 to get in the front.

16              So I was going to pick up the

17 donuts and the coffee, and he came with me in

18 exchange for me letting him in, and I guess he

19 left before I did.

20       Q.      So tell me about, there was

21 somebody who was bringing -- he held the door

22 for somebody bringing the donuts in, a white

23 woman?

24       A.      There was a white woman.  She

ASSATA ACEY

Page 47

1    had a very nice coat and she brought in the

2    donuts.

3              Q.      But where did she bring them

4    to?

5              A.      She brought them into the front

6    desk.  It took her two trips.  So he made sure

7    to watch her and see when she needed help and

8    opened the door both times back and forth and

9    asked if she was -- you know, if she was okay,

10   if she needed help with anything really.

11             Q.      Okay.  And you were standing

12   there while he did that and saw him do it?

13             A.      Yes, I did see him do it.

14             Q.      Okay.  And then what happened?

15   He took - you know, did he take the donuts and

16   leave that space?  Or what is it that occurred

17   that you ended up outside the building?

18             A.      I recall he just ran.  It was a

19   cold day, and he ran from the door, the front.

20   He left.  After that woman was good and after

21   she delivered all the things that I was going

22   to have to carry, he ran from the front door,

23   out and down the hill back to the basement,

24   which meant that I had to hold these donuts

Page 48

```
 1   and these jugs, that I had my arms full, down
 2   the sloped hill, and I wasn't really clear on
 3   how to get any doors open because --
 4         Q.    So you were both -- I take it
 5   that there was -- you weren't able to access
 6   -- is the basement only accessible from
 7   outside?
 8         A.    Yes.  You have to go around.
 9   I'm sorry, yes.
10         Q.    I'm trying to understand the
11   logistics of this issue on that item that you
12   raised.
13              All right.  So you and Brian
14   are in the building on the first floor.  You
15   let in a delivery person who has -- a white
16   woman who has donuts and coffee.  She leans
17   them on a table near the reception.
18              Do I have that right so far?
19         A.    It was Julian's desk.
20         Q.    Okay.  And then Brian, you say
21   disappeared.
22              I mean, did he -- well, I
23   guess, all you know is after the donuts and
24   the coffee were delivered he wasn't there
```

ASSATA ACEY

Page 49

1   anymore.

2          A.     I mean, I saw him when I made

3   it into the basement.

4          Q.     Did you ask him where did you

5   go, what did you do?

6          A.     I knew what he did.

7          Q.     Did you ask him, you know, why

8   didn't you help me with the donuts?  Why

9   didn't you hang around?  You know, what's the

10  story here?

11         A.     No.  I complained to him.  I

12  didn't --

13         Q.     I didn't say complain.  You

14  know, that's a conclusion.

15                Did you say anything to him

16  after this incident with the donuts?

17         A.     Yes.

18         Q.     What did you say to Brian?

19         A.     I honestly don't remember.

20         Q.     Do you have any recollection of

21  what Brian might have said back to what you

22  might have said to him?

23         A.     I just know that he left and

24  got his own coffee after that.

ASSATA ACEY

Page 50

1          Q.      Okay.  All right.

2                  Did you raise this issue with

3     anyone other than Judy in this meeting?

4          A.      I told Joren the day that it

5     happened.

6          Q.      All right.  And did Joren

7     indicate to you that he had addressed it?

8          A.      No, not at that time.

9          Q.      Did he indicate to you at a

10    later time that he had talked to Brian about

11    this donut delivery incident?

12         A.      Yes.

13         Q.      And were you satisfied that

14    Joren had addressed the situation based upon

15    what Joren said to you?

16         A.      At the time, yes.

17         Q.      Well, when you say at the time,

18    what do you mean at the time?  In retrospect

19    you decided you shouldn't have been satisfied?

20         A.      Joren did his best, and every

21    time he confronted someone I thought that

22    would be the end, and it wasn't, so --

23         Q.      Well, is there some other thing

24    that Brian did that you relate to some kind of

ASSATA ACEY

Page 51

1   racial or gender animus, Brian Kenney?

2          A.      When we were both deciding to

3   do modifications for a prototype, metal box

4   thing -- and Maria and Bogdan Proca were the

5   lead engineers.  And Brian Kenney, he didn't

6   -- I'm trying not to give you a conclusion.

7   He -- his teamwork was -- it's very hard.  I'm

8   going to just have to tell you, and you'll

9   just have to tell me if it's your form or what

10  you need.

11         Q.      Sure.

12         A.      But basically he was not very

13  friendly.  He did not do all of his work.  And

14  when the opportunity showed up for him to make

15  himself look good he would become very hostile

16  towards me.

17                 At one point he took no notes

18  of what was happening, what was necessary, and

19  he just snatched my notes out of my hand and

20  like stared at me when Bogdan Proca came so

21  that he could present him as though -- just so

22  he would present to him how things were going

23  and what his ideas were.

24                 And then when things did not go

ASSATA ACEY

Page 52

```
 1   his way he shouted at me in front of the front
 2   office and stormed out.
 3          Q.      What was Brian's position?
 4          A.      He was general technician for
 5   the product -- he was general -- or product
 6   introduction technician.
 7          Q.      When did this event occur in
 8   front of the staff that you just described?
 9          A.      That was -- I think it would be
10   between February and April of 2022.  I think
11   that that project was also in discovery, yeah.
12          Q.      Did you speak with Brian after
13   the incident with the notes and you say
14   yelling at you about what's going on here, you
15   know, what is this behavior you're showing me
16   and demonstrating around?
17          A.      Absolutely not.  I only --
18   those types of things I only talk to my
19   manager and HR.  I don't want to escalate it
20   with him.
21          Q.      Okay.  Tell me, the incident
22   with Jorge about --
23          A.      Jorge.
24          Q.      Jorge, sorry.  About Jorge
```

ASSATA ACEY

Page 53

```
 1   asking you about what you were doing in the
 2   basement.
 3            A.     Yes.
 4            Q.     What's that about?
 5            A.        That was weird.  I mean, his
 6   desk is next to mine.  So like we were in the
 7   cubicle.  Rob's across from me.  Tina's behind
 8   me.  Jorge is diagonal.  And he was making
 9   comments along the lines of not seeing me at
10   my desk, not seeing me around as often, and
11   what have you been doing.
12                    And it didn't -- at the time I
13   did not feel comfortable because it was not
14   the first time I had heard people asking me
15   about what I had been doing or whether I was
16   doing enough work.
17                    And so I wasn't comfortable
18   with the topic, and I just said, you know, I'm
19   helping out with this project.  And he started
20   asking me, more specifically, what my role was
21   or what I was contributing and why I had to be
22   there.
23                    And I just kept trying to
24   indicate to him socially, you know, by trying
```

ASSATA ACEY

Page 54

```
 1    to answer his questions without being overly
 2    specific and saying that's what I feel
 3    comfortable sharing.
 4                   And he just kept pushing me and
 5    being insistent and it gave me the same
 6    feeling as -- it made me kind of lump him in
 7    with my other coworkers who had been
 8    hypervigilant at work.
 9         Q.       Approximately when did this
10    incident occur with Jorge that you are
11    describing?
12         A.       That would have to be between
13    January and February.  So most of the stuff
14    that's happening in the basement is around a
15    project that we labeled as VW.
16                   So the issues with Brian and
17    the donuts, again, that's the VW project.  The
18    questions about Jorge leaving the basement.
19    So all of these are kind of around the same
20    time period.
21         Q.       Did you go to Joren regarding
22    the questions that you were being asked by
23    Jorge?
24         A.       Yes.  Joren knew about it
```

ASSATA ACEY

Page 55

```
 1   before Judy did.
 2         Q.     And did Joren address it to
 3   your knowledge -- to your knowledge, did Joren
 4   address it?
 5         A.     Yes, February 18th or so he
 6   sent me a message saying that he had spoken to
 7   Jorge about it.
 8         Q.     Did you notice any difference
 9   in Jorge's, you know, inquisitiveness of you
10   after that time?
11         A.     I mean, a month or two later I
12   overheard him talking to another coworker
13   about willingness to share information and
14   being a team player, and I felt like he was
15   talking about me.
16         Q.     Do you know he was talking
17   about you?
18         A.     Not without reviewing the
19   evidence in front of me.
20         Q.     Well, what evidence would you
21   need for that?
22         A.     Well, when it happened, as was
23   my pattern, I told my boss what I was
24   overhearing and where he was and exactly the
```

ASSATA ACEY

Page 56

1    words I heard him say.  Without those specific

2    words and those details I can't confirm for

3    you whether he was talking about me.  I can

4    just tell you what I felt.

5            Q.    Let's talk about your

6    compensatory damages.

7                  What are you making a claim for

8    as far as what I'll describe as kind of, you

9    know, nonmonetary based damages?

10                 And I think, as I described

11    earlier, that would be, you know, what you

12    think you ought to get for pain and suffering

13    or embarrassment or emotional distress that

14    you suffered because of the wrongful behavior

15    toward you by InductEV.

16           A.    Okay.  So I remember the end of

17    the question, but can you repeat the beginning

18    so I can try to be as succinct as possible?

19           Q.    Please describe for me the

20    basis of the claim you're making for

21    compensatory damages, those being damages

22    related to distress, pain and suffering,

23    embarrassment, humiliation as a result of

24    violations of the law by InductEV.

Page 125

```
 1              A.      Yes.

 2              Q.      Okay.   What was your purpose in

 3    writing this e-mail of September 23 at 10:39?

 4    Take your time and look at the whole thing if

 5    you want to.

 6              A.      The purpose of the e-mail was

 7    in my mind to cut through the games that I

 8    felt were being played and to get as soon as

 9    possible a tangible contract with all terms

10    and to adjust the amount on that contract

11    commensurate with what I saw as their behavior

12    and my -- I guess my attempt to still try to

13    be fair.

14              Q.      Did any of the facts that you

15    cite -- let's refer to page 53 in the lower

16    right-hand corner.

17              A.      Okay.

18              Q.      You knew all those facts when

19    you were in the mediation on September 19th,

20    didn't you?

21              A.      Yeah, I was stating some of

22    them before -- when I was rebutting the May

23    Mon Post.

24              Q.      There's nothing in this e-mail
```

ASSATA ACEY

Page 190

1    looking at accommodations with my doctors and
2    medication and stuff.
3            Q.      And it suggested you were kind
4    of concerned because you had sort of lost
5    track of Joren.  Mr. Hackman said, oh, he's
6    been in touch with me.
7            A.      Yes.
8            Q.      And then starting with, "hope
9    he's just tired or doing family stuff and
10   that's he's okay."
11                   My understanding is that's a
12   reference to Joren?
13           A.      Yes.  I did want to clarify,
14   the mention about a two-week vacation, I think
15   what I was saying is if I came back to the
16   company with a new job I might only be back
17   for a week or two.
18           Q.      Thank you.  Yes.  Okay.  Okay.
19           A.      But you said that I'm asking
20   about Joren, worried that he's not okay.
21   Yeah, that was about Joren.
22           Q.      Yes, that's what I thought.
23                   Okay.  Then is it your
24   recollection that the mediation occurred -- it

ASSATA ACEY

Page 191

```
 1   was September 19th, correct?
 2           A.      I believe so.
 3                        -  -  -
 4                   (Exhibit AA-43 was marked for
 5           identification.)
 6                        -  -  -
 7   BY MR. SCHAUER:
 8           Q.      I'm going to show you what's
 9   been marked as Exhibit AA-43.
10           A.      Yes.
11           Q.      This is taken -- I was going to
12   say to you, ask if you can confirm, but this
13   is taken again from the messages between you
14   and your grandmother I believe on
15   September 19th of 2022.
16           A.      I don't recall if this is the
17   date, but it looks like the message -- this
18   looks like a familiar message.  I think this
19   is the screen shot that I sent.  I don't know
20   if I sent it to my grandmother on my husband,
21   but -- yeah.
22           Q.      And at 3:32 p.m. on
23   September 19th, you're communicating with this
24   guy Greg Casee, who you worked previously,
```

ASSATA ACEY

Page 218

1     get through these.

2              A.       Yes.

3              Q.       This says, "excited utterance"

4     -- paragraph 11 -- "excited utterance from

5     myself to my supervisor about unwanted touch

6     from Mike Russell, who had tapped my shoulder

7     while grazing past me from behind in a

8     standard-size walkway."

9                       Do you see that?

10             A.       Yes.

11             Q.       And is that just what you are

12    describing?

13                      Did this Mike Russel walk past

14    you in a standard-size walkway and tap you on

15    your shoulder in addition to grazing past you?

16             A.       Yes.

17             Q.       And did he -- the grazing part,

18    did he brush up against you in some fashion or

19    did he nod and the only contact here was

20    tapping your shoulder?

21             A.       I believe he brushed across my

22    -- it's hard to describe that without using

23    physics, but the surface, the surface of my

24    form, he brushed across that.

ASSATA ACEY

Page 219

1          Q.      Okay.  And he was going past
2     you in a hallway?
3          A.      He wasn't going that far.  I
4     was like right in front of his desk.
5          Q.      Was he going past you in a
6     hallway?
7          A.      He was going past me, and I was
8     in the hallway, yes.
9          Q.      Okay.  And when you say
10    standard-size walkway, what is that to you or
11    did you ever measure that?  I'm just trying to
12    get a visual of what happened to you.
13         A.      I would guess about from that
14    metal post there to about here.
15         Q.      Okay.  That would be about 6
16    feet?
17         A.      Yep.
18         Q.      And then you -- what follows is
19    a dialogue of sorts between and you Joren
20    where you send information and Joren writes
21    back, correct?
22         A.      Yes.
23         Q.      And basically you said if it
24    happens again I will address it with Russell,

ASSATA ACEY

```
                                          Page 226

 1                           -   -   -

 2                 THE VIDEOGRAPHER:   The time is

 3          now 2:41 p.m.   We're going back on the

 4          video record.   This will begin media

 5          unit number four.

 6                 MR. SCHAUER:   Thank you.

 7    BY MR. SCHAUER:

 8          Q.    Ms. Acey, I'd like for you  to

 9    turn to page 17 of, please -- of Exhibit

10    AA-47, your third brief in response to Motion

11    to Dismiss.   Okay?

12          A.    Okay.

13          Q.    And there is a paragraph 3,

14    where you say -- this is July 7th, 2021 --

15    "excited utterance, present sense impression

16    and recorded recollection from myself to my

17    supervisor about negative and seemingly

18    derogatory comments from my coworkers."

19                 Do you see that?

20          A.    Yes.

21          Q.    All right.   And is this the

22    writing you say -- you mentioned earlier today

23    that you made to Joren about your coworkers

24    and what they're saying, the things they say?
```

ASSATA ACEY

Page 230

1    for."

2                    What was his job?

3           A.    I don't recall.  I just know he

4    worked in inventory.  It's in the evidence

5    somewhere, but, yeah.

6           Q.    He wasn't in assembly; is that

7    right?

8           A.    Right.  He was not in assembly.

9           Q.    He was not a technician or was

10   he?

11          A.    I don't think he was.

12          Q.    You don't know?  Okay.

13                And then in "c" there it says,

14   "Frank: "This is Assata.  She's a technician

15   with a" -- then you have it in bold -- Physics

16   degree.  She's doing better things,

17   introducing a new hire with a smile."

18                Do you see that?

19          A.    Yes.

20          Q.    And did that bother you?

21          A.    Yes.  He was making a big deal

22   to a stranger about my role and my degree

23   being at odds -- as though they were at odds

24   with each other, like I was some commodity,

ASSATA ACEY

Page 231

1 and it made me feel uncomfortable.  It's like

2 --

3          Q.     Well, how do you interpret him

4 then following up with, "she'll be doing

5 better things" -- that's not complimentary or

6 do you consider that to be somehow belittling

7 or --

8          A.     It made me uncomfortable.  I

9 don't think Frank was trying to belittle me.

10         Q.     Right.

11         A.     I mean, it just made it clear

12 he thought what I was doing -- there was

13 something better, and it made me feel like he

14 thought negatively of what I was doing and

15 like he thought I was a commodity for having

16 that role with a degree.

17         Q.     What's Frank's role?

18         A.     He was -- what was Frank?  He

19 was the manager of R & D.  He oversaw Stan

20 Gallagher, R & D, engineering.

21         Q.     On page 18, right above

22 paragraph 4, it appears that Joren responds to

23 you at 11:06:23, where he invites you to sit

24 down and discuss it with him.

ASSATA ACEY

Page 243

```
 1    comparing, when I took my aspirins, and even
 2    my teammates, former teammates, nobody had
 3    been -- complained, remembered being
 4    complained about by Diana for those small
 5    things she complained about me.
 6             Q.      Well, she checked with your
 7    boss; isn't that correct?
 8                     That's what she did; is that
 9    right?
10             A.      Yes.
11             Q.      Okay.  Does any of that show up
12    in your evaluation review?  Do you recall
13    being dinged for missing meetings?  No, you
14    didn't.  You weren't, were you?
15             A.      You know what I thought or I
16    recall.  I'm sorry, Attorney Schauer, I don't
17    think it's appropriate --
18             Q.      I'll strike the question.  I'll
19    strike the question.  It's getting long in the
20    day.  Okay.
21                     Okay.  Let's go to paragraph 14
22    on page 22.  Take a moment, if you would,
23    please, and kind of look through that.
24                     Is this a paragraph where you
```

ASSATA ACEY

Page 244

```
 1    address the concept that you felt you were
 2    being accused of stealing time?
 3            A.      I believe so.
 4            Q.      And is it my understanding,
 5    correct, that you appear to be 30 minutes --
 6    short 30 minutes of a 40-hour workweek in a
 7    particular week?
 8                    Is that correct?
 9            A.      Yes.
10            Q.      Well, we can look at the entry
11    at 10:34:47, where you communicate with Joren
12    saying, "I talked to Judy again.  She'd given
13    me the impression before that vacation
14    automatically prepopulates into gaps when it's
15    under 40 hours and that we're only supposed to
16    request vacation in four-hour increments."
17                    Do you see that?
18            A.      Yes.
19            Q.      Okay.  And so what did Judy
20    come to you and -- or it says Joren came to
21    you in the beginning and said Assata Acey,
22    39.5 hours last week.
23                    Is that right?  Do you see
24    that?
```

ASSATA ACEY

Page 245

1      A.      Attorney Schauer, it is Acey.

2      Q.      I'm sorry, Acey.

3      A.      And, yeah, he messaged to me on

4   Teams while I was out and about.  And I guess

5   according to this Judy came to me before I saw

6   his message.

7      Q.      But this is the series of

8   messages that relate to your belief that you

9   were accused of stealing time by Ms. Talis?

10      A.      Yes.

11      Q.      If you go to the very bottom of

12   the page, 10:56:44, where it says, "direct

13   reply to message, 10:55:47," which is up

14   above.

15               "So possibly implying time,

16   quote, theft, but that's not what she's saying

17   you should do and that's not what you are

18   doing."

19               Right?  Do you see that?

20      A.      Yes.

21      Q.      All right.  And then you

22   respond, correct?

23      A.      Yes.

24      Q.      Oh, fifteen on page 23 involves

ASSATA ACEY

Page 251

1   you wanted to at least let Joren know where

2   you stood, your thoughts.

3              Is that fair?

4        A.    Yes.  I mean, it's generally

5   saying if they don't have that role, I'm okay

6   with not being there, but I needed them to

7   know what I was seeking.

8        Q.    Okay.  Let's go to page 28,

9   paragraph 26.

10             Is this a report by you on a

11  conversation with Judy around February 10 of

12  2022?

13       A.    Yes.

14       Q.    It says, "Judy has decided to

15  make everyone redo diversity training and

16  plans to teach mustache man how to not risk

17  company lawsuit.  She may be reaching out to

18  you about Brian (I've explained that it's been

19  handled, etc., but she was clear she wanted

20  something easy to try)."

21             Do you see that?

22       A.    Yes.

23       Q.    And that's a result of the

24  conversation that you had with Judy Talis,

ASSATA ACEY

Page 252

```
 1    correct?
 2           A.     Yes.
 3           Q.     Okay.  You expressed concern
 4    around, I guess, what -- Ms. Talis recommended
 5    you might want to visit her gynecologist?
 6           A.     Her daughter's gynecologist.
 7           Q.     Her daughter's?  Okay.
 8                  And did you somehow believe
 9    that was an inappropriate suggestion on her
10    part?
11           A.     Absolutely.
12           Q.     And why was that?
13           A.     It was uncomfortable.  I didn't
14    want to see the same gynecologist of somebody
15    who would supervise me at work.  It would be a
16    weird cross of private information.
17                  Nor did I think I should be
18    exposed to her daughter's private information
19    as far as where she goes or what problems
20    she's had.
21                  And I also did not think it was
22    Judy's place to ask me about like feminine
23    health things that didn't involve work.  I
24    don't think feminine health things do involve
```

ASSATA ACEY

Page 253

1  work unless I brought them to her.

2          Q.      Do you think that Ms. Talis

3  made that recommendation for the purpose of

4  making you uncomfortable?

5          A.      No.  I think she overstepped

6  her bounds.

7          Q.      Do you think she was doing it

8  to somehow be of some assistance to you,

9  however misplaced her thinking might have been

10  in your mind?

11          A.      No.

12          Q.      You don't think she was trying

13  to be helpful?

14          A.      No.  She's the head of HR, and

15  a lot of women lie about whether they're

16  pregnant or not because of a belief that HR is

17  not trying to be helpful in pregnancy --

18          Q.      Well, I'm not talking about

19  many women.

20          A.      I know --

21          Q.      I'm talking about Ms. Talis,

22  and I'm talking about you.

23                  Do you believe that somehow she

24  was going to try and get information from you

ASSATA ACEY

Page 254

1   about you by the fact that you might use her

2   daughter's gynecologist?  That's your thought

3   process in part?

4          A.     No.  I believe she was trying

5   to get information from me and asking if I was

6   pregnant.

7          Q.     Okay.  Did she ever ask if you

8   were pregnant?

9          A.     She did.

10         Q.     Okay.  And when did that

11  happen?

12         A.     The same time of the comment

13  about her daughter's gynecologist.  I believe

14  it's disclosed in the same transcript.

15         Q.     Is that -- do you believe that

16  she was somehow doing that because of your

17  race or gender?

18         A.     Gender, yes.  I don't think she

19  would ask a man if he was pregnant.

20         Q.     I think you're probably right.

21  It says, as I read it here, "she barely

22  stopped herself from asking if I was pregnant

23  after the implicitly now obligatory

24  explanation of hormonal nausea."

ASSATA ACEY

Page 255

```
 1                    Do you see that?
 2         A.     Yes.
 3         Q.     What do you mean by she barely
 4  stopped herself from asking if I was pregnant?
 5         A.     She got the words out before
 6  she changed the sentence.
 7         Q.     So that's what you're referring
 8  to as asking you if she [sic] was pregnant?
 9         A.     Yes.
10         Q.     Okay.  We're going to skip to
11  page 42.
12                Do you see -- look at paragraph
13  17 at the bottom of page 42.
14         A.     Okay.
15         Q.     April, 1, 2022.  "Excited
16  utterance.  Present sense impression to" Joren
17  "about Rosenberg's opposition to the team's
18  newly-purchase lift and inappropriate
19  statement."
20                Do you see that?
21         A.     Yes.
22         Q.     Okay.  So let's go to page 43
23  at the top.
24                There's an entry next to
```

Page 256

```
 1   11:26:32, correct?
 2           A.     Yes.
 3           Q.     "Rob" -- you're saying that Rob
 4   said, quote, "brand new one, to make the bitch
 5   happy," end quote.
 6                  Do you see that?
 7           A.     Yes.
 8           Q.     Then there's an asterisk, "says
 9   something else (that I can't quite parse
10   without making up words)."
11                  So what was Rob referring to,
12   if you know, when he said first, "the brand
13   new one"?
14                  Is that the lift?
15           A.     Yes.
16           Q.     And do you know who he was
17   referring to when he said "to make the bitch
18   happy"?
19           A.     Me.
20           Q.     And he said this to you or in
21   front of you?
22           A.     He said it in front of me.
23           Q.     Okay.  Did you say anything to
24   him?
```

# EXHIBIT 3

Page 1

1            IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2                            - - -

    ASSATA ACEY,                 :

3                                :

              Plaintiff,   :NO.  2:23-cv-01438-GEKP

4                                :

          vs.                    :

5                                :

    INDUCTEV,                     :

6                                :

          Defendant.       :

7                            - - -

8               Wednesday, March 27, 2024

9                            - - -

10          Virtual deposition of JACQUELINE ACEY,

11     taken pursuant to notice in TAMPA, FLORIDA,

12     beginning at 1:42 p.m., before Alicia Fortin, a

13     Professional Reporter and a Notary Public in and

14     for the Commonwealth of Pennsylvania.

15                           - - -

16

17

18

19

20

21

22

23

24     Job No. CS6605046

JACQUELINE ACEY

1      Q.      Does anybody else live with you?

2      A.      No.

3      Q.      What's your son's name?

4      A.      Chidozie (ph.).

5      Q.      The plaintiff in this case, Assata

6   Acey, is your granddaughter, correct?

7      A.      That's right.

8      Q.      And at some point, you attended a

9   mediation with her; right?

10      A.      That's true, yes.

11      Q.      I want to talk about that mediation

12   process.  I'm going to introduce what I'll call

13   Exhibit-A and I'm going to share my screen.

14                        -   -   -

15              (Whereupon, the document was

16         marked for identification purposes as

17         Exhibit A.)

18                        -   -   -

19   BY MR. LONGO:

20      Q.      Can you see my screen, Ms. Acey?

21      A.      Barely, yes.

22      Q.      Does that help?

23      A.      Yes.

24      Q.      As I said before, I'd like to mark

JACQUELINE ACEY

Page 14

1    existing claims in return for a settlement of

2    50,000 from Momentum, not withstanding the rest of

3    this e-mail?

4           A.        There was a verbal agreement that

5    she would resign and dismiss existing claims in

6    return for a settlement amount of 50,000 dollars

7    from dyn -- Momentum Dynamics, Corporation, but

8    the agreement was never received and never

9    executed.

10          Q.        When you say received, what do you

11   mean?

12          A.        She never received a written

13   agreement from Momentum Dynamics and she was

14   dismissed regardless even though the agreement was

15   never executed.

16          Q.        But she verbally agreed to resign,

17   right?

18          A.        She agreed to an agreement, in

19   which, she would resign and dismiss the existing

20   claims in return for a settlement amount of 50,000

21   dollars from Momentum Dynamics, Corporation and

22   she would have to receive the written agreement

23   and sign it.

24                    It should be executed.   It was

JACQUELINE ACEY

Page 16

1    provide Momentum with the said resignation letter

2    on or before September 23rd, 2022; therefore,

3    Momentum has accepted your resignation as of that

4    date.

5              Did I read that correctly?

6         A.        You read it correctly, but the

7    statement is incorrect.

8         Q.        How is the statement incorrect?

9         A.        The statement is incorrect because

10   she did not agree to resign effective

11   immediately.  She agreed to resign based upon

12   receiving the agreement from Momentum which she

13   would execute.

14             And at that point, she would --

15   inside the agreement, it should say that she would

16   resign and receive the 50,000 dollars, but she

17   never received that agreement from Momentum which

18   she could sign as far as I know.

19        Q.        Moving on to this next paragraph,

20   it reads, additionally, you agreed to provide

21   Momentum with a verification form from a medical

22   provider on or about -- on or before September

23   23rd, 2022 returning you to work on full duty with

24   or without restrictions.

JACQUELINE ACEY

Page 69

1    lot of things that have to do with race.

2                    If you want me to mention them one

3    by one, I would have to go through the documents

4    and tell you what they are.  Because I wasn't

5    there, but I did read her documents.

6         Q.      Did Plaintiff explicitly say there

7    was racism in the workplace before she filed

8    anything in this case?

9         A.      I don't know.

10        Q.      And you would agree with me, the

11   four things that we talked about, the four things

12   we mentioned earlier, being chased around, cell

13   phone process, time off, from what you testified

14   about Plaintiff's interaction with Judy, there's

15   no mention of racism in any of those discussions

16   between us?

17        A.      I don't know.  I'd have to look at

18   her documents and I could underline each one and

19   then get back to you.

20        Q.      Okay --

21        A.      Other than that, I -- no.  When I

22   read them, a lot of things that happen to her, I

23   didn't even know was happening to her until I read

24   the document.

JACQUELINE ACEY

Page 71

1          A.        It's clear.

2          Q.        Let's walk through the items listed

3     under 1.  Did Plaintiff ever talk to you about her

4     claim that she was not promoted to the role of

5     senior technician due to race?

6          A.        I believe she did.

7          Q.        Do you remember the details of that

8     conversation --

9          A.        No, I don't.

10          Q.        Do you remember when she told you

11     about that?

12          A.        No, I don't.

13          Q.        Do you remember her telling you

14     that she was harassed on the basis of race?

15          A.        Yes.

16          Q.        Do you remember the details of --

17          A.        No.

18          Q.        Do you remember when that

19     conversation occurred?

20          A.        No.

21          Q.        Do you remember how that

22     conversation occurred?

23          A.        No.

24          Q.        Is there anything you could look at

# EXHIBIT 4

# In The Matter Of:

*Acey vs.*
*Induct EV*

---

*Patti Rensel*
*March 28, 2024*

---

*Media Court Reporting*
*211 North Olive Street, Suite 210*
*Media, PA   19063*
*610.566.0805*
*www.mediacourtreporting.com*

Original File 032824PR.txt
Min-U-Script® with Word Index

```
 1                    THE WITNESS:   I can't answer --
 2          can you rephrase that question.
 3                    MS. ACEY:   Sure.
 4   BY MS. ACEY:
 5   Q.      Has anyone spoken to you about my
 6   employment with the defendant outside of
 7   counsel?
 8   A.      I can't answer that question the way
 9   it's being asked.  Can you rephrase it for me?
10   Q.      Do you recall hearing anything about my
11   employment with the defendant?
12   A.      No.
13   Q.      Do you recall discussing my complaint
14   with employees of the defendant?
15   A.      No.
16   Q.      Do you recall discussing my complaint
17   with Diana Wilmes?
18                    MR. SCHAUER:   Are you referring
19          to the complaint filed in this case
20          because --
21                    MS. ACEY:   I understand.
22          That's a reasonable question.
23   BY MS. ACEY:
24   Q.      Do you recall discussing the claims of
```

```
 1   my EEOC Complaint with Diana Wilmes?
 2   A.     I don't -- it's very difficult to
 3   answer your question because it's so broad.
 4   Could you be more specific?
 5   Q.     Do you recall initiating or
 6   participating in any conversations about the
 7   allegation of my EEOC Complaint?
 8   A.     I don't recall specific conversations
 9   about the EEOC Complaint.
10   Q.     Thank you.  Did you attend the
11   mediation on behalf of the defendant?
12   A.     I attended mediation.
13   Q.     Did you attend medication on behalf of
14   the defendant to settle my EEOC Complaint?
15   A.     I don't know.  I don't know if that's
16   what it's considered, so I don't know how to
17   answer that question.
18   Q.     Okay.  To your knowledge, what was the
19   medication for?
20   A.     I believe you requested the mediation.
21   Q.     To your knowledge, what was the
22   defendant's goal in attending the mediation?
23   A.     I don't recall.
24   Q.     During mediation, do you recall hearing
```

```
 1   me at any time stating an agreement of any
 2   kind?  Actually, strike that.
 3           Do you recall any verbal agreement
 4   being entered during mediation?
 5   A.      Yes.
 6   Q.      What is the verbal agreement that you
 7   recall from mediation?
 8   A.      You were asked to resign from
 9   employment in exchange for compensation.
10   Q.      Do you recall who was relaying this
11   agreement, who was speaking about the details
12   of this agreement to me during mediation?
13   A.      I don't recall.  It was not me.
14   Q.      Do you recall any of the attorneys
15   present with you, May Mon Post or Alexa
16   Heisler, stating the details of this agreement
17   to me during the mediation?
18                   MR. SCHAUER:  Are you asking
19           about the agreement that the witness
20           just testified to?
21                   MS. ACEY:  Yes.
22                   MR. SCHAUER:  Thank you.
23           Sorry.
24                   THE WITNESS:  As I stated, I
```

# EXHIBIT 5

Page 1

1              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2                    CASE NO. 2:23-cv-01438

3

4     ASSATA ACEY,                      ) REMOTE
                      Plaintiff(s),     ) DEPOSITION OF:
5                                       )
          v.                            ) OMAR JACKSON
6                                       )
      INDUCTEV,                         )
7                     Defendant(s).     )
      _____  )

8

9

10              TRANSCRIPT of the stenographic notes of
11    the remote proceedings in the above-entitled matter,
12    as taken by and before , a Certified
13    Court Reporter and Notary Public of the State of New
14    Jersey, held via video conference, on Wednesday,
15    April 3, 2024, commencing at 12:05 p.m.
16
17
18
19
20
21
22
23
24
25       Job No. CS6630993

Page 33

1   or even farther than that from where I lived at.

2        Q.    Okay.  But it had nothing to do with a

3   dispute at work?

4        A.    Oh, no.  I had no dispute at work.

5   Honestly, I -- I don't -- I shouldn't get into that

6   part.  I shouldn't get into that part.

7        Q.    What do you mean?

8        A.    The company -- I feel like the company

9   saved my life; you know, because they gave me a job

10  when I was down, when my wife was down.  I was

11  depressed at that time at the job.  So that's why I

12  had my headphones on.  That's why I stayed to myself.

13            That's why I just came and I did my

14  work.  So I came five o'clock in the morning, opened

15  the shop up.  They trusted me enough to give me the

16  key to open the shop.  Everybody had the key, but I

17  turned the alarms and stuff off.

18            You know, that company helped me, so

19  that's how I feel about the company.  Whether they

20  was going in a different direction -- I just didn't

21  see my family being able to eat later.  That's how I

22  felt, so I had to find a new job.

23        Q.    Understood.

24            Purely business decisions?

25        A.    That's all.  That's all.  It was a

Page 38

1          A.      I'm sorry.

2          Q.      What is it about what you saw with

3    respect to Ms. Acey's behavior that led you to

4    believe that she was uncomfortable?

5          A.      Because she -- I guess the way she sat

6    inside the -- the cabinet one day.  And she was just

7    in there, and she wouldn't say anything.

8                  I went and ask her how she was doing.

9    She ignore me.  She would always say something, but

10   that day she didn't.  All I know whether she had

11   problems -- I mean, Joren was the guy that she would

12   talk to.

13                 And so like, you know, I try to stay out

14   of things, so I never even asked.  And, you know,

15   just didn't ask.

16         Q.      Okay.  She -- you have no -- you have no

17   sense of why she would have been

18   uncomfortable; right?

19         A.      No.  Nope.

20         Q.      Did you ever hear anything that you

21   understood to be racial animus directed toward Ms.

22   Acey?

23         A.      I don't know any of that.  No.

24         Q.      During your time at InductEV, did you

25   ever hear anything that you understood to be racial

Omar Jackson - by Mr. Longo

Page 46

1   during that conversation?

2        A.      I may have said something like that.

3   Honestly, in me being angry, I probably said, if I

4   was a white guy, I probably would have had this

5   already, honestly.

6              But when I -- when I talk to myself, and

7   I said Seth is in the same position, and he's a white

8   guy.  He's been here longer than me.  He doesn't have

9   it.  So I had to nullify everything that I said.  I

10  know I said it, sitting here talking about it.  I

11  know those type of words came out of my mouth.

12             I don't even know if Seth was around.

13  It might have been just me and Assata.  I almost

14  think there was a third person there, because I was

15  so upset when we was talking.  She said -- I think

16  she was saying you do deserve it.  That's what she

17  was saying, you do deserve it.

18        Q.    Who was saying that?

19        A.    Assata, she was saying that.

20             But at that time, you know, Seth was

21  working the same thing, so how can I say that and

22  feel like, you know.  I had to step back and

23  understand where I was at, and like where he was at

24  at the same time.  I dropped that.

25             When I did go in there and talk to Joren

Omar Jackson - by Mr. Longo

Page 47

1    about my raise, I was like, What about Seth?  And I

2    didn't know Seth was gonna get it either.  But one

3    day Seth came out the office and said, I got

4    promoted.  I said, Well, you deserved it, Seth.

5             But I know -- I know I said those words.

6    It was race coming out of my mouth.  It was.  And I

7    felt like at that point, man, I don't know.  I was

8    speaking out of anger.  I know I was.

9        Q.    You don't -- you don't stand behind

10   those words today; right?

11       A.    No.  No.  No.  I don't.  No.  I don't.

12             That's why I say I step back, actually,

13   stepped back, and talked to my daughters.

14             You know, everything I go through -- I

15   only have my kids.  I only have them.  So I come

16   home.  I talk to them.  And, you know, we rationalize

17   things out.  And that's how I -- you know, I try to

18   be a level guy.  You know what I mean.

19             Everything is fair across the board, so,

20   you know, even in my job experience today, how did I,

21   you know, in a predominantly white steel mill right

22   now, I go in and get what I get and get promoted just

23   like I got.  So, no, I don't think that.  So, no.

24       Q.    Understood.

25             Do you remember Ms. Acey discussing race

Page 48

1    with you during that conversation?

2          A.    I can't remember what she said.  I know

3    what I said.  I was -- I dominated that conversation.

4    I don't know if she did say anything.  I don't recall

5    what she said.

6          Q.    Okay.  Let's take a five to six minute

7    break.  Let's resume the deposition at 1:15.  Okay?

8                MS. ACEY:  I want to remind you that I

9    do need to pause at 1:45 to get my son from school.

10               MR. LONGO:  Yeah.  You said you'll be

11   about ten minutes?

12               MS. ACEY:  Yes.

13               MR. LONGO:  That's fine.  Let's come

14   back at 1:15, please.

15               (Discussion held off the record.)

16               (Whereupon a short break was taken.)

17         Q.    Okay.  We are back on the record.

18               Mr. Jackson, during your time working

19   with Ms. Acey, did Ms. Acey ever indicate to you that

20   she could do her -- could do certain jobs better than

21   other InductEV employees?

22         A.    No.  Not that I can recall.  No.

23         Q.    Did you ever get the impression that Ms.

24   Acey believed that she was smarter than other

25   InductEV employees?

Omar Jackson - by Mr. Longo

Page 50

```
 1    time while at InductEV?
 2          A.     No.
 3          Q.     Did Ms. Acey ever talk to you about
 4    being asked whether she was pregnant?
 5          A.     No.
 6          Q.     Did Ms. Acey ever talk to you about
 7    being told to see a gynecologist?
 8          A.     Can you repeat the question?  I'm sorry.
 9          Q.     Sure.
10                 Did Ms. Acey ever speak to you about
11    being told that she should see a gynecologist?
12          A.     No.
13          Q.     Did Ms. Acey ever talk to you about
14    being compared to chocolate ice cream?
15          A.     No.
16          Q.     Had you ever heard that before?
17          A.     No.
18          Q.     Did Ms. Acey ever talk to you about
19    being told she was from the wrong side of the tracks?
20          A.     No.
21          Q.     Did you ever hear about an issue
22    involving a comment like that at work?
23          A.     No.
24          Q.     Did Ms. Acey ever talk to you about her
25    issues with the cell phone reimbursement process?
```

Omar Jackson - by Mr. Longo

Page 54

1          Q.    Mr. Jackson, you were identified by Ms.
2     Acey as someone with knowledge of the facts relating
3     to this case.
4               Do you have any idea why that is?
5          A.    No.
6          Q.    At this point, I'd like to share my
7     screen.  And I'm gonna mark one of the -- known as
8     Exhibit-A.  I'll go ahead and share my screen.   Bear
9     with me.
10              Can you see my screen?
11         A.    Yes.
12         Q.    Marking this as Exhibit-1.
13              Mr. Jackson, these are written
14    interrogatories exchanged between the parties in this
15    case.  And this case is the defendant InductEV and
16    the plaintiff Ms. Acey.
17              I'd like to direct your attention to
18    this first paragraph.  Can you see my curser?
19         A.    Yes.  I can.
20         Q.    I'll go ahead and read this paragraph.
21              Identify all persons who have knowledge
22    of the facts and circumstances relating to the claims
23    or defenses in this action and include a brief
24    description of their knowledge.  Please include any
25    and all witnesses to the alleged discriminatory

Omar Jackson - by Mr. Longo

Page 55

1    and/or retaliatory acts by defendant.

2                Did I read that correctly?

3         A.    Yes, you did.

4         Q.    Did you ever talk to Ms. Acey about

5    these interrogatories?

6         A.    I can't recall.  Is that Steve Brown?

7    Who is Steve Brown?  I don't even know him.

8                I can't recall somebody saying I was

9    lazy, in other words being lazy.

10        Q.    We're gonna walk through this.

11        A.    Okay.  I'm sorry.  I'm sorry.  I went

12   ahead.

13        Q.    That's okay.

14               Just in general have you ever seen these

15   interrogatories before?

16        A.    No.

17        Q.    Did Ms. Acey ever contact you to discuss

18   these interrogatories?

19        A.    No.

20        Q.    Okay.  Did you talk to plaintiff about

21   this deposition by the way?

22        A.    No.

23        Q.    Or Ms. Acey rather.  Excuse me.  Okay.

24               I'm gonna scroll down here to where you

25   were identified as a person with knowledge of the

Page 56

1    facts in this case.  Okay?

2          A.    Uh-huh.

3          Q.    You see this paragraph here?

4          A.    Yes.  I do.

5          Q.    Omar Jackson?

6          A.    Uh-huh.

7          Q.    I'm gonna go ahead and read this.

8                Omar Jackson.  First and only promoted

9    black employee in defendant's history.  Originally

10   denied senior title due to employment gap.

11               Do you know what Ms. Acey is referring

12   to here when she says, "employment gap?"

13         A.    No.

14         Q.    Okay.  Do you have any idea why she said

15   that?

16         A.    No.  There was no employment gap.

17   Explain that to me.

18         Q.    I'm not aware of what Ms. Acey means

19   here.  I'm gonna go ahead and read the next sentence.

20               Also experienced scrutiny from HR and

21   comments from co-workers.

22               You have any idea why Ms. Acey would

23   have said that?

24         A.    No.  I don't.

25         Q.    Do you agree with this statement that

Omar Jackson - by Mr. Longo

Page 57

1    you experienced scrutiny from HR and comments from

2    co-workers?

3         A.    No.

4         Q.    Is it fair to say that that statement is

5    not accurate?  What was that?

6         A.    It is not.

7         Q.    Not accurate?

8         A.    No.

9         Q.    Okay.  The next sentence reads:  Present

10   for a great deal of criticism I received from Rob

11   Rosenberg and other co-workers.

12              Were you ever present for a great deal

13   of criticism Ms. Acey received?

14        A.    In the meeting, Rob would say things

15   like -- I can't say -- he was -- he didn't think she

16   was getting the work done fast enough.  And he

17   would -- he would state his opinion inside these

18   meetings.

19              On the floor, Rob would never say

20   anything to me or Assata, no.  Everything was said in

21   the meetings that I witnessed.

22        Q.    So who was Rob Rosenberg, by the way?

23        A.    He was a senior technician.  He was the

24   first -- he was the senior technician, a part of our

25   team.

Omar Jackson - by Mr. Longo

Page 58

1          Q.      And he would have had a -- have known
2     whether Ms. Acey was completing the work in a timely
3     manner?
4          A.      Yes.   I mean -- yes.   Yes.   Yes; 'cause
5     he -- he was there every day.   Yes.
6          Q.      Okay.   So the criticism that Ms. Acey is
7     referring to here, she's referring to meetings within
8     the company where you would discuss job performance;
9     fair?
10         A.      That's the one time I heard Rob say
11    anything about her, yes.
12         Q.      Did you ever hear Rob say anything
13    related to race?
14         A.      Not in front of me.   No.
15         Q.      Did you ever take anything Mr. Rosenberg
16    said to be based on race?
17         A.      I can't -- no.   I can't recall.   No.
18         Q.      Okay.   Did you have any reason to think
19    that Rob Rosenberg had any racial animus toward
20    anybody in the company?
21         A.      He didn't have it with me.   That's for
22    sure.   No.
23         Q.      So it's fair to say you had no reason to
24    believe Rob had any type of racial animus toward
25    anyone in the company?

Omar Jackson - by Mr. Longo

Page 59

1          A.      Not me.  No.

2          Q.      The next sentence reads.  First/only

3     employee to tell me of suspected racial differences

4     in pay.

5               Do you know what Ms. Acey is referring

6     to here?

7          A.      When I had that argument, and I was

8     frustrated about my pay and about how I thought.

9     That's the only thing I can think of.  That's it,

10    what I testified about earlier.

11         Q.      Let me ask you this:  Is this line here

12    that you were the first and only employee to tell Ms.

13    Acey of suspected racial differences in pay, is that

14    an accurate representation of what you had talked

15    about with Ms. Acey that day?

16         A.      No.

17         Q.      How is it inaccurate?

18         A.      First and only employee -- I never

19    really looked at -- I just looked at me at that time

20    as far as my pay.  Yeah.  I -- wow.  That was out of

21    context.  That's why I don't really say -- wow.

22         Q.      Just to confirm, you don't think this is

23    an accurate representation of what you said regarding

24    your pay; is that right?

25         A.      Right.  I mean I thought at that time I

Omar Jackson - by Mr. Longo

Page 60

1    was upset.  No; because they gave me raises.  No.  I
2    don't think so.
3          Q.    How long after you complained of your
4    pay did they increase your pay?
5          A.    Probably couple months.
6          Q.    Okay.  Were you satisfied with your pay
7    increase?
8          A.    Yes.  I was.
9          Q.    Were you satisfied with your subsequent
10   promotion?
11         A.    Yes.  I was.
12         Q.    Okay.  The next sentence -- let me back
13   up.
14               You're not aware of any racial
15   differences in pay at InductEV; are you?
16         A.    I wasn't.  No.
17         Q.    The next sentence reads:  Knowledge of
18   my work on the UV project.  Is that the project you
19   referred to earlier?
20         A.    Correct.
21         Q.    Okay.  What about Ms. Acey's work on the
22   project do you recall?
23         A.    I know she had -- she was -- Joren put
24   her in a big position.  She was -- her cabinets had
25   to go downstairs.  She built them.

Omar Jackson - by Mr. Longo

Page 63

1    scrutiny based on race; would you?

2        A.    No.

3        Q.    Okay.  With respect to Ms. Acey's

4    comment about coworkers, did you ever experience any

5    comments from coworkers that made you -- strike that.

6             Did you ever experience any comments

7    from co-workers that you thought were inappropriate?

8        A.    No.

9        Q.    Did you ever experience any comments

10   from co-workers that you viewed as comments based on

11   racial animus?

12       A.    No.

13       Q.    Are you able to describe how Ms. Acey

14   was perceived by her co-workers?

15       A.    They thought she didn't do her job.

16   That's what they thought.

17       Q.    Do you know why they thought that?

18       A.    No; because Joren thought she was doing

19   okay.  That's -- you know, I always take off what

20   Joren would say.  Joren thought she was doing her

21   job, so I always did my job.  You know, I didn't mind

22   what other people were doing.  I mind what I was

23   doing.

24             Joren said she was okay.  Joren said she

25   was okay.  Some people thought she wasn't doing her

Page 67

1    this paragraph of the interrogatories?

2         A.    No.  I don't remember none of that.  I

3    wouldn't even put myself in part of no conversation.

4         Q.    Understood.  Okay.

5               I'll scroll down a little bit to Jorge

6    Rive.  Do you see this paragraph here beginning with

7    Jorge Rive?

8         A.    Yes.

9         Q.    Jorge Rive, witness to some off-color

10   statements and jokes related to sex or race made by

11   Sam during some lunches, and occasionally heard these

12   statements when Sam would visit my work desk.

13              I'll stop there.  Do you know who Jorge

14   Rive is?

15        A.    Yes.  I do.

16        Q.    Did you ever witness any off-color

17   statements or jokes he made?

18        A.    No.

19              MS. ACEY:  I would like to interject.

20   His name is pronounced Jorge.

21              THE WITNESS:  Yeah.  I just remember how

22   it was spelled.

23              MR. LONGO:  Thank you, Ms. Acey, for

24   pointing that out.

25        Q.    With respect to Jorge, you had no reason

Omar Jackson - by Mr. Longo

Page 70

```
 1    Bear with me.  I'm just gonna scroll down in the
 2    complaint.
 3               I want to direct your attention to
 4    paragraph 120 of the complaint.  Okay.
 5               I'm gonna go ahead and jump around here.
 6    Stop me if I lose you.  I'll start with paragraph
 7    120.
 8               It reads:  As a black employee, I
 9    experienced ongoing and pervasive racial harassment
10    as a condition of my employment at defendant.
11               Mr. Jackson, do you have any
12    understanding of what Ms. Acey is referring to in
13    that paragraph?
14         A.    I know what it means, but I didn't
15    witness any of it.  No.
16         Q.    Okay.  I'll scroll down.  Paragraph 123
17    here.
18               Do you see this?
19         A.    Yes.
20         Q.    I'm gonna go ahead and read this
21    paragraph in its entirety, including the subparts.
22               The racial basis of these experiences is
23    informed by circumstantial evidence and prevailing
24    racial stereotypes.
25               Let me stop there.  Are you aware of any
```

Omar Jackson - by Mr. Longo

Page 71

1    racial stereotypes that existed at InductEV?

2           A.    No.

3           Q.    Is that no?

4           A.    No.

5           Q.    Okay.  Right here, subpart A.

6    Harassment described in paragraph 121 was based on

7    adopted racial stereotypes of black people being lazy

8    or untrustworthy.

9                 You testified minutes ago you're not

10   aware of any racial stereotypes at InductEV.  Are you

11   aware of any racial stereotypes at InductEV with

12   respect to plaintiff's allegation here that black

13   people are lazy or untrustworthy?

14          A.    No.  No.  Go ahead.  Go ahead.

15          Q.    Black employees such, as me, Ms. Acey,

16   Omar Jackson, and Julian Jackson, were each

17   criticized as lazy on occasions where the reasoning

18   or veracity was inaccurate or disproportionate.

19                I want to stop there and direct your

20   attention to you were described -- not described.

21   Strike that.  Criticized as lazy on occasions.

22                Were you ever criticized as lazy,

23   Mr. Jackson?

24          A.    Nobody ever told me that.

25          Q.    Okay.  So you're not aware of what

Omar Jackson - by Mr. Longo

Page 72

1    plaintiff is referring to here when she says that you

2    were being criticized as lazy?

3         A.    No.  I know I wasn't.

4         Q.    Okay.  So it's fair to say you have no

5    idea what plaintiff is talking about in this

6    paragraph; right?

7         A.    No.

8         Q.    No.  You have no idea what plaintiff is

9    talking about or --

10        A.    No.  Nobody said that to my face.

11   That's what I'm saying.  No.  I don't know what she's

12   talking about.  No.

13        Q.    Do you have a single example of where

14   you felt you were criticized at InductEV due to race?

15        A.    No.

16        Q.    Did you ever witness any employee at

17   InductEV be criticized for being lazy?

18        A.    Yeah.  Julian -- they was saying he was

19   lazy; he wasn't moving fast enough.

20        Q.    So I understand your testimony, you

21   witnessed Julian be criticized as lazy?

22        A.    Yes.

23        Q.    How did you witness that?  Did you hear

24   it?

25        A.    Yes, I did.

Page 73

1      Q.      Do you recall who said that?

2      A.      Trying to think about who would have

3   said that.  I know it was said, though.

4      Q.      At the time --

5      A.      I don't remember who said it; but I know

6   it was said.  I remember it being like, you know,

7   when you hear it, and then you see it.  Yeah.  It's

8   like, okay, he just takes his time.

9      Q.      At the time you heard that, did you

10  think the criticism had anything to do with race?

11     A.      No.

12     Q.      Did you have any reason to think it had

13  anything to do with race?

14     A.      No.

15     Q.      Okay.  Did you ever witness anything

16  that you would describe in your own words as where

17  you would take to be harassment at InductEV?

18     A.      No.

19     Q.      I'm gonna scroll down.  Okay.

20             I'm going to direct your attention to

21  paragraph 148.  Do you see that?

22     A.      Yes.

23     Q.      I'm going to read this paragraph.

24             Omar Jackson is a former black male

25  coworker who at the time held 20 years of experience

Omar Jackson - by Mr. Longo

Page 75

1    raise, yeah.  I told you that from the door.  I told
2    you that I should have got that when I came through
3    the door.
4         Q.    Understood.
5               But you didn't think that you were not
6    getting any raise; right?
7         A.    No.  I thought they were dragging their
8    feet.
9         Q.    Now, when Ms. Acey refers to
10   controversy, do you know what she's referring to?
11        A.    There was no controversy whether I was
12   gonna be a senior tech or not.  It was just when they
13   was gonna pay me.
14        Q.    So you're not aware of any controversy?
15        A.    No, because I talked to Joren
16   extensively about it.  He saw me working on it.
17        Q.    You testified earlier, in your view, you
18   were promoted because of your extensive experience;
19   right?  Because you work hard; right?
20        A.    Correct.
21        Q.    You made that clear to InductEV during
22   your time working for InductEV; right?
23        A.    Yup.
24        Q.    And in fact, InductEV recognized that
25   and gave you a raise?

Omar Jackson - by Mr. Longo

Page 76

```
 1          A.     Correct.
 2          Q.     And InductEV promoted you; right?
 3          A.     Correct.
 4          Q.     So is it fair to say you disagree that
 5     you were only promoted after a controversy?
 6          A.     Yes.
 7          Q.     Okay.  Let's scroll down to paragraph
 8     151.
 9                 This paragraph reads:  To my knowledge,
10     Omar has been the only internally promoted
11     reclassified black employee in the company's 12 year
12     history.
13                 I think you testified earlier you don't
14     know whether that is the case; do you?
15          A.     I don't.
16          Q.     Do you have any idea why Ms. Acey would
17     have said that?
18          A.     Like three of us was there when she was
19     there.
20          Q.     You don't know whether that statement is
21     accurate?
22          A.     I don't.
23          Q.     Okay.  I direct your attention to
24     paragraph 156.
25                 This paragraph reads:  Further, Omar's
```

Omar Jackson - by Mr. Longo

Page 77

1    initial classification as a product introduction
2    technician instead of a senior technician lends
3    additional circumstantial evidence to, A.
4    Defendant's ongoing practice of limiting employees on
5    the basis of their race.
6                I'm going to stop there.  Are you aware
7    that InductEV has any practice of limiting employees
8    on the basis of their race?
9         A.    No.
10        Q.    Okay.  Do you have any sense why you
11   were initially hired as a product technician?
12                Actually, let me back up.
13                When you applied for your position at
14   InductEV, what position did you apply for?
15        A.    The technician job, the entry job.
16        Q.    You applied for the product introduction
17   technician?
18        A.    Correct.
19        Q.    Okay.  So when you got that job, it was
20   of no surprise to you, because you had in fact
21   applied for it; correct?
22        A.    Correct.
23        Q.    When you were subsequently promoted to
24   senior technician, would you agree with me it was at
25   that point you had shown the company that you were

Omar Jackson - by Mr. Longo

Page 78

1    qualified for that position?

2          A.    Yes.

3          Q.    You kind of touched on this earlier.

4    But are you aware of any patterns of racial bias at

5    InductEV?

6          A.    No.

7          Q.    How about patterns of bias based on

8    gender?

9          A.    No.

10         Q.    How about patterns of bias based on sex?

11         A.    No.

12         Q.    I'm gonna stop sharing my screen.  Okay.

13               Mr. Jackson, you received a copy of a

14    subpoena with respect to this case; right?

15         A.    Correct.

16         Q.    I'm gonna go ahead and mark it at this

17    point, or introduce what I will call Exhibit-C.

18               I'm gonna go ahead and share my screen

19    again.  Mr. Jackson, can you see my screen?

20         A.    Yes.

21         Q.    Okay.  Again, I'd like to mark this as

22    Exhibit-C.  This is the exhibit that was attached to

23    the subpoena you received.

24               Mr. Jackson, does this exhibit look

25    familiar to you?

Omar Jackson - by Mr. Longo

Page 81

1  harassed based on race?

2       A.    I don't.

3       Q.    You don't have any, or you don't know?

4       A.    I don't have any.

5       Q.    Okay.  Do you know whether you have any

6  documents relating to her claim that she was harassed

7  on the basis of sex?

8       A.    I don't have any.

9       Q.    How about documents relating to

10 accusations of stealing time?

11      A.    I don't have any.

12      Q.    How about documents relating to whether

13 she was asked if she were pregnant?

14      A.    No.  I don't have any.

15      Q.    How about whether she was recommended to

16 see a gynecologist?

17      A.    Nope.  Don't have any.

18      Q.    How about her claim that she was

19 harassed during the cell phone reimbursement process?

20      A.    I don't have any documents.  No.

21      Q.    How about her claim that she was

22 compared to chocolate ice cream?

23      A.    No.  I don't.

24      Q.    How about her claim that she and other

25 black employees were subject to unfair criticism

Omar Jackson - by Mr. Longo

Page 82

1   based on racial stereotypes?

2        A.    No.  I don't.

3        Q.    Bear with me a minute.  I'm just gonna

4   review my notes.  I'll stop sharing my screen, as

5   well.

6              You testified earlier that Seth -- did

7   you testify that he received -- did not receive the

8   position for senior tech?

9        A.    Yeah.  Not until I got it.

10       Q.    Okay.  Not until you received it?

11       A.    Right.

12       Q.    Okay.  And forgive me if you testified

13  to this already.  But is Seth Caucasian?

14       A.    Yes.

15       Q.    Okay.  Mr. Jackson, is it fair to say

16  that you have no reason to believe that InductEV made

17  decisions based on race?

18       A.    No.  I don't believe that.  No.

19       Q.    You don't believe that?

20       A.    No.

21       Q.    Give me a one-minute break.  I want to

22  review my notes.  I might be finished.

23             Mr. Jackson, are you able -- would you

24  be able to locate those communications you referenced

25  earlier, the emails, the LinkedIn messages?

Page 86

1        Q.       Okay.  You didn't print out the
2    things that Ms. Acey sent over to you?
3        A.       No.  Yeah, to be clear, I had
4    looked at them the day she had sent it or maybe a
5    couple days after and kind of just left it at that
6    so, yeah, honestly, I didn't follow up with her or
7    ask about it.  I just kind of reviewed it and
8    tried to move on.
9        Q.       Okay.  With respect to the
10   documents yesterday -- strike that.
11               With respect to the documents
12   Ms. Acey sent to you --
13       A.       Uh-hmm.
14       Q.       -- what's your understanding of
15   Ms. Acey's claims based on sexual harassment from
16   those documents?
17       A.       I honestly don't remember.  Sorry.
18       Q.       Do you have any understanding of
19   what her claims are based on sexual harassment?
20       A.       I don't know the specifics.  I'd
21   have to read through it again to remember the
22   exact details.  To be honest, I don't remember.
23       Q.       So is it fair to say that, sitting
24   here today, you have no understanding of what Ms.
25   Acey's -- you have no recollection of what Ms.

Page 94

1    understanding of her job structure, if you will,
2    specifically as it relates to being promoted prior
3    to seeing those documents that she sent you?
4         A.        No, not in terms of the promotion.
5         Q.        Okay.  So it's fair to say you
6    have no understanding of her claim with respect to
7    her not being promoted; correct?
8         A.        Yes.
9         Q.        Okay.  The next point is -- reads:
10   Plaintiff claims that she was harassed on the
11   basis of race.
12                   Did I read that correctly?
13        A.        Yes, I think so.
14        Q.        What is your understanding of
15   Ms. Acey's claim with respect to race?  And let me
16   just qualify.
17                   I'm not referring to anything that
18   predated Ms. Acey's employment with the company.
19        A.        Yeah, right, understood.  Yeah, I
20   don't know that I had witnessed anything
21   firsthand.  I'm now trying to remember if we had
22   discussed that.
23        Q.        Just so I understand your
24   testimony, you didn't witness anything with
25   respect to Ms. Acey's claims of race based

Page 95

1    discrimination, but you may have discussed those

2    claims?

3              A.       That's correct, yeah.  I can't

4    think of any specific examples right now to back

5    that up, though.

6              Q.       Okay.  Do you recall having a

7    conversation with Ms. Acey with respect to those

8    claims?

9              A.       Not that I can remember right now

10   that I can give you a clear answer on or clear

11   example of.

12             Q.       When you say not that you can

13   remember, did you ever have any understanding of

14   these claims?

15             A.       I think for a lot of them in the

16   documents, some of them were new to me after

17   reading the document.  Prior to that, some of them

18   I didn't know about.

19             Q.       Is this one, the claim relating to

20   race, one that you had no idea about?

21             A.       That I can remember right now,

22   yeah, I didn't have an idea of some of this, I

23   believe so.

24             Q.       So is it fair to say that prior to

25   seeing the documents relating to this case, you

Page 96

1    had no understanding of plaintiff's claims

2    relating to the race based discrimination she

3    claimed she suffered at InductEV; right?

4          A.     I believe so.  I mean, yeah,

5    again, it's possible we had talked about it, but I

6    can't give you anything clear at this point today

7    to a say, yeah, I remember that discussion.

8          Q.     Okay.  And when you say it's

9    possible that you spoke about it, you don't recall

10   a specific conversation; right?

11         A.     Nothing in detail that I can give

12   you right now, yeah.

13         Q.     Help me understand what you mean

14   by in detail. Do you recall any conversations with

15   respect to race as it relates to Ms. Acey?

16         A.     No.

17         Q.     Okay.  Do you remember seeing

18   anything from your time at InductEV that you

19   understood to be racial animus directed toward

20   Ms. Acey?

21         A.     No.

22         Q.     Okay.  The next point reads:

23   Plaintiff claims that she was harassed on the

24   basis of sex.

25                Did I read that correctly?

Page 97

```
 1          A.      Yes.
 2          Q.      Okay.  What is your understanding
 3   of Ms. Acey's claim with respect to being harassed
 4   on the basis of sex -- strike that.
 5                  Do you have any understanding of
 6   plaintiff's claim with respect to her being
 7   harassed on the basis of sex?
 8          A.      Yeah, I am not fully remembering
 9   what was in the documents exactly, so right now,
10   not sure.
11          Q.      Prior to seeing those documents,
12   Ms. Tabbut, did you have any understanding of the
13   plaintiff's claims relating to sex?
14          A.      Yeah, similar to my answer before.
15   I mean, I'd have to say no right now but...
16          Q.      Well, similar to your answer
17   before, is it fair to say you never witnessed
18   anything at InductEV that you understood to be
19   animus directed toward Ms. Acey based on sex?
20          A.      Firsthand, I don't believe I had
21   witnessed anything.
22          Q.      Right.  Firsthand, right.  I'm
23   asking whether you saw anything that you
24   understood to be sexual harassment directed toward
25   Ms. Acey?
```

Page 98

```
1          A.      No, I don't think I remember
2     witnessing anything, no.
3          Q.      Do you remember hearing about
4     anything prior to looking at any document with
5     respect to this case?
6          A.      No.
7          Q.      Do you remember talking to
8     Ms. Acey about it?
9          A.      Again, possible we might have.  I
10    don't remember a conversation right now, so I
11    would say no.
12         Q.      Is it fair to say that after
13    reviewing these documents, if there were a
14    conversation, you would have recalled it based on
15    the subpoena and what you looked at with Ms. Acey?
16         A.      Yeah, I mean, as we mentioned, I
17    do remember some discussions about item 4, item 5
18    as well.  I don't remember specific details about
19    item 5, but I do remember there were some, some
20    issues that she had with the cell phone
21    reimbursement, and I forget if that was Diana
22    Wills or Judy Talis, but I do remember there being
23    frustration with the HR team around that.
24         Q.      And again, as you testified
25    earlier, I believe, your understanding came from
```

Page 99

1   conversations you had with Ms. Acey, not from

2   anything you saw; correct?

3          A.      Yes, correct, yeah.   Yeah, this

4   would have been prior to the documents.

5          Q.      Okay.   Is it fair to say that you

6   have no understanding of what Ms. Acey's claiming

7   with regard to sex then, based on your testimony?

8          A.      I suppose right now, no.

9          Q.      What do you mean by right now?   I

10   mean, did you see anything at InductEV when you

11   worked with InductEV that would help you

12   understand Ms. Acey's claim with respect to being

13   harassed on the basis of sex; yes or no?

14          A.      No.

15          Q.      Is the same true for her claim

16   that she was harassed during the cell phone

17   reimbursement process; you didn't see anything at

18   InductEV with respect to that?

19          A.      I didn't see it, no.   I do

20   remember discussing it afterwards.

21          Q.      But you have no firsthand

22   knowledge of this claim that she was harassed

23   during the cell phone reimbursement process?

24          A.      No.   I did not witness that

25   firsthand.

Page 131

```
 1   breath.  At the time it sounded to be directed to
 2   Maria.
 3               I'm going to stop there.  Do you
 4   have any understanding of what Ms. Acey is
 5   referring to?
 6        A.     I don't think I do.
 7        Q.     You would agree with me that if
 8   somebody referred to you as a bitch during your
 9   employment at InductEV, you would remember that;
10   right?
11        A.     Probably.
12        Q.     Do you remember ever being
13   referred to as a bitch by somebody during your
14   time at InductEV?
15        A.     No.
16        Q.     Okay.  I'm going to jump down a
17   bit.  I do not think Rob cursed.  Later
18   observations such as Rob calling a test bay jig a
19   quote, bitch, close quote, after struggling with
20   it dispelled my skepticism.
21               Do you know who Rob is here?  Who
22   is Ms. Acey referring to here?  Do you have any
23   idea?
24        A.     I would guess that it's Rob
25   Rosenberger.
```

Page 132

```
 1          Q.       Were there any other Robs at the
 2    company?
 3          A.       There were a couple Bobs.  I
 4    forget if there's another Rob.
 5          Q.       Okay.  Why would you guess Rob
 6    Rosenberger here?
 7          A.       Because of the test bay.  He was
 8    one that often worked on the test bay.
 9          Q.       Okay.  But not because of the word
10    he allegedly used; right?  Have you ever heard Bob
11    use that word?
12          A.       I would say yes.
13               MS. ASSATA:  Counsel, did you say
14    Bob on that last question or Rob?  I'm sorry.
15               MR. LONGO:  If I said Bob, I meant
16    Rob.
17               MS. ASSATA:  Okay.
18    BY MR. LONGO:
19          Q.       So when you heard Rob -- I'm
20    sorry.  Did you say yes, you've heard Rob use that
21    word?
22          A.       Yes.
23          Q.       In what context?
24          A.       I feel like "this thing's a bitch"
25    or "that's a bitch," something like that is
```

Page 133

1    probably how I've heard him use it.

2           Q.    Have you ever used the word in a

3    similar context?

4           A.    Yes, in my lifetime, yes.

5           Q.    Okay.  You never heard Rob use the

6    word directed toward you; right?

7           A.    No.

8           Q.    How about towards Ms. Acey?

9           A.    I have not witnessed that, no.

10          Q.    Have you ever heard it?

11          A.    To her, you mean?

12          Q.    Yes, to her.

13          A.    No, I don't think I've witnessed

14   that.

15          Q.    When you say witnessed, you mean

16   you didn't see it and you didn't hear it; right?

17          A.    No, I didn't see it or hear it.

18          Q.    Okay.  So when she says this is

19   why when he referred to me as, quote, that bitch,

20   close quote, you don't know what she's talking

21   about, do you?

22          A.    No.

23          Q.    Okay.  Did anyone ever curse at

24   you?

25          A.    No, I don't think so.  Not that I

Page 134

1  heard, at least.

2        Q.      Did you ever curse at anyone at

3  InductEV?

4        A.      No.

5        Q.      Did you ever curse at a test bay

6  jig?

7        A.      No.

8        Q.      What's a test bay jig?

9        A.      We had this setup that had two

10  coils on it, basically, to simulate one being the

11  bus and one the receiving coil on the bottom and

12  it would lower and raise to allow a certain gap

13  between the coils to simulate actual real world

14  conditions, and it's a pain but, yeah.

15        Q.      That was my next question.  It

16  sounds like a pain and you would agree with me, as

17  you testified, these test bay jigs were a pain to

18  work on?

19        A.      Yes, like to load stuff up to,

20  yeah.

21        Q.      Okay.  I'm going to scroll down a

22  bit.

23                This paragraph, paragraph 14,

24  reads:  A close colleague of Rosenberg, Rob R.,

25  was Rob Swierzoski (ph).  I'm going to go ahead

Page 142

1      Q.      Okay.  Did you ever see anything
2  that would suggest that Ms. Acey was the subject
3  of sexual harassment at work?
4      A.      No, I did not witness anything
5  firsthand.
6      Q.      Okay.  Forgive me scrolling.
7  Beginning with paragraph 175 here.  It reads:
8              As a woman employee, I was
9  subjected to a workplace culture and harassment on
10  the basis of my gender.
11             You testified a moment ago you
12  never saw anything that you understood to be
13  sexual harassment directed toward plaintiff.  Is
14  your answer the same with respect to paragraph
15  175?
16     A.      I believe, yes.
17     Q.      Okay.  In other words, did you
18  ever see anything that suggested Ms. Acey was
19  subject to a culture and harassment on the basis
20  of her gender?  Yes or no?
21     A.      No.
22     Q.      Paragraph 176 reads:
23             This harassment included targeted
24  opposition, inappropriate office jokes and
25  unwanted touching from my colleagues.

Page 143

```
 1                    Did you ever witness Ms. Acey
 2     being touched by any colleagues?
 3          A.     I did not.
 4          Q.     Okay.  Do you have any
 5     understanding of what she means by targeted
 6     opposition?
 7          A.     No.
 8          Q.     How about inappropriate office
 9     jokes?
10          A.     No, I don't know.  I don't think I
11     witnessed those.
12          Q.     So is it fair to say that you have
13     no idea what Ms. Acey's talking about with respect
14     to paragraphs 175 and 176 of her Complaint?
15          A.     No -- Yes, it's fair.
16          Q.     Yes, you have no clue what she's
17     talking about; right?
18          A.     Yes.  Or I didn't witness it
19     firsthand.
20          Q.     Okay.  Were you present during Ms.
21     Acey's new member orientation?
22          A.     No.
23          Q.     Okay.  Bear with me.  I would like
24     to direct your attention to paragraph 184.  Some
25     of this stuff we already covered so I'm just going
```

Page 144

1   to jump around.

2                   Did you ever witness anyone

3   continuously staring at Ms. Acey?

4           A.      Not that I remember.

5           Q.      Did you ever witness anyone

6   comment on Ms. Acey's physical activity?

7           A.      No.

8           Q.      Did you ever witness anyone pursue

9   Ms. Acey from across a lab?

10          A.      Not after hours, I don't think I

11  would have been there.

12          Q.      During hours?

13          A.      I don't think so.  I wasn't really

14  paying attention to that stuff.

15          Q.      Okay.  Do you have any idea what

16  Ms. Acey's referring to when she says she was

17  pursued from across the lab after hours?

18          A.      No.

19          Q.      Did she ever talk to you about

20  that?

21          A.      This, I don't believe so. I don't

22  remember.

23          Q.      How about continuously staring or

24  commenting on her physical activity; did she ever

25  talk to you about that?

Page 145

```
 1          A.      I don't remember.

 2          Q.      Do you recall whether Ms. Acey was

 3   ever warned not to go to her manager for anything?

 4          A.      No, I don't think I know.

 5          Q.      Okay.  Are you -- paragraph 190,

 6   sub part A reads:

 7                  Mike Russell went out of his way

 8   in an open corridor to brush against me.

 9          A.      No, I didn't witness that, no.

10          Q.      You have no -- okay.  Sam -- the

11   next paragraph reads:

12                  Sam G. behaved lewdly toward me in

13   front of another colleague.

14                  Do you know what Ms. Acey's

15   referring to there?

16          A.      No.  I didn't interact with either

17   of these individuals very much so, I don't know.

18          Q.      Let me go ahead and stop sharing

19   my screen.  I'm going to share my screen one more

20   time, here.  Do you see my screen?

21          A.      Yes.

22          Q.      Paragraph 23(b) refers to sexually

23   biased opposition towards following Maria's

24   documents.

25                  Are you aware of any sexually
```

# EXHIBIT 7

Page 1

1                                      - - -

2              IN THE UNITED STATES DISTRICT COURT

3            FOR THE EASTERN DISTRICT OF PENNSYLVANIA

4                                      - - -

5      ASSATA ACEY                 : CIVIL ACTION

                                   :

6              vs.                 : No. 2:23-cv-01438

                                   :

7      INDUCTEV                    :

8                                      - - -

9                     Tuesday, April 9, 2024

10                                     - - -

11             Oral Deposition of DANIEL HACKMAN, taken

12      remotely via Zoom with the witness being present

13      at 640 Mohawk Avenue, Pennsylvania 19074,

14      beginning at 10:04 a.m., reported stenographically

15      by Barbara C. Logan, Certified Professional

16      Shorthand Reporter and a Pennsylvania Notary

17      Public.

18                                     - - -

19

20

21

22

23

24          Job No. CS6641996

DANIEL HACKMAN

Page 36

1     Q.     -- did you report it to anyone?

2     A.     No.

3     Q.     Did you say anything to anyone about

4   it?

5     A.     No.

6     Q.     Do you know whether anyone said

7   anything to mis- -- to Bill Gallagher about it?

8     A.     I do not know.

9     Q.     Can you provide any additional

10   examples of memories that corroborate anything

11   Ms. Acey is claiming in this case?

12     A.     Can you clarify your question, please?

13     Q.     Sure.

14            What other memories do you have of

15   instances when you were working at Momentum of

16   something that stuck out to you as racially

17   denigrating?

18            We'll start with race.

19     A.     Racially denigrating.  I'm going to

20   say no.  I can't say that I have memories of

21   witnessing or observing anything as far as race is

22   concerned.

23     Q.     Okay.  How about sex is concerned?

24     A.     Sure.

DANIEL HACKMAN

Page 42

1    discrimination.

2         Q.    Okay.  I'll -- Ms. Acey has made very

3    specific claims in this case with respect to race

4    and sexual harassment.

5              Would you agree with me that they're

6    very serious claims; right?

7         A.    Oh, yes.

8         Q.    Can you provide me specifics, specific

9    concrete examples, not abstract general themes,

10   but specifics of things that you witnessed at

11   InductEV that suggest that Ms. Acey was

12   discriminated against on the basis of race?

13        A.    I'm going to say, no, I don't think I,

14   personally, witnessed anything that -- no, I don't

15   think so.

16        Q.    How about with respect to sex?

17              Can you provide me with a specific

18   example of something that you witnessed that

19   suggests that Ms. Acey was subject to sexual

20   harassment at work?

21              And just to qualify my question, I'm

22   not asking about things that you heard from

23   somebody else.

24        A.    Right.  Right.  I understand.

Page 43

```
 1        Q.      Things you witnessed.
 2        A.      I understand.
 3                No, the answer is no, I cannot.
 4        Q.      Okay.  So it's fair to say you didn't
 5   witness a single instance of behavior that you
 6   considered to be sexual or racial animus directed
 7   toward Ms. Acey; is that right?
 8        A.      I'm sorry.  I think you cut out for
 9   just a second.
10                Could you repeat that?
11        Q.      Is it fair -- is it fair to say that
12   you did not witness a single instance of racial or
13   sexual animus directed toward Ms. Acey during your
14   time at InductEV?
15        A.      I think that's fair to say, yes.
16        Q.      During your time at Momentum did you
17   notice behavioral changes in Ms. Acey?
18                In other words, was Ms. Acey acting
19   different?
20        A.      Is your question did I notice a change
21   in her over time while she was employed there?
22        Q.      Let me strike the question.
23                When you and Ms. Acey worked together
24   at Momentum, did you notice Ms. Acey's attitude
```

DANIEL HACKMAN

Page 69

```
 1            Do you have any experience working
 2   with Patti Rensel?
 3       A.    I'm going to say no.  I knew -- I know
 4   who she is.  I had even less and fewer
 5   interactions with her than I did with Judy Talis.
 6   If I remember correctly, she sat in the front
 7   office of the old building.  So it was common to
 8   pass her, you know, on my way in or on my way out
 9   some days.  So we would occasionally wave or say
10   good night or good morning.  I believe that was
11   the extent of it.  I don't remember -- I don't
12   remember having much more interaction with her
13   than that.
14       Q.    Okay.  So like Judy Talis, there was
15   never anything that Patti Rensel did or said that
16   led you to believe she had any racial animus;
17   right?
18       A.    I think that's right.  I don't think I
19   noticed anything.
20       Q.    Similarly, there was never anything
21   Patti Rensel did that led you to believe that she
22   had any degree of animus based on sex; right?
23       A.    Correct.
24       Q.    How about gender?
```

# EXHIBIT 8

COMMONWEALTH OF PENNSYLVANIA
GOVERNOR'S OFFICE
PENNSYLVANIA HUMAN RELATIONS COMMISSION

Assata Acey
    **Complainant(s)**    : PHRC Case No. 202102397

   v.        : EEOC No.   17F202261016

Momentum Dynamics Corporation
    **Respondent(s)**   :

## COMPLAINT

1. **COMPLAINANT(S) (name(s)/address(es)/phone number(s))**
Assata Acey
5121 Brown St, Philadelphia PA 19139
770-231-1017

2. **RESPONDENT(S) (name(s)/address(es)/phone number(s))**
(person, employer, union, labor organization or other entity against whom you are filing this complaint)

Momentum Dynamics Corporation
3 Pennsylvania Ave Malvern, PA 19355
484-320-8222

3. **Number of Employees Employed by Respondent(s):**

    ☐ Fewer than 4  ☐ 4 to 14    ☐ 15 to 20  ☑ 20+

4a. ☑ **I was employed by Respondent as** Technician   **since** 06/14/2021.

4b. ☐ **I applied for employment with Respondent as** _____ **on** _____.

5. **Protected Class(es)** (check all reasons you have been discriminated against and specify the class, e.g. race, African American; sex, female)

    ☑ Race: African American   ☐ Religious Creed:

    ☐ Color:          ☐ National Origin:

    ☑ Sex:   Female       ☐ Ancestry:

    ☐ Age/Date of Birth:     ☑ Retaliation

    ☐ Disability:        ☐ Use of Guide or Support Animal

    ☐ Other (specify):

6.   **Dates of Discrimination:**

     **Beginning:** 05/21/2021 _____   **Ending:** _____

     **Continuing?** ☑ Yes          ☐ No

7.   **DESCRIBE THE DISCRIMINATORY CONDUCT, WITH SPECIFICITY, AND EXPLAIN HOW THE DISCRIMINATORY CONDUCT IS RELATED TO YOUR PROTECTED CLASS:**

     (e.g. failure to hire, discharge from employment, demotion, leave denied, forced transfer, denial of religious or disability accommodation. retaliation)

     Please see following page for description of discriminatory conduct

**WARNING: FAILURE TO COMPLETE THIS SECTION MAY RESULT IN YOUR COMPLAINT BEING REJECTED FOR INSUFFICIENCY.**

A. Discriminatory terms and conditions of classification for employment and failure to promote on the basis of race and gender.

1. On Mar 25, 2021, Assata was recruited by Jennifer Orloski on behalf of Momentum Dynamics Corporation (MD) for the role of Senior Technician.

2. From 04/05/2021 to 05/14/2021 Assata matriculated through 5 rounds of extensive review, each indicated for the position of Senior Technician.

3. At no point during the interview process, was Assata notified of her perceived disqualification from the role of Senior Technician.

4. On May 21, 2021, Assata was presented with a written employment offer by Chief Administrative Officer (CAO, Judy Talis) for the role of Technician.

5. During a negotiation of terms on May 24, 2021, CAO informed Assata that she was being offered the Technician role due to being "unqualified" for the Senior Technician role.

6. CAO expressed Assata's being "unqualified" for the Senior Technician role as a basis for her to be given less compensation.

7. However, CAO confirmed that Assata was still expected to conduct duties discussed during her interviews for the role of Senior Technician.

8. MD's human resources department has the power to make and execute final recommendations for offers of employment, subject to the approval of the CEO.

9. While feedback is collected during each hiring process, the final recommendations of the CAO are not required to align with all the employee feedback regarding said hiring process.

10. CAO has made and executed recommendations for offers of employment in the face of opposing employee feedback.

11. One such recommendation was for the hire of the Mechanical Engineering Manager, Kerry Guarino.

12. CAO's recommendation limited Assata's classification and terms of employment to a level below that which she was interviewed or eventually completed work for.

13. From the beginning of employment, Assata engaged in work tasks that were noticeably different from the general perception of her title and the contributions of her teammates.

14. On Sept 7, 2021, two members of Assata's then 5-member team were promoted to Senior Technician, leaving Assata as the lowest ranking member and the only technician without senior designation on the PIT team until October 4.

15. From Sept 7 ,2021 to now, there has not been any communicated quota for senior technicians within Assata's team or MD.

16. On Dec 6, 2021, Assata submitted her performance review, detailing her span of work from the previous 6 months.

17. By Feb 6, 2022, Assata's Manager (Joren Wendschuh) and CAO had reviewed and discussed her performance review.

18. In Feb 2022, Assata began work with her supervisor to adjust her formal role so as to formally incorporate:
    a) Assata's previous and current work within MD
    b) Opportunities for Assata to grow within MD.

19. From June 2021 to today, MD has been in a self-professed period of "growth", involving the creation of and hiring for numerous new and pre-existing roles within the company.

20. From June 2021 to today, a great majority of MD's new hires have been white and more than 80% or a great majority MD's workforce has been white.

21. From June 2021 to today, a great majority of MD' new hires have been male, and more than 80% or a great Majority of MD workforce has been male.

22. Assata is and has been the only woman, the only African American woman on her team and is one of two African American women employed by MD.

23. As attached to her interview documents in 2021 and emailed to her by CAO on April 18, 2022, the descriptions for Senior Technician and Technician have the same requirements and duties.

24. To date, Assata has received no notification of any discussions or action within the HR department to reclassify her role in alignment with Assata's work tasks or ability for growth.

25. Assata alleges that her disqualification from the Senior Technician role was not the result of a bona fide occupational qualification.

26. Assata alleges that her race and gender were the basis of CAO's decision to classify, and present terms of employment to Assata that were below her demonstrated qualifications for the Senior Technician role on May 21, 2021.

27. Assata alleges CAO's discriminatory behavior and or attitudes towards her have hindered Assata in:
    a. Acquiring employment terms or classification as appropriate to her work tasks
    b. Receiving consideration for promotion or opportunities for continued growth within MD.

28. Assata alleges that the conflict between her employment classification and job duties was created on the basis of her race and gender and that this conflict contributed to pervasive and/or severe workplace tension which affected her ability to fulfill her job.

B. Harassment on the basis of race and gender and in retaliation for disclosing a workplace incident that involved policy in violation of Pa. Code § 44.5.

1. Throughout the time of Assata's employment at MD, employees have occasionally elected to physically lift items (equipment, products etc.) themselves instead of using the electronic lift equipment.

2. Prior to review of Assata's workplace incident, there had been no established, and or/ actively adopted procedure within MD's policy to ensure her safety in using Momentum Dynamics Corp's electronic lift equipment or in the event that such equipment buckled or failed.

3. Due to the lack of procedure, employees who needed to use electronic lift equipment were subjected to preventable risks that were avoidable to employees that were able to physically lift items themselves.

4. MD's lack of safety protocol for using electronic lift equipment violated Pa. Code § 44.5 by placing undue risk on employees whose disability would limit them from lifting items at work on their own.

5. Assata's workplace incident initiated through equipment failure and would not have occurred if she had been willing and able to physically lift the item in question herself.

6. Assata's disclosure of a work-place incident brought attention to MD's lack of protocol.

7. On Sept 30, 2021:
    a) Assata's cell phone was crushed in the workplace incident.
    b) Assata immediately disclosed the incident to her manager, who then disclosed it to upper management.
    c) Assata purchased a new replacement phone from a Target within 6 minutes of her workplace.
    d) VP of Engineering (Ben Cohen, sibling to CAO) initiated a process to reimburse Assata for her crushed phone, also referenced here as reimbursement or "reimbursement for a workplace incident".

8. It is generally accepted that Operations and Human Resources Coordinator (OHC, Diana Wilmes) has and will:
    a) relay messages and directions to employees of MD on behalf of her supervisor, the CAO
    b) work to execute procedures and protocols that have been orchestrated by CAO.

9. The procedure and protocol for this reimbursement was orchestrated by CAO and OHC served as a liaison for CAO in the execution of CAO's procedure.

10. The requirements for reimbursement, as dictated by the CAO, were not satisfied by only the provision of the make, model, or other information as sufficient to prove the current market price of the damage phone.

11. The CAO's dictated requirements for reimbursement included (as chronologically given to Assata):
    a) The brand, model, memory size of the damaged phone
    b) the brand, model, and memory size of the new phone that Assata purchased as a replacement
    c) an "acceptable" proof of purchase for the new phone
    d) receipt of original purchase for the damaged phone.

12. No pre-existing procedure or guidelines for reimbursement requirements were presented to Assata and the need for new or different "proof" was only disclosed to her after the preceding requirement had been met.

13. On Oct 5,2021, Assata disclosed to OHC that she had lost her physical receipt.

14. On Oct 5,2021, OHC rejected Assata's initial submission of her credit card statement as proof of purchase and instructed her to solicit a new itemized receipt from Target.

15. Assata's digital confirmation of purchase from Target (submitted Oct 06, 21) was also not accepted as proof of purchase.

16. When local Target was unable to provide a new itemized receipt of purchase, OHC encouraged Assata to solicit a "Mock receipt."

17. The "mock receipt" provided by target on was not accepted as proof of purchase.

18. To prove purchase of the damaged phone, Assata had to reopen records of an inactive account with a cell phone provider.

19. Assata's effort to complete the reimbursement requirements resulted in sufficient time away from work tasks and several visits to the local Target, and even required her to reopen records of an inactive account with a cell phone provider.

20. By chance or design, the reimbursement process proved to be so difficult for Assata, that she tried to opt out of reimbursement altogether.

21. When Assata tried to opt out of reimbursement altogether, OHC told her to "at least try".

22. Bringing forward paragraphs 20-22 of subparagraph A, Assata alleges that the CAO's arbitrarily arranged course of reimbursement subjected her to severe and or pervasive harassment on the basis of her race and gender, and in retaliation of her involvement in workplace incident and willingness to review the incident and be compensated for damages associated.

23. On October 14, 2021, OHC came to Assata's desk in person to relay CAO's instruction: "we will replace... [the damaged phone] this time but [Assata] cannot have her phone out in the lab from now on".

24. CAO's instruction also expressed that:
    a) any issues with CAO's instruction should be expressed by Assata to her manager and not to CAO directly
    b) Assata should not feel singled out in being asked to comply because a policy would be enacted in the future to prohibit all employees from having their phones in the lab.

25. The CAO's instruction on phone access came only after a reimbursement amount had been determined for Assata's damaged phone and entailed a standard of conduct that would only immediately apply to Assata.

26. Prior to this instruction, Assata had anxiously been relying on phone access to deescalate the unequal scrutiny and reprimands received regarding timeliness to meetings and responsiveness to meeting invites.

27. After immediately disclosing the exchange to and receiving direction from her manager, Assata sought confirmation and direct wording of CAO instruction from OHC.

28. When asked for exact wording, OHC iterated that Assata was not to have her phone on her person "wherever safety glasses are needed".

29. In response to OHC's iteration, and to prevent grounds for reprimand, Assata's Manager advised her to comply while a solution was worked out for her.

30. On Oct 14, 2021, implications of CAO's instruction were discussed within Assata's team, as well as between Assata's Manager, VP of Engineering and VP of research and Development (Frank McMahon).

31. At no time was any additional communication written or otherwise given to suggest the emergence of company-wide policy on phone access.

32. At no time before October 18, was any information given to Assata to construe relief from CAO's instruction on phone access.

33. On Oct 15, 2021, and in direct contradiction to CAO's message, Assata reached out to CAO for clarity on all communications and policies surrounding her reimbursement and workplace access to her phone.

34. CAO declined to provide sufficiently conclusive clarification in writing and insisted on discussing the matter in person.

35. During an in-person meeting on, Oct 18, 2021, CAO maintained that none of the relayed message was true and that OHC had "misconstrued" CAOs words.

36. Assata avers that the CAO orchestrated the reimbursement process and denied her access to her phone in retaliation to this disclosure, and on the basis of her identity as an African American woman.

37. By denying any involvement, CAO failed to provide any reflection or assurances that she:
    a) would not punish associated employees for her own actions
    b) would cease from use of retaliatory harassment in the future.

38. CAO's lack of assurances added to the effect of feeling singled out and being made to fear loss of good standing at her job--because they added an anticipation of future instances of CAO's discretionary retaliation and harassment.

39. While Assata eventually received reimbursement for her phone, and verbal permissions to access her phone at work, the CAO's instruction and orchestration concerning these were reasonably intimidating subjected Assata to severe and/or pervasive harassment.

C. Harassment in retaliation to complaining about paid time off /unpaid time off policy that was believed to violate Pa. Code § 44.5.

1. On April 18, 2022, Assata complained via email about a previously intimated work policy which was requiring her and other employees whom Momentum Dynamics classified as full-time to use paid time off (as opposed to unpaid time off) for any absence resulting in a workweek of less than 40 hours.

2. Assata's specific concern was that the policy, as enforced and communicated, created an unfair penalty (and hazard) for worker's whose short-term or long-term disability prevented them from (or behooved them against) working more than 30 hours per week or 130 hours per month.

3. Assata's email went to lengths to explain her perception of the work policy as a discriminatory practice, her current health symptoms and how she felt effected by using her PTO in this manner.

4. In a meeting held later April 18(same day), CAO expressed to Assata that employees who needed time off for medical reasons would be allowed to do so and retain full time status, so long as they continued to meet ACA requirements, and met with CAO to express such need.

5. On April 21, CAO initiated conversation with Assata in which she disclosed that her doctor would have a signed ADA (accommodations request) form before or by April 22.

6. CAO sounded out Assata's use of acronym "ADA" as "accommodation request form."

7. CAO's sounding out was done in an office cubicle that was within earshot of several other cubicles where employees were actively working.

8. During this same conversation, CAO advised Assata to "put in PTO" for hours missing for a pay period (April 11-24) that would be up for approval April 25.

9. At the moment of this advisement:
   a) Assata had disclosed her medical condition as the cause of her missing work hours in previous weeks
   b) CAO had made no indication of doubt that Assata was attempting use of unpaid PTO for non-medical reasons
   c) no reason was given as to why she should "put in PTO" for a timesheet whose approval date was after the anticipated arrival of her doctor's certification
   d) no written communications were (or had been) made to document that Assata was being instructed (and had not voluntarily elected) to "put in PTO"
   e) CAO had been privy to written and verbal discussion of the stress and pressure Assata experienced as a result of having to use PTO for her emerging disability.

10. Assata alleges that CAO's actions in paragraphs 6 and 8 were made in retaliation for making a good-faith complaint about a work policy that Assata believed to be discriminatory towards ill or otherwise disabled employees.

11. Assata alleges that this retaliation is a continuation of the harassment CAO has enacted towards Assata with discrimination to her status as a African American woman.

12. Assata also alleges that subparagraphs B and C represent a pattern of ongoing severe and/or pervasive harassment that she has been subjected to on the basis of her race and gender.

13. Assata anticipates this pattern to remain continuous in the future.

8. Based upon the foregoing, I/we allege that the Respondent(s) violated Section 5 of the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963, and the implementing regulations, 16 Pa. Code §§ 41.1-47.74.

9. The Pennsylvania Human Relations Commission has jurisdiction over this matter pursuant to the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963.

10. I/we pray that the Respondent(s) be required to provide all appropriate remedies under Section 9 of the Pennsylvania Human Relations Act.

11. If applicable, this Complaint will be dual-filed with the U.S. Equal Employment Opportunity Commission (EEOC), pursuant to the work-sharing agreement between the PHRC and the EEOC. Based upon the foregoing, I/we allege that the Respondent(s) violated one or more of the following federal statutes: Title VII of the Civil Rights Act of 1964 and/or The Pregnancy Discrimination Act and/or The Equal Pay Act of 1963 and/or The Age Discrimination in Employment Act of 1967 and/or Title 1 of the Americans with Disabilities Act of 1990 and/or Sections 102 and 103 of the Civil Rights Act of 1991 and/or Sections 501 and 505 of the Rehabilitation Act of 1973 and/or The Genetic Information Nondiscrimination Act of 2008.

## VERIFICATION

I hereby verify that the statements contained in this Complaint are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S.A. § 4904, relating to unsworn falsification to authorities.

05/08/2022
Date

Signature
Assata Acey
Printed Name

Date

Signature

Printed Name

**WARNING: COMPLAINTS MUST BE SIGNED AND FILED WITHIN 180 DAYS OF THE ALLEGED ACT OF HARM.**

**WARNING: IF YOU FAIL TO COMPLETE ANY PORTION OF THIS COMPLAINT, THE PHRC MAY NOT ACCEPT YOUR COMPLAINT FOR FILING.**

COMMONWEALTH OF PENNSYLVANIA

### GOVERNOR'S OFFICE

### PENNSYLVANIA HUMAN RELATIONS COMMISSION

RE: Assata Acey vs. Momentum Dynamics Corporation
PHRC Case No. 202102397
EEOC Case No. 17F202261016

## Certificate of Service

Pursuant to the requirements of 1 Pa. Code § 33.31, I hereby certify that I have this day served the foregoing Complaint by first class mail, postage prepaid, as follows:

**Complainant:**
Assata Acey
5121 Brown Street
Philadelphia, PA 19139

**Respondent:**
Momentum Dynamics Corporation
3 Pennsylvania Avenue
Malvern, PA 19355

**Complainant Attorney:** (if applicable)

**Respondent Attorney:** (if applicable)

Date: 6/22/2022

By: Samantha Lopez

# EXHIBIT 9

COMMONWEALTH OF PENNSYLVANIA
GOVERNOR'S OFFICE
PENNSYLVANIA HUMAN RELATIONS COMMISSION

| | | |
|---|---|---|
| Assata Acey _____ , | : | |
| **Complainant(s)** | : | PHRC Case No.   202102397 |
| | : | |
| v. | : | EEOC No. |
| | : | |
| Momentum Dynamics Corporation ____ , | : | |
| **Respondent(s)** | : | |

## FIRST AMENDED COMPLAINT

1.  **COMPLAINANT(S) (name(s)/address(es)/phone number(s))**

    Assata Acey
    5121 Brown St
    Philadelphia, PA 19139

2.  **RESPONDENT(S) (name(s)/address(es)/phone number(s))**
    (person, employer, union, labor organization or other entity against whom you are filing this complaint)

    Momentum Dynamics Corporation
    3 Pennsylvania Ave
    Malvern, PA 19355

3.  **Number of Employees Employed by Respondent(s):**

    ☐ Fewer than 4       ☐ 4 to 14       ☐ 15 to 20       ☑ 20+

4a. ☑ **I was employed by Respondent as** Technician **since** 6/14/2021 .

4b. ☐ **I applied for employment with Respondent as** _____ **on** _____ .

5.  **Protected Class(es)** (check all reasons you have been discriminated against and specify the class, e.g. race, African American; sex, female)

    ☑ Race:  African American            ☐ Religious Creed:

    ☐ Color:                             ☐ National Origin:

    ☑ Sex:  Female                       ☐ Ancestry:

    ☐ Age/Date of Birth:                 ☑ Retaliation

    ☐ Disability:                        ☐ Use of Guide or Support Animal

    ☐ Other (specify):

6. **Dates of Discrimination:**

**Beginning:** 5/21/2021       **Ending:** _____

**Continuing?**   ☑ Yes      ☐ No

7. **DESCRIBE THE DISCRIMINATORY CONDUCT, WITH SPECIFICITY, AND EXPLAIN HOW THE DISCRIMINATORY CONDUCT IS RELATED TO YOUR PROTECTED CLASS:**
(e.g. failure to hire, discharge from employment, demotion, leave denied, forced transfer, denial of religious or disability accommodation, retaliation)

1. I am an African American female.
2. On or about May 21, 2021, Respondent presented me with a written offer of employment for the job of Technician.
3. Prior to this offer, I was recruited and interviewed for the position of Senior Technician.
4. The stated requirements for both jobs are identical.
5. Respondent claimed that I was not qualified for the Senior Technician position, which is why they instead offered me the Technician position.
6. On or about September 7, 2021, Respondent promoted Technicians Omar Jackson (African American male) and Seth Wolgemuth (Caucasian male) to Senior Technicians.
7. I believe that Respondent denied me the position of Senior Technician and other promotional opportunities because I am an African American female, in violation of the Pennsylvania Human Relations Act.

8. On or about September 30, 2021, my cell phone was crushed in a workplace accident.
9. On or about September 30, 2021, Respondent informed me that they would reimburse me for the cost of replacing my phone.
10. The process that Respondent imposed on me to obtain reimbursement was unnecessarily complicated and burdensome.
11. I believe that Respondent treated me more harshly because I am an African American female, in violation of the Pennsylvania Human Relations Act.

12. On or about April 18, 2022, I informed Respondent that I had a physical disability that impaired my ability to concentrate and caused me physical pain.
13. On that same date, I inquired about the process for obtaining medical leave and expressed the view that Respondent's process was unfair to people with disabilities.
14. On that same date, Respondent granted my requested accommodation.
15. Respondent did not provide me with all of the administrative information that I requested during the interactive process.
16. Respondent also delayed the implementation of my reasonable accommodation.
17. I believe that Respondent withheld information and delayed the implementation of my reasonable accommodation to harass me because I am an African American female, in violation of the Pennsylvania Human Relations Act.
18. I believe that Respondent harassed me in retaliation for objecting to the way they engaged in the interactive process, in violation of the Pennsylvania Human Relations Act.

**WARNING: FAILURE TO COMPLETE THIS SECTION MAY RESULT IN YOUR COMPLAINT BEING REJECTED FOR INSUFFICIENCY.**

8. Based upon the foregoing, I/we allege that the Respondent(s) violated Section 5 of the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963, and the implementing regulations, 16 Pa. Code §§ 41.1-47.74.

9. The Pennsylvania Human Relations Commission has jurisdiction over this matter pursuant to the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963.

10. I/we pray that the Respondent(s) be required to provide all appropriate remedies under Section 9 of the Pennsylvania Human Relations Act.

11. If applicable, this Complaint will be dual-filed with the U.S. Equal Employment Opportunity Commission (EEOC), pursuant to the work-sharing agreement between the PHRC and the EEOC. Based upon the foregoing, I/we allege that the Respondent(s) violated one or more of the following federal statutes: Title VII of the Civil Rights Act of 1964 and/or The Pregnancy Discrimination Act and/or The Equal Pay Act of 1963 and/or The Age Discrimination in Employment Act of 1967 and/or Title 1 of the Americans with Disabilities Act of 1990 and/or Sections 102 and 103 of the Civil Rights Act of 1991 and/or Sections 501 and 505 of the Rehabilitation Act of 1973 and/or The Genetic Information Nondiscrimination Act of 2008.

## VERIFICATION

I hereby verify that the statements contained in this Complaint are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S.A. § 4904, relating to unsworn falsification to authorities.

Date

Signature

Printed Name

06/21/2032
Date

Signature
Assata Acey
Printed Name

**WARNING: COMPLAINTS MUST BE SIGNED AND FILED WITHIN 180 DAYS OF THE ALLEGED ACT OF HARM.**

**WARNING: IF YOU FAIL TO COMPLETE ANY PORTION OF THIS COMPLAINT, THE PHRC MAY NOT ACCEPT YOUR COMPLAINT FOR FILING.**

# EXHIBIT 10



**pennsylvania**
HUMAN RELATIONS COMMISSION

June 22, 2022

Assata Acey
5121 Brown Street
Philadelphia, PA 19139

RE:     Assata Acey vs. Momentum Dynamics Corporation
        PHRC Case No. 202102397
        EEOC Case No. 17F202261016

Dear Complainant:

The enclosed complaint and first amended complaint were received by the Pennsylvania
Human Relations Commission (PHRC). After careful evaluation, the PHRC determined that it
does not have jurisdiction over the complaint. However, it will be served on Respondent(s) as
of the date of this letter.

Please be advised that the case is being transferred to the U.S. Equal Employment Opportunity
Commission (EEOC), which may have jurisdiction over the case. Please allow two weeks for
the case to be transferred to EEOC. After two weeks, you may contact the EEOC at 1-800-669-
4000 for status.

Thank you for your cooperation,

Intake Supervisor
Pennsylvania Human Relations Commission

cc:
Momentum Dynamics Corporation
3 Pennsylvania Avenue
Malvern, PA 19355

COMMONWEALTH OF PENNSYLVANIA
GOVERNOR'S OFFICE
PENNSYLVANIA HUMAN RELATIONS COMMISSION

Assata Acey
_____ ,          :
               **Complainant(s)**        :          PHRC Case No.   202102397
                                         :
          v.                             :          EEOC No.   17F202261016
                                         :
Momentum Dynamics Corporation            :
_____ ,          :
               **Respondent(s)**         :

## FIRST AMENDED COMPLAINT

1.  **COMPLAINANT(S) (name(s)/address(es)/phone number(s))**

    Assata Acey
    5121 Brown St
    Philadelphia, PA 19139

2.  **RESPONDENT(S) (name(s)/address(es)/phone number(s))**
    (person, employer, union, labor organization or other entity against whom you are filing this complaint)

    Momentum Dynamics Corporation
    3 Pennsylvania Ave
    Malvern, PA 19355

3.  **Number of Employees Employed by Respondent(s):**

    ☐ Fewer than 4      ☐ 4 to 14          ☐ 15 to 20      ☑ 20+

4a.  ☑  **I was employed by Respondent as** Technician _____ **since** 6/14/2021 _____ .

4b.  ☐  **I applied for employment with Respondent as** _____ **on** _____ .

5.  **Protected Class(es)** (check all reasons you have been discriminated against and specify the
    class, e.g. race, African American; sex, female)

    ☑ Race:  African American          ☐ Religious Creed:
    ☐ Color:                           ☐ National Origin:
    ☑ Sex:    Female                   ☐ Ancestry:
    ☐ Age/Date of Birth:               ☑ Retaliation
    ☐ Disability:                      ☐ Use of Guide or Support Animal
    ☐ Other (specify):

                              PHRC Amended Employment Complaint, Rev. 1-2021
                              Page 1 of 3

6.   **Dates of Discrimination:**

**Beginning:**  5/21/2021 _____        **Ending:** _____

**Continuing?**   ☑ Yes        ☐ No

7.   **DESCRIBE THE DISCRIMINATORY CONDUCT, WITH SPECIFICITY, AND EXPLAIN HOW THE DISCRIMINATORY CONDUCT IS RELATED TO YOUR PROTECTED CLASS:**
(e.g. failure to hire, discharge from employment, demotion, leave denied, forced transfer, denial of religious or disability accommodation, retaliation)

1. I am an African American female.
2. On or about May 21, 2021, Respondent presented me with a written offer of employment for the job of Technician.
3. Prior to this offer, I was recruited and interviewed for the position of Senior Technician.
4. The stated requirements for both jobs are identical.
5. Respondent claimed that I was not qualified for the Senior Technician position, which is why they instead offered me the Technician position.
6. On or about September 7, 2021, Respondent promoted Technicians Omar Jackson (African American male) and Seth Wolgemuth (Caucasian male) to Senior Technicians.
7. I believe that Respondent denied me the position of Senior Technician and other promotional opportunities because I am an African American female, in violation of the Pennsylvania Human Relations Act.

8. On or about September 30, 2021, my cell phone was crushed in a workplace accident.
9. On or about September 30, 2021, Respondent informed me that they would reimburse me for the cost of replacing my phone.
10. The process that Respondent imposed on me to obtain reimbursement was unnecessarily complicated and burdensome.
11. I believe that Respondent treated me more harshly because I am an African American female, in violation of the Pennsylvania Human Relations Act.

12. On or about April 18, 2022, I informed Respondent that I had a physical disability that impaired my ability to concentrate and caused me physical pain.
13. On that same date, I inquired about the process for obtaining medical leave and expressed the view that Respondent's process was unfair to people with disabilities.
14. On that same date, Respondent granted my requested accommodation.
15. Respondent did not provide me with all of the administrative information that I requested during the interactive process.
16. Respondent also delayed the implementation of my reasonable accommodation.
17. I believe that Respondent withheld information and delayed the implementation of my reasonable accommodation to harass me because I am an African American female, in violation of the Pennsylvania Human Relations Act.
18. I believe that Respondent harassed me in retaliation for objecting to the way they engaged in the interactive process, in violation of the Pennsylvania Human Relations Act.

**WARNING: FAILURE TO COMPLETE THIS SECTION MAY RESULT IN YOUR COMPLAINT BEING REJECTED FOR INSUFFICIENCY.**

8. Based upon the foregoing, I/we allege that the Respondent(s) violated Section 5 of the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963, and the implementing regulations, 16 Pa. Code §§ 41.1-47.74.

9. The Pennsylvania Human Relations Commission has jurisdiction over this matter pursuant to the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963.

10. I/we pray that the Respondent(s) be required to provide all appropriate remedies under Section 9 of the Pennsylvania Human Relations Act.

11. If applicable, this Complaint will be dual-filed with the U.S. Equal Employment Opportunity Commission (EEOC), pursuant to the work-sharing agreement between the PHRC and the EEOC. Based upon the foregoing, I/we allege that the Respondent(s) violated one or more of the following federal statutes: Title VII of the Civil Rights Act of 1964 and/or The Pregnancy Discrimination Act and/or The Equal Pay Act of 1963 and/or The Age Discrimination in Employment Act of 1967 and/or Title 1 of the Americans with Disabilities Act of 1990 and/or Sections 102 and 103 of the Civil Rights Act of 1991 and/or Sections 501 and 505 of the Rehabilitation Act of 1973 and/or The Genetic Information Nondiscrimination Act of 2008.

## VERIFICATION

I hereby verify that the statements contained in this Complaint are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S.A. § 4904, relating to unsworn falsification to authorities.

_____          _____
Date                                        Signature

                                            _____
                                            Printed Name

06/21/2032
Date                                        Signature
                                            Asseta Aren
                                            Printed Name

**WARNING: COMPLAINTS MUST BE SIGNED AND FILED WITHIN 180 DAYS OF THE ALLEGED ACT OF HARM.**

**WARNING: IF YOU FAIL TO COMPLETE ANY PORTION OF THIS COMPLAINT, THE PHRC MAY NOT ACCEPT YOUR COMPLAINT FOR FILING.**

COMMONWEALTH OF PENNSYLVANIA
GOVERNOR'S OFFICE
PENNSYLVANIA HUMAN RELATIONS COMMISSION

Assata Acey
_____,
                  **Complainant(s)**

v.

Momentum Dynamics Corporation
_____,
                  **Respondent(s)**

PHRC Case No.  202102397

EEOC No.   17F202261016

## COMPLAINT

1.  **COMPLAINANT(S) (name(s)/address(es)/phone number(s))**
    Assata Acey
    5121 Brown St, Philadelphia PA 19139
    770-231-1017

2.  **RESPONDENT(S) (name(s)/address(es)/phone number(s))**
    (person, employer, union, labor organization or other entity against whom you are filing this complaint)

    Momentum Dynamics Corporation
    3 Pennsylvania Ave Malvern, PA 19355
    484-320-8222

3.  **Number of Employees Employed by Respondent(s):**

    ☐ Fewer than 4       ☐ 4 to 14          ☐ 15 to 20        ☑ 20+

4a. ☑ **I was employed by Respondent as** Technician _____ **since** 06/14/2021 _____.

4b. ☐ **I applied for employment with Respondent as** _____ **on** _____.

5.  **Protected Class(es)** (check all reasons you have been discriminated against and specify the class, e.g. race, African American; sex, female)

    ☑ Race: African American              ☐ Religious Creed:
    ☐ Color:                              ☐ National Origin:
    ☑ Sex:  Female                        ☐ Ancestry:
    ☐ Age/Date of Birth:                  ☑ Retaliation
    ☐ Disability:                         ☐ Use of Guide or Support Animal
    ☐ Other (specify):

6.  **Dates of Discrimination:**

    **Beginning:** 05/21/2021 _____     **Ending:** _____

    **Continuing?**  ☑ Yes          ☐ No

7.  **DESCRIBE THE DISCRIMINATORY CONDUCT, WITH SPECIFICITY, AND EXPLAIN HOW THE DISCRIMINATORY CONDUCT IS RELATED TO YOUR PROTECTED CLASS:**

    (e.g. failure to hire, discharge from employment, demotion, leave denied, forced transfer, denial of religious or disability accommodation. retaliation)

    Please see following page for description of discriminatory conduct

**WARNING: FAILURE TO COMPLETE THIS SECTION MAY RESULT IN YOUR COMPLAINT BEING REJECTED FOR INSUFFICIENCY.**

A. Discriminatory terms and conditions of classification for employment and failure to promote on the basis of race and gender.
   1. On Mar 25, 2021, Assata was recruited by Jennifer Orloski on behalf of Momentum Dynamics Corporation (MD) for the role of Senior Technician.
   2. From 04/05/2021 to 05/14/2021 Assata matriculated through 5 rounds of extensive review, each indicated for the position of Senior Technician.
   3. At no point during the interview process, was Assata notified of her perceived disqualification from the role of Senior Technician.
   4. On May 21, 2021, Assata was presented with a written employment offer by Chief Administrative Officer (CAO, Judy Talis) for the role of Technician.
   5. During a negotiation of terms on May 24, 2021, CAO informed Assata that she was being offered the Technician role due to being "unqualified" for the Senior Technician role.
   6. CAO expressed Assata's being "unqualified" for the Senior Technician role as a basis for her to be given less compensation.
   7. However, CAO confirmed that Assata was still expected to conduct duties discussed during her interviews for the role of Senior Technician.
   8. MD's human resources department has the power to make and execute final recommendations for offers of employment, subject to the approval of the CEO.
   9. While feedback is collected during each hiring process, the final recommendations of the CAO are not required to align with all the employee feedback regarding said hiring process.
   10. CAO has made and executed recommendations for offers of employment in the face of opposing employee feedback.
   11. One such recommendation was for the hire of the Mechanical Engineering Manager, Kerry Guarino.
   12. CAO's recommendation limited Assata's classification and terms of employment to a level below that which she was interviewed or eventually completed work for.
   13. From the beginning of employment, Assata engaged in work tasks that were noticeably different from the general perception of her title and the contributions of her teammates.
   14. On Sept 7, 2021, two members of Assata's then 5-member team were promoted to Senior Technician, leaving Assata as the lowest ranking member and the only technician without senior designation on the PIT team until October 4.
   15. From Sept 7, 2021 to now, there has not been any communicated quota for senior technicians within Assata's team or MD.
   16. On Dec 6, 2021, Assata submitted her performance review, detailing her span of work from the previous 6 months.
   17. By Feb 6, 2022, Assata's Manager (Joren Wendschuh) and CAO had reviewed and discussed her performance review.
   18. In Feb 2022, Assata began work with her supervisor to adjust her formal role so as to formally incorporate:
      a) Assata's previous and current work within MD
      b) Opportunities for Assata to grow within MD.
   19. From June 2021 to today, MD has been in a self-professed period of "growth", involving the creation of and hiring for numerous new and pre-existing roles within the company.
   20. From June 2021 to today, a great majority of MD's new hires have been white and more than 80% or a great majority MD's workforce has been white.

21. From June 2021 to today, a great majority of MD' new hires have been male, and more than 80% or a great Majority of MD workforce has been male.

22. Assata is and has been the only woman, the only African American woman on her team and is one of two African American women employed by MD.

23. As attached to her interview documents in 2021 and emailed to her by CAO on April 18, 2022, the descriptions for Senior Technician and Technician have the same requirements and duties.

24. To date, Assata has received no notification of any discussions or action within the HR department to reclassify her role in alignment with Assata's work tasks or ability for growth.

25. Assata alleges that her disqualification from the Senior Technician role was not the result of a bona fide occupational qualification.

26. Assata alleges that her race and gender were the basis of CAO's decision to classify, and present terms of employment to Assata that were below her demonstrated qualifications for the Senior Technician role on May 21, 2021.

27. Assata alleges CAO's discriminatory behavior and or attitudes towards her have hindered Assata in:
    a. Acquiring employment terms or classification as appropriate to her work tasks
    b. Receiving consideration for promotion or opportunities for continued growth within MD.

28. Assata alleges that the conflict between her employment classification and job duties was created on the basis of her race and gender and that this conflict contributed to pervasive and/or severe workplace tension which affected her ability to fulfill her job.

B. Harassment on the basis of race and gender and in retaliation for disclosing a workplace incident that involved policy in violation of Pa. Code § 44.5.

1. Throughout the time of Assata's employment at MD, employees have occasionally elected to physically lift items (equipment, products etc.) themselves instead of using the electronic lift equipment.

2. Prior to review of Assata's workplace incident, there had been no established, and or/ actively adopted procedure within MD's policy to ensure her safety in using Momentum Dynamics Corp's electronic lift equipment or in the event that such equipment buckled or failed.

3. ` Due to the lack of procedure, employees who needed to use electronic lift equipment were subjected to preventable risks that were avoidable to employees that were able to physically lift items themselves.

4. MD's lack of safety protocol for using electronic lift equipment violated Pa. Code § 44.5 by placing undue risk on employees whose disability would limit them from lifting items at work on their own.

5. Assata's workplace incident initiated through equipment failure and would not have occurred if she had been willing and able to physically lift the item in question herself.

6. Assata's disclosure of a work-place incident brought attention to MD's lack of protocol.

7. On Sept 30, 2021:
    a) Assata's cell phone was crushed in the workplace incident.
    b) Assata immediately disclosed the incident to her manager, who then disclosed it to upper management.
    c) Assata purchased a new replacement phone from a Target within 6 minutes of her workplace.
    d) VP of Engineering (Ben Cohen, sibling to CAO) initiated a process to reimburse Assata for her crushed phone, also referenced here as reimbursement or "reimbursement for a workplace incident".

8. It is generally accepted that Operations and Human Resources Coordinator (OHC, Diana Wilmes) has and will:
    a) relay messages and directions to employees of MD on behalf of her supervisor, the CAO
    b) work to execute procedures and protocols that have been orchestrated by CAO.

9. The procedure and protocol for this reimbursement was orchestrated by CAO and OHC served as a liaison for CAO in the execution of CAO's procedure.

10. The requirements for reimbursement, as dictated by the CAO, were not satisfied by only the provision of the make, model, or other information as sufficient to prove the current market price of the damage phone.

11. The CAO's dictated requirements for reimbursement included (as chronologically given to Assata):
    a) The brand, model, memory size of the damaged phone
    b) the brand, model, and memory size of the new phone that Assata purchased as a replacement
    c) an "acceptable" proof of purchase for the new phone
    d) receipt of original purchase for the damaged phone.

12. No pre-existing procedure or guidelines for reimbursement requirements were presented to Assata and the need for new or different "proof" was only disclosed to her after the preceding requirement had been met.

13. On Oct 5,2021, Assata disclosed to OHC that she had lost her physical receipt.

14. On Oct 5,2021, OHC rejected Assata's initial submission of her credit card statement as proof of purchase and instructed her to solicit a new itemized receipt from Target.

15. Assata's digital confirmation of purchase from Target (submitted Oct 06, 21) was also not accepted as proof of purchase.

16. When local Target was unable to provide a new itemized receipt of purchase, OHC encouraged Assata to solicit a "Mock receipt."

17. The "mock receipt" provided by target on was not accepted as proof of purchase.

18. To prove purchase of the damaged phone, Assata had to reopen records of an inactive account with a cell phone provider.

19. Assata's effort to complete the reimbursement requirements resulted in sufficient time away from work tasks and several visits to the local Target, and even required her to reopen records of an inactive account with a cell phone provider.

20. By chance or design, the reimbursement process proved to be so difficult for Assata, that she tried to opt out of reimbursement altogether.

21. When Assata tried to opt out of reimbursement altogether, OHC told her to "at least try".

22. Bringing forward paragraphs 20-22 of subparagraph A, Assata alleges that the CAO's arbitrarily arranged course of reimbursement subjected her to severe and or pervasive harassment on the basis of her race and gender, and in retaliation of her involvement in workplace incident and willingness to review the incident and be compensated for damages associated.

23. On October 14, 2021, OHC came to Assata's desk in person to relay CAO's instruction: "we will replace... [the damaged phone] this time but [Assata] cannot have her phone out in the lab from now on".

24. CAO's instruction also expressed that:
    a) any issues with CAO's instruction should be expressed by Assata to her manager and not to CAO directly
    b) Assata should not feel singled out in being asked to comply because a policy would be enacted in the future to prohibit all employees from having their phones in the lab.

25. The CAO's instruction on phone access came only after a reimbursement amount had been determined for Assata's damaged phone and entailed a standard of conduct that would only immediately apply to Assata.

26. Prior to this instruction, Assata had anxiously been relying on phone access to deescalate the unequal scrutiny and reprimands received regarding timeliness to meetings and responsiveness to meeting invites.

27. After immediately disclosing the exchange to and receiving direction from her manager, Assata sought confirmation and direct wording of CAO instruction from OHC.

28. When asked for exact wording, OHC iterated that Assata was not to have her phone on her person "wherever safety glasses are needed".

29. In response to OHC's iteration, and to prevent grounds for reprimand, Assata's Manager advised her to comply while a solution was worked out for her.

30. On Oct 14, 2021, implications of CAO's instruction were discussed within Assata's team, as well as between Assata's Manager, VP of Engineering and VP of research and Development (Frank McMahon).

31. At no time was any additional communication written or otherwise given to suggest the emergence of company-wide policy on phone access.

32. At no time before October 18, was any information given to Assata to construe relief from CAO's instruction on phone access.

33. On Oct 15, 2021, and in direct contradiction to CAO's message, Assata reached out to CAO for clarity on all communications and policies surrounding her reimbursement and workplace access to her phone.

34. CAO declined to provide sufficiently conclusive clarification in writing and insisted on discussing the matter in person.

35. During an in-person meeting on, Oct 18, 2021, CAO maintained that none of the relayed message was true and that OHC had "misconstrued" CAOs words.

36. Assata avers that the CAO orchestrated the reimbursement process and denied her access to her phone in retaliation to this disclosure, and on the basis of her identity as an African American woman.

37. By denying any involvement, CAO failed to provide any reflection or assurances that she:
    a) would not punish associated employees for her own actions
    b) would cease from use of retaliatory harassment in the future.

38. CAO's lack of assurances added to the effect of feeling singled out and being made to fear loss of good standing at her job--because they added an anticipation of future instances of CAO's discretionary retaliation and harassment.

39. While Assata eventually received reimbursement for her phone, and verbal permissions to access her phone at work, the CAO's instruction and orchestration concerning these were reasonably intimidating subjected Assata to severe and/or pervasive harassment.

C. Harassment in retaliation to complaining about paid time off /unpaid time off policy that was believed to violate Pa. Code § 44.5.

1. On April 18, 2022, Assata complained via email about a previously intimated work policy which was requiring her and other employees whom Momentum Dynamics classified as full-time to use paid time off (as opposed to unpaid time off) for any absence resulting in a workweek of less than 40 hours.

2. Assata's specific concern was that the policy, as enforced and communicated, created an unfair penalty (and hazard) for worker's whose short-term or long-term disability prevented them from (or behooved them against) working more than 30 hours per week or 130 hours per month.

3. Assata's email went to lengths to explain her perception of the work policy as a discriminatory practice, her current health symptoms and how she felt effected by using her PTO in this manner.

4. In a meeting held later April 18(same day), CAO expressed to Assata that employees who needed time off for medical reasons would be allowed to do so and retain full time status, so long as they continued to meet ACA requirements, and met with CAO to express such need.

5. On April 21, CAO initiated conversation with Assata in which she disclosed that her doctor would have a signed ADA (accommodations request) form before or by April 22.

6. CAO sounded out Assata's use of acronym "ADA" as "accommodation request form."

7. CAO's sounding out was done in an office cubicle that was within earshot of several other cubicles where employees were actively working.

8. During this same conversation, CAO advised Assata to "put in PTO" for hours missing for a pay period (April 11-24) that would be up for approval April 25.

9. At the moment of this advisement:
   a) Assata had disclosed her medical condition as the cause of her missing work hours in previous weeks
   b) CAO had made no indication of doubt that Assata was attempting use of unpaid PTO for non-medical reasons
   c) no reason was given as to why she should "put in PTO" for a timesheet whose approval date was after the anticipated arrival of her doctor's certification
   d) no written communications were (or had been) made to document that Assata was being instructed (and had not voluntarily elected) to "put in PTO"
   e) CAO had been privy to written and verbal discussion of the stress and pressure Assata experienced as a result of having to use PTO for her emerging disability.

10. Assata alleges that CAO's actions in paragraphs 6 and 8 were made in retaliation for making a good-faith complaint about a work policy that Assata believed to be discriminatory towards ill or otherwise disabled employees.

11. Assata alleges that this retaliation is a continuation of the harassment CAO has enacted towards Assata with discrimination to her status as a African American woman.

12. Assata also alleges that subparagraphs B and C represent a pattern of ongoing severe and/or pervasive harassment that she has been subjected to on the basis of her race and gender.

13. Assata anticipates this pattern to remain continuous in the future.

8.  Based upon the foregoing, I/we allege that the Respondent(s) violated Section 5 of the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963, and the implementing regulations, 16 Pa. Code §§ 41.1-47.74.

9.  The Pennsylvania Human Relations Commission has jurisdiction over this matter pursuant to the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963.

10. I/we pray that the Respondent(s) be required to provide all appropriate remedies under Section 9 of the Pennsylvania Human Relations Act.

11. If applicable, this Complaint will be dual-filed with the U.S. Equal Employment Opportunity Commission (EEOC), pursuant to the work-sharing agreement between the PHRC and the EEOC. Based upon the foregoing, I/we allege that the Respondent(s) violated one or more of the following federal statutes: Title VII of the Civil Rights Act of 1964 and/or The Pregnancy Discrimination Act and/or The Equal Pay Act of 1963 and/or The Age Discrimination in Employment Act of 1967 and/or Title I of the Americans with Disabilities Act of 1990 and/or Sections 102 and 103 of the Civil Rights Act of 1991 and/or Sections 501 and 505 of the Rehabilitation Act of 1973 and/or The Genetic Information Nondiscrimination Act of 2008.

## VERIFICATION

I hereby verify that the statements contained in this Complaint are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S.A. § 4904, relating to unsworn falsification to authorities.

05/08/2022

Date

Signature

Assata Acey

Printed Name

Date

Signature

Printed Name

**WARNING: COMPLAINTS MUST BE SIGNED AND FILED WITHIN 180 DAYS OF THE ALLEGED ACT OF HARM.**

**WARNING: IF YOU FAIL TO COMPLETE ANY PORTION OF THIS COMPLAINT, THE PHRC MAY NOT ACCEPT YOUR COMPLAINT FOR FILING.**

## COMMONWEALTH OF PENNSYLVANIA

### GOVERNOR'S OFFICE

### PENNSYLVANIA HUMAN RELATIONS COMMISSION

RE: Assata Acey vs. Momentum Dynamics Corporation
PHRC Case No. 202102397
EEOC Case No. 17F202261016

## Certificate of Service

Pursuant to the requirements of 1 Pa. Code § 33.31, I hereby certify that I have this day served the foregoing Complaint by first class mail, postage prepaid, as follows:

**Complainant:**
Assata Acey
5121 Brown Street
Philadelphia, PA 19139

**Respondent:**
Momentum Dynamics Corporation
3 Pennsylvania Avenue
Malvern, PA 19355

**Complainant Attorney:** (if applicable)

**Respondent Attorney:** (if applicable)

Date: 6/22/2022

By: Samantha Lopez

# EXHIBIT 11



## Interview Evaluation Form

**Momentum**
Wireless Power

Candidate Name: Assata Acey

Interviewer: Rob Rosenberger

Position: Senior Technician, Product Introduction

Date: 05/14/2021

---

1.) **Culture Fit:** Candidate's beliefs and behaviors align with the company's core values and company culture.

   Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect culture fit)

   1 ☐  2 ☐  3 ☐  4 ☑  5 ☐

   Please comment on the reason for your rating:

   Assata is very enthusiastic and outgoing to want to be employed at Momentum Dynamics. She sounds like she wants to be part of a team and not just an individual.

2.) **Skill/Competency Fit:** Do the skills the candidate will bring to the job align with the job competencies?

   Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect skillset)

   1 ☐  2 ☐  3 ☐  4 ☑  5 ☐

   Please comment on the reason for your rating:

   Assata has held positions at her previous employers that incorporated testing of mechanical and electrical capabilities. She is very intelligent and should be able to adapt at MD. The physical part of the job might be an issue.



EXHIBIT
AA-13
PENGAD 800-631-6989

3.) **Technical Fit:** Does this candidate have the technical aptitude needed to succeed in this position?

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect technical fit)

1 ☐  2 ☐  3 ☐  4 ✓  5 ☐

Please comment on the reason for your rating:

Assata has an excellent technical aptitude and could be a great Senior Technician for MD. She does lack experience and may take longer than someone with past experience.

4.) **Overall Fit:** Average your ratings and please select yes or no on moving forward with this candidate.

Average Rating: 4

Yes ✓  No ☐

Overall Comments:

I feel that Assata is very intelligent and very well schooled. I also feel that she might not be happy in a Technician position and really should be an Engineer. I asked her in our verbal interview this question and she replied that she wanted to learn as a Technician before moving into an Engineering position.



## Interview Evaluation Form

Candidate Name: ___Assata Acey___

Interviewer: ___Judy Talis___

Position: ___Senior Technician___

Date: ___4/28/2021___

---

1.) **Culture Fit:** Candidate's beliefs and behaviors align with the company's core values and
company culture.

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect culture fit)

1 ☐  2 ☐  3 ☐  4 ✓  5 ☐

Please comment on the reason for your rating:

Candidate has a very innovative take on her work. She has always looked
beyond the task and thinks out of the box. It is in her nature. She gave several
examples of schooling where she would be given an assignment and she
would complete it but then go beyond that initial assignment and look at it
from different angles. She thinks MD is somewhere that can be valued.
Having said that she understands the need to do her job as asked as well.

2.) **Skill/Competency Fit:** Do the skills the candidate will bring to the job align with the job
competencies?

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect skillset)

1 ☐  2 ☐  3 ☐  4 ✓  5 ☐

Please comment on the reason for your rating:

While she may not have the exact skills we are looking for she is certainly
capable with her background on learning them. She mentioned when the
interview team asked her about her use of tools, she made a joke she didn;t
think they understood, but she has a strong grasp of the tools of the trade. In
her job at comcast she got one day of training shadowing someone and then
was left to do the job including writing of results of testing she was doing.
Seems capable.



EXHIBIT
AA 71
PENGAD 800-631-6989

3.) **Technical Fit:** Does this candidate have the technical aptitude needed to succeed in this position?

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect technical fit)

1 ☐   2 ☐   3 ☑   4 ☐   5 ☐

Please comment on the reason for your rating:

4.) **Overall Fit:** Average your ratings and please select yes or no on moving forward with this candidate.

Average Rating: __4.0__

Yes ☑ No ☐

Overall Comments:

Assata is an out of box thinker. I of course addressed the fact that she has an engineering degree and did she see this technician role as a way to get into the company. She feels the technician role is fundamental to engineering. The lines can be blurry for an entry level engineering and the hands on components will ⊞



## Interview Evaluation Form

Candidate Name: Assata Acey

Interviewer: Ryan Taggart

Position: Senior Technician

Date: 14MAY21

---

1.) **Culture Fit:** Candidate's beliefs and behaviors align with the company's core values and company culture.

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect culture fit)

1 [ ]   2 [ ]   3 [ ]   4 [✓]   5 [ ]

Please comment on the reason for your rating:

Assata has a great personality.  She's not afraid to ask questions.  Has good communication.

2.) **Skill/Competency Fit:** Do the skills the candidate will bring to the job align with the job competencies?

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect skillset)

1 [ ]   2 [✓]   3 [ ]   4 [ ]   5 [ ]

Please comment on the reason for your rating:

Assata showed familiarity with digital calipers but struggled with a drill and center punch.  Assata also struggled determining where to drill the hole in the inverter while using the drawing and technical documentation.  Assata did not know which direction to put the drill in to drill a hole.



3.) **Technical Fit:** Does this candidate have the technical aptitude needed to succeed in this position?

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect technical fit)

1 ☐   2 ✓   3 ☐   4 ☐   5 ☐

Please comment on the reason for your rating:

Assata, with her college and lab background, has the knowledge to do the job. However, I believe she lacks experience with hand tools and will need a lot of time and attention to hone her knowledge into practical experience.

4.) **Overall Fit:** Average your ratings and please select yes or no on moving forward with this candidate.

Average Rating: 2.5

Yes ☐  No ✓

Overall Comments:

Assata has a great personality and educational background and should fit well with our culture.
In my evaluation, she exhibited very limited practical experience or understanding with technical drawings and hand tools. Will require in depth 1

Additional screen in Taggart Interview Form

on 1 training for some time.

Assata has never led a team or a project in a work/lab environment.

I believe Assata is more suited for an engineering role rather than a hands on senior technical role.





## Interview Evaluation Form

Candidate Name: Assata acey

Interviewer: Omar and Bruce

Position: Sr. Tech

Date: 4/28/2021

---

1.) **Culture Fit:** Candidate's beliefs and behaviors align with the company's core values and company culture.

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect culture fit)

1 ☐  2 ☐  3 ☐  4 ☐  5 ☑

Please comment on the reason for your rating:

2.) **Skill/Competency Fit:** Do the skills the candidate will bring to the job align with the job competencies?

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect skillset)

1 ☐  2 ☐  3 ☐  4 ☐  5 ☑

Please comment on the reason for your rating:



EXHIBIT
AA-8
PENGAD 800-631-6989

3.) **Technical Fit:** Does this candidate have the technical aptitude needed to succeed in this position?

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect technical fit)

1 ☐  2 ☐  3 ☐  4 ☑  5 ☐

Please comment on the reason for your rating:

She seemed to be know what she talking about. i believe she was transparent during interview.

4.) **Overall Fit:** Average your ratings and please select yes or no on moving forward with this candidate.

Average Rating: 14

Yes ☑ No ☐

Overall Comments:



## Interview Evaluation Form

Candidate Name: Assata Acey

Interviewer: Bruce Mitchell

Position: Sr tech

Date: 4/28/2021

---

1.) **Culture Fit:** Candidate's beliefs and behaviors align with the company's core values and company culture.

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect culture fit)

1 ☐  2 ☐  3 ☐  4 ☐  5 ✓

Please comment on the reason for your rating:
Seems they have a good enginerring mindset of thinking how and why components work and understanding it. Expressed her interest in why material science and pyhics play a role in her interest of this job field

2.) **Skill/Competency Fit:** Do the skills the candidate will bring to the job align with the job competencies?

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect skillset)

1 ☐  2 ☐  3 ✓  4 ☐  5 ☐

Please comment on the reason for your rating:
Seems to be still honing and practicing her skills after graduation, possible she was limited on what she was allowed to do from previous employers but doesnt seem to fully fit the skills for a Sr tech role

EXHIBIT
AA-9
FENGAD 800-631-6989

3.) **Technical Fit:** Does this candidate have the technical aptitude needed to succeed in this position?

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect technical fit)

1 ☐   2 ☐   3 ✓   4 ☐   5 ☐

Please comment on the reason for your rating:
would need to be trained still on certain technical abilities- seemed to have little tool knowledge and experience, wiring, cabeling stripping and crimping which are needed for a senior tech role

4.) **Overall Fit:** Average your ratings and please select yes or no on moving forward with this candidate.

Average Rating: 6/10

Yes ✓   No ☐

Overall Comments:
Had a great attitude and personality, willing to be hands on, be here in person everday which is what this team needs. Definitely seems to fit a enginerring postion instead of a senior tech role



## Interview Evaluation Form

**Candidate Name:** Assata Acey

**Interviewer:** Joren Wendschuh

**Position:** Sr Tech

**Date:** 4-28

---

1.) **Culture Fit:** Candidate's beliefs and behaviors align with the company's core values and company culture.

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect culture fit)

1 ☐   2 ☐   3 ☐   4 ☐   5 ☑

Please comment on the reason for your rating:

Loves to learn and explore and do research.  Interested in everything!
Passionate about science and trying things.

2.) **Skill/Competency Fit:** Do the skills the candidate will bring to the job align with the job competencies?

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect skillset)

1 ☐   2 ☑   3 ☐   4 ☐   5 ☐

Please comment on the reason for your rating:

I think Assata is a bit of a unique person for this role, and I would look to more
as a technician ("title") coming on board, unless Omar & Seth are Sr's.
Brings a unique "science and engineering" background and knowledge to the
job - would expect to be doing some borderline engineering work, while learning
some of the "Sr" tech side of things at least in our niche.



EXHIBIT
AA-10

3.) **Technical Fit:** Does this candidate have the technical aptitude needed to succeed in this position?

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect technical fit)

1 ☐   2 ☐   3 ☐   4 ✔   5 ☐

Please comment on the reason for your rating:

Aptitude yes - willing and interested from what I can see in an interview. Excited about work and wanting to overcome.

4.) **Overall Fit:** Average your ratings and please select yes or no on moving forward with this candidate.

Average Rating: 3.5

Yes ✔   No ☐

Overall Comments:

Looking to move forward pending interview debrief and others thoughts. That is, move forward to an in person "shadow" / meet / greet / on site "interview".



EXHIBIT
AA-10
PENGAD 800-631-6989



## Interview Evaluation Form

**Momentum**
Wireless Power

Candidate Name: Assata

Interviewer: Joren

Position: Sr Tech

Date: 5-14

---

1.) **Culture Fit:** Candidate's beliefs and behaviors align with the company's core values and company culture.

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect culture fit)

1 ☐   2 ☐   3 ☐   4 ☑   5 ☐

Please comment on the reason for your rating:

Seemed interested to learn, interested to jump in and do.  A bit of a wildcard but seems OK

2.) **Skill/Competency Fit:** Do the skills the candidate will bring to the job align with the job competencies?

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect skillset)

1 ☐   2 ☑   3 ☐   4 ☐   5 ☐

Please comment on the reason for your rating:

Some skills could use work, would require teaching from what I understand. Willing to learn and seems quick to pick things up.



EXHIBIT

*HH-15*

PENGAD 800-631-6989

3.) **Technical Fit:** Does this candidate have the technical aptitude needed to succeed in this position?

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect technical fit)

1 [ ]   2 [ ]   3 [ ]   4 [✓]   5 [ ]

Please comment on the reason for your rating:

Skills from background seemed picked up quickly, eager to learn, has a background including electronics, troubleshooting, documentation, all things needed for role. Also has some background in CAD (Both E & M), which could prove to be an interesting addition to the team / growth opportunity.

4.) **Overall Fit:** Average your ratings and please select yes or no on moving forward with this candidate.

Average Rating: 3.5

Yes [✓] No [ ]

Overall Comments:

Because of the unique nature of this candidate, would like to hold my go / no go for the debrief. I could see them coming in, learning quickly and getting up to speed, and hopefully becoming an individual contributor in addition to the directed work.

Having them as a Sr Tech implies more leadership and knowledge of the ▣

Additional screen in Joren's Interview Form

Having them as a Sr Tech implies more leadership and knowledge of the product before joining - I think this might be a bit to soon for that. I'd rather them come in as a tech, and have them grow in what area they are interested in.

AA- Ka



## Interview Evaluation Form

Candidate Name: Assata Acey

Interviewer: Seth Wolgemuth

Position: Product Introduction Senior Technician

Date: 05/17/2021

---

1.) **Culture Fit:** Candidate's beliefs and behaviors align with the company's core values and company culture.

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect culture fit)

1 ☐  2 ☐  3 ☐  4 ☐  5 ✔

Please comment on the reason for your rating:

The impression I was left with was that she's someone who belongs in an R&D environment.

2.) **Skill/Competency Fit:** Do the skills the candidate will bring to the job align with the job competencies?

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect skillset)

1 ☐  2 ☐  3 ✔  4 ☐  5 ☐

Please comment on the reason for your rating:

I have no concerns regarding competency. Some specific skills seem a little weak, but should not be difficult to pickup and bring to a proficient level.

3.) **Technical Fit:** Does this candidate have the technical aptitude needed to succeed in this position?

Rate the candidate on a 1-5 scale (1 = not a fit; 5 = perfect technical fit)

1 [ ]  2 [ ]  3 [ ]  4 [✓]  5 [ ]

Please comment on the reason for your rating:

Based on Assata's background and conversations had I would expect her to be a fairly good technical fit less some experience.

4.) **Overall Fit:** Average your ratings and please select yes or no on moving forward with this candidate.

Average Rating: 4

Yes [✓] No [ ]

Overall Comments:

I think Assata could transition into the role well and pickup what she may be lacking skill-wise very quickly. My only real concern is her not being satisfied in this position and leaving us without an experienced tech in the role a year from now. Technician skills aren't exactly hard to pick up I think her intelligence,

# EXHIBIT 12

Skip 2 and 6

1. Identify all persons who have knowledge of the facts and circumstances relating to the claims or defenses in this action and include a brief description of their knowledge. Please include any and all witnesses to the alleged discriminatory and/or retaliatory acts by Defendant.

RESPONSE: unless indicated phone numbers place of work etc are unknown, the persons whom I currently know of include:

**Steve Brown(?)-**Made comments which I categorize as racist: comments in the electrical engineering group chat about Omar Being lazy for taking PTO in comparison to a white team member, jokes in the product introduction team group chat about omar's use of PTO, and asking my whereabouts from Rob.

**Diana Wilmes-** worked directly under Judy as HR assistant. Privy to performance evaluations, interview evaluations, hiring decisions and compensation for different employees. Worked with recruiters, made most complaints about my attendance and timesheets.

**Judy Talis-** acting administrative officer during majority of my employment with defendant. Knowledge of my racial complaints, sexual complaints, disability complaints, escalation of complaints to PHRC and nature of my work.

Sam Gallagher-

**Jorge Rive-** witness to some off color statements and jokes related to sex or race made by sam during some lunches, and occasionally heard these statements when sam would visit my workdesk. I complained about Jorge aggressively pressing me for details of my "Whereabouts" as relevant to the hostile work environment created by racial harassment/discrimination.

**Julian Jackson-** witness to statements by visiting investor regarding racial hiring practices, witness to brian kennney's behaviors and outburst towards me, recipient of specific work rules and guidelines which I had earlier identified as problematic, witness to another employees comments made about race during their discussion of Dylan Roof trial.

**Omar Jackson-** first and only promoted black employee in defendant's history, originally denied senior title due to "employment gap". Also experienced scrutiny from HR and comments from coworkers. Present for a deal of criticism I received from Rob Rosenberg and other coworkers. First/only employee to tell me of suspected racial differences in pay. Knowledge of my work on the UV project. Witness to his own starting and ending pay as technician and senior technician while at MD.

**Maria Tabutt-** Only supervising female mechanical engineer. Responsible for the Assembly Documents of the 150 and 75kW US and EU cabinets. Knows of some of the Quality and Documentation related work conducted by me during employment with Defendant. Experienced scrutiny and less cooperation from male employees including Bogdan Proca, Rob Rosenberg, and men on the QA team. Listened to locker room talk from John Wolgemuth. Told during performance evaluations that she could not document her supervision of design engineer despite acting as their supervisor without full pay. First/only employee to tell me of gender differences in pay. Received weekly meetings with HR when they complained about hostile environment caused by new Manager which included performance evaluation issue. Witness to her own starting and ending pay and related negotiations while working at MD.

**Frank mcmahon-** Manager of Sam Gallagher. May know about his sexual comments/ pressuring me to go to lunch

**Sam Gallagher-**witness to jokes and comments made by himself, Jorge in relation to race, and himself and Bogdan Proca in relation to gender. witness to his own pay or compensation as R&D engineer.

**Seth Wolgemuth-** Witness to his own initial and post promotion pay as a technician and senior technician with MD.

**Brian Kenney-** Issues with Kenney regarding his treatment of me vs white employees which required intervention, he also had issue with Julians work which was categorized as racially biased.

**Bogdan Proca-** Sexual harassment witness through his own comments and behaviors.

**Mike Russell-** Sexual harassment witness through his own behavior.

**Joren Wendschuh-** Knowledge of all claims made due to direct complaints and "journaling" of notes through messages to him in Teams.

**Brenda** – witness to sexual harassment through behaviors of her QA teammates towards issues escalated by/tasks related to me or Maria.

**Alexandra Heisler-**wrongful termination, racial discrimination in hiring, compensation.

**Patti-** wrongful termination, racial discrimination in hiring, compensation.

**Thaddeus-** in charge of migrating project notes from teamworks to jira, suspected to have seen many details regarding my work/projects

**John Wolgemuth:** witness to his own comments about women made at work.

**Darren-**witness to gender discrimination; witness to his own starting pay as a mechanical engineer.

**Erik Lydick-** witness to gender discrimination; witness to his own starting pay as a mechanical engineer.

**Jerry Frank:** Asked me for consulting work on substrate, also party to comments made in electrical engineering group chat and comments by John Wolgemuth

Ben – witness to racial hiring practices. Comments made in defense of his sister's behavior.

Jed Tsada- Knowledge of my work on the UV project

**Dan Hackman-** Witness to sexual harassment through Sam Gallaghers pressuring for lunch, witness to nature of work as well as racial comments made by coworkers. Fired 10 days after I notified company of suit. Likely to use spousal privilege/avoid testifying as we are legally married.

3. Identify all healthcare professionals, including but not limited to, physicians, psychiatrists, psychologists, therapists, social workers, and other healthcare professionals with whom you consulted or from whom you received or sought treatment since 2018, including but not limited to those consulted regarding any injuries or conditions relating to any injuries or conditions relating to this action.
RESPONSE:
Sanul Corrielus
215-383-5900
702 W Girard Ave, Philadelphia, PA 19123

Chantele Mallory
484-572-4251
201 King of Prussia Rd, Ste 650, Radnor, PA 19087

Yefim Aranbayev
610-853-4350
7922 West Chester Pike, Upper Darby, PA 19082

Christopher Reid
610-527-8140
825 Old Lancaster Rd, #370, Bryn Mawr, PA 19010

Gregory C. Bolton Senior
610-896-4380
100 Lancaster Ave, Wynnewood, PA 19096

Peter Snyder
215-662-9905
51 N 39th St, Philadelphia, PA 19104

Gerald Michael Lemole
215-947-8887
2771 Philmont Ave, Huntingdon Valley, PA 19006

Tara Bussett
610-853-1112
2010 West Chester Pike Suite 350
Havertown, PA 19083

Avani P. Amin
610-708-5575
1502 West Chester Pike Ste 15,
West Chester, PA 19382

Denis Joffe
610-527-1604
825 Old Lancaster Rd #360
Bryn Mawr, PA 19010

Seth Zwillenberg
800-346-7834
5501 Old York Rd Paley, 5501 Old York Building, 2nd Floor,
Philadelphia, PA 19141

Sheri Klock
484-829-6003
308 E Lancaster Ave, Wynnewood, PA 19096

Michele Hirsch
484-476-7255
306E Lancaster Ave Suite 300,
Wynnewood, PA 19096

Mary Adefemi
484-829-6003
308 E Lancaster Ave, Wynnewood, PA 19096

Jennifer Flom
610-668-7992
915 Montgomery Ave 4th Floor,
Narberth, PA 19072

Amy Lundholm
610-896-8400
100 E Lancaster Ave #137, Wynnewood, PA 19096

Tony Anene-Maidoh
302-366-7671
774 Christiana Rd #202
Newark, DE 19713

Evelyn Partridge
856-406-5466
1717 Meadow St, Philadelphia, PA 19124

Jamie L. Rodden
610-668-7992
915 Montgomery Ave 4th Floor,
Narberth, PA 19072

Daniel Yoshor
215-316-5151
3400 Civic Center Boulevard
South Pavillion, 2nd Floor, Philadelphia, PA 19104

Stephanie Almeida
215-331-1020
7131 Frankford Ave 2nd Floor,
Philadelphia, PA 19135

Nancy Villanueva
800-836-7536
3401 N Broad St Suite D-101, Philadelphia, PA 19140

Tamara Mahr
215-316-5151
800 Walnut St 9th Floor, Philadelphia, PA 19107

Mary Antoniou
215-316-5151
3624 Market St STE 201,
Philadelphia, PA 19104

Michael E. Post
610-527-4896

825 Old Lancaster Road Suite 420
Bryn Mawr, PA 19010

Ryan Whitcomb
215-855-2693
700 Horizon Dr Ste 101, Chalfont, PA 18914

Satyen Undavia
610-446-6900
301 West Chester Pike #101,
Havertown, PA 19083

Monika K. Shirodkar
215-955-1925
Walnut Towers, 211 S 9th St Unit 600,
Philadelphia, PA 19107

Erik Zeger
610-645-2494
100 E Lancaster Ave Suite B20,
Wynnewood, PA 19096

Mark J. Kotapka
215-456-6127
5401 Old York Rd SUITE 400,
Philadelphia, PA 19141

Katie M. Hawthorne
484-476-1000
Heart Pavilion, Mezzazine Level, 100 E Lancaster Ave, Wynnewood, PA 19096

Kenneth Shindler
215-316-5151
51 N 39th St, Philadelphia, PA 19104

Michele Farber
844-337-6362
1900 Market St #115, Philadelphia, PA 19103

James J. Evans
215-955-7000
909 Walnut St, Philadelphia, PA 19107

Xin C. Wang
215-257-4900
920 Lawn Ave, Sellersville, PA 18960

Marianne Ruby
1015 Chestnut St #601, Philadelphia, PA 19107

4. Identify all chat rooms, blogs, online forums, or social media or networking websites, applications, services, software, or platforms (including but not limited to those involving video sharing, photograph sharing, blogging, messaging, or ephemeral messaging) for 11 which you have or had an account, or which you have used someone else's account to conduct activity, from January 1, 2020 through the present.
RESPONSE: linkedin, facebook, Instagram, indeed, monster, Glassdoor, ziprecruiter, careerbuilder.

5. Identify all persons who provided information used, and all documents reviewed or referenced in answering these interrogatories.
RESPONSE:  all persons in section 1 have acted as a source or provided information and or documents referenced in these interrogatories. I am now also considering calling all persons in section 1 as potential witnesses to the case.

7. State the amount of damages you are claiming for each cause of action alleged in the Complaint and how the amount was calculated.
RESPONSE: I am claiming the maximum amount for each cause of action for the combination of compensatory and punitive damages.

8. Describe in detail all facts supporting your demand for punitive damages as alleged in your Complaint.
RESPONSE: All facts listed in my motion for summary judgement, complaint, response to defendants motion to dismiss, supporting brief are in support of my demand for punitive damages.

9. Describe in detail all facts supporting your claims that Defendant discriminated against you based upon race as alleged in your Complaint.
RESPONSE: All facts listed in my motion for summary judgement, complaint, response to defendants motion to dismiss, supporting brief are in support of my claims of racial discrimination.
10. Describe in detail all facts supporting your claims that Defendant discriminated against you based upon disability as alleged in your Complaint.
RESPONSE: All facts listed in my motion for summary judgement, complaint, response to defendants motion to dismiss, supporting brief are in support of my claims of disability discrimination.

11. Describe in detail all facts supporting your claims of sexual harassment as alleged in your Complaint.
RESPONSE: All facts listed in my motion for summary judgement, complaint, response to defendants motion to dismiss, supporting brief are in support of my claims of sexual harassment.

12. Describe in detail all facts supporting your claims of unlawful termination as alleged in your Complaint. RESPONSE: All facts listed in my motion for summary judgement, complaint, response to defendants motion to dismiss, supporting brief are in support of my claims of unlawful termination.

13. Identify all efforts you have made to find employment beginning in 2017 up to present, with the exception of employment with InductEV, and if applicable, identify by name, address, and telephone number each employer for whom you have worked. RESPONSE: I have not maintained records of every

employment effort from 2017 on. I had fielded numerous recruiter calls screenings, occasional interviews and online resume submissions

Employers

Bryn Mawr College Physics Department
101 N Merion Ave,
Bryn Mawr, PA 19010

Modis staffing agency
1305 Goshen Parkway
west Chester, PA 19380
610-793-8735

Pinnacle Technologies Staffing Agency
2001 US 46 E Waterview Plaza Suite
310 Parsippany NJ 07054
646-688-3623

Onboard Services
50 Millstone Road Building 300
suite 110
East Windsor, NJ 08520
609-945-8000

Insight Global Staffing Agency
855-485-8853
1224 Hammond Drive, Suite 1500
Atlanta, GA 30346

.

14. Identify all positions held by you prior to your work at InductEV that you believe reflect or provided to you experience that should have been acknowledged by InductEV for purposes of hiring, or at some point during your employment promoting you into the Senior Technician position. With respect to those positions, please identify the employer, your direct 13 supervisor and/or others who are familiar with your employment and as much directory information as you may have, including but not limited to, name, phone numbers, email, etc. RESPONSE:

Research Assistant- Supervised by Michael Noel
mnoel@brynmawr.edu
610-526-5363

Summer Research Assistant- Supervised by Michael Lim
856-256-4365
lim@rowan.edu

Teaching Assistant- supervised by Mark Matlin email, phone
mmatlin@brynmawr.edu

Private tutor- Frog tutoring where I worked as an independent contractor
Frog Tutoring Corporate Office

1751 River Run Suite 200
Fort Worth, TX 76107
Phone: (877) 904 0134


General Technician- Ron Henry
610-436-5203
linkedin profile
https://www.linkedin.com/in/ronald-henry-4094aa67/


R&D Technician and Associate Investigator Roles-
Manager Hjalti Skulason-
805-350-3119
Hjalti.skulason@dupont.com
Supervisor John Allen
302-287-0391
John.allen@dupont.com


II RF Engineer – Supervisor was Nathan Zedan
609-929-9608
I do not know his email address. This is his linked in
https://www.linkedin.com/in/nathan-zedan-59163437/

Katherine McQuoid
worked with me while at comcast
happymcquoid@gmail.com


15. With respect to the allegation in Paragraph 144 of the Complaint, please identify the details of the
reclassification of the employees identified including the respective positions; your knowledge of
Company needs; and your knowledge of pre-existing qualifications and job tasks in association with the
reclassification of each individual. RESPONSE:
I have no further knowledge than what was stated in complaint, or attached as supporting exhibits in my
Response to motion to dismiss. All details in my complaint and supporting brief and exhibits are details

of the reclassification that I currently possess. I am constantly searching for new knowledge regarding the same.

16. With respect to the allegation in Paragraph 145 of the Complaint, please identify the details of the reclassification of the employees identified including the respective positions; your knowledge of Company needs; and your knowledge of pre-existing qualifications and job tasks in association with the reclassification of each individual. RESPONSE:

I have no further knowledge than what was stated in that paragraph or attached as supporting exhibits in my Response to motion to dismiss. All details in my complaint and supporting brief and exhibits are details of the reclassification that I currently possess.  I am constantly searching for new knowledge regarding the same.

# EXHIBIT 13

| From: | Assata Acey |
| To: | Post, May Mon |
| Cc: | Patti Rensel; Alexa Heisler; Barbara Foxman; horniqtracy@gmail.com |
| Subject: | Re: Acey v. Momentum |
| Date: | Tuesday, September 27, 2022 4:47:31 PM |

## EXTERNAL EMAIL

Relevant work samples, as organized and shared with Patti Rensel yesterday evening, have also been submitted.

On Tue, Sep 27, 2022, 2:52 PM Assata Acey <aceyassata@gmail.com> wrote:
As you are currently aware, this case has been moved to investigation.
I reject your contract.

In mediation I did agree to
a verbal agreement in which I would resign and dismiss existing claims(prior to Sep 19) in return for a settlement amount of 50,000 from Momentum Dynamics Corp.
The execution of this agreement was contingent on a contract that included agreeable material terms. The fact that you requested me to execute terms of an agreement that I had yet to review or sign suggests that we did not resolve the issue.

At no point was resignation agreed to as a requirement to review or receive any agreement. At no point was a deadline agreed to for resignation. The only requirement agreed to as a condition of receiving a contract was that I would provide a letter from my doctor. The deadline given for this letter was September 26 2022. My Grandmother is a witness to my agreements during mediation and can confirm the same.

As of yet, I have not resigned and I consider my immediate lock-out from company databases as a direct attempt to fire me after my complaint, which is to be added to my charge file along with all other documents submitted to Alexa and Pattis Momentum emails this past friday afternoon.

On Tue, 27 Sept 2022 at 14:10, Post, May Mon <maymon.post@bunkerray.com> wrote:

Dear Ms. Acey,

I am confused by your email below. At the mediation on September 19, 2022, the parties agreed on the following material terms:

You agreed to resign from employment with Momentum effective immediately (September 19, 2022) and further agreed to provide Momentum with the said resignation letter on or before September 23, 2022. Therefore, Momentum has accepted your resignation as of that date.



Additionally, you agreed to provide Momentum with a verification form from a medical provider, on or before September 23, 2022, returning you to return to work on full duty with or without restrictions.

In addition, you agreed to a general release, non-disparagement and confidentiality, and Momentum agreed to provide a neutral reference.

In exchange for the above, within 30 days of the execution of the settlement agreement by you, Momentum agreed to pay the settlement proceeds in the total amount of $50,000 (less ordinary deductions required by law, if applicable].

I indicated to the mediators that a settlement agreement would be sent to you for execution as soon as it was finalized. To that end, I am attaching it herewith.

Thank you.

**May Mon Post, Esq. | Lead Employment Attorney | Bunker & Ray**

Employees of ACE American Insurance Company, a Chubb Company

436 Walnut St. | WA01A | Philadelphia, PA 19106
(215) 845-6154 (direct) | (267) 372-1240 (mobile)
maymon.post@bunkerray.com

This email (which includes any attachments) is intended to be read only by the person(s) to whom it is addressed. This email may contain confidential, proprietary information and may be a confidential attorney-client communication, exempt from disclosure under applicable law. If you have received this email in error, do not print it, forward it or disseminate or use it or its contents. In such event, please notify the sender by return email (or by phone at the number shown above) and delete the email file immediately thereafter. Thank you for your cooperation.

We strive to be a paperless office. I encourage you to send all correspondence via email instead of U.S. mail when at all possible. If you email a document to me, it is not necessary to send a separate copy via U.S. mail. Thank you.

**From:** Assata Acey <aceyassata@gmail.com>
**Sent:** Friday, September 23, 2022 10:39:46 PM
**To:** Post, May Mon <Maymon.post@bunkerray.com>; Patti Rensel
<patti.rensel@momentumdynamics.com>; Alexa Heisler
<Alexa.Heisler@momentumdynamics.com>; Assata Acey
<Assata.Acey@momentumdynamics.com>
**Subject:** Re: Acey v. Momentum

## EXTERNAL EMAIL

My collected evidence of inferred bias is proof of discrimination in my hiring decision
work classification/failure to promote. This bias consists mainly of experiences I had with
HR that were not replicated with my colleagues (accusations of stealing time, asks of if I
were pregnant/should see daughter's gynecologist, degree of meeting invite harassment,
response to reported bias and harassment incidents at work etc). Failure to classify or
promote would be a part of that because the performed tasks were reasonably beyond the
scope of my role, requiring skills of a process engineer/beyond technician job description.
And not only was HR aware of this through my performance review and subsequent
communications, but I specifically mentioned in my performance review that I would be
seeking compensation commensurate with the tasks that I was completing.

Regardless of your evaluation of evidenced inferred bias, conspicuous skill gap between
my tasks and role, and previous (re performance review) request to be adequately
compensated. My claim still holds additional charges of severe harassment and ADA
related retaliation. The severe racially/gender impacted harassment of not being allowed to
use my cell phone and an evidently unusual/severe reimbursement process (where I was
denied from opting out) is supported by the same inferred bias as well as additional bias
acts by coworkers( pen markings on a work desk vowing not to "talk about race", comic
regarding a fake "phizzics" degree posted outside my cubicle, additional
biased/policing behavior of coworkers)

This retaliation would include the onset of my illness when I expressly needed to take time
off and was told at the last minute before heading out that the current pay period would
not allow me to do unpaid time (as supported by my 5/12 doctors note). Which caused me
such severe distress that after returning from two doctor's appointments, I worked until
9:00 PM in pain to make up those pay period hours.

The stress of this ordeal is further documented in my diagnosis of major depressive
disorder from both my PCP and therapist as well as therapy sessions where these issues
were discussed.

Due to the documentation of this issue, I am convinced that a full investigation will find
Momentum Dynamics Corporation in noncompliance of EEOC law with order to pay the
full 50,000 amount regardless of whether I resigned--being that resignation would be my
right.

Beyond this, I do perceive your emails of this week as attempts to:
a) have this case dismissed

b) convince me to resign (a condition contingent on our "meeting of minds" as demonstrated through a contract) without submitting and written documentation/contract for my review between myself and you to review or sign.

c) change or misconstrue existing and communicated FMLA policy to use PTO payment as a bargaining chip towards part b.

I view these as direct actions to intimidate and retaliate against me for filing this EEOC complaint if not to also interfere with EEOC process by avoiding the need to include your resignation condition in a written unredacted settlement agreement

In the scope of the merit of my claims(existing complaint), right to resign or not, previously noted actions, and supporting documentation, I am now asking for a settlement amount of $130,000, acceptable for review ONLY with receipt legally drafted settlement offer (including ALL material terms: resignation, rehire eligibility, time scale/terms of payment, confidentiality, etc).

Unless/until an agreement is signed detailing resignation, I am an employee of Momentum Dynamics Corp and will be either using PTO or reporting to work.

All supporting documentation has been attached. Please refer any questions, comments, or followup to my email.

On Fri, 23 Sept 2022 at 16:13, Assata Acey <aceyassata@gmail.com> wrote:

---------- Forwarded message ---------
From: **Assata Acey** <aceyassata@gmail.com>
Date: Fri, 23 Sept 2022 at 16:10
Subject: Re: Acey v. Momentum
To: Post, May Mon <maymon.post@bunkerray.com>

Thank you for your clarifying email. Please confirm whether the following previous PTO/FMLA/REturn to work policies, as communicated in the attached email PDFs and FMLA form, have been changed to match what you are currently saying. thank you.

On Fri, 23 Sept 2022 at 16:01, Post, May Mon <maymon.post@bunkerray.com> wrote:

Good afternoon, Ms. Acey:

I understand that you requested to take PTO for September 22 and 23. Please be advised that you are unable to put in for PTO as you are still on disability leave and you cannot take PTO unless you are back to work. (Also, per your doctor's note, you are not to be released to return until Monday, which is a moot point as you have

                     INDUCTEV INITDISCL000054

resigned or will be resigning shortly). However, you will be paid the balance of your PTO upon your resignation. If you resign today through Sunday, you will receive your final pay check on 09/30. If you resign 09/26 – 10/09, you will receive your final pay check on 10/14. Please provide me with a copy of your resignation letter as soon as possible.

Thank you, and please let me know if you have any questions.

**May Mon Post, Esq. | Lead Employment Attorney | Bunker & Ray**

Employees of ACE American Insurance Company, a Chubb Company

436 Walnut St. | WA01A | Philadelphia, PA 19106
(215) 845-6154 (direct) | (267) 372-1240 (mobile)
maymon.post@bunkerray.com

This email (which includes any attachments) is intended to be read only by the person(s) to whom it is addressed. This email may contain confidential, proprietary information and may be a confidential attorney-client communication, exempt from disclosure under applicable law. If you have received this email in error, do not print it, forward it or disseminate or use it or its contents. In such event, please notify the sender by return email (or by phone at the number shown above) and delete the email file immediately thereafter. Thank you for your cooperation.

We strive to be a paperless office. I encourage you to send all correspondence via email instead of U.S. mail when at all possible. If you email a document to me, it is not necessary to send a separate copy via U.S. mail. Thank you.

This email (including any attachments) is intended for the designated recipient(s) only, and may be confidential, non-public, proprietary, and/or protected by the attorney-client or other privilege. Unauthorized reading, distribution, copying or other use of this communication is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) should not be deemed a waiver of any privilege or protection. If you are not the intended recipient or if you believe that you have received this email in error, please notify the sender immediately and delete all copies from your computer system without reading, saving, printing, forwarding or using it in any manner. Although it has been checked for viruses and other malicious software ("malware"), we do not warrant, represent or guarantee in any way that this

CONFIDENTIAL

INDUCTEV INITDISCL000055

communication is free of malware or potentially damaging defects. All liability for any actual or alleged loss, damage, or injury arising out of or resulting in any way from the receipt, opening or use of this email is expressly disclaimed.

CONFIDENTIAL

INDUCTEV INITDISCL000056

# EXHIBIT 14



**JOB TITLE:** Senior Technician
**REPORTS TO:** Manufacturing Manager
**DEPARTMENT:** Productive Introduction
**JOB CATEGORY:** Technician

### JOB SUMMARY:
Provides hands-on support in design and development efforts. Performs functions associated with all manufacturing operations, including working with engineers in set-up and calibration tasks, as well as performing rework and quality testing related to the production of parts, components, subassemblies and final assemblies. Develops and maintains methods, operation sequence and processes in the manufacture or fabrication of parts, components, subassemblies and final assemblies. Team member that contributes, advises and interfaces with engineering in coordinating the release of new products.

### ESSENTIAL FUNCTIONS/RESPONSIBILITIES:
- Hands-on technical contributor for the hardware development organization.
- Collaboration with engineers throughout the Development, Test, Manufacturing, and Operations organizations to effectively identify and help resolve hardware design issues and assist in driving these issues to closure.
- Contribute in efforts to define and write test plans and reports.
- Develop and document fixes for equipment configuration issues and make recommendations for enhancements.
- Effectively document technical issues, test and measurement results, proposed solutions, etc.
- Develop and follow established processes and procedures.
- Participate in technical reviews.
- Provide regular status and progress towards milestones with team leads.
- Perform functional or parametric testing of electronic circuit boards or assemblies.
- Use schematic analysis combined with standard electronic test techniques to perform failure analysis and root cause determination to a component level.
- Perform component-level repair on these assemblies using both SMT and through-hole rework techniques.
- Assist the Engineering staff as necessary in the design, fabrication, or validation of new production test fixtures.

### KNOWLEDGE, SKILLS AND ABILITIES:
- Ability to follow and assist in the development of processes and procedures.
- Ability to lead and motivate a team environment.
- Capable of reaching technical decisions within the scope of responsibilities.
- Must have ability to mentor and lead more junior technicians.
- Experience in cable design and assembly
- Proficient in use of small hand tools (e.g., pliers, screwdrivers, nut drivers)
- Able to troubleshoot independently to the component level, locating advanced manufacturing defects or defective components

EXHIBIT

PENGAD 800-631-6989

*A4-6*



- Test & debug electronics with an oscilloscope, multimeter, function generator and other electronic lab equipment.
- Build and rework prototype surface mount PCBA's, mixed-technology PCBA's and cable assemblies.
- Visually inspect work with a sharp eye for quality.
- Organize BOM's, order and manage electronic materials to support prototype builds.
- Create accurate written records of work.
- Maintain a clean, orderly and professional work environment and comfortable working in a shop/laboratory environment

**CORE COMPENTENCIES:**

- INNOVATION: Generates new and creative ideas, products or methods. Shows great initiative and will readily challenge the status quo. Not afraid to take professional risk and supports change and solves problems creatively.
- INTEGRITY: Is trustworthy and honorable, displays professionalism, discretion, and sound judgment. Deals with others in a straightforward and honest manner, is accountable for actions, maintains confidentiality and supports company values. Inspires trust and behaves in a way that earns and maintains the respects of others.
- QUALITY OF WORK: Maintains high standards and delivers on time what was promised while adding value beyond what was expected. Is attentive to detail and accuracy – does it right the first time. Looks for improvements continuously, seeks to find the root cause of any problems or issues in a commitment to excellence.
- TEAMWORK: Is an honest and dependable team player who contributes to group collaboration and shows empathy and respect for others. Builds and maintains good working relationships. Actively solicits feedback from peers and other team members when planning and making significant decisions. Provides insight and readily shares their knowledge and experience. As a leader understands and advocates that the best solutions come from working collaboratively – establishes an atmosphere of trust, championing issues and sharing successes.
- INITIATIVE: Takes independent action including seeking out new responsibilities or opportunities. Supports an environment that encourages improvement, innovation and challenging traditional approaches.

**EDUCATION AND EXPERIENCE:**

- Associates degree, completion of electronic technology certification, or equivalent technical experience.
- 8+ years' experience in a test environment for emerging technology.

**TRAVEL REQUIREMENTS:**

- Minimal travel.



**PHYSICAL REQUIREMENTS:**
- Must be able to lift, stand for periods of time and work in a  laboratory environment.

# EXHIBIT 15



# **Momentum**®
Wireless EV Charging

## 2021 ANNUAL PERFORMANCE MANAGEMENT

**INTRODUCTION:** The year-end review is a key component of the Performance Management process. Complete the self-evaluation, accomplishments, career development, goals, and competency sections and forward to your supervisor for review. Your manager will supply evaluations on each category and overall performance comments.

| REVIEW DATE: | |
|---|---|
| **NAME:** | Assata Acoy |
| **JOB TITLE:** | Product Introduction Technician |
| **MANAGER:** | Joren Wendschuh |
| **DEPARTMENT:** | Product Introduction |

### ACCOMPLISHMENTS, CHALLENGES AND STRENGTHS:

What do you consider to be your accomplishments, challenges, and strengths throughout the year?

In the 6 months of being here, I have approached our 150 and 75kw cabinets in areas of inventory, assembly, and documentation, while doing my part to support sustainable interdepartmental/team structure and vendor quality. I would say that my strengths are in emotional intelligence, detail, and documentation. I am challenged with learning more about the product and processes and people surrounding its development. Highlights of my work regarding cabinet inventory, assembly and documentation can be found below.

**Cabinets**

*Inventory*

- Created an inventory document for 176 hardware and miscellaneous tech held cabinet items by description and location by hand counting, using excel and consulting Manufacturing BOMs for US and EU 150 and 75kw cabinets.
- Consolidated inventory from 4 carts to 2 by drafting and engaging a plan for better labeling and organization of tech-held cabinet inventory.
- Sustained effective tech-held inventory by submitting orders for necessary hardware or related communal tools and resources in reference to latest BOMS.

*Assembly*

- Updated 4 cabinets (two EU 150s one US 150, one EU 75) by reviewing them in reference to 30- 60- Vendor Quality page (150-180 step) assembly documents.
- Built two cabinets (ones US 150 and one US 75) and made headway on a third (US 75) cabinet in reference to latest documents

*Documentation*

- Propelled improvement of 150kw (EU and US) and 75kw (EU and US) cabinet, flow, light tower, and fan assembly documents by finding and creating documentation for:

    a    Labeling error (does reference number match Bom number)
    b    Accuracy (are pins going to right places)
    c    Clarity (how often will this wording lead to workmanship error)
    d    Connection to design intent (does the result match the idea)

- Prevented against repeat errors and re-investigation by fortifying organizational memory through

    a    initiation and documentation of total inspections by Maria and Quality
    b    documentation of case-by-case investigations and correspondence (rail alignment, inverter connectors) by mech engineering and product Introduction manager and concerning the progression of repairs made



EXHIBIT
M-820
PENGAD 800-631-6989



## Momentum®
Wireless EV Charging

## 2021 ANNUAL PERFORMANCE MANAGEMENT

**CAREER DEVELOPMENT AND GOALS:**

Where do you want to grow in your career? How can we help you get there through education/training, experiences?

[Growth]
With momentum Dynamics, I am seeking to deepen my hands-on skills and continue gathering information from my team and surrounding coworkers on issues in the assembly and problem-solving process.
1. I want to know the implications of various designs, not just theoretically, but how:
   - they translate to assembly steps
   - how these steps along with formal collaborative lines can inform labor times, longevity, quality
2. I want to learn more about how we channel concerns and how it can affect the way product knowledge travels from hands on parts of the company to theoretical parts.
3. Beyond this I am excited to view and learn the backend lifecycle of these products:
   - how they are tested and repaired after delivery, and
   - the performance factors that can uphold an image of reliability and value in Momentum's products
4. Further still, I am interested in building my theoretical knowledge in the materials science aspect of engineering.

[Help]
I feel that much of my goals can be met through observing and gathering information from my position over time, in addition to training. I know there can be conferences and or formal training around topics like efficiency, collaboration, innovative team structures and I would be open to those. So long as my role and compensation continue to match my tasks, I am excited to continue my pursuit of growth at Momentum Dynamics.

What do you consider to be your most important goals in the next year?

My goals in the next year are to:
a) do my part to get cabinet builds/assembly docs as streamlined and close to target as possible
b) develop more hands -on knowledge of product to learn more about the experiences of other sub-assemblies from my team
c) continue to document new and old issues as they come to my attention to save time/money and enact improvement
d) continue to support a positive work environment by doing my part for inter and intrateam coordination



**Momentum®**
Wireless EV Charging

## 2021 ANNUAL PERFORMANCE MANAGEMENT

COMPETENCY EVALUATION: Employees are evaluated on each of the factors listed below. Please use the space to comment on how the listed competency was demonstrated and/or progress made.

| CORE COMPETENCIES | DESCRIPTION |
|---|---|
| **INNOVATION** | Generates new and creative ideas, products or methods. Shows great initiative and will readily challenge the status quo. Not afraid to take personal risk and supports change and solves problems creatively. |

Employee self-evaluation: My biggest moments of innovation would be providing 4 theoretically informed, accessible, and combinable methods to increase the bonding properties of an alternative primer within a day's notice; supporting the VW test system by providing drafts of a four-switch safety stop circuit; and brainstorming 4 cost effective environmental tests, materials, and criterion to determine the specifications of a connector on the VA coil.

Manager evaluation:

In Assata's time here, they have exceeded expectations, providing insight and innovative ideas to different areas of the company. They do well with design and documentation review – finding and offering solutions to wording, explanation, and order – helping the documentation become better and lowering confusion.

| **TEAMWORK** | Is an honest and dependable team player who contributes to group collaboration and shows empathy and respect for others. Builds and maintains good working relationships. Actively solicits feedback from peers and other team members when planning and making significant decisions. Provides insight and readily shares their knowledge and experience. As a leader understands and advocates that the best solutions come from working collaboratively – establishes an atmosphere of trust, championing issues and sharing successes. |
|---|---|

Employee self-evaluation: Teamwork is where am I able to use my strength of emotional intelligence. I continue to look out for signs of developing or preexisting tension between my team members and departments that I collaborate with to make sure we are receiving the full benefit of everyone skills and that folks feel respected and valued enough to bring their best, and willingly improve each other.
When issues appear, I:
a	Take note of what words are said to imply tension
b	Follow up with expressive parties and gather information from all involved members
c	Summarize team member or interdepartmental complaints into key clarity points
d	Brief my manger on these points and follow up with proposed solutions
A larger example of this would be:
Organizing initial meetings between QA and Mech engineering to streamline knowledge transfer, cabinet inspections processes and documentation, collecting and distributing meeting notes/future actions

Manager evaluation:

Assata is integrating into the team pretty well. They have built relationships both in and outside of the team and in their role working with Maria, has openly solicited feedback and shared their knowledge and insight. Making good progress within the team.

| **PROFESSIONAL/TECHNICAL KNOWLEDGE & SKILLS** | Understands area of responsibility, seeks clarity and/or guidance when appropriate; acquires, understands, and applies professional and technical knowledge, skills, and information. Uses technology and resources to improve effectiveness and productivity; gathers and analyzes information skillfully, demonstrating understanding of the issues at hand. |
|---|---|

Employee self-evaluation: I use my strengths of detail and quality along with technical knowledge to approach vendor quality. I continue to evaluate products in cabinet assembly for practical use and quality to support reliable and workable cabinets and avoid costly and embarrassing errors.
Where issues appear, I:
a	seek to document product shortcomings through physical imaging, written details/reasoning, citings and attached excerpts of momentum's documented specifications
b	Enrich and inform documentation by initiating and documenting interdepartmental specialist input or investigation: [Maria-Mech Intent Cabinet Design; Rob- Historical/practical Experience in Cabinet Assembly; Taylor- Historical purchasing/sourcing info, etc.]
c	Brief Joren with this information, and where prompted, escalated details to QA for address.
d	Provide additional information throughout escalations process, perform and review vendor suggestions, edit/review procedures for internal use
Examples of this would be:



## 2021 ANNUAL PERFORMANCE MANAGEMENT

Proofing mis- 0shape of PAI 150kw main-cabinet Antenna holes; Highlighting Oztek hole misalignment and reorganizing the repair procedure; Highlighting PAI provided Flow assembly workmanship (used in cabinet cooling systems) and Quick Disconnects ($200 each), Hoffman Handle Replacement procedure inconsistency and spec inadequacy.

Manager commenting on employee's demonstration of above competency:

Assata's background has assisted them in different areas, as shown above – adding breadth to the team's background.  Their technical skills have improved, and they aren't afraid to ask for help when they find the extent of their skills.  They have done a couple detailed research projects for the team as well, and have gathered and utilized appropriate resources to complete the projects.

**OVERALL MANAGER COMMENTS:**

Assata is doing well joining the team, with their unique background adding value to their position. Assata has done well learning the tools and organization to the shop and suggesting improvements where they make sense.  They have jumped in on certain projects where urgent assistance was needed.  I look forward to their growth within Windchill, Confluence and Jira in the next year and their growth within the team.

**COMPANY GOALS/TARGETS FOR 2022:**

Grow with their soldering and assembly skills
Integrate better within the team, reading the room for when to wrap up a tangent.
Work toward providing clear and concise feedback and status updates where needed.
Integrate the new software into their daily routine.



## 2021 ANNUAL PERFORMANCE MANAGEMENT

EMPLOYEE SIGNATURE: Assata S. Acey                     Feb 4, 2022

MANAGER SIGNATURE: *Joren Wendschuk*                    Feb 6, 2022

DATE: 12/4/2021

# MDPerformanceReviewForm2021 - Acey

Final Audit Report                                                                 2022-02-06

| | |
|---|---|
| Created: | 2022-02-04 |
| By: | Joren Wendschuh (joren.wendschuh@momentumdynamics.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA6gau6gS1qozWhH4jLkj8CfBbxqdksiDZ |

## "MDPerformanceReviewForm2021 - Acey" History

📄 Document created by Joren Wendschuh (joren.wendschuh@momentumdynamics.com)
2022-02-04 - 7:38:32 PM GMT- IP address: 173.49.200.70

📧 Document emailed to Assata S Acey (assata.acey@momentumdynamics.com) for signature
2022-02-04 - 7:39:35 PM GMT

📄 Email viewed by Assata S Acey (assata.acey@momentumdynamics.com)
2022-02-04 - 8:20:01 PM GMT- IP address: 73.81.119.82

✍️ Document e-signed by Assata S Acey (assata.acey@momentumdynamics.com)
Signature Date: 2022-02-04 - 8:28:06 PM GMT - Time Source: server- IP address: 73.81.119.82

📧 Document emailed to Joren Wendschuh (joren.wendschuh@momentumdynamics.com) for signature
2022-02-04 - 8:28:08 PM GMT

📄 Email viewed by Joren Wendschuh (joren.wendschuh@momentumdynamics.com)
2022-02-06 - 5:27:38 PM GMT- IP address: 50.78.131.36

✍️ Document e-signed by Joren Wendschuh (joren.wendschuh@momentumdynamics.com)
Signature Date: 2022-02-06 - 5:28:08 PM GMT - Time Source: server- IP address: 50.78.131.36

✅ Agreement completed.
2022-02-06 - 5:28:08 PM GMT

# EXHIBIT 16

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented to: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | X  FEPA<br>X  EEOC | 202102397<br>17F-2022-61016 |

| | PHRC | | and EEOC | |
|---|---|---|---|---|
| | *State or local Agency, if any* | | | |

| Name (*indicate Mr. Ms. Mrs.*) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Assata Acey | 7702311017 | |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| 5121 Brown Street | Philadelphia, PA, 19139 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Induct EV (Formerly Momentum Dynamics Corp.) | 76 | 484-320-8222 |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| 3 Pennsylvania Ave | Malvern, PA 19355 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| | | |

| DISCRIMINATION BASED ON (*Check appropriate box(es).*) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest            Latest |
| X RACE  __ COLOR  X SEX __ RELIGION __ NATIONAL ORIGIN | 05/24/2021 |
| X RETALIATION __ AGE  X DISABILITY __ OTHER (Specify below.) | X  CONTINUING ACTION |

THE PARTICULARS ARE (*If additional paper is needed, attached extra sheet(s)*):

1. Discriminatory Terms, conditions, privileges of employment (05/24/2021-present) based on race and gender
2. Harassment based on Race and gender (07/21/2021-present)
3. Retaliation for protesting ADA/PTO policy (04/21/2022)
4. Discrimination based on disability (06/07/2022)
5. Retaliation for filing EEOC complaint (09/23/2022-present)
   Please see attached 3 pages for details of each claim.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|

| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLANANT |
|---|---|
| 10/24/2022<br>*Date*          *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(*month, day, year*) |

Discriminatory Terms Conditions and privileges of employment based on race and gender.

1. I am an African American Woman, and Citizen of the United States and Pennsylvania, formerly employed by Momentum Dynamics Corp (MD) from June 14, 2021-09 27, 2022.
2. While at MD, I held job duties comparable to internal roles of:
   i)   senior quality technician (review assembly documents, find/report defects, and recommend/document preventative actions, exhibits 126, 131, 132, 134)
   ii)  project management (engage conflict resolution, intradepartmental structure, create procedure/implementation plans, exhibits 136,137, 141, 146, 147, 155, 156)
   iii) R&D electrical engineer roles (provide theoretical and design background to various products, calculate safety threshold and test concepts, exhibits 142,157, 160-162).
3. I believe there is significant overlap between my duties and the duties described in the job descriptions emailed to internal interviewers (including recruiters Ryan Mackenzie and Jennifer Orloski) for each of those roles.
4. The Human Resources Department (HR) was aware of my job duties and received detailed description of several of them as well as an ask to be compensated for my work tasks on 12/04/2022 when I submitted my performance review (exhibit 29).
5. Around 01/07/2022, my performance review was discussed between my manager and HR (exhibit 28).
6. Between 12/20/2022 and 03/20/2022, employees Diana Wilmes (white, female), Taylor Johnson (white, male), Harry Nask (white, male), and Andrea Neff (white, female) were reclassified based on company structure, qualifications, and job duties (exhibits 108-123).
7. Around 03/14/2022 I was granted (3%) pay increase on basis of performance within my formal role.
8. Within 4 years before and sometime after my employment, Bill Gallagher (white, male) was reclassified from his role of Principal Electrical Engineer to Principal Test Engineer, and Senior Technician, Rob Rosenberger (white, male) was also reclassified from Product Introduction to the Testing Team.
9. The denial of my request for proper compensation and reclassification to match my job duties was a harmful act of discrimination based on my race and gender.
10. This act barred me from similar compensation or classifications granted to employees satisfying duties in departments of Quality, Project Management and R&D engineering.
11. I believe that this practice of biased classification is evidenced through my negotiation experience where I was:
    i)   Presented an offer in contradiction to written communications given to me and interviewers of the Product Introduction team throughout my 1 month, 5-round interview process (exhibits 3-12).
    ii)  Told that the lower role was the new basis for my starting compensation ($34/hr vs the $40/hr I asked for, exhibits 14-16).
    iii) Assured that despite the lower role, I would be expected to perform the same duties discussed in interviews for the Senior Technician Role (exhibits 15 and 16).
12. The motivating bias of this classification is further evidenced through the race and gender-based harassment I experienced from CAO (exhibits 34, 54-61, 63, 65), and their response to my complaints of workplace bias (exhibits 31, 32, 35, 89).
13. This act of harm caused me to feel anxious (acutely manifested as nausea and digestive urgency) about my work performance and professional qualifications, while affecting my ability to collaborate with and relate to my coworkers (exhibits 18-24, 26-27).

Race and Gender Harassment

14. During my employment at Momentum Dynamics, I was subject to continuous harassment based on my race and gender as a Black woman.
15. This would involve HR disparate treatment (exhibits 54-61) and comments suggesting that I was "stealing time" (exhibits 63, 65), pregnant and should see daughter's gynecologist (exhibit 34), as well as coworker complaints that I wasn't performing adequately, false accusations of safety violation, and a comic placed at my cubicle to mock my degree (exhibits 25 and 88).
16. One such severe instance of harassment is where the cell phone reimbursement process (09/2021-10/2021) was made more severe due to my race and gender (exhibits 52-53).

17. On 02/07/2022 I suggested a movie list for black history month to reduce microaggressions and was told to meet with HR for "discussion" (exhibit 89).
18. In my meeting, I spent 73 minutes discussing detailed instances of harassment I experienced from coworkers and why I felt the current diversity training was not effective (exhibits 31, 32).
19. On 02/11/2022 Hr called me, for 16 minutes, to "clarify details" of experienced bias (exhibits 32, 35).
20. On 02/14/2022 Hr emailed me to claim that I had not provided specific instances or enough information asking me to provide "brief notes" for use in training (exhibit 35).
21. I took these statements HR to be contradictory to the full content discussed, and time invested to recount stressful experiences.
22. I moreover assumed HR's email as an attempt to establish a specific narrative about our conversation while also discouraging me from making suggestions or complaints by implying that my concerns would not be taken seriously.
23. The harassment suffered and HRs response strained my mental health and physical nervous system through numerous panic attacks and time spent to objectively present experiences, defend my work, apologize for otherwise common employee behavior, despite the sense that my emotional health was not as valued as my performance and the comfort of those harassing me (exhibits 18-19, 54-55, 61).

Policy Protest Retaliation

24. On 04/18/2022 I wrote to Hr to protest a policy that I felt to be discriminatory under ADA and its consequent disparate effects on me (exhibits 62, and 69).
25. On 04/18/2022, I met with HR to discuss this, and was told that xxx, giving the impression that I would only need to disclose my medical condition, pending a doctor's note to excuse timesheet gaps (exhibits 62 and 69).
26. On 04/21/2022 I was informed by HR that accommodations would be granted only after the next pay period.
27. The stress of this information and how it was relayed (in a cubicle/within earshot of coworkers) caused me to return to work after 2 geographically separated doctors' appointments (related to my urgent health issues) to make up the missing hours, in pain, until 9:30pm (exhibits 76, 77, 106, 107, 164, 165).
28. I believe that the CAO attempted to retaliate against me for making an ADA complaint by misrepresenting the accommodations process until the later part of the workweek.

Disability Discrimination

29. On 04/18/2022 I disclosed my chronic illness to CAO while complaining about the PTO policy.
30. CAO received additional physician relayed information regarding my disability on:
    i)    04/23/2022 (initial diagnosis sent through manager, exhibit 71)
    ii)   04/25/2022 (accommodation request form, exhibits 71 and 72)
    iii)  05/13/2022 CAO received PCP (short-term disability forms, exhibits 90, 91).
31. On 06/07/2022 date, I was asked to sign FMLA form if my insurance-managed disability leave would extend beyond 06/17/2022 (exhibit 78).
32. On 06/13/2022, I emailed back to enquire why the document I was asked to sign left fields blank that would indicate whether I would be let go while on leave, eligibility for leave/concurrent use of PTO, deadlines/frequency/depth of medical information required, etc (exhibit 78).
33. I also asked that all fields could be specified in the document for my review (exhibit 78).
34. On the same day, CAO emailed the same blank form (this time without my name on the file title) stating, without explanation, that I would not have fields filled out until my leave was extended by disability insurance (exhibit 78).
35. On 06/27/2022 date, after my leave was extended, I was sent a filled FMLA notice.
36. I believe that the company's attempt to have me certify receipt of a blank notice was harmful act made to provide pretext to discriminatory discharge on the basis of my disability.
37. I assert that the combined stress of my employment experience with MD and this act of harm is a contributing factor to my diagnosis and episode of recurrent major depressive disorder (exhibit 183).

EEOC complaint Retaliation

38. On 06/26/2022, Dual Filed FEPA/EEOC complaint was served to the defendant.

39. On 09/19/2022 date, I participated in private mediation with the defendant over terms of compensation, resignation (with no agreed date), confidentiality, pending the receipt, review, and execution of a written agreement for all material terms (exhibit 103)

40. With or without successful mediation, I had planned to return to work and/or begin use of PTO starting 09/22/2022, date of FMLA leave expiration, and (if applicable) ending on the date of settlement-executed resignation (exhibit 95).

41. No written agreement from mediation was presented to me either review or sign before 09/23/2022.

42. On 09/21/2022, MD's representative emailed EEOC mediator to suggest that we had come to a complete agreement and ask about dismissing the charge (exhibit 97).

43. On (09/21/23), I emailed Hr and my supervisor of my intent to request PTO for the dates of 09/22/2022-09/23/2022 but for being locked out of the Employee time system (BambooHR) for months (exhibit 94).

44. On 09/23/2022, I completed company tech support session and gained access to request PTO (exhibit 99)

45. Within 11 minutes, I received an email from representation advising me (exhibit 98) that:
    i)   I could not take PTO during my medical (FMLA) leave.
    ii)  I "had resigned or would be resigning shortly" and should send a resignation letter.
    iii) I would receive payment for PTO after resigning.
    iv)  I would receive sooner payment of PTO if I resigned over the weekend.

46. I immediately attached references of and requested confirmation of deviation from previous communications of company FMLA policy and PTO use to no response.

47. Later that same day, 09/23/2022, I submitted PTO for 09/21/2022-09/27/2022.

48. On 09/27/2022 I virtually reported to work, in accordance with current worksite construction (exhibit 101).

49. I have received no additional acknowledgement of my system PTO request.

50. On 09/27/2022, I was simultaneously locked out of my work accounts and emailed by MD rep that I had already agreed to resign at mediation (09/19/2022) "effective immediately" and that MD "accepts my resignation" (exhibits 102, 104, 105).

51. I believe that the company tried to coerce me to resign by misrepresenting PTO policy and FMLA policy in retaliation for my filing an EEOC complaint.

52. I also believe that the company wrongfully terminated me to prevent me from gathering evidence relevant to my claims process and in retaliation for my filing an EEOC complaint and EEOC mediator moving my complaint back from ADR to investigation.

53. I also believe that the company attempted to tamper with processing of my EEOC/FEPA claim by misrepresenting the status of mediation to the EEOC mediator and trying to coerce my unwritten execution of their mediation proposal conditions without providing me any written contract to review or execute.

54. On 09/16/2022, I began treatment for secondary autonomic disorder (ANS/Autonomic Nervous System), which is reasonably enhanced by stress, and has been enhanced by the stress of MDs conduct (exhibits 166).

55. On 06/18/2022 I began weekly therapy to help process the weight of my employment experience (exhibits 167-182) and have considered changing to biweekly sessions to accommodate the additional acts of MD.

# EXHIBIT 17

**From:** Assata Acey <aceyassata@gmail.com>
**Sent:** April 11, 2024 7:54 AM
**To:** Schauer, Randall C. <RSchauer@foxrothschild.com>; Longo, Alberto <ALongo@foxrothschild.com>
**Cc:** Hanley, Krista M. <KHanley@foxrothschild.com>
**Subject:** [EXT] Deposition Supplement

---------- Forwarded message ----------
**From: Mtaalamu Acey** <acey3645@gmail.com>
Date: Saturday 22 October 2022
Subject: Acey, Assata v. Momentum Dynamics Corporation; CLAIMS REF NO KY22K2593096-A DOL 06/22/2022
To: Assata Acey <aceyassata@gmail.com>

Well done.

**EXHIBIT**
*AA-32*
FENGUO 800-631-6989

On Sat, Oct 22, 2022, 7:08 PM Assata Acey <aceyassata@gmail.com> wrote:

This is the major problem. I was of impression that anything tenatively discussed would be bound by a formal written contract.

And when they attempted to secure a tentative term(resignation) and then moved to enforce those terms without provision of or executing of such contract, it became clear that they were of a different understanding.

If they were not(as expereince could make them aware that mediations are expected to be finalized through formal written agreements), then everything said to force me to carry out what they knew as tentative before receiving any contract would be predatory.

Beyond this the resignation date is essential because it effects a monetary term of negotation. Since I had planned to return to work unless we reached a settlement with mediation, terminating me robbed me of any earnings(and free training since there was OSHA-30 training) Id have made while reviewing the contract even if I chose to later sign it.

1

Earned income is still money and money is an essential part of a settlement.

Thats not even counting the value I may have placed on saying goodbye to teammates and colleagues or ensuring projects were properly transitioned or completed.

There is precedent for this
https://www.williamsmullen.com/news/deal-or-no-deal-don%E2%80%99t-leave-mediation-without-signed-final-settlement-agreement

Changes or additions to an aggreement even if signed
https://www.jdsupra.com/legalnews/no-meeting-of-the-minds-where-material-6908765/

Also the mediation consent form that I signed specifies that the mediator will draft our agreement if we reach a settlement with the opportunity for it to be reveiwed by legal counsel. The only exception it gives for acceptance of an aggreement not being formally signed is if there is a technology access issue.

However there was nothing preventing a DocuSign from being created and signed during mediation, their legal counsel instead chose to draft their own version of an agreement and to take over a week to provide it.

This is why the mediators iterated to me that I should get the submitted contract reviewed by a lawyer and that I was under no pressure to sign anything/agreement could still fail.

Since no written agreement was presented, no verbal consent could be given as "serving signature" per our mediation consent forms.


On Saturday, 22 October 2022, Mtaalamu Acey <acey3645@gmail.com> wrote:

Ok. Please let me know what you find out.

On Sat, Oct 22, 2022, 2:44 PM Assata Acey <aceyassata@gmail.com> wrote:

Hoping to hear from the investigator this week

On Saturday, 22 October 2022, Assata Acey <aceyassata@gmail.com> wrote:

Im hooing to gear from the investigator this week.

On Saturday, 22 October 2022, Mtaalamu Acey <acey3645@gmail.com> wrote:

Hi Assata

I understand both sides and the attorneys' increased stress, but what is your plan now? I hope you will be getting these people completely out of your life more sooner than later. Have you planned your next step?

On Fri, Oct 21, 2022, 5:17 PM Assata Acey <aceyassata@gmail.com> wrote:


---------- Forwarded message ----------
From: **Post, May Mon** <maymon.post@bunkerray.com>
Date: Friday, 21 October 2022
Subject: Acey, Assata v. Momentum Dynamics Corporation; CLAIMS REF NO KY22K2593096-A DOL 06/22/2022

To: Assata Acey <aceyassata@gmail.com>
Cc: Alexa Heisler <Alexa.Heisler@inductev.com>, Patti Rensel <Patti.Rensel@inductev.com>

Ms. Acey:

Our position has not changed. The fact that you agreed to resign and dismiss your claims in exchange for $50,000 is not in dispute, is confirmed by you in writing, and constitutes an enforceable contract. Your latest email does not even dispute these terms – your only objection is that resignation would occur after execution of the agreement. Accordingly, even assuming a fact finder found in your favor, they would conclude resignation was effective no later than the time allotted to have the agreement reviewed by counsel.

Nevertheless, if you wish to review the settlement agreement with an attorney and propose a counteroffer, including the date of your resignation date (i.e., effective the date of execution of the settlement agreement), I will forward the counteroffer to my client as soon as I receive it from you. Would two weeks (Friday, November 4, 2022) be enough for you to review the agreement with an attorney and get back to me? Please advise.

Nothing in this email constitutes a counteroffer or a new offer, and my client has no obligation to accept the terms of your counteroffer. However, I will do my best to persuade them to take it into consideration, if reasonable. With respect to our position as outlined in my email dated October 17th, my client reserve all rights and waives none.

Thank you.

May Mon Post, Esq. | Lead Employment Attorney | Bunker & Ray

Employees of ACE American Insurance Company, a Chubb Company

436 Walnut St. | WA01A | Philadelphia, PA 19106
(215) 845-6154 (direct) | (267) 372-1240 (mobile)
maymon.post@bunkerray.com

This email (which includes any attachments) is intended to be read only by the person(s) to whom it is addresse
email may contain confidential, proprietary information and may be a confidential attorney-client communicatic
exempt from disclosure under applicable law. If you have received this email in error, do not print it, forward it c
disseminate or use it or its contents. In such event, please notify the sender by return email (or by phone at the
shown above) and delete the email file immediately thereafter. Thank you for your cooperation.

We strive to be a paperless office. I encourage you to send all correspondence via email instead of U.S. mail whe
possible. If you email a document to me, it is not necessary to send a separate copy via U.S. mail. Thank you.

**From:** Assata Acey <aceyassata@gmail.com>
**Sent:** Monday, October 17, 2022 7:18 PM
**To:** Post, May Mon <maymon.post@bunkerray.com>
**Subject:** [EXTERNAL] Re: Acey, Assata v. Momentum Dynamics Corporation; CLAIMS REF NO
KY22K2593096-A DOL 06/22/2022

Thank you for your correspondence.

I have been as forthcoming as possible, submitting all communications regarding this dispute to EEOC.
I did not agree to resign effective September 19. And was of the impression, as communicated, that I
would receive a settlement contract (for review with optional legal counsel) detailing resignation effective
on the date of execution.
Your communicated understanding of our mediation was that I would resign effective sept 19 with or
without prior receipt/execution of a written agreement.

These understandings are not the same. If your understanding of our mediation as shown in your emails
and submitted contract is different than mine, then we did not reach an agreement.

With this understanding, I am under no obligation to accept any agreement that I did not verbally agree
to.

On Mon, 17 Oct 2022 at 15:26, Post, May Mon <maymon.post@bunkerray.com> wrote:

Good afternoon, Ms. Acey:

4

Your claims against InductEV (f/k/a Momentum Dynamics Corporation) were fully resolved during mediation on September 19th. Your September 27th email provides written confirmation of the parties' agreement: you agreed to "resign and dismiss existing claims" in exchange "for a settlement amount of [$]50,000." At mediation, I made it repeatedly and unambiguously clear that settlement was contingent on resignation being effective immediately. You accepted. InductEV did not (and would never) agree to a resignation at some unknown point in the future – that's an unreasonable assertion on its face since it would defeat the entire purpose of settling the claims.

Be advised that the parties' agreement reached on September 19th – later confirmed by you in writing – constitutes a binding contract and InductEV will take all necessary action to ensure you honor and comply with that agreement, as outlined below.

You cannot void or invalidate your agreement by stating it "was contingent on a contract that included agreeable material terms." Regardless, the document I provided includes all of and only the material terms the parties agreed upon (including, for example, you agreeing to a general release, non-disparagement and confidentiality, and InductEV agreeing to provide a neutral reference). Any other language is immaterial to the agreement to settle your claims and was included because it is either standard practice or legally required. In any event, I do appreciate you may have been taken aback by a document containing legal language you may be unfamiliar with. We strongly recommend that you retain a lawyer to help you understand all the terms. If you do not plan to hire one, I am willing to simplify the document and/or remove specific language you are uncomfortable with, provided those changes do not modify the material terms we agreed to on September 19th.

Regardless of whether we have a formal signed document memorializing of our settlement, our agreement is a binding, enforceable contract. If you continue pursuing your claims against my client this will constitute breach of contract. When the matter reaches court, InductEV will seek dismissal of your claims and enforcement of the settlement agreement. More importantly, InductEV will sue for breach of contract and demand reimbursement of all attorneys' fees it has incurred as a result of your breach, including all fees spent on defending against claims you already agreed to settle. InductEV may take any other legal and equitable action available to it regarding your breach, now or in the future. My client reserves all rights and waives none.

To avoid any such consequences, we need to execute a document that memorializes the terms agreed to by both parties at mediation on September 19th. If you would like me to revise any terms or language in that document, please let me know and, as mentioned above, I will do my best to work with you to arrive at a document that contains mutually agreeable language. Please see attached Word version of the settlement agreement, which you can feel free to mark up. I look forward to hearing from you.

If we do not hear back from you by the end of this Friday, October 21st, we will assume you have chosen to reject your contractual obligations and InductEV will proceed accordingly.

Thank you.

May Mon Post, Esq. | Lead Employment Attorney | Bunker & Ray

Employees of ACE American Insurance Company, a Chubb Company

436 Walnut St. | WA01A | Philadelphia, PA 19106
(215) 845-6154 (direct) | (267) 372-1240 (mobile)
maymon.post@bunkerray.com

This email (which includes any attachments) is intended to be read only by the person(s) to whom it is addressed. This em contain confidential, proprietary information and may be a confidential attorney-client communication, exempt from disc

under applicable law. If you have received this email in error, do not print it, forward it or disseminate or use it or its conte event, please notify the sender by return email (or by phone at the number shown above) and delete the email file imme thereafter. Thank you for your cooperation.

We strive to be a paperless office. I encourage you to send all correspondence via email instead of U.S. mail when at all pc you email a document to me, it is not necessary to send a separate copy via U.S. mail. Thank you.

This email (including any attachments) is intended for the designated recipient(s) only, and may be confidential, non-public, proprietary, and/or protected by the attorney-client or other privilege. Unauthorized reading, distribution, copying or other use of this communication is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) should not be deemed a waiver of any privilege or protection. If you are not the intended recipient or if you believe that you have received this email in error, please notify the sender immediately and delete all copies from your computer system without reading, saving, printing, forwarding or using it in any manner. Although it has been checked for viruses and other malicious software ("malware"), we do not warrant, represent or guarantee in any way that this communication is free of malware or potentially damaging defects. All liability for any actual or alleged loss, damage, or injury arising out of or resulting in any way from the receipt, opening or use of this email is expressly disclaimed.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ASSATA ACEY

Plaintiff,

v.

INDUCTEV

Defendant.

Case No.: 2:23-cv-01438

Judge Gene E.K. Pratter

### DEFENDANT'S MOTION TO DISMISS

Pursuant to Federal Rules Civil Procedure 12(b)(1) and 12(b)(6), and for all the reasons set forth in the accompanying Memorandum of Law, which are incorporated herein by reference, Defendant respectfully moves the Court for an Order dismissing the Complaint because: (a) the parties agreed to settle and resolve Plaintiff's claim at mediation; (b) the Complaint and the Twenty Counts therein are subject to dismissal for Plaintiff's failure to exhaust administrative remedies before the Pennsylvania Human Relations Commission and/or Equal Employment Opportunity Commission and/or failure to state a claim upon which relief can be granted. In the event the Court does not enforce the Settlement Agreement or dismiss the Complaint, Defendant moves that Plaintiff's prayer for punitive damages be stricken.

Respectfully submitted,
**FOX ROTHSCHILD LLP**
By: */s/ Randall C. Schauer*
    Randall C. Schauer, Esquire
    Alberto M. Longo, Esquire
    Eagleview Corporate Center
    747 Constitution Drive, Suite 100
    Exton, PA 19341-0673
    Tel – (610) 458-4967
    Fax – (610) 458-7337
    rschauer@foxrothschild.com
    alongo@foxrothschild.com

    **ATTORNEYS FOR DEFENDANT,**
    **InductEV**

i

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ASSATA ACEY

Case No.: 2:23-cv-01438

Plaintiff,

Judge Gene E.K. Pratter

v.

INDUCTEV

Defendant.

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

**FOX ROTHSCHILD LLP**

By: */s/ Randall C. Schauer*
Randall C. Schauer, Esquire
Alberto M. Longo, Esquire
Eagleview Corporate Center
747 Constitution Drive, Suite 100
Exton, PA 19341-0673
Tel – (610) 458-4967
Fax – (610) 458-7337
rschauer@foxrothschild.com
alongo@foxrothschild.com

**ATTORNEYS FOR DEFENDANT,
InductEV**

ii

## TABLE OF CONTENTS

I.     Introduction ............................................................................................................... 1

II.    Plaintiff's Claims ...................................................................................................... 2

       A.     Plaintiff's Administrative Claims .......................................................... 3

       B.     Claims Articulated in the Complaint ..................................................... 5

III.   ARGUMENT ............................................................................................................ 10

       A.     PLAINTIFF ENTERED INTO A BINDING SETTLEMENT AGREEMENT
              WITH DEFENDANT ................................................................................. 10

              1.     Applicable Legal Standard ........................................................ 10

              2.     The Parties reached an enforceable settlement. ........................ 11

       B.     PLAINTIFF FAILED TO EXHAUST HER ADMINISTRATIVE
              REMEDIES FOR the CLAIMS MADE UNDER TITLE VII, THE ADA,
              AND THE PHRA. ....................................................................................... 14

              1.     Plaintiff's Title VII Violations should be dismissed because plaintiff
                     did not raise those claims to the EEOC. .................................... 14

              2.     Plaintiff's ADA claims should be dismissed because Plaintiff did not
                     raise ADA claims to the EEOC. ................................................. 17

              3.     Plaintiff's PHRA claims should be dismissed because Plaintiff did not
                     raise those claims to the PHRC ................................................. 19

       C.     Plaintiff has failed to allege facts sufficient to state a claim for relief on: ALL
              those claims NOT SUBJECT TO DISMISSAL FOR FAILURE TO
              EXHAUST REMEDIES; AS WELL AS MANY THAT ARE SUBJECT TO
              DISMISSAL FOR FAILURE TO EXHAUST REMEDIES. ............................... 21

              1.     Count I - Discriminatory Intimidation for Opposing Unlawful Racial
                     Harassment in Violation of Title VII of The Civil Rights Act Of 1964,
                     42 U.S.C. § 2000e-3 (a). Complaint Paragraphs 90 – 103 ........................ 23

              2.     Count II - Aiding and Abetting Unlawful Employment Discrimination
                     in Violation of The Pennsylvania Human Relations Act, 43 P.S. § 955
                     (e). Paragraphs 104 – 107. ........................................................ 25

              3.     Count III - Discriminatory Intimidation on The Basis of Opposing
                     Forbidden Racial Discrimination, In Violation of The Pennsylvania
                     Human Relations Act, 43 P.S. § 955 (d). Paragraphs 108 -115 ............... 25

i

4.    Count IV - Intentional Unequal Pains-Intimidation in Violation of The
      Civil Rights Act Of 1866; 42 U.S.C. § 1981. Paragraphs 116 – 119. ...... 26

5.    Count V - Racial Harassment as A Discriminatory Condition of
      Employment in Violation of Title VII of The Civil Rights Act Of
      1964, 42 U.S.C. § 2000e-2 (a)(1). Paragraphs 120 – 129......................... 27

6.    Count VI - Racial Harassment as A Discriminatory Condition of
      Employment in Violation of In Violation of The Pennsylvania Human
      Relations Act, 43 P.S. § 955 (a). Paragraphs 130 – 132. .......................... 28

7.    Count VII - Discriminatorily Limited Opportunity on The Basis of
      Race in Violation of Title VII of The Civil Rights Act Of 1964, 42
      U.S.C. § 2000e-2 (A)(2).   Paragraphs 133 – 164...................................... 28

8.    Count VIII - Intentional Unequal Contracts in Violation of The Civil
      Rights Act Of 1866, 42 U.S.C. §1981. Paragraphs 165 – 169................. 29

9.    Count IX - Intentional Unequal Pains- Racial Harassment in Violation
      of The Civil Rights Act Of 1866; 42 U.S.C. §1981. Paragraphs 170 –
      174........................................................................................................... 30

10.   Count X - Discriminatory Conditions-Sexual Harassment in Violation
      of Title VII of The Civil Rights Act Of 1964, 42 U.S.C. § 2000e-2
      (A)(1). Paragraphs 175 – 194................................................................... 30

11.   Count XI - Discriminatory Conditions- Sexual Harassment in
      Violation of The Pennsylvania Human Relations Act, 43 P.S. 955(A).
      Paragraphs 195 – 197............................................................................... 31

12.   Count XII - Aiding Unlawful Discrimination-Sexual Harassment in
      Violation of The Pennsylvania Human Relations Act, 43 P.S. 955(E).
      Paragraphs 198 – 204............................................................................... 31

13.   Count XIII - Perpetuating Disability Discrimination Through
      Administrative Methods in Violation of The Americans with
      Disabilities Act Of 1990; 42 U.S.C. § 12112 (b)(3)(B). Paragraphs
      205 – 219................................................................................................. 32

14.   Count XIV - Abetting or Attempting Disability Discrimination in
      Violation of The Pennsylvania Human Relations Act, 43 P.S. § 955
      (E).  Paragraphs 220 – 228....................................................................... 34

15.   Count XV - Discriminatory Conditions of Employment-Harassment
      on The Basis of Disability in Violation of The Americans With
      Disabilities Act Of 1990, 42 U.S.C. § 12112 (A). Paragraphs 229 –
      243........................................................................................................... 34

16.    Count XVI - Discriminatory Conditions of Employment-Harassment on The Basis of Disability in Violation of The Pennsylvania Human Relations Act, 43 P.S.§ 955 (A). Paragraphs 244 – 245 ........................... 35

17.    Count XVII - Attempting to Coerce Unlawful Discrimination - Constructive Termination in Violation of The Pennsylvania Human Relations Act, 43 P.S. § 955 €, Paragraphs 246 – 258. ............................ 36

18.    Count XVIII - Discrimination for Filing a Charge-Wrongful Termination in Violation of Title VII of The Civil Rights Act Of 1964, 42 U.S.C. §2000e-3(a). Paragraphs 259 – 275. ............................... 37

19.    Count XIX - Discrimination for Filing a Charge-Wrongful Termination in Violation of The Pennsylvania Human Relations Act, 43 P.S. § 955 (d). Paragraphs 276 – 277.................................................... 38

20.    Count XX - Intentional Infliction of Emotional Distress in Violation of The Pennsylvania Tort Law. Paragraphs 278 – 285............................ 38

D.    PLAINTIFF'S REQUEST FOR PUNITIVE DAMAGES SHOULD BE STRICKEN ........................................................................................................ 40

IV.   CONCLUSION............................................................................................................ 42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Antol v. Perry,*
  82 F.3d 1291 (3d Cir. 1996).................................................................................................19

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)...................................................................................................29, 30

*Assoc. Builders & Contractors, Eastern PA Chapter, Inc. v. Cty. of Northampton,*
  376 F. Supp. 3d 476 (E.D. Pa. 2019) ...................................................................................40

*Bannar v. Miller,*
  701 A.2d 232 (Pa. Super. Ct. 1997) .....................................................................................40

*Bowser v. Clarion County,*
  206 A.3d 68 (Pa. Commw. Ct. 2019) ...................................................................................22

*Castleberry v. STI Group,*
  863 F.3d 259 (3d Cir. 2017)..................................................................................................22

*Ceesay v. Miller, Mason & Dickenson,*
  1990 WL 121218 (E.D. Pa. Aug. 15, 1990) .........................................................................39

*Chandler v. La-Z-Boy, Inc.,*
  2022 WL 3357674 (E.D. Pa. Aug. 15, 2022) .......................................................................27

*Cochetti v. Desmond,*
  572 F.2d 102 (3rd Cir. 1978) ...............................................................................................40

*Comptu Forms Control Inc. v. Altus Group. Inc.,*
  574 A.2d 618 (Pa. Super. 1990)...........................................................................................10

*Coney v. Pepsi Cola Bottling Co.,*
  1997 WL 299434 (E.D. Pa. May 29, 1997).....................................................................38, 40

*Corbett v. Morgenstern,*
  934 F.Supp. 680 (E.D. Pa. 1996) .........................................................................................41

*Daniels v. School Dist. of Philadelphia,*
  982 F. Supp. 2d 462 (E.D. Pa. 2013) ...................................................................................23

*DeAngelo v. DentalEZ, Inc.,*
  738 F. Supp. 2d 572 (E.D. Pa. 2010) (Pratter, J.) ...............................................................19

*DeLa Cruz v. Piccari Press*,
  521 F. Supp. 2d 424 (E.D. Pa. 2007) (Pratter, J.) ...................................................15, 16, 19, 20

*Delahanty v. First Pennsylvania Bank, N.A.*,
  464 A.2d 1243 (Pa. Super. Ct. 1983)......................................................................................41

*Dici v. Commonwealth of Pennsylvania*,
  91 F.3d 542 (3d Cir. 1996)......................................................................................................22

*Doe v. Triangle Doughnuts, LLC*,
  472 F. Supp. 3d 115 (E.D. Pa. 2020) .....................................................................................32

*E.E.O.C. v. Connectiv*,
  2006 WL 1451527 (E.D. Pa. May 25, 2006) (Pratter, J.) .......................................................15

*Fugarino v. Univ. Servs.*,
  123 F. Supp. 2d 838 (E.D. Pa. 2000) .........................................................................38, 39, 40

*Green v. Postmaster Gen.*,
  437 F. App'x 174 (3d Cir. 2011) .............................................................................................14

*Hampton v. Tokai Fin. Servs., Inc.*,
  1999 WL 83934 (E.D. Pa. Feb 18, 1999) ..........................................................................38, 40

*Hess v. Hess*,
  580 A.2d 357 (Pa. Super. Ct. 1990).........................................................................................41

*Hewitt v. BS Transportation of Illinois, LLC*,
  355 F. Supp. 3d 227 (E.D. Pa. 2019) ......................................................................................34

*Hoff v. Spring House Tavern*,
  2013 WL 2434615 (E.D. Pa. June 5, 2013)..............................................................................28

*Hood v. N.J. Dep't of Civil Serv.*,
  680 F.2d 955 (3d Cir. 1982) ("intentional discrimination is a required element
  of a § 1981 claim") ...................................................................................................................26

*Infinity Broadcast. Corp., v. Pennsylvania Human Relations Com'n*,
  893 A.2d 151 (Pa. Commw. Ct. 2006) .....................................................................................23

*Keenan v. City of Philadelphia*,
  983 F.2d 459 (3rd Cir. 1992)....................................................................................................40

*Kroptavich v. Pennsylvania Power & Light Co.*,
  795 A.2d 1048 (Pa. 2002).........................................................................................................22

*Lightcap-Steele v. KidsPeace Hosp., Inc.*,
  2006 WL 1147476 (E.D. Pa. 2006) (Pratter, J.) ......................................................................17

*Mammen v. Thomas Jefferson University,*
    462 F. Supp. 3d 518 (E.D. Pa. 2020) .......................................................................................14

*Mudie v. Phila. College of Osteopathic Medicine,*
    577 F. Supp. 3d 375 (E.D. Pa. 2021) ............................................................................26, 29, 30

*Parker v. DPCE, Inc.,*
    1992 WL 501273 (E.D. Pa. Nov. 3, 1992) ........................................................................39, 40

*Paz v. Hughes,*
    2016 WL 6276397 (E.D. Pa. Oct. 17, 2016)..........................................................................15

*Pennsylvania State Police v. Suders,*
    542 U.S. 129 (2004)................................................................................................................36

*Phillips v. County of Allegheny,*
    515 F.3d 224 (3d Cir. 2008)....................................................................................................24

*Polselli v. Nationwide Mutual Fire Insurance Co.,*
    23 F.3d 747 (3rd Cir. 1994) ....................................................................................................41

*R.J. Reynolds State Farm Mut. Auto. Ins. Co. v. Campbell,*
    538 U.S. 408 (2003)................................................................................................................41

*Slater v. Marshall,*
    915 F. Supp. 721 (E.D. Pa. 1996) ..........................................................................................29

*Walker v. Wetzel,*
    2022 WL 17650456 (E.D. Pa. Dec. 13, 2022) (Pratter, J.,)..........................................15, 21, 22

*Woodson v. Scott Paper Co.,*
    109 F.3d 913 (3d Cir. 1997)...........................................................................................19, 21

*Young v. St. James Management, LLC,*
    749 F. Supp. 2d 281 (E.D. Pa. 2010) ....................................................................................22

*Zong v. Lynch,*
    2014 WL 4722625 (E.D. Pa. Sept. 22, 2014) ........................................................10, 11, 12, 13

**Statutes**

42 U.S.C. § 12112 (b)(3)(B) ............................................................................................................32

Americans with Disabilities Act, 42 U.S.C. § 12101 *et. seq.* (ADA)....................................*passim*

Civil Rights Act of 1964 Title VII, 42 U.S.C. § 2000e ........................................................*passim*

Civil Rights Act of 1990 Section 1981, 42 U.S.C. § 1981 ....................................................*passim*

Equal Employment Opportunity Act ........................................................................3

Family and Medical Leave Act (FMLA) ........................................................... *passim*

Pennsylvania Human Relations Act, 43 P.S. § 951-963 (PHRA) ........................................... *passim*

Pennsylvania Tort Law. Paragraphs 278 – 285 ...........................................38

Title VII ........................................................................................................ *passim*

**Other Authorities**

Fed. R. Civ. P. 8 ............................................................................19, 29, 31, 36

Fed. R. Civ. P. 12(b)(6) ........................................................................2, 14, 21

## I.    INTRODUCTION

Defendant, InductEV ("Defendant") by and through undersigned counsel respectfully submits this Memorandum of Law in Support of Defendant's Motion to Dismiss for the reasons provided below:

(a)    the parties have an enforceable settlement agreement that Plaintiff wants to repudiate;

(b)    Sixteen of the Twenty Counts therein are subject to dismissal for Plaintiff's failure to exhaust administrative remedies before the Pennsylvania Human Relations Commission and/or Equal Employment Opportunity Commission; and/or

(c)    Each of the Twenty Counts fails to state a claim upon which relief can be granted.

In the event the Court does not enforce the Settlement Agreement or dismiss Plaintiff's Complaint, Defendant requests that Plaintiff's prayer for punitive damages be stricken.

Plaintiff's two hundred and ninety-six (296) paragraph Complaint alleges twenty (20) separate counts: Nine (9) counts in violation of the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951-963; Five (5) counts in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e; Three (3) counts in violation of Section 1981 of the Civil Rights Act of 1990 ("Section 1981"), 42 U.S.C. § 1981; Two (2) counts in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et. seq.*; and One (1) count of Intentional Infliction of Emotion Distress ("IIED") under Pennsylvania law.

Plaintiff's Nine Counts under the PHRA, Five Counts under Title VII, and Two Counts under the ADA (for a total of 16 counts) are subject to administrative exhaustion requirements satisfied by having filed same with the EEOC or PHRA. Those 16 counts ***were not*** presented to the PHRC and/or the EEOC for purposes of investigation and exhaustion of Plaintiff's

administrative remedies and are significantly broader than those that were presented.[1]Because those 16 counts were not before the PHRC and/or the EEOC for purposes of exhausting the statutory administrative requirements, they should be dismissed for failure to exhaust the administrative review requirement. Furthermore, each and all of Plaintiff's claims is factually and legally deficient as a matter of law.

This motion will first address the existence of a binding settlement agreement between the parties, followed by Plaintiff's failure to exhaust her administrative remedies for her claims brought under Title VII, the ADA, and the PHRC. Defendant will then depart from what might be standard practice, and address, on a Count-by-Count basis the additional reason(s) each of Plaintiff's Twenty Counts fails as a matter of law and should be dismissed.[2]

As Defendant's Motion is based on the details of the numerous allegations in Plaintiff's Complaints to the Pennsylvania Human Relations Commission and in the Complaint in this case, a lengthy but necessary review of same follows.

## II.    PLAINTIFF'S CLAIMS

This action was initiated in the Chester County Court of Common Pleas, Pennsylvania on March 14, 2023 when Plaintiff filed a Complaint with 297 paragraphs and 20 Counts citing a variety of statutory and common law claims, including alleged racial discrimination and sexual and racial harassment under Title VII, Section 1981 and the Pennsylvania Human Relations Act (PaHRA); violations of the American Disabilities Act, and the Family Medical Leave Act;

---

[1]As mentioned above, Plaintiff's grievances presented to the PHRC and the EEOC can be distilled into three separate claims:  Plaintiff's (1) Position Classification Claim; (2) Phone Reimbursement Claim; and (3) Accommodation Process Claim.

[2]Should this Court agree that Plaintiff has failed to exhaust her administrative remedies for her sixteen claims under the PHRC, ADA, and Title VII, the Court need not address defendant's arguments in support of its motion to dismiss same based on Fed. R. Civ. P.  12(b)(6).

Pennsylvania common law. *See*, EFC 1, Exhibit A to Notice of Removal. (hereinafter referred to as "Complaint"). The claims arise from Plaintiff's employment with the Defendant as a Technician, which began on June 14, 2021, pursuant to an offer of employment accepted by Plaintiff on May 31, 2021. Complaint Section II, Paragraphs 2 and 4[3]). Plaintiff last performed work for Defendant on or about May 16, 2022 when she went on a medical leave and was separated from employment on or about September 19, 2022 when during a mediation of the PaHRC she resigned and agreed to a release of claims as of that date, in exchange for $50,000 as part of an agreed settlement of Plaintiffs claims, which settlement has been repudiated by Plaintiff. (Complaint, ¶¶ 58;  259 - 268).

After receiving a Right-to-Sue letter dated December 16, 2022, Plaintiff filed a Complaint in the Chester County Court of Common Pleas, Pennsylvania on March 14, 2023. Defendant removed the case to this Honorable Court court on April 14, 2023. *See*, EFC 1

## A.    PLAINTIFF'S ADMINISTRATIVE CLAIMS

In Section I, Paragraph 7 of the Complaint, Plaintiff asserts that she ". . . exhausted my administrative remedies pursuant to the Equal Employment Opportunity Act and the Pennsylvania Human Relations Act." referring to a "Right-to-Sue" letter issued by the EEOC and said to be attached as Exhibit A to the Complaint (no Right to Sue letter was attached to the service copy of the Complaint but is attached hereto as Exhibit A). The attached Right to Sue letter was issued on December 16, 2022, at Plaintiff's request, as stated therein "The EEOC has granted your request for a Right to Sue..." Exhibit A.

---

[3]The Complaint has two Sections,  Sections I and II, each with paragraphs numbered consecutively beginning with "1". References to a Paragraph in the Complaint will be to Section II "History of the Case" unless otherwise noted.

The Plaintiff initiated this action by filing a Complaint with the Pennsylvania Human Relations Commission on or about May 6, 2022. A true and correct copy of the Complaint filed with the Pennsylvania Human Relations Commission on May 6, 2022 ("PaHRC Complaint") is attached as Exhibit B. Thereafter, on June 21, 2022, Plaintiff filed a "First Amended Complaint". A true and correct copy of the First Amended Complaint ("Amended PaHRC Complaint", collectively with the PaHRC Complaint "PaHRC Complaints") is attached as Exhibit C. A review of the two Complaints filed with the PaHRC indicates that the Amended PaHRC Complaint restates, in a more concise manner, the same three claims asserted in the PaHRC Complaint. *See*, Exhibit B and C. As the PaHRC Complaints address the same three claim, counsel will not argue that the First Amended Complaint superseded the original Complaint and will consider the allegations and claims in both for purposes of this Motion.

The PaHRC served both PaHRC Complaints on the Defendant under a cover letter dated June 22, 2022. A true and correct copy of the June 22, 2022, PaHRC letter is attached as Exhibit D. In its cover letter, the PaHRC states that the "PHRC determined that it does not have jurisdiction of the Complaint" and indicated that the case would be transferred the United States Equal Employment Opportunity Commission (EEOC) which may have jurisdiction." *Id.*

Plaintiff articulates three very specific complaints with the conduct of the defendant in the PaHRC Complaints. They are:

1.    A claim that the Defendant should have hired or promoted her into a "Sr. Technician" position rather than that of Technician. Plaintiff was offered the Technician position on May 21, 2021, after she applied for a Senior Technician position, and that the failure to do so was because of her race and gender. (*See*, Exhibit "C", paragraphs 1 – 7; Exhibit B, Section A, Paragraphs A.1 – A.28. ("Position Classification Claim").

2.    A complaint that after her cell phone was crushed in a workplace accident, and the Defendant made it difficult for her to be compensated or reimbursed for the cost of replacing the phone. *See*, Exhibit "C" paragraphs 8 – 11; Exhibit "B", Section B Paragraphs B.1 – B.39. ("Phone Reimbursement Claim").

3.    A claim that in processing Plaintiff's request for leave after informing Defendant of a disability on April 18, 2022, and allegedly claiming Defendant's policy requiring use of PTO were unfair to people with disabilities, Defendant harassed her and retaliated by delaying an accommodation, and withholding information she wanted, notwithstanding the fact the leave was granted immediately. *See*, Exhibit "C", Amended PaHRC Complaint, paragraphs 12 – 18; Exhibit "B", Section C, Paragraphs C.1 – C.13. ("Accommodation Process Claim").

All three claims set forth in the PaHRC Complaints allege the complained-of events occurred because ". . . I am an African American female". *See* Amended PaHRC Complaint, Exhibit "C",  ¶¶ 7, 11 and 18. In Paragraph 5 of both PaHRC Complaints, where Plaintiff is asked to identify her "Protected Class(es)" by checking any number of boxes, Plaintiff checks the following boxes "Race: African American"; "Sex: female" and; "Retaliation". Exhibit "B" and "C", ¶ 5. Plaintiff does not check the box "Disability". *Id.*

A detailed reading of Plaintiff's PaHRC Complaints reveals a lack of allegations citing specific, factual actions on the part of Defendant that reflect overt or covert words or actions evidencing racial or gender animus, discrimination, or harassment. Rather the allegations of prohibited animus or actions are based on Plaintiff's attribution of discriminatory intent to workplace interactions and events that do not go as Plaintiff would prefer, but fail to suggest prohibited animus on the part of the Defendant. A similar pattern is found in the Complaint.

**B.    CLAIMS ARTICULATED IN THE COMPLAINT**

Plaintiff's Complaint is also very non-specific with respect to any actions on the part of the Defendant that reflect racial or gender animus, discrimination or harassment. Before setting forth the basis for her legal claims in the Counts of the Complaint, Plaintiff pleads an eleven paragraph Section I titled "Parties and Jurisdiction" and an eighty-nine paragraph Section II titled "History of the Case".

In Paragraph 5 through 23 of the Complaint[4], Plaintiff describes dissatisfaction with the workplace due to alleged concerns anonymously voiced about her by co-workers regarding bathroom break frequency, attendance, and time spent working versus talking; and interactions with Sr. Technician Rob Rosenberg a non-supervisory colleague. *See*, Complaint, Para. 5 – 23. In Paragraph 9 of the Complaint, Plaintiff states that she was concerned that she was being racially stereotyped by her supervisor but provides no specific examples by word or deed evidencing same. In Paragraph 12, she says that she "felt targeted" and in support thereof again cites Rob Rosenberg[5] alleging that "…she noticed he would more regularly butt heads…" with she, a fellow Black team member, and a female mechanical engineer leading her to conclude that Plaintiff being a woman and Black intensified Mr. Rosenberg's conflict with her – citing no direct words or specific conduct, or comparators. In Paragraph 13, Plaintiff references hearing Mr. Rosenberg saying the word "bitch" under his breath while working on a bench, and another time while working on another job.  It is unclear to whom it is directed towards, but Plaintiff infers it was the person who asked him to do the work.  Indeed, absent a desire to attribute gender animus, the alleged use of the word "bitch" Paragraph 13 could easily be read indicate that the work being done is difficult for Mr. Rosenberg to do.  Indeed, essentially all allegations of the Complaint take neutral statements or behaviors and attribute racial or gender animus without basis for same. None of the foregoing occurrences were raised in the PaHRC Complaints.

In Paragraphs 25 through Paragraph 31, Plaintiff relates a number of concerns of things that occurred involving other employees which do not relate to actions towards her, nor are such

---

[5]Here cited as a former team member as he apparently was transferred to the Testing Department at some point. *See*, Complaint, Para. 145

as to create what may be considered a hostile or offensive workplace given the lack of direct experience of same and the relatively random nature of same. Indeed, in Paragraph 29 of the Complaint, Plaintiff *complains* because the Company has begun working to increase the number of Black employees, and one of the managers is alleged to say that it has "come along way."

Beginning on or about Paragraph 32, there are several paragraphs where Plaintiff discusses her dissatisfaction with her job classification and her efforts to be classified as a Senior Technician. The detailed concerns fail to appear to be related to any harassment or animus connected to race or gender, but rather reflects dissatisfaction with her classification as a Technician at hire, and a lack of reclassification during her time at InductEV. *See*, Complaint Para 32 – 36.

Beginning at Paragraph 39 of the Complaint, in a meeting where she asked the Chief Administrative Officer to share a curated movie list for Black History Month, she describes three workplace occurrences (none of which are cited in the PaHRC Complaints) which fail to reflect direct or contextual racial or gender animus or would be considered to create a hostile and offensive atmosphere in the workplace on the basis of either. *See*, Complaint Para. 39 – 42. In Paragraphs 41 and 42, Plaintiff appears to reference an inquiry from HR regarding her concerns about which she was told that she had not recounted details. This is lack of actionable allegations is consistent with the rest of her Complaint. Beginning in Paragraph 43 of the Complaint and moving forward to Paragraph 50, Plaintiff states concerns around a safety issue and reports with no connection to any allegations referencing gender or racial animus.

Beginning in Paragraph 51, Plaintiff discusses an April 18, 2022, meeting that is described in the Amended PaHRC Complaint at Paragraph 12 to 17 and in the PaHRC Complaint in Section (C), Paragraphs 1 through 13. In essence, the allegations of the Complaint, as well as those in the PaHRC Complaint, state Plaintiff's personal objections to a policy that requires individuals who

7

take time off or receive leave for medical circumstances to utilize PTO for the time. Plaintiff fails to identify any unequal treatment or application of the policy based on a protected class (or otherwise), or why she thinks this policy is violative of the ADA.

In Paragraphs 56 through 62, Plaintiff criticizes the manner in which InductEV handles its FMLA application process, and the determination of whether Plaintiff was entitled to the protections of the Family and Medical Leave Act, which she received ("FMLA"). Plaintiff fails to identify any unequal treatment, interference, or mis application of the FMLA based on a protected class (or otherwise), or why she thinks the process is violative of the FMLA.

A close reading of Paragraphs 44 through 58 suggest that Plaintiff was not particularly concerned with the various workplace occurrences she now complains of until on or about April 18, 2022, when she experienced "...an onset of symptoms that later became a chronic condition." Compl. at ¶ 44. Plaintiff then cites "...CAO's insisted in-person meeting to discuss these concerns off-record..." and discussions regarding a safety report and dealings with a co-worker as problematic. Compl. at ¶ 46 - 50   Defendant also discusses her desire to take unpaid time off around the condition, and her displeasure with the refusal of HR to allow use of unpaid time and rather utilize PTO. Compl. at ¶¶ 51 – 55

Then providing insight as to the context and impetus for her complaint to the PaHRC, and eventually this action, as well as essentially admitting her lack dissatisfaction with her treatment in the workplace up until that time, the Plaintiff states:

> 55.   HR continued to affirm that I was denied unpaid time by emailing before the weekend and calling after I asked my supervisor to inform them of my abnormal MRI results—to request that I submit a PTO request for "missing time".
>
> 56.   **The trauma of being harassed by HR while simultaneously coming to terms with my sudden regard as having a serious illness was so jarring, that I resolved to evaluate my experiences in totality.**

8

57.    Finding several instances where I was treated below the legal standard, and holding no faith that these issues would cease to occur without further action, I filed a complaint to the PHRC office.

58.    Due to the implications of medical results, I was placed on medical leave effective May 16, 2022.

*See*, Complaint.

Based on Plaintiff's allegations, the filing of her initial PaHRC Complaint of the Complaint on May 6, 2022 was triggered after she evaluated her workplace experiences of the prior year "... in totality", arising out of symptoms of a serious illness and objecting to application to her of Defendant's generally applicable policy of requiring use of PTO rather than allowing unpaid time for workweeks of less than 40 hours. See Exhibit "B". Counsel does not judge or question the significant impact or effect of the onset of a serious illness on Plaintiff, but simply cites this series of allegations to underscore an apparent lack of belief until late April or early May that Defendant may have been acting in violation of her legal rights, and/or its legal obligations.  *Id.*

In Paragraph 63 of the Complaint, Plaintiff states that the Company was served with the notice of the PaHRC Complaint on June 22, 2022. As a result of that PaHRC Complaint the parties agreed to a private mediation, and in Paragraph 64 through 74, Plaintiff details her understanding of the mediation process.  That Mediation was scheduled and occurred on September 19, 2022, and concluded with an agreement that Plaintiff would release all claims and resign in exchange for payment of Fifty Thousand Dollars ($50,000). *See,* Complaint Para. 68.  Plaintiff repudiated the settlement agreement soon thereafter.

In Paragraphs 75 through 88 Plaintiff attempts to justify why she thinks it was acceptable for her to renege on the settlement reached during mediation. This appears to be in response to an email cited by Plaintiff in Paragraph 266 of the Complaint, which reads as follows (prior Paragraph included for context):

9

265.  On 10/17/2022, and in response to my communications, Defendant chose to double down on their claims, including their intent to sue for breach of contract unless I "memorialize[d] our agreement".

266.  This doubling down relied on an emailed statement that I had clumsily and fearfully made on 09/27/2022: *"I did agree to a verbal agreement in which I would resign and dismiss existing claims (prior to Sep 19) in return for a settlement amount of 50,000 from Momentum Dynamics Corp. The execution of this agreement was contingent on a contract that included agreeable material terms."* [italics not in original]

A true and correct copy of the above referenced email exchange between the Parties is attached as Exhibit "E".

In Paragraphs 82 through 88, Plaintiff further creates "red herrings" and various narratives in further attempts to justify why she has decided not to acknowledge a settlement had occurred. None of these allegations involve race, gender animus, harassment or retaliation. As the employer thought that there had been a settlement reached in Mediation and that Plaintiff would be resigning, Plaintiff did not return to work after September 21, 2022.

## III.  ARGUMENT

### A.  PLAINTIFF ENTERED INTO A BINDING SETTLEMENT AGREEMENT WITH DEFENDANT

#### 1.  Applicable Legal Standard

The enforceability of settlement agreements is determined according to state contract law principles. *Zong v. Lynch*, 2014 WL 4722625, at *4, n.6 (E.D. Pa. Sept. 22, 2014) (citing *Mastroni-Mucker v. Allstate Ins. Co.*, 976 A.2d 510, 517-18 (Pa. Super. Ct. 2009)); *Comptu Forms Control Inc. v. Altus Group. Inc.*, 574 A.2d 618, 624 (Pa. Super. 1990). "Where [as here] a settlement agreement contains all the requisites for a valid contract, a court must enforce the terms of the agreement." *Zong*, 2014 WL 4722625, at *4 (alteration added) (citing *McDonnell v. Ford Motor Co.*, 643 A.2d 1102, 1105 (Pa. Super. Ct. 1994), *appeal denied*, 652 A.2d 1324 (Pa. 1994)). "This

is true **_even_** if the terms of the agreement are not yet formalized in writing." *Id.* (emphasis added) (citing *Mazzella v. Koken*, 739 A.2d 531, 536 (Pa. 1999)). It is "well-settled Pennsylvania law" that "oral agreements to settle are enforceable without a writing." *Id.* (citing *Pulcinello v. Consolidated Rail Corp.*, 784 A.2d 122, 124 (Pa. Super. Ct. 2001), *appeal denied*, 796 A.2d 984 (Pa. 2002)). "There is a strong judicial policy in favor of settling lawsuits because it reduces the burden on the courts and expedites the transfer of money into the hands of a complainant." *Zong*, 2014 WL 4722625, at *4 (citing *Felix Giuseppe Kitchens & Baths, Inc.*, 848 A.2d 943, 946 Pa. Super. 2004)).

## 2. The Parties reached an enforceable settlement.

At mediation on September 19, 2022, the parties reached an agreement that Defendant would pay the Plaintiff $50,000 in exchange for the Plaintiff resigning and releasing all claims through that date. In paragraph 266, Plaintiff refers to "an emailed statement" dated September 27, 2022, wherein Plaintiff stated "*I did agree to a verbal agreement* in which I would resign and dismiss existing claims (prior to Sep 19) in return for a settlement amount of $50,000 from Momentum Dynamics Corp." *See* Exhibit "E", p.1, email from Assata Acey dated 9/27/22 @ 2:53:02 PM.

The email acknowledging the agreement follows a series of emails between Plaintiff and Defendant's then counsel May Mon Post, Esquire, after the mediation. The string of emails starts on 9/23/22 at 16:01 with an email from Ms. Post responding to a request by Plaintiff to use PTO so she could be paid for September 22 and 23, as she was out on a medical leave at that point, and not eligible for PTO. See, Exhibit "E", p. 4. Not getting the desired response (i.e., she was not able to use PTO), nine minutes later Plaintiff writes an email demanding to know if Defendant's leave

11

policies were modified to reflect what Ms. Post communicated, as apparently Plaintiff does not

read the InductEV policies in a similar way. *Id.*

Having no further response to the question around the leave policies, later in the evening

of September 23, at 10:39:46 PM, Plaintiff writes again stating that:

> "Due to the documentation of this issue, I am convinced that a full
> investigation will find Momentum Dynamics Corporation in noncompliance
> of EEOC law with order to pay the full 50,000 amount regardless of whether
> I resigned – being that resignation would be my right."

Exhibit "E", p.3.

And later in the same email Plaintiff states:

> In the scope of the merit of my claims (existing complaint), right to
> resign or not, previously noted actions, and supporting documentation, **I am
> now asking for a settlement amount of $130,000,** acceptable for review
> ONLY with receipt legally drafted settlement offer (including ALL material
> terms: resignation, rehire eligibility, timescale/terms of payment,
> confidentiality, etc.).

*Id.,* p.4 (emphasis not in original)

In the time between the late September 2022 email exchange with defendant's then counsel

and the filing of the Complaint on March 14, 2023, Plaintiff, rightfully and patently concerned

about that fact of settlement and anticipating the issue, developed several other "reasons" why she

should not be held to her agreement to settle. Compl. at ¶¶ 246 – 275. In Counts XVIII and XVIV,

spanning 43 paragraphs with subparts, Plaintiff goes to great length and effort to distance herself

from both her agreement to settle her claims at mediation, and her September 27, 2022, e-mail

acknowledging the agreement to settle. Compl. at ¶¶ 246 through 275. This is best illustrated by

the Plaintiff's assertion in Paragraph 266 of the Complaint claiming the 9/27/22 email where she

acknowledged the agreement to settle was "…an emailed statement that I had clumsily and

fearfully made…" Compl. at ¶ 266. None of the excuses or reasons why the settlement should not

be enforced are sufficient to void or undo her agreement. In contrast, Defendant's counsel was steadfast in her confirmation of the very same settlement terms Plaintiff acknowledges. See, Exhibit "E".

Plaintiff acknowledges her settlement with Defendant throughout her Complaint. For example, Plaintiff alleges that she and Defendant "each signed separate agreements to mediate that detailed any binding agreement would be typed up and signed during mediation—with the sole exception of technological limitations." A copy of the Mediation Agreement signed by Defendant, which is believed to be the mirror of that signed by Plaintiff, is attached as Exhibit "F". Notably, neither Plaintiff nor the signed Mediation agreement *__condition__* settlement on a signed agreement; rather, as Plaintiff acknowledges, any agreement reached would be memorialized in writing. *See, e.g.*, Compl. at ¶ 67 ("Respondent forewent a partial agreement, instead opting to write up a final agreement after mediation."); *id.* at ¶ 68 ("Instead, respondent and I had tentatively agreed that so long as I presented a return-to-work letter by September 26, Defendant would present me with a contractual agreement to resign and drop my claims in exchange for $50,000, and so long as long [sic] as other terms seemed reasonable, I would consider this agreement.").

Importantly, although a writing ultimately was required to memorialize the agreement between the parties, it is well settled that the absence of any writing does not invalidate the agreement reached as a matter of law. *Zong*, 2014 WL 4722625, at \*4 (recognizing that a court must enforce the terms of the settlement so long as a settlement agreement contains all the requisites for a valid contract even if the terms of the settlement agreement are not yet in writing).

Unfortunately for the Plaintiff's interest in increasing the amount of money she would like to receive in this case, under Pennsylvania law her statements establish the elements of an enforceable settlement agreement.    Simply put, Plaintiff agreed to resign and release her claims

against Defendant in exchange for $50,000. That is a valid contract by any measure of contract law. Plaintiff should not be permitted to repudiate her contractual obligations in hopes of obtaining more money through the Courts.

Although Defendant, for the reasons set forth below, believes the entire Complaint should be dismissed without payment of any monies for lack of legal or factual merit, and despite the additional costs generated by the defense of the Complaint, it will stand by the agreement it made to pay Plaintiff $50,000 for a resignation and a release of claims as of September 19, 2022, and an end to these proceedings. Accordingly, and without waiver of the motions made below or any other defenses, Defendant asks the Court to enter an Order to that effect.

## B.    PLAINTIFF FAILED TO EXHAUST HER ADMINISTRATIVE REMEDIES FOR THE CLAIMS MADE UNDER TITLE VII, THE ADA, AND THE PHRA.

Failure to exhaust administrative remedies provides a basis for dismissal under Rule 12(b)(6). *Mammen v. Thomas Jefferson University*, 462 F. Supp. 3d 518, 529 (E.D. Pa. 2020) (citing *Anjelino v. New York Times Co.*, 200 F.3d 73, 87-88 (3d Cir. 2000)). Courts within this Circuit (including this Court) have not hesitated to dismiss claims "for failure to exhaust administrative remedies even where the plaintiff argued that some of the underlying facts overlapped with a claim that was properly exhausted." *Id.* (citing *Antol v. Perry*, 82 F.3d 1291, 1296 (3d Cir. 1996)); *Green v. Postmaster Gen.*, 437 F. App'x 174, 178 (3d Cir. 2011) (affirming dismissal of hostile work environment claim for failure to exhaust because the plaintiff only raised failure to promote claim to the EEOC "which [did] not encompass her separate claim of hostile work environment").

### 1.    Plaintiff's Title VII Violations should be dismissed because plaintiff did not raise those claims to the EEOC.

14

A plaintiff alleging violations of Title VII "must first exhaust his administrative remedies by filing a charge with the EEOC." *E.E.O.C. v. Connectiv*, 2006 WL 1451527, at *2 (E.D. Pa. May 25, 2006) (Pratter, J.). The congressional objective behind this framework is "to resolve discrimination claims administratively through cooperation and voluntary compliance in an informal, noncoercive manner." *Id.* (quoting *Burgh v. Borough Council of Montrose*, 251 F.3d 465, 470 (3d Cir. 2001)). "A plaintiff may not bring a suit under Title VII without exhausting his administrative remedies and receiving a right-to-sue letter." *Id.* (citing *Burgh*, 251 F.3d at 471). This Court has adhered to that principle in the Title VII context and beyond. *Id.* (describing the plaintiff's failure to exhaust his administrative remedies as "fatal to his individual Title VII action" and dismissing his complaint (citing *Joyner v. School Dist. of Phila.*, 313 F. Supp. 2d 495, 500 (E.D. Pa. 2004)); *Walker*, 2022 WL 17650456, at *1 (Pratter, J.) (dismissing claim on 12(b)(6) grounds for failure to exhaust administrative remedies); *Paz v. Hughes*, 2016 WL 6276397, at *2 (E.D. Pa. Oct. 17, 2016) (dismissing complaint for failure to exhaust administrative remedies).

Critically, this Court has explained that "the parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow of the charge of discrimination." *DeLa Cruz v. Piccari Press*, 521 F. Supp. 2d 424, 433 (E.D. Pa. 2007) (Pratter, J.) (quoting *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398-99 (3d Cir. 1976). "Thus, the ensuing suit is limited to claims that are within the scope of the original administrative charge." *Id.* (citing *Antol*, 82 F.3d at 1295). "Courts have taken a 'fact-specific' approach to this inquiry, analyzing each claim on a case-by-case basis. *Id.* Courts consider whether there exists a "close nexus" between the facts and each charge made in the EEOC complaint and the judicial complaint, or whether "additional charges made in the judicial complaint may fairly

15

be considered explanations of the original charge or growing out of it." *Id.* at 433-44 (quoting *Janis v. La-Z-Boy Furniture Galleries*, 2006 WL 724156, at \*5 (E.D. Pa. Mar. 17, 2006)).

Plaintiff asserts **_three_** specific claims in her PaHRC Complaints. First, Plaintiff claims Defendant should have hired or promoted her to a "Sr. Technician" position and that Defendant's failure to do so was because of race and gender. See, Section I.A., *_supra_*. Second, Plaintiff asserts that, after her cell phone was crushed in a workplace accident, and Defendant made it difficult for her to be compensated or reimbursed for the costs of replacing the phone. *Id.* Third, Plaintiff claims that, after informing Defendant of a disability and allegedly claiming Defendant's PTO policy was unfair to people with disabilities, Defendant harassed her and retaliated by delaying an accommodation and withholding information she wanted. *Id.*.

In her judicial Complaint, however, Plaintiff asserts five (5) counts under Title VII claiming: discriminatory intimidation for opposing unlawful racial harassment (Count I); racial harassment as a discriminatory condition of employment (Count V); discriminatorily limited opportunity on the basis of race (Count VII); discriminatory sexual harassment (Count X); and discrimination for filing a charge-wrongful termination (Count XVIII). *See generally* Compl. at ¶¶ 90-103, 120-129, 133-164, 175- 194, 259-275.

A review of Plaintiff's PaHRC Complaints confirms that all five counts under Title VII should be dismissed because (a) there is no nexus between the facts alleged in her PaHRC Complaints and Plaintiff's Title VII claims; and (b) Plaintiff's Title VII charges are not explanations of, or grow out of, the three claims in her PaHRC Complaints. Plaintiff's PaHRC Complaints contain scant references to race and none about sexual harassment, asserting merely her conclusions that she was denied "the position of Senior Technician and other promotional opportunities because [she is] an African American female, in violation of the Pennsylvania

Human Relations Act", and that she was denied reasonable accommodations due to being an "African American female". See, Section II.A. *supra*. Plaintiff makes no reference to any Title VII violation. Importantly, Plaintiff's administrative charge contains ***no facts*** (only her vague conclusions) reflecting racial animus of any kind on the part of Defendant. Nor do the PaHRC Complaints contain any claim – much less any facts – regarding sexual harassment, as alleged in Count X of Plaintiff's Complaint. Because all five Title VII claims (and the alleged facts upon which they rely) are far beyond "the scope of the original administrative charge".

The lack of nexus between the Complaint and the PaHRC Complaints is illustrated if one were to put themselves in the shoes of an EEOC Investigator investigating, or the Defendant defending, the claims in the PaHRC Complaints. The information that would inform or respond to the Phone Reimbursement, Accommodation Process, and the Position Misclassification Claims in the PaHRC Complaints would wholly fail to touch on, or respond to, the claims in the Complaint. Accordingly, Plaintiff has failed to exhaust her administrative remedies and Counts I, V, VII, X, XVIII under Title VII should be dismissed.

> **2.    Plaintiff's ADA claims should be dismissed because Plaintiff did not raise ADA claims to the EEOC.**

"The requirement that a plaintiff must exhaust all administrative remedies before seeking judicial relief is a well-accepted tenet of administrative law." *Lightcap-Steele v. KidsPeace Hosp., Inc.*, 2006 WL 1147476, at *6 (E.D. Pa. 2006) (Pratter, J.). "The administrative prerequisites to filing employment discrimination claims under the ADA are no exception." *Id.* (quoting *DuBose v. District 1199(c), Nat'l Union of Hosp. & Health Care Employees*, 105 F. Supp. 2d 403, 410 (E.D. Pa. 2000)).

As mentioned above, Plaintiff's PaHRC Complaints are limited to three specific claims: the (1) Position Classification Claim; (2) Phone Reimbursement Claim; and (3) Accommodation

17

Process Claim. Plaintiff's judicial Complaint asserts two (2) counts under the ADA: perpetuating disability discrimination through administrative methods (Count XIII) and discriminatory conditions of employment-harassment on the basis of disability (Count XV).

Like Plaintiff's rote claims of racial animus, Plaintiff's PaHRC Complaints contain only fleeting reference to her alleged "physical disability that impaired [her] ability to concentrate and caused [her] physical pain" in support of her Accommodation Process Claim. *See* Exhibit "C" at ¶12. Plaintiff's claims in the PaHRC Complaints are based on her belief (made without any factual support) that Defendant delayed and ultimately did not provide her with "all the administrative information that [she] requested during the interactive process" and "delayed the implementation of her reasonable accommodation." *Id.* at ¶¶ 15,16 The allegations in the original Complaint filed by the Plaintiff are less clear but appear to be based on Plaintiff's: dislike of an InductEV policy applicable to all requiring use of PTO for medical leaves based on a disability; and a belief others may have heard the Chief Administrative Officer of InductEV discussing her request for a medical leave with her. See, Exhibit "B", ¶¶ C.1 – C.9. Significantly, Plaintiff did not identify herself as discriminated against on the protected class of "Disability" in Paragraph 5 of either PaHRC Complaint, when she could have done so by simply checking a box indicating so. Exhibit "B" ¶5; Exhibit "C" ¶5. Plaintiff made no claims in either PaHRC Complaint that she had been denied rights under the ADA, or otherwise on the basis of any disability, but rather says there was a delay (not a denial) because she was an African American female. Exhibit "C" at ¶ 17; Exhibit "B" ¶¶ C. 10 – C. 13.

In contrast, Plaintiff asserts several allegations in paragraphs 205 through 219 (Count XIII) and paragraphs 229 through 243 (Count XV) in her Complaint which are ***not*** present in Plaintiff's

administrative charge.[6] Plaintiff seeks to assert entirely new claims based upon previously unasserted "facts" – a practice disavowed by this Court and the Third Circuit.[7] *See, e.g., DeLa Cruz*, 521 F. Supp. 2d at 435 (Pratter, J.) (dismissing plaintiff's claims under Title VII and PHRA to the extent they are outside the scope of the EEOC complaint); *Antol*, 82 F.3d at 1295 (holding that gender discrimination claim is beyond the scope of EEOC investigation, the gravamen of which centered on disability discrimination).[8] Because Plaintiff has failed to include the specific facts forming the basis for her ADA claims in her PaHRC Complaints (when she could have included those specific facts), Plaintiff failed to exhaust her administrative remedies and Counts XIII and XV should be dismissed.

### 3.    Plaintiff's PHRA claims should be dismissed because Plaintiff did not raise those claims to the PHRC.

Like Title VII and the ADA, "Pennsylvania law requires that a plaintiff exhaust her administrative remedies under the PHRA before maintaining a civil suit under that act." *DeAngelo v. DentalEZ, Inc.*, 738 F. Supp. 2d 572, 586 (E.D. Pa. 2010) (Pratter, J.) (citing 43 P.S. § 962(c)); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 925 (3d Cir. 1997). "This statutory scheme reflects a legislative intent 'to make administrative procedures under the PHRA a mandatory rather than

---

[6]For example, Count XIII relies upon allegations concerning Plaintiff's request for FMLA leave. *See, e.g.*, Compl. at ¶¶ 205-219. The PaHRC Complaints contain limited allegations to that effect. *Compare* Compl. ¶¶ 205-219 *with* Exhibit C. The same is true of Count XV. *Compare* Compl. ¶¶ 229-243 *with* Exhibit C.

[7]Defendant in no way concedes that Plaintiff has adequately alleged causes of action on her ADA claims. To the contrary, as argued in Section III. C., *infra*, Plaintiff's ADA claims fail to satisfy Rule 8's pleading standard as a matter of law.

[8]This Court emphasized in *DeLa Cruz* that the plaintiff could have included the additional facts forming the basis for its Title VII and PHRA claims in its EEOC complaint but failed to do so, explaining that "courts generally have been less sympathetic toward unexhausted allegations that arose *prior* to the filing of the EEOC complaint as opposed to allegations pertaining to events that occurred *after* the filing of the EEOC complaint." *DeLa Cruz*, 521 F. Supp. 2d at 434-45 (emphases in original). The same is true here. Plaintiff *could* have included the additional facts asserted in her PaHRC Complaints but failed to do so..

19

discretionary means of enforcing the rights created thereby.'" *Id.* (quoting *Clay v. Advanced Computer Applications, Inc.*, 559 A.2d 917, 919 (1989)). "[I]nvocation of the procedures set forth in the [PHRA] entails more than filing of a complaint; it includes the good faith use of procedures provided for disposition of the complaint." *Id.* (alterations in original) (quoting *Lyons v. Springhouse Corp.*, 1993 WL 69515, at *3 (E.D. Pa. Mar. 10, 1993)).

Plaintiff asserts nine (9) counts claiming violation of the PHRA: aiding and abetting unlawful employment discrimination (Count II); discriminatory intimidation on the basis of opposing forbidden racial discrimination (Count III); racial harassment as a discriminatory condition of employment (Count VI); discriminatory conditions-sexual harassment (Count XI); aiding unlawful discrimination-sexual harassment (Count XII); abetting or attempting disability discrimination (Count XIV); discriminatory conditions of employment-harassment on the basis of disability (Count XVI); attempting to coerce unlawful discrimination-constructive termination (Count XVII); and discrimination for filing a charge-wrongful termination (Count XIX).

It bears repeating that Plaintiff asserts three (and only three) very specific claims in her PaHRC Complaints. Nowhere does Plaintiff allege ***any facts*** suggesting racial, sexual, disability-based harassment. Indeed, ***none*** of these claims (and the facts alleged in their support) were presented to the PHRC for review. And therefore, ***none*** are within the scope of the original administrative charge." *DeLa Cruz*, 521 F. Supp. 2d at 433. At best, Plaintiff's PaHRC Complaints contain vague and unsubstantiated ***conclusions*** (not facts) that she suffered discrimination because she is (a) African American; and (b) female – and nothing more.

The exhaustion requirement was adopted to prevent situations like the present – where an unhappy employee decides to burden the Court and judicial system with any number of perceived transgressions, circumventing the administrative expertise of the EEOC where the complaints can

20

be promptly investigated, the employer heard on the topic, the claims hopefully conciliated. Plaintiff should not be permitted to exponentially transform the generalized allegations in her administrative charge – which is limited to the three specific claims discussed above – into a 20 Count 297 Paragraph Complaint. Permitting her to do so would frustrate the entire purpose of the PHRC administrative exhaustion requirement: to allow "the PHRC to use its specialized expertise to attempt to resolve discrimination claims **_without_** the parties resorting to court." *Woodson*, 103 F.3d at 925 (emphasis added). Accordingly, Counts II, III, VI, XI, XII, XIV, XVI, XVII, and XIX should be dismissed for failure to exhaust the PHRC administrative requirement.

C.    **PLAINTIFF HAS FAILED TO ALLEGE FACTS SUFFICIENT TO STATE A CLAIM FOR RELIEF ON: ALL THOSE CLAIMS NOT SUBJECT TO DISMISSAL FOR FAILURE TO EXHAUST REMEDIES; AS WELL AS MANY THAT ARE SUBJECT TO DISMISSAL FOR FAILURE TO EXHAUST REMEDIES.**

Without waiver of the arguments set forth, Defendant moves, pursuant to Fed. R. Civ. P 12 (b)(6), for dismissal of all of Plaintiff's claims not subject to dismissal for failure to exhaust administrative requirements as stated above, as they fail to allege facts sufficient to state a claim for relief on those claims and therefore fail as a matter of law. Defendant also moves, in the alternative and for the reasons set forth below and pursuant to Fed. R. Civ. P 12 (b)(6), for dismissal of many of Plaintiff's claims which are subject to dismissal for failure to exhaust administrative remedies.

To survive a motion to dismiss, the plaintiff must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Walker v. Wetzel*, 2022 WL 17650456, at *1 (E.D. Pa. Dec. 13, 2022) (Pratter, J.,) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted))). While a court may accept a complaint's factual allegations,

21

mere "bald assertions" or "legal conclusions" are insufficient. *Id.* (quoting *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).

As the Court has significant experience with the law applicable to Title VII and related claims, Defendant will not lengthen this Motion with a detailed explanation of the law, or lengthy applications relative to each of Plaintiff's claims.  The applicable law is not complicated or obscure. To state a claim for discrimination under Title VII, a plaintiff must show that she is (1) a member of a protected class; (2) qualified for the position she sought to attain or retain; (3) that she suffered an adverse employment action; and (4) that the action occurred under circumstances that could give rise to an inference of intentional discrimination. *Young v. St. James Management, LLC*, 749 F. Supp. 2d 281, 288 (E.D. Pa. 2010) (citing *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)).

To state a claim for hostile work environment on the basis of race under Title VII, a plaintiff must establish that (1) the employee suffered intentional discrimination because of his or her race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability such that the employer is responsible. *Castleberry v. STI Group*, 863 F.3d 259, 263 (3d Cir. 2017) (citing *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)). Similar considerations apply to claims of a hostile work environment based on other protected classes such as age.

"Generally, claims brought under the PHRA are analyzed under the same standards as their federal counterparts." *Kroptavich v. Pennsylvania Power & Light Co.*, 795 A.2d 1048, 1055 (Pa. 2002); *Bowser v. Clarion County*, 206 A.3d 68, 75 (Pa. Commw. Ct. 2019) (same); *Dici v. Commonwealth of Pennsylvania*, 91 F.3d 542, (3d Cir. 1996) ("the PHRA is generally applied in

22

accordance with Title VII.") Thus, to state a claim for race based discrimination under the PHRA, Plaintiff must show that she (1) is a member of a protected class; (2) is qualified for the position she sought to attain or retain; (3) suffered an adverse employment action; and (4) that the action occurred under circumstances giving rise to an inference of intentional discrimination. *Daniels v. School Dist. of Philadelphia*, 982 F. Supp. 2d 462, 479 (E.D. Pa. 2013).

Thus, to establish a hostile work environment under the PHRA, a complainant must show that she (1) suffered intentional discrimination because of race or gender; (2) suffered harassment that was severe or pervasive and regular; (3) that the harassment detrimentally affected him or her; (4) that the harassment would detrimentally affect a reasonable person of the same protected class; and (5) that the harasser was an employee of agent of the employer. *Infinity Broadcast. Corp., v. Pennsylvania Human Relations Com'n*, 893 A.2d 151, 158 (Pa. Commw. Ct. 2006) (citing *Barra v. Rose Tree Media Sch. Dist.*, 858 A.2d 206, 215 (Pa. Commw. Ct. 2004)). "In determining whether a working environment is sufficiently hostile or abusive, courts must look at the totality of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening, or a mere offensive utterance; and whether it unreasonable interferes with an employee's work performance.'" *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)).

Though admittedly lengthy and tedious, Defendant will address each of the Counts subject to dismissal for failure to state a claim below.

> **1.     Count I - Discriminatory Intimidation for Opposing Unlawful Racial Harassment in Violation of Title VII of The Civil Rights Act Of 1964, 42 U.S.C. § 2000e-3 (a). Complaint Paragraphs 90 – 103.**

The allegations in Count I appear to be a Complaint that the Company failed to utilize materials or use input from the Plaintiff in designing or presenting its harassment or diversity

23

training programs. *See* Compl. ¶¶ 90-103. It appears that Plaintiff believes that because the Chief Administrative Officer ("CAO") indicated that she would not be utilizing information provided by Plaintiff in the training, the CAO was intending to intimidate her for opposing racial discrimination, and was that Defendant was not sincere in its work to address racial discrimination in the workplace. *See* Compl. at ¶ 102.

Incorporating the allegations in Paragraphs 1-89 before it, Count I fails to state a claim that is cognizable under Title VII of the Civil Rights Act. There are no allegations of adverse actions taken towards the Plaintiff for the purpose of or based upon her race; and to the extent Plaintiff claims inferred harassment when the CAO failed to take her suggestions with respect to training, the allegations fall far short of that required to support a finding that the Defendant was intimidating the Plaintiff, or allowing and perpetrating a hostile and offensive environment in the workplace.

Throughout the Complaint, Plaintiff repeatedly ascribes discriminatory intent to the CAO and other employees of Defendant, without legally recognized reasons based in fact therefore. Plaintiff then cites workplace events and interactions that are relatively benign but that she does like, and because she is a black female *ipso facto* those actions are events demonstrate race or gender discrimination. Recall that it was not until May of 2022 that Plaintiff decided to reflect on possible unlawful treatment in the workplace, and the context thereof. Such logic should not – and cannot – form the basis of cognizable claim under Title VII or the PHRA. Pleading a plausible claim for relief requires that the plaintiff not only provide fair notice of the claim but also the grounds upon which it rests. *Phillips v. County of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008). Count I fails to meet to meet that standard, and therefore fails as a matter of law.

      **2.**    **Count II - Aiding and Abetting Unlawful Employment Discrimination in Violation of The Pennsylvania Human Relations Act, 43 P.S. § 955 (e). Paragraphs 104 – 107.**

Count II incorporates the allegations of Count I above, citing the PHRA (as opposed to Title VII), and declares without direct or inferential support, that the CAO was intending to allow racial harassment to continue, and to intimidate the Plaintiff. Compl. at ¶¶ 104-107. Like Count I, there are no allegations of any adverse taken toward Plaintiff. Plaintiff essentially repeats Count I and seeks to hold Defendant liable for not taking Plaintiff's suggestions with respect to training. Such allegations fall woefully short of asserting that Defendant was complicit in creating a hostile work environment in the workplace and leave Defendant speculating about the nature of Plaintiff's claims. For those reasons, Count II fails as a matter of law.

      **3.**    **Count III - Discriminatory Intimidation on The Basis of Opposing Forbidden Racial Discrimination, In Violation of The Pennsylvania Human Relations Act, 43 P.S. § 955 (d). Paragraphs 108 -115.**

The allegations in Count III fails to satisfy even the most basic requirements for setting forth a claim under the Pennsylvania Human Relations Act. As a starting point, Plaintiff repeats the allegations in Counts I and II (which fail for the reasons described above) and asserts that "Defendant willfully engaged in the adverse action of intimidation, AND that this action was done with discriminatory basis of my having opposed workplace racial discrimination, which is declared unlawful[.]" [emphasis in original] Compl. at ¶ 114. Furthermore, Plaintiff asserts that because she provided Defendant a movie list – and because Defendant chose not to utilize her movie list as part of its employee training – Defendant willfully engaged in unlawful discrimination on the basis of opposing forbidden racial discrimination. Compl. at ¶¶ 108, 110, 112, and 114. Plaintiff alleges no facts suggesting any willful intimidation or discriminatory intent. Accordingly, Count III should be dismissed.

25

**4.    Count IV - Intentional Unequal Pains-Intimidation in Violation of
The Civil Rights Act Of 1866; 42 U.S.C. § 1981. Paragraphs 116 – 119.**

42 U.S.C. § 1981 provides in relevant part "[a]ll persons within the jurisdiction of the

United States shall have the same right in every state . . . to make and enforce contracts . . .." *Mudie*

*v. Phila. College of Osteopathic Medicine*, 577 F. Supp. 3d 375, 380 (E.D. Pa. 2021). "Although

§ 1981 does not explicitly refer to 'race,' the Supreme Court has construed the section to forbid all

'racial' discrimination in the making of' private and public contracts." *Id.* (quoting *St. Francis Coll*

*v. Al-Khazraji*, 481 U.S. 604, 609 (1987)).

"To state a claim under § 1981, a party must allege facts "sufficient to show that (1)

Plaintiff is a member of a racial minority; (2) intent to discriminate on the basis of race by the

defendant; and (3) discrimination concerning one or more of the activities enumerated in the

statute, which includes the right to make and enforce contracts.'" *Id.* at 380-81 (quoting *Gross v.*

*R.T. Reynolds, Inc.*, 487 F. App'x 711, 716 (3d Cir. 2012); *Hood v. N.J. Dep't of Civil Serv.*, 680

F.2d 955, 959 (3d Cir. 1982) ("intentional discrimination is a required element of a § 1981 claim")

The facts pled by Plaintiff fail to reflect that Defendant intended to "discriminate on the

basis of race" or "discrimination concerning one or more activities enumerated" in 42 U.S.C. §

1981. It is unclear what Plaintiff is alleging in this Count beyond her repeated claim that her

attempt to provide input into diversity and equity training was perceived as opposition to a racially

prescribed activity, for which she suffered intimidation. Plaintiff goes as far as alleging that had

she not "been Black" she "would not have to oppose racial harassment" and that, but for "being

black" she would not have suffered "the pain of intimidation." Compl. at ¶ 117-119. Even if

Plaintiff adequately alleged discriminatory conduct by Defendant (she has not), Plaintiff fails to

tie any allegedly discriminatory action to race, or how same affect any contractual rights protected

by § 1981. Put simply, has failed allege *any* facts showing intentional discrimination.

26

Accordingly, Count IV fails to state a claim for relief under 42 U.S.C. § 1981 as a matter of law and should be dismissed.

### 5.    Count V - Racial Harassment as A Discriminatory Condition of Employment in Violation of Title VII of The Civil Rights Act Of 1964, 42 U.S.C. § 2000e-2 (a)(1). Paragraphs 120 – 129.

In this Count, Plaintiff claims that she was the victim of ongoing and pervasive racial harassment which she identifies as scrutiny from human resources; allegedly anonymous accusations from co-workers of stealing time and missing meetings; anonymous and direct co-worker criticisms of work attendance and work ethics; hostile sabotage from co-workers where access to tools and equipment were affected; and a joke perceived to relate to the Plaintiff being from the wrong side of the tracks, Compl. at ¶¶ 120-121.[9] Plaintiff cites circumstantial evidence and prevailing racial stereotypes (as defined by Plaintiff) as the reason these occurrences are reflective of racial basis. *Id.* at ¶ 123. Critically, Plaintiff cites *no* adverse employment action suffered, or words or actions explicitly or implicitly reflecting racial or gender animus.

Rather, Plaintiff cites having to document her work in progress for others to view and send emails to the supply chain through her manager instead of just copying him. *Id.* at ¶¶ 126-127. Plaintiff also asserts without support that Defendant "knowingly and recklessly enabled an environment of racial discrimination" by "[f]ailing to proactively address workplace culture and attitudes before it produced further harassment"; and "[c]hoosing not to maintain a reasonably nonhostile communication channel to communicate and address ongoing issues." *Id.* at 126. Plaintiff offers no facts demonstrating any "knowing" or "reckless" conduct by Defendant, much

---

[9]Even accepting Plaintiff's allegations as true, together with all inferences, this Court has held that "[i]solated incidents and offhanded comments are not sufficient to sustain a hostile work environment claim." *Chandler v. La-Z-Boy, Inc.,* 2022 WL 3357674 (E.D. Pa. Aug. 15, 2022) (holding that one comment referring to the "colored girl" were not sufficiently severe or pervasive to support a hostile work environment claim (quoting *Stucke v. City of Phila.,* F. App'x 150, 153 (3d Cir. 2017)).

27

less that Defendant cultivated a workplace culture and attitudes in furtherance of harassment. *See Hoff v. Spring House Tavern*, 2013 WL 2434615 (E.D. Pa. June 5, 2013) ("the fact that Plaintiff encountered an unpleasant isolated incident does not mean that the terms and conditions of Plaintiff's employment were altered.").

The allegations set forth in Count V – even if true – and giving Plaintiff the benefit of all reasonably drawn inferences – simply fail to support a claim for racial harassment in the workplace. That is true even considered in conjunction with the remaining allegations of the Complaint. Plaintiff has failed to allege a single fact suggesting racial animus on Defendant's part. In the absence of any facts suggesting race-based discrimination by Defendant, Accordingly, Count V should be dismissed.

> **6. Count VI - Racial Harassment as A Discriminatory Condition of Employment in Violation of In Violation of The Pennsylvania Human Relations Act, 43 P.S. § 955 (a). Paragraphs 130 – 132.**

Count VI incorporates the claims set forth in Count V by and asserts they as violative of the Pennsylvania Human Relations Act. *See* Compl. ¶¶ 130-132. For the same reasons given in the preceding Subparagraph, Count VII fails to state a claim under the PHRA as a matter of law and should be dismissed.

> **7. Count VII - Discriminatorily Limited Opportunity on The Basis of Race in Violation of Title VII of The Civil Rights Act Of 1964, 42 U.S.C. § 2000e-2 (A)(2). Paragraphs 133 – 164.**

The crux of Count VII is that Plaintiff, having accepted a Technician's role on May 31, 2021, Plaintiff felt that she should have been hired into, and was immediately qualified to be promoted to, a Senior Technician position. In support she cited four other individuals who were promoted during her time at InductEV. *See* Compl. at ¶ 146. Plaintiff also cites others who achieved the Senior Technician designation, including other females and a Black male. *See*

28

Compl. at ¶¶ 144,145, 148. Based upon her belief, Plaintiff concludes (again without any support and without alleging any specific facts) that she was improperly classified due to racial bias against African American employees. *See* Compl. at ¶¶ 146, 161-162. Plaintiff's beliefs – without more – do not allege a claim to relief beyond a speculative level. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Accordingly, Count VII should be dismissed.

### 8.    Count VIII - Intentional Unequal Contracts in Violation of The Civil Rights Act Of 1866, 42 U.S.C. §1981. Paragraphs 165 – 169.

Count VIII involves the same allegations as Count VII but relies upon 42 U.S.C. § 1981, alleging that Defendant denied Plaintiff "the privilege of contract modification on the basis of her race when Defendant, through its human resources department (HR), chose not to reclassify [her] role, despite choosing to do so for several White employees."

As mentioned above, to state a claim under § 1981, a party must allege facts "sufficient to show that (1) Plaintiff is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute, which includes the right to make and enforce contracts.'" *Mudie*, 577 F. Supp. 3d at 380-81.

Like Count IV, Count VIII is unsupported by any facts showing an "intent to discriminate on the basis of race by the defendant" based upon "one or more activities enumerated in the statute," including "the right to make and enforce contracts." *Id.* Plaintiff instead asserts that but for her race, her role would have been reclassified and, "[b]y following an unwritten policy of intentional racial bias, Defendant limited [her] contract benefits and privilege" with respect to her race. *See* ¶¶ 166-167, 169. Plaintiff's allegations are precisely the type of vague and conclusory allegations that do not suffice under Rule 8. *See Slater v. Marshall*, 915 F. Supp. 721, 723 (E.D.

29

Pa. 1996) ("Vague and conclusory allegations do not provide fair notice and will not survive a motion to dismiss."). Accordingly, Count VIII should be dismissed.

> ### 9. Count IX - Intentional Unequal Pains- Racial Harassment in Violation of The Civil Rights Act Of 1866; 42 U.S.C. §1981. Paragraphs 170 – 174.

Count IX also cites 42 U.S.C. § 1981 in claiming racial harassment for reasons similar to those set forth in Counts IV and VIII of the Complaint. Here, Plaintiff claims protection from "unequal pains" without any reasonably inferable factual basis for same. *See* Compl. at ¶¶ 171-172. Again, Plaintiff asserts without support intentional racial bias and stereotypes "that would not have applied to [her] had [she] been White." Compl. at ¶ 171. For the reasons asserted in support of dismissing Counts IV and VII, Count IX also fails as a matter of law and should be dismissed, as Plaintiff has failed to establish a right to relief on her § 1981 claim beyond the speculative level. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see also Mudie*, 577 F. Supp. 3d at 380-81 (setting forth the three requirements to plead a claim under 42 U.S.C. § 1981). Accordingly, Count IX should be dismissed.

> ### 10. Count X - Discriminatory Conditions-Sexual Harassment in Violation of Title VII of The Civil Rights Act Of 1964, 42 U.S.C. § 2000e-2 (A)(1). Paragraphs 175 – 194.

In support of this claim, Plaintiff relies upon various conclusions mischaracterized as facts which even if true apply to all employees, and do not support a cause of action for any employee, including her. These allegations include perceived failures in training (Compl. ¶¶ 177-183); and her concern that she was told to report perceived sexual harassment to the Chief Administrative Officer and not her supervisor (Compl. at ¶¶ 184-186) - which she believes were done for the purpose of discouraging further relay of details concerning sexual harassment and to refrain from investigating same. Plaintiff's conclusions and perceptions alone do not support a claim for sexual

harassment.[10] Plaintiff alleges broad conclusory statements that she was harassed – "...targeted opposition, inappropriate office jokes, and unwanted touching from my colleagues" without pleading any specific instance of same. Compl. at ¶ 176 Plaintiff fails to allege any written Complaints or other actions in response to the supposed harassment she claims. Nor does Plaintiff assert any adverse employment action or describe conditions that support a claim of an offensive and hostile workplace. Plaintiff cannot circumvent the pleading requirement of Fed R. Civ. P. 8 merely by filling her pleadings with generalized allegations of wrongdoing and leave this Court (and Defendant) guessing as to the basis for Plaintiff's claim. Accordingly, Count X should be dismissed.

        **11.**    **Count XI - Discriminatory Conditions- Sexual Harassment in Violation of The Pennsylvania Human Relations Act, 43 P.S. 955(A). Paragraphs 195 – 197.**

This Count essentially incorporates the allegations from Count X and cites the PHRA as the basis for recovery. Compl. at ¶¶ 195-197. As Count XI mirrors the allegations in Count X, so too should Count XI fail for the same reasons. Accordingly, this Court should dismiss Count XI for the reasons discussed above.

        **12.**    **Count XII - Aiding Unlawful Discrimination-Sexual Harassment in Violation of The Pennsylvania Human Relations Act, 43 P.S. 955(E). Paragraphs 198 – 204.**

This Count sets forth a separate sexual harassment claim in that Plaintiff claims the CAO aided unlawful discrimination based on sexual harassment in violation of the PHRA. Compl. at ¶¶ 198-203. Plaintiff apparently challenges Defendant's reporting structure "per the company handbook", which requires that complaints of harassment by the Chief Administrative Office had

---

[10]Notably, as mentioned above in Section III. B., *supra*, Plaintiff failed to raise this issue before the EEOC and therefore failed to exhaust her administrative remedies on her claims under Count X. See Section III.B *supra*.

to be raised with the CEO. Compl. at ¶ 201. Plaintiff further asserts that "because the HR department consisted of two people, the next most diplomatically favorable option for employees to escalate concerns dismissed by HR, was to continue bringing them directly to HR or have them voiced by their manager." *Id.* While it is unclear what Plaintiff is specifically alleging in Paragraph 201 of her Complaint, neither the PHRA nor Title VII authorize claims based upon perceived difficulties in reporting undesired behavior, as Plaintiff appears to allege. Nor is it alleged that this policy somehow impacted or interfered with any right or actions of the Plaintiff. Accordingly, Plaintiff's claims under Count XII should be dismissed for failure to state a claim upon which relief may be granted.

> **13.    Count XIII - Perpetuating Disability Discrimination Through Administrative Methods in Violation of The Americans with Disabilities Act Of 1990; 42 U.S.C. § 12112 (b)(3)(B). Paragraphs 205 – 219.**

Count XIII asserts a claim for violation of 42 U.S.C. § 12112 (b)(3)(B) of the ADA. 42 U.S.C. § 12112 (b)(3)(B) construes the terms "discriminate against a qualified individual on the basis of disability" (as prohibited under the ADA) as including "utilizing standards, criteria, or methods of administration—that perpetuate the discrimination of others who are subject to common administrative control[.]" Based upon the plain language of the statute, this is not a distinct claim under the ADA. Rather, the statutory language in (b)(3)(B) describes one way in which an employer may be liable within the scope of the ADA.

At the core of any ADA claim, plaintiff must "... show she is (1) disabled within the meaning of the ADA, (2) can perform essential functions of h[er] job with or without reasonable accommodation, and (3) suffered adverse employment action' as a result of discrimination based on her disability." *Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 137 (E.D. Pa. 2020) (quoting *Drummer v. Trustees of Univ. of Pennsylvania*, 286 F. Supp. 3d 674, 682 (E.D. Pa. 2017)).

32

A plaintiff seeking to recover under the ADA "need not plead each prima facie element, but rather must simply state facts sufficient to indicate that discovery can reasonably be expected to lead to evidence satisfying the claim's elements." *Id.*

Here, Plaintiff appears to be premising her ADA claim under Count XIII on the idea that InductEV's FMLA policies are "standards", "criteria or methods of administration" which perpetuate discrimination. Plaintiff makes **no** effort to allege any facts to satisfy any of the three (3) factors above. Rather, Plaintiff supports her ADA claim by asserting that the Defendant utilized administrative methods that perpetuated disability discrimination. *See* Compl. at ¶¶ 205-219. More specifically, Plaintiff appears to complain about the Defendant's FMLA policy and the administration thereof. *Id.* The reality is those items standard practices in the administration of FMLA, including the request of an employee to have their doctor complete the medical information; and the acknowledgment that a key employee may not be eligible to have their job held. *See id.* at ¶¶ 206-211. Plaintiff goes on to speculate that Plaintiff could have been fraudulently recorded if she did not sign the FMLA application form and would have been hindered in proceeding to obtain FMLA protections. *Id.* at ¶¶ 213-215. These allegations fail to suggest that discovery could result in Plaintiff being able to make a claim under this section of the ADA.

In the end, the Plaintiff claims that most if not all of the things she describes as problematic in paragraphs 205 through 215 of the Complaint are a result of receiving a blank FMLA form. *Id.* It is difficult to imagine a scenario where Plaintiff's allegations in Count XIII constitute a violation of the ADA or could develop into one going forward. Because Plaintiff has failed to allege any

facts necessary to state a claim under the ADA, Count XIII fails as a matter of law and should be dismissed.[11]

### 14. Count XIV - Abetting or Attempting Disability Discrimination in Violation of The Pennsylvania Human Relations Act, 43 P.S. § 955 (E). Paragraphs 220 – 228.

Count XIV alleges aiding or abetting disability discrimination in violation of the PHRA, citing additional reasons why the Plaintiff's application for FMLA was somehow interfered with or made more difficult because of perceived delay, disruption, or errors in its administration. Compl. at ¶¶ Paragraphs 220-228. Count XIV fails, however, because Plaintiff asserts that Defendant aided and abetting its own conduct through administration of its FMLA policy, and it is axiomatic defendant "cannot aid and abet its own unlawful conduct." *Hewitt v. BS Transportation of Illinois, LLC*, 355 F. Supp. 3d 227, 238-239 (E.D. Pa. 2019) (dismissing PHRA claim of aiding and abetting because "[t]he only misconduct underlying the aiding and abetting claim against [the defendant] is the hostile work environment claim based on sex discrimination" and the defendant "cannot aid and abet its own unlawful conduct").[12] Accordingly Count XIV fails as a matter of law and should be dismissed

### 15. Count XV - Discriminatory Conditions of Employment-Harassment on The Basis of Disability in Violation of The Americans With Disabilities Act Of 1990, 42 U.S.C. § 12112 (A). Paragraphs 229 – 243.

In Count XV Plaintiff relies upon the vague and conclusory allegations that the Company had a policy of requiring use of PTO time for time not worked due to disability (which is not clear)

---

[11]As noted above, Plaintiff has failed to exhaust her administrative remedies on her ADA claim as well. *See* Section III. B., *supra.*

[12]This claim is also not properly before this Court, as Plaintiff failed to raise it before the PaHRC and EEOC. *See* Section III. B., *supra.*

and that when the Chief Administrative Officer spoke with her about her application for accommodation and the need to take time off, it may have been overheard by others. Compl. at ¶¶ 229-237; 238-240. Plaintiff also repeats previously voiced challenges to Defendant's administration of its reasonable accommodation process, with her focus on the requirement that employees utilize PTO for leaves of absences associated with medical conditions, disabilities or otherwise.[13] *Id.* She also complains about the time it took to evaluate her request for a leave. *Id.* Plaintiff does not claim interference or retaliation, nor plead facts that appear to support same.  The allegations do not in Count XV simply failed to state a cause of action under the ADA.  Such generalized grievances fail to state a cognizable claim under the ADA as a matter of law and require that Count XV be dismissed.

### 16.    Count XVI - Discriminatory Conditions of Employment-Harassment on The Basis of Disability in Violation of The Pennsylvania Human Relations Act, 43 P.S.§ 955 (A). Paragraphs 244 – 245

Count XVI repeats the allegations from Count XV, asserting that Defendant "knowingly subjected [Plaintiff] to the condition of harassment on the discriminatory basis of [her] being disabled" in violation of the PHRA. Count XVI fails for several reasons. Plaintiff relies upon the allegations in Count XV which, as explained above, simply challenge Defendant's administration of its PTO policies. Secondly, Plaintiff offers no facts that Defendant "knowingly" subjected Plaintiff to any "condition of harassment" on the basis of her disability. To the contrary, Defendant subjected Plaintiff to its PTO policies, just like any other employee. Plaintiff is asking this Court to hold Defendant accountable for maintaining PTO policies which Plaintiff perceives to be

---

[13]Indeed, Plaintiff asserts in paragraph 235 that having to choose between attending work or using sick days made her stressed as it was her own speculation that she would run out of PTO and be placed on probation. As with many other counts and claims by the Plaintiff, for the most part, the Plaintiff is applying her own preconceptions, assumptions, and personal experience to policies of general application or workday events not violative of any federal or state laws. Moreover, this claim also was not raised before the EEOC, as argued in Section III. B., *supra.*

discriminatory based upon her own subjective belief. The law requires no such result. Accordingly, Count XVI should be dismissed.

### 17.    Count XVII - Attempting to Coerce Unlawful Discrimination - Constructive Termination in Violation of The Pennsylvania Human Relations Act, 43 P.S. § 955 €, Paragraphs 246 – 258.

Count XVII asserts a claim for attempting to coerce unlawful discrimination-constructive termination in violation of the PHRA.[14] It could be construed as a claim of retaliation under the notice pleading rules of the federal courts. Nonetheless, Plaintiff fails to state a claim under either. An employee seeking to demonstrate a constructive discharge must make a heightened showing beyond a hostile work environment. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 134 (2004). "[T]o establish 'constructive discharge,' the plaintiff must make a further showing: She must show that the abusive working environment became so intolerable that her resignation qualified as a fitting response." *Id* . Count XVII fails as a matter of law because no such "attempt" claim exists under the PHRA. Count XVII is merely another example of the types of claims deemed insufficient under Rule 8, as it is unclear what legally cognizable claim Plaintiff attempts to assert under the law.

Further, it is worth noting that Count XVII (like Counts XVIII and XIX below) arise from conduct following the mediation between Plaintiff and Defendant. Recall that Plaintiff agreed to resign from her employment with Defendant as part of the settlement reached. Compl. at ¶¶ 68, 266.  Therefore, Defendant could not have retaliated against Plaintiff, as Plaintiff would have this Court believe, because from Defendant's perspective, Plaintiff left Defendant's had resigned in exchange for release of her claims.

---

[14]As argued above, Plaintiff did not raise this claim in an administrative complaint. *See* Section III. B., *supra*.

And finally, as mentioned in Section III. B., *supra*, Plaintiff failed to raise any claim of constructive termination in her PaHRC Complaints. Plaintiff even had the opportunity to submit an amended charge; she did not, instead requesting a right to sue letter. *See*, Exhibit "A" Accordingly, Count XVII should be dismissed.

### 18. Count XVIII - Discrimination for Filing a Charge-Wrongful Termination in Violation of Title VII of The Civil Rights Act Of 1964, 42 U.S.C. §2000e-3(a). Paragraphs 259 – 275.

Plaintiff asserts that the Defendant received the PaHRC Complaints on June 22, 2022. Compl. at ¶ 63. She fails to allege any actions of the Defendant that are in retaliation for having filed the PaHRC Complaints after having received those Complaints, or because she filed them. Rather, Plaintiff asserts actions taken by Defendant following the parties mediation, where Defendant and Plaintiff agreed as part of the settlement that Plaintiff would resign. *See*, Section III. A., *supra*. ; Compl. at ¶¶ 259 – 261; Exhibit "E". Plaintiff again ignores her agreement to resign in exchange for payment of $50,000 and attempts to frame Defendants actions in reliance thereon as a constructive discharge by Defendant. It is clear that Defendant was not retaliating against the Plaintiff for exercising her rights under Title VII, but rather was acting on Plaintiff's resignation. Indeed, Plaintiff remained in the employ of Defendant for over three months after the Defendant received her charge, had ostensibly received her assertions of rights under Title VII and other statutes as set forth in the Complaint, accommodated her under the ADA by giving her a leave as of May 16, 2022, and an FMLA leave thereafter. Compl. at ¶¶ 51 – 64. Plaintiff was not discharged or suffered an adverse action following her alleged exercise of these statutory rights, during her employment. She was never discharged or suffered an adverse employment action. Ever.

Plaintiff fails to allege, as a matter of law, any claim for constructive discharge because (a) Plaintiff recognizes that she agreed to resign; and (b) Plaintiff failed to raise any claim of

constructive discharge in either of her PaHRC Complaints. Accordingly, Count XVIII should be dismissed.

> **19.   Count XIX - Discrimination for Filing a Charge-Wrongful Termination in Violation of The Pennsylvania Human Relations Act, 43 P.S. § 955 (d). Paragraphs 276 – 277.**

Count XIX mirrors Count XVIII insofar as it purports to assert a claim for constructive discharge under the PHRA – disregarding entirely Plaintiff's agreement to resign, her allegations confirming same, and her failure to raise this claim with the PHRC. For the same reasons as count XVII and XVIII above, Count XIX fails as a matter of law and should be dismissed.

> **20.   Count XX - Intentional Infliction of Emotional Distress in Violation of The Pennsylvania Tort Law. Paragraphs 278 – 285.**

Count XX asserts a claim for intentional infliction of emotion distress ("IIED") under Pennsylvania law. "The state a claim for IIED, a plaintiff must show extreme and outrageous conduct that is deliberate or reckless and causes severe emotional distress." *Fugarino v. Univ. Servs.*, 123 F. Supp. 2d 838, 844 (E.D. Pa. 2000) (citing *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988). "The conduct complained of must be so outrageous, and so extreme in degree, as to 'go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting *Clark v. Township of Falls*, 890 F.2d 611, 623 (3d Cir. 1989)). This Court routinely dismisses claims that do not meet that standard. *Id.* (dismissing IIED claim where there plaintiff' allegations were that plaintiff was (1) criticized; (2) publicly remanded; (3) disparaged professionally and personally; (4) was subject to desk searches at work; (5) asked out on dates twice; and (6) was subject to an obscene phone call at work); *Hampton v. Tokai Fin. Servs., Inc.*, 1999 WL 83934, at *3 (E.D. Pa. Feb 18, 1999) (holding racist remarks insufficient to state a claim for IIED); *Coney v. Pepsi Cola Bottling Co.*, 1997 WL 299434, at *1 (E.D. Pa. May 29, 1997) (holding "highly provocative racial slurs and other discriminatory

incidents" insufficient to state a claim for IIED); *Parker v. DPCE, Inc.*, 1992 WL 501273 (E.D. Pa. Nov. 3, 1992) (holding racial harassment insufficient to state a claim for IIED); *Ceesay v. Miller, Mason & Dickenson*, 1990 WL 121218, at \*7 (E.D. Pa. Aug. 15, 1990) (holding sexual and racial harassment insufficient to state a claim for IIED). Plaintiff's IIED claim fails consistent with the cases above. Plaintiff fails to allege the existence of facts, events or conduct that come close to "extreme and outrageous conduct that is deliberate" and transcends "all possible bounds of decency" and which is regarded as "atrocious and utterly intolerable in a civilized community." *Fugarino*, 123 F. Supp. 2d at 844 (quoting *Clark*, 890 F.2d at 623).

As stated on Page 8, *supra.*, it appears the impetus for Plaintiff's filing of her PaHRC Complaints in May 2022 was triggered after she evaluated her workplace experiences of the prior year in totality, having developed symptoms of a serious illness and unhappy about Defendant's application of a generally applicable policy of requiring use of PTO rather than allowing unpaid time for workweeks of less than 40 hours to her. Compl. at ¶¶ 51 – 64. This would suggest that events of the nature required to state a claim for IIED simply did not occur.

As with other claims in the Complaint, the Plaintiff relies on broad conclusory statements when she, for example: asserts that she "had to block out painful experiences from work that continue to resurface" (Compl. at ¶ 281); and vaguely asserts that Defendant's "outrageous acts" have caused her physical manifestations of stress. *Id.* at ¶ 283. Plaintiff further alleges language from general legal standards that she "was subjected to an egregious and ongoing combination of various forms of unlawful harassment that was intentionally aided, escalated, or enacted by Defendant." *Id.* at ¶ 278. Plaintiff does not (because Plaintiff cannot) articulate what specific harassment occurred as a matter of fact, and instead relies upon unfounded conclusions of unlawful

discrimination due to race, gender, or disability. *See Assoc. Builders & Contractors, Eastern PA Chapter, Inc. v. Cty. of Northampton*, 376 F. Supp. 3d 476, 492 (E.D. Pa. 2019) ("In ruling on a

12(b)(6) motion, courts can and should reject legal conclusions, unsupported conclusions, unwarranted references, unwarranted deductions, footless conclusions of law, and sweeping legal conclusions in the form of actual allegations." (quoting *Bright v. Westmoreland Cty.*, 380 F.3d 729, 735 (3d Cir. 2004)).

*Fugarino*, *Hampton*, *Coney*, and *Parker* all confirm that Plaintiff's allegations fall woefully short of stating a claim for IIED. Indeed, if the Court dismissed the IIED claims in those cases then so too should this Court dismiss Plaintiff's IIED claim here. That is especially true given that "[c]onduct in the employment context will rarely rise to the level of outrageousness necessary to support an intentional infliction of emotional distress claim." *Hampton*, 1999 WL 83934, at \*3 (citing *Cox*, 861 F.2d at 390)).

For the reasons stated herein, Plaintiff's IIED claim fails as a matter of law and should be dismissed.

## D.    **PLAINTIFF'S REQUEST FOR PUNITIVE DAMAGES SHOULD BE STRICKEN**

In the event the Court does not enter an Order enforcing the parties settlement agreement, or dismissing the Complaint in full, Defendant moves that any prayer for relief seeking punitive damages be dismissed. It is well established that "punitive damages are not a favorite of the law." *Cochetti v. Desmond,* 572 F.2d 102, 105 (3rd Cir. 1978)."Punitive damages in general represent a limited remedy to be reserved for special circumstances." *Keenan v. City of Philadelphia,* 983 F.2d 459, 470 (3rd Cir. 1992). Punitive damages are appropriate only when an individual's actions are of such an outrageous nature as to demonstrate intentional, willful, wanton, or reckless conduct. *Bannar v. Miller,* 701 A.2d 232, 242 (Pa. Super. Ct. 1997*).*" [A] court may not award punitive

damages merely because a tort has been committed. *Delahanty v. First Pennsylvania Bank, N.A.,* 464 A.2d 1243, 1263 (Pa. Super. Ct. 1983). Also, punitive damages are not appropriate where the conduct constitutes mere inadvertence, mistake, or error in judgment. *Id.; see also Polselli v. Nationwide Mutual Fire Insurance Co.,* 23 F.3d 747, 751 (3rd Cir. 1994). The analysis here is similar to that to be applied to a claim for intentional infliction of emotional distress.

The function of punitive damages is to deter and punish egregious behavior. *R.J. Reynolds State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). The assessment of punitive damages is proper when a person's actions are of such an outrageous nature as to demonstrate intention, willful, wanton or reckless conduct, and are awarded to punish that person for such conduct. *Corbett v. Morgenstern*, 934 F.Supp. 680, 685 (E.D. Pa. 1996) (citations omitted). In order to impose punitive damages, the wrongful conduct must be outrageous, and must show the actor's evil motive or reckless indifference to the rights of others. *Hess v. Hess,* 580 A.2d 357 (Pa. Super. Ct. 1990).

Plaintiff has failed to allege facts sufficient to state a claim for right to relief on any of her asserted causes of action, let alone conduct so outrageous such that punitive damages are warranted. Rather, Plaintiff attempts to cloak neutral workplace policies and activities with racial or gender animus. She complains because her suggestions for material to be included in harassment and diversity training are not accepted; she does not understand forms, or questions standard language on them, and faults the Defendant for her subjective, counsel suggest unreasonable and certainly not intended, reactions to same. Compl. at ¶¶ 98 – 99; 59 – 62; 205 – 217; Or, as cited above, disagreement with the Defendant's policy of requiring use of PTO for employees that work less than a 30 hour week. Compl. at ¶¶ 51 - 56. See, discussion in the preceding Section, *supra.*

41

Plaintiff simply fails to plead or allege actions or behaviors on the part of the Defendant that come close to those found to be outrageous or committed with evil motive or reckless indifference to her rights. In the absence of any well-pled facts supporting any cognizable claim as a matter of law, this Court should not be persuaded by Plaintiff's uncorroborated demand for punitive damages and strike Plaintiff's request for same.

**IV.    CONCLUSION**

Defendant stands ready to perform its obligations under the parties settlement agreement and asks the Court to enter an Order directing plaintiff to do so also,  If the Court denies enforcement of the settlement agreement, then for the reasons stated herein, Defendant asks that Plaintiff's Complaint be dismissed in its entirety for failure to state a claim upon which relief may be granted. In the event the Court allows this action to proceed on some basis, Defendant's ask that Plaintiff be prohibited from seeking punitive damages.

Dated April 27, 2023.

Respectfully submitted,

**FOX ROTHSCHILD LLP**

By: */s/ Randall C. Schauer*
    Randall C. Schauer, Esquire
    Alberto M. Longo, Esquire
    Eagleview Corporate Center
    747 Constitution Drive, Suite 100
    Exton, PA  19341-0673
    Tel – (610) 458-4967
    Fax – (610) 458-7337
    rschauer@foxrothschild.com
    alongo@foxrothschild.com

    *Attorneys for Defendant, InductEV*

42

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 27, 2023, I, Randall C. Schauer, caused the foregoing Motion

to Dismiss to be served on all counsel and parties of record via the Court's electronic filing system.

/s/ *Randall C. Schauer, Esq.*
Randall C. Schauer Esq.

*Attorney for Defendant*

# EXHIBIT A

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Philadelphia District Office**
801 Market St, Suite 1000
Philadelphia, PA 19107
(267) 589-9700
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 12/16/2022

**To:** Assata Acey
5121 Brown Street
Philadelphia, PA 19139

Charge No: 17F-2022-61016

EEOC Representative and email:    Legal Unit
(267) 589-9707

---

### DISMISSAL OF CHARGE

The EEOC has granted your request for a Notice of Right to Sue, and more than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

**Equal Pay** Act **(EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

PRIVATE SUIT RIGHTS    --    **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – not 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By: Karen McDonough
12/16/2022

Karen McDonough
Deputy District Director

**Cc:**
May Mon Post
436 Walnut St WA01A
Philadelphia, PA 19106

Judy Talis
Momentum Dynamics
3 PENNSYLVANIA AVENUE
MALVERN, PA 19355

Marisa Barreras
436 Walnut St WA01A
Philadelphia, PA 19106

Please retain this notice for your records.

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review. Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 17F-2022-61016 to the District Director at Jamie Williamson, 801 Market St Suite 1000

Philadelphia, PA 19107.

You can also make a FOIA request online at https://eeoc.arkcase.com/foia/portal/login.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to:
https://www.eeoc.gov/eeoc/foia/index.cfm.

### NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at:
http://www.eeoc.gov/laws/types/disability_regulations.cfm.

### "Actual" disability or a "record of" a disability

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.
- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system**.**
- ✓ **Only one** major life activity need be substantially limited.
- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.
- ✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or "**in remission**" (e.g., cancer) is a disability if it **would be substantially limiting when active**.
- ✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

Enclosure with EEOC Notice of Closure and Rights (01/22)

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- ✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

- ✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

- ✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability".

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For moreinformation, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

# EXHIBIT B

COMMONWEALTH OF PENNSYLVANIA
GOVERNOR'S OFFICE
PENNSYLVANIA HUMAN RELATIONS COMMISSION

Assata Acey

       **Complainant(s)**

       v.

Momentum Dynamics Corporation

       **Respondent(s)**

: PHRC Case No. 202102397

: EEOC No.  17F202261016

## COMPLAINT

1. **COMPLAINANT(S) (name(s)/address(es)/phone number(s))**
   Assata Acey
   5121 Brown St, Philadelphia PA 19139
   770-231-1017

2. **RESPONDENT(S) (name(s)/address(es)/phone number(s))**
   (person, employer, union, labor organization or other entity against whom you are filing this complaint)

   Momentum Dynamics Corporation
   3 Pennsylvania Ave Malvern, PA 19355
   484-320-8222

3. **Number of Employees Employed by Respondent(s):**

   ☐ Fewer than 4      ☐ 4 to 14      ☐ 15 to 20      ☑ 20+

4a. ☑ I was employed by Respondent as  Technician  since 06/14/2021 .

4b. ☐ I applied for employment with Respondent as _____ on _____ .

5. **Protected Class(es)** (check all reasons you have been discriminated against and specify the class, e.g. race, African American; sex, female)

   ☑ Race: African American      ☐ Religious Creed:
   ☐ Color:      ☐ National Origin:
   ☑ Sex:  Female      ☐ Ancestry:
   ☐ Age/Date of Birth:      ☑ Retaliation
   ☐ Disability:      ☐ Use of Guide or Support Animal
   ☐ Other (specify):

6.    **Dates of Discrimination:**

    **Beginning:**  05/21/2021       **Ending:** _____

    **Continuing?** ☑ Yes       ☐ No

7.    **DESCRIBE THE DISCRIMINATORY CONDUCT, WITH SPECIFICITY, AND EXPLAIN HOW THE DISCRIMINATORY CONDUCT IS RELATED TO YOUR PROTECTED CLASS:**

    (e.g. failure to hire, discharge from employment, demotion, leave denied, forced transfer, denial of religious or disability accommodation. retaliation)

    Please see following page for description of discriminatory conduct

**WARNING: FAILURE TO COMPLETE THIS SECTION MAY RESULT IN YOUR COMPLAINT BEING REJECTED FOR INSUFFICIENCY.**

A. Discriminatory terms and conditions of classification for employment and failure to promote on the basis of race and gender.

1. On Mar 25, 2021, Assata was recruited by Jennifer Orloski on behalf of Momentum Dynamics Corporation (MD) for the role of Senior Technician.

2. From 04/05/2021 to 05/14/2021 Assata matriculated through 5 rounds of extensive review, each indicated for the position of Senior Technician.

3. At no point during the interview process, was Assata notified of her perceived disqualification from the role of Senior Technician.

4. On May 21, 2021, Assata was presented with a written employment offer by Chief Administrative Officer (CAO, Judy Talis) for the role of Technician.

5. During a negotiation of terms on May 24, 2021, CAO informed Assata that she was being offered the Technician role due to being "unqualified" for the Senior Technician role.

6. CAO expressed Assata's being "unqualified" for the Senior Technician role as a basis for her to be given less compensation.

7. However, CAO confirmed that Assata was still expected to conduct duties discussed during her interviews for the role of Senior Technician.

8. MD's human resources department has the power to make and execute final recommendations for offers of employment, subject to the approval of the CEO.

9. While feedback is collected during each hiring process, the final recommendations of the CAO are not required to align with all the employee feedback regarding said hiring process.

10. CAO has made and executed recommendations for offers of employment in the face of opposing employee feedback.

11. One such recommendation was for the hire of the Mechanical Engineering Manager, Kerry Guarino.

12. CAO's recommendation limited Assata's classification and terms of employment to a level below that which she was interviewed or eventually completed work for.

13. From the beginning of employment, Assata engaged in work tasks that were noticeably different from the general perception of her title and the contributions of her teammates.

14. On Sept 7, 2021, two members of Assata's then 5-member team were promoted to Senior Technician, leaving Assata as the lowest ranking member and the only technician without senior designation on the PIT team until October 4.

15. From Sept 7 ,2021 to now, there has not been any communicated quota for senior technicians within Assata's team or MD.

16. On Dec 6, 2021, Assata submitted her performance review, detailing her span of work from the previous 6 months.

17. By Feb 6, 2022, Assata's Manager (Joren Wendschuh) and CAO had reviewed and discussed her performance review.

18. In Feb 2022, Assata began work with her supervisor to adjust her formal role so as to formally incorporate:
    a) Assata's previous and current work within MD
    b) Opportunities for Assata to grow within MD.

19. From June 2021 to today, MD has been in a self-professed period of "growth", involving the creation of and hiring for numerous new and pre-existing roles within the company.

20. From June 2021 to today, a great majority of MD's new hires have been white and more than 80% or a great majority MD's workforce has been white.

21. From June 2021 to today, a great majority of MD' new hires have been male, and more than 80% or a great Majority of MD workforce has been male.
22. Assata is and has been the only woman, the only African American woman on her team and is one of two African American women employed by MD.
23. As attached to her interview documents in 2021 and emailed to her by CAO on April 18, 2022, the descriptions for Senior Technician and Technician have the same requirements and duties.
24. To date, Assata has received no notification of any discussions or action within the HR department to reclassify her role in alignment with Assata's work tasks or ability for growth.
25. Assata alleges that her disqualification from the Senior Technician role was not the result of a bona fide occupational qualification.
26. Assata alleges that her race and gender were the basis of CAO's decision to classify, and present terms of employment to Assata that were below her demonstrated qualifications for the Senior Technician role on May 21, 2021.
27. Assata alleges CAO's discriminatory behavior and or attitudes towards her have hindered Assata in:
    a. Acquiring employment terms or classification as appropriate to her work tasks
    b. Receiving consideration for promotion or opportunities for continued growth within MD.
28. Assata alleges that the conflict between her employment classification and job duties was created on the basis of her race and gender and that this conflict contributed to pervasive and/or severe workplace tension which affected her ability to fulfill her job.
B. Harassment on the basis of race and gender and in retaliation for disclosing a workplace incident that involved policy in violation of Pa. Code § 44.5.
    1. Throughout the time of Assata's employment at MD, employees have occasionally elected to physically lift items (equipment, products etc.) themselves instead of using the electronic lift equipment.
    2. Prior to review of Assata's workplace incident, there had been no established, and or/ actively adopted procedure within MD's policy to ensure her safety in using Momentum Dynamics Corp's electronic lift equipment or in the event that such equipment buckled or failed.
    3. ‘ Due to the lack of procedure, employees who needed to use electronic lift equipment were subjected to preventable risks that were avoidable to employees that were able to physically lift items themselves.
    4. MD's lack of safety protocol for using electronic lift equipment violated Pa. Code § 44.5 by placing undue risk on employees whose disability would limit them from lifting items at work on their own.
    5. Assata's workplace incident initiated through equipment failure and would not have occurred if she had been willing and able to physically lift the item in question herself.
    6. Assata's disclosure of a work-place incident brought attention to MD's lack of protocol.
    7. On Sept 30, 2021:
        a) Assata's cell phone was crushed in the workplace incident.
        b) Assata immediately disclosed the incident to her manager, who then disclosed it to upper management.
        c) Assata purchased a new replacement phone from a Target within 6 minutes of her workplace.
        d) VP of Engineering (Ben Cohen, sibling to CAO) initiated a process to reimburse Assata for her crushed phone, also referenced here as reimbursement or "reimbursement for a workplace incident".
    8. It is generally accepted that Operations and Human Resources Coordinator (OHC, Diana Wilmes) has and will:
        a) relay messages and directions to employees of MD on behalf of her supervisor, the CAO
        b) work to execute procedures and protocols that have been orchestrated by CAO.
    9. The procedure and protocol for this reimbursement was orchestrated by CAO and OHC served as a liaison for CAO in the execution of CAO's procedure.

10. The requirements for reimbursement, as dictated by the CAO, were not satisfied by only the provision of the make, model, or other information as sufficient to prove the current market price of the damage phone.

11. The CAO's dictated requirements for reimbursement included (as chronologically given to Assata):
    a) The brand, model, memory size of the damaged phone
    b) the brand, model, and memory size of the new phone that Assata purchased as a replacement
    c) an "acceptable" proof of purchase for the new phone
    d) receipt of original purchase for the damaged phone.

12. No pre-existing procedure or guidelines for reimbursement requirements were presented to Assata and the need for new or different "proof" was only disclosed to her after the preceding requirement had been met.

13. On Oct 5,2021, Assata disclosed to OHC that she had lost her physical receipt.

14. On Oct 5,2021, OHC rejected Assata's initial submission of her credit card statement as proof of purchase and instructed her to solicit a new itemized receipt from Target.

15. Assata's digital confirmation of purchase from Target (submitted Oct 06, 21) was also not accepted as proof of purchase.

16. When local Target was unable to provide a new itemized receipt of purchase, OHC encouraged Assata to solicit a "Mock receipt."

17. The "mock receipt" provided by target on was not accepted as proof of purchase.

18. To prove purchase of the damaged phone, Assata had to reopen records of an inactive account with a cell phone provider.

19. Assata's effort to complete the reimbursement requirements resulted in sufficient time away from work tasks and several visits to the local Target, and even required her to reopen records of an inactive account with a cell phone provider.

20. By chance or design, the reimbursement process proved to be so difficult for Assata, that she tried to opt out of reimbursement altogether.

21. When Assata tried to opt out of reimbursement altogether, OHC told her to "at least try".

22. Bringing forward paragraphs 20-22 of subparagraph A, Assata alleges that the CAO's arbitrarily arranged course of reimbursement subjected her to severe and or pervasive harassment on the basis of her race and gender, and in retaliation of her involvement in workplace incident and willingness to review the incident and be compensated for damages associated.

23. On October 14, 2021, OHC came to Assata's desk in person to relay CAO's instruction: "we will replace… [the damaged phone] this time but [Assata] cannot have her phone out in the lab from now on".

24. CAO's instruction also expressed that:
    a) any issues with CAO's instruction should be expressed by Assata to her manager and not to CAO directly
    b) Assata should not feel singled out in being asked to comply because a policy would be enacted in the future to prohibit all employees from having their phones in the lab.

25. The CAO's instruction on phone access came only after a reimbursement amount had been determined for Assata's damaged phone and entailed a standard of conduct that would only immediately apply to Assata.

26. Prior to this instruction, Assata had anxiously been relying on phone access to deescalate the unequal scrutiny and reprimands received regarding timeliness to meetings and responsiveness to meeting invites.

27. After immediately disclosing the exchange to and receiving direction from her manager, Assata sought confirmation and direct wording of CAO instruction from OHC.

28. When asked for exact wording, OHC iterated that Assata was not to have her phone on her person "wherever safety glasses are needed".

29. In response to OHC's iteration, and to prevent grounds for reprimand, Assata's Manager advised her to comply while a solution was worked out for her.

30. On Oct 14, 2021, implications of CAO's instruction were discussed within Assata's team, as well as between Assata's Manager, VP of Engineering and VP of research and Development (Frank McMahon).

31. At no time was any additional communication written or otherwise given to suggest the emergence of company-wide policy on phone access.

32 At no time before October 18, was any information given to Assata to construe relief from CAO's instruction on phone access.

33. On Oct 15, 2021, and in direct contradiction to CAO's message, Assata reached out to CAO for clarity on all communications and policies surrounding her reimbursement and workplace access to her phone.

34. CAO declined to provide sufficiently conclusive clarification in writing and insisted on discussing the matter in person.

35. During an in-person meeting on, Oct 18, 2021, CAO maintained that none of the relayed message was true and that OHC had "misconstrued" CAOs words.

36. Assata avers that the CAO orchestrated the reimbursement process and denied her access to her phone in retaliation to this disclosure, and on the basis of her identity as an African American woman.

37. By denying any involvement, CAO failed to provide any reflection or assurances that she:
    a)  would not punish associated employees for her own actions
    b)  would cease from use of retaliatory harassment in the future.

38 CAO's lack of assurances added to the effect of feeling singled out and being made to fear loss of good standing at her job--because they added an anticipation of future instances of CAO's discretionary retaliation and harassment.

39. While Assata eventually received reimbursement for her phone, and verbal permissions to access her phone at work, the CAO's instruction and orchestration concerning these were reasonably intimidating subjected Assata to severe and/or pervasive harassment.

C. Harassment in retaliation to complaining about paid time off /unpaid time off policy that was believed to violate Pa. Code § 44.5.

1.  On April 18, 2022, Assata complained via email about a previously intimated work policy which was requiring her and other employees whom Momentum Dynamics classified as full-time to use paid time off (as opposed to unpaid time off) for any absence resulting in a workweek of less than 40 hours.

2.  Assata's specific concern was that the policy, as enforced and communicated, created an unfair penalty (and hazard) for worker's whose short-term or long-term disability prevented them from (or behooved them against) working more than 30 hours per week or 130 hours per month.

3.  Assata's email went to lengths to explain her perception of the work policy as a discriminatory practice, her current health symptoms and how she felt effected by using her PTO in this manner.

4.  In a meeting held later April 18(same day), CAO expressed to Assata that employees who needed time off for medical reasons would be allowed to do so and retain full time status, so long as they continued to meet ACA requirements, and met with CAO to express such need.

5.  On April 21, CAO initiated conversation with Assata in which she disclosed that her doctor would have a signed ADA (accommodations request) form before or by April 22.

6.  CAO sounded out Assata's use of acronym "ADA" as "accommodation request form."

7.  CAO's sounding out was done in an office cubicle that was within earshot of several other cubicles where employees were actively working.

8. During this same conversation, CAO advised Assata to "put in PTO" for hours missing for a pay period (April 11-24) that would be up for approval April 25.

9. At the moment of this advisement:
   a) Assata had disclosed her medical condition as the cause of her missing work hours in previous weeks
   b) CAO had made no indication of doubt that Assata was attempting use of unpaid PTO for non-medical reasons
   c) no reason was given as to why she should "put in PTO" for a timesheet whose approval date was after the anticipated arrival of her doctor's certification
   d) no written communications were (or had been) made to document that Assata was being instructed (and had not voluntarily elected) to "put in PTO"
   e) CAO had been privy to written and verbal discussion of the stress and pressure Assata experienced as a result of having to use PTO for her emerging disability.

10. Assata alleges that CAO's actions in paragraphs 6 and 8 were made in retaliation for making a good-faith complaint about a work policy that Assata believed to be discriminatory towards ill or otherwise disabled employees.

11. Assata alleges that this retaliation is a continuation of the harassment CAO has enacted towards Assata with discrimination to her status as a African American woman.

12. Assata also alleges that subparagraphs B and C represent a pattern of ongoing severe and/or pervasive harassment that she has been subjected to on the basis of her race and gender.

13. Assata anticipates this pattern to remain continuous in the future.

8.  Based upon the foregoing, I/we allege that the Respondent(s) violated Section 5 of the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963, and the implementing regulations, 16 Pa. Code §§ 41.1-47.74.

9.  The Pennsylvania Human Relations Commission has jurisdiction over this matter pursuant to the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963.

10. I/we pray that the Respondent(s) be required to provide all appropriate remedies under Section 9 of the Pennsylvania Human Relations Act.

11. If applicable, this Complaint will be dual-filed with the U.S. Equal Employment Opportunity Commission (EEOC), pursuant to the work-sharing agreement between the PHRC and the EEOC. Based upon the foregoing, I/we allege that the Respondent(s) violated one or more of the following federal statutes: Title VII of the Civil Rights Act of 1964 and/or The Pregnancy Discrimination Act and/or The Equal Pay Act of 1963 and/or The Age Discrimination in Employment Act of 1967 and/or Title 1 of the Americans with Disabilities Act of 1990 and/or Sections 102 and 103 of the Civil Rights Act of 1991 and/or Sections 501 and 505 of the Rehabilitation Act of 1973 and/or The Genetic Information Nondiscrimination Act of 2008.

## VERIFICATION

I hereby verify that the statements contained in this Complaint are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S.A. § 4904, relating to unsworn falsification to authorities.

05/08/2022

Date

Signature

Assata Acey

Printed Name

Date

Signature

Printed Name

**WARNING: COMPLAINTS MUST BE SIGNED AND FILED WITHIN 180 DAYS OF THE ALLEGED ACT OF HARM.**

**WARNING: IF YOU FAIL TO COMPLETE ANY PORTION OF THIS COMPLAINT, THE PHRC MAY NOT ACCEPT YOUR COMPLAINT FOR FILING.**

COMMONWEALTH OF PENNSYLVANIA

GOVERNOR'S OFFICE

PENNSYLVANIA HUMAN RELATIONS COMMISSION

RE: Assata Acey vs. Momentum Dynamics Corporation
PHRC Case No. 202102397
EEOC Case No. 17F202261016

## Certificate of Service

Pursuant to the requirements of 1 Pa. Code § 33.31, I hereby certify that I have this day served the foregoing Complaint by first class mail, postage prepaid, as follows:

**Complainant:**
Assata Acey
5121 Brown Street
Philadelphia, PA 19139

**Respondent:**
Momentum Dynamics Corporation
3 Pennsylvania Avenue
Malvern, PA 19355

**Complainant Attorney:** (if applicable)

**Respondent Attorney:** (if applicable)

Date: 6/22/2022

By: Samantha Lopez

# EXHIBIT C

### COMMONWEALTH OF PENNSYLVANIA
### GOVERNOR'S OFFICE
### PENNSYLVANIA HUMAN RELATIONS COMMISSION

| | | |
|---|---|---|
| Assata Acey_____ , | : | |
| **Complainant(s)** | : | PHRC Case No.   202102397 |
| | : | |
| v. | : | EEOC No.   17F202261016 |
| | : | |
| Momentum Dynamics Corporation , | : | |
| **Respondent(s)** | : | |

## FIRST AMENDED COMPLAINT

1.  **COMPLAINANT(S) (name(s)/address(es)/phone number(s))**

    Assata Acey
    5121 Brown St
    Philadelphia, PA 19139

2.  **RESPONDENT(S) (name(s)/address(es)/phone number(s))**
    (person, employer, union, labor organization or other entity against whom you are filing this complaint)

    Momentum Dynamics Corporation
    3 Pennsylvania Ave
    Malvern, PA 19355

3.  **Number of Employees Employed by Respondent(s):**

    ☐ Fewer than 4    ☐ 4 to 14    ☐ 15 to 20    ☑ 20+

4a. ☑ **I was employed by Respondent as** Technician **since** 6/14/2021 .

4b. ☐ **I applied for employment with Respondent as** _____ **on** _____ .

5.  **Protected Class(es)** (check all reasons you have been discriminated against and specify the class, e.g. race, African American; sex, female)

    ☑ Race:  African American          ☐ Religious Creed:
    ☐ Color:                           ☐ National Origin:
    ☑ Sex:  Female                     ☐ Ancestry:
    ☐ Age/Date of Birth:               ☑ Retaliation
    ☐ Disability:                      ☐ Use of Guide or Support Animal
    ☐ Other (specify):

6.  **Dates of Discrimination:**

**Beginning:** 5/21/2021            **Ending:** _____

**Continuing?**  ✓ Yes        ☐ No

7.  **DESCRIBE THE DISCRIMINATORY CONDUCT, WITH SPECIFICITY, AND EXPLAIN HOW THE DISCRIMINATORY CONDUCT IS RELATED TO YOUR PROTECTED CLASS:**
    (e.g. failure to hire, discharge from employment, demotion, leave denied, forced transfer, denial of religious or disability accommodation, retaliation)

1. I am an African American female.
2. On or about May 21, 2021, Respondent presented me with a written offer of employment for the job of Technician.
3. Prior to this offer, I was recruited and interviewed for the position of Senior Technician.
4. The stated requirements for both jobs are identical.
5. Respondent claimed that I was not qualified for the Senior Technician position, which is why they instead offered me the Technician position.
6. On or about September 7, 2021, Respondent promoted Technicians Omar Jackson (African American male) and Seth Wolgemuth (Caucasian male) to Senior Technicians.
7. I believe that Respondent denied me the position of Senior Technician and other promotional opportunities because I am an African American female, in violation of the Pennsylvania Human Relations Act.

8. On or about September 30, 2021, my cell phone was crushed in a workplace accident.
9. On or about September 30, 2021, Respondent informed me that they would reimburse me for the cost of replacing my phone.
10. The process that Respondent imposed on me to obtain reimbursement was unnecessarily complicated and burdensome.
11. I believe that Respondent treated me more harshly because I am an African American female, in violation of the Pennsylvania Human Relations Act.

12. On or about April 18, 2022, I informed Respondent that I had a physical disability that impaired my ability to concentrate and caused me physical pain.
13. On that same date, I inquired about the process for obtaining medical leave and expressed the view that Respondent's process was unfair to people with disabilities.
14. On that same date, Respondent granted my requested accommodation.
15. Respondent did not provide me with all of the administrative information that I requested during the interactive process.
16. Respondent also delayed the implementation of my reasonable accommodation.
17. I believe that Respondent withheld information and delayed the implementation of my reasonable accommodation to harass me because I am an African American female, in violation of the Pennsylvania Human Relations Act.
18. I believe that Respondent harassed me in retaliation for objecting to the way they engaged in the interactive process, in violation of the Pennsylvania Human Relations Act.

**WARNING: FAILURE TO COMPLETE THIS SECTION MAY RESULT IN YOUR COMPLAINT BEING REJECTED FOR INSUFFICIENCY.**

8.    Based upon the foregoing, I/we allege that the Respondent(s) violated Section 5 of the
      Pennsylvania Human Relations Act, 43 P.S. §§ 951-963, and the implementing regulations, 16
      Pa. Code §§ 41.1-47.74.

9.    The Pennsylvania Human Relations Commission has jurisdiction over this matter pursuant to
      the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963.

10.   I/we pray that the Respondent(s) be required to provide all appropriate remedies under Section 9
      of the Pennsylvania Human Relations Act.

11.   If applicable, this Complaint will be dual-filed with the U.S. Equal Employment Opportunity
      Commission (EEOC), pursuant to the work-sharing agreement between the PHRC and the
      EEOC. Based upon the foregoing, I/we allege that the Respondent(s) violated one or more of
      the following federal statutes: Title VII of the Civil Rights Act of 1964 and/or The Pregnancy
      Discrimination Act and/or The Equal Pay Act of 1963 and/or The Age Discrimination in
      Employment Act of 1967 and/or Title 1 of the Americans with Disabilities Act of 1990 and/or
      Sections 102 and 103 of the Civil Rights Act of 1991 and/or Sections 501 and 505 of the
      Rehabilitation Act of 1973 and/or The Genetic Information Nondiscrimination Act of 2008.

## VERIFICATION

I hereby verify that the statements contained in this Complaint are true and correct to the best of my
knowledge, information and belief. I understand that false statements herein are made subject to the
penalties of 18 Pa.C.S.A. § 4904, relating to unsworn falsification to authorities.

| | |
|---|---|
| _____ | _____ |
| Date | Signature |
| | |
| | _____ |
| | Printed Name |
| 06/21/2032 | _Sutra_ A _Aria_ |
| Date | Signature |
| | _Asseta Aren_ |
| | Printed Name |

**WARNING: COMPLAINTS MUST BE SIGNED AND FILED WITHIN 180 DAYS OF THE
ALLEGED ACT OF HARM.**

**WARNING: IF YOU FAIL TO COMPLETE ANY PORTION OF THIS COMPLAINT,
THE PHRC MAY NOT ACCEPT YOUR COMPLAINT FOR FILING.**

# EXHIBIT D



**pennsylvania**
HUMAN RELATIONS COMMISSION

June 22, 2022

Assata Acey
5121 Brown Street
Philadelphia, PA 19139

RE:    Assata Acey vs. Momentum Dynamics Corporation
       PHRC Case No. 202102397
       EEOC Case No. 17F202261016

Dear Complainant:

The enclosed complaint and first amended complaint were received by the Pennsylvania
Human Relations Commission (PHRC). After careful evaluation, the PHRC determined that it
does not have jurisdiction over the complaint. However, it will be served on Respondent(s) as
of the date of this letter.

Please be advised that the case is being transferred to the U.S. Equal Employment Opportunity
Commission (EEOC), which may have jurisdiction over the case. Please allow two weeks for
the case to be transferred to EEOC. After two weeks, you may contact the EEOC at 1-800-669-
4000 for status.

Thank you for your cooperation,

Intake Supervisor
Pennsylvania Human Relations Commission

cc:
Momentum Dynamics Corporation
3 Pennsylvania Avenue
Malvern, PA 19355

# EXHIBIT E

| | |
|---|---|
| **From:** | Assata Acey |
| **To:** | Post, May Mon |
| **Cc:** | Patti Rensel; Alexa Heisler; Barbara Foxman; hornigtracy@gmail.com |
| **Subject:** | Re: Acey v. Momentum |
| **Date:** | Tuesday, September 27, 2022 2:53:02 PM |

**EXTERNAL EMAIL**

As you are currently aware, this case has been moved to investigation.
I reject your contract.

In mediation I did agree to
a verbal agreement in which I would resign and dismiss existing claims(prior to Sep 19) in
return for a settlement amount of 50,000 from Momentum Dynamics Corp.
The execution of this agreement was contingent on a contract that included agreeable material
terms. The fact that you requested me to execute terms of an agreement that I had yet to
review or sign suggests that we did not resolve the issue.

At no point was resignation agreed to as a requirement to review or receive any agreement. At
no point was a deadline agreed to for resignation. The only requirement agreed to as a
condition of receiving a contract was that I would provide a letter from my doctor. The
deadline given for this letter was September 26 2022. My Grandmother is a witness to my
agreements during mediation and can confirm the same.

As of yet, I have not resigned and  I consider my immediate lock-out from company databases
as a direct attempt to fire me after my complaint, which is to be added to my charge file along
with all other documents submitted to Alexa and Pattis Momentum emails this past friday
afternoon.

On Tue, 27 Sept 2022 at 14:10, Post, May Mon <maymon.post@bunkerray.com> wrote:

> Dear Ms. Acey,
>
>
> I am confused by your email below. At the mediation on September 19, 2022, the parties
> agreed on the following material terms:
>
>
> You agreed to resign from employment with Momentum effective immediately (September
> 19, 2022) and further agreed to provide Momentum with the said resignation letter on or
> before September 23, 2022. Therefore, Momentum has accepted your resignation as of that
> date.
>
>
> Additionally, you agreed to provide Momentum with a verification form from a medical
> provider, on or before September 23, 2022, returning you to return to work on full duty with
> or without restrictions.

In addition, you agreed to a general release, non-disparagement and confidentiality, and Momentum agreed to provide a neutral reference.

In exchange for the above, within 30 days of the execution of the settlement agreement by you, Momentum agreed to pay the settlement proceeds in the total amount of $50,000 (less ordinary deductions required by law, if applicable].

I indicated to the mediators that a settlement agreement would be sent to you for execution as soon as it was finalized. To that end, I am attaching it herewith.

Thank you.

**May Mon Post, Esq. | Lead Employment Attorney | Bunker & Ray**

Employees of ACE American Insurance Company, a Chubb Company

436 Walnut St. | WA01A | Philadelphia, PA 19106
(215) 845-6154 (direct) |  (267) 372-1240 (mobile)
maymon.post@bunkerray.com

This email (which includes any attachments) is intended to be read only by the person(s) to whom it is addressed. This email may contain confidential, proprietary information and may be a confidential attorney-client communication, exempt from disclosure under applicable law. If you have received this email in error, do not print it, forward it or disseminate or use it or its contents. In such event, please notify the sender by return email (or by phone at the number shown above) and delete the email file immediately thereafter. Thank you for your cooperation.

We strive to be a paperless office. I encourage you to send all correspondence via email instead of U.S. mail when at all possible. If you email a document to me, it is not necessary to send a separate copy via U.S. mail. Thank you.

**From:** Assata Acey <aceyassata@gmail.com>
**Sent:** Friday, September 23, 2022 10:39:46 PM
**To:** Post, May Mon <Maymon.post@bunkerray.com>; Patti Rensel
<patti.rensel@momentumdynamics.com>; Alexa Heisler
<Alexa.Heisler@momentumdynamics.com>; Assata Acey
<Assata.Acey@momentumdynamics.com>
**Subject:** Re: Acey v. Momentum


**EXTERNAL EMAIL**

My collected evidence of inferred bias is proof of discrimination in my hiring decision work
classification/failure to promote. This bias consists mainly of experiences I had with HR that
were not replicated with my colleagues (accusations of stealing time, asks of if I were
pregnant/should see daughter's gynecologist, degree of meeting invite harassment, response
to reported bias and harassment incidents at work etc). Failure to classify or promote would
be a part of that because the performed tasks were reasonably beyond the scope of my role,
requiring skills of a process engineer/beyond technician job description. And not only was
HR aware of this through my performance review and subsequent communications, but I
specifically mentioned in my performance review that I would be seeking compensation
commensurate with the tasks that I was completing.

Regardless of your evaluation of evidenced inferred bias, conspicuous skill gap between my
tasks and role, and previous (re performance review) request to be adequately compensated.
My claim still holds additional charges of severe harassment and ADA related retaliation.
The severe racially/gender impacted harassment of not being allowed to use my cell phone
and an evidently unusual/severe reimbursement process (where I was denied from opting
out) is supported by the same inferred bias as well as additional bias acts by coworkers( pen
markings on a work desk vowing not to "talk about race", comic regarding a fake "phizzics"
degree posted outside my cubicle, additional biased/policing behavior of coworkers)

This retaliation would include the onset of my illness when I expressly needed to take time
off and was told at the last minute before heading out that the current pay period would not
allow me to do unpaid time (as supported by my 5/12 doctors note). Which caused me such
severe distress that after returning from two doctor's appointments, I worked until 9:00 PM
in pain to make up those pay period hours.

The stress of this ordeal is further documented in my diagnosis of major depressive disorder
from both my PCP and therapist as well as therapy sessions where these issues were
discussed.

Due to the documentation of this issue, I am convinced that a full investigation will find
Momentum Dynamics Corporation in noncompliance of EEOC law with order to pay the
full 50,000 amount regardless of whether I resigned--being that resignation would be my
right.

Beyond this, I do perceive your emails of this week as attempts to:
a) have this case dismissed

b)  convince me to resign (a condition contingent on our "meeting of minds" as
demonstrated through a contract) without submitting and written documentation/contract for
my review between myself and you to review or sign.

c) change or misconstrue existing and communicated FMLA policy to use PTO payment as

a bargaining chip towards part b.

I view these as direct actions to intimidate and retaliate against me for filing this EEOC complaint if not to also interfere with EEOC process by avoiding the need to include your resignation condition in a written unredacted settlement agreement

In the scope of the merit of my claims(existing complaint), right to resign or not, previously noted actions, and supporting documentation, I am now asking for a settlement amount of $130,000, acceptable for review ONLY with receipt legally drafted settlement offer (including ALL material terms: resignation, rehire eligibility, time scale/terms of payment, confidentiality, etc).

Unless/until an agreement is signed detailing resignation, I am an employee of Momentum Dynamics Corp and will be either using PTO or reporting to work.

All supporting documentation has been attached. Please refer any questions, comments, or followup to my email.


On Fri, 23 Sept 2022 at 16:13, Assata Acey <aceyassata@gmail.com> wrote:


---------- Forwarded message ---------
From: **Assata Acey** <aceyassata@gmail.com>
Date: Fri, 23 Sept 2022 at 16:10
Subject: Re: Acey v. Momentum
To: Post, May Mon <maymon.post@bunkerray.com>


Thank you for your clarifying email. Please confirm whether the following previous PTO/FMLA/REturn to work policies, as communicated in the attached email PDFs and FMLA form, have been changed to match what you are currently saying. thank you,


On Fri, 23 Sept 2022 at 16:01, Post, May Mon <maymon.post@bunkerray.com> wrote:

Good afternoon, Ms. Acey:


I understand that you requested to take PTO for September 22 and 23. Please be advised that you are unable to put in for PTO as you are still on disability leave and you cannot take PTO unless you are back to work. (Also, per your doctor's note, you are not to be released to return until Monday, which is a moot point as you have resigned or will be resigning shortly). However, you will be paid the balance of your PTO upon your resignation. If you resign today through Sunday, you will receive your final pay check on 09/30. If you resign 09/26 – 10/09, you will receive your final pay check on 10/14. Please provide me with a copy of your resignation letter as soon as possible.

Thank you, and please let me know if you have any questions.

**May Mon Post, Esq. | Lead Employment Attorney | Bunker & Ray**

Employees of ACE American Insurance Company, a Chubb Company

436 Walnut St. | WA01A | Philadelphia, PA 19106
(215) 845-6154 (direct) | (267) 372-1240 (mobile)
maymon.post@bunkerray.com

This email (which includes any attachments) is intended to be read only by the person(s) to whom it is addressed. This email may contain confidential, proprietary information and may be a confidential attorney-client communication, exempt from disclosure under applicable law. If you have received this email in error, do not print it, forward it or disseminate or use it or its contents. In such event, please notify the sender by return email (or by phone at the number shown above) and delete the email file immediately thereafter. Thank you for your cooperation.

We strive to be a paperless office. I encourage you to send all correspondence via email instead of U.S. mail when at all possible. If you email a document to me, it is not necessary to send a separate copy via U.S. mail. Thank you.

---

This email (including any attachments) is intended for the designated recipient(s) only, and may be confidential, non-public, proprietary, and/or protected by the attorney-client or other privilege. Unauthorized reading, distribution, copying or other use of this communication is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) should not be deemed a waiver of any privilege or protection. If you are not the intended recipient or if you believe that you have received this email in error, please notify the sender immediately and delete all copies from your computer system without reading, saving, printing, forwarding or using it in any manner. Although it has been checked for viruses and other malicious software ("malware"), we do not warrant, represent or guarantee in any way that this communication is free of malware or potentially damaging defects. All liability for any actual or alleged loss, damage, or injury arising out of or resulting in any way from the receipt, opening or use of this email is expressly disclaimed.

# EXHIBIT F

CORA
The Resource Center for Children, Youth and Families

# CONSENT TO MEDIATE

## Mediation Process and Role of the Mediator

I understand that the mediator(s) will explain the mediation process at the beginning of the mediation session, and that I will have an opportunity to ask questions at that time. I understand that CORA Good Shepherd Mediation and its mediators are not providing me with legal advice, legal representation, counseling or therapy. I understand that the mediation process may involve the mediator(s) speaking privately to each participant. I understand that the mediator(s), acting in a neutral capacity, will not take sides or make a legal ruling. The mediator's role is to facilitate the mediation process and help the parties understand each other's point of view. I understand that if the disputants reach a mediated settlement, the mediator(s) will write it out on an agreement form. I have been informed that prior to signing the mediated settlement, I may have it independently reviewed by my own legal counsel. A copy of the agreement (if a settlement is reached), along with this Consent to Mediate form, will be retained by CORA Good Shepherd Mediation. The terms of settlement may be legally binding in that the parties may seek its enforcement in the courts, unless the agreement, by its terms, sets forth the parties' intent that it is not legally binding or enforceable in a court of law.

## Costs of Mediation

The mediation will be conducted by volunteer or staff mediators affiliated with CORA Good Shepherd Mediation. Some mediations take more than one session, depending on the complexity of the matters involved. We understand that the per-session fee is due prior to the start of each mediation session.

## Voluntary Nature of Mediation

I am voluntarily participating in the mediation process to attempt to resolve a specific conflict. I am willing to abide by the mediation ground rules as described in the mediator(s)'s opening statement. I understand that if either disputant fails to follow the ground rules, the mediator(s) may terminate the mediation session at the mediator(s) discretion. I also understand that any disputant may decide to withdraw from the mediation at any time during the process.

## Confidentiality of Mediation

Furthermore, I understand that all mediation communications and documents are privileged and that disclosure of mediation communications and mediation documents may not be required or compelled through discovery or any other process. I understand that mediation communications and mediation documents, except the mediated settlement agreement, shall not be admissible as evidence in any action or proceeding,

CORA Services, Inc. • 8540 Verree Road • Philadelphia, PA 19111-1399 • 215-342-7660



including, but not limited to, a judicial, administrative or arbitration action or proceeding. [Section 1, Title 42 § 5949 (a)] I understand that all of the mediator (s) notes and the notes taken by the disputants will be destroyed at the end of the final mediation session. I, therefore, agree not to call the mediator(s) or CORA Good Shepherd Mediation staff as a witness(es) in any future proceedings pertaining to this case.

## Exceptions to Confidentiality

I understand that some communications and conduct are excluded from protection under the Confidential Mediation Communications and Documents law in Pennsylvania [Section 1, Title 42 § 5949 (b)]. If subsequent legal proceedings are held in this matter, the mediator may be required to testify in regard to:

- A fraudulent communication during mediation that is relevant evidence in an action to enforce or set aside a mediated agreement reached as a result of that fraudulent communication;
- A communication or threat that bodily injury may be inflicted upon a person;
- A communication of a threat that damage may be inflicted on real or personal property under circumstances constituting a felony;
- Conduct during a mediation session causing direct bodily injury to a person.

In mediations involving youth, mediators are required by the Pennsylvania Child Protection Services Act to report any suspicion of child abuse to the Child Abuse Hotline.

## Modifications for "Virtual" Mediations

I understand that I may be asked to sign this document and the agreement electronically. If that is not possible, I agree to sign and return this document as soon as possible. In addition, I understand that the agreement might be signed by the parties after the mediation session has ended, if technology access does not allow for both parties to sign the agreement during the mediation session. I agree to sign and return the agreement as soon as possible (given my technology access), and I understand that my verbal consent during the mediation session serves as my signature until I can sign and return the written agreement.

## Release from Liability

I hereby release CORA Good Shepherd Mediation and its employees and its volunteers from any liability in regard to this mediation.

Signature

August 23, 2022

Date

Page **2** of **2**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ASSATA ACEY | Case No.: 2:23-cv-01438 |
| Plaintiff, | |
| v. | Judge Gene E.K. Pratter |
| INDUCTEV | |
| Defendant. | |

## ORDER

**AND NOW**, this ____ day of _____, 2023, upon consideration of Defendant InductEV's Motion to Dismiss, any response thereto, and all proceedings herein, it is hereby **ORDERED** that Defendant's Motion to Dismiss is **GRANTED** and Plaintiff's Complaint is hereby **DISMISSED WITH PREJUDICE.**

Alternatively, it is **ORDERED** that Plaintiff's request for punitive damages is **STRICKEN.**

BY THE COURT:

_____

Pratter, J.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ASSATA ACEY, | ) |
| | ) CASE NO. |
| Plaintiff, | ) |
| | ) JUDGE |
| v. | ) |
| | ) **Removed from the Court of Common** |
| INDUCTEV | ) **Pleas of Chester County, Pennsylvania** |
| | ) **(Case No. 2023-01782-CT)** |
| Defendant. | ) |
| | ) |
| | ) |

**DEFENDANT'S NOTICE OF REMOVAL**

Defendant, InductEV ("Defendant") by and through its attorneys, Fox Rothschild LLP,

hereby removes this action pursuant to 28 U.S.C. §§ 1331 and 1441(a) in the above-captioned

matter from the Court of Common Pleas of Chester County, where it is now pending, to the United

States District Court for the Eastern District of Pennsylvania. The grounds in support of this Notice

of Removal are as follows:

**INTRODUCTION**

1.      This action was commenced by the filing of a Complaint in the Court of Common

Pleas of Chester County, Pennsylvania, Case No. 2023-01782-CT. A true and correct copy of

Plaintiff's Complaint is attached as Exhibit A.

2.      A copy of the Complaint was served on Defendant on March 29, 2023. A true and

correct copy of the Affidavit of Service of Summons and Complaint is attached hereto with Exhibit

A.

3.      The state court docket and all other filings in state court are attached hereto as

Exhibit B.

## PARTIES

4.      Defendant InductEV is a corporation formed under the laws of Delaware with a principal place of business at 660 Allendale Road, King of Prussia, Pennsylvania 19406.

5.      Plaintiff is an adult individual residing at 5121 Brown Street, Philadelphia, Pennsylvania 19406.

## TIMELINESS

6.      This Notice is timely pursuant to 28 U.S.C. § 1446(b) because it is filed prior to the expiration of the statutorily allowed 30-day period beginning when Plaintiff served Defendant with the Complaint.

7.      Removal of this matter to the Eastern District of Pennsylvania is proper because this district "embraces the place where such action is pending." 28 U.S.C. § 1441(a). The Common Pleas Court of Chester County, Pennsylvania is within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania.

## GROUNDS FOR REMOVAL

8.      Plaintiff's Complaint asserts several claims and seeks damages for alleged discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"); Section 1981 of the Civil Rights Act of 1990, 42 U.S.C. § 1981 ("Section 1981"); The Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.* ("ADA"); The Pennsylvania Human Relations Act; 42 P.S. §951-963 ("PHRA"), and Intentional Infliction of Emotional Distress ("IIED") under Pennsylvania law. (*See* Exhibit A, Compl. at p.1)

9.      Plaintiff alleges she was subject to discrimination based upon race and disability, and sexually harassed during her employment with Defendant in violation of State and Federal

2

law, therefore causing intentional infliction of emotional distress. (*See generally,* Exhibit A, Compl.)

10.     "Article III of the Constitution gives the federal courts power to hear cases 'arising under' federal statutes." *Merrell Dow Pharmaceuticals Inc. v. Thompson,* 478 U.S. 804, 807 (1996) (discussing requirements of federal question jurisdiction).

11.     "A case 'arises under' federal law within the meaning of § 1331 . . . if a 'well pleaded complaint establishes either that federal law creates the cause of action or the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.'" *Lane v. CBS Broadcasting Inc.,* 612 F. Supp. 2d 623, 627-28 (E.D. Pa. 2009) (quoting *Empire Healthchoice Assurance, Inc. v. McVeigh,* 547 U.S. 677, 689-90 (2006)).

12.     Because Plaintiff asserts claims under Title VII (42 U.S.C. § 2000e), the ADA (42 U.S.C. § 12101, *et seq.*), and Section 1981 (42 U.S.C. § 1981), Plaintiff's claims arise under federal based upon the face of Plaintiff's Complaint. *See Caterpillar v. Williams,* 482 U.S. 386, 392 (1987) ("federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint").

## NOTICE

13.     Promptly after filing this Notice of Removal, Defendant will provide written notice to all parties and a copy of this Notice of Removal will be filed with the Clerk of the Common Pleas Court of Chester County, Pennsylvania, in accordance with the provisions of 28 U.S.C. § 1446(d).

14.     In filing this Notice of Removal, Defendant does not waive any defense or counterclaim that may otherwise be available to them.

WHEREFORE, Defendant, in conformity with the requirements set forth in 28 U.S.C. § 1446, hereby gives notice that the State Court Action, which is presently pending in the Common Pleas Court of Chester County, Pennsylvania is hereby removed to this Court.

Dated: April 14, 2023

Respectfully submitted,

**FOX ROTHSCHILD LLP**

By: */s/ Randall C. Schauer*
Randall C. Schauer, Esquire
Alberto M. Longo, Esquire
747 Constitution Drive, Suite 100
P.O. Box 673
Exton, PA 19341
610-458-7500
rschauer@foxrothschild.com
alongo@foxrothschild.com

***Attorneys for Defendant***

4

**CERTIFICATE OF SERVICE**

I hereby certify that on April 10, 2023, the foregoing was electronically filed with the Clerk

of the Court via the Court's CM/ECF filing system and was served upon the following via First

Class Mail.

Assata Acey
5121 Brown St.
Philadelphia, PA 19139
*Plaintiff (Pro Se)*

/s/ *Randall C. Schauer, Esq.*
Randall C. Schauer Esq.

*Attorney for Defendant*

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

ASSATA ACEY

**DEFENDANTS**

INDUCTEV

**(b)** County of Residence of First Listed Plaintiff    PHILADELPHIA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

PRO SE

Attorneys *(If Known)*
Randall C. Schauer, Esquire; Alberto M. Longo, Esquire
747 Constitution Drive, Suite 100, P.O. Box 673
Exton, PA 19341; 610-458-7500

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [x] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                  *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product | Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | Liability | [ ] 367 Health Care/ | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel & | Pharmaceutical | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| & Enforcement of Judgment | Slander | Personal Injury | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' | Product Liability | | [ ] 835 Patent - Abbreviated | [ ] 460 Deportation |
| [ ] 152 Recovery of Defaulted | Liability | [ ] 368 Asbestos Personal | | New Drug Application | [ ] 470 Racketeer Influenced and |
| Student Loans | [ ] 340 Marine | Injury Product | | [ ] 840 Trademark | Corrupt Organizations |
| (Excludes Veterans) | [ ] 345 Marine Product | Liability | | [ ] 880 Defend Trade Secrets | [ ] 480 Consumer Credit |
| [ ] Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | Act of 2016 | (15 USC 1681 or 1692) |
| of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards | | [ ] 485 Telephone Consumer |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle | [ ] 371 Truth in Lending | Act | **SOCIAL SECURITY** | Protection Act |
| [ ] 190 Other Contract | Product Liability | [ ] 380 Other Personal | [ ] 720 Labor/Management | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal | Property Damage | Relations | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ |
| [ ] 196 Franchise | Injury | [ ] 385 Property Damage | [ ] 740 Railway Labor Act | [ ] 863 DIWC/DIWW (405(g)) | Exchange |
| | [ ] 362 Personal Injury - | Product Liability | [ ] 751 Family and Medical | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| | Medical Malpractice | | Leave Act | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation | | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | [ ] 791 Employee Retirement | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | Income Security Act | [ ] 870 Taxes (U.S. Plaintiff | Act |
| [ ] 230 Rent Lease & Ejectment | [x] 442 Employment | [ ] 510 Motions to Vacate | | or Defendant) | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ | Sentence | | [ ] 871 IRS—Third Party | [ ] 899 Administrative Procedure |
| [ ] 245 Tort Product Liability | Accommodations | [ ] 530 General | | 26 USC 7609 | Act/Review or Appeal of |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities - | [ ] 535 Death Penalty | **IMMIGRATION** | | Agency Decision |
| | Employment | **Other:** | [ ] 462 Naturalization Application | | [ ] 950 Constitutionality of |
| | [ ] 446 Amer. w/Disabilities - | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration | | State Statutes |
| | Other | [ ] 550 Civil Rights | Actions | | |
| | [ ] 448 Education | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [ ] 1 Original Proceeding
- [x] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1331 and §1441(a)

Brief description of cause:
Plaintiff alleges employment discrimination based upon race, sex, and disability leading to intentional infliction of emotional distress.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
> 50,000

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   [ ] Yes   [x] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE    4/14/2023

SIGNATURE OF ATTORNEY OF RECORD
/s/ Randall C. Schauer, Esq.

## FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# EXHIBIT "A"

# Supreme Court of Pennsylvania

## Court of Common Pleas
## Civil Cover Sheet

_____ CHESTER _____ County

| For Prothonotary Use Only: |
|---|
| Docket No: |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

## SECTION A

**Commencement of Action:**
- ☒ Complaint
- ☐ Writ of Summons
- ☐ Petition
- ☐ Transfer from Another Jurisdiction
- ☐ Declaration of Taking

Lead Plaintiff's Name:
**Assata Acey**

Lead Defendant's Name:
**InductEV**

Are money damages requested? ☒ Yes ☐ No

Dollar Amount Requested: (check one)
☐ within arbitration limits
☒ outside arbitration limits

Is this a *Class Action Suit*? ☐ Yes ☒ No

Is this an *MDJ Appeal*? ☐ Yes ☒ No

Name of Plaintiff/Appellant's Attorney: _____

☒ **Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)**

## SECTION B

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your *PRIMARY CASE.* If you are making more than one type of claim, check the one that you consider most important.

**TORT** *(do not include Mass Tort)*
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability *(does not include mass tort)*
- ☐ Slander/Libel/ Defamation
- ☐ Other: _____
  _____

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other: _____
  _____

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional: _____
  _____

**CONTRACT** *(do not include Judgments)*
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other
  _____
  _____
- ☒ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other
  _____
  _____
- ☐ Other:
  _____
  _____

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other:
  _____
  _____

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other
  _____
  _____
- ☐ Zoning Board
- ☐ Other:
  _____
  _____

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other:
  _____
  _____

# Chester County
# Court of Common Pleas
# Cover Sheet

| | |
|---|---|
| | Docket No: |

| Plaintiff(s): (Name, Address) | Plaintiff's/Appellant's Attorney (circle one) |
|---|---|
| Assata Acey,<br>5121 Brown St, Philadelphia,<br>PA 19139 | (Name, firm, address, telephone and attorney ID#) |

| Defendant(s): (Name, Address) | Are there any related cases? Please provide case nos. |
|---|---|
| InductEV<br>660 Allendale Road, King of Prussia, PA 19406 | |

**Defendants who are proceeding without counsel are strongly urged to file with the Prothonotary a written statement of an address AND a telephone number at which they can be reached.**

If this is an appeal from a Magisterial District Judgment, was appellant ◯ Plaintiff or ◯ Defendant in the original action?

Jury Trial Demanded  ◯ Yes  ⦿ No

Nature of case if not on previous cover sheet – Please choose the most applicable

| | | | |
|---|---|---|---|
| | Annulment | | Writ of Certiorari |
| | Custody · Conciliation Required | | Injunctive Relief |
| | Custody· Foreign Order | | Mechanics Lien Claim |
| | Custody - No Conciliation Required | | Issuance of Foreign Subpoena |
| | Divorce - Ancillary Relief Request | | Name Change |
| | Divorce - No Ancillary Relief Requested | | Petition for Structured Settlement |
| | Foreign Divorce | | |
| | Foreign Protection from Abuse | | |
| | Paternity | | |
| | Protection from Abuse | | |
| | Standby Guardianship | | |

**Arbitration Cases Only**

Arbitration Date [          ]
Arbitration Time [          ]

Defendants are cautioned that the scheduling of an arbitration date does not alter the duty of the defendant to respond to the complaint and does not prevent summary disposition from occurring prior to the arbitration date.

This matter will be heard by a Board of Arbitrators at the time and date specified but, if one or more of the parties is not present at the hearing, the matter may be heard at the same time and date before a judge of the court without the absent party or parties. There is no right to a trial *de novo* on appeal from a decision entered by a judge.

**Notice of Trial Listing Date**

Pursuant to C.C.R.C.P. 249.3, if this case is not subject to compulsory arbitration it will be presumed ready for trial twelve (12) months from the date of the initiation of the suit and will be placed on the trial list one (1) year from the date the suit was filed unless otherwise ordered by the Court.

To obtain relief from automatic trial listing a party must proceed pursuant to C.C.R.C.P. 249.3(b), request an administrative conference and obtain a court order deferring the placement of the case on the trial list until a later date.

**File with**: Chester County Justice Center, Prothonotary Office, 201 W. Market St., Ste. 1425, PO Box 2746, West Chester, PA 19380-0989

These cover sheets must be served upon all other parties to the action immediately after filing.
Submit enough copies for service.                    Form 1

**CHESTER COUNTY**
**COURT OF COMMON PLEAS**

ASSATA ACEY

                                              :
                                              :          CIVIL ACTION
                                              :
                                              :
        Plaintiff,                            :
                                              :
v.                                            :
                                              :
INDUCTEV                                      :
660 Allendale Rd.                             :
King of Prussia, PA 19406                     :
                                              :
        Defendant.                            :
                                              :
                                              :

## COMPLAINT

I, Assata Acey, file this complaint, alleging that my rights pursuant to Title VII of the Civil Rights Act of 1964;

42 U.S.C. § 2000e, Section 1981 of the Civil Rights Act of 1990; 42 U.S.C. § 1981, The Americans with

Disabilities Act of 1990; 42 U.S.C. § 12101 et. seq., Pennsylvania Human Relations Act; 43 P.S. § 951 - 963,

and Pennsylvania tort law regarding IIED, have been violated and aver as follows:

### I. PARTIES AND JURISDICTION

1. Plaintiff, Assata Acey, is an adult individual residing in Philadelphia, Pennsylvania with a mailing
   address of 5121 Brown Street, Philadelphia, PA 19139.

2. Defendant, InductEV, formerly known as Momentum Dynamics Corporation (hereinafter "Defendant")
   is a company, owned and existing under the laws of the Commonwealth of Pennsylvania, with a
   principal place of business at 660 Allendale Road, King of Prussia, PA 19406.

3. Defendant was Plaintiff's employer for all relevant times herein.

4. Plaintiff worked for the Defendant's facility, formerly located at 3 Pennsylvania Ave, Malvern, PA
   19355.

5. At all times material hereto, Defendant qualifies as Plaintiff's employer.

6. At all times material hereto, Defendant acted by and through its agents, servants, and employees, former and current, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

7. I have exhausted my administrative remedies pursuant to the Equal Employment Opportunity Act and the Pennsylvania Human Relations Act. (See Exhibit "A," a true and correct copy of a "right-to-sue" issued by the Equal Employment Opportunity Commission).

8. This action is instituted pursuant to Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 2000e, Section 1981 of the Civil Rights Act of 1990; 42 U.S.C. § 1981, The Americans with Disabilities Act of 1990; 42 U.S.C. § 12101 et. seq., Pennsylvania Human Relations Act; 43 P.S. § 951 - 963, and Pennsylvania tort law regarding IIED, and applicable federal and state law.

9. Jurisdiction is conferred by 42 Pa.C.S.A. § 931.

10. Supplemental jurisdiction over my federal law claims is conferred pursuant to 42 Pa.C.S.A. § 5301.

11. The venue is properly laid in this district because the Defendant conducted business in this district and because a substantial part of the acts and omissions giving rise to the claims set forth herein occurred in this judicial district. 42 Pa.C.S.A. § 5301 (1)(i) and (2)(iii). Plaintiff was working in Chester County, Pennsylvania at the time of the illegal conduct by the Defendant, as set forth herein.

## II. HISTORY OF THE CASE

1. I am an African American Woman.

2. I accepted an employment offer from Defendant for the role of Product Introduction Technician on 31, May 2021.

3. I did not see the employment offer as fair, because Defendant requested the same tasks were communicated during the Senior Technician interview process, for lower title and negotiating power. Despite this and, as a company outsider, I did not have reason to suspect the hiring decision of being rooted in racial or gender bias.

4. After beginning employment on June 14, 2021, I became aware of my being the only Black woman out of more than 80 employees.

5. Several colleagues, including then team member Rob Rosenberg, made comments about the nature and scope of my work.

6. I continued to bring these to my manager, providing direct quotes when possible and requesting clarification over my job duties to ensure good performance.

7. Eventually, I was informed by my supervisor of additional anonymous work complaints made to him regarding my bathroom break frequency, attendance, and time I spent working vs talking.

8. I came to view these complaints as biased, due to their contradiction of:

   a) Communications of collaborative workplace culture

   b) My working regular overtime as often the last to leave.

   c) Comparative time that colleagues of greater esteem spent talking.

9. I resolved to discuss my reflections and concerns of being racially stereotyped to my supervisor, including stereotypical depiction of Black people as lazy or untrustworthy and how those receiving comparatively less criticism and most coworkers, thus eligible complainers, were both White men.

10. As criticisms continued, I felt so concerned about my role that I requested and attended another meeting with my supervisor to confirm that I was performing the expected duties.

11. The scrutiny over my work increased to the point that my supervisor and I planned and implemented use of Teamwork software to document my tasks for the team to see, to reduce tension, and assist team members in the documentation of their work.

12. I faced experiences where I felt targeted for my gender. Team meetings routinely divulged into tension between myself and former team member Rob-I noticed he would more regularly butt heads with myself and fellow blk team member that the only other regular conflict appeared to be female mech engineer woman, led me to conclude that my being a woman and Black had intensified his conflict towards me.

13. This suspicion grew the first time he muttered "bitch" under his breath. At the time it sounded to be directed to Maria because he was acting on Maria's request (to stretch one of the larger cabinet unit's tubing to remove the kinks) because he did not trust me to do it. I was skeptical of what I had heard because I did not think Rob cursed. Later observations, such as Rob calling a test bay jig a "bitch" after

struggling with it, dispelled my skepticism. This is why when he referred to me as "that bitch" it no longer seemed surprising that he would:

     a)     Curse

     b)     Curse about a woman.

This was supported by circumstantial evidence such as:

     a) Removing tools from my workstation whenever a tool from the main set went missing regardless of my culpability

     b) Complaining profusely about my use of the test bay lifts and, when a dedicated lift was bought to prevent others (including me) from using his lift, constantly and aggressively confiscating the lift from my building area.

14.     A close colleague of Rosenberg (Rob R)'s was Rob Sweirzawski (Rob S), and he exhibited the same behavior mostly towards myself and Maria. During early weeks, he was reported by his supervisor and reprimanded by Judy Talis (Defendant's former Chief Administrative Officer (CAO) and head of Human resources (HR)) for racially joking in front of colleagues about me being from "the wrong side of the tracks". In contrast, his subsequent actions were either unnoticed, unreported, or unreprimanded by HR or his manager, even while my supervisor worked with me to mitigate his behavior.

15.     My builds had to pass QA dept to enter Rob S's station- and Sweirzawski would often, on a whim, and regardless of priority, insist on waiting until a whole or half day had passed from completion, before reviewing a build. And, when he did conduct these inspections, he refrained from disclosing the time of the checks until after they were done, essentially assuring my absence during many of them.

16.     At one point I went out to company's smoking dock to beg Rob S to do a check on the same day he had indicated in his email. I was accosted with silent hostility before he responded that he was smoking.

17.     In contrast, Rob S and Rob R were kind to one another and Quality checks relating to the test bay seemed to schedule and meet approval without a hitch.

18.     Rob S also often eschewed the assembly documents, choosing to determine major points irrespective of design intent or documented tolerances,  resisted writing reasons for failing a unit and would find new

issues in subsequent checks that were either minor to the assembly intent (a speck of dust/details unspecified by the SOP) , inconsistent with his previous rejection reasons (something he saw before but did not mention), or inconsistent with my build notes and memory( an unplugged cable when all connections had been tightened and torque painted).

19. His purposeful negative impact on my work became so unreasonable that I:

    a) Coordinated with my supervisor to have same attend all "pop-up" inspections.

    b) Advocated and adopted the use of signed seals to prevent pre-inspection tampering.

20. There was little else I could do about Rob S' behavior but his bias towards women became as apparent as his bias towards Black people when, having been included in a time-consuming effort to investigate and correct a deviation in expensive PAI product, he disclosed to my face that he had purposefully ignored Maria's design stipulation when approving these products for my in house use or for compliance at PAI warehouses.

21. The investigation had started when he raised a complaint about my installation of an assembly, thus rejecting the build, AND spurring further review that exposed the cause of error to be the assembly itself instead of its installation.

22. The malice behind his actions was clarified in his statement, because it proved he was the only one to know or be best positioned to know his actions to be the true cause of his complaint- yet he remained committed to, withholding information, shifting blame and risking further issue in the field for the chief purposes(or known outcomes), obstructing my work, and exerting authority over Maria's documents.

23. At that point I was able to connect his behavior towards my work and constant recklessness towards cabinet assembly procedures to his:

    a)    Racial opposition towards myself

    b)    Sexually biased opposition towards following Maria's documents (especially since she was one of two female engineers on the male-dominated lab floor-and the only one with a senior designation).

24. At one point, during my 90-day check in, I expressed concern about sexual harassment at work and how I appreciated having my supervisor's support.

25. After CAO admonished me for relying on my supervisor instead of her, I described an experience with a senior member of the electrical engineering team, Bogdan Proca, who had:

    a) Stared me down in orientation before commenting on relationships between subordinates and superiors being "natural".

    b) Compared me to dark chocolate in front of another colleague during a company ice cream day.

    c) Pursued me from across the lab while asking if we were the only employees left in the building.

26. In response to the fear and discomfort I described, CAO launched into an anecdote about a male worker staring at a female worker's breast; how they became close friends after the female worker learned that the male's "unconscious staring" was caused by autism.

27. CAO's response stuck with me throughout my time at Defendant.

28. As I continued to hear sexist comments by Electrical Engineer John Wolgemuth and experience discomforting stares from Proca, no level of sexual harassment, even an "accidental" grazing by PCB designer Mike Russel felt significant enough to be taken seriously by HR

29. At one time, the company's history of not hiring African Americans was expressed by a Black philanthropy coordinator, stating Defendant had "come a long way" by having more than three Black employees, as he had "told [acting CEO] Andy [that if he did not see more Black employees at his next visit] the money [is] off".

30. His statements, made within earshot of coordinator, Diana Wilmes, added to my concern over the company's possible bias against Black workers, being that there were 6 Black employees including me at the time.

31. Concurrently I received enhanced scrutiny and harassment from HR, including instances where:

    a) After trying to make light of a recruiter's misspelling of my name, I was told that my name's spelling "did not matter", and I was making myself look "unprofessional" for responding to an RSVP 10 minutes before the same recruiter chose to complain.

b) I was informed that I would be the only employee disallowed to carry my cellphone in the lab space—despite previous complaints of my being late for meetings and most of my job duties taking place in the lab.

32. Before the end of 2021, it became clear that the nature of my job duties was objectively more advanced than the formal designation of my role.

33. After tasks of organizing meetings to formalize the relationship between Quality and Mechanical departments, providing theoretical chemical consultation to maximize product use, and drafting circuitry for an upcoming high stakes project, it became clear that my task types were not aligned with my job classification- and as the one of the lower-ranking members of my team, I felt that this was due to race and gender.

34. I made sure to document these contributions in my performance review while hinting my desire to be properly compensated for future advanced duties.

35. I also took the time to communicate the concerns of being misclassified to my supervisor- even going so far as to send potential job titles and descriptions in line with current duties.

36. Despite this I continued to find myself completing advanced tasks such as, providing ANSI compliant calculations, documentation, and PPE procurement for laser usage—all without any change in role.

37. This continued until my leave of absence.

38. Between January and April of 2022, lack of cooperation from colleagues who had criticized me grew to be so great that my supervisor had to have me submit emails to him so that he could forward them to others with his stamp of approval—instead of the teamwide procedure of emailing others directly and cc-ing him as needed.

39. On February 7, 2022, in a meeting held by CAO to explain why we couldn't share my curated movie list for Black History Month-- I discussed recent experiences and why I saw the need for an ongoing diversity initiative.

40. These experiences included:

a) Witnessing a White employee complaining to two other non-Black employees, that Julian needed to "get off his lazy ass" to close a garage door sooner.

b) An event where one of those same witnessing employees had unrelentingly questioned me to regarding my job tasks and how I was "spending my time" while supporting a project at a location where they had been unable to surveil me.

c) Various acts of hostility towards me by a White team member including:

   i) Snatching my notes from my hands to prevent me from describing our joint project to supervising engineer.

   ii) Slamming a door in my face, after holding open the door for a White woman

   iii) Criticizing me in our shared team group chat with disproportionate and inappropriate fierceness.

41. Immediately following our meeting, I summarized its content to my supervisor in a Teams message.

42. In the days following, HR chose to call me again to confirm details, before emailing that I had not reported any events and was invited to recount details in writing along with suggestions for the annual diversity training.

43. Upon hearing I was working from home with nausea during one of the confirmation calls, CAO asked if I was pregnant and doubled down in suggesting that I see her daughter's gynecologist.

44. Around April 18, 2022, I experienced an onset of symptoms that would later become a chronic condition.

45. On April 18 I emailed CAO to request access to unpaid time off and complained that the current PTO policy placed ill people on a short track for probation and encouraged employees to prioritize attendance over safe execution of tasks.

46. During CAO's insisted in-person meeting to discuss these concerns off record, I again shared my impression about a safety infraction where I:

   a) Sought and received permission from Test Bay employees to view a model on behalf of a mechanical engineering employee.

b) Briefly approached the model while keeping my hands raised and exaggerated standing as far away as possible.

c) Responded to another employee's assertion of the dangerous voltage level in stating, "I know".

47. The safety report made about me had suggested that I was combative towards the Rob member when he tried to keep me from "touching" the high voltage model.

48. In my review, I expressed frustration that the accusations:

a) Were patently false.

b) Contrasted verbal or visual cues before and while viewing the model.

49. I also expressed concern that bias had motivated the misconception, since:

a) My perceived noncompliance contrasted with the electrical safety etiquette I had demonstrated over my time at the company.

b) Those who were accusing me routinely ignored the safety rules and each other's noncompliance.

c) My experience in high voltage testing, which I discussed with Rob when he interviewed me, contrasted the reckless behavior others had expected of me, as I was trained to operate with voltages more than 30x of what the Test department was using.

50. HR responded to my concern about the bias behind the dismissed report and the stress it had caused me by stating that no one would have seen my resume to know my qualifications.

51. I was also reassured, during our 04/18/2022 meeting, that I would be allowed to take unpaid time following the communication of my conditions and, that there was an option to modify my role or tasks in a way that fit me and the company.

52. I immediately recounted these reassurances to my supervisor in hopes that it would be of use to another chronically ill team member.

53. Despite this, I was informed only 2 days before close of the pay period that my accommodations would only take place in the next pay period.

54. This caused me to immediately stay after hours while symptomatic to make up time taken to go to two doctor's appointments that day.

55. HR continued to affirm that I was denied unpaid time by emailing before the weekend and calling after I asked my supervisor to inform them of my abnormal MRI results—to request that I submit a PTO request for "missing time".

56. The trauma of being harassed by HR while simultaneously coming to terms with my sudden regard as having a serious illness was so jarring, that I resolved to evaluate my experiences in totality.

57. Finding several instances where I was treated below the legal standard, and holding no faith that these issues would cease to occur without further action, I filed a complaint to the PHRC office.

58. Due to the implications of medical results, I was placed on medical leave effective May 16, 2022.

59. On 06/07/2022, I was presented with an FMLA form and directed to sign it if my leave would be extended beyond 06/16/2022.

60. When reviewing the form to sign, and thus, confirm elections and understanding of all notices, I realized all sections, including the one indicating my job security during the leave were left blank.

61. When I enquired after why I was given a blank form to sign off on and requested a filled one instead, I was told only that I would receive a filled form after my leave had been extended.

62. The actions and explanation created a fear of being set up for firing while my illness was being investigated; this feeling was reasonably distressing.

63. On 06/22/2022, the company was served notice of my complaint from PHRC.

64. The pace and effects of medical treatment caused me to worry that I would not be able to attend EEOC-scheduled mediation, so, I coordinated with private mediation provider, Cora services to mediate with Defendant on 09/19/2022.

65. In order to attend, Defendant and I each signed separate agreements to mediate that detailed any binding agreement would be typed up and signed during mediation—with the sole exception of technological limitations.

66. There had been no final, drafted agreement reached between myself and respondent at the end of mediation.

67. Respondent forwent a partial agreement, instead opting to write up a final agreement after mediation.

68. Instead, respondent and I had tentatively agreed that so long as I presented a return-to-work letter by September 26th, Defendant would present me with a contract contractual agreement to resign and drop my claims in exchange for $50,000, and so long as long as other terms seemed reasonable, I would consider this agreement.

69. Regarding a more formal medical disclosure on my disability and qualifying limitations, Defendant stated traditional accommodations forms "would not be necessary" and they just needed it documented that I was cleared to return to work "with or without" limitations.

70. My grandmother is witness to the events described in mediation, as she was brought on virtually, as nonparticipating emotional support.

71. I had largely assumed that additional terms, such as resignation date, opportunity to complete employee training, would continue to be negotiated.

72. This was affirmed in the mediators' parting statements and assurances that:

    a) Discussed terms were not final, no one was pressuring me to sign anything that day

    b) Remaining terms would continue to be negotiated as one agreement: leaving open the risk of settlement negotiations falling apart.

    c) They [the mediators] recommended bring any written contract from the respondent to a lawyer for review before signing.

73. On 09/21/2022 I provided the required return to work letter from my doctor.

74. I received no response from the respondent.

75. On 09/22/2022, instead of receiving the promised contract for review, I was copied in an email to the EEOC mediator requesting that the case be closed due to us reaching "settlement".

76. Seeing my case be recommended for closure without my receipt or review of any promised contract caused me to question the respondent's initial designs for obtaining my return-to-work letter.

77. In order to act in good faith while protecting my interests, I maintained business as usual professional communications, including a PTO request to extending my leave 2 days beyond that allowed in FMLA, for the purposes of:

   a) Giving the respondent more time to produce a contract in case a settlement could be reached before
      returning to work.

   b) Maintain good standing so that I could return to work if negotiations fell through.

78. On Friday 09/23/2022, the respondent had not sent any contract to review, instead choosing to assert that
    I was not permitted to use previously assured PTO, that I had resigned or would be soon, and that I
    would be paid sooner if I resigned sooner.

79. I became shocked, scared, and angry at the realization that the Respondent might intend to exploit my
    legal inexperience good faith efforts by:

   a) Disqualifying me for the disability that I used to pay bills.

   b) Blocking me from the ability to remain in good standing and earn income through an accommodated
      return to work.

80. With those emotions, I emailed them to reemphasize my position, confront the previous false assertion
    of our having "settled", present conditions that I would be interested in as well as my intent to return to
    work until or unless negotiations worked out.

81. I also made sure to request PTO within the system that I gained access to through tech support and
    report to work on 09/27/2022.

82. That same evening, I was presented with a settlement agreement that requested my resignation effective
    sept 19 while asserting that I would have 11 days from signing to recant my agreement.

83. The agreement was attached to an email stating that I had "verbally agreed to resign" and sent
    concurrently with my being locked out of company databases.

84. I rejected this offer on the principle that its terms were already being coercively enforced by my
    wrongful termination.

85. I also explained to respondent on several occasions why I did not see any legal obligation to accept and
    sign the proposed contract.

86. Reasons included:

   a) Lack of any signed agreement

b) Lack of any verbal, non-contingent agreement to sign the presented contract.

c) Non-discussion of all monetary terms (resignation date and access to then offered company training)

d) Impression that all discussed terms had only been tentatively discussed.

e) There having been no meeting of minds regarding whether we had been finalizing terms **in part** or tentatively negotiating partial terms before reviewing and approving all terms together as **one agreement**.

87. That respondent's asserted deadline for my return-to-work letter did not match the deadline I or my grandmother had noted was further assurance that we were not on the same page during mediation.

88. Despite my reasonings, respondent continued to argue the finality of tentative settlement terms, and on 10/27/2022 asserted that they would pursue me for any and all legal damages if I did not halt the EEOC investigation that had been reinitiated by our assigned EEOC mediator.

89. These threats caused me to feel reasonable distress, in addition to any PTSD I was facing from recounting my workplace experiences.

### III. LEGAL ARGUMENT

### COUNT I:

# DISCRIMINATORY INTIMIDATION FOR OPPOSING UNLAWFUL RACIAL HARASSMENT IN VIOLATION OF TITLE VII OF THE CIVIL

## RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-3 (a)

90. Racial tension is a common and expected workplace issue, to the extent that Employers have been encouraged to proactively empower employees to minimize illegal discrimination.

91. Generally, all of Defendant's employee education and communication regarding civil rights compliant behavior, policy and practices were relegated to an annual 3–6-hour training period and state regulated posters in the breakroom. Defendant abstained from perennial company-wide events or communications to advise employees of civil rights compliant behavior, or of any open-door policy or complaints process.

92. While the annual meetings satisfy state requirements in frequency and duration, the spirit of the law, and its intent of limiting harassment on bases that included race, was recklessly discarded by the refusal proactively assess and regulate the understanding of employees, even when concerning ideas had been brought in training.

93. Before my 02/14/2022 meeting, I had described my experiences with racial bias with CAOon two occasions:

   a) I had described previous racial experiences during new employee orientation, to help colleagues around a compliance concept.

   b) I had described concerns brought to me in an offsite lunch with colleagues-where they raised questions around what constituted racial bias.

94. On both occasions there was no acknowledgement for the need for more company-led education; I was instead encouraged that contributions that I could give to employee understanding were welcome-on a volunteer basis.

95. Because I had been explicitly informed by CAO that any input that I volunteered towards employee education would be welcome, I set aside my time over the weekend to detail a voluntary diversity exercise for staff and presented it to CAO via email, and with reference to perceived business advantages and it being Black History Month.

96. On 02/07/2022, I relayed specific instances of racial harassment detailed instances of harassment I experienced from coworkers and why I felt the current diversity training was not effective. This was in the same 73-minute meeting CAO had initiated to inform me that neither my emailed activity nor any mention of Black History Month would be communicated on the company list serv.

97. On 02/11/2022 CAO called me, for 16 minutes, to "clarify details" of recounted experiences.

98. On 02/14/2022, I received an email claiming that I had not provided specific instances and requesting "brief notes" for use in training. This claim directly contradicted the duration and content of my meetings with CAO and enhanced then chronic, symptoms of anxiety and demoralization.

99. The person emailing had to be aware of the contradiction because they had been present for our meetings, knew first-hand the number of examples I had given, and had acknowledged the degree of detail through their reasoning for follow up in paragraph 97.

100. There would be no logical purpose to knowingly present false information except to convey to me that they were purposefully ignoring my allegations.

101. Such a conveyance was successful in making me feel like my suggestions, motivating complaints, and the trauma and trepidation involved in recounting them were being cast aside on purpose.

102. I aver the communication of paragraph 98 was sent with the intent and effect of intimidating me for opposing racial discrimination, and aiding administration in maintaining false images of both taking racial discrimination seriously and welcoming employee feedback.

103. By diligently and purposefully intimidating me in discrimination to my having opposed racial harassment, Defendant intentionally violated 42 U.S.C. §2000e-3(a) and is therefore liable for all applicable affirmative action, compensatory and punitive damages as granted under 42 U.S.C §2000e–7, and 42 U.S.C. §1981a(a)(1), as well as any other relief designated by the court.

## COUNT II:

### AIDING AND ABETING UNLAWFUL EMPLOYMENT DISCRIMINATION
### IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS
### ACT, 43 P.S. § 955 (e)

104. As stated in 43 P.S. §955(e), it is unlawful:

> "For any person, employer, employment agency, labor organization or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act or any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be an unlawful discriminatory practice".

105. Bringing forth the allegations in Count I, I assert that CAO, acted on behalf of Defendant to aid the continuation of racial harassment within their provided work environment. This action caused me

sufficient injury, as several memories I had to block out to complete my work for Defendant under the duress of racial discrimination—these memories have continued to resurface, and require the support of my therapist, even 10 months after my first day of medical leave.

106. Racial harassment, as a discriminant condition of employment, is declared unlawful by section 955 (a) of that same act, 43 P.S.§955(a).

107. By intimidating me in aid of workplace racial discrimination, Defendant intentionally violated 43 P.S. § 955 (e) and is therefore liable for all applicable affirmative action, as granted under 43 P.S.§ 962, as well as any other relief designated by the court.

## COUNT III:

## DISCRIMINATORY INTIMIDATION ON THE BASIS OF OPPOSING FORBIDDEN RACIAL DISCRIMINATION, IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S. § 955 (d)

108. I invoke the allegations from counts I and II.

109. Corrective action can take various form including employee discipline, education, and training.

110. When I sent my movie list on 02/07/2022, I made clear my intent of training Defendant employees to view Black people, thereby Black colleagues beyond the scope of harmful racial stereotypes.

111. It became clear that I was advocating employee training as a corrective and or preventative action when I contextualized my suggestion with racial harassment I had witnessed and experienced at work.

112. A reasonable person would have understood that I was opposing unlawful racial harassment once it became clear that I was advocating what I saw as corrective action to prevent further racial harassment.

113. Workplace racial harassment is a condition of employment that operates with discrimination on the basis of race and is accordingly declared unlawful in 43 P.S. § 955 (a).

114. Incorporating paragraphs 108-113 with the arguments for counts I and II, I allege that Defendant willfully engaged in the adverse action of intimidation, AND that this action was done with discriminatory basis of my having opposed workplace racial discrimination, which is declared unlawful by 43 P.S.§ 955 (a).

115. By diligently and purposefully intimidating me in discrimination to my having opposed racial harassment, Defendant intentionally violated 43 P.S. § 955 (d) and is therefore liable for all applicable affirmative action, as granted under 43 P.S.§ 962, as well as any other relief designated by the court.

## COUNT IV:

## INTENTIONAL UNEQUAL PAINS-INTIMIDATION IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1866; 42 U.S.C. § 1981

116. Calling forth the allegations of counts I-III, I suffered discrimination for opposing unlawful practices when Defendant purposefully intimidated me via email in response to my complaints of workplace racial harassment.

117. Discrimination for opposing a racial harassment is an unequal pain compared to White citizens because had I not been Black, I would not be engaged in the behavior that Defendant's discrimination was predicated upon; had I not been Black I would not have had to oppose racial harassment.

118. Therefore, by extension, the pain of intimidation was unequal to that which White citizens are subjected to because but for my being Black I would not have suffered it.

119. By diligently and purposefully intimidating me in discrimination to my having opposed racial harassment towards me, Defendant subjected me to pains I would not have faced had I been White; Defendant has intentionally violated 42 U.S.C. § 1981, and is therefore liable for all applicable equitable relief, compensatory and punitive damages, as well as any other relief designated by the court.

## COUNT V:

## RACIAL HARASSMENT AS A DISCRIMINATORY CONDITION OF EMPLOYMENT IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-2 (a)(1)

120. As a Black employee, I experienced ongoing and pervasive racial harassment as a condition of my employment at Defendant.

121. This harassment included:

a) Enhanced scrutiny from HR and their false accusations me of stealing time and purposefully missing meetings.

b) Anonymous and direct coworker criticisms of my work attendance, work ethic, bathroom breaks frequency.

c) Hostile sabotage from coworkers where my access to work tools and equipment, or my ability to get completed build approved were greatly affected.

d) Written and verbal jokes- including a comic posted on my cubicle about a hypothetical "phizzics" degree, and one employee's joke about me being on the wrong side of the tracks.

122. Because of the race-specific element to my harassment, my White coworkers did not have to endure it as a condition of employment; it is a discriminant condition and an "unequal pain" that is explicitly written in the purpose of the Civil Rights Act of 1866, 42 U.S.C. §1981 (a).

123. The racial basis of these experience is informed by circumstantial evidence and prevailing racial stereotypes:

a) Harassment described in paragraph 121 was based on adopted racial stereotypes of Black people being lazy or untrustworthy.

b) Black employees such as me, Omar Jackson, and Julian Jackson were each criticized as lazy on occasions where the reasoning or veracity was inaccurate or disproportionate.

124. HR did not act in good faith to investigate or prevent further instances of harassment.

125. The only person who acted in good faith to alleviate harassment was my supervisor and unfortunately his actions were not sufficient nor was his role designed to alleviate and prevent ongoing racial harassment.

126. Drawing forth the allegations of my previous counts, the company knowingly and recklessly enabled an environment of racial discrimination by:

a) Failing to proactively address workplace culture and attitudes before it produced further harassment.

b) Choosing not to maintain a reasonably nonhostile communication channel to communicate and address ongoing issues.

c) Knowingly acting to intimidate me from bringing further complaints.

127. This harassment was significant to prompt my having to plan how to document my work and progress for my teammates to view (on the teamwork site, before the company ever transitioned to JIRA), having to send emails to the supply chain through my manager instead of just copying him to the email like my other teammates.

128. The additional labor required for me to perform my role under the condition of enduring racial harassment and caused me sufficient exhaustion in addition to various physical manifestations of anxiety, including nausea, sudden urge to defecate, and fear. This physical and emotional exhaustion also affected my home life: as I started placing my all into preforming under racial pressures, chronic stress caused me to lose interest in things I previously cared about; my previous enjoyment of and capacity to cook dwindled, requiring me to order take out more often (especially for work lunch), if I remembered to eat at all.

129. By intentionally subjecting me to an environment of racial discrimination as a condition of my employment, Defendant violated 42 U.S.C. §2000e-2(a)(1) and is therefore liable for all applicable affirmative action, compensatory and punitive damages as granted under 42 U.S.C §2000e–7, and 42 U.S.C. §1981a(a)(1), as well as any other relief designated by the court.

## COUNT VI:

## RACIAL HARASSMENT AS A DISCRIMINATORY CONDITION OF EMPLOYMENT
## IN VIOLATION OF IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS
## ACT, 43 P.S. § 955 (a)

130. 43 P.S.§ 955 (a) forbids employers from discriminating on the basis of race with conditions of employment.

131. Drawing forth all previously stated allegations, as a Black employee, I experienced racial harassment as a race-based discriminatory condition of my employment.

132. By knowingly subjecting me to an environment of racial discrimination as a condition of my employment, Defendant violated 43 P.S. § 955 (a) and is therefore liable for all applicable affirmative action, as granted under 43 P.S.§ 962, as well as any other relief designated by the court.

## COUNT VII:

## DISCRIMINATORILY LIMITED OPPORTUNITY ON

## THE BASIS OF RACE IN VIOLATION OF TITLE VII OF THE CIVIL

## RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-2 (a)(2)

133. Bringing forth the allegations of Count V, I endured continuous harassment based on my race as a condition of my employment at InductEV.

134. While working for the Defendant, I completed tasks that were formally incorporated into other roles through internal job descriptions sent to internal interviewers during relevant hiring processes.

135. Such duties included:

    a. Review assembly documents, find/report defects, and recommend/document preventative actions (senior quality technician).

    b. Engage conflict resolution, intradepartmental structure, create procedure/implementation plans (project manager).

    c. Provide theoretical and design background to various products, calculate safety threshold and test concepts, (R&D or electrical engineer).

136. I believe there is significant overlap between my duties and the duties described in the job descriptions emailed to internal interviewers (including recruiters Ryan Mackenzie and Jennifer Orloski) for each of those roles.

137. Informally, the role of Product Introduction Technician mainly consisted of assembly with or without supporting documentation, provision of verbal feedback, and occasional document redlining.

138. During the time of my employment, I created documentation for build progress, feedback for both assembly process and documentation, in addition to creating procedures for projects including laser,

Oztek integration. Due to the level of detail in my documentation, I was chosen instead of PAI (Defendant's product manufacturing partner) to carry out fit checks for a new vendor evaluation.

139. The only other Product Introduction Team member who had authored documentation or procedures was, White male, Rob Rosenburg, and he was not only designated as a Senior Technician but reclassified into the Test department.

140. Similarly, tasks involving comparative research, material/test design, or compliance calculations were generally given to engineers.

141. Despite this, I completed comparative research and mathematical calculations on several projects under the designation of "Product Introduction Technician":

    a) laser classification calculations

    b) laser lens requirement calculations

    c) cabinet hole compliance calculations

    d) ANSI laser compliance research

    e) substrate chemical consult comparative research

    f) emergency Stop-Circuit schematic design

    g) environmental testing and diagnostics procedure design

142. The Human Resources Department (HR) was aware of my job tasks and received detailed description of several of them when I submitted my performance review on 12/04/2022.

143. Around 01/07/2022, my performance review was discussed and signed by both my manager and HR.

144. Despite this, I was not among the four employees reclassified between 12/20/2022 and 03/20/2022, with attention to company needs, and preexisting qualifications, and job tasks: Diana Wilmes (White, female), Taylor Johnson (White, male), Harry Nask (White, male), and Andrea Neff (White, female).

145. Within 4 years before and sometime after my employment, Bill Gallagher (White, male) was reclassified from his role of Principal Electrical Engineer to Principal Test Engineer, and Senior Technician, Rob Rosenberger (White, male) reclassified from Product Introduction to the Testing Team and Daniel Schwartz (White male) was promoted to vice president of Supply Chain.

146. Similarly on May 31, 2021, I was:

    a)    Presented an offer for a lesser role despite communications given to me and the role description provided to company interviewers to evaluate and approve me through 5 interview rounds.

    b)    Told that the lower role was the basis for limiting my starting compensation.

    c)    Presented an offer for a role with a description identical to Senior Technician description in every way but its titular "Senior" designation.

    d)    Assured that despite the lower title, I would be expected to perform the same duties discussed in interviews for the Senior Technician Role.

147. At the time, I held no contextual knowledge to ascertain race as a cause of the decision, but hindsight of my previous racial experiences suggests an interconnection.

148. Omar Jackson is a former Black male coworker who, at the time held 20 years of experience and held roles beyond the requirements of the formal role yet was only promoted after controversy surrounding hiring process for a senior technician.

149. Such a controversy involved an hiring decision stalemate, when, after heated debate and split votes within my team, supervisors Joren Wendschuh and Mark Smith both refrained from giving any collaborative endorsement for selected external Senior Product Introduction Technician finalists.

150. This controversy was significant enough for CAO to interview product introduction team members individually to determine the cause of stalemate, at which point I disclosed Omar's non-promotion as a part of the conflict.

151. To my knowledge, Omar has been the only internally promoted/reclassified Black employee in the company's 12-year history.

152. It should not take a bachelor's degree, 2.5 times the minimum formal experience requirement AND controversy for Defendant to promote a Black employee for the first time, particularly where such a role also stipulates exchangeable requirements of an associate degree OR technical certification OR equivalent experience.

153. Contrastingly, our other White male colleague who was also simultaneously promoted to Senior Technician, held, at the time of promotion, 8.25 year of experience but no education or active certification beyond a high school diploma.

154. Even if the equivalent experience clause were applied on a year-for year basis, with an associate degree measured at two years, that would leave the employee below the "formal requirements" with a diploma plus two years supplementary experience, and 6.25 total years of additional experience.

155. The comparison between Omar's promotion and that of our teammate proves, Defendant's' willing practice of evaluating education and experience on a whole and general basis as opposed to strict adherence to formal requirements-the former being especial common among modern employers.

156. Further, Omar's initial classification as a product introduction technician instead of a senior technician lends additional circumstantial evidence to:

    a) Defendant's ongoing practice of limiting employees on the basis of their race.

    b) The relative insignificance of years of experience when hiring for the Senior Product Introduction Technician; Defendant would not have hired me for the role even if I had additional experience because I still would be Black.

157. Comparing further, the highest-ranked Black employee at InductEV, titled, Manager of Project Engineering (hired for the role after possessing 23+ years of experience, an electrical engineering bachelor's degree, Pennsylvania professional engineer certification, master's degree in business and Project Management Professional certification) has also never been promoted in his 3+ years at the company.

158. HRs indifference towards and participation in racially based harassment provides additional circumstantial evidence to their holding of racial bias and likelihood of practicing intentional discrimination.

159. I do believe that engineers, as a class of employee at InductEV, enjoy higher salary averages than general technicians.

160. Just as my non-senior designation was used in my hiring negotiation to deny my request of $40 per hour (in favor of the final rate of $35 per hour), my improper designation has broadly limited my negotiating power, thus effecting my overtime pay, and my ability to benefit from annual employee raises (I received a 3.5% raise effective 03/14/2022 for satisfying my role)

161. In closing, I allege that:

   a)   My job classification was incongruent to the formal and or informal associations of my tasks.

   b)   Defendant has an established willingness and ability to reclassify White employees of varied seniority, with and without strict adherence to formal role requirements.

   c)   Defendant has an established pattern of not promoting Black employees and setting exceeding high standards for Black candidates (compared to other candidates) when hiring above the general technician level.

162. These allegations support my overarching allegation that Defendant chose not to properly classify me due to their intentional enactment of racial bias against African American employees.

163. As a result of this I have sustained damages of self-doubt, lost dignity, performance anxiety, strained relationship with and emboldened racial scrutiny of coworkers, as well as loss of any salary benefits that would have been actualizable under appropriate classification.

164. By limiting my employment opportunities in discrimination to my race, Defendant intentionally violated 42 U.S.C. §2000e-2(a)(2) and is therefore liable for all applicable affirmative action, compensatory and punitive damages as granted under 42 U.S.C §2000e–7, and 42 U.S.C. §1981a(a)(1), as well as any other relief designated by the court.

## COUNT VIII:

## INTENTIONALL UNEQUAL CONTRACTS IN VIOLATION OF THE CIVIL RIGHTS ACT
## OF 1866, 42 U.S.C. §1981

165. As stated in 42 U.S.C. §1981 (b), the equal right to make and enforce contracts as conferred in 42 U.S.C. §1981 (a) is made to include rights to contract modification.

166. Calling forth previous allegations of Count VII, I was denied the privilege of contract modification on the basis of my race when Defendant, through its human resources department (HR), chose not to reclassify my role, despite choosing to do so for several White employees.

167. I further allege that my designation as outside of Engineer classification would not be but for my race; in support of which I call forth all previously made allegations in addition to my possessing a bachelor's degree in physics, relevant experience, nature, and performance of tasks during employment.

168. As a result of Defendant's actions, I have sustained damages of self-doubt, lost dignity, performance anxiety, strained relationship with and emboldened racial scrutiny of coworkers, as well as loss of any salary benefits that would have been actualizable under appropriate classification.

169. By following an unwritten policy of intentional racial bias, Defendant limited my contract benefits and privileges with discrimination to my race; Defendant has violated 42 U.S.C. § 1981, and is therefore liable for all applicable equitable relief, compensatory and punitive damages, as well as any other relief designated by the court.

## COUNT IX:

## INTENTIONAL UNEQUAL PAINS- RACIAL HARASSMENT IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1866; 42 U.S.C. §1981

170. 42 U.S.C. §1981 (a) states that all persons within U.S. jurisdiction shall be subject to like pains as White citizens.

171. Calling forth previous allegations, I experienced harassment that was based in racial bias and stereotypes that would not have applied to me had I been White.

172. This harassment was an unequal pain; and when formally made aware, Defendant intentionally and willfully chose to aid these practices and discriminate against me for reporting them.

173. The actions have perpetuated undue emotional turmoil, including anger, depreciating self-image, self-doubt, and general trauma that has:

    a) Physically manifested in headaches, panic attacks

    b) Contributed to my major depressive episode of June 2022.

c) Contributed to my need for and attendance of therapy since June 2022.

174. By knowingly subjecting me to an environment of racial harassment as a condition of my employment, Defendant has violated 42 U.S.C. § 1981, and is therefore liable for all applicable equitable relief, compensatory and punitive damages, as well as any other relief designated by the court.

## COUNT X:

### DISCRIMINATORY CONDITIONS-SEXUAL HARASSMENT

### IN VIOLATION OF TITLE VII OF THE CIVIL

### RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-2 (a)(1)

175. As a woman employee, I was subjected to a workplace culture and harassment on the basis of my gender.

176. This harassment included targeted opposition, inappropriate office jokes, and unwanted touching from my colleagues.

177. Generally, all of Defendant's employee education and communication regarding civil right compliant behavior, policy and practices were relegated to annual 3–6-hour training period and state regulated posters in the breakroom. Defendant abstained from perennial events or communications to advise employees of civil rights compliant behavior, or of any open-door policy or complaints process.

178. New employees received an identical separate training in lieu of general annual training.

179. While the annual meetings satisfy state requirements in frequency and duration, the spirit of the law, and its intent of limiting harassment on bases that included race, was recklessly discarded by the refusal proactively assess and regulate the understanding of employees, even when concerning ideas had been brought in training.

180. During my new member orientation, Bogdan Proca stated, within a related question (the question was how Defendant dealt with families and couples operating within the company), that romantic involvement between bosses and subordinates was natural.

181. CAO, as the acting facilitator of company training, gave an impression of condonement to Proca's reasoning when, instead of addressing the inherent bias in same, she affirmed the question with examples of the company spouses and family members.

182. In further failure to discourage sexual harassment, and during training section covering sexual harassment, CAO gave an unclear anecdote: A female employee who complained of a male employee staring at her breasts during meetings; after complaining to CAO, the man disclosed his having autism and embarrassment and both parties became the best of friends.

183. CAO's anecdote:

   a)    Conveniently left out considerations of employee retaliation, or any other reason why a complaining employee would feel pressure to act as though they forgave a harasser who was aware of their complaints and whom they could not prove was purposefully harassing them.

   b)    Suggested to myself and others that her first method of investigation was to directly confront the person accused.

   c)    Encouraged harassment through its suggestion that the impact and determination of harassment could be constrained to the expressed intent of the person accused.

184. Later, during my 90-day check in, I complained of this same employee comparing me to dark chocolate ice cream in front of a colleague, continuously staring, commenting on my physical activity, and even pursuing me from across the lab after hours while asking if we were "the only employees left".

185. My complaint was given after being admonished to bring sexual harassment concerns to CAO instead of relying on my supervisor.

186. CAO's response to my complaint was to dismiss my concerns and experiences with the same anecdote from orientation.

187. As a human resources professional who had conducted employee training, they were aware of the seriousness of my claims, my protected right to work without the discriminatory condition of sexual harassment and the related laws.

188. A reasonable person could expect that unchecked unlawful behavior could continue or become worse.

189. With conclusion to paragraphs 184-188, CAO acted with reckless and intentional indifference to my rights by choosing:

   a) To discourage further relay of details concerning sexual harassment

   b) To refrain from investigating or thus addressing my complaints of harassment

190. Being warned not to go to my manager, and having my claims directly dismissed, I had no certain channel to communicate various consequential events of sexual harassment, including when:

   a) Mike Russel went out of his way in a n open corridor to brush against me.

   b) Sam G. behaved lewdly towards me in front of another colleague and started lying to other colleagues to pressure me into to attending group lunches with him.

191. CAO did not act in good faith to investigate or prevent further instances of harassment.

192. The only person who acted in good faith to alleviate harassment was my supervisor, who went out of his way to redirect Bogdan when he stared at my backside instead of observing a team member's demonstration and spoke to Sam's supervisor to get him to stop pressuring me. Unfortunately, his actions were not sufficient nor was his role designed to alleviate and prevent ongoing sexual harassment and the warning from CAO made asking him for hep very trepidatious.

193. Calling forth paragraph 6, CAO was Defendant's upper management, HR executive; Defendant acted through CAO, whom, at all times, acted within the scope of her role, with and for Defendant.

194. By knowingly subjecting me to the discriminatory work condition of sexual harassment, Defendant has intentionally and recklessly violated 42 U.S.C. §2000e-2(a)(1) and is therefore liable for all applicable affirmative action, compensatory and punitive damages as granted under 42 U.S.C §2000e–7, and 42 U.S.C. §1981a(a)(1), as well as any other relief designated by the court.

## COUNT XI:

## DISCRIMINATORY CONDITIONS- SEXUAL HARASSMENT

## IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S. 955(a)

195. 43 P.S.§ 955 (a) forbids employers from discriminating with conditions of employment on the basis of sex.

196. Drawing forth all previously stated allegations, as a female employee, I experienced sexual harassment as a sex-based discriminatory condition of my employment and, despite my complaints, my employer intentionally and recklessly aided in this condition.

197. By knowingly subjecting me to the discriminatory work condition of sexual harassment, Defendant has violated 43 P.S. § 955 (a) and is therefore liable for all applicable affirmative action as granted under 43 P.S.§ 962, as well as any other relief designated by the court. Pleading.

## COUNT XII:

### AIDING UNLAWFUL DISCRIMINATION-SEXUAL HARRASSMENT

### IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S. 955(e)

198. CAO knew or should have known the seriousness of my allegations.

199. CAO knew or should have known that uncorrected employee behavior bears risks of continued or escalated behavior.

200. With reasonable knowledge of the risks, they chose to:

    a)    Dismiss any claims I brought about behavior escalating from the previous behavior that they chose to ignore.

    b)    Admonish me not to share issues with the second most reasonable choice-my manager with the intent of dismissing the majority of my allegations without prejudice.

201. It is pertinent to note that, per the company handbook, any complaints about the CAO, had to be raised to the CEO, and because the HR department consisted of two people, the next most diplomatically favorable option for employees to escalate concerns dismissed by HR, was to continue bringing them directly to HR or have them voiced by their manager.

202. The choice to limit my opposition to harassment was made with knowledge that it would aid my being harassed further.

203. CAO was Defendant's upper management, HR executive; Defendant acted through CAO, whom, at all times, acted within the scope of her role, with and for Defendant.

204. By intimidating me and choosing not to investigate my claims, Defendant knowingly aided the discriminatory condition of workplace sexual harassment; Defendant intentionally violated 43 P.S. § 955 (e) and is therefore liable for all applicable affirmative action, as granted under 43 P.S.§ 962, as well as any other relief designated by the court.

## COUNT XIII:

## PERPETUATING DISABILITY DISCRIMINATION THROUGH ADMINISTRATIVE METHODS IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990; 42 U.S.C. § 12112 (b)(3)(B)

205. On 06/07/2022, Defendant emailed me with explicit instruction to sign an attached FMLA notice "on or before 06/29/2022", should my leave extend past 06/17/2022.

206. On the notice, all sections, including employer designations of whether my job was essential or not was left blank; signing the document would have suggested my acceptance of various unknown terms.

207. To be clear in what I was acknowledging being informed of, I requested that the blank sections be filled, and enquired as to why they were unfilled.

208. In response, Defendant gave no explanation of the blank section and instead asserted that I would receive a filled form to sign after my leave had been extended.

209. Employers are obligated to hold jobs during FMLA, except for "key employee" roles, the holding of which would cause undue hardship.

210. Since they are not obligated to hold an opening for essential role, the employer is free to terminate the "key" disabled employee's employment at any point during or after leave.

211. However, while the employer may designate a role as "key", that decision is open to dispute.

212. Additionally, room to dispute is greatly reduced where it is demonstrated that the employee was formally informed and accepting of employer's designation of their role.

213. Such an informed acceptance could have been fraudulently recorded had I signed the form while blank.

214. Because this documentation would ultimately and severely hinder any attempt to question Defendant's designation and consequent right to terminate my employment, any administrative methods resulting in

the receipt of such documentation would provide fraudulent aid to my being terminated on the basis of my disability.

215. Because my leave would not have occurred without my having held a disability, such status is an critical factor in my having received this form, and a basis for the discriminate effect of these actions on persons with disability.

216. It is for all of these reasons that I affirm that Defendant's administrative method of sending me a blank FMLA form perpetuated the progeny of discrimination on the basis of disability.

217. To date, Defendant has provided neither acknowledgement of these actions or addressed the emotional harm caused by them.

218. This act caused me to feel the unending necessity of questioning everything momentum sent to me, bringing on a damagingly evocative paranoia and distress that, in adding to my cumulation of previous experiences, brought on my first major depressive episode, experienced 06/11/2022, diagnosed by my primary doctor on 06/17/2022 and treated in therapy since 06/22/2022.

219. By deploying administrative methods that perpetuate disability discrimination, Defendant violated 42 U.S.C. § 12112 (3)(B), and is therefore liable for all applicable affirmative action, compensatory and punitive damages as granted under 42 U.S.C §2000e–7, and 42 U.S.C. §1981a(a)(2), as well as any other relief designated by the court.

## COUNT XIV:

### ABETTING OR ATTEMPTING DISABILITY DISCRIMINATION

### IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S. § 955 (e)

220. Bringing forth the allegations of count XIII, the actions taken by Defendant regarding my leave of absence would have provided fraudulent aid to the company's election to terminate my employment on the basis of my disability.

221. Certain circumstances support that this act was intentional, including:

    a)    At no point during the 6-day period, from before the form was sent to after I mentioned its blankness, did the CAO correctively fill the form, recognize the error, inform me and fill the form.

    b)    After being confronted with the error CAO eschewed explanations of administrative purpose nor an accident to explain, choosing instead to not respond.

    c)    After being asked to fill out the form CAO insisted on a delay and stated, "[a filled form would be sent] if leave was extended beyond 06/17/2022.

222. These actions are not expected for an honest mistake, when viewed cumulatively, there is little support for a simple mistake in the multiplied odds that someone would:

    a)    Edit a form's name to include the name of the intended employee.

    b)    Miss that the labeled form was blank.

    c)    Within 6 days of not getting a response from a subordinate, never check the sent email, and

    d)    Never notice that the from was mistakenly blank or reach out to correct it.

    e)    Once informed of the error, offer no assertion of it being a mistake.

    f)    Once requested to fix the error, refuse to provide a corrected version (if one existed) or update the form with predetermined answers.

    g)    Present an irrelevant cause to delay information that had been critical to the execution of their previous and explicit instruction.

223. As an executive officer who presided over the companies human resources and relevant compliance, it is unlikely that CAO was not aware of the details surrounding an FMLA notice and related policy.

224. It is further unlikely that she would not have considered or conclusively deliberated the details which happened to coincide with the notice, regarding my eligibility.

225. It is a common reflex to admit something as an error when it is one and had there been a labeling of the wrong file, nothing would have prevented CAO from immediately attaching the correct file. Additionally, had there been a legitimate reason for delaying the relay of such information until 06/17/2022, CAO would not have provided the form on 06/07/2022, with instruction to sign it, nor

would she have created a new reply thread. It should not have taken as long to determine, as demonstrated by the filled form, that I was not a key employee.

226. For these reasons, and for the existence of other underhanded behaviors by the CAO, I aver that the same purposefully engaged an attempt to fraudulently aid Defendant's termination of my employment; such fraud would have been enabled with discrimination to my being disabled because my disability prompted my leave of absence.

227. This act caused me to feel the unending necessity of questioning everything Defendant sent to me, bringing on a damagingly evocative paranoia and distress that, in adding to my cumulation of previous experiences, brought on my first major depressive episode, experienced 06/11/2022 and diagnosed by my primary doctor on 06/17/2022 and treated in therapy since 06/22/2022.

228. By using administrative methods to attempt unlawful disability discrimination, Defendant has violated 43 P.S. § 955 (e) and is therefore liable for all applicable affirmative action, as granted under 43 P.S.§ 962, as well as any other relief designated by the court.

## COUNT XV:

## DISCRIMINATORY CONDITIONS OF EMPLOYMENT-HARRASSMENT ON THE BASIS OF DISABILITY IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990, 42 U.S.C. § 12112 (a)

229. At the time of this event, I was I good standing and to the knowledge of myself and others was capable of adequately meeting the demands of my role.

230. My esteemed effective adequacy is further underlined by my supervisor's willingness to be cited as a refence to my performance in the 04/18/2022 email, as well as the accommodations meeting where HR accepted my affirmed capacity to meet their stipulation that I would receive my desired accommodation so long as I could complete 30 hours a week.

231. Despite these, the symptoms that I described in my email included items that established disability because they affected my major body function and aspect of life.

232. At no point did CAO express any doubt in my medical condition, despite my offer to disclose further information (up to and including signed doctor's visit notes); CAO insisted that my doctor's provision of the company disability form would be sufficient.

233. Although there was a general expectation of reasonable timeliness, CAO did not specify a deadline for the receipt of the company disability form; there was no specification over how the timeline of receipt of the form connected to the timeline of the implied instant relief of unpaid time off for the current pay period.

234. On 04/21/2022, CAO stopped me, while on my way to one of two doctor's appointments and informed me my request for unpaid time off would not go into effect until the next pay period and advised me to use paid time off for the, then current, pay period.

235. There were two reasons for Defendant to anticipate their communication as stress inducing:

   a)   In my email, sent 04/18/2022 I described the symptoms of my illness and the stressful dilemma I perceived between attending work or using sick days.

   b)   During our private accommodations meeting I exhibited several visual signs of anxiety including nervous fidgeting, shaky voice--and still reiterated how and why nonaccess to unpaid time off, and the associated fear of running out of PTO and being placed on probation despite meeting performance guidelines were causing me great stress.

236. The stress and vulnerability communicated to HR was largely due to performance pressures from four major sources:

   a)   From the start of my employment with Defendant I had faced several work comments criticizing my work ethic and attendance.

   b)   I had already been accused of stealing time in front of my colleagues by HR.

   c)   HR had already voiced concern while approving my scheduled PTO and asked my boss to have a separate talk with me since their inaccurate math suggested, that even barring sick days I would reach negative PTO during the year.

    d)     A then-teammate had already been placed on probation for running out of PTO due to his health, and as such had resolved to attend work or "make up the hours" on days where he was concerningly ill.

237. To confirm their liability, it is common sense that giving false sense of urgent relief and taking it away can cause severe rebound stress to the victim., and the triggering actions of CAO held no legitimate purpose because:

    a)     They held sufficient authority to provide unpaid PTO.

    b)     There was no time-consuming obstacle of technical mechanism.

    c)     CAO's review and approval of timesheets for the pay period in question was not scheduled to take place until 04/25/2022.

    d)     There was no business loss, as the positive status of my tasks had been expressed by me over email and during our meeting and accepted by HR in the latter.

238. CAO chose to relay this message in the front office which, in its open layout, held the main entrance to company, in addition to no less than 6, often occupied, cubicles- the furthest of which would have been about 20 feet from her own.

239. Her assessment of the privacy of that space was demonstrated in her eschewing of it, for an isolated room with a door, for various onsite one-on one meetings, including the accommodations meeting.

240. The administrative decision to suddenly, and without regard to my privacy, communicate the postponement of my requested accommodation was made with intent towards or reckless knowledge of the distress it would cause.

241. CAO was Defendant's upper management, HR executive; Defendant acted through CAO, whom, at all times, acted within the scope of her role, with and for Defendant.

242. Had I not been disabled, there would have been no stressful conflict between my need for sick days and fear of losing PTO; thus, there would have been no accommodations for CAO to fashion to my distress.

243. By knowingly subjecting me to the condition of harassment on the discriminatory basis of my being disabled, Defendant intentionally violated 42 U.S.C. § 12112 (a), and is therefore liable for all

applicable affirmative action, compensatory and punitive damages as granted under 42 U.S.C §2000e–7, and 42 U.S.C. §1981a(a)(2), as well as any other relief designated by the court.

## COUNT XVI:

## DISCRIMINATORY CONDITIONS OF EMPLOYMENT-HARRASSMENT ON THE BASIS OF DISABILITY IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S.§ 955 (a)

244. Pennsylvania statute 43 P.S.§ 955 (a) prohibits employers from discriminating against employees on the basis of disability.

245. Bringing for the allegations of Count XV, Defendant knowingly subjected me to the condition of harassment on the discriminatory basis of my being disabled; Defendant has violated 43 P.S. § 955 (a) and is therefore liable for all applicable affirmative action, as granted under 43 P.S.§ 962, as well as any other relief designated by the court.

## COUNT XVII:

## ATTEMPTING TO COERCE UNLAWFUL DISCRIMINATION -CONSTRUCTIVE TERMINATION IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S. § 955 (e)

246. I put in a request for PTO days to avoid going to work until chances of settlement could be made clearer, since my FMLA leave had expired.

247. In accordance with previous practice, I emailed the new head of HR and my supervisor to make clear my intention/informally state that I was taking these days off.

248. I also gave the reason for giving notice informally; I was unable to access the employee PTO request site due to a then-apparent technical issue.

249. My initial notice went unaddressed until 09/23/2022, when Defendant advised me that I could not take PTO, citing reasoning that PTO cannot be disbursed for dates before my return to work, and that I had or

would be resigning sooner, and if I resigned by 09/25/2022, I would receive payment for all banked
PTO within the current pay period.

250. Because I had been given explicit written notice that I would be allowed to use PTO during FMLA
leave, the reason provided in paragraph 249 was false, and used as a pretext to deny my PTO.

251. This is further confirmed by Defendant's choice to not engage my request for explanation as to how
their reasoning aligned with the communications I received regarding leave, which I attached in my
clarity seeking email.

252. Further, Defendant's intent of coercing my resignation is shown by their insistence that I would be
resigning without having received or signed a written contract, as well as the undertone of presenting the
payment of eligible yet pretextually denied PTO as a direct benefit my resignation.

253. The suggestion of disbursing PTO in timing to a tendered resignation is not solely deciding; by stating a
denial of my request, stating the inevitability of resignation, and only spotlighting resignation as a path
for disbursement, Defendant constructed a problem and spotlighted resignation as the inevitable
solution.

254. Under 43 P.S.955(d) prohibits employers from discriminating against employees for having filed a
charge.

255. Under this statue, discrimination can be construed to include termination of employment, and, because
these actions occurred after a failed mediation, there is a reasonable connection between Defendant's
actions and my having filed a charge of discrimination.

256. The pressure of Defendant's coercion caused me to experience confusion, incredulous rage, and fear for
how my standing in the case would be affected should they succeed in unconditionally enforcing all of
their desired terms for settling my charges against them.

257. As a result of these actions, I suffered additional distress beyond what was already present from
processing Defendant's prior harm done to me.

258. By attempting to coerce unlawful discrimination, Defendant has violated 43 P.S. § 955 (e) and is therefore liable for all applicable affirmative action, as granted under 43 P.S.§ 962, as well as any other relief designated by the court.

## COUNT XVIII:

## DISCRIMINATION FOR FILING A CHARGE-WRONGFUL TERMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §2000e-3(a)

259. On 09/27/2022, I reported to work virtually, by logging in to the company provided laptop and associated accounts, and informing my supervisor via Teams instant-message that I was available for new tasks.

260. That afternoon I received an email asserting that I had "agreed to resign" during the private mediation, and that Defendant "accepts my resignation".

261. This was Defendant's provided reasoning for terminating me as an employee; shortly after reading the email, I discovered myself to be locked out of all work accounts.

262. The way I had reported to work was both ordinary and reasonable because:

   a)   Reporting to supervisor after a break from work had been a normalized procedure.

   b)   There had been a recent email requesting employees to report to work virtually due to parking lot construction.

263. I had not and to this time have not entered any binding agreement to drop charges against or resign from Defendant, as explained below:

   a)   There was not and is not any written agreement between me and Defendant to enforce terms of resignation.

   b)   Both parties signed an "agreement to mediate" prior to mediation, stipulating that any mediation settlement reached during the session would be compiled, into an agreement form, by the mediator.

c)   There was no written agreement created or distributed during the session; to the contrary, Defendant elected to create its own contract which was communicated to me on 09/27/2022, 8 days after the failed mediation.

d)   The stipulation of point b dictated one exception that could be relevant to verbal contracts: verbal signatures were to temporarily take place of written signatures-- only if "technology access" prevented signing and returning of documents, electronically or otherwise, in-session.

e)   During mediation, neither I nor Defendant made any claims of technical barrier, in contrast, Defendant elected to draw up their own proposal on the contingency of my providing a return-to-work letter from my primary doctor.

f)   The contingency stated in part d, asserts that Defendant did not recognize itself as bound to present me with a proposal, much less to adhere to the written terms of such proposal.

g)   Defendant's written proposal included a 10-day revocation period during which I could refuse the contract after signing; their written contract is to be taken as the embodiment of their asserted "verbal contract"; the inclusion of this revocation period suggests Defendant's acknowledgement that terms of their asserted "verbal contract" were not final or irreversible.

h)   During mediation, mediators expressed to me that: negotiations were not yet complete; "nobody was forcing me to sign anything [the day of session]"; after receipt of Defendant's proposal, and before signing anything, I should have everything reviewed by a lawyer.

i)   At all times during mediation, I was under the impression that, as an unrepresented employee without a legal license-that my contingency for executing Defendant's proposed terms was fully communicated: I agreed to discussed terms subject to reviewing and processing the final contract.

j)   Any verbal agreement stated as tentative, is subject to change and thus cannot be construed as equal to a final written agreement. It is clear that I meant to communicate that our

discussions of compensation were tentative and that any agreement would contingent upon review and approval of written terms.

k)     I was not made aware of all Defendant's desired terms during mediation (such as provision of a resignation letter or resignation date), and as such had no opportunity to question or negotiate those terms.

l)     We did not discuss all material terms during mediation; resignation date was a material term for me because it effected my ability to earn income in my final workdays as well as access to company sponsored OSHA-40 training-such training had not been completely organized until after my medical leave of absence.

m)    As a non-participating witness to the mediation, my grandmother confirmed that, neither she nor I heard of any precontract demands of a resignation letter or resignation date, nevertheless, requiring these as pre-contract contingencies would also support point e.

n)     As a non-participating witness to the mediation, my grandmother has confirmed, during mediation, neither she nor I heard of any agreement being final or otherwise not subject to the receipt and review of the final contract.

264. I believe that these points are reasonably sufficient to establish their lack of authority to enforce their terms, I also believe that they either knew or should have known that their assertions were false because Defendant had held full knowledge of points a-g, and I had done everything in my power to articulate h-n to them.

265. On 10/17/2022, and in response to my communications, Defendant chose to double down on their claims, including their intent to sue for breach of contract unless I "memorialize[d] our agreement".

266. This doubling down relied on an emailed statement that I had clumsily and fearfully made on 09/27/2022: "I did agree to a verbal agreement in which I would resign and dismiss existing claims (prior to Sep 19) in return for a settlement amount of 50,000 from Momentum Dynamics Corp. The execution of this agreement was contingent on a contract that included agreeable material terms."

267. I am not a lawyer; though clumsily worded and improperly placed into two sentences, the combined meaning of both sentences is the same as communicated in point 263(i).

268. Defendant's doubling down was not an attempt to enforce the company's rights, but like my unlawful termination, and the coercive action of count XVI, Defendant was yet again attempting to coerce me from exercising my rights.

269. On, 12/27/2022 my FOIA request to view my charge file was granted with the exception of internal investigator notes.

270. According to this file, at no point did Defendant elect to submit their professed "proof" to our investigator to have the investigation concluded in their favor or determined to be non-jurisdictional—such a submission would have been the natural course of action had they truly believed that their evidence was clear and sufficient.

271. Defendant's assertion (in paragraph 260) was an intentional prescribing of pretext to a knowingly fraudulent enforcement of unagreed terms.

272. I affirm that Defendant's presented reason for and committed acts in relation to my termination, prove that my termination held no legitimate basis other than my having filed a charge against them.

273. After being terminated, I began to look for work until 12/07/2022 when the demands of managing my health and preparing this complaint became too great.

274. As to be expected of anyone under these circumstances, my sudden and wrongful termination caused a stressful initial combination of shock, outrage, and fear-- and these manifested through dizziness, and chest pains, in addition to days-long an inability to concentrate, and physical fatigue.

275. By discriminating against me for filing a charge of discrimination, Defendant violated 42 U.S.C. §2000e-3(a) and is therefore liable for all applicable affirmative action, compensatory and punitive damages as granted under 42 U.S.C §2000e-7, and 42 U.S.C. §1981a(a)(1), as well as any other relief designated by the court.

**COUNT XIX:**

**DISCRIMINATION FOR FILING A CHARGE-WRONGFUL TERMINATION IN VIOLATION**

**OF THE PENNSYLVANIA HUMAN RELATIONS ACT, 43 P.S. § 955 (d)**

276. Pennsylvania statute 43 P.S. § 955 (d) prohibits employers from discriminating against employees for having filed a charge.

277. Bringing forth the allegations of Count XVII, Defendant terminated me on the discriminatory basis of my having filed a charge; Defendant has violated 43 P.S. § 955 (d) and is therefore liable for all applicable affirmative action, as granted under 43 P.S. § 962, as well as any other relief designated by the court.

## COUNT XX:

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS IN VIOLATION OF THE**

**PENNSYLVANIA TORT LAW**

278. Bringing forth all previous allegations, I was subjected to an egregious and ongoing combination of various forms of unlawful harassment that was intentionally aided, escalated, or enacted by Defendant.

279. As detailed in the Pennsylvania Human Relations Act, the Civil Rights Act of 1964, and the Americans with Disability Act, Defendant is responsible for working in good faith to prevent, address or eliminate unlawful discrimination related to my race, gender, or disability, in which they have failed.

280. As detailed in 43 PS 25-2, Employer establishments are to protect the morals of employees "reasonably and adequately"; Defendant has effectively demoralized me to an extent of severe impact.

281. When viewed cumulatively, the reckless behavior of Defendant as expressed in previous counts meets the threshold of outrageous behavior.

282. In order to perform my role, I had to block out painful experiences from work that continue to resurface now that I have been removed from the work environment.

283. The outrageous acts of Defendant have caused me long term stress which caused early physical manifestations of stress including nausea, fecal urgency, and panic attacks—and later, contributed to the major depressive episode I suffered in June 2022, as well my concurrent diagnosis of major depressive disorder and need of ongoing therapy.

284. Further, Defendant's commitment to their pattern of outrageous behavior, has denied me the opportunity to pursue additional roles or classifications within the company that would have allowed me to perform adequately within my needed accommodations.

285. I am asking that the court find Defendant liable for their intentional infliction of emotional distress and grant all applicable compensatory and punitive damages.

## IV. CONCLUSION

**WHEREFORE**, I, Plaintiff, Assata Acey, demand judgment in my favor and against the Defendant, InductEV, finding them liable for their violations: 5 counts of violation of the Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 2000e, 3 counts of violation of Section 1981 of the Civil Rights Act of 1990; 42 U.S.C. § 1981, 2 counts of violation of the Americans with Disabilities Act of 1990; 42 U.S.C. § 12101 et. seq., 9 counts of violation of the Pennsylvania Human Relations Act; 43 P.S. § 951 - 963, and one violation of Pennsylvania tort law (IIED),

And an award in excess of $50,000 together with:

A. Compensatory damages, including but not limited to: back pay, front pay, past lost wages, future lost wages, lost pay increases, lost pay incentives, lost opportunity, lost benefits, lost future earning capacity, injury to reputation, mental and emotional distress, pain and suffering.

B. Punitive damages.

C. Costs of suit.

D. Interest, delay damages; and.

E. Any other further relief under 43 P.S. §962, 42 U.S.C. §1981, §1981a(a)(1), (2) or as this Court deems just, proper, and equitable.

Respectfully submitted,

Assata Acey
5121 Brown St,
Philadelphia, PA 19139

Dated: March 10, 2023

# EXHIBIT "B"

Prothonotary  > Case #2023-01782-CT > ACEY, ASSATA VS. INDUCTEV INCORPORATED et al

Search Again          Case Details          🖨 Print

4/10/2023 3:26 PM

Case Details

Case#:  **2023-01782-CT**
Case Type: **EMPLOYMENT DISPUTE: DISCRIMINATION**

Initial Date:  **3/14/2023**
Status:  **PENDING**

Status Date:  **3/14/2023**

Judge: **VERWEY, ANTHONY T**

| Date | Docket Notes |
|---|---|
| 3/14/2023 | COMMENCEMENT OF ACTION FEE |
| | :: :: On behalf of Plaintiff: ASSATA ACEY :: Filed By: ASSATA ACEY Receipt: 907506 Date: 03/15/2023 |
| 3/14/2023 | COMPLAINT FILED |
| | :: :: On behalf of Plaintiff: ASSATA ACEY :: Filed By: ASSATA ACEY |
| 3/14/2023 | NOTICE |
| | :: :: On behalf of Plaintiff: ASSATA ACEY :: Filed By: ASSATA ACEY |
| 3/14/2023 | VERIFICATION |
| | :: :: On behalf of Plaintiff: ASSATA ACEY :: Filed By: ASSATA ACEY |
| 3/14/2023 | COVER SHEET(S) FILED |
| | :: :: On behalf of Plaintiff: ASSATA ACEY :: Filed By: ASSATA ACEY |
| 3/14/2023 | REQUEST |
| | :: :: On behalf of Plaintiff: ASSATA ACEY :: Filed By: ASSATA ACEY |
| 3/15/2023 | EFILING FEE Receipt: 907506 Date: 03/15/2023 |
| 3/23/2023 | ORDER BY PER CURIUAM DATED MARCH 20, 2023 RE; UPON CONSIDERATION OF THE FOREGOING PETITION, IT IS HEREBY ORDERED THAT: A RULE ISSUED UPON THE RESPONDENT TO SHOW CAUSE WHY THE PETITIONER IS NOT ENTITLED TO THE RELIEF REQUESTED; THE RESPONDENT SHALL FILE AN ANSWER TO THE PETITION WITHIN TWENTY TWENTY (20) DAYS OF SERVICE UPON THE RESPONDENT: THE PETITION SHALL BE DECIDED UNDER PA.R.C.P. NO. 206.7: DEPOSITIONS SHALL BE COMPLETED WITHIN FORTY-FIVE (45) DAYS OF THE SERVICE UPON PETITIONER OF THE ANSWER TO THE PETITION; NOTICE OF THE ENTRY OF THIS ORDER SHALL BE PROVIDED TO ALL PARTIES BY THE PETITIONER. (SEE ORDER FOR DETAILS) |
| | COPIES SENT TO ALL COUNSEL AND UNREPRESENTED PARTIES ON 03/23/2023 SEE NEF FOR ECF NOTIFICATION |
| | :: :: On behalf of : THE COURT :: Filed By: THE COURT |
| 3/23/2023 | NOTIFICATION OF ELECTRONIC FILING |
| 3/24/2023 | CERTIFICATE OF SERVICE OF FOREGOING DOCUMENTS SERVED UPON DEFT VIA MAIL ON 03/23/23 |
| 3/28/2023 | REQUEST FOR PRODUCTION OF DOCUMENTS AND THINGS BY PRO SE PLTF ASSATA ACEY |
| 3/28/2023 | NOTICE - INTENT TO SERVE SUBPOENA TO PRODUCE DOCUMENTS AND THINGS FOR DISCOVERY PURSUANT TO RULE 4009.21 BY PRO SE PLTF ASSATA ACEY |
| 3/28/2023 | NOTICE - INTENT TO SERVE SUBPOENA TO PRODUCE DOCUMENTS AND THINGS FOR DISCOVERY PURSUANT TO RULE 4009.21 BY PRO SE PLTF ASSATA ACEY |
| 3/28/2023 | COPIES Receipt: 908434 Date: 03/28/2023 |
| 3/28/2023 | CERTIFICATION OF SERVICE OF FOREGOING DOCUMENTS SERVED UPON DEFT VIA MAIL ON 03/29/23 |
| 4/6/2023 | SHERIFF SERVICE |

## Acey, Assata vs InductEV Incorporated                     2023-01782-CT

**COURT OF COMMON PLEAS OF CHESTER COUNTY—CIVIL ACTION**
NOTICE OF INTENT TO SERVE A SUBPOENA TO PRODUCE
DOCUMENTS AND THINGS FOR DISCOVERY PURSUANT
TO RULE 4009.21

I, Assata Acey, Plaintiff, intend to serve a subpoena identical to the one that is attached to this notice. You have twenty (20) days from the date listed below in which to file of record and serve upon the undersigned an objection to the subpoena. If no objection is made, the subpoena may be served.

Date: 03/28/2023

Assata Acey (Pro Se)

**Acey, Assata vs InductEV Incorporated**                    **2023-01782-CT**

# COURT OF COMMON PLEAS OF CHESTER COUNTY—CIVIL ACTION

## SUBPOENA TO PRODUCE DOCUMENTS OR THINGS FOR DISCOVERY PURSUANT TO RULE 4009.22

TO:

Judy Talis

Within twenty (20) days after service of this subpoena, you are ordered by the court to produce the following documents or things:

1. Originals or photo copies of all possessed notes and presentations used by Judy Talis regarding InductEV's general employee diversity training.

at

5121 Brown St
Philadelphia, PA, 19139

You may deliver or mail legible copies of the documents or produce things requested by this subpoena, together with the certificate of compliance, to the party making this request at the address listed above. You have the right to seek in advance the reasonable cost of preparing the copies or producing the things sought.

If you fail to produce the documents or things required by this subpoena within twenty (20) days after its service, the party serving this subpoena may seek a court order compelling you to comply with it.

This subpoena was issued at the request of the following person:

Assata Acey (Pro Se)
5121 Brown St,
Philadelphia, PA 19139
770-231-1017

BY THE COURT:

DATE:

By

## Acey, Assata vs InductEV Incorporated

**2023-01782-CT**

**COURT OF COMMON PLEAS OF CHESTER COUNTY—CIVIL ACTION**
NOTICE OF INTENT TO SERVE A SUBPOENA TO PRODUCE
DOCUMENTS AND THINGS FOR DISCOVERY PURSUANT
TO RULE 4009.21

I, Assata Acey, Plaintiff, intend to serve a subpoena identical to the one that is attached to this notice. You have twenty (20) days from the date listed below in which to file of record and serve upon the undersigned an objection to the subpoena. If no objection is made, the subpoena may be served.

Date: 03/28/2023

Assata Acey (Pro Se)

## Acey, Assata vs InductEV Incorporated                    2023-01782-CT

## COURT OF COMMON PLEAS OF CHESTER COUNTY—CIVIL ACTION
### SUBPOENA TO PRODUCE DOCUMENTS OR THINGS FOR DISCOVERY PURSUANT TO RULE 4009.22

TO:

Ace American Insurance Co: Carmona Linda (aka Chubb)

Within twenty (20) days after service of this subpoena, you are ordered by the court to produce the following documents or things:

1. Claims documents submitted by InductEV Incorporated for Chubb's regular business purpose (of approving or denying Defendant's liability insurance claim) relating to my charges against Defendant.
2. Claims Documents, submitted by Chubb investigators prior to approval of the claim(s) filed by InductEV Incorporated, used for Chubb's approval or denial of Defendant's insurance claim(s).
3. Claims history for InductEV Incorporated for claims filed with Chubb the last 6 years for the regular business purposes of approving or denying customer claims.

   at
   5121 Brown St
   Philadelphia, PA 19139.

You may deliver or mail legible copies of the documents or produce things requested by this subpoena, together with the certificate of compliance, to the party making this request at the address listed above. You have the right to seek in advance the reasonable cost of preparing the copies or producing the things sought.

If you fail to produce the documents or things required by this subpoena within twenty (20) days after its service, the party serving this subpoena may seek a court order compelling you to comply with it.

This subpoena was issued at the request of the following person:

Assata Acey (Pro Se)
5121 Brown St,
Philadelphia, PA 19139
770-231-1017

BY THE COURT:

DATE:

By

## Acey, Assata vs. InductEV Incorporated                    **2023-01782-CT**

### COURT OF COMMON PLEAS OF CHESTER COUNTY—CIVIL ACTION
### REQUEST FOR PRODUCTION OF DOCUMENTS AND THINGS

In light of case: Assata Acey v. InductEV Incorporated,
Please produce the following documents in PDF format:

1. Emails sent to and from Joren Wendschuh's Employee account which include my name in the body and originating within dates 04/23/2021-06/17/2022.
   Answer:

2. Emails sent to and from Judy Talis' former Employee account which include my name in the body and originating within dates: 04/23/2021 - 06/17/2022.
   Answer:

3. Emails sent to and from Diana Wilmes' Employee account which include my name in the body and originating within dates: 04/23/2021 - 06/17/2022.
   Answer:

4. Microsoft Teams messages sent to and from Diana Wilmes' Employee account which include my name in the body and originating within dates: 04/23/2021-06/17/2022.
   Answer:

5. Microsoft Teams messages sent to and from Judy Talis' Employee account which include my name in the body and originating within dates: 04/23/2021 - 06/17/2022.
   Answer:

6. Microsoft Teams messages sent between myself and Maria Tabbut and originating within dates: 09/01/2021 - 11/20/2021.
   Answer:

7. Microsoft Teams and Microsoft Meeting records (invites or calendar views showing time, title and participants is fine) between Joren Wendschuh and Judy Talis and originating within dates: 01/17/2022 - 06/17/2022.
   Answer:

8.  Copies of all preexisting documents and statements gathered by InductEV Incorporated pursuant to our dispute.
    Answer:

9.  Copies of all notes and presentations used by Judy Talis regarding InductEV Incorporated's general employee diversity training.
    Answer:

10. Copies of all notes and presentations used by InductEV Incorporated's designated agents in the most recent general employee diversity training.
    Answer:

11. Claims documents submitted by InductEV Incorporated for Chubb's regular business purpose of approving or denying defendant's liability insurance claim relating to my charges against defendant.
    Answer:

12. Customer claims history for InductEV Incorporated for claims filed with Ace American Insurance Company (a.k.a Chubb) in the last 6 years as a part of Chubb's regular business purposes of approving or denying customer claims.
    Answer:

**\*\*Please note inclusion of my name, re: items 1-5, is construed to include non-caps sensitive variations such as: "Assata"; "Asatta"; "acey"; "Assatta".**

Sincerely,

**Assata Acey (Pro Se)**
**5121 Brown St**
**Philadelphia, PA 19139**
**03/28/2023**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 5121 Brown Street, Philadelphia PA 19139 _____

Address of Defendant: _____ 660 Allendalte Road, King of Prussia, PA 19406 _____

Place of Accident, Incident or Transaction: _____ 3 Pennsylvania Ave, Malvern, PA 19355 _____

---

**RELATED CASE, IF ANY:**

Case Number: _____  Judge: _____  Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?          Yes ☐   No ☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?          Yes ☐   No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?          Yes ☐   No ☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?          Yes ☐   No ☐

I certify that, to my knowledge, the within case ☐ is / ☑ is not  related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 04/14/2023 _____  _____*Randy Schram*_____  _____34273_____
                                  *Attorney-at-Law / Pro Se Plaintiff*        *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

*A.   Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☑ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☐ 11. All other Federal Question Cases
      *(Please specify):* _____ TITLE VII; ADA _____

*B.   Diversity Jurisdiction Cases:*

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify):* _____
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
      *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____, counsel of record *or pro se* plaintiff, do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: _____  _____*Sign here if applicable*_____  _____
                      *Attorney-at-Law / Pro Se Plaintiff*        *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

*Civ. 609 (5/2018)*